**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| BENJAMIN SCHOENTHAL, | ) | |
| MARK WROBLEWSKI, JOSEPH VESEL, | ) | |
| and DOUGLAS WINSTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, in his official capacity | ) | |
| as Attorney General of Illinois, | ) | |
| | ) | Case No. 3:22 CV 50326 |
| RICK AMATO, in his official capacity | ) | |
| as State's Attorney of DeKalb County, | ) | |
| Illinois, | ) | |
| | ) | |
| ROBERT BERLIN, in his official capacity | ) | **PLAINTIFFS' MEMORANDUM** |
| as State's Attorney of DuPage County, | ) | **IN SUPPORT OF MOTION FOR** |
| Illinois; | ) | **SUMMARY JUDGMENT** |
| | ) | |
| KIMBERLY M. FOXX, in her official | ) | |
| Capacity as State's Attorney of Cook | ) | |
| County, Illinois, and | ) | |
| | ) | |
| ERIC RINEHART, in his official capacity | ) | |
| as State's Attorney of Lake County, Illinois, | ) | : |
| | ) | |
| Defendants. | ) | |

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS .....................................................................................2

I.     Illinois Public Transportation Carry Ban ........................................................2

II.    Public Transportation Carry Ban's Effect on Plaintiffs ...............................3

ARGUMENT ..........................................................................................................4

I.     The Public Transportation Carry Ban Violates the Second Amendment .........................4

      a.    Plaintiffs' proposed course of conduct falls withing the plain text of the Second Amendment ..................................................................................4

      b.    The State will be unable to demonstrate that the Public Transportation Carry Ban is consistent with the historical tradition of firearms regulation in the United States ..................................................................................5

            i.    The State can only meet its burden by identifying well-established and representative historical analogues from the Founding ......................5

            ii.    The State will be unable to identify analogous sensitive place restrictions justifying the Public Transportation Carry Ban .....................9

            iii.    The Public Transportation Carry Ban is not analogous to recognized sensitive places ....................................................................11

CONCLUSION.....................................................................................................15

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Bridgeville Rifle & Pistol Club, Ltd. V. Small*,
    176 A.3d 632 (Del. 2017) ................................................................12

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...................................................4, 5, 7, 10

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..........................................................7

*Gamble v. United States*,
    139 S. Ct. 1960 (2019) ...................................................................7

*Hardaway v. Nigrelli*, 22-CV-771,
    2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ........................11, 12

*Khan v. State Oil Co.*,
    93 F.3d 1358 (7th Cir. 1996) ..........................................................8

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961) ..........................................................................4

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ........................................................................7

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ........................................................................7

*Moran v. Calumet City*,
    54 F.4th 483 (7th Cir. 2022) ..........................................................4

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ..........................................................7

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ...........................1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 13

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ............................................................................8

*Virginia v. Moore*,
    553 U.S. 164 (2008) ........................................................................7

## Constitutions and Statutes

U.S. Const. amend. II ................................................................................4

U.S. Const. amend. III ...............................................................................5

U.S. Const. amend. IV ...............................................................................5

Ill. Const. Art. XIII, § 7 ............................................................................2

430 Ill. Comp. Stat. 66/65(a)(8) ........................................................1, 2, 14

430 Ill. Comp. Stat. 66/70(e) ....................................................................3

720 Ill. Comp. Stat. 5/24-1(a)(4) ...............................................................2

720 Ill. Comp. Stat. 5/24-1(a)(10) .............................................................2

730 ILCS 5/5-4.5-55 ................................................................................3

730 ILCS 5/5-4.5-60 ................................................................................3

19 The Colonial Records Of The State Of Georgia: Part I, Statutes, Colonial
     And Revolutionary, 1768–1773 .......................................................13

The Public Laws of the State of South Carolina (Grimke, ed., 1790) .............11

A Digest of the Laws of the State of Georgia (Watkins eds., 1800) ................11

5 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The
     First Session Of The Legislature (William Waller Hening ed., 1809) ...........12

1812 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing
     Concealed Arms, Except in Certain Cases, ch. 89, § 1 ...........................10

1819 Ind. Acts 39, An Act to prohibit the wearing of concealed weapons, ch. XXIII, § 1 .........10

1821 Tenn. Acts 15, An Act to prevent the wearing of dangerous and unlawful
     weapons, ch. XIII ..........................................................................10

9 Statutes at large of South Carolina (1841) ...............................................9

## Additional Sources

*Arrest made in shooting of 16-year-old on CTA Red Line train near Chinatown*,
     CBS Chicago (Jan 5., 2023), https://cbsn.ws/3XB8qyu ...........................14

Br. for the  Center for Human Liberty as Amicus Curiae in Supp. of Plfs.-Appellees and
    Affirmance, *Antonyuk v Nigrelli*, No. 22-2908, Doc. 313 (2d Cir. Feb. 9. 2023) ......12, 13

*Bruen*, Oral Arg. Tr. (Nov. 03, 2021) ........................................................................................15

Chicago Transp. Auth.; *Annual Ridership Report*, Calendar Year 2019 (Jan. 16, 2020),
    https://bit.ly/3ItZXrl ...........................................................................................................13

Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, The Quarterly
    Journal of the New York State Historical Association (1931) ............................9

Johnson, et al., Second Amendment: Regulation, Rights, and Policy (3d ed. 2021) ...........9

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational
    Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ...................11, 13

*Man, 60, dies after Chatham shooting on CTA Red Line train: Chicago police*,
    ABC7 Chicago (Oct. 17, 2022), https://abc7.ws/3fBnv3a ........................................14

Metra *Ridership Trends Annual Report 2019* (Feb. 2020), https://bit.ly/3Eaij9c .....................14

John O'Connor, *More police promised for Chicago trains after fatal shooting*,
    Associated Press (Aug. 6, 2022), https://bit.ly/3DCMvPN ..........................................14

Pace Annual Report 2019 (2020), https://bit.ly/3EuzXuL ........................................................14

Dane Placko, *CTA union president says violence on Chicago trains, buses is out of
    control*, Fox32 Chicago (Apr. 10, 2022), available at https://bit.ly/3hbsCYz ...............14

*Transit System*, Ill. Dept. of Transp., available at https://bit.ly/3CdxcMP
    (last visited Feb. 24, 2023) ................................................................................................13

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
    An Analytical Framework and a Research Agenda*,
    56 UCLA L. Rev. 1443 (2009) ................................................................................14, 15

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON, by and through LAW FIRM OF DAVID G. SIGALE, P.C., their attorney, and for their Memorandum in Support of their F.R. Civ. P. 56(a) Motion for Summary Judgment, states as follows:

## INTRODUCTION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court affirmed that individuals have a constitutional right under the Second Amendment to publicly carry firearms for self-defense. In doing so, *Bruen* unequivocally reaffirmed that when a law is challenged on Second Amendment grounds, a court's analysis of the challenged restriction must be rooted in the *text* of the Amendment and the *history* showing which types of firearms regulation were accepted at the Founding as consistent with the right to keep and bear arms. In fact, the Supreme Court clarified in *Bruen* that *the only way* that a law burdening conduct falling within the Second Amendment's scope can be upheld is if the government can demonstrate a "historical tradition" of regulation, rooted in the Founding, that burdened the right to bear arms in a similar way and for similar reasons. *Id.* at 2130, 2133.

Illinois bans Plaintiffs—law-abiding citizens, who are licensed to carry firearms under Illinois law—from carrying their firearms for self-defense "on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8). This Public Transportation Carry Ban is unconstitutional. After *Bruen*, there is no doubt that the Second Amendment's text "presumptively protects" Plaintiffs' intent to "carry[] handguns publicly for self-defense," including on public

transit. *Bruen*, 142 S. Ct. at 2130, 2134. Indeed, as authoritatively interpreted by the Supreme Court, as a matter of plain text to "bear" arms means simply to carry them, and that unquestionably is what Plaintiffs seek to do. Therefore, the only way the Public Transportation Carry Ban can be found constitutional is if Illinois can demonstrate this outright ban is "consistent with this Nation's historical tradition of firearm regulation" with "relevantly similar" restrictions with roots in the Founding. *Id.* at 2135. Illinois cannot meet its burden. Plaintiffs are not aware of any Founding-era evidence of any law remotely analogous to Illinois's Ban.

The Second Amendment is not confined to the home but extends to the means people use to travel from their home to other places in public. As there is no genuine dispute as to any material facts, Plaintiffs respectfully request this Court grant summary judgment in their favor.

## STATEMENT OF FACTS[1]

### I. Illinois' Public Transportation Carry Ban.

When the citizens of Illinois enacted their Constitution, they provided that "[p]ublic transportation is an *essential* public purpose for which public funds may be expended." ILL. CONST. Art. XIII, § 7 (emphasis added). SUF 1. Nevertheless, the Illinois General Assembly has forbidden the exercise of Illinoisans' Second Amendment rights on this "essential" mode of transportation, barring individuals from lawfully carrying firearms for self-defense.

In general, Illinois bars the carrying of handguns by ordinary citizens in public for self-defense unless they first acquire a license to carry. 720 ILCS 5/24-1(a)(4), (a)(10). SUF 2. Yet even for licensees, Illinois has established a Public Transportation Carry Ban. Specifically, under 430 ILCS 66/65(a)(8), a firearm licensee "shall not knowingly carry a firearm on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building,

---

[1] Plaintiffs incorporate their *Plaintiffs' L.R. 56.1(a)(2) Statement of Undisputed Facts* and its exhibits as if fully restated herein, and references thereto are designated as "SUF ##."

real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." SUF 3. A first violation of the Public Transportation Carry Ban is a Class B misdemeanor punishable by a fine of up to $1500.00 and confinement in jail for up to 180 days. 430 ILCS 66/70(e); 730 ILCS 5/5-4.5-60. SUF 4. A second or subsequent offense is a Class A misdemeanor punishable by a fine of up to $2500.00 and confinement in jail for up to 364 days. 430 ILCS 66/70(e); 730 ILCS 5/5-4.5-55. SUF 5.

## II.  Public Transportation Carry Ban's Effects on Plaintiffs.

Plaintiffs are law-abiding citizens who are licensed to carry a handgun. SUF 6, All would use public transportation or would make greater use of public transportation were they not forbidden by the Public Transportation Carry Ban to carry for self-defense. SUF 8. Plaintiff Schoenthal occasionally uses public transportation for work and more frequently for errands. SUF 9. In particular, he would like to use it more since it is an environmentally friendly option compared to single-occupancy car driving. *Id.* Plaintiff Wroblewski travels from his home in the suburbs to the city for recreational purposes via public transportation. SUF 10. He would utilize it more, were he able to exercise his constitutional right to carry for self-defense. *Id.* Plaintiff Vesel has avoided using public transportation because he cannot carry a firearm for self-defense while doing so. SUF 11. Plaintiff Winston rarely takes public transportation because he must disarm before he does so to avoid prosecution. Specifically, Winston would take public transportation with his family to cities like Evanston and Chicago were he able to carry a concealed firearm. SUF 12.

Because of the risk of exposing themselves to arrest and criminal charges for carrying a handgun on public transportation, Plaintiffs either disarm prior to riding on public transportation or decline to utilize public transportation altogether. SUF 13.

## ARGUMENT

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022) (quoting FED. R. CIV. P. 56(a)). Here, there can be no genuine dispute as to any material fact and Plaintiffs are entitled to entry of summary judgment.

### I. The Public Transportation Carry Ban Violates the Second Amendment.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "When the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30 (emphasis added). Once this prima facie textual showing has been made, "[t]he *government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130 (emphasis added). "*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961) (emphasis added).

#### a. Plaintiffs proposed course of conduct falls within the plain text of the Second Amendment.

In *Bruen*, the Supreme Court articulated a framework for determining if firearms regulations are constitutional. It begins with the text. If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then that conduct is presumptively protected. *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the key terms in *Heller* and *Bruen*. "The people" presumptively means "all Americans," "Arms" presumptively includes "all instruments that constitute bearable arms," and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008).

In this case, there is no dispute that Plaintiffs are Americans who seek to carry bearable arms. SUF 6. Plaintiffs seek to carry their firearms for purposes of self-defense as they go about their daily lives, specifically when, as a matter of necessity or convenience, they choose to take public transportation. SUF 7. In other words, Plaintiffs seek to "possess and carry weapons in case of confrontation" on public transit because "confrontation can surely take place outside the home." *Bruen*, 142 S. Ct. at 2135 (quoting *Heller*, 554 U.S. 592). As in *Bruen*, these undisputed facts end the textual inquiry. There is nothing in the plain text of the Second Amendment that makes any locational distinction at all—unlike other Amendments like the Third and the Fourth. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."); *Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction."). It is only from historical scrutiny that permissible locational restriction can be identified and only *then*—through history—can certain activity be determined to be outside the scope of the Second Amendment. And, as *Bruen* makes clear, the State bears the burden of both production and persuasion to support its Ban through history. *Bruen*, 142 S. Ct. at 2150 (noting it is the government's burden to "sift the historical materials"); *id*. at 2130 n.6.

**b. The State will be unable to demonstrate that the Public Transportation Carry Ban is consistent with the historical tradition of firearms regulation in the United States.**

**i. The State can only meet is burden by identifying well-established and representative historical analogues from the Founding.**

States can exercise regulatory authority over the right to carry firearms in certain narrow circumstances. When doing so, the government must "affirmatively prove that its firearms

regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. *Bruen* makes clear that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

In considering whether the government has met its historical burden, courts are to engage in "reasoning by analogy." *Id.* at 2132. Specifically, the State must identify historical analogues. To be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id.* Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id.* at 2133. But, critically, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133) (internal quotation marks omitted). Thus, the identified analogues must be both "well-established and representative." *Bruen*, 142 S. Ct. at 2133. Only then can the analogues be said to constitute an "enduring American tradition of state regulation." *Id.* at 2154.

It is also important to identify that *the* key period for establishing the meaning of the Second Amendment is the Founding Era, in particular 1791. Although the Court in *Bruen* discussed whether, when considering state laws, the answer is 1791 (when the Second Amendment was

adopted) or 1868 (when the Fourteenth Amendment was adopted), the Court noted that its past precedents had "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137; *see also id.* at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)). Moreover, the Supreme Court's precedents establish that, for a lower court at least, 1791 must be the right answer. Not only is that consistent with the Seventh Circuit's most recent precedent on the issue, *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (holding that 1791 is "the critical year for determining the amendment's historical meaning"); *but see Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011), but 1791 is the key because of the confluence of two lines of Supreme Court precedent. One establishes that with respect to the federal government, one must look to 1791 to determine the original meaning of provisions of the Bill of Rights. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). The other establishes that incorporated Bill of Rights provisions bear the same meaning when applied to the States as they do when applied to the federal government. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (explaining that the Court has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment" (internal

quotation marks omitted)). The combination of these two lines of precedent leads to the inescapable conclusion that when determining the scope of the Second Amendment as applied to the States through the Fourteenth, the key date is 1791, not 1868. *See, e.g., Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings even with a "wobbly, moth-eaten foundation" until overruled by the Supreme court), vacated by *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but making clear that the "Court of Appeals was correct in applying [stare decisis] . . . for it is this Court's prerogative alone to overrule one of its precedents"). In other words, there is just one Second Amendment, and its meaning was established in 1791.

In any event, *Bruen* already delineated the *one* aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying (in circumstances not present here)—restrictions on the carrying of firearms in particular locations: the limited tradition of designating certain narrow areas as "sensitive places." *Bruen*, 142 S. Ct. at 2133. The Court explained that while "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—[the Court was] also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Thus, the Court held that going forward, "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). In other words, courts must assess claimed sensitive place restrictions by whether they are "relevantly similar" to longstanding restrictions on firearms in legislative assemblies, polling places, and courthouses.

### ii. The State will be unable to identify analogous sensitive place restrictions justifying the Public Transportation Carry Ban.

The Public Transportation Carry Ban is "inconsistent with the Second Amendment" because Illinois will be unable to justify such a restriction with historically grounded analogies. Under 430 ILSC 66/65-(a)(8), a firearm licensee "shall not knowingly carry a firearm on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." This blanket prohibition on carrying in and around these common modes of transportation cannot be "justif[ied]" as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Indeed, we are not aware of a single remotely analogous law from the Founding era that could be used to justify Illinois's Ban.

Public transportation itself is not a new phenomenon and existed at the time of the Founding. For instance, passengers would share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it. *See, e.g.,* Oliver W. Holmes, *The Stage-Coach Business In The Hudson Valley*, THE QUARTERLY JOURNAL OF THE NEW YORK STATE HISTORICAL ASSOCIATION 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia."). In addition to stagecoaches, riverboats and ferries were utilized by the public during the Founding. And arms were carried on these forms of transportation. For example, South Carolina established a "public ferry" as early as 1725 and mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses." 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841). And arms, such as blunderbusses, were carried on stagecoaches. *See* Johnson, et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols."). Plaintiffs

9

are not aware of any Founding-era tradition of banning the possession of a firearm while traveling on these public modes of transportation.

The absence of Founding era restrictions on public conveyances makes sense given that several States *exempted* travelers from then-existing firearms regulations. *See, e.g.*, 1812 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1 ("[A]ny person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined...."); 1819 Ind. Acts 39, An Act to prohibit the wearing of concealed weapons, ch. XXIII, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . Provided, however, that this act shall not be so construed as to affect travelers."); 1821 Tenn. Acts 15, An Act to prevent the wearing of dangerous and unlawful weapons, ch. XIII (exempting "any person that may be on a journey to any place of out his county or state").

As *Bruen* explained, where the government seeks to address a "perceived societal problem," such as violence while traveling, and it "employ[s] a regulation" that the "Founders themselves could have adopted to confront that problem," such as a "flat ban on the possession of handguns," the absence of any such bans from the Founding is proof that modern ban is "unconstitutional." 142 S. Ct. at 2131 (citing *Heller*, 554 U.S. at 631, 634). Moreover, *Bruen* also instructs that a modern law is likely unconstitutional "if earlier generations addressed the societal problem, but did so through materially different means." *Id*. In this case, both are true—the Founders did not ban those traveling on public conveyances, in fact they at times exempted travelers from restrictions.

10

### iii. The Public Transportation Carry Ban is not analogous to recognized sensitive places.

Because public transportation was present at the Founding, the lack of any Founding Era evidence supporting the Public Transportation Carry Ban is dispositive. But even if modern public transportation could be considered to be a "new" phenomenon, the Supreme Court has instructed the proper "sensitive place" analysis for these "*new*" places is still to consider whether they are "analogous" to recognized Founding Era sensitive places: courthouses, legislative assemblies, and polling places. *Bruen*, 142 S. Ct. at 2133. We know that the three recognized sensitive places are sensitive because of extensive evidence that comprehensive security was provided for in these locations and these were locations critical to the function of democratic governance where assassination or intimidation risk was acute. *See Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022) (explaining these "are civic locations sporadically visited in general, *where a bad-intentioned armed person could disrupt key functions of democracy*. Legislative assemblies and courthouses, further, are typically secured locations, where uniform lack of firearms is generally a condition of entry, and *where government officials are present and vulnerable to attack*"); *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 290 (2018). There is extensive evidence to justify these restrictions from across the early American states. For example, South Carolina provided that "sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts." THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke, ed., 1790). Georgia required that "the sheriff of each county or his deputy" shall "attend at . . . elections for the purpose of enforcing orders of the presiding magistrates in preserving good order." A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 611 (Watkins eds., 1800). Other states required

or provided for security in these places and in their state legislative assemblies as well. *See* Br. for the Center for Human Liberty as Amicus Curiae in Supp. of Plfs.-Appellees, *Antonyuk v Nigrelli*, No. 22-2908, Doc. 313 at 8–17 (2d Cir. Feb. 9. 2023) ("Ctr. for Human Liberty Amicus Br.") (collecting statutes regulating or providing for security in courthouses, legislative assemblies, and polling places).

Yet unlike a permissible sensitive place such as a courthouse, "where visitors are screened by security," many modes of public transportation "do not have controlled entry points" or comprehensive security. *Bridgeville Rifle & Pistol Club, Ltd. V. Small*, 176 A.3d 632, 659 (Del. 2017); *Hardaway*, 2022 WL 16646220, at *14 (explaining sensitive places are "typically secured locations"). This makes public transportation offerings rather unlike the area past TSA screening at airports where entry *is* controlled, and comprehensive security *is* provided. Further, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," transit stops may be comparatively "remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Bridgeville*, 176 A.3d at 659.

Notably, for locations that lacked comprehensive security where people gathered and could be vulnerable to attack, Colonial and Founding Era governments *armed* law-abiding citizens, it did not disarm them. For example, many Colonial and Founding Era governments required individuals to brings arms to churches and other public assemblies. *See, e.g.*, 5 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature at 19 (William Waller Hening ed., 1809) (1738 Virginia statute providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches"); 19 The Colonial Records Of The State

Of Georgia: Part I, Statutes, Colonial And Revolutionary 138 (1770 Georgia statute mandating that all those "liable to bear arms in the militia" and "resorting, on any Sunday or other times, to any church, or other place of divine worship . . . shall carry with him a gun . . . and shall take the said gun or pistols with him to the pew or seat . . . ."). *See also* Ctr. for Human Liberty Amicus Br. at 22–25 (collecting statutes); Kopel & Greenlee, *supra* at 233 ("Americans certainly did not think that bringing guns to town was a problem; to the contrary, laws typically required that arms be brought to churches or to all public meetings."). Illinois's Ban therefore *reverses* the Founding Era solution of arming Americans to enable self-defense.

Additionally, unlike other permissible sensitive place restrictions, the ban on carrying for self-defense in public transportation affects people in their day-to-day lives and effectively extends the ban to other places too. This is relevant under *Bruen* because analogical reasoning includes comparing how and why any purportedly analogous laws burden the right to keep and bear arms. *See* 142 S. Ct. at 2133. Of course, the foregoing demonstrates that the Public Transportation Carry Ban is unconstitutional even apart from consideration of its broader burdens. But Founding Era carry restrictions in discrete locations such as courthouses, legislative assemblies, and polling places did not burden the right to carry firearms to nearly the extent that Illinois's ban does.

Public transportation is a vital part of everyday life with people riding public transit to commute to work, to complete errands, or to connect with family and friends. According to the Illinois Department of Transportation, "ninety-six out of the state's 102 counties offer some type of transit service to their communities." *Transit System*, ILL. DEPT. OF TRANSP., available at https://bit.ly/3CdxcMP. In the Chicagoland area, prior to the Covid-19 pandemic, CTA transported 468 million riders on trains and buses, Metra commuter rail transported over 74 million, and Pace buses transported nearly 33 million. CHICAGO TRANSP. AUTH.; *Annual Ridership Report*, Calendar

Year 2019 at 1 (Jan. 16, 2020), https://bit.ly/3ItZXrl; METRA *Ridership Trends Annual Report 2019* at 1 (Feb. 2020), https://bit.ly/3EAij9c; Pace Annual Report 2019 at 5 (2020), https://bit.ly/3EuzXuL**.** There are many common scenarios where individuals may need to bring firearms for self-defense in public transportation areas. Indeed, the need for self-defense on public transportation in Illinois is hardly speculative. *See, e.g.*, *Arrest made in shooting of 16-year-old on CTA Red Line train near Chinatown*, CBS CHICAGO (Jan 5., 2023), https://cbsn.ws/3XB8qyu; *Man, 60, dies after Chatham shooting on CTA Red Line train: Chicago police*, ABC7 CHICAGO (Oct. 17, 2022), https://abc7.ws/3fBnv3a; John O'Connor, *More police promised for Chicago trains after fatal shooting*, ASSOCIATED PRESS (Aug. 6, 2022), https://bit.ly/3DCMvPN ("The Chicago Sun-Times reported that as of mid-July [2022], CTA has reported 488 violent crimes this year, higher than at any point since the same period in 2011."); Dane Placko, *CTA union president says violence on Chicago trains, buses is out of control*, FOX32 CHICAGO (Apr. 10, 2022), available at https://bit.ly/3hbsCYz.

The ban on carrying on public transit additionally "strips people of the ability to have a gun present for self-defense not just" while traveling *on* public transportation "but also on the way to and from" the public transportation. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1525 (2009). This is especially so under Illinois's Public Transportation Carry Ban, which explicitly extends to "parking area[s]" too. 430 ILSC 66/65(a)(8). After all, if you cannot park with your firearm at a "park and ride" stop, you cannot leave your house with your firearm. And if you cannot have your firearm with you on public transit, no matter how you arrive at your stop, you cannot have your firearm prior to boarding and you will not have it after departing. Individuals who travel by public transportation are not only deprived of their Second Amendment rights while

they ride but also in *every place* that they ride to and from—every neighborhood, every restaurant, every store, every time they leave the house and do not limit themselves to private vehicles or their own two feet. This effect is particularly pernicious on individuals who "have to walk some distance through a high-crime area" after departing public transportation. *Bruen*, Oral Arg. Tr. at 67 (Nov. 03, 2021. By effectively prohibiting carrying before the journey, while on the journey, and after the journey, "law-abiding citizens are *stripped* of the ability to bear arms in self-defense," Volokh, *supra*, at 1525 (emphasis added). There is no historical justification for such a denial of Second Amendment rights.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs and permanently enjoin enforcement of the Public Transportation Carry Ban.

Dated: March 1, 2023                                    Respectfully Submitted,


                                                        /s/ David G. Sigale
                                                        Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2023, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the Northern District of Illinois by

using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system.

/s/ David G. Sigale
*Attorney for Plaintiffs*

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

16