IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

BENJAMIN SCHOENTHAL, *et al.*,

        Plaintiffs,

v.

KWAME RAOUL, *et al.*,

        Defendants.

No. 3:22-CV-50326

Hon. Iain D. Johnston

**STATEMENT OF MATERIAL FACTS**

Defendants Illinois Attorney General Kwame Raoul, DeKalb County State's Attorney Rick Amato, DuPage County State's Attorney Robert Berlin, and Lake County State's Attorney Eric Rinehart (the "State Parties"), by and through Illinois Attorney General Kwame Raoul, respectfully submits the following statement of material facts in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56:

1. Public transit systems in Illinois are most heavily concentrated in Chicago and its surrounding counties. *See* Expert Report of Professor Joshua Salzmann ("Salzmann Report"), Ex. 1, at 46–47.

2. The Chicago Transit Authority ("CTA"), which serves the Chicago region, is the nation's second largest transportation system—according to the Illinois Department of Transportation, the CTA transports more than 545 million riders per year on approximately 140 bus routes and 242 miles of rapid transit railroad track. *Id.*

3. The Metra commuter rail agency, which serves the six-county Chicago region and extends into Wisconsin, has 11 lines, 241 stations, and an annual ridership of more than 81 million. *Id.*

4. Illinois has an extensive, economically-significant public transit system beyond Chicagoland: sixty-three different public transit agencies operate in Illinois, together serving 95 of 101 counties other than Cook. *Id.*

5. These agencies, which generally provide bus service, are integral to the economies and transit systems of communities across Illinois—in 2022, for instance, Peoria's 18 bus routes carried 1.7 million riders, Springfield's 17 routes transported 1.1 million riders, and Rockford's 19 lines carried 941,000 riders. *Id.*

6. Plaintiff Benjamin Schoenthal is a resident of DeKalb County, Illinois. Declaration of Benjamin Schoenthal, Ex. 2, at ¶¶ 2–5.

7. Plaintiff Mark Wroblewski is a resident of DuPage County, Illinois. Declaration of Mark Wroblewski, Ex. 3, at ¶¶ 2–5.

8. Plaintiff Joseph Vesel is a resident of Cook County, Illinois. Declaration of Joseph Vesel, Ex. 4, at ¶¶ 2–5.

9. Plaintiff Douglas Winston is a resident of Lake County, Illinois. Declaration of Douglas Winston, Ex. 5, at ¶¶ 2–5.

10. Defendant in his official capacity Kwame Raoul is the Attorney General of the State of Illinois, and has statutory duties as defined in 15 ILCS 205/4. *See* Answer of Raoul *et al.*, Ex. 6, ¶ 18.

11. Defendant in his official capacity Rick Amato is the State's Attorney of DeKalb County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. *See* Answer of Raoul *et al.*, Ex. 6, ¶ 19.

12. Defendant in his official capacity Robert Berlin is the State's Attorney of DuPage County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. *See* Answer of Raoul *et al.*, Ex. 6, ¶ 20.

13. Defendant in her official capacity Kimberly M. Foxx is the State's Attorney of Cook County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. *See* Answer of Raoul *et al.*, Ex. 6, ¶ 21.

14. Defendant in his official capacity Eric Rinehart is the State's Attorney of Lake County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. *See* Answer of Raoul *et al.*, Ex. 6, ¶ 22.

15. Plaintiffs assert that a State-law restriction on carrying concealed firearms on public buses and trains violates the Second Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, and that the they would ride buses and trains while carrying concealed firearms if they were able to do so without fear of prosecution. *See* Schoenthal Decl., Ex. 2, at ¶¶ 7–8; Wroblewski Decl., Ex. 3, at ¶¶ 7–8; Vesel Decl., Ex. 4, at ¶¶ 8–11; Winston Decl., Ex. 5, at ¶¶ 8–11.

16. Plaintiffs have asserted no intention to travel to or visit any buildings, real property, or parking area under the control of a public transportation facility, and no intention to do so while carrying a concealed firearm. *See* Schoenthal Decl., Ex. 2, at ¶¶ 7–8 (asserting prior use of "the Metra Union Pacific West line" and an intention to "ride Metra more" if allowed to carry a concealed handgun); Schoenthal Dep., Ex. 7, at 56:8–57:4 (confirming accuracy of declaration); Wroblewski Decl., Ex. 3, at ¶¶ 7–8 (asserting prior use of "the Metra" and an intention to "ride public transportation more, such as Metra" if allowed to carry a concealed handgun); Wroblewski Dep., Ex. 8, at 48:12–49:10 (confirming accuracy of declaration); Vesel Decl., Ex. 4, at ¶¶ 8–11

3

(asserting he would use "bus" or "rail" transit options if allowed to carry a concealed handgun); Vesel Dep., Ex. 9, at 49:5–7 (confirming accuracy of declaration); Winston Decl., Ex. 5, at ¶¶ 8–11 (asserting an intention to "ride public transportation more" if allowed to carry a concealed handgun); Winston Dep., Ex. 10, at 64:4–65:5 (confirming accuracy of declaration).

17. In concluding that polling places, courthouses, and legislative assemblies are "sensitive" places, the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen* cited to two secondary sources: (a) Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute 11–17. 597 U.S. 1, 30 (2022).

18. Those two sources, in turn, specifically cited to five Colonial or Founding era regulations restricting firearms at these locations:

    a. Ex. 16, Del. Const. of 1776 art. 28.

    b. Ex. 17, Act of Jan. 26, 1787 N.Y. Laws 345.

    c. Ex. 18, 1647 Md. Laws 216.

    d. Ex. 19, 1650 Md. Laws 273

    e. Ex. 20, 1786 Va. Acts 33, ch.21

19. The sources cited by the Supreme Court also purported to identify an additional 1676 Virginia statute relating to courthouses, which required persons to attend court while armed. *See* 597 U.S. at 30 (citing Ex. 14, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 232 n.109 (2018) (referencing 2 Hening 126 as a "1676 Virginia law that "all people" be "required to goe armed" to church and court "for their greate security")).

20. This statute is incorrectly cited in the Supreme Court's source—contrary to Kopel and Greenlee's citation to 2 Hening 126, this Virginia statute actually appears at 2 Hening 333 (attached as Ex. 21).

21. It is unclear whether this statute was passed in 1674 or 1676. Ex. 21, 2 Hening 326.

22. In concluding that schools are "sensitive" places, *Bruen* cites to two secondary sources: (a) Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute 11–17. 597 U.S. 1, 30 (2022). *See Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626–27.

23. Those two sources, in turn, specifically cited to no Colonial or Founding era regulations, and four 19th century regulations, relating to these locations:

    a. Ex. 22, Meeting Minutes of University of Virginia Board of Visitors 4–5 Oct. 1824, https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-04-02-02-4598.

    b. Ex. 23, University of Nashville 1837 rule, 7 American Annals of Education and Instruction 185 (1837), https://babel.hathitrust.org/cgi/pt?id=iau.31858033351408&view=1up&seq=191.

    c. Ex. 24, Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina ch. 5, § 13 (1838) at 11, https://docsouth.unc.edu/true/ncga/ncga.html.

    d. Ex. 25, 1878 Miss. Laws 176.

24. These two sources also asserted that Dickinson College, La Grange College, and Waterville College also imposed restrictions on students carrying firearms, but provided no

5

citations or references to, or quotations from, any restrictions that may have been implemented by these schools. *See* Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute 11–17.

25. "Public transportation dates to the first half of the 20th century." *See* Salzmann Report, Ex. 1, at 3–4.

26. Prior to the 20th century, "transportation services were provided exclusively by private entities that usually received a charter or license to operate from a state or local government." *Id.*; *see also* Expert Report of Dr. Brennan Rivas ("Rivas Report"), Ex. 11, at 24 ("Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers."); Ex. 12, Brian J. Cudahy, *Cash Tokens and Transfers* 128–29 (1982) (first truly publicly owned and operated municipal mass transit service started in 1905).

27. Modern public transit systems are the result of dramatic technological changes when compared to the transportation infrastructure and vehicles of 1791 and 1868. *See* Salzmann Report, Ex. 1, at 3–4 (comparing and contrasting the four "eras" of transportation throughout American history).

28. "Technology has enabled the creation, maintenance, and expansion of light rail, bus, and other systems that far surpass what was possible, or even thinkable, in 1791." Rivas Report, Ex. 11, at 4.

29. During the Colonial and Founding eras "[m]anmade infrastructure was limited to a fragmented network of rough roads constructed, in various turns, by individuals, corporations, and local governments." Salzmann Report, Ex. 1, at 3.

30. Until the late 19th and 20th centuries there were no publicly owned and operated passenger trains, electric- or gasoline- powered buses, parking lots, elevated lines, subways, or any of the other infrastructure, technology, and machinery that comprise modern mass transit systems. *See* Salzmann Report, Ex. 1, at 15–37.

31. The canals, steamboats, omnibuses, horse-carts, wagons, and coal- and steam-powered engines of the 19th Century used different technology than is used by public transit systems today. *Id.*

32. The canals, steamboats, omnibuses, horse-carts, wagons, and coal- and steam-powered engines of the 19th Century served different economic and societal roles than the modern public transit systems of today. *Id.*

33. It was not until the late 1800s that technologies and systems anticipating those used by public transit systems today came into wider use, including streetcars, trolleys, cable cars, electricity, internal combustion, and intracity railroads. *Id.*

34. "According to 1753 tax records, the entire colony [of Massachusetts] contained just 6 coaches. Massachusetts also had 18 chariots, 339 chaises, and 992 chairs and calashes—the vast majority of which were located in Boston." *Id.* at 11.

35. Travel during the Colonial and Founding eras was expensive, and long-distance travel through stage-coaches and other vehicles was usually used by persons such as bankers, foreign travelers, and merchants. *Id.* at 11–13.

36. The American cities of the Colonial and Founding eras were small. Philadelphia, one of the largest of them, was home to 2,000 people in 1700, and 62,000 in 1800. *See id.* at 6.

37. "Popular CCW handgun calibers such as 9mm or .40 S&W can easily penetrate glass vehicle windows and sheet aluminum, plastic seats and seat cushioning / foam (common

7

public transit vehicle component materials)." Expert Report of James E. Yurgealitis ("Yurgealitis Report"), Ex. 13, at 3.

38. In 1789, prior to the establishment of the system created by the new Constitution, the public governmental facilities of the Confederation Congress (including the Confederation Congress itself, the Department of the Treasury, the Department of War, and the Department of Foreign Affairs) were each staffed by a "door-keeper," several of whom also doubled as messengers—no personnel to provide security of these government facilities existed beyond the doorkeepers assigned to certain Departments. *See* Ex. 26, "Schedule I: Estimate of the Expenditure for the Civil List of the United States for the year 1789, 19 September 1789," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-05-02-0162-0002. [Original source: *The Papers of Alexander Hamilton*, vol. 5, *June 1788–November 1789*, ed. Harold C. Syrett. New York: Columbia University Press, 1962, pp. 381–388.] (summarizing final civil list expenditures of Confederation Congress).

39. Besides the House of Representatives, which appointed a "sergeant-at-arms," during the early years of the Republic, the other organs of the executive and legislative branches of the new government established by the Constitution had no personnel responsible for security apart from clerks, door-keepers, and office-keepers. *See*, *e.g.*, *id.* (summarizing initial civil list of government established by Constitution in 1789); Ex. 27, "Enclosure: Schedule I, [9 January 1790]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-06-02-0076-0002-0010. [Original source: *The Papers of Alexander Hamilton*, vol. 6, *December 1789–August 1790*, ed. Harold C. Syrett. New York: Columbia University Press, 1962, pp. 129–136.] (summarizing civil list of 1790); Ex. 28, "Report on the Estimate of Expenditures for 1792, 4 November 1791," *Founders*

8


*Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-09-02-0326. [Original source: *The Papers of Alexander Hamilton*, vol. 9, *August 1791–December 1791*, ed. Harold C. Syrett. New York: Columbia University Press, 1965, pp. 456–475.] (summarizing civil list of 1792).

40. Prior to 1827 the Capitol Building was guarded by a "lone watchman, John Golding." *See* Ex. 29, United States Capitol Police, *Our History* (Jan. 24, 2024), *available at* https://www.uscp.gov/the-department/our-history.

41. During the period in which Charles Dickens visited in the White House, in 1842, it was possible to enter the White House and approach the office of the President without encountering security beyond that which could be provided by clerks, a "master of ceremonies," and/or other visitors. Ex. 30, CHARLES DICKENS, AMERICAN NOTES 702–04 (John W. Lovell Company Ed., 1883) (1842).

42. During the Civil War a force of several policemen was assigned to protect the White House for the first time. Ex. 31, PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, Appendix 7 at 508–09 (1964), *available at* https://www.archives.gov/research/jfk/warren-commission-report/appendix7.html.

43. More comprehensive protection (in the form of an expanded, 27-person police force and protection by the Treasury Department's Secret Service) would not be provided to the White House until the mid-1890s. *Id.*

44. CTA facilities and riders are protected by hundreds of CTA security guards, more than 33,000 security cameras, and patrols by personnel from the Chicago Police Department, as

well as the police departments of other municipalities served by the CTA. Ex. 32, *Security*, CTA (Jan. 24, 2024) at 2, *available at* https://www.transitchicago.com/security/.

45. Metra maintains a force of "more than 140 sworn officers and civilian support staff who are responsible for the security of Metra passengers, employees, equipment, yards, stations and other Metra property." Ex. 33, *Metra Police Department*, Metra (Jan. 24, 2024), *available at* https://metra.com/metra-police-department.

46. Metrolink, serving Illinoisians in the St. Louis area, is policed by more than 40 officers from St. Louis County and St. Clair County. Ex. 34, *Special Operations*, St. Louis County Police (Jan. 19, 2024) at 2, *available at* https://stlouiscountypolice.com/who-we-are/divisions-bureaus/division-of-special-operations/.

47. Blackstone defines "Affrays (from affraier, to terrify)" as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects." Ex. 35, William Blackstone, 4 *Commentaries* 145 (Sharswood Ed., J.B Lippincott Company 1893) (1769).

48. All Chicago public schools, and at least 199 non-public schools, distribute fare cards, known as Ventra cards, to enrolled students. Ex. 36, *CTA Student Ventra Card Distribution Schools*.

49. CTA has published materials encouraging elementary and high school students to use CTA public transit infrastructure to ride to and from school, to work, and for shopping, food, events, libraries, parks, and more. Ex. 37, *Info for Elementary & High School Students*, *available at* https://www.transitchicago.com/for-students/ (Jan. 27, 2024).

50. CTA has made students eligible for a student reduced fare for CTA services. Ex. 38, *Student Reduced Fare*, *available at* https://www.transitchicago.com/students/ (Jan. 27, 2024).

51. In 1328 the Statute of Northampton was enacted, forbidding going or riding "armed by night []or by day, in fairs, markets . . . ." Ex. 39, Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.).

52. In 1786 Virginia enacted a law forbidding persons from going or riding armed "by night []or day, in fairs or markets." Ex. 40, 1786 Va. Acts 35, Ch. 49; *see also* Ex. 20, 1786 Va. Acts 33, ch.21.

53. In 1792 there was in force in North Carolina a law forbidding person from going or riding armed "by night []or day, in fairs, markets." Ex. 41, Francois Xavier Martin, Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60-61, ch. 3 (F. Martin Ed. 1792) (North Carolina Statute), *excerpt available at* https://firearmslaw.duke.edu/laws/francois-xavier-martin-a-collection-of-statutes-of-the-parliament-of-england-in-force-in-the-state-of-north-carolina-60-61-newbern-1792.

54. In the years after the Civil War Tennessee enacted a law providing that "it shall not be lawful for any person to publicly or privately carry a dirk, sword, cane, Spanish stiletto, belt or pocket pistol or revolver." Ex. 42, 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Pace and Prevent Homicide, Ch. 13, Section 1, *available at* https://firearmslaw.duke.edu/laws/1869-1870-tenn-pub-acts-2d-sess-an-act-to-preserve-the-peace-and-prevent-homicide-ch-13-c2a7-1.

55. In 1870 Texas enacted a statute barring firearms at numerous types of locations, including "any . . . public assembly." Ex. 43, 1870 Tex. Gen. Laws 63, ch. 46, *available at* https://firearmslaw.duke.edu/laws/1870-tex-gen-laws-63-an-act-regulating-the-right-to-keep-and-bear-arms-chap-46-c2a7-1#:~:text=1870%20Tex.-,Gen.,46%2C%20%C2%A7%201.

11

56. In 1883 Missouri barred the carry of firearms at numerous types of locations, including "any . . . public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state." Ex. 44, 1883 Mo. Sess. Laws 76, *excerpt available at* https://firearmslaw.duke.edu/laws/1883-mo-laws-76-an-act-to-amend-section-1274-article-2-chapter-24-of-the-revised-statutes-of-missouri-entitled-of-crimes-and-criminal-procedure-c2a7-1#:~:text=1883%20Mo.-,Laws%2076%2C%20An%20Act%20To%20Amend%20Section%201274%2C%20Article%202,Criminal%20Procedure%2C%E2%80%9D%20%C2%A7%201.&text=Category%3A,Irresponsible%2C%20Sensitive%20Places%20and%20Times.

57. In 1889 Arizona enacted a statute providing for penalties for most persons who "shall carry on or about his person, saddle, or in his saddlebags, any pistol . . . . ," or who carry a pistol into any place where people are assembled. Ex. 45, 1889 Ariz. Sess. Laws 16-18, *available at* https://firearmslaw.duke.edu/laws/act-of-mar-18-1889-1889-ariz-sess-laws-16-17.

58. In 1890 Oklahoma enacted a statute barring most persons from carrying concealed pistols and revolvers. Ex. 46, 1890 Okla. Terr. Stats., Art. 47, § 7, *excerpts available at* https://firearmslaw.duke.edu/laws/1890-okla-laws-495-art-47.

59. "[R]ecords are no longer extant for most historical transportation service providers." Rivas Report, Ex. 11, at 28–29.

60. In 1875, the North Pennsylvania Railroad Company required its conductors to "see that … passengers do not take into the cars guns, dogs, valises, large bundles or baskets," barring all firearms from their train cars. Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 17).

61. North Pennsylvania served Philadelphia and its surrounding counties, then (as now) one of the nation's largest and most populous metropolitan areas. *Id.*

62. In 1882, the Central Pacific railroad issued rules providing that only guns "in cases and not loaded . . . may be carried in day or sleeping cars without charge." *Id.* at 18.

63. Central Pacific rules also banned firearms from baggage—"[g]uns . . . are not baggage, and must not, under any circumstances, be checked." *Id.* at 23.

64. In the 1880 census Central Pacific was recorded as carrying the fourth highest number of passengers over the third-most aggregate miles among American railroads. *Id.* at 18.

65. In 1884, the Union Pacific railroad issued rules providing that "Guns in cases may be carried by passengers in the coaches without charge, or they will be checked free by baggage-agents as part of the usual baggage allowance. Guns uncased will be carried in baggage car only." *Id.* at 18.

66. Updated rules in 1898 "mirrored this language." *Id.*

67. By 1886, the International & Great Northern Railroad, an important regional railroad in the Southwest, had a practice of restricting passengers from carrying firearms on trains, but did allow them to check their firearms into baggage. *Id.* at 19.

68. By 1900 at the latest, the Albany Railroad, which operated a passenger trolley service, had implemented rules that were held to ban passengers from riding with firearms. *Id.* at 19–20.

69. By 1860 there were 246 colleges in the United States. Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 35).

70. Pursuant to the standing orders of this Court, a copy of *Frey v. Nigrelli,* an unpublished case available through Lexis, is attached to this filing as Exhibit 48. 2023 U.S. Dist. LEXIS 42067 (S.D.N.Y. March 13, 2023).

71. Pursuant to the standing orders of this Court, a copy of *Kipke v. Moore*, a case that is expected to be published but has not yet been published and is available through Lexis, is attached to this filing as Exhibit 49. 2023 U.S. Dist. LEXIS 174934 (D. Md. Sep. 29, 2023).

| | |
|---|---|
| January 29, 2024 | Respectfully submitted, |
| Isaac Freilich Jones<br>Christopher G. Wells<br>Gretchen Elizabeth Helfrich<br>Office of the Illinois Attorney General<br>115 S. LaSalle St., 20th Floor Chicago, Illinois 60603<br>Tel. 312-814-3000<br>isaac.freilichjones@ilag.gov<br>christopher.wells@ilag.gov<br>gretchen.helfrich@ilag.gov | Defendants KWAME RAOUL, RICK AMATO, ROBERT BERLIN, and ERIC RINEHART<br><br>By: KWAME RAOUL,<br>    Illinois Attorney General<br><br>*/s/ Isaac Freilich Jones*<br>*One of the Attorneys for Defendants Kwame Raoul, Rick Amato, Robert Berlin, and Eric Rinehart* |

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on January 29, 2024 they caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record.

*/s/ Isaac Freilich Jones*
Assistant Attorney General