Exhibit 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| BENJAMIN SHOENTHAL, *et al.*, | |
| Plaintiffs, | No. 3:22-CV-50326 |
| v. | |
| | Hon. Iain D. Johnston |
| KWAME RAOUL, *et al.*, | |
| Defendants. | |

**EXPERT REPORT OF DR.  BRENNAN RIVAS**

### I.     Assignment

I have been retained by the State of Illinois to render expert opinions in this case. I submit this report on the basis of my training, professional expertise, and research.  For this engagement, I was asked to provide expert opinions about historical gun regulations that pertained to travelers, transit companies, and transportation-related spaces. I was also asked to consider the firearm regulations that applied within transit infrastructure and public gathering spaces over the course of the history of the United States, with a particular focus on the Founding period.

### II.     Qualifications and Background

I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

I hold a Ph.D. in history from Texas Christian University, awarded in 2019.  My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; last year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*.

I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

1

My CV, detailing my education, experience, and publications, is attached to this declaration as Exhibit A. I have written a number of articles related to the regulation of guns, especially as to the history of nineteenth-century weapon policies and the socio-political context that made them possible.

I have provided expert analysis and expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 17-1017-BEN-JLB (S.D. Cal.); *Angelo v. District of Columbia*, No. 1:22-cv-02256-RC (D. D.C.); *Christian v. Nigrelli*, No. 22-cv-00695 (JLS) (W.D. N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D. N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-5403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-CV-7463 (RMB) (AMD) (D. N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Ore.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a *Jones v. Bonta*); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-JLK (D. Col.); *Kipke v. Moore*, No. 1:23-cv-01293-GRL (D. Mar.); *State of Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield County, OH). I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions. I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.).

### III. Retention and Compensation

For my work in this case, I am being compensated at a rate of $200/hour for research, $225/hour for writing materials, and $325/hour for deposition and testimony. My compensation is not contingent on the results of my analysis or the substance of any testimony.

### IV. Basis for Opinion and Materials Considered

The opinion I provide in this report is based on my education, expertise and research in the fields of transportation, the history of firearms and firearm regulation, and my review and analysis of a wide-range of primary and secondary sources.

### V. Methodology

This report is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous peer-reviewed books and articles, in addition to law review articles and more informal media like blogs and news articles. I have also drawn upon primary sources, such as historical laws and ordinances found in digital databases like Hein Online and Hathi Trust, and historical newspaper articles from databases like Chronicling America, ProQuest Databases, Newspapers.com, America's Historical Newspapers, and more. The writing and composition of scholarly works of history require the historian to evaluate both primary and secondary sources—using secondary sources to contextualize and interpret primary sources in ways that illuminate the past rather than confuse or obscure it.

This report also involved new research, particularly in relation to the history of Philadelphia from the latter 1600s through the early 1800s. I consulted scholarly works of history about Philadelphia, particularly those addressing architecture, urban planning, and sites of social gathering. I also consulted relevant primary sources, from paintings of the city and its structures (often reprinted in architecture books) to maps and population statistics. A particularly important source for this study is a multivolume history called *Annals of Philadelphia*. Though it was written and published in the nineteenth century, the author, John F. Watson, related oral histories from longtime residents and reprinted some government records. I also visited some of Philadelphia's historic sites and colonial-era gathering places during July 2023. As one of the United States's oldest and most-studied urban centers, the case study of Philadelphia's transportation and public gathering spaces could be carried much further—and such continued study would likely reinforce conclusions within this report rather than undermine them.

## VI.   Summary of Opinion

This report presents evidence drawn from historical research showing that Americans have historically regulated the presence of weapons in transportation-related spaces. Public carry laws were in force across much of the United States during the nineteenth century, and they applied within intra-city transit spaces as much as they did on public sidewalks. Private transportation companies also held the authority to establish rules about the carrying and shipping of firearms, and there is evidence showing that some rail companies required firearms to be transported unloaded and stowed away from passengers. The search for and analysis of historical analogues

for sensitive place laws and transit-specific gun regulations should be undertaken in light of historical transportation infrastructure as well as the types, locations, and sizes of historical public gathering places. A case study of Philadelphia shows that even one of the largest and most cultured cities in colonial and early America lacked indoor gathering spaces akin to modern venues of entertainment, art, and education, and it remained a "walking city" with relatively few intra-city transit options until the nineteenth century. Its outdoor places of public assembly, such as the city center, fairs, and marketplace, were exactly the types of gathering places encompassed within the text of the Statute of Northampton.

### VII.    Opinion

Urban mass transportation is in some ways new, and in others not. The scale of transit today far surpasses that of the Founding era, and not just as a result of population growth. Technology has enabled the creation, maintenance, and expansion of light rail, bus, and other systems that far surpass what was possible, or even thinkable, in 1791. And yet, Americans even in the colonial era could purchase fares to stagecoaches and packets[1] to nearby regional centers, and they could ride horsecars in some of the larger cities by 1800.

For this report, I explored the similarities and differences between the American urban experience today versus in the eighteenth century. This is an undertaking which a historian could spend many years studying and developing—and indeed, some have written marvelous histories of the evolution of mass transit and the growth of urban centers. In order to work within the time constraints for a project of this kind (rather than a peer-reviewed monograph or article), I employed a case study method.

At the time of the Founding, Philadelphia, Pennsylvania was the second most populous city in the United States, with approximately 28,000 residents.[2] More than that, Philadelphia during the colonial period had been one of the largest cities within the entire British Empire. As a result, Philadelphia led the nation in architecture, voluntary associations, and urban planning. A

---

[1] The word "packet" is short for *packet-boat*, defined in the Oxford English Dictionary as "A boat or ship travelling at regular intervals between two ports, originally for the conveyance of mail, later also of goods and passengers; a mailboat."

[2] U. S. Bureau of the Census, "Population of the 24 Urban Places: 1790," *Population of the 100 Largest Cities and Other Urban Places In The United States: 1790 to 1990* (June 1998). https://www2.census.gov/library/working-papers/1998/demographics/pop-twps0027/tab02.txt

look at transportation infrastructure in this sophisticated city, as well as its sites of public assembly, demonstrate that intra-city transportation and the scale of sensitive places in Philadelphia were quite different from what was common in the mid-to-late nineteenth century, and certainly from what we know today.

In addition to the Philadelphia case study, this report provides a historical overview of the ways in which public carry laws affected travelers and transportation spaces. These regulations, widespread in the nineteenth century, prohibited the carrying of various weapons and particularly the concealed-carrying of them. By 1900, most American states and territories had enacted one, and hundreds of municipalities had enacted similar or overlapping ordinances to apply within their city limits. Public carry laws applied throughout an entire jurisdiction and did not cease to be operative aboard trains, trolleys, streetcars, and ferries.

Some public carry laws specifically provided travel exemptions that allowed what was otherwise unlawful weapon-carrying among people traveling far from home. The questions of who might be considered a "traveler," and what kinds of travel might qualify for exemption appeared before nineteenth-century appellate courts. When these courts construed the travel exemption, they distinguished long-distance travel from local—applying the exemption to those venturing far from home and thereby rendering themselves particularly vulnerable in some way. Courts made it clear that moving about within one's community, hometown, or local area did not qualify for exemption. In other words, the kind of intracity transportation provided by urban mass transit today did not equate to the "travel" exempted in the text of some public carry laws.

Until well into the twentieth century, passenger transit was a public service performed by state-authorized, private companies. Their structure empowered their leadership to establish rules for passengers and employees that protected company property and promoted public safety. Historical rulebooks for railway companies show that it was common for train passengers traveling with firearms to be expected to stow them away, keep them unloaded, or check them as baggage. Some of these rulebooks are extant and have been examined by historians and law scholars seeking information about weapon-carrying aboard historical transportation services. But an unknown number are lost, having been discarded when rail companies dissolved or were acquired by other corporations.

A dearth of extant records poses significant problems for uncovering the history and tradition of weapon-carrying specifically and local law enforcement more broadly. The Statute of

5

Northampton and analogous American statutes, as well as public carry laws and common law offenses like disturbing the peace, were applied locally by magistrates or justices of the peace who left few if any records of the cases they heard. Some historians have gone to great lengths to identify existing court records from the early republic period, read them page-by-page, and mine them for information about this localized law enforcement. Their painstaking research paints a picture of municipal and county courts handling all manner of cases—many under broad headings like "disturbing the peace"—and dispensing justice based upon a combination of law and custom. Within these contexts, in which magistrates and residents knew one another by family or reputation if not personally, the enforcement of law prioritized the protection or restoration of harmony within a community rather than the application of abstract legal principles.

### A.      Philadelphia: Transit Infrastructure

The city of Philadelphia was established on the western bank of the Delaware River, across from West Jersey, in 1682. Inhabitants built makeshift caves and dwellings for themselves along the riverbank until land could be cleared and surveyed for the construction of homes on town lots. The town grew around a creek useful for docking boats, which came to be known as Dock Creek. In its earliest years, the city consisted of a cluster of buildings—particularly homes and taverns— near Dock Creek. The most notable was the Blue Anchor Inn, which was the site of a ferry connecting both sides of the creek. To the north grew what is now called the Old City, and to the south grew Society Hill. Near the turn of the eighteenth century, a drawbridge replaced the Dock Creek ferry, and by about a century after that, Dock Creek had been filled in and paved over.[3]

Wharves and docks were built along the riverfront allowing goods to be loaded and unloaded. The Society of Traders, a group of investors in Pennsylvania whose offices were in Society Hill, was made up primarily of merchants. The buying and selling, trading and transporting, of goods was the lifeblood of the city economy. Goods were transported across the wharves on carts and deposited at warehouses near the river.[4] Merchants showed and sold their warehoused products and shipped them by wagon or boat to their destinations. By 1726, there were

---

[3] John F. Watson, *Annals of Philadelphia and Pennsylvania in the Olden Time*, 2 vols. (1850), I: 35-38. See Also Martin P. Snyder, *City of Independence: Views of Philadelphia Before 1800* (New York: Praeger, 1975), 26-27 (on cave structures and scarcity of public buildings).

[4] On Philadelphia as a center of eighteenth-century international and regional trade, see Carl Bridenbaugh and Jessica Bridenbaugh, *Rebels and Gentlemen: Philadelphia in the Age of Franklin* (New York: Oxford University Press, 1962), 5-12.

two privately owned wharves in Philadelphia, both being situated between High Street (now Market Street) and Dock Creek.[5] As the population and economic significance of the city grew, more were built along the riverbank of the Old City, Society Hill, and even outlying areas.[6]

Important public buildings were constructed near the Delaware River, and the city itself initially grew along the riverbank rather than westward toward the Schuylkill River as planned. As quickly as 1685, there were some 600 homes under construction in the Philadelphia area, all of them dotting the blocks nearest the riverbank to provide access to fresh water and infrastructure. To the west of the settled and developed town lots were the Governor's Woods, which extended to the Schuylkill River. By the Revolution, clearing of the forest had reached Broad Street, which is the current site of City Hall.[7] Construction for City Hall began in 1871, and prior to that time the site had been set aside as a park and temporarily used for a water pumping station. Even though it is at the heart of the city as envisioned by William Penn, its founder, and early planners, it was at the fringe of settlement until the Founding era. The first century of development in Philadelphia hugged the coastline rather than expand into the interior. Even though the space between the rivers was ultimately cleared and surveyed, settlement did not immediately follow. So much development had occurred outside of the planned grid by 1854 that a new charter was issued that brought these other settlements under the organization of the city and county of Philadelphia.

In the mid-to-late eighteenth century, the Old City remained the heart of Philadelphia—and High Street (now Market Street) was the very heart of the Old City. High Street was home to Philadelphia's main marketplace, which provided food, essentials, and other consumer products to residents near and far. The road itself was the primary east-west thoroughfare from the docks to the interior of the city, so it featured tremendous foot, horse, and wagon traffic. Vendors rented stalls and complied with strict regulations designed to protect the trade in essential goods from bad-faith actors. Market days were limited and specified by local ordinance, and Philadelphians built a watch tower to guard the marketplace.[8] During the colonial period, semiannual "fairs"

---

[5] Watson, *Annals of Philadelphia*, I: 51.

[6] Sketches, paintings, and lithographs of eighteenth-century Philadelphia sometimes presented a view of the city from the Delaware River, which would have been the arrival point for most immigrants and visitors. Docks covered the riverbank across the eastern edge of the whole city. See images in Snyder, *City of Independence*, 30-33, 46, 58, 63.

[7] Snyder, *City of Independence*, 35.

[8] Watson, *Annals of Philadelphia*, I: 59.

brought all manner of goods to Philadelphia from outlying areas. The mayor of Philadelphia opened a fair by issuing a proclamation that reiterated the obligation of colonists to keep the King's peace, which mandated "that no person…carry any unlawful weapon, or gallop or strain horses within the built part of the city."[9] By the Revolutionary era, the center of High Street featured covered stalls, sometimes derisively labeled "shambles," where vendors showed and sold their wares to passersby. The marketplace continued several blocks, passing Fourth Street in the late 1780s.[10] In the nineteenth century, Philadelphia removed the vendor sheds, established market corporations to build fully enclosed market houses, and renamed the roadway Market Street.[11]

With High Street being the center of the Old City, Philadelphians constructed important buildings in its vicinity. The intersection of Second and High Streets was particularly significant, being home to the first Quaker meetings house as well as sites of justice, like the first courthouse and jail.[12] A whipping post and pillory were also installed there, meaning that corporal punishments were administered in an area of civic significance as well as public gathering. The office of town whipper was a paying position, and "The whipping post and pillory display was always on a market day—when the price of eggs went up much."[13] In the same area hung a bell whose ringing notified residents that a proclamation or other important notice was about to be read to the public.[14]

---

[9] Philadelphia City Ordinance, 1753, quoted in Watson, *Annals of Philadelphia*, 364. In his description of the city's markets and the colonial-era fairs (that had ceased to be held by the time of his writing), Watson provided the 1753 mayoral proclamation as an example of how such fairs would be opened. The suggestion is that the process of opening with a proclamation along these lines was standard procedure. It is worth noting that the rules laid out in the proclamation align with the Statute of Northampton and  the common law view of keeping the peace. "O yez! &c. Silence is commanded while the Fair is proclaiming, upon pain of punishment! A. B., Esq., Mayor of the city of Philadelphia, doth hereby, in the King's name, strictly charge and command all persons trading and negotiating within the Fair to keep the King's peace, and that no person presume to set up any booth or stall for the vending of strong liquors within this Fair—that none carry any unlawful weapon, or gallop or strain horses within the built part of the city. And if any person be hurt by another, let him repair to the Mayor here present. God save the King!"

[10] On markets, see Helen Tangires, *Public Markets and Civic Culture in Nineteenth Century America* (Baltimore: Johns Hopkins University Press, 2003), 3-47. See esp. Figure 2.2.

[11] https://philadelphiaencyclopedia.org/essays/public-markets/#essay

[12] Watson, *Annals of Philadelphia*, I: 59.

[13] Watson, Annals of Philadelphia, I: 103.

[14] Snyder, *City of Independence*, 26-29.

Connecting these sites to one another were roads laid out in a purposefully designed grid pattern. Many roads remained unpaved, ostensibly because loamy soil reduced some of the inconveniences arising from water or wet conditions. Still, until the 1760s there was no plan or funding for paving the city's roads. Prior to that, sections of roadway might be cobbled with flagstone for wagons and feature an elevated sidewalk for pedestrians. Carts and wagons crisscrossed the city, running ruts into the roads and struggling across uneven or muddy stretches. When the roads were being paved, the elevation of some of them had to be altered dramatically. High points were lowered, and low-lying roadways were raised up—all of which required considerable earthwork and construction.[15] Goods related to a booming regional and international trade moved along these roads in carts and wagons, including agricultural produce heading from the hinterland to many warehouses and docked ships.[16] Affluent residents traversed the city in carriages, but from the colonial period until well into the nineteenth century, most Philadelphians navigated their city on foot.[17]

Transportation in Philadelphia also embraced regional passenger travel. Within a few years of establishing Philadelphia, ferries connected the commercial center to West Jersey across the Delaware River. During the eighteenth century, stage lines connected the city to New York, Boston, and Philadelphia. Roadways also stretched into the surrounding countryside enabling farmers to travel into the city to sell or ship their crops. Turnpikes and improvements rescued these roadways from becoming "as claypits, by the continual increase of population and use."[18] There were also packet ships that moved goods, passengers, and letters to port cities elsewhere in the British colonies and later United States.

Ferryboats, packets, and turnpikes exhausted the public transportation options in Philadelphia until the 1830s, when horse-drawn omnibuses began offering alternatives. These

---

[15] Watson, *Annals of Philadelphia*, I: 233-235.

[16] Mary McKinney Schweitzer, "The Economy of Philadelphia and Its Hinterland," in *Shaping a National Culture: The Philadelphia Experience 1750-1800*, ed. Catherine E. Hutchins (Winterthur: Henry Francis du Pont Winterthur Museum, 1994), 99-127.

[17] John K. Alexander, "Poverty, Fear, and Continuity: An Analysis of the Poor in Late Eighteenth-Century Philadelphia," in *The Peoples of Philadelphia: A History of Ethnic Groups and Lower-Class Life, 1790-1940*, Allen F. Davis and Mark H. Haller, eds. (Philadelphia: Temple University Press, 1973), 17 ("Since Philadelphia was still a walking city, the least desirable housing areas were at a distance from the center of activity.").

[18] Watson, *Annals of Philadelphia*, I: 257 ("Had no turnpikes been made, roads would have become as claypits, by the continual increase of population and use.").

vehicles were on wheels and carried paying passengers along fixed routes within the city and its surrounds. Within twenty or thirty years, they were replaced by horsecars, which were similarly drawn by horses, but rather than wagon wheels, they were pulled along tracks built into the road like later streetcars. Omnibuses and horsecars presented a fairly expensive way to travel and were used primarily by the middling and upper classes of Philadelphia rather than its urban poor and laboring class. The first rail lines were built in the Philadelphia area in the 1830s, and the city subsequently became an important rail hub in the Mid-Atlantic region. The most significant developments in intra-city travel occurred well after the Founding period, and much closer to the mid- and late-nineteenth century when technology and demographic growth made urban mass transit both possible and necessary to Philadelphia.[19]

B.      **Philadelphia: Public Gathering Places**

As the leading city of the Founding-Era United States, the scale of public gathering places in Philadelphia diverged sharply from the norm throughout most of the country. Most Americans lived in exceedingly small, rural enclaves oriented around agriculture. In these rural areas of the colonial North America and the early United States, public gatherings were almost always outdoors. Regular church services were held indoors if the congregation had constructed a building, but even then, revivals and visits from preachers might draw large crowds in outdoor areas. The county courthouse was the center of public life, where men transacted business, recorded official documents, and sought legal redress for civil and criminal wrongs. On the days when court was in session, men and women from the surrounding countryside descended upon the small and otherwise deserted county seats. Court day was a time of festivity, entertainment, and fellowship with neighbors. Spectators and witnesses crowded into courtrooms, with others overflowing onto lawns. Livestock and other goods might be displayed for sale at court day, and the small taverns or "ordinaries" of the county seat became full to overflowing. On court days in rural areas, and more frequently in the seaside commercial centers, other activities were likely to

---

[19] On transportation development in Philadelphia, see Annals, I: 37-39, 211-219; II: 465-470; Charles W. Cheape, *Moving the Masses: Urban Public Transit in New York, Boston, and Philadelphia, 1880-1912* (Cambridge: Harvard University Press, 1980), 157-159; John Hepp, "Public Transportation," *Encyclopedia of Greater Philadelphia* (2013), https://philadelphiaencyclopedia.org/essays/public-transportation/ ; John Hepp, "Omnibuses," *Encyclopedia of Greater Philadelphia* (2012), https://philadelphiaencyclopedia.org/essays/omnibuses/ .

take place, such as brawling, cockfighting, horse racing, and all manner of gambling. Court days were primarily about the carrying out of government business, but the rituals of the event also reinforced shared values and social connections among neighbors.[20]

Large cities like Philadelphia diverged from this pattern. Philadelphia was constantly bustling, and its justice system was active in its policing of residents and visitors alike. Still, most of the public gathering places in early modern Philadelphia were open-air, outdoor spaces. As previously described, High Street near the banks of the Delaware was the beating heart of the city as home to government buildings and the main public market. Residents, visitors, immigrants, and all manner of other travelers walked up and down the nearby wharves and docks, along the intersecting streets, and through the numerous alleyways. Residents likely visited the marketplace several times per week, if not every day, in order to purchase fresh foodstuffs for their households. The commerce along the waterfront generated the wealth that made life in Philadelphia possible, and indirectly propped up other industries, like construction and other skilled trades. The original plan of the city called for five symmetrical squares to serve as parks and public gathering places, but Centre Square at the intersection of Broad and Market Streets was used for a water works facility during the very early 1800s and subsequently became the site of City Hall later in the nineteenth century.

Aside from the older courthouse at High and Second Streets, Philadelphia boasted additional public buildings. As the city expanded in the late 1700s, a new county courthouse and city hall were constructed about six blocks west of the riverfront and just a block south of High Street. The structures straddled the Pennsylvania State House and were temporarily home to the United States Congress and Supreme Court during the early republic period. Continued growth forced Philadelphians to construct yet another city hall in the nineteenth century. That one still

---

[20] On Court Day and other occasions in rural communities, see Rhys Isaac, *The Transformation of Virginia, 1740-1790* (Chapel Hill: University of North Carolina Press, 1982), 88-114; Robert M. Ireland, *Little Kingdoms: The Counties of Kentucky, 1850-1891* (Lexington: University Press of Kentucky, 1977), 90-100; A. G. Roeber, "Authority, Law, and Custom: The Rituals of Court Day in Tidewater, Virginia, 1720 to 1750," *The William and Mary Quarterly* 37, no. 1 (January 1980), 29-52; E. Lee Shepherd, " 'This Being Court Day': Courthouses and Community Life in Rural Virginia," *The Virginia Magazine of History and Biography* 103, no. 4 (October 1995), 459-470; Carl Lounsbury, *The Courthouses of Early Virginia: An Architectural History* (Charlottesville: University of Virginia Press, 2005).

stands in Centre Square, several blocks west of the previous site. Philadelphia's iconic City Hall was constructed over a thirty-year period beginning in the 1870s.[21]

As the capital of Pennsylvania, Philadelphia of the eighteenth century became home to the public buildings of state government. The State House, now known as Independence Hall, held chambers and courtrooms for various courts and housed the Legislative Assembly. It was completed in 1735 and was the meeting place of the Second Continental Congress. The main building was flanked by others, creating a government campus unparalleled until the development of the nation's permanent capital in Washington, D.C. The State House complex temporarily housed the national government, including the United States Congress, during the period when Philadelphia served as a national capital.[22] The State House building itself was 40' x 100', with the ground-floor chambers measuring 40' x 40' and separated by a hallway 20' wide. Upstairs was designed for public gatherings, with a long hallway measuring 20' x 100' providing access to five separate rooms.[23] The square surrounding the buildings was an outdoor gathering place for residents and demonstrators, and the site was an important one for civic activities. Some of the rooms were rentable and usable for different functions—for instance, the Library Company and Philosophical Society rented space there prior to completing their own buildings.[24] A large building for its time, the interior of the State House was a space for civic engagement and government functions, and its exterior was a site for large gatherings.

Some of the largest buildings in Founding-era Philadelphia were the well-established churches near the Delaware River. Christ Church is one of the more famous, and was one of the largest churches and tallest structures in the early United States. The building measured 61' x 118'

---

[21] On the Old Philadelphia County Courthouse (Congress Hall) and Old City Hall (Old Supreme Court), see James D. Kornwolf, *Architecture and Town Planning in Colonial North America*, 3 vols. (Baltimore: Johns Hopkins University Press, 2002), II: 1172-1173 (map and legend), 1179-1182.

[22] On the history of the State House, see Edward M. Riley, "The Independence Hall Group," *Historic Philadelphia from the Founding until the Early Nineteenth Century: Papers Dealing with its People and Buildings, with an Illustrative Map* (Philadelphia: American Philosophical Society, 1953, repr. 1973), 7-42. See also Kornwolf, *Architecture*, III: 1420.

[23] Kornwolf, *Architecture*, II: 1181.

[24] Charlene Mires, "Independence Hall," *Encyclopedia of Greater Philadelphia* (2012), https://philadelphiaencyclopedia.org/essays/independence-hall/ .

and its sanctuary may have accommodated 1,000 worshippers.[25] Still, those dimensions would not be considered particularly large by today's standards, when megachurches can host upwards of 2,000 people per service in stadium seating. The structure of St. Patrick's Cathedral in New York City, constructed more than a century after Christ Church, measures 334' long and upwards of 100' wide at the transepts. Other churches, including the Quaker meeting house, peppered the city and provided opportunity for Philadelphians to worship in accordance with their own consciences. Still, the church-to-population ratio (1 : 2,200) indicates that a substantial portion of Philadelphia's residents did not attend regular church services.[26]

Another class of large buildings in eighteenth-century Philadelphia were private homes. These were certainly not public spaces, although it was not uncommon for the owners of large houses to allow them to be used for public functions at times. For example, the Maryland colonial assembly met in private residences during the seventeenth century, and even purchased one for permanent use as an assembly hall. When the assembly was not in session, the building was let out to innkeepers and functioned as an "ordinary."[27] Philadelphia's mansions undoubtedly hosted balls, parties, weddings, and feasts that brought together dozens or hundreds of guests.

By the mid and late eighteenth century, Philadelphia was home to several large buildings that served various social functions. One of the largest meeting halls in the city during the eighteenth century was Carpenter's Hall, the official headquarters of the carpenter's guild. Today, the first floor is one open room beyond a small entry hall and stairwell. The building's dimensions indicate approximately 2,400 square feet in this room, which can accommodate 125 guests standing and 82 guests seated at dinner tables.[28] But the space was originally divided into two identically sized rooms on either side of a central hallway, effectively cutting the usable square footage by half or more.[29] The first Continental Congress met in one of the first-floor rooms in

---

[25] For dimensions of the building, see Kornwolf, *Architecture*, II: 1193. The figure of 1,000 worshippers is an estimate.

[26] Bridenbaugh and Bridenbaugh, *Rebels and Gentlemen*, 18.

[27] Wesley R. Willoughby, "Community, Identity, and Public Spaces: The Calvert House as the First State House of Maryland," in *Unearthing St. Mary's City: Fifty Years of Archaeology at Maryland's First Capital*, Henry M. Miller and Travis G. Parno, eds. (Tallahassee: University Press of Florida, 2021), 151.

[28] The dimensions of the structure are two wings of 30' x 20', plus a central area of 30' x 40'. For its current rental capacity, see https://www.carpentershall.org/hall-rental.

[29] On Carpenter's Hall, see Kornwolf, *Architecture*, II: 1187-1188.

1774. The First Bank of the United States rented the space prior to the completion of its building (nearby) in 1797.[30] The upstairs rooms could also be let out, and the Library Company used some of that space prior to the completion of its building in 1791.

The Library Company began as an association of rationalist, scientific thinkers intent upon promoting scientific innovation and discovery in what was one of the largest and most significant cities within the British Empire. The members collected books that could be read and enjoyed by subscribers. They collected thousands of titles during the eighteenth century, and rented space in various buildings before raising the necessary funds to construct their own in 1791. The Library Company collection was open to its members—who were mostly men of education and status in Philadelphia. The Library Company building contained a lecture hall to provide educational opportunities to Philadelphians. The company itself was private, and the benefits of assembly and association within its walls were reserved to members of the middle and upper classes, if not members of the organization itself.[31]

Eighteenth-century Philadelphia also had a sizeable hospital and prison. These buildings certainly brought residents together, but under unfortunate circumstances. Almshouses provided some shelter to the poor and tended to be significant structures within the city. They can hardly be interpreted as sites of public gathering and assembly. The College of Philadelphia, also known as Franklin Academy and subsequently renamed the University of Pennsylvania, was established in the eighteenth century. Its initial building measured 70' x 100' and had been built as an assembly hall in the aftermath of the First Great Awakening. A dormitory was also constructed for the students.[32]

The strong Quaker presence in Philadelphia stymied the growth of the theater there during much of the colonial period. The earliest theaters were built outside the city limits to avoid laws

---

[30] A member of the Carpenter's Company guild was involved in a bank robbery during the time that the First BUS was renting the space. On the Bank of the United States building in Philadelphia, see Kornwolf, *Architecture*, III: 1423-1424.

[31] On the Library Company see George F. Frick, "The Library Company of Philadelphia: America's First Philosophical Society," in Catherine E. Hutchins, ed., *Shaping a National Culture: The Philadelphia Experience, 1750-1800* (Winterthur: Henry Francis du Pont Winterthur Museum, 1994), 181-200. See also Kenneth Finkel, "Library Company of Philadelphia," *Encyclopedia of Greater Philadelphia* (2017), https://philadelphiaencyclopedia.org/essays/library-company-of-philadelphia/ (estimates that 1/10 of city households were members).

[32] Kornwolf, *Architecture*, II: 1183-1189.

prohibiting performances.[33] Even though plays were considered low-brow entertainment and a wasteful way to spend one's money, American audiences of the eighteenth century behaved better than their counterparts in the urban centers of the United Kingdom. London audiences were notorious for rioting, but only one such theater-driven riot occurred during the colonial era.[34] In 1791, Thomas Wignell opened the Chestnut Street Theater, which stood near the State House (Independence Hall) and became the preeminent venue for plays and performances until the structure burned down in 1820. The theater could seat about 1,100 people and fit approximately 2,000 when the pit was full. Elites rented the boxes on the two lower levels but avoided the top tier of boxes, which "was a notorious meeting place for prostitutes and ruffians."[35] Despite that, the theater had become by the late eighteenth and early nineteenth century an important social space for Philadelphians to "see and be seen."[36]

A critically important social space in Philadelphia was the tavern. The city was home to dozens of taverns or ordinaries—places where visitors could stay the night, and where residents could meet for a drink. As many as a few dozen men gathered in the barroom of a tavern (depending upon the size of the structure) to exchange ideas and hear the latest news. Tavern culture has been associated with the democratic spirit and the Revolution itself.[37] Downstairs at a tavern were rooms that clubs and societies could rent for parties and special occasions. One of Philadelphia's largest taverns, the Indian King, was three stories tall and had five such rooms on the ground floor; two of them could be joined with adjacent rooms to form larger spaces that could

---

[33] Odai Johnson and William J. Burling, *The Colonial American Stage, 1665-1774: A Documentary Calendar* (Madison: Fairleigh Dickinson University Press, 2001), 54, 73-78. See also Irvin R. Glazer, *Philadelphia Theatres, A-Z: A Comprehensive Descriptive Record of 813 Theatres Constructed since 1724* (New York: Greenwood Press, 1986), 3.

[34] That riot occurred in New York in 1776. See Johnson and Burling, *Colonial American Stage*, 87-88.

[35] Calvin Lee Printer, "William Warren's Management of the Chestnut Street Theatre Company," Ph.D. diss. (University of Illinois, 1964), 23-24.

[36] Printer, "William Warren's Management of the Chestnut Street Theatre Company," 24-25, quotation at 25.

[37] Peter Thompson, *Rum Punch and Revolution: Taverngoing and Public Life in Eighteenth-Century Philadelphia* (Philadelphia: University of Pennsylvania Press, 1999); David W. Conroy, *In Public Houses: Drink and the Revolution of Authority in Colonial Massachusetts* (Chapel Hill: University of North Carolina Press, 2018).

host up to one hundred people.[38] The remaining two floors held eighteen guest rooms, at least some of which would have bunked two or more men together. The building itself measured 40' x 21', so the space must have been fairly crowded during the times when the larger event rooms were rented out.[39]

Though the city council and other government bodies with authority over Philadelphia did not enact weapon-specific regulations for these places of public assembly, city leaders were certainly aware of and sensitive to potentially unruly gatherings there. The city government considered enacting an ordinance in 1732 to put a stop to the large gatherings of children, servants, and slaves that caused a nuisance to other residents by making noise, swearing, etc.[40] The problem persisted, with numerous complaints "that many disorderly persons meet every [evening] about the Court house of this city, and great numbers of Negroes and others sit there with milk pails, and other things, late at night, and many disorders are there committed against the peace and good government of this City." In 1741 the city government issued an ordinance requiring the dispersal of people from the vicinity of the courthouse, marketplace, and public buildings (most of which were located near Second and High Streets at that time). Constables were charged with enforcing the rule and bringing violators before a magistrate.[41] In 1743, the government enacted an ordinance providing for the construction and manning of chains blocking carriage and cart access to High Street on market days. The leaders considered "the great danger the Inhabitants of this city are in by means of Carts and Carriages driving thro' the streets at the Market Place on Market Days," and intended "to prevent the mischief that may Ensue."[42] Philadelphia militia laws prohibited militia members from meeting on muster[43] days at taverns, ostensibly for fear that they would

---

[38] Thompson, *Rum Punch and Revolution*, 86-88, 59 ("Four of these rooms could be converted to form two even larger rooms capable of seating up to a hundred 'gentlemen'.").

[39] Thompson, *Rum Punch and Revolution*, 59.

[40] Annals of Philadelphia, I: 62. At this time it remains unclear whether that ordinance was passed. Volume I of *Annals of Philadelphia* contains some selectively excerpted minutes from city council meetings, and an update on the status of this ordinance was not included.

[41] Watson, *Annals of Philadelphia*, I: 62-63.

[42] Watson, *Annals of Philadelphia*, I: 63.

[43] Militia muster was an important occasion when militia members gathered together for drill and presentation of their weapons. Militia laws generally prescribed when and where musters should take place.

become inebriated and fail to perform their duties.[44] There was also a consideration to close tavern barrooms on Sundays "as it would prevent youth from committing excesses to their own ruin, the injury of their masters, and the affliction of their parents and friends."[45] In response to an audience at the Chestnut Street Theater turning into a mob, theater management hired constables to "rigidly enforce decorum" in future.[46]

At times, armed men caused problems in Philadelphia's public spaces. Watch houses and lamps were constructed to provide the necessary infrastructure for policing the public square and protecting the peace. The constables employed by the government, in addition to the residents drafted into night watch service, were the first line of defense against such disturbances. One of the colony's early leaders, John Evans, skeptical of the Quaker commitment to pacifism, woke residents of the city one morning in 1686 "with sword drawn" and sounding the alarm for an imminent attack. The Quaker residents stood steadfast in their principles, and John Evans's political career came to a swift end over the ugly joke.[47] William Penn's eldest son, John, became embroiled in conflict over an affray outside a tavern in 1704, and the debacle prompted his permanent departure from colonial leadership. The younger Penn argued with members of the night watch about local politics and the formation of a militia, when the encounter turned into a brawl. At some point, he called on his friends to draw their pistols but was given a "severe beating" after the street light was put out. A grand jury heard evidence about the fracas, which ended John Penn's career in Pennsylvania even though the case was dropped.[48] In 1716, a man "armed with pistols" attacked the Speaker of the House of the colonial assembly and was indicted. The failure to prosecute and punish him cased "great dissatisfaction" to other members of the Assembly.[49]

---

[44] 1793 Pa. ch. 1696, "An Act for the regulation of the militia of the Commonwealth of Pennsylvania," Sec. XXIV, § 17, 473 ("No company or regiment shall meet at tavern on any of the days of exercise, nor shall march to any tavern before they are discharged, and any person who shall bring any kind of spirituous liquors to such place of training, shall forfeit such liquors, so brought, for the use of the poor belonging to the ward, district or township where such offender lives.").

[45] Watson, *Annals of Philadelphia*, I: 101.

[46] Printer, "William Warren's Management of the Chestnut Street Theatre Company," 27-28, quotation at 28. It is unclear which building the Chestnut Street Theater Company occupied at this time. The theater burned in 1820 and reopened in 1822. This riot may have occurred at a different, likely smaller theater.

[47] Watson, *Annals of Philadelphia*, I: 26.

[48] Watson, *Annals of Philadelphia*, I: 114-115.

[49] Watson, *Annals of Philadelphia*, I: 97.

17

By the Civil War Era, the carrying of concealed weapons was more common than it had been in the eighteenth century, and pocket-sized pistols were more readily available to consumers. This posed a special problem in Philadelphia, where a sizeable population and the potential for riotous assemblies made weapon-carrying a serious concern. As early as 1850, persons found carrying deadly weapons at any riotous gathering were "deemed guilty of an intention to riot, whether said fire-arms, or deadly weapon, shall be used or not . . . ."[50] State lawmakers subsequently punished the carrying of "any fire-arms, slung-shot, other deadly weapon concealed upon his person" in Philadelphia, "with the intent therewith unlawfully and maliciously to do injury to any other person."[51] In 1881, when a US president had been shot by an armed assassin and concealable revolvers were readily available at cheap prices, the mayor of Philadelphia issued a proclamation reiterating the city's public carry restrictions.[52]

Even though Philadelphia was one of the largest cities in the early United States and featured some of the largest public buildings, its main gathering places were outdoors. The docks, streets, markets, and public squares were the arteries of transit and commerce for residents, and the lifeblood of the city. The scale of urban life in Philadelphia sheds light upon the longstanding Statute of Northampton, enforced in England, its overseas empire, and even in the United States. It generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere."[53] The lawns, streets, and marketplaces of Philadelphia were the very spaces which that longstanding rule was designed to protect. These features of village, town, and urban life were notably missing from the demographic and architectural development of the plantation South and the rural backcountry, where farm families lived miles away from one another and public buildings were generally empty outside of scheduled court days.

## C.    Application of Public Carry Laws To Travelers And Transportation

Americans of the late-eighteenth and nineteenth centuries had regulations that restricted the presence of weapons in public spaces, including those related to transportation services. Some

---

[50] John Purdon and Frederick C. Brightly, *Digest of the Laws of Pennsylvania* (Philadelphia: Kay & Brother, 1862), 181. The prohibition against carrying concealed weapons in Philadelphia was enacted in May 1850 (see 181 n. 1).
[51] Idem.
[52] Charles, *Armed in America*, 163-165.
[53] 2 Edw. 3, c. 3 (1328) (Eng.); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other . . . shall be judged Treason.").

of these statutes drew heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[54] The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, which formed the heart of community life. This tradition was absorbed into American law, where numerous colonies and states put in place similar measures that called for a weapon-free public square.[55] Under this regulatory system, no one was permitted to carry arms into public areas without having a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety.[56]

---

[54] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.

[55] A non-exhaustive list includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace."); 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (… "nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth,"); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("…nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure,"); See also 1821 Me. Laws 285, ch. 76, § 1 (simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State,").

[56] The peace bond was one of many processes inspired by the common law heritage that formed the basis of the "localized" law that characterized public life in early America. On "localized" law, see Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 3-10. On peace bonds more generally, see Edwards, *The People and Their Peace*, 73-74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39,

19

Another type of public carry law that restricted the presence of weapons in public spaces, including those related to transportation services, took the form of concealed carry laws. States and municipalities enacted regulations like these primarily during the nineteenth century, beginning around the turn of that century. An early example incorporated the policy alongside language drawn from the Statute of Northampton: "That if any person or persons shall publicly ride or go armed to the terror of the people[57], or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to

---

no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[57] Early language for these laws, such as this one quoted from Tennessee, often made use of the phrase "to the terror of the people," which was itself an inheritance from the Statute of Northampton. Historical research by trained scholars has shown that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," *Southern Illinois University Law Journal* 43 (2018), 65 ("Those who take a textual approach to interpreting the Statute of Northampton…argue that carrying weapons in populated public places was intrinsically terrifying and that the discussion of public terror in judicial opinions and legal treatises was an explanation for the prohibition, rather than a separate element of the crime."); Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (June 2016), 381-382 ("But those that subscribe to the Standard Model view of the Second Amendment proclaim the Statute of Northampton can only be read as applying to the 'carrying arms in ways that caused public terror.' In making this claim, Standard Model writers have never provided sufficient evidence, at least in total historical context, to support it."); see also Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2022, forthcoming), draft pp.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'strikeh a feare.' ") [draft available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490]

jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law."[58] The approach of prohibiting the carrying of concealed weapons spread rapidly, including in slaveholding states and those removed from the Atlantic coast.[59]

As the nineteenth century wore on, concealed carry laws became more likely to mandate a criminal penalty (often a fine) rather than the surety mechanism, and they also tended to provide a number of exceptions ranging from people fearing an imminent and deadly attack, peace officers, and travelers. These statutes varied from one state to another, though many left the definition of terms like "travel" and "journey" quite ambiguous. In Texas, even exempted travelers were required to place their weapons in their baggage, which did not include saddlebags.[60]

Far from a blanket exception for people to go armed at all times outside their homes, the travel exception was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections

---

[58] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820 (Vol. I, 1821), 710. Available at the Duke Center for Firearms Law, Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/

[59] A short list of examples includes: 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 ("Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars…").

[60] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals. A Tennessee decision rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties."[61] The court's final word was that "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."[62] A Texas court addressing this question in 1880 stated that: "He was not a traveler. He resided in Williamson county, and was merely going from his residence to the county site of said county, a distance of about eighteen miles, intending to return the next day. These facts certainly did not constitute him a traveler, within the common meaning of that word, and within the spirit of the statute."[63]

Wearing one's weapons in an unfamiliar town or city could fall within the travel exception so long as such carriage was limited to merely passing through the area or conducting one's business. A case from 1879 held that:

> The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed.[64]

An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of road, instructed the jury that "if they further believed, from all the evidence

---

[61] *Smith v. State*, 50 Tenn. 511 (1872).
[62] *Smith v. State*, 50 Tenn. 511 (1872).
[63] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880). See also Shepherd, "Who Is the Arkansas Traveler," 466-482.
[64] *Carr v. State*, 34 Ark. 448 (1879).

in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."[65]

Judges recognized that terms like "travel" and "journey" needed to be interpreted in light of a defendant's particular circumstances and behaviors. According to an Arkansas court, "The jury, or court sitting as such, can best judge of all the circumstances, and determine whether the spirit of the law has been violated. No rule with regard to this can be formulated. The intent governs, and the question of fact is, was the defendant really prosecuting his journey, only stopping for a temporary purpose; or had he stopped to stay awhile, mingling generally with the citizens, either for business or pleasure."[66] A contemporary Tennessee court emphasized legislative intent by saying "It is true, the Legislature has not undertaken to define a journey, or to say whether it shall be a long or short one, but has left the courts to interpret it in the light of good sense, and with regard to the spirit and intent of the statute itself, with the positive injunction in the fourth section of the Act that the courts shall give it a liberal construction so as to carry out its true intent and meaning"—which was to reduce the needless carrying of weapons in public.[67]

An illustrative travel-related case arose in Texas in 1889. A man was convicted of violating the state's public carry law (which prohibited openly borne as well as concealed deadly weapons) by carrying a pistol on his travels to a distant town and keeping it on his person while he visited various establishments there. When he appealed his conviction on the ground that he was a traveler in an unfamiliar city, the appellate court disagreed. He had the right to carry the pistol on the road, in the wagon yard upon his arrival in town, and within the town "for a legitimate purpose, such as to procure a conveyance, or provisions, or to transact other business connected with the prosecution of his journey."[68] But that protection ceased when his purpose changed from business

---

[65] *Eslava v. State*, 49 Ala. 355 (1873).

[66] *Carr v. State*, 34 Ark. 448 (1879).

[67] *Smith v. State*, 50 Tenn. 511 (1872), "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."

[68] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

23

to leisure—it did not confer upon him a right to "idly stroll through its streets and visit its gambling dens and saloons and public places, armed with a pistol."[69] To do otherwise would "cause our cities and towns to be infested with armed men, while the citizens of such places would be prohibited from carrying arms to protect themselves from these privileged characters."[70] The judge's statement suggests that Texas courts did not understand townspeople and locals going about their everyday lives to fall within the statute's traveler exemption.

Public carry laws in force during the nineteenth century, whether they were modeled after the Statute of Northampton or took the form of concealed weapon statutes, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by appellate courts and referred to long-distance travel. The evidence clearly demonstrates that the travel exception did not apply to (and was not intended to apply to) commuting within a city or metro area like that which occurs aboard modern public transit services.

### D. Transportation Providers as Private Companies

Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers. Thus, even if a person deemed a "traveler" upon a "journey" according to law chose to make use of the travel exception by carrying a weapon aboard a train, such carriage would have been subject to any rules laid out by the private transportation company in question. Private companies would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations.

By the time railroads began spreading across the United States in the mid-nineteenth century, Americans had entered into a new era of violence and weapon-carrying. The nineteenth century marked the divergence of the United States from the rest of the western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with skepticism, violence tended to rise. The southern society predicated upon racial slavery made slaveholding states more

---

[69] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).
[70] *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

violent places than northern counterparts. Areas that were isolated from governing officials or on the fringe of Anglo-American settlement also experienced more violence than the well-established parts of the country closer to the Atlantic seaboard.[71] After the Civil War, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[72]

The expansion of America's rail system during this period of rising violence reasonably suggests that railroad companies might have had policies—written or unwritten, preserved or lost—that affected passengers' access to firearms and deadly weapons while aboard. A nineteenth century jury instruction manual contained a section for "Rules and Regulations of Carrier," which specifically stated that "a railroad company has a right to require of its passengers the observance of all reasonable rules, calculated to insure the comfort, convenience, good order and behavior of all persons on the train, and to secure the proper conduct of its business; and if a passenger wantonly disregards any such reasonable rule, the obligation to carry him farther ceases, and the company may expel him from the train at any regular station, using no more force than may be necessary for that purpose."[73] The North Pennsylvania Railroad's "rules and regulations" document for conductors specifically charged passenger conductors with the responsibility of preventing passengers from taking "into the cars guns, dogs, valises, large bundles or baskets."[74]

---

[71] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 17-26.

[72] On homicide in American history, particularly as broken down into northern and southern regions, see Roth, *American Homicide*, 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[73] Albert W. Brickwood, *Brickwood's Sackett on Instructions to Juries*, 3 vols., 3d. ed. (Chicago: Callaghan & Company, 1908), II: 1174-1175 (Sec 1819, "Right to Prescribe Rules").

[74] "Rules and Regulations for Running the Trains on the North Pennsylvania Railroad, adopted June 1, 1875, and approved by the president" (Philadelphia, 1875), 13.

Extant records for rail companies indicate that regulating the carriage of guns on board was not uncommon. Several companies, including Union Pacific and Central Pacific, North Pennsylvania Railroad, South Carolina Canal and Rail Road Company, International and Great Northern Railroad Company, and Albany Railway had specific gun-carriage policies during the nineteenth century.[75] Some rail companies shipped firearms for hunters but treated them like any other baggage—by separating them from the passengers and placing them in a designated baggage space.[76] But another company prohibited the practice ostensibly out of concern that they would be held liable for lost, damaged, or stolen firearms. In the relevant caselaw, "Courts generally deemed guns baggage when they determined that the weapons were 'necessary' to the object of a trip or 'usual' among similarly situated travelers."[77] Depending upon the size and traffic of the line, some rail cars also had space for passengers to carry their own bags and stow them under their seats or by their feet, particularly if those bags were relatively small. In the event that it was legal and permissible by company policy for a passenger to transport a firearm or other deadly weapon, stowing it away in closed baggage was altogether different from carrying in one's pocket or waistband (which was de facto a violation of the law in many American jurisdictions, as previously described).

As American rail infrastructure grew, the new challenges posed by rail travel—particularly the prospect of criminal activity taking place in transit—became more apparent. Conductors were considered the authority figures on trains and streetcars, and some states vested them with the same powers as policemen. In the 1880s, the Georgia legislature declared that "The conductors of a train carrying passengers are invested with all the powers duties, and responsibilities of police officers while on duty on their trains,"[78] and decided a decade later that "the conductors, motormen, and drivers of street railroad cars are invested with all the powers, duties, and responsibilities of police

---

[75] Josh Hochman, "The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation," *Yale Law Journal* 133, forthcoming (Draft Copy, July 27, 2023), 11-18, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4522818.

[76] In his detailed description of American rail baggage service, Marshall Monroe Kirkman wrote: "Who has not felt a tremor of apprehension as he saw his baggage melt away into the indiscriminate mass of trunks, band boxes, gripsacks, gunbags, umbrellas, burial cases, canaries and bundles that fill the station?" Kirkman, *The Science of Railways, Revised and Enlarged Edition* (New York: The World Railway Publishing Co., 1898), 389.

[77] Hochman, "Second Amendment on Board," 19-20.

[78] John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, *Code of the State of Georgia* (Atlanta: Foote & Davies Co., 1895), 230 (sec. 902).

officers while on duty on their trains or cars, and while on duty at the termini of their lines."[79]
Included within this power of conductors to police aboard their trains was a responsibility to
enforce weapon regulations in effect at the time. As a result of this status, which was in some ways
analogous to that of peace officers exempted from certain weapon regulations, conductors were
sometimes armed on the job and expected to prevent disorderly behavior aboard trains.[80] Still,
there was not a hard-and-fast rule about it, and public sentiment did not necessarily support the
carrying of firearms by conductors aboard their trains or cars.[81] There is no evidence that unarmed
conductors justified preemptive arming by passengers.

Another approach to policing railways was to authorize rail companies to employ their own
police forces. Statutes in Ohio and Pennsylvania from the 1860s show the legislatures of those
states setting out parameters in which designated rail police could "possess and exercise all the
powers, and be subject to all the liabilities of policemen of cities… ."[82] This approach was not at
all unusual at the time, which was one in which powerful corporations engaged in industries as
disparate as manufacturing and cattle ranching turned to private detectives and private police for
assistance in defending company interests against labor organizers and marketplace competitors.

---

[79] "Conferring Police Powers on Conductors, etc., of Street Railroads," Georgia - General
Assembly, Acts and Resolutions (1890-1891), 230-231.

[80] For example, a Los Angeles trolley conductor carried a pistol in 1908; see "Attempts to Rob Car
and Is Killed," *San Francisco Chronicle* (San Francisco, CA), January 12, 1908, 33.

[81] For example, in 1902, an Atlanta trolley car conductor was arrested for drawing a loaded pistol
on a passenger whom he had antagonized; news coverage of the incident stated: "The feature of
the investigation was that the conductor was on a trolley car crowded with women as well as men,
and was armed with a loaded revolver…It was a revelation to many that among the other
paraphernalia of a street car conductor a loaded revolver was carried. They had seen bell punches,
transfers, etc. but never before a pistol. It is said that McKinney [the conductor who had been
arrested] is not the only street car conductor who is in the habit of going thus armed, and within
the past six months pistols have been used more than once by street car men." See "Conductor Is
Bound Over," *The Atlanta Constitution* (Atlanta, GA), May 17, 1902, 7. It is also worth noting
that public sentiment as expressed in newspapers did not support passengers' carrying of weapons
aboard transit services—be the conductor armed or not.

[82] Joseph R. Swan and Milton Sayler, "Policemen for Railroads, An act to authorize the
employment of a police force by railroad companies," *Supplement to the Revised Statutes of the
State of Ohio, Embracing All Laws of a General Nature, Passed since the Publication of Swan and
Critchfield's Revised Statutes, 1860* (Cincinnati, R. Clarke & Co., 1868), 121-122. See also "No.
228, An Act Empowering railroad companies to employ police forces," *Laws of the General
Assembly of the State of Pennsylvania, passed at the session of 1865* (Harrisburg: Singerly &
Myers, State Printers, 1865), 225-226.

That legislatures made special arrangements for authorizing railway police and holding them accountable only underscores the significance of protecting the peace and safety of passengers in transit.

By the early twentieth century, large railway companies had sizeable departments overseeing their railway special agents. The Union Pacific Railroad (UPRR) maintained records pertaining to the firearms owned by the company, most of which were pistols assigned for use to specified employees. At periodic intervals, the supervisors of the special agents' division undertook inventories of company-owned firearms. Extant records from the early 1930s show that some of the firearms held in the company gun locker were classified as "confiscated guns," presumably confiscated from passengers carrying them illegally.[83] The UPRR special agents and rail watchmen were expected to be on the lookout for passengers carrying guns; correspondence from the Federal Bureau of Investigation from 1950 shows the FBI requesting the assistance of all law enforcement agencies, including the UPRR special agents, in tracking down the carriers of certain guns that had been used in the commission of crimes.[84]

### E. Localism and Lack of Extant Sources.

#### 1. Transportation Companies

The fact that transportation companies had the authority to establish and enforce safety regulations aboard their vehicles highlights the lack of extant sources documenting their internal ridership policies. As mentioned in the preceding section, some researchers have undertaken an exploration of the employee handbooks and other available materials pertaining to railway companies. These efforts have borne some fruit, but such records are no longer extant for most historical transportation service providers.

Although there are numerous archives, libraries, and research centers across the United States that hold collections pertaining to transportation history and the corporate records of transit companies, my brief exploration of their finding aids indicates that most of these records are from 1900 or later.[85] The availability of records from the twentieth century rather than the nineteenth

---

[83] "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

[84] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

[85] https://guides.loc.gov/railroads/association-research-collections

aligns with the development of more modern business practices and the stabilization of the rail industry after the tumultuous decades of the Gilded Age. The stock manipulations, corruption, and overbuilding that characterized the rail industry from the 1860s through the end of the century led to companies selling out to competitors and going into receivership; when these events took place, records related to assets and finances would have been more likely to be retained than others. As time wore on, companies did not necessarily choose to keep their older records, and those that did sought out archival institutions to take on the responsibility of organizing and maintaining them.[86] In other words, nineteenth-century rail records are much more rare than twentieth century ones, and they are not particularly likely to contain company ridership policies.

The UPRR records previously cited illustrate some of the difficulties in relying upon extant corporate records to ascertain company gun policies. Even though it is one of the oldest, largest, and most influential rail companies in American history, the UPRR special services records for firearms only date back to 1931; the models of guns which the company owned demonstrates that company officials purchased much of the corporate arsenal prior to that time, yet no information pertaining to it has been retained in the "Firearms Records" segment of the collection.[87] More than that, correspondence held within the "Firearms Records" makes reference to a company "Rules" document for employees who carried firearms on the job, yet the rules themselves have not been preserved within the collection. We know that one of those rules was that employees could not carry chambered rounds in their firearms, but the only reason we know of it is because an employee carried a chambered round and accidentally shot himself—prompting a reiteration of that particular requirement from the senior management over the special agents.[88] The other rules for

---

[86] For example, the robust collections of business records held by the Newberry Library in Chicago, Illinois were donated by the companies, thus relieving them of the expense of storing and caring for them. Similarly, the archival records of the Winchester Repeating Arms Company were donated to the McCracken Research Library at the Buffalo Bill Center of the West even though the company had previously employed a historian, operated a museum, and maintained its own historical records through the mid-twentieth century. Not all companies chose to preserve or donate their historical records.

[87] Company firearms tended to be revolvers chambered for the .38 special cartridge, which was first manufactured in 1898 and became quite common among law enforcement agencies by about the 1920s. "Firearms Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

[88] "Firearms Records," MS 54, Box 3, Folder 3, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

armed employees remain a matter of speculation because the company archives housed at the California State Railroad Museum contain no reference to them. Instead, the extant records remain heavily focused upon tracking company assets and implementing policies that might limit the company's liability for having an armed segment of its workforce.

## 2. Local Law Enforcement

Local legal records from the nineteenth century present similar challenges for the researcher. It is well-known that historical municipal ordinances and codes have not been digitized systematically as have state-level statutes and codes. But in addition to the significant barrier to online, digital research is the fact that many such records have not been preserved at all. America's larger cities may have archival materials related to codes and ordinances, but those are not necessarily complete (there may be gaps in the record). For the market towns and county seats that thrived in the nineteenth century but have since been relegated to the status of "small towns," ordinances may not have been officially preserved at all; instead, local newspapers published ordinances—but the papers themselves may not be digitized or the preserved copies may not constitute a complete collection. Our ability to know with certainty how municipalities regulated weapon-carrying, including aboard transportation services, is limited by the lack of systematic, comprehensive records.

As one moves back in time to the Founding Era and Early Republic period, the available legal sources become even more patchy. Statewide and colony-wide codes have been preserved, digitized, and searched. But local courts preserved the peace through the application of common law and local custom—and what little documentation they left is housed at courthouses and archives across the country. Local magistrates carried significant responsibility within early American communities in that they preserved the peace by adjudicating civil and criminal matters, in addition to carrying out administrative responsibilities related to infrastructure, taxation, and property conveyances. Their proximity to the people they judged and governed made them sensitive to local sentiment and encouraged them to abide by local, customary visions of what justice entailed rather than enforcing an abstract, monolithic law upon their communities. In these small communities, connected as they were by blood, kinship, and patronage, people knew one another as well as the justices of the peace. Lay justices, often lacking formal legal training, relied heavily upon magistrates' guidebooks and their acquired knowledge of common law as well as colonial/state law. The justice system which they oversaw enforced laws, including those

30

pertaining to carrying weapons, affray, riot, and other disturbances of the peace, in light of a person's reputation, connections, and established behaviors.[89] This "localized law" is as much a part of the American legal inheritance as statewide statute books, and was indeed more salient to the lives of Founding-Era Americans.[90] It cannot be accessed through digital databases of laws and cases, and much of its documentary record has been permanently lost.[91]

### 3. Legal History Methodology and Historiography

Legal historians maneuver around these gaps in the record by focusing upon the ways in which law shapes and is shaped by cultural, political, and economic forces. There are some details of legal procedure and some elements of local law enforcement that we simply cannot know with certainty, but applying what we do know about the time and place in question can help us reconstruct a historical legal culture that sheds light upon how the law and its development affected historical Americans.[92] Thus legal historians embed historical legal principles, concepts, and developments within their broader context in order to understand them.

Legal historians have long noted the complexity and nuance of the law as practiced and understood at previous periods in American history, and the ways in which historical notions of the law diverge not only from our modern practices, but also from our modern assumptions about the past. In his pivotal work *Law and the Conditions of Freedom in the Nineteenth-Century United*

---

[89] On the actions and responsibilities of colonial and early American justices of the peace, see Hendrik Hartog, "The Public Law of a County Court: Judicial Government in Eighteenth Century Massachusetts," *American Journal of Legal History* 20, no. 4 (October 1976), 282-329; David Thomas Konig, "Country Justice: The Rural Roots of Constitutionalism in Colonial Virginia," in *An Uncertain Tradition: Constitutionalism and the History of the South*, ed. by Kermit L. Hall and James W. Ely, Jr. (Athens: University of Georgia Press, 1989), 63-82; George L. Haskins, "Lay Judges: Magistrates and Justices in Early Massachusetts," in *Law in Colonial Massachusetts, 1630-1800*, ed. by Daniel R. Coquillette (Boston: The Colonial Society of Massachusetts; distributed by the University of Virginia Press, 1984), 39-56; Sung Yup Kim, " 'In a Summary Way, with Expedition and at a Small Expence': Justices of the Peace and Small Debt Litigation in Late Colonial New York," *American Journal of Legal History* 57, no. 1 (March 2017), 83-117.
[90] On "localized law," see Edwards, *The People and Their Peace*, 57-202, see esp. 57-63.
[91] On the dearth of day-to-day magistrates' records, see Konig, "Country Justice," 69-70 (Explaining that the extant colonial records from Virginia's lowest courts are order books which do not include denied motions and other information irrelevant to the final disposition of the case at hand. In other words, most records are lost forever and those that remain fail to capture substantial portions of the courts' day-to-day work.).
[92] Kunal M. Parker, "Writing Legal History Then and Now: A Brief Reflection," *American Journal of Legal History* 56, no. 1 (March 2016), 168-178, see esp. 176-178.

31

*States*, J. Willard Hurst discussed the misconception of early America as a champion of laissez-faire when in fact people were quite willing to embrace state action and police powers when they served a greater good.[93] Writing a generation later, Hendrik Hartog also emphasized the law's connection to the socio-political worlds which gave rise to it—and in doing so reinforced the importance of the local and the familial to the development of law in the historical United States.[94] Legal historians William J. Novak and Laura F. Edwards have focused even more purposefully upon uncovering and reconstructing the role of local government in shaping the politics, market economies, and lived experiences of Americans from the post-Revolutionary period and throughout the nineteenth century.[95] Novak's seminal work, *The People's Welfare*, used the expansive police power vested in nineteenth-century state and local law to demonstrate that Americans—far from lawless or stateless—lived within a powerful state that attempted to create a "well-regulated society."[96] Novak's influence upon the field of legal history has been profound, encouraging scholars to see law as "a tool of the state, an agent of its expansion, an articulation of its aims, not, as so many would have it, a limit on its power."[97]

The practice of legal history has long experienced tension between the "law and society" approach that dominates the field today versus an older formalism or "conservative tradition."[98] The formalist, also called "internalist," historians traced the origin and development of legal doctrines, explaining the functions served by particular doctrines and how they changed over time.

---

[93] J. Willard Hurst, *Law and the Conditions of Freedom in the Nineteenth-Century United States* (Madison: University of Wisconsin Press, 1956), 3-10.

[94] Hendrik Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997), 67-96; Hendrik Hartog, "Pigs and Positivism," *Wisconsin Law Review* no. 4 (1985), 899-936.

[95] William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (Chapel Hill: University of North Carolina Press, 1996); Edwards, *The People and Their Peace* (cited previously); Laura F. Edwards, *Only the Clothes on Her Back: Clothing and the Hidden History of Power in the Nineteenth-Century United States* (New York: Oxford University Press, 2022).

[96] Novak, *The People's Welfare* (cited above).

[97] *The Journal of American Legal History* published a roundtable about Novak's influence in 2017, coinciding with the twentieth anniversary of the publication of *The People's Welfare*. See *Journal of American Legal History* 57, no. 2 (June 2017), 223-255; quotation at 223-224.

[98] Morton J. Horwitz, "Review: The Conservative Tradition in the Writing of American Legal History," *Journal of American Legal History* 17, no. 3 (July 1973), 275-294.

Despite the focus upon impersonal principles of law and governance, "internalist" works are nonetheless bona fide works of history in that they explain change over time.

In many instances, the historical arguments mounted about the Second Amendment and gun regulation diverge not only from the "law and society" approach, but also from "internalist" doctrinal formalism. Instead, historical arguments about the Second Amendment and its implications upon current gun regulations proceed in an ahistorical way, mixing and matching laws and individual statements from wildly different time periods and circumstances without interpreting them in light of their proper context. Modern notions and descriptive categories are read backward into historical sources, transforming the historical record into something unrecognizable and completely unmoored from well-established conclusions about American history. The contours of this conflict have shaped the discussions of "law office history" that have been carried on in law reviews for many years now.[99]

Legal historians approach gaps in the historical record and an absence of spot-on analogous laws differently than do practitioners of "law office history." For legal historians, gaps can be filled through an examination of the socio-political milieu in which the law, behavior, or doctrine at hand became meaningful, and in light of what the record *can* support. For example, many states and territories which had public carry laws on their statute books do not have related caselaw from appellate courts delineating the contours of the right to bear arms within that particular jurisdiction. Practitioners of "law office history" may interpret that silence as a lack of relevant caselaw and therefore a lack of evidence of a historical tradition of regulation, while legal historians view it as evidence that a law was not frequently violated, not frequently prosecuted, or not widely understood as violative of constitutional rights. One's willingness to contextualize a law or policy within the broader socio-political history is highly dependent upon one's willingness to see social history as constitutive of law. For legal historians, an absence of spot-on analogues does not

---

[99] See Saul Cornell, "*Heller*, New Originalism, and Law Office History: Meet the New Boss, Same as the Old Boss," *UCLA Law Review* 56, no. 5 (June 2009), 1095-1126; David T. Hardy, "Lawyers, Historians and 'Law Office History'," *Cumberland Law Review* 46, no. 1 (2015), 1-32; Stephen Halbrook, "Analogical Reasoning and the Second Amendment," *The Volokh Conspiracy* (December 16, 2022), https://reason.com/volokh/2022/12/16/analogical-reasoning-and-the-second-amendment/ ; Saul Cornell, "Second Amendment Originalism and the Problem of Law Office History," *The Originalism Blog* (December 19, 2022), https://originalismblog.typepad.com/the-originalism-blog/2022/12/second-amendment-originalism-and-the-problem-of-law-office-historysaul-cornell.html .

necessarily indicate an historical rejection of analogous regulation, but could indicate a lack of need for such regulation. For instance, during the Founding Era, domestic violence was a cause of concern and redress through local courts; but domestic violence *by firearm* was not (at least in part because firearms were not conducive to such use in heated moments)—and the body of potentially analogous laws to current rules regarding perpetrators of domestic violence will necessarily reflect that fact. In a similar vein, interpersonal violence was a cause of concern during the nineteenth century, while such violence aboard intracity urban transportation may not have been; gun regulations targeted the perceived causes of interpersonal violence (particularly the carrying of concealable deadly weapons in public), and the broad acceptability of this approach indicates that similar restrictions specifically applicable to transportation spaces would likely have been supported and enacted had interpersonal violence aboard transit vehicles posed a serious danger to the public—or had Americans of that time believed their public carry laws to be inapplicable in transportation spaces.

### F.     Errors and Misinterpretations In Plaintiffs' Arguments.

For this report, I read documents submitted by Plaintiffs. At several points in the Complaint and Motion for Summary Judgment, there are errors and misconstructions that are not supported by the historical record.

At Complaint, p. 3: Plaintiffs argue that there was no Founding Era tradition of restricting armed travel. This assertion is predicated upon the idea that only statutes and ordinances may comprise the admissible historical record. Americans in the colonial era, Founding era, and in later decades still enforced the common law, which included the ability to prosecute weapon carriers and affrayers as disturbers of the peace. The Statute of Northampton was de facto in force in the British colonies, and some colonies/states reenacted it in statutory form. The discounting of more nuanced contextual evidence also fails to appreciate the local and often informal nature of legal proceedings in colonial and early American communities (see above Section E.2).

At Complaint, p. 3, and Motion, p. 10: To "travel" in an eighteenth-century context usually involved sleeping away from home (sometimes outside) for one or more nights and exposing oneself to predatory animals and highwaymen. Colonies and early states did not have the policing infrastructure that we do today—with highway patrol departments, sheriff's deputies, and city police departments overlapping one another in urban/suburban spaces and dotting the countryside

in rural zones. To travel then was altogether different from boarding a CTA bus or train in Chicago today (see above Section C).

At Complaint, p. 15: Plaintiffs argue that carrying weapons was common during the Founding Era on the basis that sometimes rules mandated it. The examples cited are mostly from the seventeenth century, when conflicts with neighboring Indian groups posed a serious threat to colonists. To take these unusual circumstances as indicative of the general attitude or behavior of Founding-Era Americans is to treat the whole period as one in which every segment of society was placed upon a war footing. To do so is to inaccurately interpret the statutes as well as the closing decade of the eighteenth century. The larger context of these laws—related to serious concerns about war and vulnerability to attack by nearby enemies—is deeply important to our efforts to understand them. Mandating the carrying of arms for communal defense is more akin to militia service than the everyday carrying of weapons for self-defense. The militia, made up of men of the community, formed the first line of defense against attacks upon colonial and early American communities. It is therefore reasonable to infer that the arms referred to were militia arms rather than the kinds of concealable weapons that can be licensed for public carry in Illinois today. In the case of the reference to Isaac Weld's *Travels through the States of North America* (quoting "[T]he people all travel on horseback, with pistols and swords,"), Plaintiff's expert takes the line out of context. That particular line refers to the author's encounter with people heading west " 'to explore,' as they call it, that is, to search for lands conveniently situated for new settlements in the western country." These explorers "all travel on horseback, with pistols or swords, and a large blanked folded up under their saddle, which last they use for sleeping in when obliged the pass the night in the woods." The author went on to say that "There is but little occasion for arms now that peace has been made with the Indians; but formerly it used to be a very serious undertaking to go by this route to Kentucky, and travellers were always obliged to go forty or fifty in a party, and well prepared for defence."[100]

At Complaint, p. 16: Plaintiffs argue that historic sensitive places statutes were quite narrow. As described above in this report, even the largest city at the time of the Founding had few public spaces capable of hosting large assemblies of people aside from the very outdoor gathering places referred to in the longstanding Statute of Northampton. In rural areas, the overlap between

---

[100] Isaac Weld, *Travels Through the States of North America, and the Provinces of Upper and Lower Canada* (1799), 234.

social gathering and civic function at public buildings is even more pronounced and has been the subject of substantial scholarly attention. These well-respected works of history underscore the social and civic importance of government buildings and the interactions which occurred there (See above Section B). During and after the mid-nineteenth century, when deadly weapons were more readily accessible and more likely to be carried in public, sensitive place laws drew a much larger circle of protection—they embraced social-political occasions like court days and election days alongside entertainment venues, educational facilities (many of which were disarmed much earlier), and social parties.[101] To take the more peaceful and less-armed eighteenth-century context as the national rule ignores the critical fact that Americans enacted these broader sensitive place rules at a time when their society was more violent and more widely armed.

At Complaint, p. 17: Plaintiffs argue that there is no evidence of firearms being restricted on transportation conveyances. This assertion is false, as demonstrated in this report. Public carry laws remained in force aboard public transportation vehicles, and even the travelers' exception was generally restricted to those making long-distance journeys. Transportation service providers not only had the legal authority to enforce reasonable rules regarding the presence of firearms on board, but sources prove that such policies were adopted by said companies and enforced by their employees (see above, Section D).

At Complaint, p. 17-18 and Motion, p. 11: Plaintiffs argue that the sensitive places doctrine only applies to those areas where added security has been provided. Based upon my research into historical weapon regulations and the logic behind them, this assertion is completely unfounded. The reasoning behind historical sensitive place rules was that large gatherings deserved protection *from armed individuals*—not that otherwise-armed individuals could demand added security in order to lay down their weapons. Americans of the nineteenth century strongly disdained the everyday carrying of deadly weapons. My own research into weapon regulations and their enforcement, as well as my exploration into public sentiment as expressed in newspapers, strongly show that Americans opposed the everyday carrying of deadly weapons in public spaces. Nor does

---

[101] 1870 Tex. Ch. 156; 1869 Ten. Ch. 22, § 2; 1870 Ga. *Public Laws—Penal Code—Amendments to*, 421, § 1; John A. Hockaday, et al, compilers, *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Reagan, State Printers and Binders, 1879), 224, § 1274; 1852 N. M. 67, 69, § 3.

my research stand alone; scholars who study historical public opinions about the carrying of weapons have found that nineteenth-century Americans overwhelmingly denounced it.[102]

At Motion, p. 9-10: Plaintiffs refer to a law mandating ferry operators to provide service to armed men at times of emergency. This statute, like those cited in Complaint 15, addressed what should happen in an unusual circumstance. It should not be taken as an indicator of a more widespread practice. The fact that it was enacted at all suggests two possibilities: 1) that ferry operators were requiring potentially expensive fares at times of emergency; and 2) that ferry operators were reluctant to push off a dock with armed passengers or during times of emergencies. The question for the historian is, *was it typical for ferry passengers to carry firearms aboard during times of peace?* The statute cited provides no insight regarding that question, while the abundant evidence about public carry laws and transportation providers' authority to establish passenger rules point toward the negative.

At Motion, p. 12: Plaintiffs refer to laws mandating the carrying of firearms into churches during worship services. These laws are notorious in their association to white supremacy and the defense of racial slavery in the American South. Guns were mandated in church because slaveholders and neighboring whites feared that the large Sunday gathering might become a target for a revolt or uprising on the part of enslaved people. There were also some laws that prohibited enslaved men from using firearms to hunt on Sundays. At or before the demise of the institution of slavery, these laws disappeared. For example, Virginia (cited by Plaintiffs) authorized local militia leaders to "order" militia members "go armed" to their churches. The rule allowed local militia leaders to exercise discretion; it did not require or mandate every male to carry arms to church. Without further research, it is unclear whether the colonial-era militia law was even applicable in the early republic period. But in 1786, 1838, and 1847, Virginia enacted public carry laws that did not provide an exception for church attendance.[103] Virginia's tradition of restricting the presence and carrying of deadly weapons in the late-eighteenth and early nineteenth century is

---

[102] See Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 161-165; Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (New York: Norton, 2011), 168-169. Winkler specifically addresses "frontier" communities, but the work of Charles and myself shows that public support for weapon regulation was national in scope rather than regional.
[103] 1786 Va. ch. 159, "An Act forbidding and punishing affrays"; 1838 Va. ch. 101, "An Act to prevent the carrying of concealed weapons"; 1847 Va. 129, § 16.

more probative than a colonial-era authorization that was rooted in the defense of a slave-based society. While it is at times necessary and fruitful to analyze such racially troubling laws as a part of our national tradition of gun regulation, to do so without acknowledging the tainted context is unpersuasive if not irresponsible.

## VIII.  Conclusion

This report has assembled historical evidence showing that:

1) One of the largest and most influential cities in eighteenth-century America, Philadelphia, lacked intracity public transportation services comparable to those currently in use in major cities today. In fact, Philadelphia was a "walking city" in which residents moved about primarily on foot.

2) Eighteenth-century Philadelphia also lacked indoor public gathering spaces analogous to the kinds of shopping, entertainment, and cultural spaces that pervade American cities today. Most of the city's large structures were churches, government buildings, and private homes. The largest and most significant gathering places, like the public market and green spaces, were outdoors.

3) Public carry laws applied to travelers and transportation spaces, unless one fell within a traveler's exemption. The traveler's exemption specifically applied to long-distance travel as opposed to the moving about within one's home community, town, and county. The limited nature of the travel exception was well established by appellate caselaw from the nineteenth century.

4) Companies providing intercity and intracity transportation services during the eighteenth and nineteenth centuries were private corporations endowed with robust property rights. This included the right to refuse service and the right to establish safety policies. Though the lack of extant records prevents the drawing of a full and complete picture, the research that has been done to date shows that rail companies had the authority to regulate (and indeed some regulated) the presence and disposition of guns aboard train cars.

5) Our ability to fully understand the history of firearm regulations is hindered by a lack of relevant extant records. Transportation companies, including intracity transit services from the nineteenth century, often left no records, or left exclusively financial records that do not address employee responsibilities or ridership policies related to firearms. In this environment, the employee handbooks that remain take on a greater significance for shedding light upon practices across the nineteenth-century transportation industry.

6) The lack of preserved documentation and consequent unknowability of the historical record presents a wider problem for researchers of historical gun and weapon regulation. Transit company ridership rules are not the only sources lost to the record; so are outcomes of criminal misdemeanor trials, issuances of surety bonds, and other proceedings from local justices of the peace who left no documentation of their critically important activities.

7) Differing schools of thought about the meaning of these gaps in the record are fundamentally at issue in Second Amendment cases such as this one, and pit practitioners of "law office history" against legal historians who interpret sources (and silences) in the record in light of a broader historical context.

In sum, the historical record supports assertions made within this report. Even the largest and most sophisticated eighteenth-century American cities lacked comparable gathering places and transportation services to those present in the greater Chicago metro area. Americans of the nineteenth century had a go-to policy for deadly weapons in public spaces, and it took the form of the public carry law. These laws restricted the carrying of small, concealable deadly weapons in public spaces, and they applied throughout an entire jurisdiction—whether that be a city or a state. The traveler's exemptions outlined by some public carry laws applied specifically to long-distance travel, not the kind of travel within a city or metro area represented by CTA and Metra services. While public carry laws generally applied within transportation spaces, the private transportation companies themselves used their robust rights to enact ridership policies and employee requirements that regulated the carrying of firearms on board. Though the full, comprehensive historical record cannot be known due to a lack of preserved historical sources, the documents which do survive show that passengers' lawful access to firearms and weapons aboard transportation vehicles was often regulated. How one chooses to interpret the meaning of gaps or complexities in the historical record depends upon whether one wishes to subscribe to the practice of legal history by embedding the historical law within its social context, or subscribe to an ahistorical approach that divorces law from its broader context within American society.

Dated: October 23, 2023

_____

Dr. Brennan Rivas

**Exhibit A**

# Brennan Gardner Rivas
Curriculum Vitae · Oct 2023

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
    University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
    2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
    the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
    1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
    on the Place of Guns in American Law and Society* (New York: Oxford University Press,
    2023)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
    (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
    Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
    Journal of the Early Republic*, October 17, 2023.
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
    Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
    Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
    *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

**Exhibit A**

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures
"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)
"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"
"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers
"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records
"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues
Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history
Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books
The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students
Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights.
Status: Editing manuscript

**Exhibit A**

"Going Armed: The Law and Culture of Carrying Deadly Weapons in the Nineteenth Century"
Aim: Scholarly article uncovering the ways in which nineteenth-century gun-toters carried their
    deadly weapons, and why they generally did so concealed.
Status: Writing in progress

## University Teaching Experience

*Instructor of Record*
Lecturer in American History, Texas Christian University           2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University           2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West,
Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed:
    Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns
    and Society, Wesleyan University, Middletown, Connecticut, October 2023

"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms
    in the Early Republic, Society for Historians of the Early American Republic Annual
    Meeting, Philadelphia, Pennsylvania, July 2023

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-
    Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy
    and Protection, Georgetown Law, Washington, D. C., June 2023

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-
    Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia,
    Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*,"
    Current Perspectives on the History of Guns and Society Symposium, Wesleyan University,
    Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations,"
    Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina,
    November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at
    the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis,
    California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical
    Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
  ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
  ~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
  ~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)

*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.

*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.

*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.

*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.

*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.

*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.

*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.

*Ohio v. Columbus*, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio

**Exhibit A**

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association