# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

BENJAMIN SCHOENTHAL, *et al.*,

                  Plaintiffs,

      v.

KWAME RAOUL, *et al.*,

                Defendants.

3:22-CV-50326

Hon. Iain D. Johnston

## STATE PARTIES' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Isaac Freilich Jones
Christopher G. Wells
Gretchen Elizabeth Helfrich
Office of the Illinois Attorney General
115 S. LaSalle St., 20th Floor
Chicago, Illinois 60603
Tel. 312-814-3000
isaac.freilichjones@ilag.gov
christopher.wells@ilag.gov
gretchen.helfrich@ilag.gov

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.  Plaintiffs lack standing to challenge concealed carry restrictions that apply to "buildings, real property, and parking areas" controlled by public transit systems. ......................................... 5

II.  Prohibiting concealed carry of firearms on public transit is consistent with history and tradition. ................................................................................................................................... 7

  A.  The Supreme Court's 21st century trilogy of Second Amendment cases. ........................ 7

   1.  *Heller*, *McDonald, and Bruen.* ................................................................................. 7

   2.  *Bruen*'s nuanced approach applies because modern public transit systems are "new" sensitive places that result from dramatic technological changes and present unprecedented societal concerns. ................................................................................................................ 14

  B.  The Act meets the standard that applies to "new" types of sensitive places. .................. 17

   1.  Public transit systems are analogous to recognized sensitive places. .......................... 17

    a.  Public transit systems share relevant characteristics with recognized sensitive spaces: crowding and vulnerable people, public accessibility, and government ownership or operation. ................................................................................................ 17

    b.  Public transit systems are "sensitive" even under Plaintiffs' proposed test. ........ 19

   2.  The Act's prohibition on concealed carry on public transit is relevantly similar to historical regulations of firearms in sensitive places. .......................................................... 23

    a.  The Act's burden on the right to armed self-defense is equivalent to historical sensitive place regulations. ............................................................................................ 23

    b.  The Act's restrictions are comparably justified as compared to valid historical regulations. ..................................................................................................................... 24

  C.  Restrictions on firearms on public transit systems are otherwise consistent with the Nation's historical tradition of firearm regulation. .................................................................. 25

CONCLUSION .................................................................................................................. 30

i

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ............................................................ passim

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ........................................ 23, 24, 25, 28

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218 (1993) ...................................................................................................... 19

*Brown v. Kansas City, Ft. S. & G.R. Co.*, 16 P. 942 (1888) ....................................................... 27

*District of Columbia v. Heller*, 554 U.S. 570 (2008).......................................................... passim

*Dowd v. Albany Ry.*, 62 N.Y.S. 179 (N.Y. App. Div. 1900) ....................................................... 30

*Ervin v. State*, 41 Wis.2d 194 (1968) ....................................................................................... 12

*Estate of Moreland v. Dieter*, 576 F.3d 691 (7th Cir. 2009).................................................... 25

*Frey v. Nigrelli*, 2023 U.S. Dist. LEXIS 42067 (S.D.N.Y. Mar. 13, 2023) ......................... passim

*Grant v. Trs. of Ind. Univ.*, 870 F.3d 562 (7th Cir. 2017)............................................................ 4

*Higgason v. Farley*, 83 F.3d 807 (7th Cir. 1996) ........................................................................ 6

*Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010 (7th Cir. 2016) ............................ 5

*Hunter v. Mueske*, 73 F.4th 561 (7th Cir. 2023) ......................................................................... 4

*Int'l & G.N.R. Co. v. Folliard*, 1 S.W 624 (Tex. 1886) ............................................................. 30

*Johnson v. Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ............................................................... 12

*Kipke v. Moore*, 2023 U.S. Dist. LEXIS 174934 (D. Md. Sep. 29, 2023)............................ 14, 18

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405 (7th Cir. 2019) ...................................... 4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........................................................................... 5

*Lutz v. York*, 899 F.2d 255 (3d Cir. 1990) ................................................................................ 13

*Marcatante v. City of Chi.*, 657 F.3d 433 (7th Cir. 2011) ........................................................... 4

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).............................................................. 7, 11

*N. Assurance Co. of Am. v. Summers*, 17 F.3d 956 (7th Cir. 1994)............................................. 4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................................................ passim

*Penn. R.R. Co. v. Langdon*, 92 Pa. 21 (Pa. 1880) ................................................................... 27

*People v. Mosley*, 2015 IL 115872 ........................................................................................... 25

*People v. Williams*, 60 Ill. App. 3d 726 (Ill. 1978)................................................................... 25

*Perry v. Arlington Heights*, 186 F.3d 826 (7th Cir. 1999)........................................................... 5

*Poole v. N. Pac. R. Co.*, 19 P. 107 (Or. 1888) .......................................................................... 27

*State v. Hill*, 53 Ga. 472 (1874) ............................................................................................... 12

*Sweeney v. Raoul*, 990 F.3d 555 (7th Cir. 2021) ................................................................... 5, 6

## Statutes

430 ILCS 66/1 *et seq.*, Firearm Concealed Carry Act ............................................... Passim

720 ILCS 5/24 ............................................................................................................... 2, 25

## INTRODUCTION

The Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). In particular, no one has a constitutional right to carry a firearm in "sensitive places"—categories of locations where the Supreme Court has identified an historical tradition of excluding firearms. This principle requires judgment for the defendants in this case.

Plaintiffs want to carry concealed handguns on public transit in Illinois and contend that a state statute forbidding them from doing so is unconstitutional under the Second Amendment. But Plaintiffs' suit fails as a matter of law. As an initial matter, Plaintiffs lack standing to challenge restrictions applicable to buildings, real property, and parking areas owned or operated by public transit agencies because they have demonstrated no specific, concrete intent to carry concealed weapons in such locations absent the restrictions imposed by Illinois law. The remainder of Plaintiffs' suit fails because modern public transportation systems are sensitive places as defined by the Supreme Court in *Bruen*, and the regulations at issue here are analogous to the restrictions that prohibited firearms at those locations. Moreover, the challenged restrictions are consistent with the well-established and representative tradition of regulating firearms existing in a "long, unbroken line, beginning from medieval England and extending beyond Reconstruction[.]" *Antonyuk v. Chiumento*, 89 F.4th 271, 358 (2d Cir. 2023). "This long, unbroken line . . . indicates that the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this nation." *Id.* (cleaned up). For all of these reasons, and because there is no genuine dispute as to material fact, the State Parties respectfully request that the Court grant their Motion for Summary Judgment, and enter final judgment in favor of Defendants.

# BACKGROUND

Open carry of firearms is not lawful in Illinois, 720 ILCS 5/24, and a person may only carry a concealed handgun in public if they hold a concealed carry license issued pursuant to the Firearm Concealed Carry Act, 430 ILCS 66/1 *et seq.* (the "Act"). The Act, however, does not authorize a concealed carry license holder to knowingly carry an assembled handgun[1] "on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8). As a result, a person knowingly carrying an assembled concealed firearm on or into these locations generally violates Illinois law regarding the unlawful use of weapons and may be subject to criminal penalties. *See* 720 ILCS 5/24-1.[2]

Public transit systems in Illinois are most heavily concentrated in Chicago and its surrounding counties. The Chicago Transit Authority ("CTA"), which serves the Chicago region, is the nation's second largest transportation system. According to the Illinois Department of Transportation, the CTA transports more than 545 million riders per year on approximately 140 bus routes and 242 miles of rapid transit railroad track. The Metra commuter rail agency, which serves the six-county Chicago region and extends into Wisconsin, has 11 lines, 241 stations, and

---

[1] The Act defines a handgun as "any device which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas that is designed to be held and fired by the use of a single hand." 430 ILCS 66/5. The Act also specifically excludes from the definition of "handgun" stun guns, tasers, machine guns as defined in item (i) of paragraph (7) of subsection (a) of Section 24-1 of the Criminal Code of 2012, short barreled rifles and shotguns, and qualifying pneumatic guns, spring guns, paint ball guns, and B-B guns. *Id.*

[2] This restriction may not apply to certain specifically enumerated categories of persons, including peace officers, prison guards, members of the armed services, and certain persons employed as security guards. *See* 720 ILCS 5/24-2.

an annual ridership of more than 81 million. *See* Expert Report of Professor Joshua Salzmann ("Salzmann Report"), Ex. 1, at 46–47; Statement of Material Facts ("SOF") ¶¶ 1–3.[3]

While metropolitan Chicago leads the state—and most of the nation—in ridership, Illinois also has an extensive, economically-significant public transit system beyond Chicagoland. Sixty-three different public transit agencies operate in Illinois, together serving 95 of 101 counties other than Cook. These agencies, which generally provide bus service, are integral to the economies and transit systems of communities across Illinois. In 2022, for instance, Peoria's 18 bus routes carried 1.7 million riders, Springfield's 17 routes transported 1.1 million riders, and Rockford's 19 lines carried 941,000 riders. *See* Salzmann Report, Ex. 1, at 46–47; SOF ¶¶ 4–5.

Plaintiffs are four individuals residing in Cook, DeKalb, DuPage, and Lake Counties who believe the Second Amendment to the United States Constitution, as applied to Illinois through the Fourteenth Amendment, guarantees them the right to carry a concealed handgun while riding public buses and trains. SOF ¶ 15. Plaintiffs say they are prevented from exercising this alleged right by the Act. *See*, *e.g.*, Compl., ECF 1, ¶ 13. Plaintiffs filed this case on September 20, 2022, naming as defendants Illinois Attorney General Kwame Raoul, DeKalb County State's Attorney Rick Amato, DuPage County State's Attorney Robert Berlin, and Lake County State's Attorney Eric Rinehart (collectively, the "State Parties"), and Cook County State's Attorney Kim Foxx. *Id.* ¶¶ 14–22. Plaintiffs seek a declaration that the Act's provisions relating to public transit systems violate the Constitution, and further seek an injunction barring the enforcement of those provisions. Compl., ECF 1, at 20.

---

[3] All references to the SOF and exhibit numbers in this Memorandum refer respectively to the SOF and the exhibits thereto filed at or near the time of the filing of this Memorandum.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Material facts are facts that might affect the outcome of the suit, and a dispute as to those facts is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (cleaned up). "Cross-motions for summary judgment do not waive the right to a trial; rather, [courts] treat the motions separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chi.*, 657 F.3d 433, 438–39 (7th Cir. 2011). "Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019). "[A] bare contention that an issue of fact exists is insufficient to raise a factual issue." *N. Assurance Co. of Am. v. Summers*, 17 F.3d 956, 961 (7th Cir. 1994). A party opposing summary judgment is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks omitted).

A court considering a constitutional challenge to a regulation on Second Amendment grounds must first decide whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If so, then "the Constitution presumptively protects that conduct." *Id.* at 24. The analysis then moves to a second stage, in which the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

## ARGUMENT

I.  **Plaintiffs lack standing to challenge concealed carry restrictions that apply to "buildings, real property, and parking areas" controlled by public transit systems.**

Plaintiffs lack standing to challenge restrictions on concealed carry applicable to buildings, real property, and parking areas controlled by public transit systems because no Plaintiffs have alleged or shown any intent to visit such buildings, real property, and parking areas while carrying a concealed handgun. SOF ¶ 16.

"Plaintiffs always bear the burden of showing they have standing to sue. If standing is challenged by a motion for summary judgment, plaintiffs cannot rest on 'mere allegations' but must offer evidence to support standing." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (internal citations omitted). A party seeking to invoke a federal court's jurisdiction has the burden of showing: (1) a concrete, particularized, and imminent injury in fact; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *See Perry v. Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999). Applying this test in the context of pre-enforcement challenges to the constitutionality of statutes, the Seventh Circuit has held that "a party may advance a preenforcement challenge before suffering an injury" where the party shows "both an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and a credible threat of prosecution thereunder." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up). A plaintiff's intent must be concrete and specific, not generalized. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("[T]he affiants' profession of an 'intent' . . . is simply not enough. Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual

or imminent' injury that our cases require."); *see also Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996) (plaintiff must demonstrate standing to as to each "grounds" on which they seek relief).

Plaintiffs cannot meet this standard as to their claims relating to buildings, real property, and parking areas because they have not shown a sufficient "intention to engage in a course of conduct arguably affected with a constitutional interest" relating to these locations. *Sweeney*, 990 F.3d at 559. Plaintiffs base their assertion of standing on four nearly identical affidavits purporting to state that each Plaintiff desires to ride on public buses or trains while carrying concealed handguns. *See* Plaintiffs' Mem. in Support of Article III Standing, ECF 27, at 5–11. ***But no Plaintiffs have alleged or asserted any prior visit to any "buildings, real property, [or] parking areas" controlled by public transit systems, or any intent to visit such places while carrying a concealed handgun.*** *See* Ex. 2, Schoenthal Decl., ECF 27-1, at ¶¶ 7–8 (asserting prior use of "the Metra Union Pacific West line" and an intention to "ride Metra more" if allowed to carry a concealed handgun); Ex. 3, Wroblewski Decl., ECF 27-2, at ¶¶ 7–8 (asserting prior use of "the Metra" and an intention to "ride public transportation more, such as Metra" if allowed to carry a concealed handgun); Ex. 4, Vesel Decl., ECF 27-3, at ¶¶ 8–11 (asserting he would use "bus" or "rail" transit options if allowed to carry a concealed handgun); Ex. 5, Winston Decl., ECF 27-4, at ¶¶ 8–11 (asserting an intention to "ride public transportation more … by utilizing CTA and Metra" and Metrolink if allowed to carry a concealed handgun); SOF ¶ 16.[4] Consequently, Plaintiffs lack standing to challenge restrictions applicable to buildings, real property, and parking areas, and their claims relating to these locations cannot proceed.

---

[4] Each Plaintiff confirmed that their declarations remained accurate during their depositions. *See* Schoenthal Dep., Ex. 7, at 56:8–57:4; Wroblewski Dep., Ex. 8, at 48:5–18; Vesel Dep., Ex. 9, at 49:3–7; Winston Dep., Ex. 10, at 64:4–65:6.

**II.    Prohibiting concealed carry of firearms on public transit is consistent with history and tradition.**

Under *Bruen*, a regulation prohibiting firearms in a "new" type of sensitive place is constitutional if (a) the location in question is analogous to previously recognized "sensitive" places, such as courthouses, legislative assemblies, polling places, and schools, and (b) if the challenged regulation is relevantly similar to sensitive place firearm regulations applicable to those locations. The government can *also* demonstrate that a regulation is consistent with history and tradition, and therefore constitutional, by identifying historical regulations that impose a comparable burden on the right of armed self-defense and justify that burden in a comparable way. The Act is constitutional under both of these tests.

**A.  The Supreme Court's 21st century trilogy of Second Amendment cases.**

**1.  *Heller*, *McDonald*, and *Bruen*.**

The Supreme Court has repeatedly confirmed that prohibitions on the carrying of firearms in "sensitive" places comport with the Second Amendment. In *District of Columbia v. Heller*, the Court recognized that the Second Amendment establishes an individual right to bear arms. 554 U.S. at 635. But the Supreme Court also made clear that this right "is not unlimited," and is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626–27. *Heller* specifically noted that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. The Supreme Court made clear that its references to "schools" and "government buildings" was not exhaustive, and that "these presumptively lawful regulatory measures" were cited "only as examples." *Id*. at n.26.

In *McDonald v. City of Chicago*, the Supreme Court held that the Second Amendment is applicable to the States. 561 U.S. 742, 791 (2010). While *McDonald* followed *Heller* in declining

to survey the full scope of the Second Amendment, the plurality opinion reemphasized the "assurances" made "clear in *Heller*" that restrictions on the carrying of firearms in sensitive places are constitutional. *Id.* at 786.

In *Bruen*, the Supreme Court clarified the standard for determining whether a regulation violates the Second Amendment, and confirmed for the third time that restrictions on firearms in sensitive places are constitutionally sound. 597 U.S. at 17, 24, 30–31. Rejecting the tiers-of-scrutiny approach applied by several courts of appeals, *Bruen* explained that a court must first decide whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If so, then "the Constitution presumptively protects that conduct." *Id.* at 24. The analysis then moves to a second stage, in which the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. The Supreme Court further explained that determining the constitutionality of a modern regulation that was "unimaginable at the founding" "will often"—but not always—"involve reasoning by analogy." *Id.* at 28. The Supreme Court predicted that in some circumstances this task "may require a more nuanced approach," singling out "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 27.

In cases where reasoning by analogy is appropriate, *Bruen* recognizes that a modern regulation is analogous to a historical regulation if "modern and historical regulations impose a comparable burden on the right of armed self-defense" and that burden is "comparably justified." *Id.* at 29. In other words, courts should determine whether a modern restriction is analogous to a historical restriction by analyzing (1) how and (2) why a given regulation "burden[s] a law-abiding citizen's right to armed self-defense." *Id*.

Applying this framework, *Bruen* built on "*Heller*'s discussion of 'longstanding' 'laws

forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" 597 U.S. at 30. *Bruen* then recognized that "courthouses," "polling places" and "legislative assemblies" are also "sensitive places" for the purposes of the Second Amendment. *Id.* "In finding those places supported by the historical record, *Bruen* cited a law review article and amicus curiae brief that cited a few laws existing around the time of the adoption of the Second Amendment," *Antonyuk*, 89 F.4th at 303, and an absence of dispute as to the lawfulness of such restrictions, *Bruen*, 597 U.S. at 30.[5]

The Court's conclusion as to "polling places" was based on (a) the 1776 Delaware Constitution,[6] and (b) a 1787 New York statute.[7] The Court's conclusion as to "legislative assemblies" was based on two Maryland colonial statutes (enacted in 1647 and 1650) barring weapons in the Maryland Assembly.[8] The Court's conclusion as to "courthouses" was based on a single 1786 Virginia statute forbidding most people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms."[9] In addition

---

[5] These statutes are the only Colonial and Founding Era historical examples of restrictions on firearms in courthouses, legislative assemblies, and polling places identified in the two sources cited by the Supreme Court in its analysis of the history of sensitive places. *See Bruen*, 597 U.S. at 30 (citing (a) Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute); SOF ¶¶ 17–18.

[6] *See Bruen*, 597 U.S. at 30 (citing Ex. 14, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 233–34 (2018) (citing Ex. 16, Del. Const. of 1776 art. 28)); SOF ¶ 18.

[7] *See Bruen*, 597 U.S. at 30 (citing Ex. 15, Brief for Independent Institute as Amicus Curiae at 13 (citing Ex. 17, Act of Jan. 26, 1787 N.Y. Laws 345)); SOF ¶ 18.

[8] *See Bruen*, 597 U.S. at 30 (citing Ex. 14, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 233 (2018) (citing Ex. 18, 1647 Md. Laws 216 and Ex. 19, 1650 Md. Laws 273)); SOF ¶ 18.

[9] *See Bruen*, 597 U.S. at 30 (citing Ex. 15, Brief for Independent Institute as Amicus Curiae at 12 (citing Ex. 20, 1786 Va. Acts 33, ch.21)); SOF ¶ 18. In addition to this statute, the sources cited by the Supreme Court also purported to identify an additional 1676 Virginia statute relating to courthouses, which required persons to attend court while armed. *See* 597 U.S. at 30 (citing Ex. 14, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 232 n.109 (2018) (referencing 2 Hening 126 as a "1676 Virginia law that "all people" be "required to goe armed" to church and

to these Colonial and Founding era laws, the sources cited by the Supreme Court also referenced a small number of 19th century rules relating to courthouses, polling places and legislative assemblies. However, "*Bruen*'s analysis was independent of those laws." *Antonyuk*, 89 F.4th at 304 n.11. At most, they would have provided the Court with "confirmation of what the Court thought had already been established" by Colonial or Founding era law. *Bruen*, 597 U.S. at 37.

Finally, while the Supreme Court's citations in support of its conclusions as to sensitive places in *Bruen* did not identify any Colonial or Founding era statutes restricting firearms in schools, they did specifically cite three mid-19th century college rules and one late-19th Century statute barring students from being armed, from the University of Virginia (1824), the University of Nashville (1837), the University of North Carolina (1838), and the State of Mississippi (1878).[10]

Having recognized that courthouses, legislative assemblies, polling places, schools, and government buildings are "sensitive places" for the purposes of the Second Amendment in reliance on the handful of statutes identified above, the Supreme Court instructed that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations

---

court "for their greate security")). This statute is incorrectly cited in the Supreme Court's source. Contrary to Kopel and Greenlee's citation to 2 Hening 126, this Virginia statute actually appears at 2 Hening 333 (attached as Ex. 21), and available sources do not make clear whether it was passed in 1674 or 1676. *Id.* This error appears to have been missed by the Supreme Court majority in the course of its inquiry into the history of the law of sensitive places. In any event, the existence of this statute did not dissuade the Supreme Court from concluding that courthouses were established as sensitive places in the history and tradition of the United States.

[10] The two secondary sources cited in *Bruen*'s discussion of the history of sensitive places collectively provide specific citations to four sources as justifying restriction on carrying firearms in schools: Ex. 22, Meeting Minutes of University of Virginia Board of Visitors 4–5 Oct. 1824 at 5; Ex. 23, University of Nashville 1837 rule, 7 American Annals of Education and Instruction 185 (1837); Ex. 24, Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina ch. 5, § 13 (1838) at 11; and Ex. 25, 1878 Miss. Laws 176. SOF ¶ 23. One of the sources also asserted, without providing citations, references, or quotations, that Dickinson College, La Grange College, and Waterville College also imposed similar restrictions on students carrying firearms. *See* Ex. 15, Brief for Independent Institute as Amicus Curiae, at 14–16; SOF ¶ 24.

prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30.

Multiple principles emerge from the Supreme Court's discussion of sensitive place restrictions in *Heller*, *McDonald*, and *Bruen*.

*First*, it is "settled" that the government can constitutionally restrict firearms in "sensitive places." *Bruen*, 597 U.S. at 30.

*Second*, the specific categories of "sensitive places" recognized by the Supreme Court— "schools and government buildings," *Heller*, 554 U.S. at 626, and "legislative assemblies, polling places, and courthouses," *Bruen*, 597 U.S. at 30—are illustrative, not exhaustive. They are the floor, not the ceiling, of the categories of places in which governments can restrict firearms. *Id*. (using "*e.g.*," rather than "*i.e.*," in listing types of sensitive places); *Heller*, 554 U.S. at 626 n.26 ("presumptively lawful regulatory measures" of sensitive places were listed "only as examples; our list does not purport to be exhaustive"); *Antonyuk*, 89 F.4th at 296 (recognizing "those 'examples' were not an 'exhaustive' list"); *see also Frey v. Nigrelli*, 2023 U.S. Dist. LEXIS 42067, *52–59 (S.D.N.Y. Mar. 13, 2023) ("subway and rails" are likely sensitive places).

*Third*, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30. In other words, even a single analogous historical regulation suffices to demonstrate a modern regulation is consistent with the history and tradition of firearm regulation so long as that analogous historical regulation is "representative" of the understanding of the generations of 1791 and/or 1868. *Id.* "[D]epending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 89 F.4th at 304.

*Fourth*, *Heller* and *Bruen* provide a benchmark for what historical evidence suffices to identify a "sensitive place". The Supreme Court recognized courthouses, legislative assemblies, and polling places as "well-established" sensitive places for the purpose of the Second Amendment based on: (a) one or two examples of a similar prohibiting the carriage of firearms at that location from even a single colony or state during the Colonial or Founding eras, and (b) an absence of "disputes regarding the lawfulness" of such regulation. *Bruen*, 597 U.S. at 30.

*Fifth*, *Heller* and *Bruen*'s designation of schools as "sensitive" places rested on sources specifically citing only four analogous 19th century regulations, and none from earlier periods. As such, a regulation can be shown to be consistent with the history and tradition of the United States based solely on evidence from the 19th century, and without any evidence from the Colonial or Founding eras. This principle applies even to types of locations (such as schools) that existed during the Founding and Colonial eras, and are therefore not "new."

*Sixth*, *Bruen* demonstrates that places can be "sensitive" even when historical analogues are inconsistent about whether firearms were historically restricted there. For example, with respect to "courthouses," the *Bruen* record shows that one of the two Colonial or Founding era laws before the Supreme Court actually *required* the bearing of arms in courthouses, and also revealed controversy about whether such restrictions were lawful into the 19th century.[11] *Id.*

---

[11] For example, the case of *State v. Hill*, 53 Ga. 472 (1874), which is often cited as the first case discussing the "sensitive place" doctrine referenced in *Bruen*, holds that weapons can be restricted from courtrooms. The mere fact that *Hill* went to the Georgia Supreme Court shows, however, that this proposition was unsettled as late as 1874. Moreover, in recognizing that the right to bear arms yielded to the right to access courtrooms, *Hill* makes clear that in sensitive places the right to bear arms must equally yield to other substantive rights, a principle that may well hold in other contexts. *See Ervin v. State*, 41 Wis.2d 194 (1968) ("The freedom to move about is a basic right of citizens under our form of government, in fact, under any system of ordered liberty worth the name."); *Johnson v. Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ("In view of the historical endorsement of a right to intrastate travel and the practical necessity of such a right, we hold that the Constitution protects a right to travel locally through public spaces and roadways."); *Lutz v. York*, 899 F.2d 255

Notwithstanding this information, however, the Supreme Court was persuaded that courthouses were and are sensitive based on a 1786 Virginia statute forbidding most people from carrying firearms in courthouses, and a handful of confirmatory 19th century regulations.

*Seventh*, restrictions on firearms must be evaluated under a "more nuanced" analytical approach when they address circumstances involving "unprecedented societal concerns" or "dramatic technological changes." *Bruen*, 597 U.S. at 27. The Supreme Court teaches that such nuance is appropriate and necessary because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*

*Eighth*, a government defendant can demonstrate that a regulation restricting firearms is consistent with history and tradition in at least two ways. With respect to a "new" type of potentially sensitive place, the constitutionality of a regulation can be established if the location in question is analogous to previously recognized "sensitive" places (such as courthouses, legislative assemblies, polling places, schools, and government buildings), *id.* at 30, and if the challenged regulation is relevantly similar to sensitive place firearm regulations applicable to those locations. *Id.* at 29–30. In the alternative, even if a location is not a "new" type of sensitive place, a government defendant can demonstrate that a regulation applying to that place is consistent with history and tradition by identifying historical regulations that impose a comparable burden on the right of armed self-defense and justify that burden in a comparable way. *Id.* at 29–30.

---

(3d Cir. 1990) ("The right or tradition we consider may be described as the right to travel locally through public spaces and roadways.")

### 2. *Bruen*'s nuanced approach applies because modern public transit systems are "new" sensitive places that result from dramatic technological changes and present unprecedented societal concerns.

*Bruen* made clear that a "more nuanced" analysis is appropriate where a Second Amendment challenge involves "unprecedented societal concerns," or "dramatic technological changes" when compared to the "regulatory challenges" that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 597 U.S. at 27. The Supreme Court further confirmed that a modified analysis would apply to "new . . . sensitive places." *Id.* at 30.

The State Parties' uncontroverted experts have shown that these predicates apply here. "Public transportation dates to the first half of the 20th century," SOF ¶ 25, Salzmann Report, Ex. 1, at 3–4, and the facilities and infrastructure that comprise modern public transportation systems are therefore a "new" type of location for the purposes of the *Bruen* analysis. Prior to the 20th century, "transportation services were provided exclusively by private entities that usually received a charter or license to operate from a state or local government." *Id.*; *see also* Expert Report of Dr. Brennan Rivas ("Rivas Report"), Ex. 11, at 24 ("Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers."); *Kipke v. Moore*, 2023 U.S. Dist. LEXIS 174934, at *31 (D. Md. Sep. 29, 2023) ("While there is no doubt that transportation existed at the time of the founding, almost all transportation was provided by private companies."); *Frey*, 2023 U.S. Dist. LEXIS 42067, at *57 ("train travel was provided by private transportation systems until the 20th century"); Ex. 12, Brian J. Cudahy, *Cash Tokens and Transfers* 128–29 (1982) (first truly publicly owned and operated municipal mass transit service started in 1905); SOF ¶ 26. "[B]ecause State-operated transit barely existed at the founding, the Court must take a more nuanced approach to the historical analysis." *Kipke*, 2023 U.S. Dist. LEXIS at *32; *see also Frey*, 2023 U.S. Dist.

LEXIS 42067, at *53 ("subway system and rails . . . implicate[] unprecedented societal concerns or dramatic technological changes [that] require a more nuanced approach").

There can also be no doubt that modern public transit systems are the result of "dramatic technological changes" when compared to the transportation infrastructure and vehicles of 1791 and 1868. *See* Salzmann Report, Ex. 1, at 3–4 (comparing and contrasting the four "eras" of transportation throughout American history); SOF ¶ 27. "Technology has enabled the creation, maintenance, and expansion of light rail, bus, and other systems that far surpass what was possible, or even thinkable, in 1791." Rivas Report, Ex. 11, at 4; SOF ¶ 28. During the Colonial and Founding eras "[m]anmade infrastructure was limited to a fragmented network of rough roads constructed, in various turns, by individuals, corporations, and local governments." Salzmann Report, Ex. 1, at 3; SOF ¶ 29. To draw parallels between "contemporary public transportation systems and the private turnpikes, ships, ferries, and stagecoaches of the preindustrial era" would be to ignore these dramatic technological changes, as well as the clear statement of the law in *Bruen*. *See* Salzmann Report, Ex. 1, at 4.

The changes since 1868 are no less dramatic. Until the late 19th and 20th centuries there were no publicly owned and operated passenger trains, electric- or gasoline- powered buses, parking lots, elevated lines, subways, or any of the other infrastructure, technology, and machinery that comprise modern mass transit systems. *See* SOF ¶ 30; Salzmann Report, Ex. 1, at 15–37. Indeed, the canals, steamboats, omnibuses, horse-carts, wagons, and coal- and steam-powered engines of the 19th Century not only used different technology than is used today, but they served different economic and societal roles. *See* SOF ¶¶ 31–32; Salzmann Report, Ex. 1, at 15–37. It was not until the late 1800s that technologies and systems anticipating those used today came into

wider use, including streetcars, trolleys, cable cars, electricity, internal combustion, and intracity railroads. *See* SOF ¶ 33; Salzmann Report, Ex. 1, at 15–37.

The changes in the scale, structure, and economic and social roles played by modern public mass transit systems also present "unprecedented societal concerns" when it comes to the management of firearms and the prevention or mitigation of violence using firearms. *Bruen*, 597 U.S. at 27. The transit infrastructure of the Colonial and Revolutionary eras was of an entirely different scale from that of today. For example, "[a]ccording to 1753 tax records, the entire colony [of Massachusetts] contained just 6 coaches. Massachusetts also had 18 chariots, 339 chaises, and 992 chairs and calashes—the vast majority of which were located in Boston." Salzmann Report, Ex. 1, at 11; SOF ¶ 34. Travel was expensive. Salzmann Report, Ex. 1, at 11–13; SOF ¶ 35. And the American cities of this era were small. Philadelphia, one of the largest of them, was home to 2,000 people in 1700, and 62,000 in 1800. *See* Salzmann Report, Ex. 1, at 6; SOF ¶ 36.

Today, by contrast, mass transportation systems are publicly owned and operated, and Illinois public transportation systems transport hundreds of millions of riders across hundreds of miles of tracks and bus routes through more than 95% of the counties in the state. *See* Salzmann Report, Ex. 1, at 6; SOF ¶. Firearms have likewise evolved to become more dangerous than ever. *See* Expert Report of James E. Yurgealitis ("Yurgealitis Report"), Ex. 13, at 3 ("Popular CCW handgun calibers such as 9mm or .40 S&W can easily penetrate glass vehicle windows and sheet aluminum, plastic seats and seat cushioning / foam (common public transit vehicle component materials)."); SOF ¶ 37. Modern public transit systems and infrastructure therefor "implicates unprecedented societal concerns" and requires "a more nuanced approach." *Frey*, 2023 U.S. Dist. LEXIS 42067, at *53 (internal quotation marks omitted).

**B.  The Act meets the standard that applies to "new" types of sensitive places.**

Public transit systems did not exist in the Founding or Reconstruction eras, and embody "dramatic technological changes" and present "unprecedented societal concerns." The Act's prohibition of concealed carry of assembled, functional firearms in such systems is therefore constitutional because (a) public transit systems are analogous to previously recognized "sensitive" places, and (b) the Act's restriction on concealed carry is "relevantly similar" to the sensitive place regulations that applied to those locations.

**1.  Public transit systems are analogous to recognized sensitive places.**

Modern public transit systems are analogous to sensitive places already recognized by the Supreme Court for two independent reasons. *First*, modern public transit systems are analogous to recognized historical sensitive places of earlier eras because (i) they are crowded spaces in which vulnerable individuals are more exposed to harm from gunfire; (ii) they are publicly accessible; and (iii) they are publicly owned or operated. *Second*, to the extent the Court accepts Plaintiffs' proposed test for sensitivity, which focuses on the amount of government-provided security, the public transportation systems of today qualify as sensitive because the government provides far more security on such systems than the government provided in the recognized sensitive places of the Colonial, Founding, and Reconstruction eras.

**a.  Public transit systems share relevant characteristics with recognized sensitive spaces: crowding and vulnerable people, public accessibility, and government ownership or operation.**

The Supreme Court has already identified courthouses, legislative assemblies, polling places, schools, and government buildings as sensitive places. Public transit systems share core characteristics with these sensitive places that make public transit systems "relevantly similar" under the analogical reasoning required by *Bruen*. 142 597 U.S. at 29.

*First*, the facilities and vehicles that make up public transit systems are generally crowded, enclosed spaces in which individuals would be more exposed to harm than persons in other places were gunfire to occur. As Mr. Yurgealitis' uncontroverted expert testimony has shown, "[e]xchanges of gunfire in confined spaces are inherently problematic when they involve simply the assailant and an armed citizen." Yurgealitis Report, Ex. 13, at 3. "Not only is there a possibility that fellow passengers may be hit due to the unpredictability of movement by the assailant and the vehicle itself, but the passengers also have little or no space in which to avoid gunfire." *Id.* Moreover, the nature of these spaces and the likely presence of especially vulnerable populations, including the many children who rely on public transit, SOF ¶¶ 48–50, only heightens these risks. These features of enclosed and potentially crowded spaces would also have held true of the courthouses, legislative assemblies, polling places, schools, and government buildings of the Founding and Reconstruction eras. *See*, *e.g.*, Rivas Report, Ex. 11, at 10–18 (describing use and structure of public spaces in Colonial and Founding eras).

*Second*, the transit infrastructure and vehicles at issue in this case are *public*—that is, they are available for members of the public to use for travel. *See* Salzmann Report, Ex. 1, at 45–47; 430 ILCS 66/65(a)(8). Just as courthouses, polling places, schools, and government buildings bring together people from across society, modern public transit systems do the same.

*Third*, the public transit systems at issue here are government funded, owned and/or operated. *See* 430 ILCS 66/65(a)(8). Government agencies therefore function as the proprietors of these facilities and vehicles, just as with the courthouses, legislative assemblies, polling places, government buildings, and many schools. *See Kipke v. Moore*, 2023 U.S. Dist. LEXIS 174934, at *32–33 (D. Md. Sep. 29, 2023); *Frey*, 2023 U.S. Dist. LEXIS 42067, at *59 (S.D.N.Y. Mar. 13, 2023) (recognizing public transit is "government owned and operated"); *cf. Bldg. & Const. Trades*

*Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 231–32 (1993) (explaining that a State may "manage its own property when pursuing a purely proprietary interests . . . where analogous private conduct would be permitted").

### b. Public transit systems are "sensitive" even under Plaintiffs' proposed test.

Plaintiffs allege that "[t]he unifying feature of the historically accepted sensitive places where individuals were deprived of the right to bear arms was security. In compensation for an individual's lessened right to protect himself, the government provided security measures to ensure the physical protection of anyone in" the sensitive place in question. Compl., ECF 1, ¶ 63. Plaintiffs allege the Act is unconstitutional because public transportation facilities are "not accompanied by security measures" analogous to those that existed in the sensitive places of the Founding era. *Id.* In other words, Plaintiffs admit that if the government provides security that is analogous to the level of security provided in recognized sensitive places during the Founding Era, then the modern transit facilities would qualify as "sensitive" places for the purposes of the *Bruen* analysis. *Id.*[12]

As an initial matter, Plaintiffs' theory fails on its face, because it cannot account for the Supreme Court's conclusion that "schools" were sensitive during the Founding and Reconstruction eras. Indeed, there is no evidence in the record that schools possessed "government provided security measures" during either period, because no such evidence exists. Plaintiffs' theory that security is the "unifying" feature of sensitive places therefore cannot stand.

---

[12] Perhaps recognizing the legal implications of their Complaint, Plaintiffs attempted in their initial summary judgment motion to add a second criteria for sensitivity: that sensitive places at the Founding were "locations critical to the function of democratic governance where assassination or intimidation risk was acute." Mem. in supp. of Mot. for Summary Judgment, ECF 33, at 11. This additional criterion cannot stand because it fails to account for the Supreme Court's conclusion that "schools" were also recognized sensitive places, and the recognition that schools are "sensitive" demonstrates that a location not "critical to the function of democratic governance" can certainly be recognized as sensitive today.

In any event, public transit systems must be recognized as "sensitive" even if the Court accepts Plaintiffs' "security" theory because security levels on such systems dramatically exceed security provided in government facilities circa 1791 and 1868. In 1789, prior to the establishment of the system created by the new Constitution, the public governmental facilities of the Confederation Congress (including the Confederation Congress itself, the Department of the Treasury, the Department of War, and the Department of Foreign Affairs) were staffed by a "door-keeper" or "house keeper," several of whom also doubled as messengers.[13] No personnel to provide for the security of these government facilities existed beyond these persons. This state of affairs continued nearly unchanged under the government established in the new Constitution—while the House of Representatives did appoint a "sergeant-at-arms," the other organs of the executive and legislative branches of the new government received no budget for personnel responsible for security apart from clerks, door-keepers, and office-keepers.[14] To the extent security was provided at all at the various presidential mansions, the United States Senate, the Department of the Treasury, the Department of War, or the Attorney General's Office, that security

---

[13] *See* Ex. 26, "Schedule I: Estimate of the Expenditure for the Civil List of the United States for the year 1789, 19 September 1789," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-05-02-0162-0002. [Original source: *The Papers of Alexander Hamilton*, vol. 5, *June 1788–November 1789*, ed. Harold C. Syrett. New York: Columbia University Press, 1962, pp. 381–388.] (summarizing final civil list expenditures of Confederation Congress); SOF ¶ 38.

[14] *See, e.g., id.* (summarizing initial civil list of government established by Constitution in 1789); Ex. 27, "Enclosure: Schedule I, [9 January 1790]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-06-02-0076-0002-0010. [Original source: *The Papers of Alexander Hamilton*, vol. 6, *December 1789–August 1790*, ed. Harold C. Syrett. New York: Columbia University Press, 1962, pp. 129–136.] (summarizing civil list of 1790); Ex. 28, "Report on the Estimate of Expenditures for 1792, 4 November 1791," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-09-02-0326. [Original source: *The Papers of Alexander Hamilton*, vol. 9, *August 1791–December 1791*, ed. Harold C. Syrett. New York: Columbia University Press, 1965, pp. 456–475.] (summarizing civil list of 1792); SOF ¶ 39.

could only have been provided by the small number of such clerks, door-keepers, and officer-keepers assigned to some (but not all) offices.

Public buildings that were unambiguously "sensitive places" continued to be protected in a similar manner throughout the Early Republic, and into the 19th century. Prior to 1827 the Capitol Building was guarded by a "lone watchman, John Golding."[15] As another example, Charles Dickens made note of security levels at the White House in 1842, writing of his first visit that he had "entered a large hall, and having twice or thrice rung a bell which nobody answered, walked without further ceremony through the rooms on the ground floor."[16] In other words, Charles Dickens walked into the White House and approached the *personal office of the President* without passing through any formal security at all beyond that which might have been provided by the President's clerks. During his second visit to the White House, to attend a public reception, the situation was much the same. Mr. Dickens noted that security was provided only by a single "master of the ceremonies," and that there were "no other officers or attendants" and "no policemen" to keep order.[17] Decades later, during the Civil War, a force of several policemen was finally assigned to protect the White House, but more comprehensive protection (in the form of an expanded, 27-person police force and protection by the Treasury Department's Secret Service) would not be provided to the White House until the mid-1890s.[18]

---

[15] Ex. 29, United States Capitol Police, *Our History* (Jan. 24, 2024), https://www.uscp.gov/the-department/our-history; SOF ¶ 40.

[16] Ex. 30, CHARLES DICKENS, AMERICAN NOTES 702 (John W. Lovell Company Ed., 1883) (1842); SOF ¶ 41.

[17] Ex. 30, CHARLES DICKENS, AMERICAN NOTES 703–04 (John W. Lovell Company Ed., 1883) (1842); SOF ¶ 41.

[18] Ex. 31, PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, Appendix 7 at 508–09 (1964); SOF ¶ 42.

It cannot be disputed that the President's home, Congress, and headquarters of the Departments of State, War, and Treasury were sensitive places in which the government could have validly prohibited concealed firearms during the Founding Era. *See Bruen*, 597 U.S. 30; *Heller*, 554 U.S. at 626. And there can be no doubt that the level of security provided in the public transit systems at issue in this case far exceeds the security that was provided in those locations during the Founding era and 19th century. For example, CTA facilities and riders are protected by hundreds of CTA security guards, more than 33,000 security cameras, and patrols by personnel from the Chicago Police Department, as well as the police departments of other municipalities served by the CTA.[19] Likewise, Metra maintains a force of "more than 140 sworn officers and civilian support staff who are responsible for the security of Metra passengers, employees, equipment, yards, stations and other Metra property."[20] Metrolink, serving Illinoisians in the St. Louis area, is policed by more than 40 officers from St. Louis County and St. Clair County.[21] And even during the periods in which sworn, uniformed security officers may not be present in a given bus or train, each such vehicle would be staffed by conductors, operators, and other personnel whose roles are analogous to the "door-keepers" who would have been the sole sources of security at the President's home and other recognized sensitive places during the Founding Era.

In sum, even under Plaintiffs' theory the public transit systems at issue in this case are analogous to recognized sensitive places because they are government facilities in which the level of security exceeds that provided in recognized sensitive places at the Founding and during the 19th century.

---

[19] Ex. 32, *Security*, CTA (Jan. 24, 2024) at 2; SOF ¶ 44.

[20] Ex. 33, *Metra Police Department*, Metra (Jan. 24, 2024); SOF ¶ 45.

[21] Ex. 34, *Special Operations*, St. Louis County Police (Jan. 19, 2024) at 2; SOF ¶ 46.

### 2. The Act's prohibition on concealed carry on public transit is relevantly similar to historical regulations of firearms in sensitive places.

The Act's provision as to public transit systems is "relevantly similar" to Colonial and Founding era regulations regarding sensitive places, because (a) it imposes a comparable burden as historical regulations, and (b) is "comparably justified" when compared to historical regulations. 597 U.S. at 29.

### a. The Act's burden on the right to armed self-defense is equivalent to historical sensitive place regulations.

"With respect to the 'how' question, judges are instructed to consider 'whether modern and historical regulations impose a comparable burden'" on the right to armed self-defense. *Bevis v. City of Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023). Historical regulations of sensitive places often consisted of outright bans on bringing firearms into those places. In other words, people entering sensitive places in the Founding or Reconstruction eras could expect to be unarmed "in case of confrontation" in those spaces. *Heller*, 554 U.S. at 592. The Act's exclusion of concealed, operable firearms from public transit systems is therefore no more burdensome than its historical analogues.

According to *Bruen*'s sources, the two known colonial statutes restricting firearms in legislative assemblies provided that no person could enter the legislature "with any gun or weapon," Ex. 19, 1650 Md. Laws 273, or "any weapon," Ex. 18, 1647 Md. Laws 216, respectively. The only colonial statute the Supreme Court's sources cited as restricting firearms in courts barred non-court personnel from bearing arms at court. *See* Ex. 20, 1786 Va. Acts 33, ch.21. And the two Founding era restrictions on firearms at polling places forbid anyone from carrying any arms to the polls. Ex. 17, Act of Jan. 26, 1787 N.Y. Laws; Ex. 16, Del. Const. of 1776 art. 28. In *Bruen*'s terms, "how" these regulations operated was consistent across these different categories of sensitive places: firearms were outright prohibited.

The burden imposed by the Act is equivalent to the burden of these historical regulations. The Act bars persons holding concealed carry licenses from knowingly carrying assembled and uncased handguns in or on public transit facilities or vehicles. 430 ILCS 66/65(a)(8). In other words, a person taking public transit does not have access to an operable firearm under the Act, just as people went unarmed into 19th and 18th century courts, legislatures, polling places, and other sensitive places. The Act therefore imposes a "comparable" burden as historical regulations by equivalently barring (i) operable firearms (ii) in a narrowly defined type of sensitive place.

### b. The Act's restrictions are comparably justified as compared to valid historical regulations.

A court considering whether two regulations are "comparably justified" must do so by considering the text of the laws in question, and may not "rely on extratextual considerations." *Bevis*, 85 F.4th at 1200. Here, the names and statutory texts of the Colonial and Founding era statutes referenced in the Supreme Court's *Bruen* citations as valid show that they were passed for the purpose of maintaining order or preventing violence. *See Bevis*, 85 F.4th at 1200 ("When we consult the text of the Act, we find the best indication of its purpose in its name."). In 1650, the Maryland legislature stated that the purpose of barring firearms in the houses of the assembly was "for the better ordering of Both Howses." Ex. 19, 1650 Md. Laws 273. The nearly-identical 1647 statute passed by the Maryland legislature contained no such explicit statement of purpose, but there is no reason to think its purpose was any different. Ex. 18, 1647 Md. Laws 216. The 1776 Delaware Constitution barred firearms from "elections" for the purpose of "prevent[ing] any violence or force being used." Ex. 16, Del. Const. of 1776 art. 28. A 1787 statute barring arms at polls was enacted so that "all elections shall be free"—impliedly, free of violence that might mar

an election. Ex. 17, Act of Jan. 26, 1787 N.Y. Laws 345. And Virginia's ban on firearms in courts was for the purpose of "forbidding and punishing affrays." [22] Ex. 20, 1786 Va. Acts 33, ch.21.

The Act and these historic laws are "comparably justified" because the Act was also passed to protect public order and safety, as confirmed by the "plain language" of the Act "and the structure of the statutory scheme" of which the Act is a part. *See Estate of Moreland v. Dieter*, 576 F.3d 691, 699 (7th Cir. 2009) (discussing methods of discerning legislative intent). The plain text of the Act provides that it is a goal of the concealed carry license application review process that applicants should "not pose a danger to himself, herself, or others, or a threat to public safety." 430 ILCS 66/10(4); *see also* 430 ILCS 66/15(a); 430 ILCS 66/20(g). Additionally, because the Act was drafted to work in concert with Illinois law regarding the unlawful use of weapons, 720 ILCS 5/24, it is relevant that "the unlawful use of a weapon statute demonstrates a 'legislative intent to regulate the possession and use of weapons for the safety and good order of society.'" *People v. Mosley*, 2015 IL 115872, ¶ 42 (quoting *People v. Williams*, 60 Ill. App. 3d 726, 727 (Ill. 1978)); *see also Bevis*, 85 F.4th at 1200 (protection of "public health, safety, and welfare" is a reason to restrict firearms that is consistent with American history and tradition). These two goals—order and safety—are more than "analogous" to the justifications behind earlier sensitive place regulations. They are the same. *Bruen*, 597 U.S. 30.

### C. Restrictions on firearms on public transit systems are otherwise consistent with the Nation's historical tradition of firearm regulation.

In addition, even if the Court concludes public transit systems are not "new," and do not involve unprecedented societal concerns or dramatic technological changes, the Act still passes

---

[22] "Affrays (from affraier, to terrify) are the fighting of two or more persons in some public place, to the terror of his majesty's subjects." Ex. 35, William Blackstone, 4 *Commentaries* 145 (Sharswood Ed., J.B Lippincott Company 1893) (1769); SOF ¶ 47.

constitutional muster. The Act fits comfortably within a long-standing tradition of prohibiting arms in crowded public spaces, which has included passenger railroads since the mid-19th century. Indeed, the Act's prohibition of operable firearms on public trains and buses is "distinctly similar" to the regulations applicable to 19th century railroad passengers. *Bruen*, 597 U.S. at 26.

Our nation has a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 89 F.4th at 356. This tradition originates as far back as "a 1328 British statute forbidding going or riding 'armed by night []or by day, in fairs, markets.'" *Id.* (citing Ex. 39, Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.)); *see also id.* at 357 n.74. At least two Founding-era statutes[23] and four Reconstruction era statutes[24] replicated this type of law. Moreover, these laws were upheld as constitutional by state courts. *Id.* at 356. "This long, unbroken line, beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this nation." *Id.* at 358 (cleaned up).

Beginning in the 19th century this unbroken tradition of firearm regulation began to be exercised in a new context that had only recently emerged—railroads. Regulations were imposed by at least five railroads, including many of the largest and most prominent in the United States. These regulations were also uncontroversial—"[a]cross state courts in the nineteenth century, it went unquestioned that railroads had the authority to protect the safety of their passengers through

---

[23] *See Antonyuk*, 89 F.4th at 356; Ex. 40, 1786 Va. Acts 35, Ch. 49; Ex. 41, Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60-61, ch. 3 (F. Martin Ed. 1792) (North Carolina Statute); SOF ¶¶ 52–53.

[24] *See Antonyuk*, 89 F.4th at 357–58; Ex. 42, 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Pace and Prevent Homicide, Ch. 13, Section 1; Ex. 43, 1870 Tex. Gen. Laws 63, ch. 46; Ex. 44, 1883 Mo. Sess. Laws 76; Ex. 45, 1889 Ariz. Sess. Laws 16-18; Ex. 46, 1890 Okla. Terr. Stats., Art. 47, § 7; SOF ¶¶ 54–58.

regulation." Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 14).[25] Moreover, because "records are no longer extant for most historical transportation service providers," *See* Rivas Report, Ex. 11, at 28–29, SOF ¶ 59, it is likely that these rules represent only a small proportion of the transportation-related firearm restrictions in effect during the 19th Century. Train travelers could not evade these restrictions by relying on the so-called "travel exception" to rules restricting the carriage of firearms, since this exception only "encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life." Rivas Report, Ex. 11, at 21–24.

In 1875, the North Pennsylvania Railroad Company required its conductors to "see that … passengers do not take into the cars guns, dogs, valises, large bundles or baskets," barring all firearms from their train cars. Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 17). North Pennsylvania served Philadelphia and its surrounding counties, then (as now) one of the nation's largest and most populous metropolitan areas. *Id.*; SOF ¶¶ 60–61.

In 1882, the Central Pacific railroad issued rules providing that only guns "in cases and not loaded . . . may be carried in day or sleeping cars without charge." *Id.* at 18. Central Pacific rules

---

[25] *See also Penn. R.R. Co. v. Langdon*, 92 Pa. 21, 27 (Pa. 1880) ("The right of a railroad company to make reasonable rules for its own protection, and for the safety and convenience of passengers, has been repeatedly recognised."); *Poole v. N. Pac. R. Co.*, 19 P. 107, 108 (Or. 1888) ("For its own safety and convenience and that of the public, a railroad company may make reasonable rules and regulations for the management of its business, and the conduct of its passengers."); *Brown v. Kansas City, Ft. S. & G.R. Co.*, 16 P. 942, 943 (1888) ("Before a person can claim the rights of a passenger in a public conveyance, he must show that all the reasonable regulations and restrictions known to him, which the carrier has thrown around its business for the safety of the passenger or the convenience of the carrier, have been complied with . . . .").

also banned firearms from baggage—"[g]uns . . . are not baggage, and must not, under any circumstances, be checked." *Id.* at 23. Together, these rules barred the carriage of any firearms on trains, except in cases and unloaded in the possession of the passenger. As with the Act's restrictions, these rules prevented a person from carrying a usable firearm onto a public train. In the 1880 census Central Pacific was recorded as carrying the fourth highest number of passengers over the third-most aggregate miles among American railroads. *Id.* at 18; SOF ¶¶ 62–64.

In 1884, the Union Pacific railroad issued rules providing that "Guns in cases may be carried by passengers in the coaches without charge, or they will be checked free by baggage-agents as part of the usual baggage allowance. Guns uncased will be carried in baggage car only." *Id.* at 18. Updated rules in 1898 "mirrored this language." *Id.*; SOF ¶¶ 65–66.

By 1886, the International & Great Northern Railroad Company, an important regional railroad in the Southwest, had a practice of restricting passengers from carrying firearms on trains, but did allow them to check their firearms into baggage. *Id.* at 19; SOF ¶ 67.

Finally, by 1900 at the latest, the Albany Railroad, which operated a passenger trolley, had implemented rules that were held to ban passengers from riding with firearms. *Id.* at 19–20; *see also* SOF ¶ 68.

These rules are directly analogous to the Act's ban on carrying concealed usable firearms on public transit, and were adopted for analogous reasons. As with the analogies discussed in the prior section, the Act's narrow restrictions on firearms in and on public transit systems are analogous to the restrictions imposed by 19th century railroad operators. The fact that the "particulars" of analogous historical regulations "varied from place to place" does not change this analysis. *Bevis*, 85 F.4th at 1199. Similarly, the justification for the Act's restrictions—protecting public safety and order—are analogous to the justification for these restrictions, whose goal was

28

to protect the safety of their passengers through regulation and maintain order on their train systems. Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 14); *see also supra*. As a court ruled in a similar case:

> an adequate[] analogy could be made between (i) the fact that historically, the rail systems were privately owned and that private transportation companies possessed the power to create their own reasonable customer/passenger rules, which in at least some instances included prohibitions against the presence of guns in passenger cars and (ii) the fact the … subway and rails are government owned and operated, and therefore the government as proprietor can impose its own restrictions on gun-carrying upon its passengers.

*Frey*, 2023 U.S. Dist. LEXIS 42067, at *58–59. In sum, the Act reflects the Nation's well-established tradition of regulation because it burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting operable firearms) and for a distinctly similar reason (*i.e.*, maintaining order in often-crowded transit systems). *Cf. Antonyuk,* 89 F.4th at 361 (restrictions on firearms in public parks are likely constitutional because their purpose is to maintain order in often crowded spaces).

Moreover, the record supporting the constitutionality of restrictions on firearms in and on public transportation systems is sufficient under *Bruen*, and is even more robust than the record that convinced the Supreme Court of the "sensitive place" status of schools. In *Heller* and *Bruen* the Supreme Court felt comfortable recognizing that schools are sensitive places based on citations that specifically referenced *no* Colonial or Founding era regulations and four 19th Century regulations, only one of which was a state law. *See* disc. *supra*. Moreover, the four specifically cited rules—three mid-19th century rules against firearms at three specific institutes of higher education and an 1878 Mississippi statute—covered a tiny percentage of the schools operating at

that time.[26] The evidence as to restrictions applying to public transportation infrastructure therefore exceeds the bar set as to schools in at least two ways. *First*, more such rules have been specifically identified in the record. And *second*, the identified rules relating to railroads are more representative than those relating to schools because the restrictions enacted by railroads applied to many of the largest and most important transportation firms, and were viewed as uncontroversial. *See, e.g.*, *Int'l & G.N.R. Co. v. Folliard*, 1 S.W 624, 625 (Tex. 1886) (court did not question railroad's right to prevent passenger from carrying firearm on their person); *Dowd v. Albany Ry.*, 62 N.Y.S. 179, 179 (N.Y. App. Div. 1900) (rule against carrying firearm on a streetcar was "reasonable" as a matter of law). The State Parties have therefore met their burden of demonstrating that the Act's prohibition of concealed carry while on public transit systems is consistent with the nation's historical tradition of firearm regulation.

## CONCLUSION

For all of these reasons, the State Parties respectfully request that the Court grant their Motion for Summary Judgment, and enter final judgment in favor of Defendants.

January 29, 2024

Isaac Freilich Jones
Christopher G. Wells
Gretchen Elizabeth Helfrich
Office of the Illinois Attorney General
115 S. LaSalle St., 20th Floor Chicago, Illinois 60603
Tel. 312-814-3000
isaac.freilichjones@ilag.gov
christopher.wells@ilag.gov
gretchen.helfrich@ilag.gov

Respectfully submitted,

Defendants KWAME RAOUL, RICK AMATO, ROBERT BERLIN, and ERIC RINEHART

KWAME RAOUL,
Illinois Attorney General

By: */s/ Isaac Freilich Jones*
*One of the Attorneys for the State Defendants*

---

[26] By 1860 there were 246 colleges in the United States. Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 35); SOF ¶ 69.

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on January 29, 2024 they caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record.

*/s/ Isaac Freilich Jones*
Assistant Attorney General