IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

BENJAMIN SCHOENTHAL, *et al.*,

        Plaintiffs,

v.

KWAME RAOUL, *et al.*,

        Defendants.

No. 3:22-CV-50326

Hon. Iain D. Johnston

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS OF COOK COUNTY STATE'S ATTORNEY KIMBERLY M. FOXX

Defendant Kimberly M. Foxx in her official capacity as the State's Attorney of Cook County, through her assistants, pursuant to Local Rule 56.1, presents her Statement of Undisputed Material Facts in support of State's Attorney Foxx's motion for summary judgment as follows:

**TABLE OF CONTENTS OF EXHIBITS:**

Exhibit 1:  Declaration of Benjamin Schoenthal (ECF 34-1).
Exhibit 2:  Declaration of Mark Wroblewski (ECF 34-2).
Exhibit 3:  Declaration of Joseph Vesel (ECF 34-3).
Exhibit 4:  Declaration of Douglas Winston (ECF 34-4).
Exhibit 5:  Kimberly M. Foxx's Answer to Plaintiffs' Complaint (ECF 26).
Exhibit 6:  Expert report of James E. Yurgealitis.
Exhibit 7:  Expert report of Dr. Brennan Rivas.
Exhibit 8:  Expert report of Professor Joshua Salzmann.
Exhibit 9:  April 23, 1945 Chicago City Ordinance Creating the Chicago Transit Authority.
Exhibit 10: CTA Ordinance No. 106-110.
Exhibit 11: Street Security Guidelines/Procedures of Pace Bus Company.
Exhibit 12: Regional Transportation Authority ("RTA") Adopted 2023 Operating Budget, Two-Year Financial Plan, and Five-Year Capital Program.
Exhibit 13: https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-metro-and-micro-statistical-areas.html
Exhibit 14: https://ides.illinois.gov/resources/labor-market-information/geographic-definitions.html
Exhibit 15: https://bit.ly/transitchicago_CTARidershipReachesHighestLevelsSince2020
Exhibit 16: https://cn.ca/-/media/Files/suppliers/CN-Policies/Work-on-Railway-RightOfWay-Non-CN-Personnel-en.pdf

**Exhibit 17:** https://www.bnsf.com/bnsf-resources/pdf/ship-with-bnsf/intermodal/general-yard-rules.pdf
**Exhibit 18:** https://bit.ly/UNIONPACIFICRAILROADCOMPANY-Contractor-Minimum-Safety-Requirements
**Exhibit 19:** Benjamin Schoenthal's July 26, 2023 answers to interrogatories.
**Exhibit 20:** Mark Wroblewski's July 25, 2023 answers to interrogatories.
**Exhibit 21:** Joseph Vesel's July 26, 2023 answers to interrogatories.
**Exhibit 22:** Douglas Winston's July 28, 2023 answers to interrogatories.
**Exhibit 23:** Benjamin Schoenthal's document production.
**Exhibit 24:** Mark Wroblewski's document production.
**Exhibit 25:** Joseph Vesel's document production.
**Exhibit 26:** Douglas Winston's document production.
**Exhibit 27:** Deposition of Benjamin Schoenthal.
**Exhibit 28:** Deposition of Mark Wroblewski.
**Exhibit 29:** Deposition of Joseph Vesel.
**Exhibit 30:** Deposition of Douglas Winston.
**Exhibit 31:** https://metra.com/train-lines/stations/elburn
**Exhibit 32:** https://metra.com/union-pacific-west
**Exhibit 33:** https://bit.ly/GoogleMapsWoodridgetoLemontStation
**Exhibit 34:** https://metra.com/train-lines/stations/lemont
**Exhibit 35:** https://bit.ly/MetraOurHistory
**Exhibit 36:** https://bit.ly/MetraLineOwnedAndServicedByBNSF
**Exhibit 38:** https://metra.com/train-lines/stations/waukegan
**Exhibit 39:** https://www.countyofkane.org/Pages/communities.aspx

## PARTIES, JURISDICTION AND VENUE

1. Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, Douglas Winston are, at all times relevant to this lawsuit, residents of the Northern District of Illinois. Ex. 1.
2. Defendant Kimberly M. Foxx is the State's Attorney for the County of Cook, Illinois. Ex. 5, at ¶ 21.
3. This Court has jurisdiction over Plaintiff's claims, except for those related to the Chicago Transit Authority ("CTA"), pursuant to 28 U.S.C. § 1331 and 1343. Ex. 5 at. 23.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### EXPERT WITNESSES

4. James Yurgealitis is a consultant and technical advisor in the field of Firearms, Forensics and their practical application in criminal cases as well as their impact and application to local state, federal law and public policy. Ex. 6 at 1(II).
5. Dr. Brennan Rivas holds a Ph. D in history from Texas Christian University, and his area of scholarship includes a focus on historical weapons regulations in the United States. Ex. 7 at 1(II).
6. Dr. Joshua Salzmann holds a Ph. D in U.S. History and his area of scholarship focuses on the history of cities, urban economies, public policy, and the built environment. Ex. 8 at 1(II).

**FACTS SPECIFIC TO MODERN NORTH EAST ILLINOIS TRANSIT AND DEMOGRAPHICS**

7. The CTA is a municipal corporation authorized by the Metropolitan Transit Authority Act of the State of Illinois, and created by ordinance of the Chicago City Council. Ex. 9 at Foxx 003329 at Preamble.
8. The CTA is granted authority to own and operate a transit system within the city of Chicago and adjacent suburbs. Ex. 9 at Fox 003231, Section 2 Par. A.
9. The CTA independently bans possession or carrying of guns on its property, except as authorized by statute. Ex. 10 at FOXX 003225 at (28).
10. Pace Bus ("Pace") independently bans firearms on its buses. Ex. 11 at Foxx 000298 Par. B(k).
11. If a passenger violates Pace's firearms ban, he can be ejected from the bus, and the driver may call Pace dispatch to take further action against that passenger. Ex. 11 at Foxx 000299.
12. Illinois state law requires CTA, Metra, and Pace to provide free or reduced fare programs for seniors and disabled persons. Ex. 12 at 16.
13. Illinois pays reimbursement to the RTA to offset the costs of those state mandated free or reduced fare programs. Ex. 12 at 16.
14. The Chicago-Naperville-Elgin Metropolitan Statistical Area population is 9,618,502 people as of the 2020 census. Ex. 12.
15. The Lake County-Kenosha County, IL-WI Metropolitan Statistical Area population is 883,507 as of the 2020 census. Ex. 13.
16. The Chicago-Naperville-Elgin Metropolitan Statistical Area includes the Illinois counties of Cook, DeKalb, DuPage, Grundy, Kane, Kendall, McHenry, and Will. Ex. 13.
17. The Lake County-Kenosha County, IL-WI Metropolitan Statistical Area includes the Illinois county of Lake, and the Wisconsin county of Kenosha. Ex. 14.
18. In 2022, CTA ridership was approximately 243.5 million rides. Ex. 15.
19. The Canadian National Railway Company does not allow firearms on its property. Ex. 16.
20. The Burlington Northern Santa Fe Railroad Company bans firearms on its property. Ex. 17 at ¶ 7.
21. The Union Pacific Railroad bans firearms on its property. Ex. 18 at ¶ 2.9.

**PLAINTIFF-SPECIFIC FACTS**

22. Plaintiffs Schoenthal, Wroblewski, Vesel, and Winston want to carry firearms on public transportation in Illinois. Ex. 27 at 20:10-20; Ex. 28 at 15:9-12; Ex. 3 at ¶ 11; Ex. 30 at 86:14-20.
23. Plaintiffs Schoenthal, Wroblewski, Vesel, and Winston are aware that transit agencies in Illinois may have related internal policies or procedures banning the carrying of firearms. Ex. 19-22, Par. 4.
24. Plaintiff Schoenthal primarily uses Metra when he travels on public transportation. Ex. 27 at 21:1-3.
25. Plaintiff Schoenthal typically boards Metra at the Elburn station, located in Kane County, Illinois. Plaintiff Schoenthal cannot board Metra in DeKalb County because the line he rides terminates at the Elburn station. Ex. 27 at 82:10-18.

26. The Elburn station is on the Metra Union Pacific-West line. Ex. 31.
27. The last stop on the Metra UP-W line is Elburn, located at 43 W. 166 Keslinger Rd., Elburn, IL 60119. Ex. 31.
28. Elburn, Illinois is located in Kane County. Ex. 39.
29. The Metra Union Pacific-West line runs on track owned by the Union Pacific Railroad and is operated and dispatched by the Union Pacific Railroad. Ex. 32.
30. Plaintiff Schoenthal does not ride other forms of public transportation. Ex. 27 at 21:9-14.
31. Plaintiff Schoenthal testified that he does not typically ride public buses, and that it had been at least a year since he rode a Pace bus. Ex. 27 at 23:18-22, 84:10-14.
32. Plaintiff Schoenthal cannot recall the last time he rode public transportation in Chicago. Ex. 27 at 83:19-22.
33. Plaintiff Wroblewski resides in Woodridge, Illinois. Ex. 28 at 10:24.
34. The closest Metra station to Plaintiff Wroblewski's home is the Lemont station. Ex. 33.
35. The Lemont Metra station is on the Metra Heritage Corridor line. Ex. 34.
36. The Metra Heritage Corridor runs on tracks owned by the Canadian National Railway Company. Ex. 35.
37. Plaintiff Wroblewski sometimes rides Metra into and out of Chicago. Ex. 28 at 48:22-24, 49:1.
38. Plaintiff Wroblewski does not currently ride CTA. Ex. 28 at 49:2-6.
39. Plaintiff Wroblewski last rode the El approximately ten years ago. Ex. 28 at 81:17-19.
40. Plaintiff Wroblewski does not ride public buses in Northern Illinois. He has never used CTA or Pace buses. Ex. 28 at 80:15-22, 81:13-16.
41. Plaintiff Wroblewski has never trained to use his firearms in a crowd. Ex. 28 at 69:15-17.
42. Plaintiff Wroblewski has never trained to use his firearms on a moving vehicle. Ex. 28 at 69:18-20.
43. Plaintiff Vesel resides in Cook County, Illinois. Ex. 29 at 38:16-23.
44. Specifically, Plaintiff Vesel resides in La Grange, Illinois. Ex. 3 at ¶ 8.
45. Plaintiff Vesel resides .4 miles from a Metra stop. Ex. 3 at ¶ 8.
46. The Burlington Northern Santa Fe Metra line stops in La Grange. Ex. 36.
47. The Burlington Northern Santa Fe Metra line runs on tracks owned by the Burlington Northern Santa Fe Railroad and is operated by the Burlington Northern Santa Fe Railroad. Ex. 37 at 3.
48. Plaintiff Vesel cannot recall when he last rode Metra, and has not ridden Metra for at least two years. Ex. 29 at 49:16-24, 50:7-11.
49. Plaintiff Vesel last rode Metra to come into Chicago. Ex. 29 at 50:7-15.
50. Plaintiff Vesel has not ridden Pace, the El, or a CTA bus in at least five years. Ex. 29 at 50:24, 51:1-6.
51. Plaintiff Winston resides in Lake County, Illinois. Ex. 30 at 14:23-24, 15:1.
52. Specifically, Plaintiff Winston resides in Waukegan, Illinois. Ex. 30 at 14:24.
53. The Metra Union Pacific-North line stops in Waukegan. Ex. 38.
54. The Metra Union Pacific-North line runs on track owned by the Union Pacific Railroad and is operated and dispatched by the Union Pacific Railroad. Ex. 32.
55. Plaintiff Winston rarely rides public transit. Ex. 30 at 65:7-10.
56. Plaintiff Winston last rode a public bus in approximately 1988. Ex. 30 at 100:7-8.
57. Plaintiff Winston had no intent to ride public transit over the previous year. Ex. 30 at 66:1-3.

58. Plaintiff Winston's intent to ride public transit in the future is speculative. Ex. 30 at 66:4-7.
59. Plaintiff Winston has never resided in Dekalb County, Illinois or ridden public transit in Dekalb County. Ex. 30 at 104:10-15.

**EXPERT REPORT FACTS**

60. Dynamic shooting, or shooting 'while on the move', is a skill which requires training and repetition to maintain proficiency and marksmanship. Ex. 6 at 2.
61. Static shooting and dynamic shooting require vastly different skillsets, and the basic Illinois concealed carry qualification course does not include a dynamic training or qualification component. Ex. 6 at 2.
62. Firing a firearm on a moving transit vehicle involves movements that are beyond the scope of static shooting training, which does not account for the random movements of the vehicle and the transmittal of that movement to the passengers. Ex. 6 at 2.
63. Static shooting training does not address the unpredictable movements of an assailant on transit, or the added difficulty of firing while moving into a confined space such as the inside of a rail car. Ex. 6 at 3.
64. Firing a gun in a congested, confined space such as a rail car involves significant elevated risk of unintended harm to third party riders. Ex. 6 at 3. Passengers may be struck by gunfire both because of the unpredictability of movement of the transit car, and because there may be little to no space to hide or retreat from the situation. Ex. 6 at 3.
65. Until the 20th century, American transit was owned and operated by private companies vested with the authority to make their own rules and regulations for customers. Ex. 7 at 24; Ex. 8 at 33.
66. Those private transit companies would have had the authority to regulate the carrying of weapons by customers aboard their vehicles and within their stations. Ex. 7 at 24.
67. America's urban/transportation history may be divided into four distinct periods: The Pre-Industrial era (1600 – 1800s); the Canal and Steamboat era (1800 – 1830s); the Industrial Railroad era (1840s to 1920s); and the era of the Modern Automotive City (1920s to 2020s). Ex. 8 at 5.
68. For long distance travel, early Americans traveled by horseback, a small boat, a wagon, or by walking. Ex. 8 at 6.
69. For short distance travel, well-off early Americans could hire wagons, or take their own wagons or horses. Ex. 8 at 6.
70. At the time of the founding, Philadelphia was America's second largest city, with a population of approximately 28,000 people. Ex. 8 at 4.
71. Prior to the 1820s, no American city possessed a land-based mass-transit system. Ex. 8 at 6.
72. Through the 19th century, chartered railroad corporations collaborated with Wall Street investors, states, and the federal government to construct a massive network of passenger and freight railroads. Ex. 8 at 22-23.
73. The development and expansion of America's rail system during this period coincided with a rise in violence and weapons carrying. Ex. 7 at 24-25.
74. Regulation of firearms by railroads during this period was not uncommon. The Union Pacific and Central Pacific, North Pennsylvania Railroad, South Carolina Canal and Rail

Road Company, International and Great Northern Railroad Company, and Albany Railway had specific gun-carriage policies during the nineteenth century. Ex. 7 at 26.
75. Some contemporary railroads established commuter rail service in and around the nation's largest cities, including New York, Philadelphia, and Chicago. Ex. 8 at 24.
76. The new commuter rail service spurred suburban real estate development. Ex. 8 at 24.
77. Inter and intra-city rail service also allowed for the development of industrial cities, such as Chicago's Union Stockyards. Ex. 8 at 26.
78. Early industrial transit companies used omnibuses, large horse-drawn cars pulled by horses, which anyone could board for a fare. Ex. 8 at 29.
79. Starting in the 1830s and 1840s, omnibuses began being replaced by horsecars, horse drawn cars on rails, through major cities. Ex. 8 at 29.
80. Transit companies began to transition away from horse power with the development of the cable car, whose heyday lasted from the 1880s through the 1910s. Ex. 8 at 30-31.
81. Eventually electric street cars largely replaced cable cars. Ex. 8 at 31.
82. Through the late 19th and early 20th century, Chicago, Boston, New York City and Philadelphia began construction on electric railway systems using a combination of grade level, subway, and elevated "El" lines. Ex. 8 at 33.
83. Unlike earlier transit systems, these new heavy rail lines were constructed and operated by a combination of private and public institutions, and therefore became the first true public transportation systems in America. Ex. 8 at 33.
84. Due to the proliferation of private automobiles, transit usage peaked in the 1920s before beginning to decline. At that time, buses began replacing street cars because they were more cost effective for transit companies. Ex. 8 at 38-39.
85. As private transit companies struggled, municipal governments began to take over their local transit systems. Ex. 8 at 40.
86. Chicago took control of its rail lines, known as the El, in the 1930s. Those lines were consolidated under the control of the Chicago Transit Authority in 1947. Ex. 8 at 40.
87. Today the CTA is the nation's second largest transportation system after the New York City Transit Authority. Ex. 8 at 46.
88. Nineteenth-century statutes, such as laws in Texas, Arkansas, and Tennessee, restricted who could conceal carry and when, when away from home. Ex. 7 at 21-22.
89. The purpose of these statutes was to reduce the needless carrying of weapons in public while permitting the traveler to protect himself from dangers on the road. Ex. 7 at 23.
90. An early Tennessee law, drawing on the Statute of Northampton, barred the private carrying of weapons "to the fear or terror of any person." Ex. 7 at 20.
91. An 1813 Louisiana statute barred the carrying of concealed weapons. Ex. 7 at 21.
92. An 1837 statute of Arkansas barred the carrying of a concealed weapon, "unless upon a journey". Ex. 7 at 21.
93. A Texas statute even required exempted travelers to place their weapons in their baggage. Ex. 7 at 21.
94. "Travelers" were permitted to conceal carry only when they ventured "outside of one's community sphere". Ex. 7 at 22.
95. The Traveler Exception was restricted to long-distance travel and did not apply to commuting within a city or a metro area. Ex. 7 at 24.

96. State appellate courts of the time applied the Traveler Exception narrowly, and variously excluded individuals who crossed into a contiguous county, or journeyed from one county 18 miles to a neighbor, with the expectation of returning the following day. Ex. 7 at 22.
97. Another contemporary appellate court held that an individual who carried a concealed firearm for reasons other than travel along a dangerous road did not constitute a "traveler" within the meaning of the exception. Ex. 7 at 23.

Dated January 29, 2024.

KIMBERLY M. FOXX
*Cook County State's Attorney*

By *s/Jessica M. Scheller*

JESSICA M. SCHELLER
Deputy Chief, Civil Actions Bureau
PRATHIMA YEDDANAPUDI,
Supervisor; Advice, Transactions &
Complex Litigation Section
JONATHON BYRER
Supervisor, Appeals & Special Projects
SILVIA MERCADO MASTERS
EDWARD M. BRENER
Assistant State's Attorneys
Civil Actions Bureau
500 W. Richard J. Daley Center
Chicago, IL 60602
(312) 603-6934
jessica.scheller@cookcountysao.org