**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

BENJAMIN SCHOENTHAL, *et al.*,

                Plaintiffs,

    v.

KWAME RAOUL, *et al.*,

             Defendants.

No. 3:22-CV-50326

Hon. Iain D. Johnston

**<u>DEFENDANT FOXX'S MEMORANDUM IN SUPPORT OF THE FED. R. CIV. P. 56
MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

STANDARD OF REVIEW ............................................................................................ 2

ARGUMENT .................................................................................................................. 3

I.  **The Plaintiffs Do Not Have a Second Amendment Right to Carry Firearms on Private Property** ........................................................................................... 3

    A. Background Principles.......................................................................... 3

    B. The Statute Does Not Implicate The Second Amendment Because Its Purpose is to Protect the Interests of the State As Proprietor Of Public Funds................. 5

    C. Plaintiffs' Alleged Injuries Cannot be Redressed Where Other Regulations Prevent the Carrying of Firearms on Public Transportation ....................... 6

II. **The Statute is Constitutional Under *Bruen*** ................................................ 8

    A. Plaintiffs' Facial Challenge To The Statute Necessarily Fails Under *Bevis* ........ 9

    B. The Statute Does Not "Infringe" The Plaintiffs' Right To "Keep" And "Bear" Arms ............................................................................................. 9

    C. The Statute Is Wholly Consistent With this Nation's Historical Treatment of Firearms ........................................................................................ 12

III. **Venue Is Improper Because Plaintiffs' Claims Do Not Concern Any Public Transportation Within This Division** .......................................................... 18

CONCLUSION.......................................................................................... 20

i

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                               <u>Pages</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ……………………………………….. 2

*Anderson v. Milwaukee County*, 433 F.3d 976 (2006) ………………………………………17, 18

*Agency for International Development v. Alliance for Open Society International, Inc.*,
    570 U.S. 205 (2013) ………………………………………………………………………... 5

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) …………………………………… 8, 9

*Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972) ………………………………………… 18

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) …………………………………………  11, 15, 16

*Carr v. State*, 34 Ark. 448 (1879) ………………………………………………………… 16

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) …………………………………………3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) …………………………………………….. 2

*Comtech Holdings v. Bruner Corp.*, 2017 U.S. Dist LEXIS 230080 (C.D. Ill. 2017) ………… 19

*District of Columbia v. Heller*, 544 U.S. 570 (2008) …………………………………  10, passim

*Darby v. State*, 23 Tax. Ct. App. 407 (1887) …………………………………………………15

*Eberts v. Goderstad*, 569 F.3d 757 (7th Cir. 2009) …………………………………………2

*Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845 (7th Cir. 2010) ……………………… 2

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) ………………………………………4, 5

*Eslava v. State*, 49 Ala. 355 (1873) ………………………………………………………… 16

*Fischer v. Avanade, Inc.*, 519 F. 3d 393 (7th Cir. 2008) ………………………………………3

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ……………………………4

*Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007) ………………………………………..4

*Greer v. Spock*, 424 U.S. 828 (1976) ……………………………………………………… 4

*Hague v. Committee for Indus. Org.*, 307 U.S. 496 (1939) …………………………………… 17

ii

*In re Chavin*, 150 F.3d 726 (7th Cir. 1998) ……………………………………………………3

*International Society for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992) ……………...4, 17

*Kaiser Aetna v. United States*, 444 U. S. 164 (1979) ……………………………………………… 4

*Kipke v. Moore Maryland*, No. GLR-23-1293, 2023 U.S. Dist. LEXIS 174934
    (D. Md. September 29, 2023) ……………………………………………………………… 5

*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) ………………………………………… 17

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) ………………………………………………… 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ……………………… 2

*Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 525 F. Supp. 2d 1039
    (N.D. Ill. 2007) ……………………………………………………………………………… 19

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ……………………… 8, passim

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981) ………………………….. 5

*Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962
    (7th Cir. 2012) ………………………………………………………………………………5

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) ……………………………………………………… 5

*Rotec Industries v. Aecon Group, Inc.*, 436 F. Supp. 2d 931 (N.D. Ill. 2006) ………………… 18

*Samuelson v. LaPorte Cnty. Sch. Corp.*, 526 F. 3d 1046 (7th Cir. 2008) ……………………….. 3

*Smith v. State*, 50 Tenn. 511 (1872) ……………………………………………………………..15

*Stilly v. State*, 27 Tex. Ct. App. 445 (1889) …………………………………………………… 16

*United States v. Kirschenbaum*, 156 F. 3d 784 (7th Cir. 1998) ………………………………… 7

*United States v. Salerno*, 481 U.S. 739 (1987) …………………………………………….. 8, 9

<u>Rules</u>

F.R.C.P. 56 ………………………………………………………………………………… 2

F.R.C.P. 65 ………………………………………………………………………………… 7

<u>Statutes and Ordinances</u>

70 ILCS 3605/3 …………………………………………………………………….. 7

430 ILCS 66/65 ……………………………………………………………… 1, passim

28 U.S.C. § 93 ……………………………………………………………….. 18

28 U.S.C. § 1391 …………………………………………………………… 18, 19

28 U.S.C. § 1404 ……………………………………………………………….. 19

28 U.S.C. § 1406 ……………………………………………………………….. 19

Cook County Code of Ordinances § 54-211 …………………………………… 9, fn 2

<u>Other Sources</u>

A DICTIONARY OF THE ENGLISH LANGUAGE: A DIGITAL EDITION OF THE 1755 CLASSIC BY SAMUEL JOHNSON …………………………………………………………………. 10

Margie Burns, COMMON SENSE IN THE SECOND AMENDMENT: EIGHTEENTH CENTURY ENGLISH & THE U.S. BILL OF RIGHTS (2020) ………………………………………………… 10

English Black Act 9 Geo. 1(1723) …………………………………………... 15

William Hawkins, 1 A TREATISE OF THE PLEAS OF THE CROWN 73 (4th ed. 1762) ….. 15

Statute of Northampton 2 Edw. 3, ch. 3 (1328) ………………………………………15

## INTRODUCTION

Thousands of Cook County residents use public transportation every day, riding in packed buses and trains traveling across the City of Chicago and suburbs. Introducing firearms into an environment of standing and sitting passengers jostling for room in tightly enclosed spaces is a safety risk the Illinois legislature rejected more than a decade ago. Since 2013, the State of Illinois has made it unlawful for individuals to carry "firearms" on public transit systems that are funded, in whole or in part, with money provided from the State treasury. 430 ILCS 66/65 (hereafter, the "the statute"). Plaintiffs, who desire to bring loaded, operable firearms in the crowded confines of these publicly funded transit systems, now challenge that statute, claiming that it violates their Second Amendment rights. Plaintiffs fail to acknowledge the full breadth of their claim. Acceptance of their interpretation of the Second Amendment strips the government of its spending discretion in cases involving firearms, thus forcing the State into a binary choice: either cease all funding of public projects or acquiesce in the use of that funding for activities with which the State does not desire to promote or associate.

Plaintiffs' claim stumbles out of the gate, for four reasons. To start, plaintiffs fail on the merits. It is well-settled that the federal Constitution provides that all governments retain the proprietary rights shared by all individuals, public or private, to control the manner in which their property is put to use, whether that be by barring certain undesired uses of real property, or imposing strict limits on the manner in which government funds are put to use. Further, the owners and operators of the transit systems plaintiffs desire to utilize all affirmatively forbid passengers to carry operable firearms. The prospective relief they desire would thus redress none of their feared injuries. It would neither shield them from criminal prosecution – for trespass of private property rules if not violation of the statute – nor would it allow them to carry firearms on their desired forms of transit. Second, plaintiffs' claim that the statute is facially invalid is foreclosed

1

under the Seventh Circuit's recent decision authorizing a categorical prohibition on ownership of assault weapons. Third, even an as-applied claim would fail under *Bruen*, because the statute is consistent with the Second Amendment's plain text as well as this nation's historical tradition of firearms regulation. Fourth, it fails for want of proper venue in this court; while one plaintiff might reside in this division of the district court, the transit systems they seek to use are all located in the eastern division, and it is in the eastern division that the prosecutions they supposedly fear would take place. We address these failings in turn.

## STANDARD OF REVIEW

"[A] motion for summary judgment requires the responding party to come forward with the evidence that it has – it is the put up or shut up moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009) (internal quotations omitted). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact that must be decided by a jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986)); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is evidence to permit a reasonable jury to return a verdict for the non-moving party. *Egonmwan v. Cook County Sheriff s Dept.,* 602 F.3d 845, 849 (7th Cir. 2010). Neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), is sufficient to defeat summary judgment. Rather, the nonmoving party must go beyond the pleadings, and by his own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although a court must view all facts and draw all reasonable inferences in favor of the nonmoving party in deciding a motion for

summary judgment, *Samuelson v. LaPorte Cnty. Sch. Corp.,* 526 F. 3d 1046, 1051 (7th Cir. 2008), those inferences must find support in the record – the court need not draw inferences that are supported by only speculation or conjecture. *Fischer v. Avanade, Inc.,* 519 F. 3d 393, 401 (7th Cir. 2008). Likewise, although credibility issues are generally left to the trier of fact, testimony used to oppose summary judgment that is so implausible or otherwise fantastical may be disregarded. *See, e.g., In re Chavin,* 150 F.3d 726, 728–29 (7th Cir. 1998).

## ARGUMENT

### I. The Plaintiffs Do Not Have a Second Amendment Right to Carry Firearms on Private Property.

In challenging the statute, plaintiffs wrongly assume that the Second Amendment is violated simply because that statute implicates their interest in bearing arms on public transit. This assumption is fatal to their claims – the statute operates outside the strictures of the Second Amendment because it was enacted to protect the State's proprietary interests in how public funds are utilized by restricting the carrying of firearms solely on methods of transit "paid for in whole or in part with public funds." 430 ILCS 66/65. The statute *only* regulates transportation systems that utilize State funds. Purely private modes of transportation are categorically exempt from regulation under the statute. Because regulations of the government's proprietary interests are, with narrow exceptions not relevant here, subject only to lenient rational-basis review, the statute survives constitutional scrutiny.

#### A. Background Principles.

One of the cornerstone principles of American law is that the owner or proprietor of private property has an absolute right to exclude others from that property. The right to exclude is "universally held to be a fundamental element of the property right," and is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Cedar Point*

*Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021)(*citing Kaiser Aetna v. United States,* 444 U. S. 164, 176, 179-180 (1979)). And it should be beyond reasonable dispute that the Second Amendment does not create an easement across private property rights – to the contrary, at least one court has expressly recognized that the Second Amendment does not provide for "the right to bring a firearm on the private property of another against the wishes of the owner." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012).

That principle applies with equal force to the government as well – indeed, the Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (cleaned up). That is because "[p]ublic property is [still] property, and the law of trespass protects public property, as it protects private property, from uninvited guests. '[T]he Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) (*citing Greer v. Spock*, 424 U.S. 828, 836 (1976)). Moreover, property does not "lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 569 (1972) (Finding the First Amendment's free speech protections do not extend to uninvited guests on private property.). As a result, when the government acts as a proprietor rather than a regulator, its actions "need only be reasonable," *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992) – in other words, they need only satisfy rational basis review.

While most familiar in the First Amendment context, as demonstrated by cases such as *Lee*, this cornerstone principle applies across the spectrum of constitutional rights. The Supreme Court

4

has expressly endorsed application of that principle in the context of the Equal Protection clause, *see Engquist*, 553 U.S. at 598, and the Dormant Commerce Clause, *see Reeves, Inc. v. Stake*, 447 U.S. 429, 445-46 (1980) (holding that a State-operated cement plant was not subject to the Commerce Clause). And at least one court has held that this principle applies to the Second Amendment as well, allowing governments acting as market participants in the public transit industry to exclude firearms on its property, just as private entities could. *Kipke v. Moore Maryland*, No. GLR-23-1293, 2023 U.S. Dist. LEXIS 174934, \*32-33 (D. Md. September 29, 2023).

## B. The Statute Does Not Implicate The Second Amendment Because Its Purpose is to Protect the Interests of the State As Proprietor Of Public Funds.

This principle is not merely limited to the State when it acts as the proprietor of *physical* property – it is also applicable to the government when acting as proprietor of government funds. Indeed, the Supreme Court has "long recognized" that the federal government "may fix the terms on which it shall disburse federal money," *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), so long as those restrictions are within "the limits of the government spending program—those that specify the activities Congress wants to subsidize" rather than "conditions that seek to leverage funding to regulate [constitutional activity] outside the contours of the program itself," *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 214-15 (2013). In other words, the restrictions on funding are appropriate so long as they reflect the government's inherent proprietary interest in the use of the funds being disbursed, rather than a barebones attempt to achieve indirectly by coercion what cannot be achieved directly by legislation. *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012).

These principles doom plaintiffs' claims here. As noted above, the statute does nothing more than restrict the carrying of firearms on transit systems paid for in whole or in part by public funds. The statute advances the State's interest in ensuring that the public funds it provides to transit providers are not used by transit providers that fail to meet what the State has concluded is a minimal level of safety regarding the transport of firearms in crowded trains and buses. Because this condition on the use of funding is specifically limited to the use of the transit systems being funded by the public money – it is not seeking to regulate the keeping or bearing of arms *outside* the property owned and operated by publicly-funded transit systems – it is subject to rational basis review. And given the obvious rational safety basis for prohibiting firearms on crowded buses and trains – particularly buses and trains to which the State provides funding for the specific purpose of improving accessibility for elderly and handicapped individuals, R. 56.1 ⁋ 12, who would be particularly vulnerable to gun violence in the narrow confines of a public bus or train – the statute passes constitutional muster without even reaching the *Bruen* analysis, requiring summary judgment for the defendants.

### C. Plaintiffs' Alleged Injuries Cannot be Redressed Where Other Regulations Prevent the Carrying of Firearms on Public Transportation.

As the plaintiffs make clear, their core concern is not with prosecution, *per se*, but with their ability to carry loaded firearms on public transit. R. 56.1 ⁋ 22. In their Memorandum in Support of Article III Standing, plaintiffs argue that their injury is "the cost of compliance (disarmament on public transportation) in the face of a criminal penalty…" ECF 27 at 14. But even if the statute never existed, they still could not engage in their desired conduct for the simple reason that they have not affirmatively shown that *any* of the transit providers they would use for their travel needs would allow loaded firearms on their buses or trains. Nor could they, had they tried.

6

The CTA was created by the Illinois Metropolitan Transit Authority Act and given the power to "acquire, construct, own, operate and maintain for public service a transportation system in the metropolitan area of Cook County." 70 ILCS 3605/3, 6. And the CTA specifically prohibits the carrying of weapons, including guns, on CTA's transportation system and property. Ord. No. 016-110(28), R. 56.1 ‖ 9. The CTA also prohibits the carrying of a firearm on its trains or buses, R. 56.1 ‖ 9. Likewise, Pace Suburban Bus has its own rule that prohibits firearms with few exceptions. R. 56.1, ‖ 10. Further, the BNSF Railway, the Canadian National Railway, and the Union Pacific Railroad, all on which Metra operates, each prohibit the carrying of firearms on their property. R. 56.1, ‖ 19, 20, and 21. The plaintiffs conspicuously do not join the CTA, Pace, or the private railroads as defendants, let alone challenge the validity of their regulations.[1] These private regulations are not subject to the Second Amendment, or this court's jurisdiction. *See* Fed. R. Civ. P. 65(d)(2); *See also United States v. Kirschenbaum*, 156 F. 3d 784, 794 (7th Cir. 1998) (holding that injunction orders are not binding on independent third parties who have not been served). Regardless of the statute, the plaintiffs would face prosecution for trespass were they not to comply with the transit agencies' and railroads' regulations against firearms.

The plaintiffs' "cost of compliance" remains the same whether this court enjoins the statute or not. Despite bearing the burden of proof on the redressability of their claims, the plaintiffs have failed to offer *any* evidence that *any* railway or bus line they might use in the future affirmatively

---

[1] For essentially the same reasons set forth above in our discussion of the merits, any such challenge would fail as a matter of law, because the CTA has the same right as any other proprietor of its property to set conditions for the use of that property, including by prohibiting loaded, operable firearms on its trains and buses. Moreover, to the extent that the plaintiffs might argue in response that their request for an injunction of any "related laws, regulations, policies, and procedures," ECF 1 at 20-21, reaches individual transit-providers' rules and regulations, their failure to join those transit providers as defendants forecloses such relief here. After all, it should go without saying that a government body is a necessary party to an action seeking to enjoin its own laws.

permits passengers to carry loaded, operable firearms on its trains or buses. Absent such evidence, the plaintiffs can only speculate that their injuries will be redressed by an injunction against the statute, and speculation is never enough to survive summary judgment.

## II.    The Statute Is Constitutional Under *Bruen*.

Even assuming, for sake of argument, that ordinary Second Amendment analysis applies here, summary judgment is still appropriate under *Bruen*. In *Bruen*, the Supreme Court cemented a two-step inquiry. First, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). Then, assuming the plain text covers the conduct, the government must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id* at 24. The plaintiffs here bring a facial challenge to the statute, *see* R. 1 at 20-21 (requesting blanket injunction against all enforcement of the-transit statute), which requires that they show that the statute is unconstitutional on any set of facts, not merely the facts of this case. *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Plaintiffs' claim fails on the merits for three reasons. First, they cannot possibly succeed on a facial challenge under the Seventh Circuit's decision in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), which recognizes that assault weapons – which it cannot be disputed are reached by the statute's broad prohibition on "firearms" on public transit – are not protected by the Second Amendment. That leaves only an as-applied challenge on the plaintiffs' specific facts, which fails under both steps of *Bruen*. At the first step, plaintiffs have failed to show that the statute has effects so severe as to "infringe" on their right to keep and bear arms within the plain meaning of the Second Amendment's text. At the second, the statute is wholly consistent with this nation's historical treatment of firearms. We address these failings in turn.

8

**A. Plaintiffs' Facial Challenge To The Statute Necessarily Fails Under *Bevis*.**

As noted above, the Seventh Circuit in *Bevis* upheld the County's categorical ban on the ownership or possession of assault weapons against a Second Amendment challenge, explaining "that the Arms protected by the Second Amendment do not include weapons that may be reserved for military use." 85 F.4th at 1194 (7th Cir. 2023). Because the statute specifically applies to any "firearm," 430 ILCS 66/65, it undoubtedly sweeps within its ambit assault weapons that are unprotected by the Second Amendment under *Bevis*.[2] That is fatal to any facial Second Amendment claim here, since such a claim requires proof that the statute is invalid on *all* conceivable sets of facts, *Salerno*, 481 U.S. at 745, and *Bevis* makes it impossible to say that the statute is invalid when applied to individuals who bring assault weapons on public transit.

**B. The Statute Does Not "Infringe" The Plaintiffs' Right To "Keep" And "Bear" Arms.**

Assuming that the plaintiffs desire to proceed with only an as-applied challenge to the statute, that claim fails as well under *Bruen*'s first step. Plaintiffs bear the burden of showing that their desired conduct falls within the plain text of the Second Amendment – namely, that it "infringes" their right to keep and bear arms. The Supreme Court's decisions in *Bruen* and *Heller* did not define that term, likely because the laws addressed in those cases effectively banned ownership and/or household use of common handguns, undoubtedly infringing the right to keep and bear those handguns no matter how that term were defined.

---

[2] Although the statute elsewhere contains definitions "concealed firearm" and "handgun," with certain exemptions, 430 ILCS 66/5, it does not separately define "firearm" for purposes of the transit-funding statute. Even assuming for sake of argument that the legislature intended to use those definitions, the result here would be the same because the assault weapons ban upheld in *Bruen* applied to certain handguns. *See* Cook County Code of Ordinances § 54-211(7)(B).

Absent an authoritative definition of that term, the interpretive analysis focuses on the meaning of the "text, as informed by history." *Bruen*, 597 U.S. at 23. Here, comparing the language of the Constitution's first two amendments and their different word choices emphasizes that "infringe" was intended to have a particular meaning. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "diminish." *See Abridge*, A DICTIONARY OF THE ENGLISH LANGUAGE: A DIGITAL EDITION OF THE 1755 CLASSIC BY SAMUEL JOHNSON, https://johnsonsdictionaryonline.com (last visited January 25, 2024) (hereafter, "JOHNSON DICTIONARY"). Thus, the First Amendment prohibits any diminishment of the rights it protects.

The Second Amendment, conversely, requires that the right to bear arms not be "infringed." In standard American English in the Founding era, to "infringe" meant to "violate" or "destroy." *See Infringe,* JOHNSON DICTIONARY, https://johnsonsdictionaryonline.com (last visited January 25, 2024). The distinction between these words is consistent in English-language dictionaries from the eighth century until the ratification of the Bill of Rights. Margie Burns, COMMON SENSE IN THE SECOND AMENDMENT: EIGHTEENTH CENTURY ENGLISH & THE U.S. BILL OF RIGHTS, 18–19 (2020). Thus, members of the founding generation would have understood that the legislature could regulate the conduct protected by the Second Amendment so long as such regulations did not effectively or actually destroy the underlying right.

This understanding of the term "infringe" also finds support in the Second Amendment's prefatory clause, which may be consulted whenever a court is confronted with an ambiguity in the language of the Amendment's operative clause. *District of Colombia v. Heller*, 554 U.S. 570, 577–78 (2008). That prefatory clause specifically contemplates a "well-regulated militia," not a militia whose members are free from all conceivable burdens or regulations on gun ownership or

possession – it is only when those burdens become so great as to infringe on or destroy the militia's ability to keep and bear certain arms that they run afoul of the Second Amendment's plain text. And while the prefatory clause contemplates only regulation of the "militia," that is a distinction without a difference because *Heller* made clear that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service." 554 U.S. at 627.

This understanding of the term "infringe" is wholly consistent with the Supreme Court's caselaw. In *Heller*, for example, the laws at issue effectively forbade the ownership of handguns by requiring their registration, but also forbidding their registration. 554 U.S. at 575. Although other guns were allowed, they could be kept at home only if they were either disassembled or rendered inoperable with a trigger lock or similar mechanism. *Id.* In *Caetano v. Massachusetts*, the law at issue involved an absolute ban on the possession of stun guns. 577 U.S. 411 (2016). And in *Bruen*, the law at issue absolutely prohibited an individual from bearing a firearm in public unless he "demonstrates a special need for self-defense." 597 U.S. at 11. In each circumstance, the regulation at issue effectively destroyed—and, thus, "infringed" within the meaning of the Second Amendment's text—the plaintiff's right to keep and bear certain arms protected by the Constitution.

Moreover, in striking down the law at issue in *Heller*, the Supreme Court specifically warned that "nothing in [its] opinion should be taken to cast doubt on longstanding . . . laws forbidding the carrying of firearms in sensitive places such schools and government buildings..." 554 U.S. at 626. Such laws undoubtedly make it more difficult to bear arms wherever one might travel, so this statement would be unusual if the Court believed its analysis cast into doubt all regulations having even the most minimal effect on an individual's ability to carry arms. Even

more unusual would have been *Bruen*'s subsequent statements affirming the existence of traditional sensitive places where firearms could be constitutionally forbidden and the possibility that "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. Such regulations would undoubtedly impose some burden on an individual's right to keep and bear arms—particularly if the right to carry in public exists—so the Supreme Court would not have expressed approval of those regulations if it believed that moderate burdens on the right to bear arms constituted an "infringement" of that right.

As set forth by the Supreme Court, text of the Second Amendment allows the government to regulate an individuals' ability to keep and possess firearms, so long as the government can "establish that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 18. And under that standard, the statute easily passes muster. On its face, it applies only to public transit systems that are funded with public money. Such a narrow restriction on the plaintiffs' ability to bear arms on effectively private property is far from an absolute or effective destruction of that right as was at issue in any of the Supreme Court's cases, and thus does not constitute an infringement under the Second Amendment's plain text.

### C. The Statute Is Wholly Consistent With this Nation's Historical Treatment of Firearms.

Even if the statute did contradict Second Amendment's plain text, it nevertheless survives *Bruen*'s second step. The government "must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 23-24 (cleaned up).

The nature of that historical inquiry depends on the societal ill or problem at issue.

12

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen*, 597 U.S. at 26-27. Put simply, the court in such circumstances "consider[s] whether historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation" supporting the challenged regulation. *Id*. at 27 (quotation marks omitted).

That said, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27-28.  In such cases, "history [will] guide our consideration of modern regulations that were unimaginable at the founding" but the "historical inquiry that courts must conduct will often involve reasoning by analogy" to ascertain "whether the two regulations are 'relevantly similar.'" *Id*. at 28. While the Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did identify at least "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29-30. Because self-defense is a "central component" of the Second Amendment right, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id*. at 29 (quotation marks omitted).

This regulation must be analyzed under *Bruen's* nuanced approach. In the centuries following the adoption of the Second Amendment, American life has been transformed by waves of transportation technologies which have reordered society. At the time of the adoption of the

Second Amendment, America was a pre-industrial society, and most Americans traveled its cities existed by walking, on private boats, or by private horsepower. R. 56.1 ⁋ 67-69. Philadelphia was the second largest city in America, with approximately 28,000 residents. R. 56.1 ⁋ 70. Prior to the 1820s, no American city possessed a land-based mass transit system. R. 56.1 ⁋ 71. Railroads did not appear until well into the 19th century, and the development and expansion of rail coincided with a rise in both violence and weapons carrying in America. R. 56.1 ⁋ 72-73. Only in the 19th century did railroads first establish commuter rail service in any American city, which began to allow for the development of the first industrial cities. R. 56.1 ⁋ 75-77.

The scope and nature of modern American transit was unknown to the founding generation. Today the combined Chicago metropolitan area is home to more than 10,000,000 residents. R. 56.1 ⁋ 1-17. In 2022, CTA alone provided over 243.5 million rides. R. 56.1 ⁋ 18. Each colonial Philadelphian would have had to board a CTA bus or train approximately 8,700 times in one year to achieve that level of ridership in pre-industrial America. Modern mass transit did not begin to emerge until the end of the 19th century, and government funded and operated transit systems like CTA and Metra are products of post-World War II America. R. 56.1 ⁋ 82-83, 85-86. These transit systems were not in place at the time of the founding both because pre-industrial walking cities had no need for them, and because the technology which made modern transit possible did not yet exist. The problem of ensuring the security of hundreds of millions of train and bus commuters was not one the Founders considered when the Second Amendment was crafted. These dramatic technological changes, which in turn gave rise to the modern phenomenon of mass public transportation, require this regulation to be analyzed under the nuanced approach.

Properly applying this nuanced approach, there are two different historically analogous legal regimes to the challenged regulation, either one of which is sufficient to rule in Defendant's

14

favor. First, time and place restrictions on the carrying of firearms have existed for centuries and entered American law through its English forebears. As early as 1328, the Statute of Northampton specifically prohibited the carrying of arms in "fairs" and "markets." 2 Edw. 3, ch. 3 (1328). The English Black Act also forbade the carrying of weapons in forests and on roads if the bearer's face was "blackened, or being otherwise disguised". Act 9 Geo. 1 c. 22 (1723). This reflects that the English treated the law of self-defense, the core right with which our Second Amendment is concerned, *Heller*, 554 U.S. at 630, differently depending on whether one was in a town or on the road, by creating:

> a Distinction between an Assault in the Highway and an Assault in a Town; for in the first Case it is said, That the Person assaulted may justify killing the other without giving back at all: But that in the second Case, he ought to retreat as far as he can without apparently hazarding his Life, in respect of the Probability of getting Assistance.

1 William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 73 § 25 (4th ed. 1762).

The distinction between the lawfulness of bearing arms where help is likely to come versus where help is unavailable entered American law and is reflected in the concealed carry exception of the Traveler. R. 56.1 ⁋ 94. The exception held that, while concealing a weapon was generally unlawful, that Travelers, who were far from home and without access to the safety of their communities, could lawfully carry a concealed weapon while on their travel. R. 56.1 ⁋ 88-89. These statutes existed in multiple jurisdictions in the 19th Century, including the states of Texas, Arkansas, and Tennessee. R. 56.1 ⁋ 88. Contemporary courts construed these statutes narrowly. In *Smith v. State*, 50 Tenn. 511 (1872), the Tennessee Supreme Court held that an individual who crossed into a neighboring county 12 miles away, did not constitute a "journey" within the meaning of the state's Traveler exception. *Id.* at 513. In 1887, the Court of Appeals of Texas held that a journey of 18 miles from one county to another with the intention of returning the following day did not invoke the Traveler exception. *Darby v. State*, 23 Tax. Ct. App. 407, 408 (1887). Likewise,

an individual who carried a concealed weapon into town while on a journey ceased to be a Traveler, and was required to set aside his concealed weapon until his journey resumed. *Carr v. State*, 34 Ark. 448, 449 (1879). The Alabama Supreme Court reached a similar conclusion in *Eslava v. State*, 49 Ala. 355 (1873). And in 1889 the Court of Appeals of Texas held that a Traveler lost the protection of the exception when his purpose changed from business to recreation, and he was not permitted to "idly stroll" through town for entertainment while armed. *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

This establishes a historical tradition of regulating the place and manner of the bearing of concealed arms, dating back prior to the founding of this country to the English Common Law, and continuing through the reconstruction period. The founding generation would have been well aware of the Statute of Northampton and its descendants and could not have intended for the Second Amendment to impose a blanket ban on the regulation of concealed carry on government property. That principle extends to modern public transportation systems. Defendant has met her burden of establishing historically analogous laws to the challenged regulation.

Further, *Heller* instructs that it is not only the Second Amendment that has a fixed meaning according to its historical understanding, but that this is how other provisions of the Bill of Rights must be understood and applied to modern situations. *Heller*, 544 U.S. at 582. The Court has repeatedly compared the Second Amendment's application to modern bearable arms with the First Amendment's protection of modern forms of communications. See, e.g., *Heller*, 554 U.S. at 582; *Caetano*, 577 U.S. at 417; *Bruen*, 597 U.S. at 28. The Second Amendment right to bear arms is no more unlimited than the First Amendment right to free speech. *Bruen*, 597 U.S. at 24 (*citing Heller*, 554 U.S. at 626). Because the First and Second Amendment must be interpreted using the same analytical lens, *Heller*, 554 U.S. at 582, content-neutral restrictions on speech on government

property are reasonable analogues to restrictions on the bearing of arms on government property. It is therefore reasonable to analogize modern and historical restrictions on the speech of travelers to the regulation in question, and to uphold the regulation on that basis. And as argued above, there is a wealth of case law holding that government is not required to permit limitless speech on property it owns, and that those restrictions do not offend the First Amendment. See, e.g., *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992).

Of particular analogue to this matter is the Seventh Circuit case *Anderson v. Milwaukee,* in which the court upheld a rule barring distribution of literature on a public bus. 433 F.3d 975, 979 (7th Cir. 2006). The court held that passing out religious literature was protected speech within the meaning of the First Amendment. *Id.* However, the court found that the interior of a city-operated transit vehicle is a nonpublic forum, meaning "public property which is not by tradition or designation a forum for public communication." *Id.* (*citing Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)). Because the bus is a nonpublic forum, the government has the right to pass limitations on otherwise protected speech so long as they are not content based restrictions. *Id.* Bus passengers represent a "captive audience" who can neither avoid nor escape from a speaker riding the bus with them, and therefore the government's interest in protecting its passengers was superior to the plaintiff's interest in engaging in protected speech. *Id.* at 980. As a result, the regulation was upheld. *Id.*

The *Anderson* decision has never been held to be ahistorical and therefore unconstitutional, and in fact the U.S. Supreme Court has announced that the state's ability to impose regulations on speech in public places for the benefit of the public has existed since ancient times. *See Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939) (holding that the rights of Americans to engage in protected speech in public is not absolute, but instead relative to the general welfare of

17

the public, and that this principle is historically well established). The train passengers riding transit with an armed passenger are in no better position to escape than the bus passengers listening to unwelcome protected speech, and with potentially deadlier consequences. R. 56.1 ⁋ 66. And of course, like in *Anderson*, the plaintiffs seek to engage in constitutionally protected behavior on privately-owned government-funded property. R. 56.1 ⁋ 13, 29, 36, 47, 54. The only real significant difference between *Anderson* and this case is the right in question, and that difference alone is not sufficient to undermine the analogy between free speech and the freedom to bear arms.

The Court has told us that the government analogy need not be a "dead ringer" for the challenged regulation, *Bruen*, 597 U.S. at 30. And in this case, the regulation against carrying guns on public transit is sufficiently analogous that it must be upheld. Under *Bruen*, nothing more is required and this court should enter summary judgment in defendant's favor.

### III. Venue Is Improper Because Plaintiffs' Claims Do Not Concern Any Public Transportation Within This Division.

Plaintiffs bear the burden of establishing that venue is proper. *Rotec Industries v. Aecon Group, Inc.*, 436 F. Supp. 2d 931, 933 (N.D. Ill. 2006) *citing Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 18 (1972). Plaintiffs allege venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Northern District of Illinois." ECF 1, ⁋ 25. However, none of the events and omissions giving rise to plaintiffs' claims occurred in the Western Division.

Under 28 U.S.C. § 93(a)(2), the Western Division of the Northern District comprises the counties of Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago. Of the four counties whose officials are included as Defendants, only DeKalb County is located in the Western Division. Plaintiff Schoenthal is the only plaintiff with a connection to DeKalb County. He alleges he is a citizen of DeKalb County and testified that he primarily uses

Metra when he travels on public transportation. R. 56.1, ℗ 24. Schoenthal also stated that he typically boards Metra at the Elburn station, which is located in Kane County. R. 56.1, ℗ 25. The line he rides terminates at the Elburn station, and he cannot board Metra in DeKalb County. R. 56.1 ℗ 25, 27. None of the other plaintiffs allege that they wish to or already do ride public transportation in DeKalb County. Plaintiffs have alleged no other facts involving DeKalb County and cannot establish a claim against Defendant Amato, the DeKalb County State's Attorney. None of the events and omissions giving rise to plaintiffs' claims occurred in the Western Division. Venue in the Western Division is improper under 28 U.S.C. § 1391, and this matter should be dismissed or transferred to the Eastern Division pursuant to 28 U.S.C. § 1406(a).

Moreover, 28 U.S.C. § 1404 weighs in favor of a transfer to the Eastern Division even if venue were proper in the Western Division. A court may consider transfer with less deference to the plaintiff's choice of forum "when another forum has a stronger relationship to the dispute or when the forum of plaintiff's choice has no significant connection to the situs of material events." *Comtech Holdings v. Bruner Corp.*, 2017 U.S. Dist LEXIS 230080, 5 (C.D. Ill. 2017) (*quoting Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 525 F. Supp. 2d 1039, 1044 (N.D. Ill. 2007)). Here, the Eastern Division clearly has a stronger relationship to the dispute as all of the material events have or would occur there and as three of the four defendants and three of the four plaintiffs are located in the Eastern Division.

Plaintiffs have not properly alleged a claim against the DeKalb County State's Attorney and cannot show any basis for proper venue in the Western Division. Venue is properly located in the Eastern Division and should be transferred to that forum.

## CONCLUSION

For each of the foregoing reasons, Defendants respectfully request that this Honorable Court grant judgment in their favor and against the Plaintiffs.

Dated January 29, 2024

KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendants*

By s/ *Jessica M. Scheller*
JESSICA M. SCHELLER
Deputy Chief; Civil Actions Bureau
PRATHIMA YEDDANAPUDI,
Supervisor; Advice, Transactions &
Complex Litigation Section
JONATHON BYRER
Supervisor, Appeals & Special Projects
SILVIA MERCADO MASTERS
EDWARD M. BRENER
MEGAN HONINGFORD
Assistant State's Attorneys
Jessica.Scheller@cookcountysao.org
Prathima.Yeddanapudi@cookcountysao.org

## CERTIFICATE OF SERVICE

I, Jessica M. Scheller, hereby certify that on January 29, 2024 I caused a true and correct copy of the Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56, and Defendants Local Rule 56.1 Statement of Facts be sent via e-filing to all counsel of record in accordance with the rules regarding the electronic filing and service of documents.

*/s/ Jessica M. Scheller*
Jessica M. Scheller
Cook County Assistant State's Attorney
50 W. Washington, 5th Floor
Chicago, Illinois 60602
(312) 603-6934
Jessica.Scheller@cookcountysao.org

20