**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

BENJAMIN SCHOENTHAL, *et al.*,

          *Plaintiffs*,

 v.

KWAME RAOUL, *et al.*,

          *Defendants.*

No. 3:22-cv-50326

Honorable Iain D. Johnston

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

ARGUMENT ..................................................................................................................... 4

    I.      Plaintiffs have Article III Standing ............................................................ 4

          A.  Plaintiffs Show Injury ..................................................................... 4

          B.  Plaintiffs Demonstrate Causation and Redressability .............................. 6

    II.     The Public Transportation Carry Ban Violates the Second Amendment ...................... 7

          A.  The Second Amendment's Plain Text Covers Plaintiffs' Conduct .......................... 8

          B.  Illinois Cannot Show that the Public Transportation Ban is Consistent with the
             Nation's Historical Tradition of Firearms Regulations ............................ 9

             1.   Illinois Will Be Unable to Identify Analogous Restrictions to the
                  Transportation Carry Ban .................................................. 15

             2.   The Ban is Not Analogous to Permissible "Sensitive Place"
                  Restrictions ........................................................... 19

             3.   Illinois Cannot Support the Public Transportation Carry Ban By
                  Pointing To a Tradition of Restricting Carry in Crowded Locations. ...... 25

CONCLUSION ................................................................................................................. 26

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*520 Mich. Ave. Assocs., Ltd. v. Devine*,
    433 F.3d 961 (7th Cir. 2006) ...........................................................................6

*Atkinson v. Garland*,
    70 F.4th 1018 (7th Cir. 2023).....................................................................9, 12

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) .........................................................................13

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ...............................................................................23

*California v. Texas*,
    141 S. Ct. 2104 (2021)......................................................................................6

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................8, 9, 10, 18, 26

*Duncan v. Bonta*,
    No. 17-cv-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023).....................12

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020)....................................................................................12

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .........................................................................5, 6

*Fed. Election Comm'n v. Cruz*,
    142 S. Ct. 1638 (2022)......................................................................................6

*Gamble v. United States*,
    139 S. Ct. 1960 (2019)....................................................................................11

*Hawkins v. Hoffman*,
    6 Hill 586 (N.Y. Sup. Ct. 1844) .....................................................................17

*Koons v. Platkin*,
    No. 22-7464, 2023 WL 3478604 (D.N.J. May 16, 2023) ...........................14, 23

*Lara v. Comm'r Pa. State Police*,
    No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024) ..............................9, 12

*Lynch v. Donnelly*,
    465 U.S. 668 (1984)........................................................................................11

*May v. Bonta*,
    No. 23-cv-1696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023).......12, 13, 19, 20

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)....................................................................................5, 10

*Md. Shall Issue, Inc. v. Moore*,
   86 F.4th 1038 (4th Cir. 2023).........................................................................................14

*Md. Shall Issue, Inc. v. Moore*,
   2024 WL 124290 (4th Cir. 2024)....................................................................................14

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012)......................................................................................9, 12

*Moran v. Calumet City*,
   54 F.4th 483 (7th Cir. 2022)...........................................................................................4

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022).................1, 2, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 17, 18, 19, 20, 23, 24, 25

*Ramos v. Louisiana*,
   140 S. Ct. 1390 (2020).......................................................................................10, 11, 13

*Range v. U.S. Att'y Gen.*,
   69 F.4th 96 (3d Cir. 2023).............................................................................................24

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006).........................................................................................................4

*Spokeo, Inc. v. Robbins*,
   578 U.S. 330 (2016)....................................................................................................4, 5

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).........................................................................................................7

*Steffel v. Thompson*,
   415 U.S. 452 (1974).......................................................................................................6

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014).......................................................................................................6

*Timbs v. Indiana*,
   139 S. Ct. 682 (2019).............................................................................................10, 11

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)...................................................................................................4

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021).....................................................................................................4

*Virginia v. Moore*,
   553 U.S. 164, 168 (2008).............................................................................................11

*Wolford v. Lopez*,
   No. 23-cv-265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)....................................18, 19

*Woods v. Devin*,
   13 Ill. 746 (Ill. 1852)...................................................................................................17

*Worth v. Harrington*,
   No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023)....................................12

**Constitutions and Statutes**

U.S. CONST.
  amend. III ................................................................................................8
  amend. IV ................................................................................................8

MD. CONST. art. 1 §§ 3, 14 (1776) ............................................................22

430 ILCS
  66/65(a)(8) ......................................................................................1, 2, 19
  66/65(b)...................................................................................................1
  66/70(e)...............................................................................................2, 3

720 ILCS
  5/24-1(a)(4), (a)(10) ...............................................................................2

730 ILCS
  5/5-4.5-60 ...........................................................................................2, 3
  5/5-4/5-55 .............................................................................................3

**Other Authorities**

1 LAWS OF NEW YORK (Websters & Skinner 2d ed. 1807) ...........................22

1 LAWS OF NEW YORK (Charles R. & George Webster 1802) ......................21

1 RECORDS OF THE COLONY OF RHODE ISLAND (John Russell Bartlett ed., 1856) ........................25

1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY
  (Nathaniel B. Shurtleff ed., 1853) ....................................................25

1 THE STATUTES AT LARGE OF VIRGINIA
  (William Waller Hening ed., Richmond, Samuel Pleasants 1809) .................26

1 STATUTES AT LARGE OF VIRGINIA (William Waller Hening ed., 1823) ...............25

1 STATUTES AT LARGE OF VIRGINIA (Samuel Shepherd ed., 1835) ...............16

10 PENNSYLVANIA STATUTES AT LARGE (William Stanley Ray ed., 1904)...............21, 22

2 LAWS OF DELAWARE (Samuel & John Adams eds., 1797) ...............21, 22, 23

2 LAWS OF VERMONT (Randolph, Sereno Wright 1808) ...............22

9 STATUTES AT LARGE OF SOUTH CAROLINA (David J. McCord ed., 1841) ...............16, 17

1812 KENTUCKY ACTS 100–01, ch. 89, § 1 ...............18

1819 INDIANA ACTS 39, ch. 23, § 1...............18

1821 TENNESSEE. ACTS 15, ch. 13 ...............18

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF
  VIRGINIA (1803)...............22

A COMPILATION OF THE LAWS OF GEORGIA
  (Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812)...............21

A DIGEST OF THE LAWS OF GEORGIA (Robert & George Watkins eds., 1800)...............16, 22

A MANUAL OF THE LAWS OF NORTH-CAROLINA
(John Haywood ed., 3d ed. 1814) ...................................................................22

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA
(Augustine Davis ed., 1796) ...........................................................................22

Act for Regulating Ferries of 1791, *in* ACTS AND LAWS OF CONNECTICUT (1791).....................16

Act for Regulating Ferries of 1797, ch. 42, *in* ACTS AND LAWS OF THE
COMMONWEALTH OF MASSACHUSETTS (1896) ...............................................16

ACTS AND LAWS OF THE STATE OF CONNECTICUT
(New London, Timothy Green 1784)................................................................22

ACTS AND RESOLVES OF MASSACHUSETTS (Boston, Adams & Nourse 1893) ..............................22

Amici Br. of Citizens Comm. for the Right to Keep & Bear Arms, et al.,
*Koons v. Platkin*, No. 23-1900 (3d Cir. Aug. 16, 2023), ECF No. 91 ...............................21

Amicus Br. of Ctr. for Hum. Liberty, *Antonyuk v. Nigrelli*, No. 22-2908
(2d Cir. Feb. 9, 2023), ECF No. 313 ................................................................21

AN ACT TO REGULATE THE FERRY BETWEEN THE CITY OF NEW YORK AND
THE ISLAND OF NASSAU (1732)....................................................................16

*Annual Ridership Report, Calendar Year 2019*, CHI. TRANSIT AUTH. (Jan. 16, 2020),
https://bit.ly/3ItZXrl.......................................................................................2

ARCHIVES OF MARYLAND
(William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) .................................25, 26

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*,
8 LIBERTY UNIV. L. REV. 653 (2014) ..............................................................26

Clayton E. Cramer, *Colonial Firearm Regulation*,
16 J. FIREARMS & PUB. POL'Y 1 (2004).............................................................26

Charles Christopher Crittenden, *Ships and Shipping in North Carolina, 1763–1789*,
*in* 8 THE NORTH CAROLINA HISTORICAL REVIEW (Jan. 1931) .................................17

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA
(Richmond, Thomas W. White 1828) ...............................................................21

JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS
OF NEW JERSEY (Burlington, Isaac Collins, *reprinted*
Woodbury, Joseph Sailer 1835) .....................................................................21

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
13 CHARLESTON L. REV. 204 (2018).............................................................20, 26

LAWS OF NEW HAMPSHIRE (1797)...........................................................................22

LAWS OF NEW JERSEY
(Joseph Bloomfield ed., Trenton, James J. Wilson 1811)........................................22

LAWS OF VERMONT (1808) ....................................................................................21

*Monday Paper*, AURORA GEN. ADVERTISER (Dec. 2, 1793).............................................17

THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK
(David Thomas Konig et al. eds., Princeton Univ. Press 2019)..........................................24

NICHOLAS J. JOHNSON ET AL., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY
(3d ed. 2021) ................................................................................................16

HENRY CHARLES MOORE, OMNIBUSES AND CABS: THEIR ORIGIN AND HISTORY 182
(London, Chapman & Hall, LD. 1902)..............................................................15

Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*,
12 Q. J. OF N.Y. STATE HIST. ASS'N 231 (1931)..................................................15

Order, *May v. Bonta*, No. 23-4356 (9th Cir. Jan. 6, 2024), ECF No. 20.1 .....................13

Order, *Koons v. Platkin*, No. 23-1900 (3d Cir. June 20, 2023), ECF No. 29.....................14

PUBLIC LAWS OF SOUTH CAROLINA (Philadelphia, R. Aitken & Son 1790) .............21, 22, 23

PUBLIC RECORDS OF THE COLONY OF CONNECTICUT
(Hartford, Brown & Parsons 1850)..................................................................26

*Ridership Trends, Annual Report 2019*, METRA: DIV. OF STRATEGIC PLAN.
& PERFORMANCE (Feb. 2020), https://bit.ly/3Eaij9c ..............................................2

*Saturday Paper*, INDEP. GAZETTEER (Aug. 31, 1782)...............................................16

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*,
HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.........9, 10

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence
on the Founders*, 2020 PEPP. L. REV. 71 (2020) ..............................................24

THE HISTORY OF THE THAMES WATERMEN....................................................................15

THE LAWS OF MARYLAND, ch. 25 (1799) ...................................................................22

THE PUBLIC LAWS OF RHODE ISLAND (Providence, Carter & Wilkinson 1798) .............21, 22

G.A. THRUPP, THE HISTORY OF COACHES (London, Kerby & Endean 1877),
https://bit.ly/41k1Wrg ..................................................................................15

*Thursday Paper*, THE PA. GAZETTE (Apr. 30, 1761) ...................................................16

Tr. of Oral Arg., *Bruen*, 597 U.S. 1 (2022) (No. 20-843) ........................................24, 25

*Transit System*, ILL. DEP'T OF TRANSP., https://bit.ly/48JR7lx (last visited Jan. 25, 2024)............2

*Tuesday Paper*, AM. DAILY ADVERTISER (Sept. 16, 1794) ......................................16, 17

*Tuesday Paper*, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768) .........16

*Wednesday Paper*, POUGHKEEPSIE J. (Apr. 18, 1787)................................................16

Ron Vineyard, *Stage Waggons and Coaches*, COLONIAL WILLIAMSBURG FOUND. (2002),
https://bit.ly/3RH6l4D (last visited Jan. 22, 2024) ..............................................15, 16

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical
Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009) ........................24, 25

GEORGE WEBB, THE OFF. AND AUTHORITY OF A JUSTICE OF PEACE
(Williamsburg, William Parks 1736) ................................................................17

Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston respectfully submit this Memorandum in Support of their Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

## INTRODUCTION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court held that individuals have a constitutional right protected by the Second Amendment to carry firearms for self-defense outside the home. Yet, under Illinois law, ordinary, law-abiding Illinoisans who are duly licensed to carry concealed firearms cannot exercise this right if they travel outside their homes on public transportation. *See* 430 ILCS 66/65(a)(8) ("Public Transportation Carry Ban" or "Ban"). The Ban is sweeping. It bars carry on all modes of public transportation, plus any associated real property such as parking lots or train stations.[1] The Ban thus imposes a burden on Second Amendment rights beyond merely being disarmed on public transportation—which itself is unconstitutional. After all, if an individual cannot have a firearm while on public transportation, that necessarily means both (1) that he cannot have his firearm *before* boarding and (2) that he is deprived of having his firearm *after* departing while he is at his destination. Illinois' ban thus effectively bars carrying before the journey, during the journey, and after the journey for all individuals that use public transit.

Plaintiffs—law-abiding citizens licensed to carry in Illinois—intend and desire to carry their firearms for self-defense on public transportation but have not for fear of arrest and prosecution. The Transportation Carry Ban infringes their Second Amendment rights and must be declared unconstitutional and enjoined. In *Bruen*, the Supreme Court reaffirmed that any Second

---

[1] The Ban only exempts firearms in parking areas of public transportation facilities that are "concealed in a case within a locked vehicle or locked container out of plain view within the vehicle" or to the extent a person is storing or retrieving a firearm within a case. 430 ILCS 66/65(b).

Amendment regulation is constitutional only if the government "demonstrate[s] that [it] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. But there is no historical tradition supporting Illinois' Ban. Modes of public transportation date back to the Founding era, but there is no tradition of banning firearms in them. On the contrary, there is a historical tradition of affirmatively *requiring* firearms on certain modes of transportation. Plaintiffs thus respectfully ask this Court to permanently enjoin enforcement of the Transportation Carry Ban.

## STATEMENT OF FACTS

Public transportation is a vital part of life for many Illinoisans who use it to commute to work, run errands, and connect with family and friends. According to the Illinois Department of Transportation, "ninety-six out of the state's 102 counties offer some type of transit service to their communities." *Transit System*, ILL. DEP'T OF TRANSP., https://bit.ly/48JR7lx (last visited Jan. 29, 2024). To cite just a few examples, the Chicago Transit Authority transported over 468 million riders on trains and buses, and Metra commuter rail transported over 74 million riders annually in recent years. *Annual Ridership Report, Calendar Year 2019* at 1, CHI. TRANSIT AUTH. (Jan. 16, 2020), https://bit.ly/3ItZXrl; *Ridership Trends, Annual Report 2019* at 1, METRA: DIV. OF STRATEGIC PLAN. & PERFORMANCE (Feb. 2020), https://bit.ly/3Eaij9c.

To publicly carry firearms in Illinois for self-defense, individuals must obtain a license. 720 ILCS 5/24-1(a)(4), (a)(10). But the Transportation Carry Ban bars those licensed individuals from carrying firearms "on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8). Violations of the Public Transportation Carry Ban are Class B misdemeanors punishable by a fine up to $1,500 and imprisonment up to 180 days. 430 ILCS 66/70(e); 730 ILCS

5/5-4.5-60. Second or subsequent violations of the Transportation Carry Ban are Class A misdemeanors punishable by a fine up to $2,500 and imprisonment up to 364 days. 430 ILCS 66/70(e); 730 ILCS 5/5-4/5-55.

Plaintiffs are law-abiding citizens licensed to carry in Illinois. Plaintiffs' Statement of Undisputed Facts ("SUF") 7–9, 15–17, 23–25, 31–33. All intend and desire to keep and bear firearms on public transportation in Illinois, and only decline to do so for fear of arrest and prosecution. SUF 10, 13, 18, 21, 16, 41, 43. For example, Plaintiff Benjamin Schoenthal rides public transportation while running personal errands, to visit Chicago, and occasionally for work. SUF 11. He would ride public transportation more frequently if he were not forced to disarm to ride. SUF 12. Similarly, Plaintiff Wroblewski uses public transportation to travel from his suburban home into Chicago for recreational purposes. SUF 19. He too would ride "more frequently" if the Transportation Carry Ban did not force him to forfeit his Second Amendment rights to self-defense before riding because "it is a more convenient way to visit Chicago." SUF 20.

Plaintiffs Vesel and Winston rarely or never take public transportation due to the Ban and their concerns about public safety. SUF 27–28, 38. Perhaps wisely so, for violent criminals have perpetrated many attacks on public transportation, or in public transportation facilities, in Illinois. SUF 42. Without the ability to carry handguns while on public transportation, Plaintiffs cannot meaningfully defend themselves in case of confrontation. SUF 14, 22, 30, 40. Plaintiff Vesel, in particular, has reason to fear for his safety in public due to his prior affiliation with the CIA. SUF 29. Plaintiffs Vesel and Winston would take public transportation more frequently if permitted to carry on it. SUF 27, 38. Plaintiff Vesel previously rode public transportation when he lived in a city where he could carry, and he would do so from his current home because he lives close to

public transportation. SUF 27. So too Plaintiff Winston, who would travel with his family into Chicago using public transportation were he allowed to carry. SUF 38.

## ARGUMENT

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).

### I.   Plaintiffs have Article III Standing

Plaintiffs must establish that they suffered an injury caused by the challenged conduct and redressable by a favorable decision from this Court. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021). As set out more fully in Plaintiffs' earlier filing, *see* Memorandum, ECF No. 27, Plaintiffs prove standing here.[2]

### A.  Plaintiffs Show Injury

An injury in fact must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The denial of Plaintiffs' Second Amendment right to carry for self-defense "outside the home" is one such injury in fact. *Bruen*, 597 U.S. at 10.

Plaintiffs' injuries are concrete and particularized. The denial of an individual constitutional right is a concrete—or "real, and not abstract"—injury. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 340 (2016) (cleaned up). The Supreme Court has repeatedly found that plaintiffs have been harmed in a concrete way when the government infringed their constitutional rights. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2204–05; *see also Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise)). A violation of the Second Amendment is no less concrete

---

[2] Of course, the Court only need find that one Plaintiff has standing to exercise jurisdiction. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006).

than the violation of any other individual constitutional right. *See Bruen*, 597 U.S. at 70 (confirming that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees" (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010))); *cf. id.* at 24 (analogizing the standard applicable to the Second Amendment to "how we protect other constitutional rights" including the First Amendment). Thus, as the Seventh Circuit has held, the Ban injures Plaintiffs in a concrete and particularized way because it infringes on their Second Amendment rights to self-defense. *See Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) ("[T]he City's ban on firing ranges inflicts continuous harm to [Plaintiffs'] claimed right to engage in range training and interferes with their right to possess firearms for self-defense. These injuries easily support Article III standing.").

Plaintiffs' injuries are also particularized. All have been denied the individual right to carry a firearm for self-defense each time they ride on public transportation or decline to ride on public transportation because they cannot carry. SUF 12, 20, 28, 39. It makes no difference that the Transportation Carry Ban applies to every individual who rides on Illinois public transit; "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339 n.7. Plaintiffs show that the Transportation Carry Ban infringes each of their Second Amendment rights to carry publicly for self-defense. SUF 12, 15, 20, 23, 29, 30, 39, 41.

Finally, Plaintiffs' injuries are actual and imminent. Plaintiffs suffered the loss of their Second Amendment rights in the past when, fearing prosecution under the Ban, they disarmed before taking public transportation. *See Ezell*, 651 F.3d at 695; SUF 15, 24, 41. And Plaintiffs currently suffer ongoing "continuous harm to their claimed right to" carry firearms for self-defense

on modes of public transportation as they cannot carry on it or they avoid taking it altogether because they cannot carry. *Ezell*, 651 F.3d at 695; SUF 14, 22, 29, 40. Plaintiffs need not actually break the law by carrying their firearms on public transportation to have standing. *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1648 (2022). For it is "well-established that pre-enforcement challenges are within Article III." *Ezell*, 651 F.3d at 695 (cleaned up). "When an individual is subject to" "threatened enforcement of a law," then "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *accord Ezell*, 651 F.3d at 695–96. Nor is the person required even to "expose himself to actual arrest or prosecution" by breaking the law "to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Here, the cost of compliance (disarmament on public transportation) in the face of a criminal penalty is sufficient for standing. *See 520 Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006). Plaintiffs show through sworn declarations that they would ride on public transportation while carrying for self-defense. SUF 12, 20, 28, 39. They cannot legally do so due to the Transportation Carry Ban. And Defendants are charged with enforcing the Ban against Plaintiffs. Thus, Plaintiffs have suffered, and are currently suffering, an injury-in-fact sufficient to support Article III standing.

## B. Plaintiffs Demonstrate Causation and Redressability

Plaintiffs also prove the causation and redressability elements of standing. Defendants are principal enforcement officers who can seek criminal penalties for violations of state law. SUF 1–6. Because the Ban is currently in effect and Defendants can enforce it, Defendants are causing Plaintiffs' injuries. *See California v. Texas*, 141 S. Ct. 2104, 2114 (2021). This Court can redress Plaintiffs' injuries with a declaration that the Transportation Carry Ban is unconstitutional and an

injunction barring Defendants and their subordinates from enforcing it prospectively. Enjoining specific parties from certain actions is "an acceptable Article III remedy" that redresses Plaintiffs' "cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

## II.     The Public Transportation Carry Ban Violates the Second Amendment

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens have the right to "'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. Accordingly, firearm carriage cannot be restricted absent the "exceptional circumstances" in which such restrictions historically have been allowed. *Id.* at 38.

To determine whether a governmental restriction on carry is constitutional under *Bruen*, the court initially determines if the Second Amendment's plain text covers an individual's conduct; if so, the Constitution presumptively protects that conduct. *See id.* at 22–24. If plaintiffs' conduct is presumptively protected, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is Illinois' burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19; *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain [the State's] statute. That is respondents' burden.").

Illinois will be unable to show that the Transportation Carry Ban is part of a historical tradition of firearm restrictions or analogous to a permissible "sensitive place" restriction. *Id.* at 30. Thus, this Court must enjoin the Ban.

### A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct

Plaintiffs' proposed course of conduct—licensed carry on public transportation and in associated facilities—falls within the Second Amendment's plain text. *Id.* at 31–32. So "the Constitution presumptively protects that conduct." *Id.* at 24.

The Supreme Court has already defined the Second Amendment's key terms. "The people" includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms," including handguns; and, to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 32–33. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. This makes it unlike the Third and Fourth Amendments, both of which specify particular locations. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"). Thus, the "definition of 'bear' naturally encompasses public carry" for self-defense. *Bruen*, 597 U.S. at 32. As the *Bruen* Court recognized, "confrontation can surely take place outside the home." *Id*. at 33.

The Supreme Court's binding interpretation of these words and phrases establishes that Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Plaintiffs are law-abiding Americans who seek to carry bearable arms (handguns) for self-defense during their

daily lives, including while riding public transportation. SUF 9–12, 17–21, 25–28, 33–34, 39. As in *Bruen*, these undisputed facts end the textual inquiry. *See* 597 U.S. at 31–32.

### B. Illinois Cannot Show that the Public Transportation Ban is Consistent with the Nation's Historical Tradition of Firearms Regulations

Under *Bruen*, the burden now shifts to Illinois. It must show that the Transportation Carry Ban is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 34. And it must do so by offering persuasive legal history. *See id.* at 24–25 & n.6 (Courts "decide a case based on the historical record compiled by the parties."). But no historical tradition of analogous regulation exists. Under *Bruen*, three considerations must guide Illinois' presentation (and this Court's consideration) of the State's historical evidence.

First, the key starting point is the Founding era, centering on 1791, when the Second Amendment was ratified. *See id.* at 34–35; *accord Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("The pertinent question, the [*Bruen*] Court explained, is what the Founders understood the Second Amendment to mean."); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning"); *Lara v. Comm'r Pa. State Police*, No. 21-1832, 2024 WL 189453, at *7–8 (3d Cir. Jan. 18, 2024) (holding that 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds). *Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36–37 (Sources originating "'75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" (quoting *Heller*, 554 U.S. at 614)). This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is crucial. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment*

*Was Adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative. *Bruen*, 597 U.S. at 35–37. Laws from the 20th-century are categorically entitled to little or no weight. *Id*. at 66 n.28.

The Second Amendment binds the States and the federal government equally. *Bruen* made clear that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id*. at 37. Likewise in *McDonald* the Court held that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 561 U.S. at 765 (cleaned up). And *Heller* established that, as applied against the Federal Government, the Second Amendment has the same scope today as at the Founding. *See* 554 U.S. at 576–77.

While *Bruen* acknowledged a "scholarly" debate about the weight evidence from the period surrounding the Fourteenth Amendment's ratification in 1868 might carry in the Second Amendment analysis, there is no such debate in the Supreme Court's case law. While the Second Amendment extends to the States via the Fourteenth Amendment, that is true of *every* Bill of Rights provision that has been incorporated against the States. To accept the period surrounding 1868 as "more probative" would be contrary to longstanding precedent incorporating other enumerated rights against the States. *See, e.g.*, *McDonald*, 561 U.S. at 764–65 & nn.12–13. For example, *Bruen* relied on two recent incorporation decisions that both looked to the Founding era: *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) and *Timbs v. Indiana*, 139 S. Ct. 682 (2019). *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track"

10

approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. *See Ramos*, 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791).

Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated against the States. 139 S. Ct. at 686–87. The Court once again looked to Founding-era sources to understand the scope of the right as it existed in 1791. *Id*. at 687–88 (discussing "colonial-era provisions" and the "constitutions of eight States"). The Court's other precedents are in accord. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance[.]"). In short, accepting 1868 as the "more probative era" would effectively throw out decades of jurisprudence that has looked to 1791 in addressing the incorporation of Bill of Rights provisions. Thus, when the Second Amendment was incorporated against the States, it carried with it the meaning established by the historical tradition in 1791—"when the people adopted" it. *Bruen*, 597 U.S. at 34 (cleaned up).

*Bruen*'s reasoning also underscores that the Founding era is the key period. After initially rejecting "medieval English regulations," *id*. at 40, *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights. *See id*. at 44–45. After finding these sources somewhat probative of the Amendment's *general* original meaning, the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id*. at 46–50. And it found that the challenged law had "no

11

historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. The Court then considered evidence prior to the Fourteenth Amendment's Ratification in 1868 because such evidence could have informed its drafters. *See id.* at 50–59. But it again found no representative or relevant historical analogue. *See id.*

Only after canvassing the historical evidence from these three periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that portions of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the Second Amendment.'" *Id.* at 67. Thus, the Court declined to rely on such laws and regulations. *See id.* at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding-era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

In other words, *Bruen*'s reasoning mandates that the Founding era is the benchmark against which historical evidence from later time periods must be measured. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established" (cleaned up)); *accord Atkinson*, 70 F.4th at 1020; *Moore*, 702 F.3d at 935; *Lara*, 2024 WL 189453, at *7–8; *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at *20 (S.D. Cal. Sept. 22, 2023) ("*Bruen* teaches the most significant historical evidence comes from 1791[.]"); *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters");

*May v. Bonta*, No. 23-cv-1696, 2023 WL 8946212, at *5 (C.D. Cal. Dec. 20, 2023) (same).[3] Restrictions on the right to keep and bear arms adopted prior to or during the Reconstruction era may be confirmatory of earlier legislation but cannot alone provide the historical analogue required by *Bruen*. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023) ("[T]he relevant question is what are the modern analogues to the weapons people used for individual self-defense in 1791, and *perhaps* as late as 1868." (emphasis added)). Only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17.

Even if the Fourteenth Amendment's enactment in 1868 somehow imbued the Bill of Rights with new meaning, laws enacted in the years *preceding* the Fourteenth Amendment's ratification would be most probative of what that new meaning is. *See, e.g.*, *Ramos*, 140 S. Ct. at 1396 (looking to the "backdrop" of many state constitutions against which the Founders drafted and the states ratified the Sixth Amendment). Illinois cannot rely on "freewheeling reliance on historical practice from the mid-to-late 19th century[,]" which is not probative of the Second Amendment's meaning in *either* 1868 or 1791. *Bruen*, 597 U.S. at 83 (Barrett, J., concurring). Indeed, given the political turmoil present in the post-Civil-War South, laws from that era and region are unlikely to be probative of the Second or Fourteenth Amendment's original meaning, much less a "National" tradition.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. Analogues are representative if they are present in many states and therefore affect large swaths of the population. On the other hand, a smattering of regulations is

---

[3] The Ninth Circuit recently declined the government's request to stay the district court's injunction of California's sensitive places law, including the public transportation portion, pending appeal. *See* Order, *May v. Bonta*, No. 23-4356 (9th Cir. Jan. 6, 2024), ECF No. 20.1.

not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *Id.* at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted); rejecting regulations applying to only 1% of the population). In other words, laws existing in only a few jurisdictions—historical "outlier[s]"—should be disregarded. *Id.* at 30; *see also Koons v. Platkin*, No. 22-7464, 2023 WL 3478604, at *68 (D.N.J. May 16, 2023) (finding three Reconstruction era laws non-representative); *see also id.* at *85 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient).[4] Similarly, laws in the territories are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69.

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id*. This requirement means that Founding-era laws arising in different contexts, and for different reasons, will be inapt comparators. *See, e.g.*, *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1047–48 (4th Cir. 2023) (rejecting Founding-era militia-training laws as improper analogues because they imposed different burdens on Second Amendment rights), *reh'g en banc granted*, 2024 WL 124290 (4th Cir. 2024).

---

[4] The Third Circuit stayed portions of the *Koons* ruling pending appeal without reasoning, but Plaintiffs appealed the case before the district court rendered a decision on their public transportation claim, so the stay did not implicate that issue. *See* Order, *Koons v. Platkin*, No. 23-1900 (3d Cir. June 20, 2023), ECF No. 29.

1. **Illinois Will Be Unable to Identify Analogous Restrictions to the Transportation Carry Ban**

While the Founding generation may not have imagined today's myriad modes of public transportation, public transportation undoubtedly existed at the Founding. Indeed, public transportation can be traced at least to 16th century England, when Henry VIII granted licenses to "watermen" who transported passengers across the Thames River. *See* THE HISTORY OF THE THAMES WATERMEN 46–53.[5] Eventually, hired hackney coaches were introduced in the 17th century. *See* HENRY CHARLES MOORE, OMNIBUSES AND CABS: THEIR ORIGIN AND HISTORY 182 (London, Chapman & Hall, LD. 1902). These coaches were so popular that they threatened the "monopoly of carrying the public" the watermen previously enjoyed. *Id.*

Both types of public transportation crossed the Atlantic and developed in the colonies. Stagecoach services providing shared transportation to passengers "began in several areas of the colonies in the early eighteenth century." Ron Vineyard, *Stage Waggons and Coaches* at 4, COLONIAL WILLIAMSBURG FOUND. (2002), https://bit.ly/3RH6l4D (last visited Jan. 29, 2024) ("Vineyard"); *see also* G.A. THRUPP, THE HISTORY OF COACHES 124 (London, Kerby & Endean 1877), https://bit.ly/41k1Wrg (noting that hackney coaches were being built in American factories by 1790); Expert Report of Dr. Brennan Rivas at 9–10 (Oct. 23, 2023) ("Rivas Rep.") (discussing development of horse-drawn omnibuses in Philadelphia in the 1830s). Early in the 1700's, stage lines connected cities in New Jersey, Boston to Rhode Island, and New York to Philadelphia. *See id.*; *see also* Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q. J. OF N.Y. STATE HIST. ASS'N 231, 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia[.]"). Some of these stage lines used a

---

[5] For ease of reference, Plaintiffs append all of the primary sources cited in this Memorandum in a contemporaneously filed appendix.

combination of boats and coaches as the topography demanded. *See* Vineyard at 4. Stagecoach services offering to carry goods and passengers were even advertised in various states' newspapers during the Founding era to attract patrons.[6] Despite widespread use of stagecoaches and stage boats, Plaintiffs are aware of no laws banning firearms while individuals traveled on them. Precisely the opposite. "Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols." NICHOLAS J. JOHNSON ET AL., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021).

Additionally, the public used various boats to travel during the Founding. Virginia, for example, established numerous ferries to be kept "constantly" running. 1 STATUTES AT LARGE OF VIRGINIA 152 (Samuel Shepherd ed., 1835). So too South Carolina, which established a public ferry as early as 1725. 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (David J. McCord ed., 1841). Many ferries during the Colonial and Founding eras were also publicly owned and operated. *See* Act for Regulating Ferries of 1797, ch. 42, *in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 74–76 (1896) (Massachusetts law providing that local government would operate the ferry and threatening fines for towns that did not provide free ferriage); Act for Regulating Ferries of 1791, *in* ACTS AND LAWS OF CONNECTICUT 405–06 (1791) (Connecticut law licensing towns to operate ferries and allowing them to receive all fares and profits).[7] Another option for river and canal travel were packet boats. These smaller vessels carried domestic mail,

---

[6] *Thursday Paper* at 4, THE PA. GAZETTE (Apr. 30, 1761); *Tuesday Paper* at 3, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768); *Saturday Paper* at 4, INDEP. GAZETTEER (Aug. 31, 1782); *Wednesday Paper* at 4, POUGHKEEPSIE J. (Apr. 18, 1787); *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794).

[7] Similar laws existed in New York and Georgia. *See* AN ACT TO REGULATE THE FERRY BETWEEN THE CITY OF NEW YORK AND THE ISLAND OF NASSAU (1732) (New York City owned ferry and was entitled to receive fares); DIGEST OF THE LAWS OF GEORGIA 283–84 (Robert & George Watkins eds., 1800) (establishing a public ferry in Augusta and directing profits to a public school).

goods, and passengers between cities during the Founding era. *See, e.g.*, *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794). Large vessels capable of weathering the ocean also existed and transported passengers. Contemporary newspaper advertisements show that many transported passengers between ports on the East Coast, and even abroad. *See* Charles Christopher Crittenden, *Ships and Shipping in North Carolina, 1763–1789* at 10–13, *in* 8 THE NORTH CAROLINA HISTORICAL REVIEW (Jan. 1931). Indeed, by 1800, passengers could travel up and down the East Coast in a matter of days. *See id.* at 11–12; *see also* Rivas Rep. at 9 (discussing ferries and packet ships "that moved goods, passengers, and letters to port cities" in the early 1800s); Expert Rep. of Prof. Joshua Salzmann at 13 (Oct. 21, 2023) (discussing ferries' "centrality to travel in colonial and early America").

Again, Plaintiffs are aware of no laws banning firearms on any of these ships. And at least some of them expressly permitted carry. For example, South Carolina mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses" on its public ferry. 9 STATUTES AT LARGE OF SOUTH CAROLINA, *supra*, at 61; *see also* GEORGE WEBB, THE OFF. AND AUTHORITY OF A JUSTICE OF PEACE 153 (Williamsburg, William Parks 1736) (men attending militia training could ride ferry for free). Similarly, guns were considered "baggage" on public conveyances such as steamboats and were "usually carried." *See Hawkins v. Hoffman*, 6 Hill 586 (N.Y. Sup. Ct. 1844); *Woods v. Devin*, 13 Ill. 746 (Ill. 1852) (baggage on common carriers includes guns carried for protection). And the packet boats traversing the Ohio River were "well armed against any Indian attempt." *Monday Paper* at 3, AURORA GEN. ADVERTISER (Dec. 2, 1793). That people would be armed on these early forms of public transportation makes sense; traveling in the early Republic was likely dangerous due to the presence of wildlife, hostile Native American tribes, and more. *Cf. Bruen*, 597 U.S. at 78 (Alito, J., concurring) (noting that in 1791 people relied on guns for self-

defense because "there were no police departments, and many families lived alone on isolated farms or on the frontiers").

The absence of Founding-era restrictions on public conveyances makes sense given that several States *exempted* travelers from then-existing firearms regulations. *See, e.g.*, 1812 KENTUCKY ACTS 100–01, ch. 89, § 1 ("[A]ny person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined...."); 1819 INDIANA ACTS 39, ch. 23, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . *Provided however*, that this act shall not be so construed as to affect travelers."); 1821 TENNESSEE. ACTS 15, ch. 13 (exempting "any person that may be on a journey to any place of out his county or state").

As *Bruen* explained, where the government seeks to address a "perceived societal problem," such as violence while traveling, and it "employ[s] a regulation" that the "Founders themselves could have adopted to confront that problem," such as a "flat ban on the possession of handguns," the absence of any such bans from the Founding is proof that a modern ban is "unconstitutional." 597 U.S. at 26–27 (citing *Heller*, 554 U.S. at 631, 634). Moreover, *Bruen* also instructs that a modern law is likely unconstitutional "if earlier generations addressed the societal problem, but did so through materially different means." *Id*. In this case, both are true—the Founders did not bar carry on public transportation, and at times exempted travelers from restrictions.

While Illinois may argue that modern transportation is more technologically advanced than the forms existing in the Colonial and Founding eras, it is not Plaintiffs' burden to identify "historical twin" locations to those challenged here. *Id*. at 30 (emphasis omitted). For "*Bruen* does

18

not direct courts to look at when a historical place became akin to the modern place being regulated. Rather, the focus is on 'determining whether a historical regulation is a proper analogue . . .'" *Wolford v. Lopez*, No. 23-cv-265, 2023 WL 5043805, at *21 (D. Haw. Aug. 8, 2023) (quoting *Bruen*, 597 U.S. at 28). Thus, Illinois cannot support its law merely by arguing that public transportation is a novel creation and may only be judged based on 19th and 20th century analogues. As the Court noted in *Bruen*, lower courts must "guard against giving postenactment history more weight than it can rightly bear" because restrictions far removed from the Founding are less probative. 597 U.S. at 35.

In sum, Illinois will be unable to identify any relevantly similar Founding-era regulations that ban firearm carriage on early public modes of transportation. *Accord May*, 2023 WL 8946212, at *8–9 (enjoining ban on firearm carry on public transportation because the government failed to meet its historical burden). Under *Bruen*, the lack of any comparable regulation is dispositive.

## 2. The Ban is Not Analogous to Permissible "Sensitive Place" Restrictions

Recognizing that it lacks analogous regulations to support restriction of carry on public transportation, Illinois will likely fall back on *Bruen*'s suggestion that carry can be restricted in "sensitive places." 597 U.S. at 30. But the State cannot stretch that narrow exception to encompass the Ban without swallowing the general rule that public carry for self-defense is permitted.

Recall that the Transportation Carry Ban bars firearm carriage "on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8). The Ban thus sweeps quite broadly. Illinoisans who drive their cars to the train station and park before riding cannot have a readily operable firearm in their car. So too the subway or bus station. And Illinoisans cannot have their firearm

19

with them after disembarking public transportation, no matter how pressing the need for self-defense may be at their ultimate destination. These individuals—including Plaintiffs—are deprived of the ability to self-defend on the way to, while taking, and after disembarking, public transportation. And the Ban disproportionately impacts those who rely on public transportation because they cannot afford private vehicles. Indeed, for those who must take public transportation in their daily lives, the Ban effectively renders licensed carry outside of the home impossible in many circumstances.

Illinois will be unable to analogize its Ban to a presumptively lawful sensitive place restriction. *Accord May*, 2023 WL 8946212, at *8. While the *Bruen* Court did not delineate an all-encompassing list of sensitive places, it mentioned only three such locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *See* 597 U.S. at 30; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204, 289–90 (2018). Accordingly, this Court may analogize to "*those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphasis added). But it cannot accept Illinois' likely attempt to link the Transportation Carry Ban to these narrow categories.

Understanding *why* these places were deemed sensitive at the Founding requires analysis of what they have in common. And the three sensitive places *Bruen* identified all shared a key characteristic at the Founding. Legislative assemblies, polling places, and courthouses were all protected by comprehensive, government-provided security, greatly reducing the public's need for individual weapons. *See e.g.*, Kopel & Greenlee, *supra*, at 292 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens.");

20

Amicus Br. of Ctr. for Hum. Liberty at 8–17, *Antonyuk v. Nigrelli*, No. 22-2908 (2d Cir. Feb. 9, 2023), ECF No. 313; Amici Br. of Citizens Comm. for the Right to Keep & Bear Arms, et al. at 8–17, *Koons v. Platkin*, No. 23-1900 (3d Cir. Aug. 16, 2023), ECF No. 91.

Founding-era examples of comprehensive security in these locations abound. Start with legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. *See* THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (Providence, Carter & Wilkinson 1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); 2 LAWS OF DELAWARE 1100, 1118 (Samuel & John Adams eds., 1797) (similar); 10 PENNSYLVANIA STATUTES AT LARGE 378 (William Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); PUBLIC LAWS OF SOUTH CAROLINA 426, 427 (Philadelphia, R. Aitken & Son 1790) (providing for payment of door-keepers for the legislature); 1 LAWS OF NEW YORK 532 (Charles R. & George Webster 1802) (similar); A COMPILATION OF THE LAWS OF GEORGIA 373 (Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (Burlington, Isaac Collins, *reprinted* Woodbury, Joseph Sailer 1835) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Richmond, Thomas W. White 1828) (similar); 2 LAWS OF VERMONT 382, 387 (Randolph, Sereno Wright 1808) (similar).

The same was true of courthouses. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. *See* THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 271 ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within

their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); 2 LAWS OF DELAWARE, *supra*, at 1088, 1091 (similar); LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (similar); 1 LAWS OF NEW YORK 176 (Websters & Skinner 2d ed. 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); 10 STATUTES AT LARGE OF PENNSYLVANIA, *supra*, at 57 (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784); A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 471, 473–74, 478; THE LAWS OF MARYLAND, ch. 25 (1799) (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS 235 (Boston, Adams & Nourse 1893) (1786 law); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF NORTH-CAROLINA 190–91, 196 (John Haywood ed., 3d ed. 1814); THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 220; 2 LAWS OF VERMONT, *supra*, at 382, 287 (1798 law).

Polling places were similarly secured by government-provided security at the Founding, including in Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina. *See* A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 611 ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796) (similar); MD. CONST. art. 1 §§ 3, 14 (1776) (similar); LAWS OF NEW JERSEY, *supra*, at 36 (providing security at polling places); 2 LAWS OF DELAWARE,

*supra*, at 984 (similar); THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 386–88 (table of fees includes payment to sheriffs for polling-place security).

In other words, legislative assemblies, polling places, and courthouses were deemed "sensitive" because the government treated them as such by providing comprehensive security. Their sensitive nature was never a matter of simple government fiat. The closest thing to the comprehensive security provided at the Founding in legislative assemblies, polling places, and courthouses today is the armed guards and metal detectors at entrances to courthouses or TSA at the airport. *See Koons*, 2023 WL 3478604, at *90 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."). That the government may be able to prohibit firearms in places secured by its own comprehensive security makes sense. The point of the Second Amendment is ensuring that Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 597 U.S. at 32, 60. But when the government secures a location and protects those in it, there is less acute of a need for ordinary, law-abiding Americans to be ready to defend themselves. The problem for Illinois is that its public transportation facilities do not have these features. Visitors are not "screened by security" and public transportation facilities "do not have controlled entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. 2017). More, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," transportation stops may be comparatively "remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Id.* (internal quotation marks omitted). Indeed, many bus stations and subway stations (especially Chicago's L)

have open-air platforms that are not secured from the Midwestern weather, let alone from violent attackers.

In sum, Illinois has impermissibly deemed the routes to and from public transportation, and all modes of public transportation, gun-free zones. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1525 (2009) (calling burdens on carry "to and from" locations "substantial" because individuals have to avoid a wide range of places to continue bearing arms in self-defense). Or, more accurately, gun-free for the law-abiding; as the Founders well knew, violent criminals are unlikely to meticulously follow restrictions on public carry, and therefore "[s]uch laws make things worse for the assaulted and better for the assailants." Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment Thinker Cesare Beccaria, who was critical of gun control laws for this reason); THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (David Thomas Konig et al. eds., Princeton Univ. Press 2019) (quoting Beccaria on this point); *see also* Tr. of Oral Arg. at 69, *Bruen*, 597 U.S. 1 (2022) (No. 20-843) ("*Bruen* Tr.") ("[A]ll these people with illegal guns, they're on the subway[.]"). Illinois thus ignores the Supreme Court's instruction that "sensitive places" are "few" and "exceptional." *Bruen*, 597 U.S. at 30, 38; *Range v. U.S. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there[.]"). Individuals who travel by public transportation are not only deprived of their Second Amendment rights while they ride but also in *every place* that they ride to and from—every neighborhood, every restaurant, every store, every time they leave the house and do not limit themselves to private vehicles or their own two feet. This effect is

24

particularly pernicious on individuals who "have to walk some distance through a high-crime area" after departing public transportation. *Bruen* Tr. at 67. By effectively prohibiting carrying before the journey, while on the journey, and after the journey, "law-abiding citizens are *stripped* of the ability to bear arms in self-defense," Volokh, *supra*, at 1525 (emphasis added). There is no historical justification for such a sweeping denial of Second Amendment rights.

### 3. Illinois Cannot Support the Public Transportation Carry Ban By Pointing To a Tradition of Restricting Carry in Crowded Locations.

While Illinois may argue firearm bans on public transportation are permitted because public transportation is generally crowded and frequented by vulnerable groups such as children, such an argument does not meet the rigorous historical burden *Bruen* places on the state. And the *Bruen* Court explicitly stated that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded[.]" 597 U.S. at 31. In other words, the simple fact that a place is crowded and frequented by vulnerable individuals, such as children and the elderly, cannot suffice to deem it sensitive.

Such a conclusion is grounded in history. For Colonial and Founding-era laws combine to form a robust tradition of permitting (and sometimes requiring) firearm carriage when people traveled and entered places of public assembly. Colonial Massachusetts, Maryland, Virginia, and Rhode Island all *required* individuals to carry arms when traveling away from their homes. *See* 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY 85 (Nathaniel B. Shurtleff ed., 1853) (1636 law requiring travelers going one mile from their homes to carry arms); ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) (1642 law, similar); 1 STATUTES AT LARGE OF VIRGINIA 127 (William Waller Hening ed., 1823) (1623 law, similar); 1 RECORDS OF THE COLONY OF RHODE ISLAND 94 (John Russell Bartlett ed., 1856) (1639 law requiring travelers going more than two miles from town to carry arms). Still more

colonies and early states required individuals to carry arms to and in places of public assembly, where children and vulnerable groups were undoubtedly present. *See* Kopel & Greenlee, *supra*, at 232–34 & n.108, 244; Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014). For example, the *Heller* Court cited a 1770 Georgia law requiring men to carry firearms "to places of public worship." 554 U.S. at 601. Similarly, Maryland in 1642 and Virginia in 1631, 1642, and 1755 required able-bodied men to bear arms while at church. ARCHIVES OF MARYLAND, *supra*, at 103; 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Waller Hening ed., Richmond, Samuel Pleasants 1809). And Connecticut in 1639, Massachusetts in 1642, and Rhode Island in 1639 all required individuals to come armed to public meetings. *See* PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95 (Hartford, Brown & Parsons 1850); 1 RECORDS OF THE COLONY OF RHODE ISLAND, *supra*, at 94. In sum, history reveals that the relevant tradition was to *require* the bearing of arms while traveling and in crowded places.

## CONCLUSION

For all these reasons, this Court should grant Plaintiffs' motion for summary judgment and permanently enjoin enforcement of the Public Transportation Carry Ban.


Dated: January 29, 2024        Respectfully submitted,

/s/ David G. Sigale

David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David G. Sigale_____

*Attorney for Plaintiffs*

David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiff*

27