# EXHIBIT A



Office of the
Illinois Attorney General
**Kwame Raoul**

# About Us

► Home ► About

Translate Website

Search

## Jump To:

Consumer Protection

Honest and Open Government

Preserving the Environment

Rights of the People

Safer Communities

## File a Complaint

## Quick Links:

► Legal Assistance Referrals
► Milestones Reports
► News Room

► Publications

## Get Connected:

outreach@ilag.gov

---

### LEARN ABOUT THESE TOPICS:

► **Office of the Attorney General Structure**

► **Biography of Illinois Attorney General Kwame Raoul**

► **Contact the Office of Attorney General Kwame Raoul**

► **Community Outreach and Public Engagement**

► **Public Meeting Announcements**

► **Annual Reports and Disclosures**

► **History of the Office of the Illinois Attorney General**

► **Office of the Attorney General Website Privacy Policy**

---

The Attorney General is the state's chief legal officer and is responsible for protecting the public interest of the state and its people.

The job of the Attorney General is to:

- Advocate on behalf of all of the people of Illinois;
- Legislate with members of the General Assembly for new laws; and
- Litigate to ensure state laws are followed and respected.
- The Attorney General provides services that cover a broad range of issues, reaching every corner of Illinois.

---

## Protecting Consumers

Protecting consumers and businesses that have been victimized by fraud, deception or unfair competition is one of the primary functions of the Attorney General. The office receives approximately 25,000 consumer complaints each year, most commonly concerning motor vehicles and home repair.

》》 **Learn More About Protecting Consumers**

---

## Advocating for Women

The Attorney General advocates for an end to domestic violence and sexual assault, offers numerous services to victims of violent crime, and awards grants to domestic violence and sexual assault service providers throughout Illinois.

》》 **Learn More About Advocating for Women**

---

## Keeping Communities Safe and Fighting Crime

The Attorney General works with law enforcement agencies at the state and local level to keep families and children safe in their communities. He created the first-of-its-kind task force to take down Organized Retail Crime networks. He protects children from online predators as leader of the Illinois Internet Crimes Against Children Taskforce. Attorney General Raoul partners with federal law enforcement to prevent mass shootings in schools and places of worship, fight violent crimes and get crime guns off the streets.

》》 **Learn More About Keeping Communities Safe and Fighting Crime**

---

## Advocating for Older Citizens

The Attorney General works to protect the rights and safety of Illinois' older citizens, who are often targeted by scam artists and abusers. The office is equipped to respond to the special needs of older citizens, including those related to consumer fraud, abuse and neglect, financial exploitation, veterans' rights and health care concerns.

>>> Learn More About Advocating for Older Citizens

## Safeguarding Children

Keeping children safe and healthy is a priority of the Attorney General. The office works on many fronts to reduce sexual assault, advocate for after school and community safety programs, and educate children and parents on various safety issues, including Internet safety and teen dating violence.

>>> Learn More About Safeguarding Children

## Defending Your Rights

Attorney General Raoul is committed to defending the rights of all the people of Illinois. Bureaus within the office are dedicated to specifically protecting civil, labor and employment, disability, and veterans rights.

>>> Learn More About Defending Your Rights

## Communications, Community Engagement and Outreach

Through the work of the Communications and Community Engagement Bureau, our staff is available to address audiences on topics ranging from consumer fraud to crime victim's assistance.

>>> Learn More About Communications, Community Engagement and Outreach

## Preserving the Environment

One of the Attorney General's principal responsibilities to public health and safety is protecting our environment. In addition to prosecuting violators of the state's environmental protection laws, the Attorney General protects agricultural producers, an essential part of Illinois' economic vitality.

>>> Learn More About Preserving the Environment

## Helping Crime Victims

The Office of the Attorney General has made it a priority to provide services that help victims of violent crime meet their challenges and regain some peace of mind.

>>> Learn More About Helping Crime Victims

## Ensuring Open and Honest Government

The Office of the Attorney General is committed to a free and open government supported by free and open exchange of information, as set forth in such laws as the Freedom of Information Act (FOIA) and the Open Meetings Act (OMA).

>>> Learn More About Ensuring Open and Honest Government

## Building Better Charities

The Attorney General works in close contact with the state's charitable organizations to ensure they have the tools necessary to follow the law and, in turn, help those in need.

>>> Learn More About Building Better Charities



    

Contact Us

Privacy Policy

500 S. 2nd St.
Springfield, IL 62701
(217) 782-1090

115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000

1745 Innovation Drive, Suites C & D
Carbondale, IL 62903
(618) 529-6400

Individuals with hearing or speech disabilities can reach us by using the 7-1-1 relay service.

# EXHIBIT B

OFFICIAL GOVERNMENT WEBSITE

# DEKALB COUNTY
## ILLINOIS

DEPARTMENTS: **STATE'S ATTORNEY'S OFFICE**

<u>DEPARTMENTS</u> > STATE'S ATTORNEY'S OFFICE

# State's Attorney's Office

The State's Attorney has the exclusive responsibility for prosecuting violations of the criminal laws of the State of Illinois, as well as traffic violations. The State's Attorney provides legal advice to all County Officials and represents the County in all actions where the County's officials or employees are a party.



**RICK AMATO**
**State's Attorney**

Phone: 815-895-7164
FAX: 815-895-7101
dekalbsao@dekalbcounty.org

The professional staff includes twelve Assistant State's Attorneys and nine support staff. The State's Attorney's staff is present in four courtrooms on a daily basis and routinely appears in branch court in DeKalb and Sandwich. Professional assistance to law enforcement agencies is available on a 24-hour basis every day of the year.

DeKalb County
Courthouse
133 West State Street
Sycamore, IL 60178
Hours: 8:30 am – 4:30 pm

**The cases handled by the State's Attorney's office include:**

- Felony and misdemeanor criminal matters
- Traffic
- Juvenile detention and prosecution
- Juvenile abuse and neglect
- Interstate reciprocal child support and public aid cases



- Mental health
- Advice to government officials
- Tax collection



The State's Attorney's Office also provides staffing for the DeKalb County Drug and DUI Treatment Courts.

*Pursuant to Illinois Supreme Court Rule 11, please use dekalbsao@dekalbcounty.org as means for email service on our office.



DeKalb County Government        200 North Main Street        Sycamore, Illinois 60178

# EXHIBIT C

# History of the DuPage County State's Attorney's Office

For the first 54 years of statehood, Illinois had no county-based prosecutor offices. Under Illinois's first two constitutions and applicable laws, prosecutors were elected or appointed in each of the state's judicial circuits which almost always included more than one county. These officers, interchangeably called Circuit Attorneys and State's Attorneys were tasked with the duty of prosecuting all criminal cases as well as providing legal advice to any state or county officials in their jurisdiction. The 1870 Constitution provided that in 1872 and every four years thereafter, the voters of each county would elect a State's Attorney. Since that time, the way in which Illinois voters have selected their local prosecutors has remained the same.

## Constitutional & Legislative History

In 1819, the First General Assembly adopted legislation providing for the duties and selection of the attorney general and three circuit attorneys with the Attorney General also serving as the circuit attorney in the First Circuit in downstate Illinois. These early prosecutors were appointed by the Governor with the advice and consent of the Illinois Senate and were entrusted with the responsibility to prosecute "all matters and things, pleas, actions, and suits, wherein the state is a party." In 1827, the term "circuit attorney" was temporarily replaced with the term "state's attorney" when the General Assembly revised the law proscribing the duties of the Attorney General and local prosecutors. Section 1 of that legislation provided that it shall be the duty of the attorney general to "when required, to give his opinion without fee or reward to any county commissioner's court [County Board] ...when required to do so, upon any question of law relating to any criminal or other matter in which the people, or any county, is concerned..." Section 4 of the 1827 Act directed state's attorneys to "do and perform the duties, within the judicial circuit in which he shall reside, which are, by the first section of this Act, required of the attorney general." Accordingly, as early as 1827, State's Attorneys have served in the dual role as prosecutors and counselors to county government.

In 1835, the General Assembly assumed the responsibility of electing state's attorneys for terms of two years, ending the previous system of appointment by and service at the pleasure of the Governor. It was during this time that the area that is now DuPage County was formally incorporated.

In the 1840s, the General Assembly reversed itself and re-designated local prosecutors as "circuit attorneys," but this change would not last for long. Beginning with the ratification of the Constitution of 1848, circuit-based prosecutors became state's attorneys again. Interestingly, from 1848 until 1867, the State of Illinois functioned without an elected or appointed Attorney General and the state's attorneys served as the sole prosecuting authority in the State of Illinois. During this time, state's attorneys were popularly elected for four-year terms in each of the multi-county judicial circuits. Between 1848 and 1870, statutes occasionally used the term "prosecuting attorney" to refer to state's attorneys as the 1848 Constitution permitted the General Assembly to provide for the election of county prosecutors in place of circuit-wide elected state's attorneys.

The state's third constitution, ratified in 1870, provided that in 1872, and every 4 years thereafter, state's attorneys were to be elected by county, rather than by judicial circuit. Since 1870, continuing after the 1970 Constitution, the principal powers and duties of the state's attorneys have remained largely the same – with some of the statutory provisions still retaining language from the 1820s.

## William George Smith, 1872-1876

The first DuPage County State's Attorney elected under this new system was William G. Smith who served one four-year term. He was born in Westhaven, VT in 1816 and moved to Illinois in 1853, settling first in McHenry County before moving to Warrenville and later Wheaton by 1864. He was admitted to the bar in 1867 and after building a successful practice, he was elected as a Republican to the newly-created office of DuPage County State's Attorney in 1872. In June 1876, Smith assisted the sheriff in arresting an "insane man." In the process, the prisoner struck Smith in the head with a stone. Four years later, this injury would lead to a severe stroke of apoplexy that resulted in Smith's retirement as an attorney. He opened and maintained a collections business operated into at least the mid 1890s.

## Aaron William Sindlinger, 1876-1880

We know very little about our second state's attorney. While the DuPage County Clerk and the Election Commission do not have records indicating the name of the individual who served in the four-year period following Smith's time as State's Attorney, records of the Illinois State Archives reflect the election of Aaron W. Sindlinger in 1876. State's Attorney Sindlinger appears to have been born in Pennsylvania in 1847 and was a graduate of the University of Michigan's law school in 1872. Interestingly, the records of the Supreme Court reflect the admission of an "Aaron W. Sindling, Jr." to the bar in 1873, and there is no record of Aaron W. Sindlinger. Mr. Sindlinger appears to have completed his term in office (there is no record of a mid-term special election) but did not seek reelection. As of 1880, the US Census reflected that there was an attorney named A. W. Sindlinger residing in Chaffee, Colorado. The records of the Colorado Bar Association also show the admission of an Aaron W. Sindlinger in 1881 suggesting that Sindlinger may have moved west after finishing his term in office. This is reinforced by contemporary alumni listings of the University of Michigan which indicated that the Aaron Sindlinger who graduated in 1872 resided in Plainfield, Illinois during the 1870s and in Denver by the 1910s and also explains why there is very little local information about him. As a footnote, an important Colorado Supreme Court case on the professional responsibilities of lawyers resulted in the disbarment of attorney A. W. Sindlinger in 1901. See People of the State of Colorado ex. rel. Colorado State Bar v. Sindlinger, 28 Colo 258 (1901). It remains unclear whether the two attorneys are one and the same.

## Lawrence Charles Cooper, 1880-1888

The next state's attorney of record was Lawrence C. Cooper, who served from 1880-1888. Cooper was born in Camden, England and immigrated to the United States at the age of 4. He was admitted to the Illinois Bar in 1868. Following his tenure as state's attorney (then the longest), Cooper continued to reside in DuPage County and practice law. He died of pneumonia at his home in Glen Ellyn in March of 1917 at the age of 73.

## John Henry Batten, Jr. 1888-1896



Like his predecessor, Republican John Batten was English by birth. Born in London in 1850, he was educated in Chicago schools. Following his admission to the bar he moved to Naperville in 1873. Batten served as state's attorney for eight years before being elected county judge in DuPage County in 1896. He later served as a judge of the Cook County Probate Court until 1902. Batten moved to Chicago and practiced law there for the remainder of his life. He succumbed to a long illness on January 19, 1928 at the age of 77.

## Mazzini Slusser, 1896-1904

DuPage County voters elected Mazzini Slusser as their state's attorney in 1896. A native of Pontiac, Michigan, he was an 1876 graduate of the University of Michigan. State's Attorney Slusser was admitted to the Illinois Bar in 1893 after having practiced law in Ohio for 10 years -- including service as Fulton County Prosecutor. During his time as state's attorney, Slusser maintained an outside law practice and served as general counsel to various telephone and telegraph companies. After leaving office, Slusser would later serve as a DuPage County judge and later a circuit judge in Cook County. In 1922, he was nominated by the GOP as one of its candidates for the Illinois Supreme Court. Slusser died in Arkansas at the age of 73 in January 1926. Slusser appears to have the distinction of being the only DuPage County State's Attorney to have served as an elected prosecutor in another state.

## Henry Howard Goodrich, 1904-1906

State's Attorney Henry H. Goodrich was born in Lisle Township in 1852 as the first son of a prominent DuPage County family. His father Charles was a founding member of the Republican Party. Goodrich attended Beloit College and what is now North Central College in Naperville and taught briefly before attending Union College of Law (now Northwestern University's Law School). After being admitted to the bar in 1879, Goodrich practiced law in Naperville and served as editor of the local newspaper, the Naperville Citizen. He was elected to succeed Mazzini Slusser in 1904, but died in office in 1906. Goodrich carries the unfortunate distinction of having the shortest tenure of any known elected DuPage County State's Attorney.

## Charles William Hadley, 1906-1920

Following Goodrich's death, Charles Hadley was appointed DuPage County State's Attorney. Hadley was born in West Chicago in 1875 to a prominent Republican family. He was an 1899 graduate of Wheaton College and was elected Justice of the Peace in 1900 while still attending Northwestern University Law School. He was admitted to the bar in 1902 and practiced law for just four years before his appointment as state's attorney. By 1910, Hadley was serving as President of the Illinois State's Attorney's Association. After leaving office in 1920, Hadley served as a Special Assistant Attorney General prosecuting public corruption cases in Rock Island and McHenry Counties. From 1929 to 1932, Hadley served as the Chairman of the Illinois Commerce Committee and unsuccessfully sought the Republican nomination for Illinois Attorney General in 1932 and 1936. According to the Historical Encyclopedia of Illinois, Volume 2 published during Hadley's tenure as state's attorney, Hadley was "an upright lawyer who is an honor to the profession. There is no man who comprehends better than he the ethics of his calling, nor who is more fearless in the prosecution of evil doers. His conscience dictates his policies and he follows them without thought of personal loss or gain." At the time of Hadley's death in 1951 at the age of 75, he was the county's oldest practicing attorney. Assuming an appointment in January 1906 soon after Goodrich's death, Hadley's approximately 5,400 days in office give him the distinction of being DuPage County's longest-tenured prosecutor.

## Chauncey William Reed, 1920-1934

In 1920, voters selected Chauncey W. Reed to serve as DuPage County State's Attorney. Reed was born in West Chicago in 1890 and by 1913 was serving as City Treasurer. Educated at Northwestern University and Webster College of Law, Reed served in World War I before returning to DuPage County to practice law. Like his predecessors, Reed was a member of the Republican Party and was DuPage County Republican Chairman for much of his time as state's attorney. Like Hadley, Reed would also spend fourteen years in office, resigning in 1934 to take a seat in the United States House of Representatives. He was elected to the next ten Congresses where he served until his death in 1956. At the time of his death, Reed was the Chairman of the House Committee on the Judiciary. He is the only DuPage County State's Attorney to have chaired a Congressional Committee.

## Russell Watson Keeney, 1934-1940

Reed was succeeded by his law partner, Russell Watson Keeney, who had also been serving as an assistant state's attorney. State's Attorney Keeney was born in downstate Pittsfield in Pike County in 1897, but was educated in Naperville. He attended DePaul University's College of Law and became the Justice of the Peace in Lisle Township in 1920, and Township Clerk in 1924. In 1940, he became County Judge in DuPage County and later a Circuit Judge in the 16th Judicial Circuit (which then included DuPage County). After 16 years in judicial service, Keeney left the bench to take a seat in Congress in 1956, but died a little more than one year into his first term on January 3, 1957 at the age of 59. Keeney and his predecessor Reed are the only two DuPage County State's Attorneys to have served in Congress.

## Lee Earle Daniels, 1940-1952

Keeney's successor was prominent Elmhurst Attorney and Republican Lee E. Daniels. A graduate of Loyola University where he played football, and a 1913 bar admittee, Daniels served as one of State's Attorney Keeney's assistants. As state's attorney, Daniels implemented and wrote the handbook for the Tax Foreclosure method of collecting taxes and was credited with collecting over a million dollars in back taxes for the county. The Illinois State's Attorney Association recognized him as "Mr. State's Attorney" in 1951 for his legislative initiatives and an educational campaign to improve traffic safety. In addition to his duties as state's attorney, and previously as an assistant state's attorney, Daniels was a prominent football referee for the Big Ten Conference having previously referred high school games in Chicago. An outspoken anti-Communist, he opted to seek the Republican Nomination for Illinois Attorney General in 1952 in lieu of a fourth term, but was defeated in the primary by DeKalb County Judge Latham Castle and returned to private practice. The following year, he was appointed to head Illinois' Youth Commission and in 1956 was elected to the first of three terms in the Illinois House of Representatives. Defeated for renomination in 1962, Daniels was preparing to run for his old seat when he suffered a fatal heart attack in February 1964 at the age of 73. One of his grandsons, Lee A. Daniels, would follow him in representing Elmhurst in the Illinois House and eventually served as its Speaker. Daniels's assistant state's attorneys included future state's attorney and federal judge William J. Bauer and future Congressman John Erlenborn.

## William Lyman Guild, 1952-1958

Next to hold the office was William L. Guild, the great nephew of Charles Hadley. State's Attorney Guild was born in 1910 in Wayne Township graduated from Wheaton College and earned his law degree from Northwestern University. He was admitted to the bar in 1934. Guild later enlisted in the Army and served in the JAG Corps during World War II. After the war and a stint in Washington, Guild returned to Wheaton and became a part-time assistant state's attorney before being elected state's attorney in 1952. Guild served for six years before being elected as a DuPage County judge in 1958. His term on the bench was cut short when he was appointed Illinois Attorney General, but he and the other statewide Republican candidates were defeated for election later that year in a Democratic landslide. He returned to the DuPage County bench in 1962 where he served until his elevation to the appellate court in 1970. He retired from the bench in 1980 and continued to practice law until his death in 1993. Guild was the first DuPage County State's Attorney to serve in an Illinois statewide constitutional office.

## Jack Eldon Bowers, 1958-1959

State's Attorney Bowers was born in Warsaw, Indiana in 1925 and attended Manchester College. After serving in the US Army Air Corps in World War II, Bowers earned his law degree from the University of Chicago Law School in 1950 and later became a DuPage County Assistant State's Attorney. When his predecessor, William Guild was elected to the bench in 1958, the outgoing Chairman of the DuPage County Board appointed Bowers as interim State's Attorney with exactly two years remaining in the term. Also vying for the appointment at the time was First Assistant State's Attorney William J. Bauer, who had been considered by many to be the favorite for the spot. Unfortunately for Bowers, litigation initiated by the Democrats forced a special election to complete Guild's term. Also unfortunate for Bowers was his limited ability to campaign due to his decision to personally prosecute a prominent murder case. Bauer defeated Bowers by more than a 2 to 1 margin in the April 1959 special Republican primary election and went on to win the special general election in June. After his defeat, Bowers returned to the private practice of law and became president of the DuPage County Bar Association. He later chaired the Illinois Parole and Pardon Board and returned to elected office serving in both the Illinois House of Representatives and the Illinois Senate. Bowers eventually retired to Normal, Illinois where he died in December 2007 at the age of 82. Although his time in office was quite short, he is the only state's attorney to have served in both chambers of the Illinois General Assembly.

## William Joseph Bauer, 1959-1964

The winner of the Bowers-Bauer primary, William J. Bauer, became State's Attorney in 1959 at the age of 32. Born in Chicago in 1926, Bauer moved to Elmhurst in 1941 and attended Immaculate Conception High School. Upon graduating from high school, Bauer attended Elmhurst College for one year before leaving to join the Army. After his military service was complete, Bauer returned to Elmhurst College in 1947 and graduated in 1949. He earned his law degree from DePaul University's College of Law in 1952 and practiced law with then-former State's Attorney Lee E. Daniels. He subsequently opened a law practice with his friend and former high school classmate, future Congressman John Erlenborn, which they would maintain together until 1964. During the 1950s, Bauer also served as an assistant state's attorney at a time where it was common for state's attorneys and their assistants to maintain outside legal practices, and was the first assistant state's attorney when his boss, William Guild, was elected county judge. After the County Board tapped Jack Bowers to succeed Guild, Bauer who had also sought the appointment, resigned from the office to launch his campaign. Following his election in June 1959, Bauer served as state's attorney until 1964 when he was elected a circuit court judge in DuPage County. While still serving as judge, Bauer was nominated by President Richard Nixon to serve as the United States' Attorney for the Northern District of Illinois in 1970, and among other things was responsible for procuring the indictment of sitting-US Court of Appeals Judge (and former Illinois Governor) Otto Kerner. Bauer served as US Attorney for 17 months before he was again nominated to a federal office by President Nixon and confirmed by the Senate – this time as Judge of the United States District Court for the Northern District of Illinois. Three years later, Nixon's successor, Gerald Ford elevated Bauer to the United States Court of Appeals for the Seventh Circuit (ironically, to the seat formerly held by then-convicted Kerner), a position he held until assuming senior status in 1994 after having served as the Circuit's Chief Judge from 1986-1993. Even today, Bauer continues to maintain a full caseload. He is the only DuPage County State's Attorney to have entered federal judicial service and to have served as a United States Attorney. In 2010, the DuPage County Board renamed the Judicial Office Facility Annex, which as of 2004 houses the State's Attorney's Office, for Bauer.

**William Valentine "Doc" Hopf, 1964-1975**

Succeeding Bauer was his First Assistant, William V. "Doc" Hopf. Hopf was born in Geneva in 1928 and was the son of a dentist who had served as DuPage County's Coroner and from whom Hopf eventually inherited the nickname "Doc." A lifelong resident of Wheaton, Hopf was the captain of the football team and a track star at Wheaton Community High School. After serving as a special deputy sheriff in 1948, Hopf earned his law degree from DePaul University's College of Law in 1952, and joined the Army during the Korean War. Upon returning to Wheaton, he was elected Justice of the Peace in Milton Township in 1955. He served as an Assistant State's Attorney from 1957 until 1964 when he became State's Attorney. In 1973, Hopf was appointed a Circuit Judge in DuPage County and later became Chief Judge in 1979. From 1981 until his retirement from judicial service in 1988, he served as a Judge of the Second District Appellate Court. Hopf passed away in 1998 at the age of 69.

## John James Bowman, 1973-1976

In 1973, former assistant public defender John Bowman was selected by the County Board to be the new State's Attorney following Hopf's appointment as judge. He received the appointment over two men, one of whom later became the County's Chief Judge and the other who became the Speaker of the Illinois House of Representatives. Bowman was born in Oak Park on Jan. 13, 1930 and received his B.A. in business administration from the University of Illinois and his J.D. from John Marshall Law School. He served in the Counter Intelligence Corps of the U.S. Army from 1952 to 1954. Following nearly a decade in private practice, Bowman became a Deputy Public Defender from 1965 to 1973 before being named State's Attorney of DuPage County. In 1976, Bowman opted not to seek election to a full term and instead ran for judge. He served on the 18th Judicial Circuit Court from 1976 to 1990. In 1990 he was elected judge of the Second District Appellate Court. Bowman is the only person to have served as DuPage County State's Attorney after having been a member of the Public Defender's Office. Bowman passed away after a battle with cancer on September 26, 2012, at the age of 82.

## Joseph Michael Fitzsimmons, 1976-1984

The 1976 Republican Primary to succeed Bowman saw two future State's Attorneys squaring off against each other in an often bitter contest. The winner, J. Michael Fitzsimmons was born in Chattanooga, Tennessee and attended law school at Northwestern University. After graduating in 1963, Fitzsimmons joined the Securities and Exchange Commission as an attorney, serving until 1966. From 1968-1970, he was an assistant state's attorney under Doc Hopf. Fitzsimmons left the office to become an assistant United States Attorney serving for two years before being named regional director with the U.S. Department of Justice's Office of Drug Abuse Law Enforcement. When State's Attorney Bowman announced his intention to run for judge, Fitzsimmons challenged and upset the preferred candidate of the Republican Party and Bowman's First Assistant, Jim Ryan, narrowly defeating him in the GOP primary by 300 votes. During Fitzsimmons' tenure, DuPage County, as well as his office, grew rapidly. His assistant state's attorneys included many of the county's future elected officials, including a county board chairman, state's attorney, and numerous judges. After being defeated by Jim Ryan in an equally bitter primary in 1984, Fitzsimmons returned to private practice. Suffering from a debilitating muscular disorder, Fitzsimmons died in 2001 at the age of 63. He appears to have been the only elected incumbent state's attorney ever to have been defeated for renomination, let alone, reelection.

## James Edward "Jim" Ryan, 1984-1995

Jim Ryan was born in Chicago in 1946 and attended what is now Benet Academy and Benedictine University in Lisle. As a young man, Ryan took up boxing and was the 1964 Chicago Golden Gloves Middleweight Champion. He earned his law degree from Chicago-Kent College of Law in 1971 and entered the DuPage County State's Attorney's Office. Just three years later, he was tapped by State's Attorney Bowman to serve as his First Assistant. Ryan sought the Republican nomination for state's attorney in 1976 but was defeated by J. Michael Fitzsimmons. After eight years in private practice, Ryan challenged Fitzsimmons for the GOP nomination. Ryan criticized Fitzsimmons's handling of several high-profile cases and went on to win the primary by approximately 10,300 votes. He was subsequently elected, and re-elected in 1984, 1988, and 1992. During his time as state's attorney, he was elected President of the Illinois State's Attorney's Association. In 1990 he was the Republican Nominee for Illinois Attorney General, but lost a narrow race to then-State Comptroller Roland Burris. Four years later Ryan captured the Attorney General's Office in a landslide election, a feat he repeated in 1998. Ryan was credited for his efforts to professionalize the Office of Attorney General and for taking a leadership role in the war on crime. His office vigorously enforced environmental and consumer protection laws and

lished a healthcare bureau to protect patients' rights. In 2002, Ryan was the Republican nominee for Governor, but was

defeated by Rod Blagojevich as part of a ticket-wide Democratic landslide. After leaving politics, Ryan practiced law briefly before focusing on a teaching position at his alma mater, Benedictine University. Active in various community organizations, Ryan attempted a comeback in 2010 by seeking his party's gubernatorial nomination but was unsuccessful in a heavily fractured field. He remains the only DuPage County State's Attorney to have been elected to statewide office.

## Anthony Marando Peccarelli, 1995-1996

Upon Jim Ryan's election as Illinois Attorney General, DuPage County Board Chairman Gayle Franzen was faced with the prospect of choosing a successor. He had two apparent choices: Criminal Bureau Chief Joseph Birkett or County Board Member Robert Heap. Not wanting to give either candidate a "leg-up" in what was likely to be a hotly-contested primary, Franzen tapped Illinois Appellate Judge Anthony M. Peccarelli as Ryan's successor. Peccarelli was born April 12, 1928, in Newark, New Jersey. He received his law degree from the John Marshall Law School and was admitted to the bar in 1961. From 1962 until 1968, he served as an Assistant State's Attorney before entering private practice. He was elected as a delegate to the Sixth Illinois Constitutional Convention, and served alongside future Illinois political leaders including Richard M. Daley, Michael J. Madigan, and Dawn Clark Netsch. In 1979, he was appointed an associate judge for the Eighteenth Judicial Circuit. He went on to become a circuit judge in 1982, and chief judge for the Eighteenth Judicial Circuit in 1989. In 1993, he was appointed to the Second District Appellate Court where he served until his appointment as State's Attorney in 1994. After retiring as State's Attorney in 1996, Peccarelli founded a mediation service and practiced law until his death in September 2005. He was the first State's Attorney to have been in judicial service (other than as a justice of the peace) prior to his appointment and is one of two former Chief Judges to serve in the office.

## Joseph Edward Birkett, 1996-2010

Joe Birkett was appointed state's attorney in October 1, 1996, a few days before his election to the first of four terms as state's attorney. State's Attorney Birkett was born in Chicago on February 13, 1955, and lived with his mother and nine siblings in the Austin neighborhood on the city's west side after his father's accidental death. Following his freshman year of High School, Birkett was recruited to play football by Aurora Central Catholic High School and would eventually captain the football team North Central College team several years later. While attending college, Birkett was an avid amateur boxer whose career included a Chicago Golden Gloves Championship in 1976. Birkett graduated from John Marshall Law School in Chicago and was admitted to the bar in 1981. Later that fall, Birkett joined the DuPage County State's Attorney's Office and would remain in the office for the next 29 years. Over the years, Birkett advanced through the ranks and eventually was named the Chief of the Criminal Prosecutions Bureau under State's Attorney Jim Ryan. In 1996, Birkett won a hotly contested election for the Republican nomination for State's Attorney in 1996 - winning all but one precinct countywide in what was initially expected to be a one-sided primary (to Birkett's disadvantage). In 2002, Birkett was the Republican nominee for Illinois Attorney General, but narrowly lost the election to Lisa Madigan. Four years later, he was then-State Treasurer Judy Baar Topinka's running mate for Lt. Governor, but was defeated in a statewide Democratic sweep. Birkett's tenure as State's Attorney ended on December 13, 2010 upon his appointment to the Illinois Appellate Court, Second District. At 14 years, 2 months, and 12 days, Birkett's tenure was approximately 8 months shorter than that of Charles Hadley's – however when added to the 15 years Birkett spent as an Assistant State's Attorney, Birkett's total time in the office appears to exceed the length of service of any of his predecessors.

## Michael Robert Galasso, 2010

Birkett's appointment to the Appellate Court occurred one day prior to a scheduled County Board meeting to select his successor. In order to prevent a vacancy from interfering with the essential operations of the office, DuPage County Chief Judge Stephen Culliton appointed Michael R. Galasso state's attorney just as Birkett was being sworn in as an appellate judge on December 13, 2010. State's Attorney Galasso graduated from York High School in 1954 and earned his undergraduate degree from Elmhurst College. In 1961, he graduated valedictorian from Chicago-Kent Law School. Galasso worked in private practice in Villa Park until 1984 when he was appointed as an associate judge for DuPage County. He later became a full circuit judge and in 1995 was elected Chief Judge, a position he held for four years. In February 1999, Galasso was appointed to the appellate court and remained there until 2000 when he retired from the bench. At the time of his appointment as state's attorney, Galasso was of counsel to the Wheaton-based law firm of Schiller, DuCanto and Fleck, LLP. Galasso's peaceful, and largely uneventful, 2-day reign as state's attorney earned him the distinction of having the shortest known tenure of any DuPage County State's Attorney. He and Anthony Peccarelli are the only two individuals to have served as State's Attorney following their judicial service as Chief Judge of DuPage County.

## Robert Bruce Berlin, 2010 - Present

Michael Galasso's tenure as State's Attorney proved to be as brief as expected. On the morning of December 14, 2010, the DuPage County Board unanimously confirmed Chairman Dan Cronin's nomination of Criminal Bureau Chief Robert B. Berlin to complete the term of Joe Birkett effective the following day. A career prosecutor, Berlin had previously served as Deputy Chief of Criminal Bureau's Juvenile and Felony Trial Divisions. Prior to joining the DuPage County State's Attorney's Office, Mr. Berlin served as the First Assistant State's Attorney in Kane County and as a felony prosecutor in Cook County. Mr. Berlin was raised in the northern suburbs of Chicago and is a graduate of Dickinson College and Washington University College of Law. He and his wife Carolyn have two daughters.

Sign Up for News and Updates          **Sign Up →**

# EXHIBIT D



**COOK COUNTY
STATE'S ATTORNEY (/)**

(/)

MENU

# ABOUT THE COOK COUNTY STATE'S ATTORNEY'S OFFICE



The Cook County State's Attorney's Office (CCSAO) is a diverse and inclusive team of dedicated civil professionals who are committed to upholding justice and maintaining safety for the over 5 million residents of Cook County, Illinois.

As the second-largest prosecutor's office in the United States, the CCSAO is responsible for prosecuting violations of criminal laws and regulatory statutes, including child support, civil matters, domestic violence, fraud, and immigration services. With over 1,200 employees, including 600+ attorneys, 115 investigators, and 390+ administrative staff, the CCSAO is structured with six bureaus and four independent units to ensure comprehensive coverage in handling diverse legal matters.

The CCSAO prosecutes tens-of-thousands of cases annually, addressing both misdemeanors and felony crimes in Cook County. With a deep sense of responsibility, the CCSAO tirelessly advocates for the well-being of the community and the protection of their rights. The CCSAO is committed to inclusivity,

encouraging diverse perspectives and vibrant collaboration within the office. As the CCSAO upholds the values of accountability, respect, and fairness, it stands united in its pursuit of justice.

## Mission

To do justice in the pursuit of thriving, healthy, and safe communities.

## Vision

We are committed to creating a safer, stronger Cook County. That means approaching every case with integrity, demanding accountability, and increasing our presence in the community.

Our success is not measured by convictions. We belive in doing what's right - fighting for the best, fairest otucomes, whatever form that takes. It's our responsiblity to address the historic inequities in our justice system. Everyone deserves a fair shot at justice, regardless of their zip code, paycheck, or the color of their skin.

## Values

Accountability, Collaboration, Fairness, Integrity, Respect. Read about our values in more detail, here (https://www.cookcountystatesattorney.org/about/values).

## Bureaus and Units

- Bureau of Administrative Services (BAS (https://www.cookcountystatesattorney.org/administrative-services-bureau))
- Alternative Prosecution and Sentencing Unit (APSU) (https://www.cookcountystatesattorney.org/resources/diversion-programs)
- Criminal Prosecutions Bureau (CPB) (https://www.cookcountystatesattorney.org/criminal-prosecutions-bureau)
- Civil Actions Bureau (CAB) (https://www.cookcountystatesattorney.org/civil-actions-bureau)
- Conviction Integrity Unit (CIU) (https://www.cookcountystatesattorney.org/conviction-integrity-unit)
- Investigations Bureau (IB) (https://www.cookcountystatesattorney.org/investigations-bureau)
- Juvenile Justice Bureau (JJB) (https://www.cookcountystatesattorney.org/juvenile-justice-bureau)
- Special Prosecutions Bureau (SPB) (https://www.cookcountystatesattorney.org/special-prosecutions-bureau)

# EXHIBIT E

Newsletters

Police Accountability
Timeline

Conviction Integrity Unit

Case
Expungement/Sealing

Alternative Prosecution
Programs

Gun Violence Prevention
Initiative (GVPI)

# Welcome





As State's Attorney, I am fighting to make our beautiful county safer and fairer for all people — regardless of race, class, gender, or sexual orientation.

Prior to being sworn in as Lake County State's Attorney on Dec. 1, 2020, I spent 18 years fighting for clients in courtrooms throughout Illinois. Whether the case was in front of a jury, the Appellate Court, or the Illinois Supreme Court, I have never stopped fighting for what I believe in: that each one of us deserves equal and just treatment under the law.

I was raised in a small town and my parents are teachers. They instilled in me that everyone must be treated equally, regardless of the circumstances of their birth. America's sacred mission is to provide a political, economic, and legal system that allows everyone to prosper.

The prosecutor's office is the most powerful actor in the criminal justice system. Crime destroys families and communities. We need smart, tough prosecutors who are zealously expending every ounce of energy to prevent crime now and in the future. Smart prosecution equals safer communities. Moral prosecution equals a fairer society that nurtures the worth of every individual regardless of class, race, or gender.

**As State's Attorney, I will ensure that every prosecution is
smart, fair, and just.**

## Press Releases

**01/24/2024**

### Jury Convicts Man Of Murdering Fox Lake Man With Assault Weapon

Monday, January 22, 2024, a jury convicted Azim Ibrahim of
First-Degree Murder in connection to the 2022 shooting of a
Fox Lake man.  Read on...

**01/03/2024**

### Waukegan Police Officer Charged With Official Misconduct And Battery To A Civilian

The Lake County State's Attorney Office has charged
Waukegan Police Officer Richard Tabisz with felony official
misconduct and misdemeanor battery to a civilian after the
officer threw down the civilian while he was handcuffed and
cooperating on December 14, 2023. Read on...

**12/15/2023**

### Round Lake Man Enters "Guilty" Plea For Killing His Three Children

Jason Karels, 36, entered a "guilty but mentally ill" plea to
three counts of first-degree murder for the June 13, 2022,
killing of his three children who were ages 2, 3, and 5. Read
on...

### Read All Press Releases

Government Websites by CivicPlus®

# EXHIBIT F

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois, | ) ) ) |
| RICK AMATO, in his official capacity as State's Attorney of DeKalb County, Illinois, | ) ) ) Civil Action No. 3:22-cv-50326 |
| ROBERT BERLIN, in his official capacity as State's Attorney of DuPage County, Illinois, | ) ) ) |
| KIMBERLY M. FOXX, in her official capacity as State's Attorney of Cook County, Illinois, | ) ) ) ) |
| ERIC RINEHART, in his official capacity as State's Attorney of Lake County, Illinois, | ) ) ) |
| Defendants. | ) |

## DECLARATION

I, Benjamin Schoenthal, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.  I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.  I am a citizen of the United States, and a resident and citizen of the State of Illinois, currently residing in DeKalb County.

3.  I have never been charged or convicted of any misdemeanor or felony offense.

4.  I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

5.  I am currently licensed to carry a handgun pursuant to Illinois law.

6.  Despite my license to carry a handgun, under 430 ILSC 66/65-(a)(8), I am prohibited from " knowingly carry[ing] a firearm on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds."

7.  I ride public transportation occasionally for work, but also for running personal errands. Specifically, I ride the Metra Union Pacific West line when I am needed to work in either Winfield or Chicago, Illinois, but only every three-four months due to the firearm carry restrictions. Also, I go with my family to see sights in Chicago but I only do that using Metra every six months or so due to the carry restrictions. I would like to ride Metra more because it is a more environmentally friendly option compared to single occupant driving. I would intend to utilize public transportation more frequently if I were permitted to carry a handgun for self-defense.

8.  I have abstained from carrying a handgun for self-defense on modes of public transportation because otherwise, if I were to carry a firearm, I would be exposing myself to arrest, criminal charges, incarceration, and or/fine.

9.  When I ride on public transportation without carrying a handgun, I am left without the ability to meaningfully defend myself in case of confrontation. Because of the ban, I am suffering diminished personal safety before I board public transportation, while I ride public transportation, and when I reach my destination.

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of December, 2022.

Benjamin Schoenthal

EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON<br><br>Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of Illinois,<br><br>RICK AMATO, in his official capacity as State's Attorney of DeKalb County, Illinois,<br><br>ROBERT BERLIN, in his official capacity as State's Attorney of DuPage County, Illinois,<br><br>KIMBERLY M. FOXX, in her official capacity as State's Attorney of Cook County, Illinois,<br><br>ERIC RINEHART, in his official capacity as State's Attorney of Lake County, Illinois,<br><br>Defendants. | Civil Action No. 3:22-cv-50326 |

## DECLARATION

I, Mark Wroblewski, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.  I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.  I am a citizen of the United States, and a resident and citizen of the State of Illinois, currently residing in DuPage County.

3.  I have never been charged or convicted of any misdemeanor or felony offense.

4.    I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

5.    I am currently licensed to carry a handgun pursuant to Illinois law.

6.    Despite my license to carry a handgun, under 430 ILSC 66/65-(a)(8), I am prohibited from "knowingly carry[ing] a firearm on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds."

7.    I ride public transportation for recreational purposes. Specifically, I ride Metra from my home in the suburbs to Chicago a few times per year. I would like to ride public transportation, such as Metra more because it is a more convenient way to visit Chicago. I would intend to utilize public transportation more frequently if I were permitted to carry a handgun for self-defense.

8.    I have abstained from carrying a handgun for self-defense on modes of public transportation because otherwise, if I were to carry a firearm, I would be exposing myself to arrest, criminal charges, incarceration, and or/fine.

9.    When I ride on public transportation without carrying a handgun, I am left without the ability to meaningfully defend myself in case of confrontation. Because of the ban, I am suffering diminished personal safety before I board public transportation, while I ride public transportation, and when I reach my destination.

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this ⎯12⎯ th day of December, 2022.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Mark Wroblewski

3

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON<br><br>Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of Illinois,<br><br>RICK AMATO, in his official capacity as State's Attorney of DeKalb County, Illinois,<br><br>ROBERT BERLIN, in his official capacity as State's Attorney of DuPage County, Illinois,<br><br>KIMBERLY M. FOXX, in her official capacity as State's Attorney of Cook County, Illinois,<br><br>ERIC RINEHART, in his official capacity as State's Attorney of Lake County, Illinois,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:22-cv-50326 |

## DECLARATION

I, Joseph Vesel, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.      I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.      I am a citizen of the United States, and a resident and citizen of the State of Illinois, currently residing in Cook County.

3.      I have never been charged or convicted of any misdemeanor or felony offense.

4.      I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

5.      I am currently licensed to carry a handgun pursuant to Illinois law.

6.      Despite my license to carry a handgun, under 430 ILSC 66/65-(a)(8), I am prohibited from "knowingly carry[ing] a firearm on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds."

7.      My wife and I previously lived in Boston and used the public transit train (the "T") extensively. I could carry a concealed firearm there without issue.

8.      We moved to La Grange a few years ago and one of the reasons we chose this location is due to the easy proximity to public transit. It is a short walk to bus lines as well at the Metra rail. According to Google Maps, we are 0.4 miles away (12 min walk) from both bus and rail options. Indeed, public transit has always been a part of our transportation plan as we have only owned one car for many years.

9.      My wife maintains an office in the Fashion Outlets of Chicago in Rosemount, IL. If she is at her office and I needed or wanted to visit her, I could not drive as we only have one car and she would be using it. Public transit would be my only option, although currently I would default to Uber or taxi or some other option due to the restrictions on carry.

10.     Additionally, we occasionally go into the City for dinner or sightseeing. While we would normally choose public transit (again, it is why we moved so close to public transit) it is not an option if I wish to carry. Recently I accompanied my mother-in-law to an appointment with a

glaucoma specialist in the City and was forced to drive, despite public transit being the easier option, due to the ban on carry.

11.    I do not ride public transportation because I must disarm before doing so. If I were permitted to carry a handgun for self-defense, I would intend to ride public transportation, including Metra and the CTA, into Chicago and other locations as described above.

12.    Personal safety for me and my family is important and relevant. As a former CIA Operations Officer I was a high value target for terrorists and other entities that are hostile to U.S. and western interests. In my previous assignment I worked JTTF (Joint Terrorism Task Force) with the FBI and other federal and local law enforcement officers. I lived and worked in the Middle East for years, where the threat to U.S. personnel was high enough that we had an armed guard in front of our home at all times and we were trained and instructed to check the vehicle for explosive devices before entering and starting the vehicle.

13.    While I do not live in constant fear of attack here in Illinois, it is not unreasonable to assert that my risk profile is higher than most, especially now that I have left and rolled back my cover and openly declare my prior affiliation with CIA.

14.    I have abstained from riding on public transportation without carrying a handgun because I would be left without the ability to meaningfully defend myself in case of confrontation. Because of the ban, I would suffer diminished personal safety before I boarded public transportation, while I rode public transportation, and when I arrived at my destination.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this __12__ th day of December, 2022.

Joseph Vesel

# EXHIBIT I

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois, | ) ) ) | |
| RICK AMATO, in his official capacity as State's Attorney of DeKalb County, Illinois, | ) ) ) | Civil Action No. 3:22-cv-50326 |
| ROBERT BERLIN, in his official capacity as State's Attorney of DuPage County, Illinois, | ) ) ) | |
| KIMBERLY M. FOXX, in her official capacity as State's Attorney of Cook County, Illinois, | ) ) ) ) | |
| ERIC RINEHART, in his official capacity as State's Attorney of Lake County, Illinois, | ) ) ) | |
| Defendants. | | |

## DECLARATION

I, Douglas Winston, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1. I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2. I am a citizen of the United States, and a resident and citizen of the State of Illinois, currently residing in Lake County.

3. I have never been charged or convicted of any misdemeanor or felony offense.

4.     I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

5.     I am currently licensed to carry a handgun pursuant to Illinois law.

6.     I work as a full-time paramedic and firefighter. I am a certified Basic Arson Investigator, the training for which included the same 40-hour Mandatory Firearms Training course required of police/peace officers, deputy sheriffs, and probation/parole officers in the State of Illinois. Until my retirement from my previous employment, I was classified as a Peace Officer under Illinois law, and I completed the same regular use of force and firearms qualifications as police officers for my municipal employer. In my past position, I routinely carried a sidearm while investigating the cause, origin, and circumstances of fires or explosions. I also work part-time as a CCW instructor.

7.     Despite my license to carry a handgun, under 430 ILSC 66/65-(a)(8), I am prohibited from " knowingly carry[ing] a firearm on or into . . . [a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds."

8.     I rarely ride public transportation because I must disarm before doing so. I would intend to ride public transportation more with my family on trips to cities like Evanston and Chicago by utilizing the CTA and Metra, but for the ban on carrying a firearm for self-defense.

9.     I have also repeatedly traveled to St. Louis, Missouri using public transportation. Specifically, I have taken the Metra to Chicago's Ogilvie Station, then walked to Union Station to ride Amtrak to East St. Louis, where I catch a Metrolink across the river to St. Louis.

10.     I realize Amtrak is federal and has its own rules, which I follow. But since I cannot carry a concealed firearm on either Amtrak or Metra, I will not unpack my pistol just to carry during the walk from one station to another, only to then have to find a secure location to disarm, unload and repack my sidearm. I would do this if I was allowed to carry a concealed firearm on my trip prior to boarding the Amtrak train.

11.     In those instances when I have ridden on public transportation, I have abstained from carrying a handgun for self-defense because otherwise, if I were to carry a firearm, I would be exposing myself to arrest, criminal charges, incarceration, and or/fine.

12.     When I ride on public transportation without carrying a handgun, I am left without the ability to meaningfully defend myself in case of confrontation. Because of the ban, I am suffering diminished personal safety before I board public transportation, while I ride public transportation, and when I reach my destination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 12-th day of December, 2022.

Douglas Winston

3

EXHIBIT J

CHICAGO       News    Weather    Sports    Video                    ☁ 37°

LOCAL NEWS ›

## Arrest made in shooting of 16-year-old on CTA Red Line train near Chinatown



By **CBS Chicago Team**
January 5, 2023 / 8:26 PM CST / CBS Chicago



**Be the first to know**

Get browser notifications for breaking news, live
events, and exclusive reporting.

h the shooting of a 16-year-old boy

apted murder and aggravated

ck of East 79th Street, according to

Russell was arrested by members of CPD and the Great Lakes Regional Fugitive Task Force on Wednesday.

Watch CBS News

He is expected in bond court on Friday.

The teen was shot in the ear and eye and told police he heard multiple shots.

## More from CBS News

**20-year-old woman shot in Chicago's South Shore neighborhood**


**Teenage girl in critical condition after shooting on West Side**


**Gun locks handed out on Chicago's South Side after toddler killed in "accidental" shooting**


**1 killed, 8 hurt in weekend shootings across Chicago**


**In:**    Shooting     Chicago Transit Authority     Crime

**CBS Chicago Team**

The CBS Chicago team is a group of experienced journalists who bring you the content on CBSChicago.com.



## Be the first to know

Get browser notifications for breaking news, live events, and exclusive reporting.

©CBS NEWS AND STATIONS

©2024 CBS Broadcasting Inc. All Rights Reserved.

Watch CBS News

| | |
|---|---|
| Terms of Use | About Us |
| Privacy Policy | Advertise |
| California Notice | Paramount+ |
| Your Privacy Choices | CBS Television Jobs |
| CBS 2 | Public File for WBBM-TV / CBS2 |
| Contests & Promotions | Public Inspection File Help |
| Program Guide | FCC Applications |
| Sitemap | EEO Report |

# EXHIBIT K

**WEATHER ALERT**  Flood Warning

CHICAGO SHOOTING

# Man, 60, dies after Chatham shooting on CTA Red Line train: Chicago police

Man shot near 87th Street Red Line station, CPD says

By ABC7 Chicago Digital Team

Monday, October 17, 2022

WATCH LIVE                                                    Log In

menu



A CTA Red Line train shooting in Chicago left a 60-year-old man critically hurt on 87th Street on the South Side, the police department said.

WLS

CHICAGO (WLS) -- The 60-year-old man shot after getting into an argument with another man on the Red Line over the weekend has died, Chicago police said early Monday morning.

The shooting happened in the Chatham neighborhood near the 87th Street Red Line stop about 6:10 a.m. Saturday, police said.

The victim was transported to the University of Chicago Medical Center in critical condition, police said.

The man died just after 4:50 a.m. Sunday, according to CPD.

**SEE MORE: Chicago shooting: Man, 60, critically hurt after shot during argument on CTA Red Line, police say**

Police said the shooter fled from the train at 87th Street. No one is in custody and Area Two detectives are investigating.

The man killed was not immediately identified.

Crime on the CTA is becoming all too common, riders say.

CTA rider Raymond Head said he's forced to take the train daily to work.

"I got to get home and make the money for my kids, so I'm trying to stay safe myself," he said.

*The video in the player above is from an earlier report.*

Report A Correction Or Typo

Copyright © 2024 WLS-TV. All Rights Reserved.

# Related Topics

CHICAGO   CHATHAM   CHICAGO SHOOTING   TRAIN SAFETY   CHICAGO CRIME

SHOTS FIRED   GUN VIOLENCE   SHOOTING   CHICAGO VIOLENCE   MAN SHOT

TRAINS   CHICAGO POLICE DEPARTMENT   CTA

Home

AccuWeather

Traffic

Local News

Categories

Station Info

Shows

Apps



Follow Us:

Privacy Policy   Do Not Sell My Personal Information

Children's Privacy Policy   Your US State Privacy Rights   Terms of Use

Interest-Based Ads   Public Inspection File   FCC Applications

Copyright © 2024 ABC, Inc., WLS-TV Chicago. All Rights Reserved.

# EXHIBIT L

EVEN WHEN THE NEWS IS FREE, JOURNALISM IS NOT.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE

# More police promised for Chicago trains after fatal shooting



FILE - A man stands in a heating shelter at the Chicago Transit Authority's Merchandise Mart "L" station, Monday, March 23, 2020, in Chicago. Chicago Transit Authority President Dorval Carter addresses the media in Chicago, Saturday, Aug. 6, 2022 saying the transportation system will reinstate canine security units on CTA trains in coming weeks to stem increased violent crime, including the shooting death of a 29-year-old man early Saturday. (AP Photo/Charles Rex Arbogast, file)

Read More

BY JOHN O'CONNOR
Published 5:09 PM EST, August 6, 2022

SPRINGFIELD, Ill. (AP) — Chicago police and transit officials on Saturday pledged additional security for the city's trains to stem a spike in violent crime after the shooting death of a passenger overnight.

A 29-year-old man, Diuntel Moon, was shot multiple times in the chest and abdomen on a Chicago Transit Authority Red Line train on 79th Street in the Chatham neighborhood about 2 a.m. Saturday, Chicago Police Superintendent David Brown said at a news conference.

Moon was pronounced dead at a hospital. No suspects are in custody, Brown said.

"Senseless gun violence and incidents like these … have no place in this city. It is unacceptable and will not be tolerated," Brown said. "No resident should think twice about their safety on any part of CTA or in our neighborhoods."

Brown and CTA president Dorval Carter denounced the spike in numbers, not seen for a decade. The Chicago Sun-Times reported that as of mid-July, CTA has reported 488 violent crimes this year, higher than at any point since the same period in 2011.

Gun violence in particular continues to haunt Chicago. In addition to Moon's killing, Chicago police Deputy Chief Rahman Muhammad on Saturday reported four other early morning homicides in the city. However, gun crimes are down this year compared to 2020 and 2021.

Through June, Chicago police reported 1,255 shootings and 310 homicides. That grisly pace would mean more than 600 for the year, but significantly fewer than the 836 in 2021.

Brown promised additional police officers will be assigned to the CTA starting Sunday, but he declined to specify how many for security reasons. He said the police presence on the CTA had been fortified earlier this year as well.

The CTA, which has an unarmed security force, will reinstate the use of canine patrols, Carter said without elaborating.

"It's just another additional resource to use, obviously, in addition to the security guards," Carter said. "There's nothing magical about the canine unit."

"The more we can add to the CTA in both an unarmed security and prevention mode, armed CPD officers in an enforcement mode and really aggressive investigative efforts in bringing offenders to justice is all part of the criminal justice effort," Brown said.

------

Follow Political Writer John O'Connor at https://twitter.com/apoconnor

# EXHIBIT M

*Watch Live*

# CTA union president says violence on Chicago trains, buses is out of control

By Dane Placko | Published April 10, 2022 | Updated 9:35PM | Chicago Transit Authority | FOX 32 Chicago |

**CTA union president says violence on Chicago trains, buses is out of control**

Sunday's shooting was the fifth violent incident in the past week on Chicago's C trains and buses. Other attacks included stabbings, and beatings on train platforms. On Monday, the operator of a Red Line train was lured by a person w claimed to need help retrieving their phone; that person then pushed the operate on to the tracks. Dane Placko reports.

---

**CHICAGO** - After a man was shot on a CTA bus in Chicago's Lawndale neighborhood early Sunday, transit union president Keith Hill said the violence h gotten out of control.

"It's sad to say it's become a norm for us. We see this all day, every day," Hill sa

Sunday's shooting happened on a Route 53 bus at Pulaski and Polk. An eyewitness said the 31-year-old victim was chased off the bus by the gunman, then hopped back on. The eyewitness aid the victim tried to hide between the seats and was shot. The victim was hospitalized in good condition.

That shooting was the fifth violent incident in the past week on the CTA. Other attacks included stabbings, and beatings on train platforms in the South Loop. C Monday, the operator of a Red Line train was lured by a person who claimed to

need help retrieving their phone; that person then pushed the operator on to the tracks.

Last month, the CTA held a news conference with Chicago Police Superintende David Brown, pledging to boost the number of security guards and police officer on trains and buses. The CTA board has also approved multi-year contracts totaling $71 million to two private security companies.

Hill was skeptical that unarmed security guards could make a difference.

"I don't see them being a deterrent. I don't see them stopping anything. They're unarmed. They're just like a regular rider. Why would they jeopardize their lives stop anything?" Hill said.

**DOWNLOAD THE FOX 32 CHICAGO APP FOR BREAKING NEWS ALERTS**

This material may not be published, broadcast, rewritten, or redistributed. ©2024 FOX Television Stations

# EXHIBIT N



☰    🔍   $1/6 MTHS Ends soon    LOG IN

| | | |
|---|---|---|
| 2 teenagers shot and killed in 'ambush' while leaving Loop high school identified |  Nearly a thousand take chilly plunge off Oak Street Beach for annual fundraiser |  Man who conspired with sister in infamous 1993 'black widow' murder case released from prison |

ADVERTISEMENT

**BREAKING NEWS**

## Police: Homicide suspect's actions forced confrontation in deadly Metra train shootout

**By Robert McCoppin and Tony Briscoe**
**Chicago Tribune • Last Updated: Jan 10, 2017 at 7:23 am**

  

⛶ Expand    ▶ Autoplay     1 of 9 ‹ ›




Top Videos: - Exclusive: Argentine President Milei Says Th…   close

WINTER SALE    ONLY $1 FOR 6 MONTHS Go ahead, gift yourself    SAVE NOW



One person was shot about 10:30 p.m. Jan. 6, 2017, on an outbound Milwaukee District North Line Metra train at the Lake Cook Metra station in suburban Deerfield. (Joe Shuman / Chicago Tribune)

Listen to this article

Police said Monday they had not planned to confront a homicide suspect aboard a Metra train late Friday in Deerfield, but the man forced their h<br>
passengers and left the suspect dead.

The incident prompted questions about why polic<br>
sending passengers scrambling to avoid gunfire. A<br>
way, but had to act quickly when the suspect, Jam<br>
train at the Deerfield station as they expected.

Top Videos: - Exclusive: Argentine President Milei Says Th…   close

ADVERTISEME

WINTER SALE    ONLY $1 FOR 6 MONTHS    SAVE NOW
Go ahead, gift yourself

Authorities had been trailing Parks as a possible suspect in the shooting death a day earlier of a man in south suburban Evergreen Park. The investigation led police to believe Parks would get off the commuter train about 10:30 p.m. at Deerfield's Lake Cook station, where local police were waiting to assist, according to Orland Park Police Chief Tim McCarthy, head of the Cook County South Suburban Major Crimes Task Force, and Illinois State Police, who are investigating the police-involved shooting.

But instead of exiting, Parks remained on the outbound train, which McCarthy said prompted investigators to move in. Parks apparently spotted the officers, most of whom, McCarthy said, were in plain clothes with badges around their necks. That prompted Parks to run to the upper level of the rail car, and as one officer attempted to take him into custody, he broke free, pulled out a handgun and fired multiple shots at several officers on the train, officials said.

ADVERTISEMENT

Top Videos: - Exclusive: Argentine President Milei Says Th…    close

TODAY'S TOP

WINTER SALE     ONLY $1 FOR 6 MONTHS     SAVE NOW
                Go ahead, gift yourself

Only one officer returned fire and the suspect was struck, McCarthy said. Parks was transported to a nearby hospital where he was pronounced dead. His gun was recovered at the scene, and no one else was reported hurt, officials said.

That officer was placed on desk duty pending an investigation into the shooting, McCarthy said.

As of late Monday, authorities had not released autopsy results for Parks or revealed how many times he was struck by gunfire. Authorities did not release the name of the officer who shot Parks or which agency employs the officer.

Parks' death was the culmination of events that began about 6:15 p.m. Thursday about 10 miles away in a drugstore parking lot at 87th Street Police said they responded to a report of shots fired Murrell, of Chicago, dead with multiple gunshots

Top Videos: - Exclusive: Argentine President Milei Says Th…    close

Authorities said they believed Parks was among th were still searching Monday for the two other sus

An autopsy on Parks was completed Monday by th were not released. The officers involved had not yet been interviewed by police, pending the

WINTER SALE    ONLY $1 FOR 6 MONTHS    SAVE NOW
Go ahead, gift yourself

# EXHIBIT O

# 30 years for the man who shot a CTA bus driver in downtown Chicago



*Dennis Green and the scene of a shooting where a CTA bus driver was injured on Saturday evening, September 4, 2021. | Chicago Police Department; Provided*

A Chicago man was sentenced on Friday to 30 years in prison for **shooting an on-duty CTA bus driver** during an altercation in the Loop two years ago.

The 34-year-old driver asked Dennis Green, 40, to exit the bus when they reached the end of the line on the first block of East Washington around 8:58 p.m. on September 4, 2021, prosecutors said. Green allegedly responded by yelling at the driver and spitting in his face.

Police arrived, but the situation escalated as the driver tried to escort Green to a squad car, prosecutors said in the days following the shooting. As the altercation turned physical, Green pulled out a gun and shot the driver in the left jaw.

A witness reportedly kept an eye on Green as he ran from the area and removed some of his outer clothing. The witness directed cops to his location, and they took him into custody minutes after the shooting. Prosecutors said a loaded 9-millimeter handgun fell from Green's jacket as police arrested him.

The bus driver suffered a fractured jaw and underwent surgery to repair his injuries.

On August 23, a jury found Green guilty of aggravated battery by discharging a firearm and aggravated battery of a transit employee. Judge Timothy Joyce sentenced him yesterday to 27 years for the firearm discharge and three consecutive years for the second count, according to clerk of court records.

Prosecutors dropped eight felonies before trial. The jury acquitted Green of attempted murder, armed habitual criminal, and a second count of aggravated battery by discharging a firearm, the court records show.

Green is expected to appeal.

He has been sentenced to prison four other times, including eight years for aggravated robbery in 2001, five years for attempted burglary in 2005, and 42 months for unlawful use of a weapon by a felon in 2009, according to court records.

**Click here to support CWB Chicago's court reporting for just $49 a year.**

Passengers on the train said they were terrified by hearing shots and seeing other passengers running down the aisle to flee the scene.

After shots rang out, conductors directed the 40 to 50 passengers on the train to an empty car away from the confrontation, Metra spokeswoman Meg Reile said.

"When conductors were made aware (of the shooting), they cleared passengers as far away from the incident as possible as quickly as possible," Reile said.

Passengers were not immediately evacuated off the train to the station platform because that could have placed them in the line of fire, she said.

Once safe access was arranged to a nearby store, passengers were evacuated and remained there as witnesses, in some cases for several hours until police could interview them.

Passengers reported that before the shooting, conductors made an announcement that the train was being delayed temporarily at the Deerfield Lake Cook station. Reile said Metra officials were told the delay was at the request of police.

But Metra police were not involved in the attempt to apprehend Parks.

"We're working with the (police) agencies to figure out what happened," Reile said.

One of the passengers on board was Brian Johnson, a comedian who had just finished performing at a lounge in Chicago and was riding the train back to his home in Grayslake.

Johnson, 33, said he had gone to use the bathroom on the train when he heard the gunfire.

"I thought it would be a normal train ride, as usual," Johnson said. "We stopped (at the Lake Cook station) and the conductors said there was aTop Videos: - Exclusive: Argentine President Milei Says Th…     close
an allergy attack and went to the bathroom to blo
The conductor was yelling for us to get in the othe

Johnson said he and about four other passengers
shootout took place. He said they were herded to t
lot and eventually to the store. Anxiety was increa
Friday that left five people dead at a Fort Lauderd

WINTER SALE     ONLY $1 FOR 6 MONTHS
Go ahead, gift yourself     SAVE NOW

Johnson said he was kept at the store for nearly five hours until a Pace bus arrived to transport the train passengers.

Parks has an extensive criminal history.

In 2009, he pleaded guilty to being a felon in possession of a firearm and sentenced to three years in prison, according to court records. In 2002, he was convicted of armed robbery without a firearm in Lake County and sentenced to nine years in prison.

Parks was convicted twice of misdemeanor resisting or obstructing a police officer: once in Jackson County, Wis., in 2011, and once in Lake County in 2007, for which he served 60 days in jail, records show.

At the time Parks was shot, there was a pending warrant for his arrest stemming from charges filed against him in August 2016 that included possession of cannabis, failure to stop at a stop sign and driving on a suspended license, records show. The warrant was issued because Parks apparently missed a court date on those charges, according to the court records.



**Daywatch**

Weekdays

Start each day with Chicago Tribune editors' top story picks, delivered to your inbox.

By submitting your email to receive this newsletter, you agree to our **Subscriber Terms & Conditions** and **Privacy Policy**.

> ENTER YOUR EMAIL ADDRESS

Ken Wallentine, a former prosecutor who conduct~~ed~~ ... Top Videos: - Exclusive: Argentine President Milei Says Th... close

general, said he could not comment specifically on

Wallentine said that, generally speaking, police typ~~ically~~

public, in a contained area where the suspect can't

intent in this case, he said, but plans often change

"The cops can drive a plan," he said, "but no plan

adversary."

**WINTER SALE**    **ONLY $1 FOR 6 MONTHS**    SAVE NOW
Go ahead, gift yourself