# Exhibit 2

WITH CONFIDENTIAL DESIGNATIONS          Page 1

1              IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF ILLINOIS

2                      EASTERN DIVISION

3

BENJAMIN SCHOENTHAL,                    )

4                                       )

                   Plaintiff,           )

5                                       )

vs.                                     ) 3:22 cv 50326

6                                       )

KWAME RAOUL, Attorney General           )

7    of the State of Illinois, et        )

al.,                                    )

8                  Defendants.          )

9

10                  The remote deposition of BENJAMIN

11   SCHOENTHAL, called by the Defendants for

12   examination, pursuant to Notice and pursuant to the

13   Federal Rules of Civil Procedure for the United

14   States District Courts, taken before Victoria D.

15   Rocks, CSR, and Notary Public in and for the County

16   of Cook, State of Illinois, commencing at 9:30

17   o'clock a.m., on the 8th day of September 2023, A.D.

18

19

20

21

22

23

24

```
                                              Page 2

 1   APPEARANCES:

 2

             LAW FIRM OF DAVID G. SIGALE, PC
 3           MR. DAVID G. SIGALE
             430 W. Roosevelt Road
 4           Wheaton, Illinois  60187
             dsigale@sigalelaw.com
 5
             appeared on behalf of the Plaintiff;
 6

 7           MS. SYLVIA MERCADO MASTERS
             MR. EDWARD BREMER
 8           500 Richard J. Daley Center
             Chicago, Illinois  60602
 9           sylvia.mercadomasters@cookcountyil.gov

10           appeared on behalf of the Defendant,
             Kim Foxx;

11

12           MR. ISSAC FREILICH JONES
             ASSISTANT ATTORNEY GENERAL
13           100 W. Randolph Street
             Chicago, Illinois  60601

14

15           appeared on behalf of the Defendant,
             Kwame Raoul.

16

17

18

19

20

21

22

23

24
```

Page 3

1                    I-N-D-E-X

2

3   WITNESS:   BENJAMIN SCHOENTHAL

4

    Direct Examination by MR. JONES:      7 - 73
5   Cross-Examination by MS. MERCADO:     73 - 85

    Cross-Examination by MR. SIGALE:      85 - 87
6   Redirect Examination by MR. JONES:    88 - 90

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                              Page  4

 1             (Witness sworn.)

 2        MR. JONES:  Good morning, Mr. Schoenthal.  How

 3   are you doing?

 4        THE WITNESS:  I'm doing okay.

 5        MR. JONES:  My name is Assistant Attorney

 6   General, Isaac Freilich Jones.  I represent all of

 7   the defendants in the case of Schoenthal et al

 8   versus Kwame Raoul, except for Kim Foxx, who is

 9   represented today by two attorneys from the Cook

10   County State's Attorney's office.

11        So that means that I represent Kwame Raoul,

12   the Attorney General of Illinois, Rick Amato, the

13   State's Attorney, Robert Berlin, another State's

14   Attorney and Eric Rinehart, the third State's

15   Attorney.

16        You're aware that today you are being deposed

17   in Schoenthal, et al versus Raoul, et al, the case

18   in which you are a plaintiff?

19        THE WITNESS:  Correct.

20        MR. JONES:  And do you understand that today

21   you are under oath to tell the truth?

22        THE WITNESS:  Correct.

23        MR. JONES:  You understand that it's the same

24   sort of an oath you take in a courtroom if you are
```

Page 5

1    sitting in front of a judge?

2         THE WITNESS:  Correct.

3         MR. JONES:  Have you ever taken a deposition

4    before or is this your first one?

5         THE WITNESS:  This would be my first.

6         MR. JONES:  If it is okay by you, I would like

7    to go over a couple of ground rules that are going

8    to make today go as easily as possible.

9         First, as you know, we're taking this

10   deposition via Zoom.  However, there's still a court

11   reporter here, Victoria Rocks, who is going to take

12   down everything that you say.  And again, to make

13   that as easy as possible one thing I would request

14   of you is that you don't answer my questions until I

15   finish asking the question even if you know exactly

16   what I'm going to ask.  Does that sound okay?

17        THE WITNESS:  Yes.

18        MR. JONES:  By the same token, I'll do my best

19   not to interrupt you while you're speaking so our

20   reporter can get everything down.  Does that sound

21   okay as well?

22        THE WITNESS:  Yes.

23        MR. JONES:  Third, please answer audibly using

24   words.  So avoid saying uh-huh or uh-uh.  That is

Page 6

1   hard for the court reporter to write down.

2          Similarly, please don't gesture or give a

3   thumbs up sign to indicate because our reporter

4   again can't take that down.  Does that sound okay by

5   you?

6          THE WITNESS:  Yes, it does.

7          MR. JONES:  If you don't understand one of the

8   questions that is asked of you today, just ask us to

9   clarify it.  That is perfectly fine.  But if you do

10  answer the question, we're going to assume that you

11  understood it.  Does that sound okay to you?

12         THE WITNESS:  Yes.

13         MR. JONES:  Your attorney is on the call today,

14  Mr. David Sigale.  He may object to some of my

15  questions during this deposition and that is

16  perfectly fine, but unless he directs you not to

17  answer the question, after Mr. Sigale has made his

18  objection, go ahead and answer.  That is perfectly

19  fine.  Does that make sense?

20         THE WITNESS:  Yes, it does.

21         MR. JONES:  You can take a break at any time

22  during the deposition for any reason.  If you need a

23  moment, that is okay.  My only request is that if I

24  have asked a question, answer that question before

1  we go to a break so we don't lose track of where we

2  are.  Does that sound all right by you?

3       THE WITNESS:  That sounds fair.

4       MR. JONES:  Do you have any questions about

5  some of the ground rules I have just shared or do

6  they all make sense?

7       THE WITNESS:  They all make sense.

8                 BENJAMIN SCHOENTHAL,

9  called as a witness herein, having been first duly

10  sworn, was examined upon oral interrogatories and

11  testified as follows:

12                 DIRECT EXAMINATION

13                 BY MR. JONES:

14       Q.   A few quick preliminary matters.  Are you

15  under the influence of any substances or medication

16  that might impair your ability to give complete

17  truthful answers or remember things accurately?

18       A.   No, I am not.

19       Q.   Are there any other reasons that today you

20  might not be able to give full truthful answers or

21  remember things accurately?

22       A.   No.

23       Q.   Are you alone in the room right now we're

24  you're sitting?

Page 8

1      A.    I am alone, yes.

2      Q.    Would you agree to let me know if anybody

3  enters the room during our deposition?

4      A.    Of course.

5      Q.    And besides for the Zoom application we're

6  using to speak right now, are there any other

7  applications or windows open on your screen?

8      A.    I still have my gmail with the link.  I

9  will close that out.

10     Q.    Yes, please close out the gmail account.

11     A.    Okay.

12     Q.    So I understand you have closed the gmail

13  account.  Now that you have closed that, are there

14  any other windows or applications open on the

15  computer?

16     A.    No.

17     Q.    Are there any applications on your screen

18  that will give you a notification if you receive a

19  communication?

20     A.    Let me check.  I have closed all

21  applications that may notify me of an update or sale

22  or something.  So there should not be anything

23  running right now.

24     Q.    Understood.  Is your phone off or on

Page 9

1    silent right now?

2         A.   It is on vibrate.  I meant to turn this

3    off before.  So let me turn it off.  It is now off.

4         Q.   And do you have any hard copies of

5    documents in front of you right now?

6         A.   No.

7         Q.   Do you have any notes in front of you, for

8    example, writing on a white board or a post it note?

9         A.   No.

10        Q.   Did you prepare in any way for today's

11   deposition?

12        A.   My lawyer, David Sigale, gave me a quick

13   rundown of what to expect.

14        Q.   Did you review any documents or you

15   didn't?

16        A.   He did send me documents that had been

17   submitted for me to review.

18        Q.   Do you recall what those documents were?

19        A.   I believe it's my original statement.

20   There's some lawyer documents that I don't

21   understand, but trust the Dave is submitting them in

22   my best interests.

23             There's the images submitted, such as my

24   CCL, my driver's license.  The pictures of my

Page 10

1    firearm.  And I believe that was everything.

2        Q.   And the statement that you're talking

3    about, was that the declaration that you put in in

4    probably late December of last year?

5        A.   Yes.

6        Q.   When you say the lawyer documents, could

7    you describe what those were to the best of your

8    ability?

9        A.   They were talking about the Constitutional

10   rights.  I read them last night.  They're so wordy

11   I can't remember specifics, but it's talking about

12   the Constitutional rights.  The reasoning behind why

13   we're filing the suit.

14       Q.   Was it called a complaint perhaps?

15       A.   Yes, it may have been the complaint.

16       Q.   Were there any other documents besides the

17   ones we have just discussed that you reviewed?

18       A.   I just reviewed the complaint.

19       Q.   And you shared that you spoke to

20   Mr. Sigale, is that right?

21       A.   Correct.

22       Q.   For about how long did you speak to him?

23       A.   Like an hour and a half.

24       Q.   And that happened yesterday?

Page 11

1      A.    Yesterday.

2      Q.    Had you spoken to anyone else, for

3   example, a family member, a colleague, to prepare

4   for this deposition or no?

5      A.    No.  I kind of forgot about this

6   proceeding, like the lawsuit.  Because I've had to

7   do literally very minimal input.

8      Q.    Where do you reside?

9      A.    Do you want my full street address?

10     Q.    Yes.

11     A.    I live at 445 Clover Lane Drive, Sycamore,

12   Illinois 60718.

13     Q.    Do you resides with anyone else?

14     A.    I live with my wife and two children and

15   occasionally my niece.

16     Q.    How old are your children?

17     A.    My daughter is 17.  My son is 14.

18     Q.    When were you married?

19     A.    8-10-2001.

20     Q.    Aside from your wife, your two children

21   and on occasion your niece, have you resided with

22   anyone else since that time?

23     A.    We have hosted exchange students, and

24   we've had a young lady who needed a place to stay

Page 12

1    live with us.

2         Q.    When did that happen?

3         A.    Let's see.  She was with us last year.

4    But then she was with Disney for like six months.

5    She would go to Disney and intern for six months and

6    maybe two years before that she was with us as well.

7         Q.    Is this your niece that you are talking

8    about or one of the exchange students?

9         A.    No.  A friend of ours got kicked out of

10   her home.  So we had a spare bedroom to allow her to

11   stay in while she got on her feet.

12        Q.    How many exchange students did you host?

13        A.    Two.

14        Q.    When did you host them?

15        A.    I don't remember specifically.  Like three

16   years ago.  When Covid started, the last one went

17   home.  And that was the second one from Germany.

18              And then our Asian student had moved out

19   at Christmas of the year that Covid lockdowns went

20   into full effect.

21        Q.    So they moved around December to March of

22   2019 to 2020?

23        A.    Yes.

24        Q.    About how long had they been with you?

1    A.   The German student had been with us since

2  the beginning of that school year.  The Asian

3  student had been with us the year before, and she

4  had returned to finish out her high school study

5  abroad.

6    Q.   Is the list we have gone over, two

7  exchange students, the niece, the friend, your two

8  children and your wife the only folks that have

9  resided with you since 2001?

10    A.   Yes.

11    Q.   Where have you lived since 2001, all at

12  the same place or in a couple of locations?

13    A.   Originally when we got married in 2001, we

14  moved to North Aurora, an apartment, 851 Staghorn

15  Lane.  Also I have to clarify.  We then moved to

16  St. Charles.

17         My sister lived with us in an apartment

18  in St. Charles.  Then we were looking to buy a

19  house.  So we moved into her uncle's house where we

20  stayed for about a year and then we moved out.

21    Q.   What year was that?

22    A.   So 2001 we got married.  We were in North

23  Aurora for one year.  We then moved to an apartment

24  in St. Charles that next year.  We were there a year

Page 14

1  and then we decided to purchase a house.  So we

2  moved into my aunt and uncle's house another year,

3  at which point we bought our townhome.

4         We bought right before the bubble

5  crashed, but I don't remember a specific date of

6  that purchase.

7      Q.   That townhome is where you reside?

8      A.   No, that is a rental property right now.

9      Q.   So carry us forward. You were in the

10 townhome about how long?

11     A.   Let's see.  We were in the townhome for --

12 I've been in this home for five.  That takes me to

13 2018.

14        Then we were in the Prairie Field home

15 three years.  That takes me to 2015.  We were in the

16 townhome from 2006, 2007 until we moved to Prairie

17 Field in 2015.

18     Q.   Have you ever resided outside of Illinois?

19     A.   Yes.

20     Q.   When did you reside and where did you

21 reside?

22     A.   I was born in the United Kingdom.  I moved

23 to North Carolina because my dad was in the Air

24 Force, which is why I moved.  We moved to North

Page 15

1    Carolina until 1994.

2             Then my dad moved back to Illinois

3    because Illinois is where he was born.  We moved to

4    Batavia, Illinois, where we lived in Conn Printing

5    apartments about a year, year and a half while my

6    parents built a house in Batavia, where I went to

7    middle school and high school.

8        Q.   Where did you graduate from high school?

9        A.   Batavia High School.

10       Q.   What year was that?

11       A.   2001.

12       Q.   Did you obtain any degrees after high

13   school?

14       A.   I completed my bachelors with DeVry

15   University.

16       Q.   You completed your bachelors, say that one

17   more time.

18       A.   DeVry University.

19       Q.   What year did you get your bachelors

20   degree?

21       A.   I don't recall.

22       Q.   Do you have an approximate?

23       A.   Like 2013.

24       Q.   What was your degree in?

Page 16

1      A.    Network administration.

2      Q.    Did you obtain any degrees or certificates

3  besides the BA after high school?

4      A.    No.  Well, but I am currently working on

5  my masters degree.

6      Q.    Where are you studying for your masters?

7      A.    Western Illinois University.

8      Q.    What will that degree be in?

9      A.    It was an MBA in information services.

10      Q.    How long have you been pursuing that

11  degree actively since?

12      A.    On and off since I got my bachelors, as I

13  have time.

14      Q.    Always the same university?

15      A.    Yes, always at the same university.

16      Q.    Do you have an expected graduation date?

17      A.    January 1st of 2024.

18      Q.    Congratulations.  It's a long journey.

19  Are you currently employed?

20      A.    Yes.

21      Q.    What is your employment?

22      A.    My employment status like full time, part

23  time?

24      Q.    For whom do you work?

1     A.    I work for Northwestern Medicine.

2     Q.    In what capacity do you work for

3 Northwestern Medicine?

4     A.    I am an IT team lead.

5     Q.    How much do you earn per year for that

6 work?

7     A.    I believe it is $106,000 and some change

8 because I don't know the specific dollars.

9     Q.    How long have you had that job?

10     A.    As an IT team lead, I think that it's five

11 years I have been with Northwestern Medicine 15. But

12 that is grandfathering.  It used to be Kish Health

13 System.

14     Q.    Moving backwards through time, could you

15 walk us through the roles you've had at the health

16 system under either name in those 15 years?

17     A.    I originally started out as a transporter

18 for the health system.  I was there about like three

19 years.  I was studying my Sysco certification,

20 which prompted the IT manager to offer me a project

21 to work on.

22         At that point after I completed the

23 project, he said he had a job.  So after the three

24 years I then became a desktop slash help disk

1    associate with Kish Health.  At that point I worked

2    I think we got merged in 2016 or 2017 when they

3    bought us out, and they opened a team lead position

4    because of the distance from Central DuPage, Delnor

5    for which I applied for and then I got that

6    position.

7         Q.    Prior to working for the health system

8    under either name, what was your employment?

9         A.    I worked for Delnor Health System as a

10   transporter for three years as well.  Before that I

11   worked for Chase Bank.  At the time it was Bank One

12   when I started.  Then I worked for Meijer in

13   St. Charles.

14        Q.    Correct my math, but you've been with the

15   current health system that employs you since maybe

16   2008, 2009 to about 2005, 2006.

17              You had been in a prior position.  And

18   if you could repeat the job before that as well and

19   how long you were there?

20        A.    The Meijer position.

21        Q.    When did that start?

22        A.    I want to say 2000 because I think it was

23   my junior year that I got the job.

24        Q.    Have you ever been a plaintiff in a

Page 19

1    lawsuit before?

2          A.    I have been in a class action lawsuit.  I

3    think that is the only time I have been in a

4    lawsuit.

5          Q.    Were you the plaintiff in that or did you

6    put in a claim form for recovery?

7          A.    I put in a claim form for recovery.

8          Q.    Is that the only time you were involved in

9    a lawsuit as a plaintiff or as a beneficiary?

10         A.    Yes.

11         Q.    Have you ever been a defendant in a

12   lawsuit?

13         A.    Not to my knowledge.

14         Q.    Have you ever been a witness in a lawsuit

15   or been interviewed as part of a lawsuit?

16         A.    No.

17         Q.    Have you been involved in a lawsuit in any

18   other capacity besides the ones I have just shared

19   or this one is it?

20         A.    This one is it.

21         Q.    So what do you want to achieve out of this

22   lawsuit?  Why did you file it?

23         A.    Generally like my Constitutional rights.

24   I would like to be able to travel without worrying

Page 20

1    of violating the law and potentially facing prison

2    time.

3         Q.   But this isn't about all of the

4    Constitutional rights.  So what constitutional right

5    are you hoping to have?

6         A.   My second amendment right, my right to

7    carry, conceal per the state statutes.  I want to be

8    able to do that without having to worry about once

9    again falling afoul of the law.

10        Q.   Is your goal in this lawsuit to carry in a

11   field to go hunting or is it some other way of

12   carrying it?

13        A.   To be able to carry on the public

14   transportation so that, which would allow me to

15   carry to Central DuPage, Delnor, or downtown Chicago

16   if my manager or work requires me to.

17        Q.   Is that the only thing you're hoping to

18   achieve out of the lawsuit or anything else?

19        A.   That is the primarily goal of my lawsuit

20   here.

21        Q.   Are there any secondary goals?

22        A.   I haven't thought of them.  So no.

23        Q.   When you say public transportation just

24   now, what does that mean to you?

Page 21

1      A.    The primary form of public transportation
2    I use is the Metra system when I have to go downtown
3    or to Central DuPage.
4      Q.    Are there any other modes of
5    transportation besides Metra that you are speaking
6    of when you say public transportation?
7      MR. SIGALE:  I object as to the form of the
8    question.  But you could go ahead and answer.
9      THE WITNESS:  That is the only public
10   transportation I currently use, and those are the
11   only ones that I know I can't carry on because, like
12   I said, this is my primary use of public
13   transportation.  I would say yes, that's the only at
14   the moment.
15   BY MR. JONES:
16     Q.    So there is no other mode of
17   transportation that you plan on taking besides
18   Metra, is that right?
19     A.    Well, I use Uber and Lyft when downtown in
20   the city, and I believe they allow for as long as
21   I'm not -- I know that a driver can't carry.  But
22   I'm not aware of anything that says a passenger who
23   is properly licensed in their state cannot.
24     Q.    Do you believe Uber is a form of public

Page 22

1   transportation?

2        A.   It's a private company.  So no.  Sorry, I

3   have to think about it.  Uber and Lyft are private

4   companies.  So I don't know how the State would view

5   them.

6        Q.   How do you view them?

7        A.   I view them like taxis and buses.  I

8   consider them generally public transportation.

9        Q.   So your goal with the lawsuit is to be

10  able to carry a firearm or concealed firearm on

11  Metra, Uber and Lyft, is that accurate?

12       A.   Yes.

13       Q.   Are there any other forms of public

14  transportation besides Metra, Uber and Lyft that you

15  consider to be the targets of this lawsuit?

16       A.   I would say --

17       MR. SIGALE:  I am going to object that

18  ultimately this is a legal conclusion, something

19  that is public transportation under the law or

20  isn't.

21            Having said that, Benjamin, go ahead and

22  answer.

23       THE WITNESS:  If it's banned on a bus, I want

24  to be able to carry on a bus if I have to take a

Page 23

1   bus.  That is part of public transportation.

2   BY MR. JONES:

3       Q.   Are all buses part of public

4   transportation as you mean it in this lawsuit?

5       A.   So the NIU public transportation bus out

6   at DeKalb I would consider public transportation.

7   The VAC system, that is the Voluntary Action

8   Committee public, which is for I believe low income

9   people.  I'm not 100 percent sure, I don't use it.

10          I would consider them public

11  transportation.  The Pace bus service I would

12  consider public transportation.  I mean, except for

13  a privately rented out bus or like a school bus

14  because that is not open to -- like I can't get on a

15  public school bus because I am not a student, but it

16  is technically public transportation because it's

17  being provided by a service.

18      Q.   So if you win this lawsuit, do you intend

19  to carry a concealed firearm on the NIU university

20  bus?  I understand that is Northern Illinois.  Is

21  that correct?

22      A.   I don't use them, but if I had the need

23  and they're used as a public transportation for the

24  DeKalb area, yes.

Page 24

1        If I needed to go to Wal-Mart, and I was

2   at a spot that picked me up and took me to Wal-Mart

3   and NIU, then I would use that bus system.

4        Q.   If you win this lawsuit did you intend to

5   carry a concealed firearm on Greyhound buses?

6        A.   I don't use Greyhound.  So the answer

7   would be no

8        Q.   If you win this lawsuit, do you intend to

9   carry a concealed firearm on the VAC bus that you

10  spoke about?

11       A.   I don't know if I can use the VAC system.

12  So the answer would be no.

13       Q.   If you win this lawsuit do you intend to

14  carry a concealed firearm on any school bus?

15       A.   As I am not a student in middle school or

16  high school I would not be carrying a firearm and my

17  be on the bus except for the bus driver would not be

18  of legal age to carry a firearm.  The answer is no.

19       Q.   Is it your understanding that there are 18

20  year olds in high school?

21       A.   Yes.

22       Q.   Is it your understanding that someone who

23  is 18 years old, they can carry a firearm legally in

24  the State of Illinois?

1     A.    With a FOID card, yes.

2     Q.    If you win this lawsuit, will those 18

3  year olds be allowed to carry concealed firearms on

4  a school bus in your view?

5     MR. SIGALE:  Objection, calls for a legal

6  conclusion and speculation.  And the witness lacks

7  foundation to answer these questions.  But Benjamin,

8  go ahead and answer.

9     THE WITNESS:  As a carry conceal in the State

10  of Illinois I believe you have to be the age of 21

11  years old.

12        So they would be unable to carry a concealed

13  firearm on a school bus because they are of the age

14  of 18, I believe is what you said.

15  BY MR. JONES:

16     Q.    So there's no circumstancein which anyone

17  can carry a concealed firearm on a school bus or

18  there is?

19     MR. SIGALE:  The same objection.  Go ahead and

20  answer.

21     THE WITNESS:  A bus driver who is of the legal

22  age to obtain a concealed carry permit by going

23  through the proper process could in theory carry

24  except unless their employer told them that they

Page 26

1   can't.

2   BY MR. JONES:

3       Q.   Does that mean an employer can limit

4   someone's second amendment right to carry a firearm

5   in your view?

6       A.   I don't know if they legally -- let me

7   clarify.  I know that there are companies that will

8   say you cannot bring a firearm or have it in a

9   parking lot despite the law saying I have a parking

10  lot exception to store my firearm as a conceal

11  carry.

12           Is that legal?  I don't know.  That

13  would require some sort of lawsuit to determine if

14  they could curtail your second amended right.  But

15  assuming it is private property, I don't know.

16      Q.   Through this lawsuit do you seek to carry

17  a firearm anywhere besides the places we've just

18  discussed or are those the only places?

19      A.   I carry a firearm wherever I am legally

20  allowed to because the law says if they have a sign

21  up I can't carry it there.  And as I stated, I don't

22  want to run afoul of the law.

23      Q.   But if you win this lawsuit, you're going

24  to have the right, you think, you've told us to

Page 27

1   carry firearms concealed in places that you can't
2   currently do that.

3           You have listed a couple of those places
4   over the last couple of minutes.  Besides the ones
5   you've listed are there any other places you are
6   hoping to carry a concealed weapon or are those the
7   only ones?  Again, just from your perspective?

8       A.   Ideally, I would be able to carry
9   anywhere, no restriction.  But this lawsuit is very
10  specific to what it's trying to achieve.  So at the
11  end of this lawsuit I want to be carry any place
12  that the lawsuit is about.

13      Q.   And you've listed a bunch of places that
14  this lawsuit is about including Metra.  You said
15  it's about Uber.  You said it's about Lyft.  You
16  said that it's about Pace.

17          Aside from those places you've mentioned
18  are there any other places you are hoping to carry a
19  concealed firearm if you win this lawsuit?

20      A.   If I win this lawsuit, anything that is
21  determined by law as public transportation is where
22  I want to be able to carry.

23      Q.   And again, I am asking what public
24  transportation means to you.  You shared a list of

1  places.  Is that the full list of places that is

2  included in the category of public transportation as

3  you understand it?

4      A.   I believe so.

5      Q.   Are you uncertain?

6      A.   I don't know every public transportation

7  company that may be available in the State of

8  Illinois.  So the ones I have listed are the ones

9  that I know or I believe to be public

10  transportation.

11     Q.   And you don't know of any others right now

12  as we sit here?

13     A.   No.  I could do a quick Google search to

14  try to finds so other answers.  But for right now

15  those are the ones.

16     Q.   Those are the ones?

17     A.   Yes.

18     Q.   Did you review the complaint that you have

19  filed that was put in this case before it was filed?

20     A.   I did read it, yes.

21     Q.   And you approved everything in it, right?

22     A.   Yes.

23     Q.   Nothing that you saw in it was wrong or

24  inaccurate?

Page 29

```
 1       A.    To the best of my recollection, yes.
 2       Q.    Because you wouldn't obviously have
 3  approved it if you saw any issues, right?
 4       A.    Correct.
 5       Q.    Do you know who Mark Wroblewski is?
 6       A.    I believe he's one of the coplaintiffs.
 7       Q.    Have you ever met him?
 8       A.    No.
 9       Q.    Have you ever seen him to your knowledge?
10       A.    To my knowledge, no.
11       Q.    Have you ever communicated with him in any
12  way to your knowledge?
13       A.    No.
14       Q.    Have you ever to your knowledge even stood
15  in the same room with him?
16       A.    To my knowledge, no.
17       Q.    Who is Douglas Winston?
18       A.    I do not know.  Well, I'm assuming he's a
19  coplaintiff.
20       Q.    Why are you assuming that?
21       A.    Based on the line of questioning.
22       Q.    Other than that, you don't know even that
23  name, right?
24       A.    No.
```

Page 30

1     Q.   Who is Joseph Vessel?

2     A.   I do not know.

3     Q.   Have you ever been convicted of a felony?

4     A.   No.

5     Q.   Have you ever been accused of a felony?

6     A.   No.

7     Q.   Have you ever been accused of a

8  misdemeanor?

9     A.   Clarify.  Is a traffic violation a

10 misdemeanor?

11    Q.   I guess it could depend, but what

12 violation are you talking about?

13    A.   I have received a speeding ticket, and I

14 have been in a car accident.

15    Q.   Were you cited following the car accident

16 in any way or not?

17    A.   I don't think I was.  I might have.

18    Q.   Was it a fine to your recollection or

19 something like a ticket if you were cited?

20    A.   Yes.

21    Q.   Do you recall about when that might have

22 happened?

23    A.   No.

24    Q.   Just a general estimate, approximate year?

Page 31

1     A.   I could run through my cars.  Maybe 2016.

2     Q.   After that event, you don't recall going

3  into court or having a more elaborate proceeding at

4  all.  It was a citation, if anything?

5     A.   Yes, I think it was a citation.  I did not

6  go into a court.

7     Q.   Have you ever used cocaine?

8     A.   No.

9     Q.   Have you ever used heroin?

10    A.   No.

11    Q.   Have you ever used marijuana?

12    A.   No.

13    Q.   Have you ever used any prescription

14  opioids?

15    A.   I don't believe so.

16    Q.   Have you ever used methamphetamine?

17    A.   No.

18    Q.   Have you ever taken any controlled

19  substance?

20    A.   Barring that my doctor prescribed me

21  something which I don't remember, the answer would

22  be no.

23    Q.   Do you have a medicinal cannabis card?

24    A.   No.

Page 32

1     Q.   Why not?

2     MR. SIGALE:  Object to the form of the

3  question.  You could answer.

4     THE WITNESS:  I went to high school.  I saw pot

5  heads.  I realized the damage it was doing to their

6  brains and, therefore, decided based on those

7  examples it was not for me.

8  BY MR. JONES:

9     Q.   Have you ever been subject to an order of

10  protection or a no contact order?

11     A.   No.

12     Q.   Has anyone sought such an order against

13  you in the past?

14     A.   Not to my knowledge.

15     Q.   Have you ever been accused or convicted of

16  aggravated assault for the violation of an order of

17  protection or a similar offense?

18     A.   No.

19     Q.   Are you a United States citizen?

20     A.   Yes.

21     Q.   Were you born a U.S. citizen or are you

22  naturalized?

23     A.   I was born a U.S. citizen.

24     Q.   Have you ever failed a drug test?

Page 33

```
 1       A.   No.
 2       Q.   Have you ever been a fugitive from
 3  justice?
 4       A.   No.
 5       Q.   Have you ever been adjudicated as mentally
 6  defective?
 7       A.   No.
 8       Q.   Have you ever been a patient in a mental
 9  institution?
10       A.   No.
11       Q.   Have you ever received treatment whether
12  it's patient, outpatient or otherwise for a mental
13  illness?
14       A.   No.
15       Q.   Have you ever been to a therapist?
16       A.   No.
17       Q.   Are you intellectually disabled or
18  developmentally disabled?
19       A.   No.
20       Q.   Have you ever been adjudicated by a court
21  as mentally disabled or developmentally disabled?
22       A.   No.
23       Q.   Have you ever been required by a court to
24  engage in any mental health treatment at all?
```

Page 34

1        A.    No.

2        Q.    Aside from the two circumstances we just

3    mentioned, the traffic violation speeding and

4    possible citation after an accident, have you ever

5    been arrested?

6        A.    No.

7        Q.    Are you subject to a pending arrest

8    warrant or have you ever been subject to a pending

9    arrest warrant?

10       A.    No.

11       Q.    Have you ever been subject to an

12   investigation of any kind by a government agency or

13   entity?

14       A.    No.

15       Q.    So, for example, you have never sought or

16   obtained a security clearance or you never had a

17   routine background check conducted?

18       A.    Besides the FOID card background check, I

19   believe that's the only background.

20       Q.    Have you ever been ordered by a court to

21   get treatment for alcoholism, alcohol use or drug

22   use?

23       A.    No.

24       Q.    Besides the two events we discussed, the

Page 35

1    possible citation and the speeding ticket, have you

2    ever had any interaction with law enforcement

3    officers?

4         A.   Besides waving at them as you drive by,

5    no.

6         Q.   Have you ever consumed an alcoholic

7    beverage?

8         A.   Clarify.  In my entire life?

9         Q.   Yes.

10        A.   Yes.

11        Q.   How often over the last three years have

12   you consumed an alcoholic beverage?

13        A.   Zero times.

14        Q.   When was the last time you had an

15   alcoholic beverage?

16        A.   I do not remember.  It has been so long.

17        Q.   Could you give us an approximate date?

18        A.   2013 maybe.

19        Q.   Have you ever driven within an hour of

20   having an alcohol beverage?

21        A.   No, that would be irresponsible.

22        Q.   I understand that you have taken firearm

23   training as part of your various applications for

24   permits, is that right?

Page 36

1      A.   Yes.

2      Q.   What training have you taken?

3      A.   So for my concealed carry I did the

4  concealed carry course, which is training, plus live

5  fire exercises.  Since then I have become a

6  certified NRA pistol instructor.

7      Q.   Are those the only two sequences of

8  courses you've taken or have there been others?

9      A.   Those are the only two sequence of

10 courses.

11     Q.   When did you take the CCL course?

12     A.   The license is good for five years.  I

13 renewed in 2023.  So it would be like 2018.

14     Q.   Do you recall who gave that course, who

15 were the instructors or the company that provided

16 it?

17     A.   I think it was out of the Rockford

18 Protective Agency.

19     Q.   How many hours do you recall that course

20 to have been?

21     A.   It was 16 across two days.

22     Q.   Where did it take place?

23     A.   Up in the Rockford Protective Agency.  And

24 then they did the, I think it was called Pine Tree

Page 37

1    Pistol Club for the proficiency.

2         Q.   Do you recall the name of the instructor?

3         A.   I do not.

4         Q.   Did it cover firearm safety, the course

5    we're discussing?

6         A.   It covered whatever is required for CCL

7    certification.

8         Q.   Do you recall that it covered firearm

9    safety or no?

10        A.   Yes.

11        Q.   Do you recall if it covered marksmanship?

12        A.   Yes.

13        Q.   Do you recall that it covered the

14   cleaning, clearing and loading and unloading of a

15   concealed firearm?

16        A.   Not necessarily a concealable firearm.  It

17   went over the cleaning, clearing and loading of a

18   firearm.

19        Q.   Did the teaching it gave you cover

20   concealable firearms as well?

21        A.   I need you to clarify that question.

22        Q.   Were the principals they taught you

23   regarding the issues like cleaning and care, were

24   those principals applicable to concealable firearms

Page 38

1   too?

2         A.    Yes, they would apply to a concealable

3   firearm.

4         Q.    Did the class cover applicable state and

5   federal laws relating to the ownership, storage,

6   carry and transport of concealable firearms?

7         A.    Yes.  There was a very long section on

8   that.

9         Q.    Did this lesson cover the appropriate and

10  lawful interactions you may have with a law

11  enforcement officer while you're carrying a

12  concealed firearm?

13        A.    Yes.

14        Q.    Did you complete the live fire

15  requirement?

16        A.    Yes.

17        Q.    And how long and what was that line of

18  fire requirement in that particular course?

19        A.    It is the Illinois State concealed carry

20  requirement, which is 310 rounds groups.  I think

21  it's five, seven and 10-yards with a 70 percent

22  passing rate.

23        Q.    And you passed, I take it?

24        A.    Yes.

Page 39

1    Q.   Outstanding.  You mentioned a couple of

2    minutes ago you had taken a sequence of courses to

3    get your NRA pistol instructor certification.  Am I

4    recalling that accurately?

5    A.   Yes.

6    Q.   Can you walk us through the series of

7    training and when they occurred and what was covered

8    at a high level?

9    A.   I can't remember dates because it's been a

10   while, but for the NRA, to become an instructor you

11   have to take and pass the course you're going to be

12   instructing.

13           So I took Moni (phonetic) and the girl

14   that lived with us a while, my friend went and took

15   the pistol course.  Then it might have been

16   September of this last year, I took the instructor

17   course.

18   Q.   How long were those two courses

19   approximately?

20   A.   They were I believe they were like two, 8

21   hour days.

22   Q.   Besides those two, 8 hour days, were there

23   any other courses in that sequence or those were the

24   two?

Page 40

1        A.    Those were the two.

2        Q.    Where did you take them, and it was the

3    NRA that sponsored them or someone else?

4        A.    It was an NRA course.  I took it with an

5    NRA instructor.  I took it at GAT Guns.

6        Q.    I'm going to share my screen in a moment.

7    Let me know if you are able to see what I am sharing

8    clearly if that's okay.

9        A.    Okay.

10       Q.    Mr. Schoenthal, do you see what I'm

11   sharing right now?

12       A.    Yes.

13       Q.    I'm going to slide down.  You see at the

14   bottom there is a stamp on the right that ends with

15   ISP 00008?

16       A.    Yes.

17       Q.    I'm scrolling back up.  Take the time you

18   need to look at it or if you need me to zoom in so

19   you could see it clearly.  When you are able to see

20   it clearly, can you share what we are looking at?

21       A.    It looks like you're sharing an FOID

22   application.

23       Q.    Is it yours?

24       A.    It says Schoenthal.

Page 41

1      Q.   Take a look at this.  Is there anything
2  you are looking at right now that is not accurate?
3  Take the time you need to review it carefully.
4      A.   Okay.
5      Q.   It looks accurate to you?
6      A.   The question marks, a medical marijuana
7  medical card, question mark.
8      Q.   Aside from that, you see nothing else that
9  you would contest?
10     A.   My weight has dropped, but that's recent.
11     Q.   Anything else?
12     A.   No.
13     Q.   So this, if I highlight it, it appears
14  that there's a gmail address here?
15     A.   Yes.
16     Q.   Is that accurate?
17     A.   Yes.
18     Q.   Is it still your phone number just above
19  your gmail address?
20     A.   That is correct.
21     Q.   I'm going to scroll down a little bit.
22  Let me know if it's difficult to see.  I am coming
23  to the next page.  It ends in nine to the bottom
24  right.  Hopefully you're able to see that.

1          Does this appear to be the certification

2    page you signed when you submitted the document or

3    the application?

4          A.   Well, on the website it doesn't look like

5    this, but if that is how it ends up for this page I

6    would say that's correct.

7          Q.   And you have no reason to believe the text

8    is different from the one you signed?

9          A.   I have no reason to think that the text

10   would be different.

11         Q.   And you did, in fact, apply in late August

12   of 2021.  You recall that, right?

13         A.   Yes.

14         Q.   I'm going to continue scrolling down.

15   There's a blank page.  I'm going to the next page.

16   Are you able to see this page clearly?

17         A.   Yes.

18         Q.   And similar to what we just did, could you

19   take a look.  Take the time you need and let me know

20   if there is anything here that appears to be

21   incorrect.

22         A.   It looks correct.

23         Q.   Nothing here that you have any reason to

24   think is not right?

Page 43

1      A.    That is correct.

2      Q.    I'm going to scroll down because there are

3  a few additional questions on this one, on the next

4  page ending in 12.  You could see that at the bottom

5  right hand corner I'm going to scroll up so you

6  could see the questions.

7             Again, the same question, there is

8  nothing here that is incorrect.  Right?

9      A.    Nothing incorrect.  Once again, I don't

10 know why there are question marks.

11     Q.    Aside from that, nothing appears to be

12 wrong?

13     A.    Nothing appears to be wrong.

14     Q.    Again, I'm going to scroll down here to

15 the page that the stamp is labeled.  You're able to

16 see that, Mr. Schoenthal?

17     A.    Yes.

18     Q.    This appears to be the certification that

19 you signed when you applied for the license in, it

20 appears October of 2020, right?

21     A.    Yes.

22     Q.    I'm going to scroll up to the top.  What

23 we are looking at is, again, the same date ending in

24  6, right?  Do you see that?

Page 44

1        A.    Yes.

2        Q.    If you have any problems seeing this, let

3    me know.  This is a report that was produced in

4    discovery.

5             If you could review the results of this

6    report.  Is there anything here that appears to be

7    incorrect at all?  And to narrate it while you're

8    looking at it, this is the history of your

9    applications and the status changes for your FOID

10   card?

11       A.    Correct.

12       Q.    Are any of these dates, all of these dates

13   seem accurate to you to the best of your

14   recollection?

15       A.    To the best of my recollection, yes.

16       Q.    I'm going to scroll down again.  This is a

17   document, the stamp is ending in 7.  Do you agree,

18   you see that at the bottom?

19       A.    Yes.

20       Q.    This is a document produced in discovery.

21   It shows the history of your status changes with

22   respect to conceal carry licensing.

23             If you could take a moment to look at

24   that and let us know if to the best of your

Page 45

1    recollection that appears to be correct?

2         A.    To the best of my recollection that

3    appears to be correct.

4         Q.    I'm going to stop sharing my screen.  Let

5    me know when it comes off.

6         A.    It has come off.

7         Q.    Do you own any firearms right now?

8         A.    Yes.

9         Q.    What firearms do you own?

10        A.    From my memory, I will try to be as

11   accurate as possible.

12        MR. SIGALE:  Before you answer, Benjamin --

13        MR. JONES:  I have to remind you, Mr. Sigale,

14   you have an objection to make?

15        MR. SIGALE:  Thank you, I appreciate that.

16   It's less an objection than a clarification that the

17   information elicited by this question is subject to

18   the confidential information portion of the

19   protective order that was entered into in this case.

20        With that said, Benjamin, go ahead and

21   answer.

22   ███████████  ████████████████████

███  ████████  ██████████████████████

███  █████████████████  ████████████████



[redacted]

Page 47



19          The Rhino would be difficult to conceal.
20   And I think all the other ones would be concealable.
21       Q.   Did you purchase all of these firearms
22   that you just listed for us or were any of them
23   transferred to you through interfamilial gift or
24   some other mechanism?

Page 48

1 ████ ████████████████████ ████

2 ██ ████████████████

3    Q.   Did you purchase all of them in Illinois

4 or did you purchase any of them outside of the

5 state?

6    A.   I need you to clarify.  While I was living

7 in Illinois or from vendors and dealers outside of

8 the state?

9    Q.   Where was the origin of the firearm?

10    A.   I ordered some of them from licensed FFL

11 dealers using a gun broker and have them shipped to

12 an FFL in Sycamore.

13    Q.   Did you acquire all of them that way or

14 were some purchased inside Illinois?

15    A.   Some were purchased inside Illinois.

16 ████ ████████████

██ ███████████████████████

██ ████ ██████████████

██ █████████████████████████

██ ███████████ ████████████ ████████

██ ████████

██ ████ ████████████████████

██ ████████████████████████

██ ████ ████████████

Page 49

1      Q.   As a general rule, you acquired others by

2  ordering them, and they were shipped to a licensed

3  dealer, and you picked them up?

4      A.   Yes.

5      Q.   Where did you pick them up?

6      A.   The two FFLs.  They were either shipped to

7  Morengo Guns or to Cops, Inc. in Sycamore.

8      Q.   And the ones you purchased were purchased

9  from those locations too?

10          Let me back up.  You said you ordered

11  some that originated outside of Illinois.  The ones

12  that originated inside Illinois, were they also

13  acquired from those two locations or from another?

14  ████   ██████████████████████   ███████████████

   ██  █████████████   ████████████████████████

16     Q.   Did you provide pictures in discovery of

17  all of these firearms or no?

18     A.   No.

19     Q.   Why not?

20     A.   Because they are not my carry gun.

21     Q.   So you don't carry any firearms in a

22  concealed manner besides the one you provided

23  pictures of, is that right?

24     A.   By preference, yes.

Page 50

1 ████ ████████████████████████████

2 ██████████████████████████████████

3 █ ███████████████████████████

4 █ ████ ████████████████████████

5 █ ██████████████████

6     Q.   Is that the only one you have ever carried

7 in a concealed manner?

8     A.   Yes.

9     Q.   Are there others that you carried in a

10 canceled manner or is there no possibility way that

11 would happen?

12     A.   There's a preference order of my guns

13 because of how they shoot and how accurate I am.

14 Those are the two that I shoot the best and,

15 therefore, I would prefer not to carry any of the

16 ████████████████████████████████████

17     Q.   So you would?

18     A.   I could.  I choose not to because of the

19 fact that I am more accurate with the ones, well, my

20 ██████████████████████████

21     Q.   Are there any circumstances you would

22 carry the others?

23     A.   No, or not to my knowledge.

24     Q.   Well, I'm not asking about your knowledge.

Page 51

1   I am asking about your intent.

2       A.   You're asking me about future

3   possibilities.  There could be circumstances at some

4   point in the future where I might decide that

5   another one could be carried, but my preference as

6   of today as of this conversation is no, I would not

7   ████████████████████████████████████████

8   accurately, and it's the most comfortable to wear.

9       Q.   Are you concerned about your accuracy with

10  the others?

11      A.   No.

12      Q.   So you have no concerns about your

13  accuracy with the others at all, but you do have a

14  preference for one because of accuracy reasons.  Can

15  you help me understand that?

16      A.   I shoot better with it.  I could shoot the

17  other ones within the --  let me think about this.

18  I can shoot them all to the standards of the

19  concealed carry test.

20      Q.   What about to your standards?  Can you

21  shoot them to your standards or no?

22      A.   ██████████████████     ████████████

23  comfortable to shoot.  So I could shoot it to my

24  standards.  I just don't because recoil for the hand

Page 52

1    because of the size of the firearm.

2         Q.   So your accuracy with all of them is the

3    same?

4         A.   Within my standards.

5         Q.   So there is no difference in your ability

6    to shoot accurately with one versus the other?

7         A.   Gripping size is different.

8         Q.   So you're more or less accurate with one

9    or the other?

10        A.   I would be saying my grouping size is

11   different, but I still hit the target within my

12   comfort level.

13        Q.   Have you ever driven a car with a firearm

14   inside it?

15        A.   Yes.

16        Q.   When?

17        A.   Every day when I drive to work.

18        Q.   Do you carry that firearm in to work with

19   you?

20        A.   No.

21        Q.   Why not?

22        A.   Northwestern Medicine is a hospital, and

23   any site affiliated with a hospital facility or a

24   health system is a gun free zone.

Page 53

1      Q.    Do you wish you could carry it in with

2   you?

3      A.    Yes.

4      Q.    Why?

5      A.    Because you do not know when crime is

6   going to happen.

7      Q.    Do you live in fear of crime?

8      A.    I would like to be prepared for as many

9   eventualities as possible.

10      Q.    What eventualities besides crime?

11      MR. SIGALE:   I'm going to object as to the form

12   of the question.   It sounded like Benjamin was

13   asking to clarify anyway.   Go ahead.

14      THE WITNESS:   I wanted to clarify.   So I have a

15   fire extinguisher because there potentially could be

16   a fire.   So I like to be prepared for that. I was a

17   boy scout.   So I like to be prepared for an

18   eventuality.   I don't carry because I'm afraid.   I

19   carry just because I want to be prepared in case I

20   get into an eventuality where deadly grievous bodily

21   harm could be inflicted upon me.

22   BY MR. JONES:

23      Q.    And you're not confident in your ability

24   to deal with that absent a concealed firearm, right?

Page 54

1    A.    No, because the idea is that deescalation

2    is always the first path, but there's a list of

3    things you do.  Deadly force is considered the last

4    to my understanding.

5              So because if someone were to -- we do

6    active shooter trainings.  If someone comes in with

7    a gun, deescalation may not be an option.  So being

8    prepared for that is a way to respond would be what

9    I consider would be a reasonable response.

10    Q.    Setting aside training, work at the range

11    and target practice that sort of thing, have you

12    ever held a gun in your day-to-day life unholstered

13    it, and brandished it for any reason?

14    A.    Brandished it, no.  I have held a gun to

15    unload, reholster it and put away, et cetera.

16    Q.    And I will characterize that as basic

17    maintenance tasks or movement.  Again, training and

18    basic movement and tests aside, you have never

19    brandished or unholstered it in any sense?

20    A.    Correct.

21    Q.    Have you ever wanted to?

22    A.    No.

23    Q.    Have you ever felt the need to?

24    A.    No.

Page 55

1      Q.   Have you ever been in a circumstance where
2   it would be called for?
3      A.   No.
4      Q.   Have you ever carried a firearm on public
5   transportation?
6      A.   No, because that would be a violation of
7   the law.
8      Q.   Have you ever carried a firearm in an
9   Uber?
10     A.   No.
11     Q.   Have you ever carried a firearm in a Lyft?
12     A.   No.
13     Q.   Have you ever carried a firearm in someone
14  else's car?
15     A.   Clarifying, are you excluding family
16  members?
17     Q.   No.
18     A.   Then yes.
19     Q.   Who are they?
20     A.   My wife.  My friends.
21     Q.   Setting those folks aside for a moment,
22  have you ever carried a firearm in a vehicle owned
23  by someone else, again, setting aside family and
24  friends?

Page 56

1      A.   No, to my knowledge.

2      Q.   I'm going to share my screen one more

3   time.  Let me know when you're able to see it if

4   that's okay.

5           Are you able to see the document I'm

6   sharing?

7      A.   Yes.

8      Q.   At the beginning of our conversation you

9   said that you reviewed a declaration.  Is this the

10  declaration you recall reviewing ahead of this

11  conversation?

12     A.   I believe that is, yes.

13     Q.   I will scroll down so you could see it as

14  well.

15     A.   All right.

16     Q.   That seems to be the document you

17  reviewed?

18     A.   That seems to be the document, yes.

19     Q.   Everything here is accurate still to this

20  day?  I know you filed it in December.  So if you

21  could take a look at it and let me know if anything

22  has changed.  Let me know if you would like me to

23  scroll.

24     A.   No, that looks accurate.

Page 57

1      Q.   I am going to keep scrolling.  I think

2  there's a few extra lines.  Are you able to see?

3  Does that look accurate as well?

4      A.   Yes.

5      Q.   I'm going to pull down my screen.  Let me

6  know when it disappears.

7      A.   Okay.

8      Q.   How did you come to get involved in this

9  lawsuit?

10     A.   When I had a Twitter account I saw a

11 message from the Firearms Policy Coalition asking

12 for residents in Illinois who would like to be able

13 to ride public transportation with their concealed

14 firearm, and I reached out.

15     Q.   How did you reach out?  Did you send a

16 letter, message or e-mail?

17     A.   I think it was an e-mail.

18     Q.   Do you recall who you sent that email to?

19     A.   I think it's their action list e-mail.  I

20 think it's a generic response e-mail that you click

21 on.

22     Q.   What is your Twitter handle or Twitter

23 name or was it when you had the Twitter account?

24     A.   I don't remember.  I think it might be

Page 58

1  @Schernobyl. I think, I'm not 100 percent.

2      Q.   When did you cease to have a Twitter

3  account?

4      A.   I don't remember.  Social media, it's

5  divisive, and nothing productive happens.  And it

6  was making me angry reading all the arguing.  So it

7  was like I have to get that out of my life.

8      Q.   Is it possible you still have it or you

9  deleted it?

10     A.   I believe I deleted it.  I know I have a

11 Facebook page, which is 100 percent inaccurate with

12 the information on it because I like to troll

13 Facebook or at least I did.

14     Q.   And your Fastbook page is under your

15 actual legal name?

16     A.   It's my actual legal name, but it says I'm

17 a communist and has the wrong birth date and other

18 things.

19     Q.   Were you on any other social media now or

20 previously?

21     A.   Nothing now.  And I think Twitter and

22 Facebook were really the only things I was on.

23     Q.   So you shared a minute ago that you got

24 that outreach.  You saw something on Twitter from

Page 59

1    FPC.  If I say that do you understand that is the

2    Firearm Policy Coalition?

3         A.   Yes.

4         Q.   You saw that from FPC, and you reached out

5    to them.  What happened next?

6         A.   They called me.  They asked some questions

7    of me.  Then they said we're going to send you a

8    document for -- I don't know what the document is

9    called.  But they wanted -- that I wished to join

10   the lawsuit.  They would provide representation, and

11   I think that was it.

12        Q.   Who called you?  Do you remember who that

13   was?

14        A.   I do not.

15        Q.   Male or female?

16        A.   It was a man.

17        Q.   Did they identify their role at FPC?

18        A.   They probably did.  I don't remember.

19        Q.   Do you remember when that phone call

20   occurred time wise?

21        A.   I don't.

22        Q.   Was it in 2020, 2021, the same year you

23   filed in 2022?

24        A.   Yes.  When did we file?  I want to say

Page 60

1    maybe three to six months before we filed.  I'm
2    guessing.
3         Q.    So you would say probably late 2021, first
4    half of 2022 would be about right?
5         A.    Yes.
6         Q.    So let me back up.  You put in your
7    request e-mail.  They called you back.  How long was
8    the gap between putting in that submission and
9    getting that call back?
10        A.    I think it was like a week or so.
11        Q.    Do you recall what questions they asked
12   you?
13        A.    They asked me like how often do you ride.
14   Why don't you ride.  They asked me if it would be
15   okay.  Are you okay because your employer may find
16   out about this lawsuit.  And they say, are you
17   willing to risk job loss, et cetera, with this
18   lawsuit.
19        Q.    Anything else?
20        A.    Not that I can remember.
21        Q.    So you had that conversation.  Do you
22   recall how long it lasted, three hours, an hour?
23        A.    I would say 30 minutes to an hour.
24        Q.    So you had that call.  Then what happens?

Page 61

1      A.   They send me an e-mail with a form that I
2   need to sign saying that I'm going to join, that I
3   wish to proceed and join the lawsuit.  And then so I
4   think that was it.  There's some verbiage on there.
5   I don't remember the verbiage.

6      Q.   So I presume, correct me if I'm wrong, you
7   read the form.  You signed the form.  Do you
8   remember about when that happened in terms of the
9   time line?

10      A.   I do not.  I would say probably within a
11   month of the initial contact.

12      Q.   Did you sign the form relatively quickly
13   after you got it?

14      A.   No.  I talked to my wife.

15      Q.   What did you say to your wife?

16      A.   I asked her I said, hey, I'm planning to
17   do this.  Do you have any concerns.  And we went
18   forward.

19      Q.   What did she say?

20      A.   I don't remember.  I wouldn't have signed
21   the form if she wasn't okay with it.

22      Q.   Did she read the form?

23      A.   Probably not.

24      Q.   Did she read anything else from FPC?

Page 62

1      A.   No.

2      Q.   At this point in the process, had you ever

3   talked to a lawyer or no?

4      A.   No.  I don't want to speak over you.  To

5   clarify, I have talked to an estate planning

6   attorney.  I have not talked to Mr. Sigale.

7      Q.   A fair clarification.  Just zeroing in on

8   this process and not folks you may have spoken to in

9   other areas of your life.

10         At this point you never spoke to an

11  attorney yet, right?

12     A.   Correct.

13     Q.   The person who you spoke to at FPC, they

14  didn't say that they were your attorney, right?

15     A.   Correct.

16     Q.   They did not identify themselves as

17  counsel, and they didn't try to give you legal

18  advice, right?

19     A.   Correct.

20     Q.   Did you sign the form before you spoke to

21  counsel?

22     A.   I signed the form before my counsel had

23  spoken to me.

24     Q.   So then you spoke to your wife.  Correct

Page 63

1   me if I'm getting any of this wrong.  You spoke to

2   your wife.  You had a conversation.

3           You thought about it and then the next

4   step you signed the document.  Is that basically

5   correct?

6       A.    That is basically correct.

7       Q.    And that signature happened you shared

8   maybe about a month after that initial contact, that

9   initial exchange?

10      A.    Correct.

11      Q.    Then what happened?

12      A.    Then eventually Mr. Sigale reached out to

13  me.

14      Q.    When did that happen?

15      A.    I wish I remembered.  I am terrible with

16  dates.  I do not know, unfortunately.  I don't know

17  specific dates.  I assume it was before we filed

18  because he had to get information from me.

19      Q.    Just an estimate.

20      A.    Maybe a month after I had signed the

21  document.  Maybe a little sooner.

22      Q.    So within a month of the signature is

23  probably a fair estimate?

24      A.    Probably.

1      Q.    Did he identify himself as your attorney
2   when he called?
3      A.    I believe it was an e-mail originally.
4      Q.    He identified himself at that point as
5   your attorney or no?
6      A.    I believe he mentioned that he was going
7   to be representing me as part of this litigation.
8      Q.    Do you have any other attorneys in this
9   lawsuit besides Mr. Sigale or is he the only one?
10     A.    He's the only one.
11     Q.    So you had that contact from Mr. Sigale
12  and then about how much time passed until you filed
13  the lawsuit to your recollection?
14     A.    I don't remember when we filed the
15  lawsuit.  I just know that he provided documentation
16  he needed clarity on and then I filled it out and
17  provided the information he needed.  Like I said, I
18  kind of forgot about this lawsuit.
19           I have a day-to-day family I'm taking
20  care of.  So when he provides updates, that's when I
21  know.
22     Q.    How frequently have you spoken or gotten
23  contact from Mr. Sigale since you filed?
24     A.    I believe I have nine e-mails from him.

Page 65

1   They might be because of split chains, someone
2   responds individually to a group email.
3        Q.   Did you have any emails from him before
4   the lawsuit?
5        MR. SIGALE:  I'm going to object to the form of
6   the question.
7   BY MR. JONES:
8        Q.   Before the filing of the complaint.
9        A.   Yes, I believe so because he had to --
10       MR. SIGALE:  Benjamin, I'm going to direct you
11  not to answer any information that would involve
12  what you and I spoke about.
13       MR. JONES:  To clarify, I'm not asking and
14  wouldn't ask what he said in the e-mail.  But did
15  you receive an e-mail?
16       THE WITNESS:  Yes.
17       MR. JONES:  I'd like to go off the record
18  briefly.
19              (Off record)
20       MR. JONES:  I'm going back on the record,
21  unless anyone else would like a break.
22              (Recess)
23  BY MR. JONES:
24       Q.   How much have you paid your lawyer for

Page 66

1    this case, Mr. Schoenthal?

2         A.   I have paid nothing to my lawyer.

3         Q.   Why not?

4         A.   Because I believe that FPC is covering the

5    costs at the moment.

6         Q.   What is the basis for your belief?

7         A.   I believe in the form that I signed for

8    FPC they mentioned that they were covering costs.

9         Q.   Did they say that in any other form or was

10   that just in your submission to FPC?

11        A.   Can you clarify?

12        Q.   Sure.  Did you sign any contracts that

13   say -- let me back up and be more clear.

14              You signed an agreement for

15   representation in this case, right?

16        A.   Correct.

17        Q.   Did that agreement say who would be paying

18   for the case?

19        A.   Yes, I believe it did.

20        Q.   Who did it say would be paying for the

21   case?

22        A.   I believe FPC.

23        Q.   Did it say anyone else would be paying for

24   the case?

Page 67

```
1        A.    Not to my knowledge.
2        Q.    Did anyone any other time share with you
3    in writing or verbally that anyone besides FPC would
4    be paying for the case?
5        A.    Can you repeat that.
6        Q.    Sure.  Did anyone share with you at any
7    time in writing or in a spoken word that anyone
8    besides FPC would be paying for the case?
9        A.    No.
10       Q.    You would remember that if they had?
11       A.    I believe I would.
12       Q.    Do you know how high the bills are so far
13   in this case or no one has told you?
14       A.    I have not received any information on
15   cost or fees.
16       Q.    Are there any circumstances in which you
17   might have to pay for the fees or costs or there's
18   no circumstances in which that would happen?
19       A.    I believe FPC's documentation says if for
20   some reason you become, how do I say, nonresponsive
21   or I don't know the exact wording, but I think
22   nonresponsive was their point and they dropped you
23   as a plaintiff from the case, you would then be
24   liable for fees.
```

Page 68

1      Q.   Can you say that one more time.  If you

2    become nonresponsive and are dropped from the case

3    or dropped from the case?  What was your

4    understanding?

5      A.   My understanding was if I were to hinder,

6    lie, request unethical actions by the FPC

7    representative and therefore -- I don't know if it's

8    dropped, but they would require you to pay fees.

9      Q.   And they would require to your

10   understanding paying all of the fees that were

11   accrued up to that point, is that accurate?  That

12   would be the idea?

13     A.   I believe that would be the idea.

14     Q.   Did anyone walk you through this

15   provision, explain it to you in any way or they just

16   sent you the paper?

17     A.   Send you a paper, ask you to read it.

18     Q.   Did you seek legal counsel from anyone

19   else about the paper, the contract or no?

20     A.   No.

21     Q.   Is your contract with Mr. Sigale or is it

22   with FPC or someone else?

23     A.   The fee is literally FPC's document.

24     Q.   That is an FPC document?

Page 69

1        A.    Yes.

2        Q.    Was it in your contract for representation

3    in the case or was it in a separate document?

4        A.    Okay, so that was when they originally

5    asked me to, they said here is the document if you

6    want to proceed.  And here to sign, that is the

7    document.

8              Whereas, I don't know how it relates to

9    any other document, but that is where it's at.

10       Q.    Do you believe you had a contract with

11   FPC?

12       A.    I would assume so since I signed a

13   document that they were going to represent me or

14   provide representation.

15       Q.    Do you have a contract with Mr. Sigale?

16       A.    I don't want to make an assumption.  It's

17   hard to answer this question.  You send me a

18   document about when they said he was my

19   representation.  I don't know if that's a contract

20   or not.

21       Q.    And that document was from Mr. Sigale, not

22   from FPC?

23       A.    When he was saying he was counsel, he was

24   going to need information.

Page 70

```
 1        Q.    Did you sign that document and return it
 2   to him?
 3        A.    Yes, I believe I did.
 4        Q.    And did that document have any provisions
 5   about paying fees?
 6        A.    Not to my knowledge.
 7        Q.    Did you read that document?
 8        A.    I did read that document, but it was a
 9   while ago.
10        Q.    Did you understand it when you read it?
11        A.    I understood it when I read it.
12        Q.    But you don't recall what it says, though,
13   do you?
14        A.    No.   I would have to find it and read it
15   again to remember it.
16        Q.    I'm going to share my screen quickly.  Let
17   me know when you're able to see it.  Are you able to
18   see what I'm sharing?
19        A.    Yes.
20        Q.    This is a press release by an organization
21   called the Second Amendment Foundation.  Do you know
22   who they are?
23        A.    I am a life member of them.
24        Q.    So you know them well?
```

1      A.   Yes.

2      Q.   If you could review this press release

3  quickly and let me know when you're done.  Take the

4  time you need.  You don't have to do it quickly.

5      MR. JONES:  There may be a word cut off on the

6  right.  I'm going to scroll so that all of it is

7  visible.

8      THE WITNESS:  I'm assuming on the fourth

9  paragraph down it says all plaintiffs in this case

10  are law abiding citizens.

11  BY MR. JONES:

12      Q.   It appears to say?

13      A.   On the last paragraph we're going to help

14  -- There's a T that is cut off for me.

15      Q.   You are right.  I'm not sure what that

16  word is.  It's fair to say it's understandable,

17  though, the general gist of that sentence?

18      A.   Yes.

19      Q.   Did you know the Second Amendment

20  Foundation was financing your lawsuit?

21      A.   I did not.

22      Q.   So no one ever told you that?

23      A.   No.

24      Q.   No one felt the need for you to know that

1  the Second Amendment, FPC or Mr. Sigale, no one

2  shared that with you?

3      A.    No one shared it with me.

4      Q.    Isn't that something you would be

5  interested in as a plaintiff?

6      A.    Since FPC said they're footing the bill,

7  the answer to that question is no.

8      Q.    Was it true when FPC said they were

9  footing the entire bill, if that's what they said?

10     A.    I would have to look at the wording of

11  their contract to make sure that is the exact

12  saying.

13          I don't know if it is, but it would

14  matter -- if I was going to violate the FPC contract

15  it would matter, but I wasn't.  So to me at this

16  point it did not matter to me who was paying the

17  bill.

18     Q.    Are you in control of this lawsuit,

19  Mr. Schoenthal?  Do you get to call the shots on

20  strategy?

21     A.    No.

22     MR. JONES:  No further questions at this time.

23  I'm going to pull down this stop sharing.  Let me

24  know when it's gone.  Mr. Bremer, I don't know if

Page 73

1  you would like to get started.

2              CROSS-EXAMINATION

3              BY MS. MERCADO:

4      Q.    My name is Sylvia Mercado.  I am an

5  Assistant State's Attorney, and I represent Kim

6  Foxx, State's Attorney of Cook County in this

7  matter.

8              I have a few questions following up on

9  some of the questions that you were asked.  You had

10  looked at your FOID card application, and my

11  question is when did you first get a FOID card, at

12  what age?

13     A.    I want to say I think maybe 13 or 14.

14     Q.    And how were you able to get a FOID card

15  at that age?

16     A.    Parental consent, they sign the form.

17     Q.    And did you have a gun at that time?

18     A.    I did not.

19     Q.    Did you use one of your parents' guns?

20     A.    No.

21     Q.    Did you ever go target shooting?

22     A.    I did with the Boy Scouts and then with my

23  wife's uncle.

24     Q.    So you knew your wife at the age of 14,

Page 74

1  who would become your wife?

2      A.   Yes.

3      Q.   And it wasn't a requirement of the Boy

4  Scouts for you to get a FOID card.  Correct?

5      A.   Correct.

6      Q.   And was that something that you had

7  decided to do or how did that come about?

8      A.   I took a hunter safety course.  And then I

9  was interested in shooting and found out I needed a

10 FOID card.

11     Q.   Did you hunt at that time?

12     A.   No.

13     Q.   Are you a hunter now?

14     A.   Yes.

15     Q.   Where do you hunt?

16     A.   DeKalb mostly.  I last year started Elk

17 hunting.  So in Colorado.

18     Q.   Do you have a hunting license in Illinois?

19     A.   Yes.

20     Q.   And do your children have FOID cards?

21     A.   My daughter does.  And I am submitting my

22 son's when he turns 15 this month.

23     Q.   When he turns 15, that is when he is

24 legally able to have a FOID card?

Page 75

1     A.    No.  I could get it before then.  Based on

2   the maturity of my children, I make that decision.

3     Q.    When you got your FOID card at 13 or 14,

4   did you take a firearms safety course?

5     A.    No, but firearm safety is covered in

6   hunter safety certification.

7     Q.    And you said you took a hunter safety

8   course?

9     A.    Yes.

10    Q.    You had mentioned that you were a member

11  of the Second Amendment Foundation, correct?

12    A.    Correct.

13    Q.    Are you a member of the FPC as well?

14    A.    Yes.

15    Q.    Are you a member of any other second

16  amendment advocacy groups?

17    A.    National Rifle Association.  I believe I'm

18  still a member of the Illinois State Rifle

19  Association, Gun Owners of America.

20    Q.    Were you looking at something?

21    A.    I have my membership cards on my window

22  sill.

23    Q.    And that last one was?

24    A.    Gun Owners of America.

Page 76

1        Q.    And do you support all of those groups

2    with monetary contributions?

3        A.    Not all of them.  FPC I contribute to and

4    GOA at the moment.

5        Q.    But the NRA, you don't contribute

6    monetarily?

7        A.    Not since my life membership.

8        Q.    And what sort of benefits do you get from

9    your membership in these organizations?

10       A.    Occasionally I get a sticker or a patch.

11   But besides that, they're fighting for

12   Constitutional rights that I agree with.

13       Q.    And have you ever done any advocacy

14   yourself?

15       A.    Official advocacy like for the second

16   amendment, like one of their events?

17       Q.    Yes.

18       A.    No.

19       Q.    Have you ever written letters to an

20   elected representative?

21       A.    I have filled out their template forms

22   from time to time.

23       Q.    Whom have you sent those forms to?

24       A.    It would be my local representatives for

1    the Illinois Senate and House.  And then for the

2    senators of the United States Congress and house

3    members.  And the president and that because it's a

4    form I used to send it to everybody.

5         Q.   Do you send the form or do you fill the

6    form out, and they send it on your behalf?  How does

7    that work?

8         A.   It's an e-mail template form.  So it's an

9    e-mail.

10        Q.   And then do you send it out?

11        A.   It's from their sheet, they use my

12   information and my e-mail address.  But it's from

13   their back end server, however that is set up.

14        Q.   When is the last time you did that?

15        A.   Maybe three months ago.

16        Q.   Do you recall was it a particular event?

17        A.   It was one of the ATF rules changes, I

18   believe.

19        Q.   Do you know what the rules change was?

20        A.   I don't know if it was the 80 percent

21   receiver or if it was the pistol brace rule, but it

22   was one of those two.

23        Q.   Could it have been both?  Did you fill

24   something out for both of those?

1      A.    It was one of them, not both.

2      Q.    You mentioned that you were on social

3  media, that you were on Twitter previously.  Can you

4  repeat your Twitter handle?

5      A.    I believe it was @Schernobyl.

6      Q.    How long did you have Twitter for?

7      A.    I think maximum two years.

8      Q.    What year did you say you canceled it?

9      A.    I don't remember.  I honestly don't

10 remember.  It's one of those things where I dropped

11 and forgot about it.

12     Q.    How often would you post on your Twitter

13 account?

14     A.    Maybe once a day.  Maybe twice at most.

15     Q.    How long a period would you spend on

16 Twitter each day, would you say?

17     A.    Maybe an hour.

18     Q.    And were there certain Second Amendment

19 advocacy groups on this list that you would follow?

20     A.    I followed all of the groups that I was a

21 member of.  Then it was just random people that I

22 followed I think.

23     Q.    Do you recall any of their names or

24 Twitter handles?

Page 79

1      A.   Uley, he was a  linebacker or something

2   like that.  I followed him for a while.  I did some

3   of the conservative media stuff like Daily Wire,

4   Matt Walsh.

5            There's a democrat on it in California

6   who is pushing for nuclear power.  I followed him

7   because I agree with that.  I followed some animated

8   subs.  Some authors I follow like Brian Sanderson.

9   It was very random.

10     Q.   Would you sometimes post on their feeds as

11  well?

12     A.   I would reply to comments.

13     Q.   Would you engage in discourse with other

14  people?

15     A.   From time to time.

16     Q.   Do you feel that that had gotten divisive

17  as well?

18     A.   Yes.

19     Q.   On Facebook you mentioned that you troll.

20  What do you mean by that?

21     A.   My contact information is not accurate.

22  So like it says I'm a Communist.  It says I was born

23  January 1, 1970.  It's inaccurate information, and I

24  really don't use it.

Page 80

```
 1        Q.   Do you follow any groups on Facebook or
 2   are members of any groups?
 3        A.   No, I really use it for I get updates from
 4   my family abroad.
 5        Q.   Do you have a Reddit account?
 6        A.   I do, yes.
 7        Q.   What is your handle on Reddit?
 8        A.   I think it's @Schernobyl as well.
 9        Q.   Is there a particular reason that that is
10   your handle?  Like what does that mean to you?
11        A.   When me and my friend used to play the PS
12   Vita.  We would play and every time I threw a
13   grenade I did not die and then the grenade would go
14   off.  And he said you're like Chernobyl because
15   you're going to kill people after they're dead.
16   It's unique game where you go somewhere and most
17   people don't have it.
18        Q.   How much time do you spend on Redditt on a
19   daily basis?
20        A.   Maybe an hour and a half.
21        Q.   Do you follow any particular groups?
22        A.   Battle Tech.  Elk hunting.  I'm on a DIY
23   group, but I don't remember which one.
24        Q.   Like a do it yourself?
```

Page 81

1    A.   Yes.

2    Q.   A home improvement type thing?

3    A.   Yes.

4    Q.   Do you follow anything that has a

5  particular second amendment focus?

6    A.   No.

7    Q.   And do you post?

8    A.   I respond, yes.  I don't post original,

9  but I will respond.  Elk hunting, we get a lot of

10 questions, and I generally direct people to like for

11 Colorado it's like if you need information here's

12 the official government website on big game hunting.

13   Q.   You mentioned that you have what sounded

14 like more than 20 firearms.  Where are those stored?

15 How are they stored?

16   A.   I have a safe.

17   Q.   And they're all kept in the safe?

18   A.   Except for my conceal carry gun, yes, all

19 of them are kept in the safe.

20   Q.   And you mention that you carry your

21 concealed carry weapon.  You carry that in the car

22 with you pretty much on a daily basis?

23   A.   Yes.

24   Q.   And in your declaration you mention you

Page 82

1   sometimes take public transportation for work, is

2   that correct?

3       A.   Yes.

4       Q.   How often is that?

5       A.   It was once a quarter.  Like every three

6   or four months just because of needing to go

7   downtown or like to Central DuPage Hospital.

8       Q.   You said you take the Metra?

9       A.   Yes.

10      Q.   Where do you board the Metra?

11      A.   Usually Elburn.

12      Q.   Is that in DeKalb County?

13      A.   No.  It is across the border, I believe.

14   It goes into Kane.

15      Q.   What did you say?

16      A.   It would be Kane County, I believe.

17      Q.   Does Sycamore have a Metra stop?

18      A.   No.  We're pushing for one.

19      Q.   Would it be on that same line?

20      A.   Most likely, yes.

21      Q.   Does that line terminate in Elburn?

22      A.   Yes.

23      Q.   What public transportation options are

24   available in DeKalb?

Page 83

1      A.   Like I said, the NIU line of bus.  The VAC
2   and that is pretty much it.
3      Q.   Are the NIU and that means the Northern
4   Illinois University?
5      A.   Yes.
6      Q.   Are those available to nonuniversity
7   students or employees?
8      A.   So there was a merger if I remember where
9   we had a public and then there was the NIU bus
10  system and then they're like we'll make it one bus
11  system because they're duplicating efforts
12  basically.
13     Q.   Do you have a card to access the NIU bus
14  line?
15     A.   Not at the moment because they don't
16  service -- I would have to drive to a bus stop.  And
17  I would have to pass, like places I would be driving
18  to to get to a bus stop.
19     Q.   And when is the last time you took public
20  transportation to come into the City of Chicago?
21     A.   I haven't used it in a while because I
22  can't carry.  So I've had to drive in.
23     Q.   And you drive in from Sycamore into the
24  city?

Page 84

1      A.   Yes.

2      Q.   And you have your concealed carry firearm

3  in that car with you when you do that.  Correct?

4      A.   Yes.

5      Q.   Let me review my notes.

6           When was the last time you rode a

7  public bus?

8      A.   Because I cannot carry I have not ridden a

9  bus in a while, in probably over a year.

10     Q.   What was the last bus line that you rode?

11     A.    I think it was Delnor, and I think I used

12  their Pace bus.  Where I did go?  I don't remember.

13  I know it was at Delnor because they have a

14  passenger stop.

15     Q.   Is Delnor a town?

16     A.    It's a hospital.

17     Q.   Do you know what town that is in?

18     A.    Geneva.

19     Q.   Have you ever ridden the NIU bus?

20     A.    No.

21     Q.   Is that because of its location?

22     A.    Yes.

23     Q.   When you've gone to DuPage County, you

24  said you sometimes go to Central DuPage Hospital?

Page 85

1    A.   Yes.

2    Q.   How do you get there when you go?  How

3  would you get there by public transportation?

4    A.   I would get dropped off in the Elburn

5  station and take the Elburn train.

6    Q.   Is that the Metra train?

7    A.   Yes.

8    Q.   And that will get you into?

9    A.   Winfield, which is right by the hospital

10  there.

11   MS. MERCADO:  I think that is all I have.

12  Thank you.

13   MR. SIGALE:  Let me ask you a few questions.

14            CROSS-EXAMINATION

15            BY MR. SIGALE:

16   Q.   You were asked earlier in the deposition

17  by Mr. Jones what do you hope to get out of this,

18  and you answered, I'm paraphrasing, of course, that

19  you would like to be able to carry concealed on

20  public transportation.

21        Do you recall that exchange earlier?

22   A.   Yes.

23   Q.   And you mentioned that you were asked

24  earlier why don't you.  And you mentioned something,

Page 86

1  again I am paraphrasing, that you don't want to be

2  arrested.  Do you recall that?

3      A.   Yes.

4      Q.   To your understanding, why would you be

5  arrested if you were to carry concealed on public

6  transportation?  Let's say that you were to do it

7  today.

8          You walked out of your home or office

9  wherever you are right now, and you grabbed your

10 concealed carry and you got on a train and.  Of

11 course, you got caught somehow.  Why would you be

12 arrested?

13     A.   Because the Illinois statute for CCW says

14 I cannot go on public transportation with my

15 firearm.

16     Q.   If the judge in this case ultimately says

17 that that law, that part of the concealed carry act

18 is unconstitutional, and you were able to carry

19 concealed on public transportation for self-defense

20 purposes, would that give you what you're looking

21 for from this lawsuit?

22     A.   Yes.

23     Q.   Is that why you are a part of this

24 lawsuit?

Page 87

1    A.    Yes.

2    Q.    I want you to assume for purposes of this

3    question that there is nothing in any agreement you

4    signed with my office or with FPC preventing you

5    from walking away.

6         You have the ability to say I want no

7    part of this and to back out of it right now if you

8    wanted to with no financial consequences or anything

9    like that.  Would you still stay in this lawsuit?

10   MR. JONES:  I object to the form of the

11   question.  That assumes facts not in evidence and is

12   coaching the witness.

13   MR. SIGALE:  You could answer the question.

14   THE WITNESS:  Yes, because I want my rights, my

15   Constitutional rights to apply as broadly as

16   possible.  I would stay in this lawsuit.

17   MR. JONES:  I have a few more questions.

18   MR. SIGALE:  For the record, I will just say

19   that I don't have any other questions.

20              REDIRECT EXAMINATION

21              BY MR. JONES:

22   Q.    Mr. Schoenthal, are you aware that your

23   attorney refused to provide a copy of your contract

24   in this lawsuit?

Page 88

1       A.    I am unaware.

2       Q.    So no one sought your approval for that?

3       A.    I received no communication about it.

4       Q.    Why do you think your attorney refused to

5   provide a copy of your contract in the lawsuit?

6       MR. SIGALE:  I object as to speculation and

7   lack of foundation.  But Benjamin, to the extent you

8   can go ahead and answer.

9       THE WITNESS:  Probably because it's not

10  pertinent to the lawsuit.

11  BY MR. JONES:

12      Q.    You don't think that there is something in

13  there that people don't want to come out?

14      A.    I would assume that whatever contract that

15  has been signed is perfectly legal, fine and no

16  issues with it when viewed by other people and that

17  he's looking out for the best interests of us and

18  that is why he doesn't want to give you the

19  information.

20      Q.    Even though he never spoke to you before

21  you signed the contract, right?

22      A.    I trust that FPC would only work with

23  attorneys who would be looking out for the best

24  interests of myself first and foremost and then the

Page 89

1    actual lawsuit going forward.

2        Q.   And no one disclosed any conflict of

3    interest to you, did they?

4        MR. SIGALE:  Objection, that assumes facts not

5    in evidence.  You could answer.

6    BY MR. JONES:

7        Q.   No one disclosed any conflicts of

8    interest, did they?

9        A.   No.

10       Q.   Not Mr. Sigale and not FPC?

11       A.   No.

12       Q.   Is that surprising?

13       MR. SIGALE:  The same objection.  Speculation.

14   That assumes facts not in evidence.  And certainly

15   lack of foundation for whatever this hypothetical

16   is.  You could answer.

17       THE WITNESS:  I have forgotten the question.

18   Can you repeat the question.

19   BY MR. JONES:

20       Q.   That is okay.  Is that surprising to you

21   that no one disclosed any conflict of interest?

22       MR. SIGALE:  The same objections.  Go ahead.

23       THE WITNESS:  As I don't have a way to

24   determine if there's a conflict of interest, I can't

Page 90

1   speculate on why someone would or wouldn't give me

2   that information.

3   BY MR. JONES:

4        Q.   You would expect that your attorney would

5   disclose any potential conflict of interest, right?

6        A.   Yes.

7        MR. JONES:  No further questions.

8        MR. SIGALE:  Nothing based on that.

9        MR. JONES:  We would like to order an expedited

10  copy of the deposition.

11       MR. SIGALE:  We'll reserve signature.  What

12  that means what I said about reserving signature is

13  when Ms. Rocks is going to write up a transcript

14  that is going to look like a really boring movie

15  script, and you're going to review it before it

16  becomes official for any typographical errors.

17       You don't get to change your answer.  You can

18  say I didn't say bed, I said bread.  And we'll make

19  those arrangements on Ms. Rocks' time line.  She

20  will let us know.

21

22

23

24

Page 91

1    STATE OF ILLINOIS    )

2                         ) ss:

3    COUNTY OF C O O K    )

4

5              I, VICTORIA D. ROCKS, C.S.R., Notary

6    Public, within and for the County of Cook, State of

7    Illinois, a Certified Shorthand Reporter of said

8    state, do hereby certify:

9              That previous the commencement of the

10   examination of the witness, BENJAMIN SCHOENTHAL, was

11   first duly sworn to testify to the whole truth

12   concerning the matters herein;

13             That the foregoing deposition

14   transcript was reported stenographically by me and

15   was thereafter reduced to typewriting via

16   computer-aided transcription under my personal

17   direction, and constitutes a true record of the

18   testimony given and the proceedings had;

19             That the said deposition was taken

20   before me at the time and place specified;

21             That the reading and signing by the

22   witness of the deposition transcript was not waived;

23             That I am not a relative or employee of

24   attorney or counsel, nor a relative or employee of

Page 92

1  such attorney or counsel for any of the parties

2  hereto, nor interested directly or indirectly in the

3  outcome of this action.

4          IN WITNESS WHEREOF, I do hereunto set

5  my hand and affix my seal of office at Chicago,

6  Illinois this 18th day of September, 2023.

7                    *Victoria Rocks*

8

_____

9                    VICTORIA D. ROCKS, C.S.R.

                    License No. 084-002692

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                            Page 93
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                          Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
      September 20, 2023
 5
      To: David G. Sigale, Esq.
 6
      Case Name: Schoenthal, Benjamin v. Raoul, Kwame, et al.
 7
      Veritext Reference Number: 6060564
 8
      Witness:  Benjamin Schoenthal      Deposition Date:  9/13/2023
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24    NO NOTARY REQUIRED IN CA
```

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 6060564
 3      CASE NAME: Schoenthal, Benjamin v. Raoul, Kwame, et al.
        DATE OF DEPOSITION: 9/13/2023
 4      WITNESS' NAME: Benjamin Schoenthal
 5           In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7           I have made no changes to the testimony
        as transcribed by the court reporter.
 8
        _____        _____
 9      Date                    Benjamin Schoenthal
10           Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11      the referenced witness did personally appear
        and acknowledge that:
12
             They have read the transcript;
13           They signed the foregoing Sworn
                   Statement; and
14           Their execution of this Statement is of
                   their free act and deed.
15
             I have affixed my name and official seal
16
        this _____ day of_____, 20_____.
17
                        _____
18                      Notary Public
19                      _____
                        Commission Expiration Date
20
21
22
23
24
25
```

Page 95

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 6060564
 3     CASE NAME: Schoenthal, Benjamin v. Raoul, Kwame, et al.
       DATE OF DEPOSITION: 9/13/2023
 4     WITNESS' NAME: Benjamin Schoenthal
 5         In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7         I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
 8 well as the reason(s) for the change(s).
 9         I request that these changes be entered
   as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____        _____
   Date                    Benjamin Schoenthal
14
           Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18             in the appended Errata Sheet;
           They signed the foregoing Sworn
19             Statement; and
           Their execution of this Statement is of
20             their free act and deed.
21         I have affixed my name and official seal
22 this _____ day of_____, 20____.
23             _____
               Notary Public
24
               _____
25             Commission Expiration Date
```

Veritext Legal Solutions

Page 96

1                    ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2              ASSIGNMENT NO: 6060564
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                   Benjamin Schoenthal
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24

                    _____
25                  Commission Expiration Date

**[00008 - able]**

| 0 |
|---|
| **00008** 40:15 |
| **084-002692** |
| 92:9 |

| 1 |
|---|
| **1** 79:23 |
| **10** 38:21 |
| **100** 23:9 58:1 |
| 58:11 |
| **106,000** 17:7 |
| **1100** 93:1 |
| **12** 43:4 47:3 |
| **12754** 92:8 |
| **13** 73:13 75:3 |
| **14** 11:17 73:13 |
| 73:24 75:3 |
| **15** 17:11,16 |
| 46:13,13 74:22 |
| 74:23 |
| **16** 36:21 |
| **17** 11:17 |
| **18** 24:19,23 |
| 25:2,14 |
| **1820** 93:2 |
| **1865** 46:23 |
| **18th** 92:6 |
| **1970** 79:23 |
| **1994** 15:1 |
| **1a** 46:21 |
| **1oo** 2:13 |
| **1st** 16:17 |

| 2 |
|---|
| **20** 46:12 81:14 |
| 93:4 94:16 |

95:22 96:22
**2000** 18:22
**2001** 13:9,11,13
13:22 15:11
**2005** 18:16
**2006** 14:16
18:16
**2007** 14:16
**2008** 18:16
**2009** 18:16
**2013** 15:23
35:18
**2015** 14:15,17
**2016** 18:2 31:1
**2017** 18:2
**2018** 14:13
36:13
**2019** 12:22
**2020** 12:22
43:20 59:22
**2021** 42:12
59:22 60:3
**2022** 59:23
60:4
**2023** 1:17
36:13 92:6
93:4
**2024** 16:17
**21** 25:10
**216-523-1313**
93:3
**22** 45:22,23
46:2 50:4
**223/5.56.** 46:16

| 3 |
|---|
| **30** 46:20 60:23 |
| **30-06** 46:22 |
| **300** 46:13 |
| **303** 46:23 |
| **310** 38:20 |
| **320** 48:1 50:5 |
| 50:20 51:7 |
| ███ 46:1 |
| **3762539** 46:18 |
| **380** 46:3,4,8 |
| **3:22** 1:5 |

| 4 |
|---|
| **40** 45:24 46:2 |
| **419** 46:14 |
| **43o** 2:3 |
| **44114** 93:2 |
| **445** 11:11 |
| **45** 46:3 |
| **47** 46:17 |

| 5 |
|---|
| **500** 2:8 46:11 |
| **50326** 1:5 |
| **54r** 46:22 |

| 6 |
|---|
| **6** 43:24 46:20 |
| **60187** 2:4 |
| **60601** 2:13 |
| **60602** 2:8 |
| **6060564** 93:7 |
| 94:2 95:2 96:2 |
| **60718** 11:12 |
| **62** 46:21 |

| 6p | 48:1 |
|---|---|

| 7 |
|---|
| **7** 3:4 44:17 |
| **70** 38:21 46:20 |
| **73** 3:4,5 |
| **76b** 46:21 |

| 8 |
|---|
| **8** 39:20,22 |
| **8-10-2001** |
| 11:19 |
| **80** 77:20 |
| **85** 3:5,5 |
| **851** 13:14 |
| **87** 3:5 |
| **870** 47:3 |
| **88** 3:6 |
| **8th** 1:17 |

| 9 |
|---|
| **9** 46:24 47:5,6 |
| **9/13/2023** 93:8 |
| 94:3 95:3 |
| **90** 3:6 |

| a |
|---|
| **a.d.** 1:17 |
| **a.m.** 1:17 |
| **a1** 46:18 |
| **abiding** 71:10 |
| **ability** 7:16 |
| 10:8 52:5 |
| 53:23 87:6 |
| **able** 7:20 19:24 |
| 20:8,13 22:10 |
| 22:24 27:8,22 |
| 40:7,19 41:24 |

**[able - appear]**

42:16 43:15
56:3,5 57:2,12
70:17,17 73:14
74:24 85:19
86:18
**above** 41:18
93:17
**abroad** 13:5
80:4
**absent** 53:24
**access** 83:13
**accident** 30:14
30:15 34:4
**accordance**
94:5 95:5
**account** 8:10
8:13 57:10,23
58:3 78:13
80:5
**accrued** 68:11
**accuracy** 51:9
51:13,14 52:2
**accurate** 22:11
41:2,5,16
44:13 45:11
50:13,19,20
52:8 56:19,24
57:3 68:11
79:21
**accurately** 7:17
7:21 39:4 51:8
52:6
**accused** 30:5,7
32:15

**achieve** 19:21
20:18 27:10
**acknowledge**
94:11 95:16
**acquire** 48:13
**acquired** 49:1
49:13
**act** 86:17 94:14
95:20
**action** 19:2
23:7 57:19
92:3
**actions** 68:6
**active** 54:6
**actively** 16:11
**actual** 58:15,16
89:1
**additional** 43:3
**address** 11:9
41:14,19 77:12
93:15
**adjudicated**
33:5,20
**administration**
16:1
**advice** 62:18
**advocacy** 75:16
76:13,15 78:19
**affiliated** 52:23
**affix** 92:5
**affixed** 94:15
95:21
**afoul** 20:9
26:22

**afraid** 53:18
**age** 24:18 25:10
25:13,22 73:12
73:15,24
**agency** 34:12
36:18,23
**aggravated**
32:16
**ago** 12:16 39:2
58:23 70:9
77:15
**agree** 8:2 44:17
76:12 79:7
**agreement**
66:14,17 87:3
**ahead** 6:18
21:8 22:21
25:8,19 45:20
53:13 56:10
88:8 89:22
**aided** 91:16
**air** 14:23
**ak** 46:17
**al** 1:7 4:7,17,17
93:6 94:3 95:3
**alcohol** 34:21
35:20
**alcoholic** 35:6
35:12,15
**alcoholism**
34:21
**allow** 12:10
20:14 21:20
**allowed** 25:3
26:20

**amato** 4:12
**amended** 26:14
**amendment**
20:6 26:4
70:21 71:19
72:1 75:11,16
76:16 78:18
81:5
**america** 75:19
75:24
**angry** 58:6
**animated** 79:7
**answer** 5:14,23
6:10,17,18,24
21:8 22:22
24:6,12,18
25:7,8,20
31:21 32:3
45:12,21 65:11
69:17 72:7
87:13 88:8
89:5,16 90:17
**answered**
85:18
**answers** 7:17
7:20 28:14
**anybody** 8:2
**anyway** 53:13
**apartment**
13:14,17,23
**apartments**
15:5
**appear** 42:1
94:11 95:15

**[appearances - beginning]**                                    Page 3

| | | | |
|---|---|---|---|
| **appearances** 2:1 | ■ 46:13,13 | **assume** 6:10 63:17 69:12 87:2 88:14 | **avoid** 5:24 **aware** 4:16 21:22 87:22 |

**appearances**
  2:1
**appeared** 2:5
  2:10,15
**appears** 41:13
  42:20 43:11,13
  43:18,20 44:6
  45:1,3 71:12
**appended**
  95:11,18
**applicable**
  37:24 38:4
**application** 8:5
  40:22 42:3
  73:10
**applications**
  8:7,14,17,21
  35:23 44:9
**applied** 18:5
  43:19
**apply** 38:2
  42:11 87:15
**appreciate**
  45:15
**appropriate**
  38:9
**approval** 88:2
**approved**
  28:21 29:3
**approximate**
  15:22 30:24
  35:17
**approximately**
  39:19 48:17

**■** 46:13,13
**area** 23:24
**areas** 62:9
**arguing** 58:6
**armory** 46:12
  46:17
**arrangements**
  90:19
**arrest** 34:7,9
**arrested** 34:5
  86:2,5,12
**asian** 12:18
  13:2
**aside** 11:20
  27:17 34:2
  41:8 43:11
  54:10,18 55:21
  55:23
**asked** 6:8,24
  59:6 60:11,13
  60:14 61:16
  69:5 73:9
  85:16,23
**asking** 5:15
  27:23 50:24
  51:1,2 53:13
  57:11 65:13
**assault** 32:16
**assignment**
  94:2 95:2 96:2
**assistant** 2:12
  4:5 73:5
**associate** 18:1
**association**
  75:17,19

**assume** 6:10
  63:17 69:12
  87:2 88:14
**assumes** 87:11
  89:4,14
**assuming** 26:15
  29:18,20 71:8
**assumption**
  69:16
**atf** 77:17
**attached** 95:7
**attorney** 1:6
  2:12 4:5,12,13
  4:14,15 6:13
  62:6,11,14
  64:1,5 73:5,6
  87:23 88:4
  90:4 91:24
  92:1
**attorney's** 4:10
**attorneys** 4:9
  64:8 88:23
**audibly** 5:23
**august** 42:11
**aunt** 14:2
**aurora** 13:14
  13:23
**authorize**
  95:11
**authors** 79:8
**available** 28:7
  48:19 82:24
  83:6
**ave** 93:1

**avoid** 5:24
**aware** 4:16
  21:22 87:22

**b**

**ba** 16:3
**bachelors**
  15:14,16,19
  16:12
**back** 15:2
  40:17 49:10
  60:6,7,9 65:20
  66:13 77:13
  87:7 93:15
**background**
  34:17,18,19
**backwards**
  17:14
**bank** 18:11,11
**banned** 22:23
**barring** 31:20
**based** 29:21
  32:6 75:1 90:8
**basic** 54:16,18
**basically** 63:4,6
  83:12
**basis** 66:6
  80:19 81:22
**batavia** 15:4,6
  15:9
**battle** 80:22
**bed** 90:18
**bedroom** 12:10
**beginning** 13:2
  56:8

[behalf - carry]                                                        Page 4

behalf  2:5,10
  2:15 77:6
belief  66:6
believe  9:19
  10:1 17:7
  21:20,24 23:8
  25:10,14 28:4
  28:9 29:6
  31:15 34:19
  39:20 42:7
  46:21 56:12
  58:10 64:3,6
  64:24 65:9
  66:4,7,19,22
  67:11,19 68:13
  69:10 70:3
  75:17 77:18
  78:5 82:13,16
beneficiary
  19:9
benefits  76:8
benjamin  1:3
  1:10 3:3 7:8
  22:21 25:7
  45:12,20 53:12
  65:10 88:7
  91:10 93:6,8
  94:3,4,9 95:3,4
  95:13 96:20
berlin  4:13
best  5:18 9:22
  10:7 29:1
  44:13,15,24
  45:2 47:4,11
  47:13 50:14

88:17,23
better  51:16
beverage  35:7
  35:12,15,20
big  81:12
bill  72:6,9,17
bills  67:12
birth  58:17
bit  41:21
  ███████  46:13
blank  42:15
board  9:8
  82:10
bodily  53:20
border  82:13
boring  90:14
born  14:22
  15:3 32:21,23
  79:22
bottom  40:14
  41:23 43:4
  44:18
bought  14:3,4
  18:3 47:9
boy  53:17
  73:22 74:3
brace  77:21
brains  32:6
brandished
  54:13,14,19
bread  90:18
break  6:21 7:1
  65:21
bremer  2:7
  72:24

brian  79:8
briefly  50:4
  65:18
bring  26:8
broadly  87:15
broker  48:11
bubble  14:4
built  15:6
bunch  27:13
bus  22:23,24
  23:1,5,11,13,13
  23:15,20 24:3
  24:9,14,17,17
  25:4,13,17,21
  83:1,9,10,13,16
  83:18 84:7,9
  84:10,12,19
buses  22:7 23:3
  24:5
buy  13:18

c
c  91:3
c.s.r.  91:5 92:9
ca  93:24
caliber  46:2
calibur  45:22
california  79:5
call  6:13 59:19
  60:9,24 72:19
called  1:11 7:9
  10:14 36:24
  46:14 55:2
  59:6,9,12 60:7
  64:2 70:21

calls  25:5
canceled  50:10
  78:8
cannabis  31:23
capacity  17:2
  19:18
car  30:14,15
  52:13 55:14
  81:21 84:3
card  25:1 31:23
  34:18 41:7
  44:10 73:10,11
  73:14 74:4,10
  74:24 75:3
  83:13
cards  74:20
  75:21
care  37:23
  64:20
carefully  41:3
carolina  14:23
  15:1
carried  50:2,6
  50:9 51:5 55:4
  55:8,11,13,22
carry  14:9 20:7
  20:10,13,15
  21:11,21 22:10
  22:24 23:19
  24:5,9,14,18,23
  25:3,9,12,17,22
  25:23 26:4,11
  26:16,19,21
  27:1,6,8,11,18
  27:22 36:3,4

**[carry - comes]** Page 5

38:6,19 44:22
49:20,21 50:4
50:15,22 51:7
51:19 52:18
53:1,18,19
81:18,20,21,21
83:22 84:2,8
85:19 86:5,10
86:17,18
**carrying** 20:12
24:16 38:11
**cars** 31:1
**case** 4:7,17
28:19 45:19
53:19 66:1,15
66:18,21,24
67:4,8,13,23
68:2,3 69:3
71:9 86:16
93:6 94:3 95:3
**category** 28:2
**caught** 86:11
**ccl** 9:24 36:11
37:6
**████** 47:7 48:20
48:22 49:14
**████** 47:6
**ccw** 86:13
**cease** 58:2
**center** 2:8
**central** 18:4
20:15 21:3
82:7 84:24
**certain** 78:18

**certainly** 89:14
**certificate**
95:11
**certificates**
16:2
**certification**
17:19 37:7
39:3 42:1
43:18 75:6
94:1 95:1
**certified** 36:6
91:7
**certify** 91:8
**cetera** 54:15
60:17
**chains** 65:1
**change** 17:7
77:19 90:17
93:13,14 95:8
96:3
**changed** 46:15
56:22
**changes** 44:9
44:21 77:17
93:12 94:7
95:7,9
**characterize**
54:16
**charles** 13:16
13:18,24 18:13
**chase** 18:11
**check** 8:20
34:17,18
**chernobyl**
80:14

**████** 45:24
**chicago** 2:8,13
20:15 83:20
92:5
**children** 11:14
11:16,20 13:8
74:20 75:2
**choose** 50:18
**christmas**
12:19
**circumstance**
55:1
**circumstancein**
25:16
**circumstances**
34:2 50:21
51:3 67:16,18
**citation** 31:4,5
34:4 35:1
**cited** 30:15,19
**citizen** 32:19,21
32:23
**citizens** 71:10
**city** 21:20
83:20,24
**civil** 1:13 94:5
95:5
**claim** 19:6,7
**clarification**
45:16 62:7
**clarify** 6:9
13:15 26:7
30:9 35:8
37:21 47:7
48:6 53:13,14

62:5 65:13
66:11
**clarifying**
55:15
**clarity** 64:16
**class** 19:2 38:4
**cleaning** 37:14
37:17,23
**clear** 66:13
**clearance**
34:16
**clearing** 37:14
37:17
**clearly** 40:8,19
40:20 42:16
**cleveland** 93:2
**click** 57:20
**close** 8:9,10
**closed** 8:12,13
8:20
**clover** 11:11
**club** 37:1
**coaching** 87:12
**coalition** 57:11
59:2
**cocaine** 31:7
**colleague** 11:3
**colorado** 74:17
81:11
**████** 46:3
**come** 45:6 57:8
74:7 83:20
88:13
**comes** 45:5
54:6

| | | | |
|---|---|---|---|
| **comfort**  52:12 | **computer**  8:15 | **conflict**  89:2,21 | 69:15,19 72:11 |
| **comfortable** | 91:16 | 89:24 90:5 | 72:14 87:23 |
| 51:8,22,23 | **conceal**  20:7 | **conflicts**  89:7 | 88:5,14,21 |
| **coming**  41:22 | 25:9 26:10 | **congratulations** | **contracts**  66:12 |
| **commencem...** | 44:22 47:17,19 | 16:18 | **contribute**  76:3 |
| 91:9 | 81:18 | **congress**  77:2 | 76:5 |
| **commencing** | **concealable** | **conn**  15:4 | **contributions** |
| 1:16 | 37:16,20,24 | **consent**  73:16 | 76:2 |
| **comments** | 38:2,6 47:14 | **consequences** | **control**  72:18 |
| 79:12 | 47:16,18,20 | 87:8 | **controlled** |
| **commission** | **concealed** | **conservative** | 31:18 |
| 94:19 95:25 | 22:10 23:19 | 79:3 | **conversation** |
| 96:25 | 24:5,9,14 25:3 | **consider**  22:8 | 51:6 56:8,11 |
| **committee**  23:8 | 25:12,17,22 | 22:15 23:6,10 | 60:21 63:2 |
| **communicated** | 27:1,6,19 36:3 | 23:12 54:9 | **convicted**  30:3 |
| 29:11 | 36:4 37:15 | **considered** | 32:15 |
| **communication** | 38:12,19 49:22 | 47:16 54:3 | **cook**  1:16 4:9 |
| 8:19 88:3 | 50:2,7 51:19 | **constitutes** | 73:6 91:6 |
| **communist** | 53:24 57:13 | 91:17 | **cookcountyil...** |
| 58:17 79:22 | 81:21 84:2 | **constitutional** | 2:9 |
| **companies**  22:4 | 85:19 86:5,10 | 10:9,12 19:23 | **copies**  9:4 |
| 26:7 | 86:17,19 | 20:4,4 76:12 | **coplaintiff** |
| **company**  22:2 | **concerned**  51:9 | 87:15 | 29:19 |
| 28:7 36:15 | **concerning** | **consumed**  35:6 | **coplaintiffs** |
| **competition** | 91:12 | 35:12 | 29:6 |
| 46:3 | **concerns**  51:12 | **contact**  32:10 | **cops**  49:7 |
| **complaint** | 61:17 | 61:11 63:8 | **copy**  87:23 |
| 10:14,15,18 | **conclusion** | 64:11,23 79:21 | 88:5 90:10 |
| 28:18 65:8 | 22:18 25:6 | **contest**  41:9 | **corner**  43:5 |
| **complete**  7:16 | **conducted** | **continue**  42:14 | **correct**  4:19,22 |
| 38:14 | 34:17 | 46:9 | 5:2 10:21 |
| **completed** | **confident**  53:23 | **continuing** | 18:14 23:21 |
| 15:14,16 17:22 | **confidential** | 46:7 | 29:4 41:20 |
| 93:15 | 45:18 | **contract**  68:19 | 42:6,22 43:1 |
| | | 68:21 69:2,10 | 44:11 45:1,3 |

54:20 61:6
62:12,15,19,24
63:5,6,10
66:16 74:4,5
75:11,12 82:2
84:3
**corrections**
93:12 95:17
**cost** 67:15
**costs** 66:5,8
67:17
**counsel** 62:17
62:21,22 68:18
69:23 91:24
92:1
**county** 1:15
4:10 73:6
82:12,16 84:23
91:3,6 94:10
95:15
**couple** 5:7
13:12 27:3,4
39:1
**course** 8:4 36:4
36:11,14,19
37:4 38:18
39:11,15,17
40:4 74:8 75:4
75:8 85:18
86:11
**courses** 36:8,10
39:2,18,23
**court** 1:1 5:10
6:1 31:3,6
33:20,23 34:20

94:7
**courtroom** 4:24
**courts** 1:14
**cover** 37:4,19
38:4,9
**covered** 37:6,8
37:11,13 39:7
75:5
**covering** 66:4,8
**covid** 12:16,19
**crashed** 14:5
**crime** 53:5,7,10
**cross** 3:5,5 73:2
85:14
**csr** 1:15
**current** 18:15
**currently** 16:4
16:19 21:10
27:2
**curtail** 26:14
**cut** 71:5,14
**cv** 1:5

| **d** |
| --- |

**d** 1:14 3:1 91:5
92:9
**dad** 14:23 15:2
**daily** 79:3
80:19 81:22
**daley** 2:8
**damage** 32:5
**date** 14:5 16:16
35:17 43:23
58:17 93:8
94:3,9,19 95:3
95:13,25 96:20

96:25
**dates** 39:9
44:12,12 63:16
63:17
**daughter** 11:17
74:21
**dave** 9:21
**david** 2:2,3
6:14 9:12 93:5
**day** 1:17 50:1,1
52:17 54:12,12
56:20 64:19,19
78:14,16 92:6
94:16 95:22
96:22
**days** 36:21
39:21,22 93:18
**dead** 80:15
**deadly** 53:20
54:3
**deal** 53:24
**dealer** 49:3
**dealers** 48:7,11
**dear** 93:10
**december** 10:4
12:21 56:20
**decide** 51:4
**decided** 14:1
32:6 74:7
**decision** 75:2
**declaration**
10:3 56:9,10
81:24
**deed** 94:14
95:20

**deemed** 93:19
**deescalation**
54:1,7
**defective** 33:6
**defendant** 2:10
2:15 19:11
**defendants** 1:8
1:11 4:7
**defense** 86:19
**degree** 15:20
15:24 16:5,8
16:11
**degrees** 15:12
16:2
**dekalb** 23:6,24
74:16 82:12,24
**deleted** 58:9,10
**delnor** 18:4,9
20:15 84:11,13
84:15
**democrat** 79:5
**department**
93:22
**depend** 30:11
**deposed** 4:16
**deposition** 1:10
5:3,10 6:15,22
8:3 9:11 11:4
85:16 90:10
91:13,19,22
93:8,11 94:1,3
95:1,3
**describe** 10:7
**desktop** 17:24

**[despite - errata]** Page 8

despite 26:9
determine
26:13 89:24
determined
27:21
development...
33:18,21
devry 15:14,18
die 80:13
difference 52:5
different 42:8
42:10 52:7,11
difficult 41:22
47:19
direct 3:4 7:12
65:10 81:10
direction 91:17
directly 92:2
directs 6:16
disabled 33:17
33:18,21,21
disappears
57:6
disclose 90:5
disclosed 89:2
89:7,21
discourse 79:13
discovery 44:4
44:20 49:16
discussed 10:17
26:18 34:24
discussing 37:5
disk 17:24
disney 12:4,5

distance 18:4
district 1:1,1
1:14
division 1:2
divisive 58:5
79:16
diy 80:22
doctor 31:20
document 42:2
44:17,20 56:5
56:16,18 59:8
59:8 63:4,21
68:23,24 69:3
69:5,7,9,13,18
69:21 70:1,4,7
70:8
documentation
64:15 67:19
documents 9:5
9:14,16,18,20
10:6,16
doing 4:3,4
32:5
dollars 17:8
douglas 29:17
downtown
20:15 21:2,19
82:7
drive 11:11
35:4 52:17
83:16,22,23
driven 35:19
52:13
driver 21:21
24:17 25:21

driver's 9:24
driving 83:17
dropped 41:10
67:22 68:2,3,8
78:10 85:4
drug 32:24
34:21
ds 45:24
dsigale 2:4
duly 7:9 91:11
dupage 18:4
20:15 21:3
82:7 84:23,24
duplicating
83:11

**e**

e 3:1 57:16,17
57:19,20 60:7
61:1 64:3,24
65:14,15 77:8
77:9,12
earlier 85:16
85:21,24
earn 17:5
easily 5:8 48:19
eastern 1:2
easy 5:13
edward 2:7
effect 12:20
efforts 83:11
either 17:16
18:8 49:6
elaborate 31:3
elburn 82:11
82:21 85:4,5

elected 76:20
elicited 45:17
elk 74:16 80:22
81:9
else's 55:14
email 57:18
65:2 93:17
emails 65:3
employed
16:19
employee 91:23
91:24
employees 83:7
employer 25:24
26:3 60:15
employment
16:21,22 18:8
employs 18:15
enclosed 93:11
ends 40:14
41:23 42:5
enforcement
35:2 38:11
engage 33:24
79:13
entered 45:19
95:9
enters 8:3
entire 35:8 72:9
94:5 95:5
entity 34:13
eric 4:14
errata 93:13,18
95:7,10,18
96:1

**[errors - firearms]**

**errors** 90:16
**esq** 93:5
**estate** 62:5
**estimate** 30:24
  63:19,23
**et** 1:7 4:7,17,17
  54:15 60:17
  93:6 94:3 95:3
**event** 31:2
  77:16
**events** 34:24
  76:16
**eventualities**
  53:9,10
**eventuality**
  53:18,20
**eventually**
  63:12
**everybody** 77:4
**evidence** 87:11
  89:5,14
**exact** 67:21
  72:11
**exactly** 5:15
**examination**
  1:12 3:4,5,5,6
  7:12 73:2
  85:14 87:20
  91:10
**examined** 7:10
**example** 9:8
  11:3 34:15
**examples** 32:7
**except** 4:8
  23:12 24:17

25:24 81:18
**exception**
  26:10
**exchange** 11:23
  12:8,12 13:7
  63:9 85:21
**excluding**
  55:15
**executed** 95:10
**execution**
  94:14 95:19
**exercises** 36:5
**expect** 9:13
  90:4
**expected** 16:16
**expedited** 90:9
**expiration**
  94:19 95:25
  96:25
**explain** 68:15
**extent** 88:7
**extinguisher**
  53:15
**extra** 57:2

**f**

**facebook** 58:11
  58:13,22 79:19
  80:1
**facility** 52:23
**facing** 20:1
**fact** 42:11
  50:19
**facts** 87:11
  89:4,14

**failed** 32:24
**fair** 7:3 62:7
  63:23 71:16
**falling** 20:9
**family** 11:3
  55:15,23 64:19
  80:4
**far** 67:12
**fastbook** 58:14
**fear** 53:7
**federal** 1:13
  38:5
**fee** 68:23
**feeds** 79:10
**feel** 79:16
**fees** 67:15,17
  67:24 68:8,10
  70:5
**feet** 12:11
**felony** 30:3,5
**felt** 54:23 71:24
**female** 59:15
**ffl** 48:10,12
**ffls** 49:6
**field** 14:14,17
  20:11
**fighting** 76:11
**file** 19:22 59:24
**filed** 28:19,19
  56:20 59:23
  60:1 63:17
  64:12,14,23
**filing** 10:13
  65:8

**fill** 77:5,23
**filled** 64:16
  76:21
**financial** 87:8
**financing** 71:20
**find** 48:19
  60:15 70:14
  93:11
**finds** 28:14
**fine** 6:9,16,19
  30:18 88:15
**finish** 5:15 13:4
**fire** 36:5 38:14
  38:18 53:15,16
**firearm** 10:1
  22:10,10 23:19
  24:5,9,14,16,18
  24:23 25:13,17
  26:4,8,10,17,19
  27:19 35:22
  37:4,8,15,16,18
  38:3,12 48:9
  52:1,13,18
  53:24 55:4,8
  55:11,13,22
  57:14 59:2
  75:5 84:2
  86:15
**firearms** 25:3
  27:1 37:20,24
  38:6 45:7,9
  47:21 49:17,21
  57:11 75:4
  81:14

**[firm - going]** Page 10

**firm** 2:2
**first** 5:4,5,9 7:9
  54:2 60:3
  73:11 88:24
  91:11
**five** 14:12
  17:10 36:12
  38:21
**focus** 81:5
**foid** 25:1 34:18
  40:21 44:9
  73:10,11,14
  74:4,10,20,24
  75:3
**folks** 13:8
  55:21 62:8
**follow** 78:19
  79:8 80:1,21
  81:4
**followed** 78:20
  78:22 79:2,6,7
**following** 30:15
  73:8
**follows** 7:11
**footing** 72:6,9
**force** 14:24
  54:3
**foregoing**
  91:13 94:13
  95:18
**foremost** 88:24
**forgot** 11:5
  64:18 78:11
**forgotten** 89:17

**form** 19:6,7
  21:1,7,24 32:2
  53:11 61:1,7,7
  61:12,21,22
  62:20,22 65:5
  66:7,9 73:16
  77:4,5,6,8
  87:10
**forms** 22:13
  76:21,23
**forward** 14:9
  61:18 89:1
  93:15
**found** 74:9
**foundation**
  25:7 70:21
  71:20 75:11
  88:7 89:15
**four** 82:6
**fourth** 71:8
**foxx** 2:10 4:8
  73:6
**fpc** 59:1,4,17
  61:24 62:13
  66:4,8,10,22
  67:3,8 68:6,22
  68:24 69:11,22
  72:1,6,8,14
  75:13 76:3
  87:4 88:22
  89:10
**fpc's** 67:19
  68:23
**free** 52:24
  94:14 95:20

**freilich** 2:12
  4:6
**frequently**
  64:22
**friend** 12:9
  13:7 39:14
  80:11
**friends** 55:20
  55:24
**front** 5:1 9:5,7
**fugitive** 33:2
**full** 7:20 11:9
  12:20 16:22
  28:1
**further** 72:22
  90:7
**future** 51:2,4

**g**

**g** 2:2,3 93:5
**game** 80:16
  81:12
**gap** 60:8
  ████████46:22
**gat** 40:5 49:14
**gauge** 46:12
  47:3
**general** 1:6
  2:12 4:6,12
  30:24 49:1
  71:17
**generally** 19:23
  22:8 81:10
**generic** 57:20
**geneva** 84:18

**german** 13:1
**germany** 12:17
**gesture** 6:2
**getting** 60:9
  63:1
**gift** 47:9,23
  48:1
**girl** 39:13
**gist** 71:17
**give** 6:2 7:16,20
  8:18 35:17
  62:17 86:20
  88:18 90:1
**given** 91:18
  ████████ 46:2 50:4
**gmail** 8:8,10,12
  41:14,19
**go** 5:7,8 6:18
  7:1 12:5 20:11
  21:2,8 22:21
  24:1 25:8,19
  31:6 45:20
  53:13 65:17
  73:21 80:13,16
  82:6 84:12,24
  85:2 86:14
  88:8 89:22
**goa** 76:4
**goal** 20:10,19
  22:9
**goals** 20:21
**goes** 82:14
**going** 5:7,11,16
  6:10 22:17
  25:22 26:23

31:2 39:11
40:6,13 41:21
42:14,15 43:2
43:5,14,22
44:16 45:4
47:4 53:6,11
56:2 57:1,5
59:7 61:2 64:6
65:5,10,20
69:13,24 70:16
71:6,13 72:14
72:23 80:15
89:1 90:13,14
90:15
**good** 4:2 36:12
**google** 28:13
**gotten** 64:22
79:16
**government**
34:12 81:12
**grabbed** 86:9
**graduate** 15:8
**graduation**
16:16
**grandfathering**
17:12
**grenade** 80:13
80:13
**greyhound**
24:5,6
**grievous** 53:20
**gripping** 52:7
**ground** 5:7 7:5
**group** 65:2
80:23

**grouping** 52:10
**groups** 38:20
75:16 76:1
78:19,20 80:1
80:2,21
**guess** 30:11
**guessing** 60:2
**gun** 47:17
48:11 49:20
52:24 54:7,12
54:14 73:17
75:19,24 81:18
**guns** 40:5 49:7
49:14,15 50:2
50:12 73:19

### h

**half** 10:23 15:5
60:4 80:20
**hand** 43:5
51:24 92:5
**handle** 57:22
78:4 80:7,10
**handles** 78:24
**happen** 12:2
50:11 53:6
63:14 67:18
**happened**
10:24 30:22
59:5 61:8 63:7
63:11
**happens** 58:5
60:24
**hard** 6:1 9:4
69:17

**harm** 53:21
**head** 48:23
**heads** 32:5
**health** 17:12,15
17:18 18:1,7,9
18:15 33:24
52:24
**held** 54:12,14
**help** 17:24
51:15 71:13
**hereto** 92:2
**hereunto** 92:4
**heroin** 31:9
**hey** 61:16
**high** 13:4 15:7
15:8,9,12 16:3
24:16,20 32:4
39:8 67:12
**highlight** 41:13
**hinder** 68:5
**history** 44:8,21
**hit** 52:11
**home** 12:10,17
14:12,14 81:2
86:8
**honestly** 78:9
**hope** 85:17
**hopefully** 41:24
**hoping** 20:5,17
27:6,18
**hospital** 52:22
52:23 82:7
84:16,24 85:9
**host** 12:12,14

**hosted** 11:23
**hour** 10:23
35:19 39:21,22
60:22,23 78:17
80:20
**hours** 36:19
60:22
**house** 13:19,19
14:1,2 15:6
77:1,2
**huh** 5:24
**hunt** 74:11,15
**hunter** 74:8,13
75:6,7
**hunting** 20:11
74:17,18 80:22
81:9,12
**hypothetical**
89:15

### i

**idea** 54:1 68:12
68:13
**ideally** 27:8
**identified** 64:4
**identify** 59:17
62:16 64:1
**illinois** 1:1,7,16
2:4,8,13 4:12
11:12 14:18
15:2,3,4 16:7
23:20 24:24
25:10 28:8
38:19 47:18
48:3,7,14,15,17
48:23,24 49:11

49:12 57:12
74:18 75:18
77:1 83:4
86:13 91:1,7
92:6
**illness** 33:13
**images** 9:23
**impair** 7:16
**improvement**
81:2
**inaccurate**
28:24 58:11
79:23
**included** 28:2
93:13
**including** 27:14
**income** 23:8
**incorporated**
95:12
**incorrect** 42:21
43:8,9 44:7
**indicate** 6:3
**indicating**
93:13
**indirectly** 92:2
**individually**
65:2
**inflicted** 53:21
**influence** 7:15
**information**
16:9 45:17,18
58:12 63:18
64:17 65:11
67:14 69:24
77:12 79:21,23

81:11 88:19
90:2
**initial** 61:11
63:8,9
**input** 11:7
**inside** 48:14,15
48:17,23,24
49:12 52:14
**institution** 33:9
**instructing**
39:12
**instructor** 36:6
37:2 39:3,10
39:16 40:5
**instructors**
36:15
**intellectually**
33:17
**intend** 23:18
24:4,8,13
**intent** 51:1
**interaction**
35:2
**interactions**
38:10
**interest** 89:3,8
89:21,24 90:5
**interested** 72:5
74:9 92:2
**interests** 9:22
88:17,24
**interfamilial**
47:23
**intern** 12:5

**interrogatories**
7:10
**interrupt** 5:19
**interviewed**
19:15
**investigation**
34:12
**involve** 65:11
**involved** 19:8
19:17 57:8
**irresponsible**
35:21
**isaac** 4:6
**isp** 40:15
**issac** 2:12
**issues** 29:3
37:23 88:16

**j**

**j** 2:8
**january** 16:17
79:23
**job** 17:9,23
18:18,23 60:17
**join** 59:9 61:2,3
**jones** 2:12 3:4,6
4:2,5,6,20,23
5:3,6,18,23 6:7
6:13,21 7:4,13
21:15 23:2
25:15 26:2
32:8 45:13
46:5 53:22
65:7,13,17,20
65:23 71:5,11
72:22 85:17

87:10,17,21
88:11 89:6,19
90:3,7,9
**joseph** 30:1
**journey** 16:18
**judge** 5:1 86:16
**junior** 18:23
**justice** 33:3

**k**

**k** 91:3
**kane** 82:14,16
**keep** 57:1
**kept** 81:17,19
**kicked** 12:9
**kill** 80:15
**kim** 2:10 4:8
73:5
█████ 47:5
48:20,22
**kind** 11:5 34:12
64:18
**kingdom** 14:22
**kish** 17:12 18:1
**knew** 73:24
**know** 5:9,15
8:2 17:8 21:11
21:21 22:4
24:11 26:6,7
26:12,15 28:6
28:9,11 29:5
29:18,22 30:2
40:7 41:22
42:19 43:10
44:3,24 45:5
53:5 56:3,20

56:21,22 57:6
58:10 59:8
63:16,16 64:15
64:21 67:12,21
68:7 69:8,19
70:17,21,24
71:3,19,24
72:13,24,24
77:19,20 84:13
84:17 90:20
**knowledge**
19:13 29:9,10
29:12,14,16
32:14 47:4,11
47:13 50:23,24
56:1 67:1 70:6
**kwame**   1:6
2:15 4:8,11
93:6 94:3 95:3

**l**

**labeled**   43:15
**lack**   88:7 89:15
**lacks**   25:6
**lady**   11:24
**lane**   11:11
13:15
**lasted**   60:22
**late**   10:4 42:11
60:3
**law**   2:2 20:1,9
22:19 26:9,20
26:22 27:21
35:2 38:10
47:18 55:7
71:10 86:17

**lawful**   38:10
**laws**   38:5
**lawsuit**   11:6
19:1,2,4,9,12
19:14,15,17,22
20:10,18,19
22:9,15 23:4
23:18 24:4,8
24:13 25:2
26:13,16,23
27:9,11,12,14
27:19,20 57:9
59:10 60:16,18
61:3 64:9,13
64:15,18 65:4
71:20 72:18
86:21,24 87:9
87:16,24 88:5
88:10 89:1
**lawyer**   9:12,20
10:6 62:3
65:24 66:2
**lcp**   51:22
**lcpn**   46:3,4,8
**lead**   17:4,10
18:3
**legal**   22:18
24:18 25:5,21
26:12 58:15,16
62:17 68:18
88:15 93:1
96:1
**legally**   24:23
26:6,19 74:24

**lesson**   38:9
**letter**   57:16
93:19
**letters**   76:19
**level**   39:8 52:12
**liable**   67:24
**license**   9:24
36:12 43:19
74:18 92:9
**licensed**   21:23
48:10 49:2
**licensing**   44:22
**lie**   68:6
**life**   35:8 50:1
54:12 58:7
62:9 70:23
76:7
**likely**   82:20
**limit**   26:3
**line**   29:21
38:17 61:9
82:19,21 83:1
83:14 84:10
90:19 93:13
95:7 96:3
**linebacker**   79:1
**lines**   57:2
**link**   8:8
**list**   13:6 27:24
28:1 47:12
54:2 57:19
78:19
**listed**   27:3,5,13
28:8 47:22
95:7,17

**listing**   95:7
**literally**   11:7
68:23
**litigation**   64:7
**little**   41:21
63:21
**live**   11:11,14
12:1 36:4
38:14 53:7
**lived**   13:11,17
15:4 39:14
**living**   48:6
**loading**   37:14
37:17
**local**   76:24
**location**   84:21
**locations**   13:12
49:9,13
**lockdowns**
12:19
**long**   10:22
12:24 14:10
16:10,18 17:9
18:19 21:20
35:16 38:7,17
39:18 47:15
60:7,22 78:6
78:15
**look**   40:18 41:1
42:4,19 44:23
56:21 57:3
72:10 90:14
**looked**   73:10
**looking**   13:18
40:20 41:2

[looking - moment]

Page 14

43:23 44:8
47:1 75:20
86:20 88:17,23
**looks** 40:21
41:5 42:22
56:24
**lose** 7:1
**loss** 60:17
**lot** 26:9,10 81:9
**low** 23:8
**lyft** 21:19 22:3
22:11,14 27:15
55:11

**m**

■ 46:22
**madam** 93:10
**made** 6:17 94:7
■ 46:1
**mail** 57:16,17
57:19,20 60:7
61:1 64:3
65:14,15 77:8
77:9,12
**mails** 64:24
**maintenance**
54:17
**make** 5:8,12
6:19 7:6,7
45:14 69:16
72:11 75:2
83:10 90:18
**making** 58:6
**male** 59:15
**man** 59:16

**manager** 17:20
20:16
**manner** 49:22
50:2,7,10
**march** 12:21
**marijuana**
31:11 41:6
**mark** 29:5 41:7
**marks** 41:6
43:10
**marksmanship**
37:11
■ 46:22
**married** 11:18
13:13,22
**mart** 24:1,2
**masters** 2:7
16:5,6
**math** 18:14
**matt** 79:4
**matter** 72:14
72:15,16 73:7
**matters** 7:14
91:12
**maturity** 75:2
**maximum** 78:7
**mba** 16:9
**mean** 20:24
23:4,12 26:3
79:20 80:10
**means** 4:11
27:24 83:3
90:12
**meant** 9:2

**mechanism**
47:24
**media** 58:4,19
78:3 79:3
**medical** 41:6,7
**medication**
7:15
**medicinal**
31:23
**medicine** 17:1
17:3,11 52:22
**meijer** 18:12,20
**member** 11:3
70:23 75:10,13
75:15,18 78:21
**members** 55:16
77:3 80:2
**membership**
75:21 76:7,9
**memory** 45:10
**mental** 33:8,12
33:24
**mentally** 33:5
33:21
**mention** 81:20
81:24
**mentioned**
27:17 34:3
39:1 64:6 66:8
75:10 78:2
79:19 81:13
85:23,24
**mercado** 2:7
3:5 73:3,4
85:11

**merged** 18:2
**merger** 83:8
**message** 57:11
57:16
**met** 29:7
**methampheta...**
31:16
**metra** 21:2,5,18
22:11,14 27:14
82:8,10,17
85:6
**micro** 47:5
**middle** 15:7
24:15
**midwest** 93:17
96:1
**millimeter**
46:24 47:6
**mine** 46:11
**minimal** 11:7
**minute** 58:23
**minutes** 27:4
39:2 60:23
**misdemeanor**
30:8,10
**mode** 21:16
**model** 46:14,20
46:23
**modes** 21:4
**moment** 6:23
21:14 40:6
44:23 48:20
55:21 66:5
76:4 83:15

**[monetarily - old]**

**monetarily**
76:6
**monetary** 76:2
**moni** 39:13
**month** 61:11
63:8,20,22
74:22
**months** 12:4,5
60:1 77:15
82:6
**morengo** 49:7
49:15
**morning** 4:2
▆▆▆▆ 46:21
▆▆▆▆▆
46:11
**moved** 12:18
12:21 13:14,15
13:19,20,23
14:2,16,22,24
14:24 15:2,3
**movement**
54:17,18
**movie** 90:14
**moving** 17:14
▆▆▆ 47:16

**n**

**n** 3:1 46:3,16
46:17
▆▆▆▆ 46:21
**name** 4:5 17:16
18:8 29:23
37:2 57:23
58:15,16 73:4
93:6 94:3,4,15

95:3,4,21
**names** 78:23
**narrate** 44:7
**national** 75:17
**naturalized**
32:22
**necessarily**
37:16
**need** 6:22 23:22
37:21 40:18,18
41:3 42:19
48:6 54:23
61:2 69:24
71:4,24 81:11
**needed** 11:24
24:1 50:16
64:16,17 74:9
**needing** 82:6
**network** 16:1
**never** 34:15,16
54:18 62:10
88:20
**niece** 11:15,21
12:7 13:7
**night** 10:10
**nine** 41:23
64:24
**niu** 23:5,19
24:3 83:1,3,9
83:13 84:19
**nonresponsive**
67:20,22 68:2
**nonuniversity**
83:6

**north** 13:14,22
14:23,24
**northern** 1:1
23:20 83:3
**northwestern**
17:1,3,11
52:22
**notarized**
93:14
**notary** 1:15
91:5 93:24
94:10,18 95:15
95:23 96:23
**note** 9:8 93:12
**notes** 9:7 84:5
**notice** 1:12
**notification**
8:18
**notify** 8:21
**nra** 36:6 39:3
39:10 40:3,4,5
76:5
**nuclear** 79:6
**number** 41:18
46:23 93:7,13
**numbers** 95:7

**o**

**o** 91:3,3
**o'clock** 1:17
**oath** 4:21,24
**object** 6:14
21:7 22:17
32:2 53:11
65:5 87:10
88:6

**objection** 6:18
25:5,19 45:14
45:16 89:4,13
**objections**
89:22
**obtain** 15:12
16:2 25:22
**obtained** 34:16
**obviously** 29:2
**occasion** 11:21
**occasionally**
11:15 76:10
**occurred** 39:7
59:20
**october** 43:20
**odd** 46:20
**offense** 32:17
**offer** 17:20
**office** 4:10 86:8
87:4 92:5
**officer** 38:11
**officers** 35:3
**official** 76:15
81:12 90:16
94:15 95:21
**ohio** 93:2
**okay** 4:4 5:6,16
5:21 6:4,11,23
8:11 40:8,9
41:4 56:4 57:7
60:15,15 61:21
69:4 89:20
**old** 11:16 24:23
25:11

**olds** 24:20 25:3
**once** 20:8 43:9
   78:14 82:5
**ones** 10:17
   19:18 21:11
   27:4,7 28:8,8
   28:15,16 47:20
   48:22 49:8,11
   50:16,19 51:17
**open** 8:7,14
   23:14
**opened** 18:3
**opioids** 31:14
**option** 54:7
**options** 82:23
**oral** 7:10
**order** 32:9,10
   32:12,16 45:19
   50:12 90:9
**ordered** 34:20
   48:10 49:10
**ordering** 49:2
**organization**
   70:20
**organizations**
   76:9
**origin** 48:9
**original** 9:19
   81:8
**originally**
   13:13 17:17
   64:3 69:4
**originated**
   49:11,12

**outcome** 92:3
**outpatient**
   33:12
**outreach** 58:24
**outside** 14:18
   48:4,7 49:11
**outstanding**
   39:1
**own** 45:7,9
**owned** 55:22
**owners** 75:19
   75:24
**ownership** 38:5

**p**

**p** 50:5,20 51:7
   ▮▮▮ 50:16
**pace** 23:11
   27:16 84:12
**page** 41:23
   42:2,5,15,15,16
   43:4,15 58:11
   58:14 93:13,15
   95:7 96:3
**paid** 65:24 66:2
   ▮▮▮ 46:12
   46:17
**paper** 68:16,17
   68:19
**paragraph**
   71:9,13
**paraphrasing**
   85:18 86:1
**parental** 73:16
**parents** 15:6
   73:19

**parking** 26:9,9
**part** 16:22
   19:15 23:1,3
   35:23 64:7
   86:17,23 87:7
   95:9
**particular**
   38:18 77:16
   80:9,21 81:5
**parties** 92:1
**pass** 39:11
   83:17
**passed** 38:23
   64:12
**passenger**
   21:22 84:14
**passing** 38:22
**past** 32:13
**patch** 76:10
**path** 54:2
**patient** 33:8,12
   ▮▮▮ 46:14
**pay** 67:17 68:8
**paying** 66:17
   66:20,23 67:4
   67:8 68:10
   70:5 72:16
**pc** 2:2
**pending** 34:7,8
**people** 23:9
   78:21 79:14
   80:15,17 81:10
   88:13,16
**percent** 23:9
   38:21 58:1,11

**77:20**
**perfectly** 6:9,16
   6:18 88:15
**period** 78:15
**permit** 25:22
**permits** 35:24
**person** 62:13
**personal** 91:16
**personally**
   94:11 95:15
**perspective**
   27:7
**pertinent** 88:10
**phone** 8:24
   41:18 59:19
   93:3
**phonetic** 39:13
**pick** 49:5
**picked** 24:2
   49:3
**picture** 50:3
**pictures** 9:24
   49:16,23
**pine** 36:24
**pistol** 36:6 37:1
   39:3,15 77:21
**pistols** 45:23
**place** 11:24
   13:12 27:11
   36:22 91:20
**places** 26:17,18
   27:1,3,5,13,17
   27:18 28:1,1
   83:17

**plaintiff**  1:4 2:5
  4:18 18:24
  19:5,9 67:23
  72:5
**plaintiffs**  71:9
**plan**  21:17
**planning**  61:16
  62:5
**play**  80:11,12
**please**  5:23 6:2
  8:10 46:9
  93:11,11
**plus**  36:4
**point**  14:3
  17:22 18:1
  46:16 51:4
  62:2,10 64:4
  67:22 68:11
  72:16
**policy**  57:11
  59:2
**portion**  45:18
**position**  18:3,6
  18:17,20
**possibilities**
  51:3
**possibility**
  50:10
**possible**  5:8,13
  34:4 35:1
  45:11 53:9
  58:8 87:16
**post**  9:8 78:12
  79:10 81:7,8

**pot**  32:4
**potential**  90:5
**potentially**
  20:1 53:15
**power**  79:6
**practical**  50:1
**practice**  54:11
**prairie**  14:14
  14:16
**precision**  46:18
**prefer**  50:15
**preference**
  49:24 50:12
  51:5,14
**preliminary**
  7:14
**prepare**  9:10
  11:3
**prepared**  53:8
  53:16,17,19
  54:8
**prescribed**
  31:20
**prescription**
  31:13
**president**  77:3
**press**  70:20
  71:2
**presume**  61:6
**pretty**  81:22
  83:2
**preventing**
  87:4
**previous**  91:9

**previously**
  58:20 78:3
**primarily**
  20:19
**primary**  21:1
  21:12
**principals**
  37:22,24
**printing**  15:4
**prior**  18:7,17
**prison**  20:1
**private**  22:2,3
  26:15
**privately**  23:13
**probably**  10:4
  59:18 60:3
  61:10,23 63:23
  63:24 84:9
  88:9
**problems**  44:2
**procedure**  1:13
  94:5 95:5
**proceed**  61:3
  69:6
**proceeding**
  11:6 31:3
**proceedings**
  91:18
**process**  25:23
  62:2,8
**produced**  44:3
  44:20
**production**
  93:15,17,22

**productive**
  58:5
**proficiency**
  37:1
**project**  17:20
  17:23
**prompted**
  17:20
**proper**  25:23
**properly**  21:23
**property**  14:8
  26:15
**protection**
  32:10,17
**protective**
  36:18,23 45:19
**provide**  49:16
  50:3 59:10
  69:14 87:23
  88:5
**provided**  23:17
  36:15 49:22
  64:15,17
**provides**  64:20
**provision**  68:15
**provisions**  70:4
**ps**  80:11
**public**  1:15
  20:13,23 21:1
  21:6,9,12,24
  22:8,13,19
  23:1,3,5,6,8,10
  23:12,15,16,23
  27:21,23 28:2
  28:6,9 55:4

57:13 82:1,23
83:9,19 84:7
85:3,20 86:5
86:14,19 91:6
94:10,18 95:15
95:23 96:23
**pull** 57:5 72:23
**purchase** 14:1
14:6 47:21
48:3,4
**purchased** 48:2
48:14,15,17
49:8,8
**purposes** 86:20
87:2
**pursuant** 1:12
1:12
**pursuing** 16:10
**pushing** 79:6
82:18
**put** 10:3 19:6,7
28:19 54:15
60:6
**putting** 60:8

**q**

**quarter** 82:5
**question** 5:15
6:10,17,24,24
21:8 32:3
37:21 41:6,7
43:7,10 45:17
53:12 65:6
69:17 72:7
73:11 87:3,11
87:13 89:17,18

**questioning**
29:21
**questions** 5:14
6:8,15 7:4 25:7
43:3,6 59:6
60:11 72:22
73:8,9 81:10
85:13 87:17,19
90:7
**quick** 7:14 9:12
28:13
**quickly** 61:12
70:16 71:3,4

**r**

**randolph** 2:13
**random** 78:21
79:9
**range** 54:10
**raoul** 1:6 2:15
4:8,11,17 93:6
94:3 95:3
**rate** 38:22
**reach** 57:15
**reached** 57:14
59:4 63:12
**read** 10:10
28:20 61:7,22
61:24 68:17
70:7,8,10,11,14
94:5,6,12 95:5
95:6,17
**reading** 58:6
91:21 93:19
**realized** 32:5

**really** 58:22
79:24 80:3
90:14
**reason** 6:22
42:7,9,23
54:13 67:20
80:9 93:14
95:8 96:3
**reasonable**
54:9
**reasoning**
10:12
**reasons** 7:19
51:14
**recall** 9:18
15:21 30:21
31:2 36:14,19
37:2,8,11,13
42:12 56:10
57:18 60:11,22
70:12 77:16
78:23 85:21
86:2
**recalling** 39:4
**receipt** 93:18
**receive** 8:18
65:15
**received** 30:13
33:11 67:14
88:3
**receiver** 77:21
**recent** 41:10
**recess** 65:22
**recoil** 51:24

**recollection**
29:1 30:18
44:14,15 45:1
45:2 64:13
**record** 48:19
65:17,19,20
87:18 91:17
95:9
**recovery** 19:6,7
**reddit** 80:5,7
**redditt** 80:18
**redirect** 3:6
87:20
**reduced** 91:15
**reference** 93:7
94:2 95:2
**referenced**
94:11 95:15
**refused** 87:23
88:4
**regarding**
37:23
**reholster** 54:15
**relates** 69:8
**relating** 38:5
**relative** 91:23
91:24
**relatively** 61:12
**release** 70:20
71:2
**remember** 7:17
7:21 10:11
12:15 14:5
31:21 35:16
39:9 46:15

47:2 49:15
57:24 58:4
59:12,18,19
60:20 61:5,8
61:20 64:14
67:10 70:15
78:9,10 80:23
83:8 84:12
**remembered**
63:15
**remind** 45:13
▮▮▮▮▮▮ 47:3
**remote** 1:10
**renewed** 36:13
**rental** 14:8
**rented** 23:13
**repeat** 18:18
46:6 67:5 78:4
89:18
**reply** 79:12
**report** 44:3,6
**reported** 91:14
**reporter** 5:11
5:20 6:1,3 91:7
94:7
**represent** 4:6
4:11 69:13
73:5
**representation**
59:10 66:15
69:2,14,19
**representative**
68:7 76:20
**representatives**
76:24

**represented** 4:9
**representing**
64:7
**request** 5:13
6:23 60:7 68:6
95:9,11
**require** 26:13
68:8,9
**required** 33:23
37:6 93:24
**requirement**
38:15,18,20
74:3
**requires** 20:16
**reserve** 90:11
**reserving** 90:12
**reside** 11:8
14:7,20,21
**resided** 11:21
13:9 14:18
**residents** 57:12
**resides** 11:13
**respect** 44:22
**respond** 54:8
81:8,9
**responds** 65:2
**response** 54:9
57:20
**rest** 48:2
**restriction** 27:9
**results** 44:5
**return** 70:1
**returned** 13:4
93:18

**review** 9:14,17
28:18 41:3
44:5 71:2 84:5
90:15 93:12
94:1 95:1
**reviewed** 10:17
10:18 56:9,17
**reviewing**
56:10
**revolver** 45:23
▮▮▮▮▮▮ 45:24
47:19
**richard** 2:8
**rick** 4:12
**ridden** 84:8,19
**ride** 57:13
60:13,14
**rifle** 46:22
75:17,18
**rifles** 47:15
**right** 7:2,23 8:6
8:23 9:1,5
10:20 14:4,8
20:4,6,6 21:18
26:4,14,24
28:11,14,21
29:3,23 35:24
40:11,14 41:2
41:24 42:12,24
43:5,8,20,24
45:7 47:12
49:23 53:24
56:15 60:4
62:11,14,18
66:15 71:6,15

85:9 86:9 87:7
88:21 90:5
**rights** 10:10,12
19:23 20:4
76:12 87:14,15
**rinehart** 4:14
**risk** 60:17
**rmpcn** 46:24
**road** 2:3
**robert** 4:13
**rockford** 36:17
36:23
**rocks** 1:15 5:11
90:13,19 91:5
92:9
**rode** 84:6,10
**role** 59:17
**roles** 17:15
**room** 7:23 8:3
29:15
**roosevelt** 2:3
**rounds** 38:20
**routine** 34:17
▮▮▮▮▮▮ 46:3,8
▮▮▮▮▮▮ 45:22
**rule** 49:1 77:21
**rules** 1:13 5:7
7:5 77:17,19
94:5 95:5
**run** 26:22 31:1
**rundown** 9:13
**running** 8:23

| s | | | |
|---|---|---|---|
| **s**  93:15 95:8,8 96:3 | 16:3 23:13,15 24:14,15,16,20 25:4,13,17 32:4 | 44:18 46:10 56:3,5,13 57:2 70:17,18 | **services**  16:9 |
| **safe**  47:1,4 81:16,17,19 | **scout**  53:17 | **seeing**  44:2 | **set**  77:13 92:4 |
| **safety**  37:4,9 74:8 75:4,5,6,7 | **scouts**  73:22 74:4 | **seek**  26:16 68:18 | **setting**  54:10 55:21,23 |
| **sale**  8:21 | **screen**  8:7,17 40:6 45:4 56:2 57:5 70:16 | **seem**  44:13 | **seven**  38:21 |
| **sanderson**  79:8 | **script**  90:15 | **seems**  56:16,18 | **share**  40:6,20 56:2 67:2,6 70:16 |
| **saw**  28:23 29:3 32:4 57:10 58:24 59:4 | **scroll**  41:21 43:2,5,14,22 44:16 56:13,23 71:6 | **seen**  29:9 | **shared**  7:5 10:19 19:18 27:24 58:23 63:7 72:2,3 |
| **saying**  5:24 26:9 52:10 61:2 69:23 72:12 | **scrolling**  40:17 42:14 57:1 | **self**  86:19 | **sharing**  40:7,11 40:21 45:4 56:6 70:18 72:23 |
| **says**  21:22 26:20 40:24 58:16 67:19 70:12 71:9 79:22,22 86:13 86:16 | **seal**  92:5 94:15 95:21 | **senate**  77:1 | **sheet**  48:19 77:11 93:13 95:7,10,18 96:1 |
| **schernobyl** 58:1 78:5 80:8 | **search**  28:13 | **senators**  77:2 | **shipped**  48:11 49:2,6 |
| **schoenthal**  1:3 1:11 3:3 4:2,7 4:17 7:8 40:10 40:24 43:16 66:1 72:19 87:22 91:10 93:6,8 94:3,4,9 95:3,4,13 96:20 | **second**  12:17 20:6 26:4,14 70:21 71:19 72:1 75:11,15 76:15 78:18 81:5 | **send**  9:16 57:15 59:7 61:1 68:17 69:17 77:4,5,6,10 | **shoot**  50:13,14 51:7,16,16,18 51:21,23,23 52:6 |
| | **secondary**  20:21 | **sense**  6:19 7:6,7 54:19 | **shooter**  54:6 |
| | **section**  38:7 | **sent**  57:18 68:16 76:23 | **shooting**  46:19 73:21 74:9 |
| | **security**  34:16 | **sentence**  71:17 | **shorthand**  91:7 |
| **school**  13:2,4 15:7,7,8,9,13 | **see**  12:3 14:11 40:7,10,13,19 40:19 41:8,22 41:24 42:16 43:4,6,16,24 | **separate**  69:3 | **shot**  45:23 |
| | | **september**  1:17 39:16 92:6 93:4 | **shotgun**  47:3 |
| | | **sequence**  36:9 39:2,23 | **shotguns**  46:10 47:15 |
| | | **sequences**  36:7 | |
| | | **series**  39:6 46:12 | |
| | | **server**  77:13 | |
| | | **service**  23:11 23:17 83:16 | |
| | | **serviced**  50:5 50:16 | |

**shots** 72:19
**shown** 93:16
**shows** 44:21
 ■ 46:13
**sigale** 2:2,3 3:5
 6:14,17 9:12
 10:20 21:7
 22:17 25:5,19
 32:2 45:12,13
 45:15 53:11
 62:6 63:12
 64:9,11,23
 65:5,10 68:21
 69:15,21 72:1
 85:13,15 87:13
 87:18 88:6
 89:4,10,13,22
 90:8,11 93:5
**sigalelaw.com**
 2:4
**sign** 6:3 26:20
 61:2,12 62:20
 66:12 69:6
 70:1 73:16
**signature** 63:7
 63:22 90:11,12
 92:8 93:14
**signed** 42:2,8
 43:19 61:7,20
 62:22 63:4,20
 66:7,14 69:12
 87:4 88:15,21
 94:13 95:18
**signing** 91:21
 93:19

**silent** 9:1
**sill** 75:22
**similar** 32:17
 42:18
**similarly** 6:2
**sincerely** 93:21
**single** 45:23
**sir** 93:10
**sister** 13:17
**sit** 28:12
**site** 52:23
**sitting** 5:1 7:24
**six** 12:4,5 46:24
 60:1
**size** 52:1,7,10
**slash** 17:24
**slide** 40:13
**sm** 46:13
**social** 58:4,19
 78:2
**solely** 48:23,24
**solutions** 93:1
 96:1
**someone's** 26:4
**son** 11:17
**son's** 74:22
**sooner** 63:21
**sorry** 22:2
**sort** 4:24 26:13
 54:11 76:8
**sought** 32:12
 34:15 88:2
**sound** 5:16,20
 6:4,11 7:2

**sounded** 53:12
 81:13
**sounds** 7:3
**spare** 12:10
**speak** 8:6 10:22
 62:4
**speaking** 5:19
 21:5
**specific** 14:5
 17:8 27:10
 63:17
**specifically**
 12:15 46:15
**specifics** 10:11
**specified** 91:20
**speculate** 90:1
**speculation**
 25:6 88:6
 89:13
**speeding** 30:13
 34:3 35:1
**spend** 78:15
 80:18
**split** 65:1
**spoke** 10:19
 24:10 62:10,13
 62:20,24 63:1
 65:12 88:20
**spoken** 11:2
 62:8,23 64:22
 67:7
**sponsored** 40:3
**spot** 24:2
 ■ 45:22

**ss** 91:2
**st** 13:16,18,24
 18:13
**staghorn** 13:14
**stamp** 40:14
 43:15 44:17
**standards**
 51:18,20,21,24
 52:4
**start** 18:21
**started** 12:16
 17:17 18:12
 73:1 74:16
**state** 1:7,16
 20:7 21:23
 22:4 24:24
 25:9 28:7 38:4
 38:19 46:12,17
 48:5,8 75:18
 91:1,6,8 94:10
 95:15
**state's** 4:10,13
 4:13,14 73:5,6
**stated** 26:21
**statement** 9:19
 10:2 94:13,14
 95:19,19
**states** 1:1,14
 32:19 77:2
**station** 85:5
**status** 16:22
 44:9,21
**statute** 86:13
**statutes** 20:7

**stay**  11:24
    12:11 87:9,16
**stayed**  13:20
**stenographic...**
    91:14
**step**  63:4
**sticker**  76:10
**stood**  29:14
**stop**  45:4 72:23
    82:17 83:16,18
    84:14
**storage**  38:5
**store**  26:10
**stored**  81:14,15
**strategy**  72:20
**street**  2:13 11:9
**student**  12:18
    13:1,3 23:15
    24:15
**students**  11:23
    12:8,12 13:7
    83:7
**study**  13:4
**studying**  16:6
    17:19
**stuff**  79:3
**sub**  47:16
**subject**  32:9
    34:7,8,11
    45:17
**submission**
    60:8 66:10
**submitted**  9:17
    9:23 42:2

**submitting**
    9:21 74:21
**subs**  79:8
**subscribed**
    94:10 95:14
    96:21
**substance**
    31:19
**substances**
    7:15
**suit**  10:13
**suite**  93:2
**superior**  93:1
**support**  76:1
**sure**  23:9 46:23
    66:12 67:6
    71:15 72:11
**surprising**
    89:12,20
**sworn**  4:1 7:10
    91:11 94:10,13
    95:14,18 96:21
**sycamore**  11:11
    48:12 49:7
    82:17 83:23
**sylvia**  2:7 73:4
**sylvia.merca...**
    2:9
**sysco**  17:19
**system**  17:13
    17:16,18 18:7
    18:9,15 21:2
    23:7 24:3,11
    52:24 83:10,11

### t

**t**  71:14
█  46:18
█  46:18
**take**  4:24 5:11
    6:4,21 22:24
    36:11,22 38:23
    39:11 40:2,17
    41:1,3 42:19
    42:19 44:23
    56:21 71:3
    75:4 82:1,8
    85:5
**taken**  1:14 5:3
    31:18 35:22
    36:2,8 39:2
    91:19
**takes**  14:12,15
**talked**  61:14
    62:3,5,6
**talking**  10:2,9
    10:11 12:7
    30:12
**target**  52:11
    54:11 73:21
**targets**  22:15
**tasks**  54:17
**taught**  37:22
**taxis**  22:7
**teaching**  37:19
**team**  17:4,10
    18:3
**tech**  80:22
**technically**
    23:16

**tell**  4:21 48:16
**template**  76:21
    77:8
**terminate**
    82:21
**terms**  61:8
**terrible**  63:15
**test**  32:24
    51:19
**testified**  7:11
**testify**  91:11
**testimony**
    91:18 94:6,7
    95:6,9,12
**tests**  54:18
**text**  42:7,9
**thank**  45:15
    85:12
**theory**  25:23
**therapist**  33:15
**thing**  5:13
    20:17 54:11
    81:2
**things**  7:17,21
    54:3 58:18,22
    78:10
**think**  17:10
    18:2,22 19:3
    22:3 26:24
    30:17 31:5
    36:17,24 38:20
    42:9,24 45:24
    46:13,14 47:2
    47:20 48:20
    51:17 57:1,17

[think - uncertain]

57:19,20,24
58:1,21 59:11
60:10 61:4
67:21 73:13
78:7,22 80:8
84:11,11 85:11
88:4,12
**third** 4:14 5:23
**thirty** 93:18
**thought** 20:22
63:3
**three** 12:15
14:15 17:18,23
18:10 35:11
60:1,22 77:15
82:5
**threw** 80:12
**thumbs** 6:3
**ticket** 30:13,19
35:1
██████46:18
**time** 6:21 11:22
15:17 16:13,22
16:23 17:14
18:11 19:3,8
20:2 35:14
40:17 41:3
42:19 56:3
59:20 61:9
64:12 67:2,7
68:1 71:4
72:22 73:17
74:11 76:22,22
77:14 79:15,15
80:12,18 83:19

84:6 90:19
91:20
**times** 35:13
**today** 4:9,16,20
5:8 6:8,13 7:19
51:6 86:7
**today's** 9:10
**token** 5:18
**told** 25:24
26:24 67:13
71:22
**took** 24:2 39:13
39:14,16 40:4
40:5 74:8 75:7
83:19
**top** 43:22 48:23
**town** 84:15,17
**townhome** 14:3
14:7,10,11,16
**track** 7:1
**traffic** 30:9
34:3
**train** 85:5,6
86:10
**training** 35:23
36:2,4 39:7
54:10,17
**trainings** 54:6
**transcribed**
94:7
**transcript**
90:13 91:14,22
93:11,12 94:5
94:12 95:5,11
95:17

**transcription**
91:16
**transferred**
47:23
**transport** 38:6
**transportation**
20:14,23 21:1
21:5,6,10,13,17
22:1,8,14,19
23:1,4,5,6,11
23:12,16,23
27:21,24 28:2
28:6,10 55:5
57:13 82:1,23
83:20 85:3,20
86:6,14,19
**transporter**
17:17 18:10
**travel** 19:24
**treatment**
33:11,24 34:21
**tree** 36:24
**troll** 58:12
79:19
**true** 72:8 91:17
**trust** 9:21
88:22
**truth** 4:21
91:11
**truthful** 7:17
7:20
**try** 28:14 45:10
62:17
**trying** 27:10

**turn** 9:2,3
**turns** 74:22,23
**twice** 78:14
**twitter** 57:10
57:22,22,23
58:2,21,24
78:3,4,6,12,16
78:24
**two** 4:9 11:14
11:20 12:6,13
13:6,7 34:2,24
36:7,9,21
39:18,20,22,24
40:1 45:22
46:10 49:6,13
50:14 77:22
78:7
**type** 81:2
**typewriting**
91:15
**typographical**
90:16

**u**

**u.s.** 32:21,23
**uber** 21:19,24
22:3,11,14
27:15 55:9
**uh** 5:24,24,24
**uley** 79:1
**ultimately**
22:18 86:16
**unable** 25:12
**unaware** 88:1
**uncertain** 28:5

| | | | |
|---|---|---|---|
| **uncle** 73:23 | 16:14,15 23:19 | **veritext.com.** | 26:22 27:11,22 |
| **uncle's** 13:19 | 83:4 | 93:17 | 53:19 59:24 |
| 14:2 | **unload** 54:15 | **versus** 4:8,17 | 62:4 69:6,16 |
| **unconstitutio...** | **unloading** | 52:6 | 73:13 86:1 |
| 86:18 | 37:14 | **vessel** 30:1 | 87:2,6,14 |
| **under** 4:21 | **update** 8:21 | **vibrate** 9:2 | 88:13,18 |
| 7:15 17:16 | **updates** 64:20 | **victoria** 1:14 | **wanted** 53:14 |
| 18:8 22:19 | 80:3 | 5:11 91:5 92:9 | 54:21 59:9 |
| 47:18 58:14 | **use** 21:2,10,12 | **view** 22:4,6,7 | 87:8 |
| 91:16 | 21:19 23:9,22 | 25:4 26:5 | **warrant** 34:8,9 |
| **understand** | 24:3,6,11 | **viewed** 88:16 | **waving** 35:4 |
| 4:20,23 6:7 | 34:21,22 73:19 | **violate** 72:14 | **way** 9:10 20:11 |
| 8:12 9:21 | 77:11 79:24 | **violating** 20:1 | 29:12 30:16 |
| 23:20 28:3 | 80:3 | **violation** 30:9 | 48:13 50:10 |
| 35:22 51:15 | **used** 17:12 | 30:12 32:16 | 54:8 68:15 |
| 59:1 70:10 | 23:23 31:7,9 | 34:3 55:6 | 89:23 |
| **understandable** | 31:11,13,16 | **visible** 71:7 | **we've** 11:24 |
| 71:16 | 77:4 80:11 | **vita** 80:12 | 26:17 |
| **understanding** | 83:21 84:11 | **voluntary** 23:7 | **weapon** 27:6 |
| 24:19,22 54:4 | **using** 5:23 8:6 | **vs** 1:5 | 81:21 |
| 68:4,5,10 86:4 | 48:11 | | **wear** 51:8 |
| **understood** | **usually** 82:11 | **w** | **website** 42:4 |
| 6:11 8:24 | **v** | **w** 2:3,13 | 81:12 |
| 70:11 | | **waived** 91:22 | **week** 60:10 |
| **unethical** 68:6 | **v** 93:6 94:3 | 93:19 | **weight** 41:10 |
| **unfortunately** | 95:3 | **wal** 24:1,2 | **went** 12:16,19 |
| 63:16 | **vac** 23:7 24:9 | **walk** 17:15 | 15:6 32:4 |
| **unholstered** | 24:11 83:1 | 39:6 68:14 | 37:17 39:14 |
| 54:12,19 | **various** 35:23 | **walked** 86:8 | 61:17 |
| **unique** 80:16 | **vehicle** 55:22 | **walking** 87:5 | **western** 16:7 |
| **united** 1:1,13 | **vendors** 48:7 | **walsh** 79:4 | **wheaton** 2:4 |
| 14:22 32:19 | **verbally** 67:3 | ▬▬▬▬▬ 47:6,7 | **whereof** 92:4 |
| 77:2 | **verbiage** 61:4,5 | 49:14 | **white** 9:8 |
| **university** | **veritext** 93:1,7 | **want** 11:9 | **wife** 11:14,20 |
| 15:15,18 16:7 | 96:1 | 18:22 19:21 | 13:8 47:5 48:1 |
| | | 20:7 22:23 | |

**[wife - zoom]**                                        Page 25

55:20 61:14,15
62:24 63:2
73:24 74:1
**wife's** 46:11
47:7 73:23
**willing** 60:17
**win** 23:18 24:4
24:8,13 25:2
26:23 27:19,20
████████████
46:20
**window** 75:21
**windows** 8:7,14
**winfield** 85:9
**winston** 29:17
**wire** 79:3
**wise** 59:20
**wish** 53:1 61:3
63:15
**wished** 59:9
**witness** 3:3 4:1
4:4,19,22 5:2,5
5:17,22 6:6,12
6:20 7:3,7,9
19:14 21:9
22:23 25:6,9
25:21 32:4
45:22 53:14
65:16 71:8
87:12,14 88:9
89:17,23 91:10
91:22 92:4
93:8,11 94:1,4
94:11 95:1,4
95:15

**witness'** 93:14
**word** 67:7 71:5
71:16
**wording** 67:21
72:10
**words** 5:24
**wordy** 10:10
**work** 16:24
17:1,2,6,21
20:16 52:17,18
54:10 77:7
82:1 88:22
**worked** 18:1,9
18:11,12
**working** 16:4
18:7
**worry** 20:8
**worrying** 19:24
████████████ 45:23
**write** 6:1 90:13
**writing** 9:8
67:3,7
**written** 76:19
**wroblewski**
29:5
**wrong** 28:23
43:12,13 58:17
61:6 63:1

**x**

**x** 3:1

**y**

**yards** 38:21
**year** 10:4 12:3
12:19 13:2,3

13:20,21,23,24
13:24 14:2
15:5,5,10,19
17:5 18:23
24:20 25:3
30:24 39:16
59:22 74:16
78:8 84:9
**years** 12:6,16
14:15 17:11,16
17:19,24 18:10
24:23 25:11
35:11 36:12
78:7
**yesterday**
10:24 11:1
**young** 11:24

**z**

**zero** 35:13
**zeroing** 62:7
**zone** 52:24
**zoom** 5:10 8:5
40:18

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions


**Signing and Filing Depositions**

(a) Submission to Deponent; Changes; Signing.
Unless signature is waived by the deponent, the
officer shall instruct the deponent that if the
testimony is transcribed the deponent will be
afforded an opportunity to examine the deposition
at the office of the officer or reporter, or
elsewhere, by reasonable arrangement at the
deponent's expense, and that corrections based on
errors in reporting or transcription which the
deponent desires to make will be entered upon the
deposition with a statement by the deponent that
the reporter erred in reporting or transcribing the
answer or answers involved. The deponent may not
otherwise change either the form or substance of
his or her answers. The deponent shall provide the
officer with an electronic or physical address to
which notice is to be sent when the transcript is
available for examination and signing. When the
deposition is fully transcribed, the officer shall
deliver to the deponent, at the address supplied,

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.
(1) If the testimony is transcribed, the officer

shall certify within the deposition transcript that
the deponent was duly sworn by the officer and that
the deposition is a true record of the testimony
given by the deponent. A deposition so certified
requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with
the clerk of the court as a matter of course. The
party filing a deposition shall promptly serve
notice thereof on the other parties and shall
file the transcript and any exhibits in the
form and manner specified by local rule.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.