# Exhibit 3

WITH CONFIDENTIAL DESIGNATIONS Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4    BENJAMIN SCHOENTHAL, et al.,

5                                     )

                Plaintiffs,           )
6                                     )
     vs.                              ) 3:22 cv 50326
7                                     )

     KWAME RAOUL, Attorney General    )
8    of the State of Illinois, et     )
     al.,                             )
9                                     )

                                      )
10              Defendants.           )

11

12              The remote deposition of MARK
13   WROBLEWSKI, called by the Defendants for
14   examination, pursuant to Notice and pursuant to the
15   Federal Rules of Civil Procedure for the United
16   States District Courts, taken before Victoria D.
17   Rocks, CSR, and Notary Public in and for the County
18   of Cook, State of Illinois, commencing at 9:30
19   o'clock a.m. on the 8th day of September 2023, A.D.

20

21

22

23

24

```
                                          Page 2
 1   APPEARANCES:
 2            LAW FIRM OF DAVID G. SIGALE, PC
              MR. DAVID G. SIGALE
 3            430 W. Roosevelt Road
              Wheaton, Illinois  60187
 4            dsigale@sigalelaw.com
 5            appeared on behalf of the Plaintiff;
 6
              MS. SYLVIA MERCADO MASTERS
 7            MR. EDWARD M. BREMER
              500 Richard J. Daley Center
 8            Chicago, Illinois  60602
              sylvia.mercadomasters@cookcountyil.gov
 9
              appeared on behalf of the Defendant,
10            Kim Foxx;
11
12            MR. ISSAC FREILICH JONES
              ASSISTANT ATTORNEY GENERAL
13            100 W. Randolph Street
              Chicago, Illinois  60601
14
15            appeared on behalf of the Defendant,
              Kwame Raoul.
16
17
18
19
20
21
22
23
24
```

Page 3

1                       I-N-D-E-X

2

3    WITNESS: MARK WROBLEWSKI

4

     Direct Examination by MR. JONES:      7 - 63

5    Cross-Examination by MR. BREMER:     64 - 81

     Cross-Examination by MR. SIGALE:     82 - 84

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                        Page  4

1              (Witness sworn.)

2         MR. JONES:  Good morning. Can you please state

3    your full name for the record.

4         THE WITNESS:  Mark Wroblewski.

5         MR. JONES:  Mark, thanks for joining us this

6    morning.  My name is Assistant Attorney General

7    Isaac Freilich Jones.

8           I'm representing all of the defendants in the

9    case of Benjamin Schoenthal versus Raoul that you

10   are a plaintiff in except for Kim Foxx, who is

11   represented by attorneys from the Cook County

12   State's Attorney's office today.  They may ask you a

13   few questions later on as well.

14          You're aware that today you're being deposed

15   in the case of Schoenthal, et al. versus Raoul, et

16   al., pursuant to notice that was given to you?

17        THE WITNESS:  Yes.

18        MR. JONES:  And do you understand that today

19   you're under oath to tell the truth?

20        THE WITNESS:  Yes.

21        MR. JONES:  And you understand that this is the

22   same oath you would take in a courtroom or the same

23   type of oath you'd be taking in a courtroom sitting

24   before a judge?
```

1    THE WITNESS:  Yes.

2    MR. JONES:  Have you ever taken or given a

3  deposition before?

4    THE WITNESS:  I have not.

5    MR. JONES:  Well, if it's okay by you, I would

6  like to go through a couple of ground rules and

7  understanding that will make today as easy as

8  possible.

9    First, we're taking today's deposition via

10  Zoom, but there is still a court reporter who is

11  here taking down everything that we have to say.

12  That is Victoria Rocks, who you see on our screen.

13    Because the court reporter has to take

14  everything down, I am going to ask that you don't

15  start answering a question until I am done asking it

16  even if you know exactly what I am going to say.  By

17  the same token, I am going to do my very best not to

18  interrupt you even if I know exactly what you're

19  going to say.  Does that sound okay?

20    THE WITNESS:  Yes.

21    MR. JONES:  Second, please answer audibly using

22  full words.  Don't make a gesture like a thumbs up

23  sign.  Don't say uh-huh or uh-uh.  That makes it

24  possible for the reporter to get it down cleanly and

Page 6

1  accurately relay what you're trying to communicate.

2  Can we agree on that?

3       THE WITNESS:  Yes.

4       MR. JONES:  If you don't understand one of the

5  questions I ask, ask me for a clarification.  If you

6  go ahead and answer a question, I'm going to assume

7  that you fully understood the question that I asked.

8  Does that sound like a fair arrangement?

9       THE WITNESS:  Yes.

10      MR. JONES:  Your attorney, Mr. Sigale, who is

11 here on this call from time to time might object to

12 questions that I ask or that somebody else asks and

13 that is okay.

14      However, unless he directs you not to answer

15 the question that is asked, you should go ahead and

16 answer that question.  Does that sound like a

17 reasonable arrangement?

18      THE WITNESS:  Yes.

19      MR. JONES:  You can take a break at any time

20 during this deposition.  Just let us know that you

21 need a short break.  My one request is if I have

22 asked a question, finish answering that question

23 before we take the break.  Is that okay?

24      THE WITNESS:  Yes.

                                                    Page 7

1        MR. JONES:  Do you understand the rules and the

2    arrangements I have just shared or do you have any

3    questions about them that you would like to ask at

4    this point?

5        THE WITNESS:  I understand.

6                    MARK WROBLEWSKI,

7    called as a witness herein, having been first duly

8    sworn, was examined upon oral interrogatories and

9    testified as follows:

10                   DIRECT EXAMINATION

11                   BY MR. JONES:

12       Q.   Today are you under the influence of

13   alcohol or any medication or substance that could

14   impair your ability to remember things accurately or

15   give truthful answers?

16       A.   No.

17       Q.   Is there any other reason that exists

18   today that might prevent you from testifying,

19   remembering and giving truthful answers?

20       A.   No.

21       Q.   Right now are you alone in the room you're

22   sitting in?

23       A.   Yes.

24       Q.   Will you agree to let me know if somebody

Page 8

1    enters the room that you are in right now during the

2    deposition?

3          A.   Yes.

4          Q.   And besides the Zoom app that is open on

5    your device, are there any other windows or

6    applications open on your screen?

7          A.   Yes.  I could close those.

8          Q.   Let me know when those are closed.

9          A.   Okay, they're all closed.

10         Q.   So you have no e-mail program open and no

11   web browser program open right now?

12         A.   Correct.

13         Q.   Do you have any applications on your

14   computer or your phone which would give you a

15   notification if you received a message even though

16   the app itself is closed?

17         A.   Nothing on my computer.  I do have my

18   phone is off to the side.  I have a smart watch on

19   my desk.  And the work phone next to me.

20         Q.   Would you be willing to turn off your

21   watch and your two phones for the duration of the

22   deposition?

23         A.   Yes.  The watch is off and work phone off.

24   I also have an ipad.  I'll turn that off too.  The

Page 9

1    ipad is off, and the other phone is off.

2        Q.    So there are no more devices open in your

3    vicinity right now, is that correct, or on in your

4    vicinity?

5        A.    Correct.

6        Q.    And do you have any hard copies of

7    documents visible to you right now?

8        A.    I do not.

9        Q.    Do you have any notes?  For example, notes

10   on a white board or anything like that visible to

11   you right now?

12       A.    I do not.

13       Q.    How did you prepare for the deposition

14   that you are giving today?

15       A.    I briefly discussed some rules of

16   engagement with my attorney yesterday and reviewed

17   previously submitted documents.

18       Q.    About how long was your conversation with

19   your attorney yesterday?

20       A.    About 40 minutes.

21       Q.    Is that the only conversation that you've

22   had with your attorney to prepare for this

23   deposition?

24       A.    Yes.

Page 10

1      Q.   You mentioned a second ago that you had
2    reviewed a couple of documents to prepare for the
3    deposition.  What documents were those?
4      A.   The statement I gave previously, the basic
5    questions there.  I believe it was the initial
6    complaint.  Excuse me if I mix up the technical
7    terms and then the owner's manual I submitted for
8    the concealed carry pistol I own.
9      Q.   And when you say the document you
10    submitted, are you talking about the declaration
11    that you submitted?
12      A.   Yes.
13      Q.   I think this would have been in December
14    of last year?
15      A.   Yes.
16      Q.   Did you review any other documents besides
17    those three in preparation for this deposition?
18      A.   No.
19      Q.   Did you speak to anybody at all besides
20    your attorney while preparing for this deposition?
21      A.   No.
22      Q.   Where do you reside?  What's your home
23    address?
24      A.   925 Naples Lane, Woodridge, Illinois

Page 11

1    60517.

2        Q.    Do you reside with anyone else?

3        A.    My parents.

4        Q.    And what are their names?

5        A.    Mark Wroblewski and Debra Wroblewski.

6        Q.    How long have you resided at that

7    location?

8        A.    Twenty-six years.

9        Q.    Have you resided with your parents at that

10   location that entire time?

11       A.    Yes.

12       Q.    Have you lived with anyone at that

13   location besides your parents over those 26 years?

14       A.    My sister.

15       Q.    When did you reside with your sister at

16   that location?

17       A.    She just moved out about a month ago.

18       Q.    When did she start residing there?

19       A.    24 years ago.

20       Q.    How old are you?

21       A.    30.

22       Q.    When is your birthday?

23       A.    December 30, 1992.

24       Q.    What's the highest level of education you

1  have right now?

2      A.   A bachelors degree.

3      Q.   When did you earn your bachelors degree

4  and from where?

5      A.   I believe it was 2017 from SIU.

6      Q.   What was your degree in?

7      A.   Automotive technology.

8      Q.   I take it you graduated from high school

9  prior to that, right?

10      A.   Correct.

11      Q.   When did you graduate from high school and

12  from which high school did you graduate?

13      A.   2011 from Marist.

14      Q.   What town is Marist in?

15      A.   Chicago.

16      Q.   Do you hold any degrees besides the high

17  school and college degrees that you just shared with

18  us?

19      A.   A bachelors or associates from Moraine

20  Valley.

21      Q.   Moraine Valley Community College?

22      A.   Yes.

23      Q.   And what town is Moraine Valley Community

24  College in?

Page 13

1      A.    I don't remember.

2      Q.    When did you earn that associates degree?

3      A.    I believe 2015.

4      Q.    What was that associates degree in?

5      A.    Also automotive technology.

6      Q.    Working backwards, can you share your

7  employment history with us starting now and going

8  back to when you graduated high school?

9      A.    Yes.  I worked at Cycles and Sports in

10 Worth, Illinois.  And then during my time at SIU, I

11 had an internship at Robert Bosch, LLC, and I have

12 continued working there ever since.

13     Q.    Excuse me if I get the name wrong.  What

14 period were you working at Cycles and Sports?

15     A.    It's been a while.  2013 through 2015.

16     Q.    What did you do there?

17     A.    Sales associate, bike mechanic.

18     Q.    And you had roughly the same

19 responsibilities over the entire duration of that

20 employment, is that correct?

21     A.    Correct.

22     Q.    During your time at Bosch LLC, when did

23 you start that employment?

24     A.    June 2015.

```
                                        Page 14

1        Q.   What has been your responsibilities there

2    during the period in which you've had that

3    employment?

4        A.   I started off as an intern in the diesel

5    marketing group and intern for product management.

6             I was hired full time in 2017, I

7    believe, as a full-time product manager for the

8    diesel marketing team.  And then in 2020, I switched

9    over to our technical support group as a product

10   support manager.

11       Q.   You're still employed there, right?

12       A.   Correct.

13       Q.   And you still have -- that last role is

14   the role you hold today?

15       A.   Correct.

16       Q.   Besides the two places of employment you

17   shared, have you had any other employment since high

18   school?

19       A.   I have not.

20       Q.   Have you ever been a plaintiff in another

21   lawsuit?

22       A.   No.

23       Q.   Have you ever been a defendant in another

24   lawsuit?
```

Page 15

1        A.    No.

2        Q.    Have you ever been a witness in another

3   lawsuit?

4        A.    No.

5        Q.    Have you ever been involved in another

6   lawsuit in any way perhaps by being a juror or any

7   other capacity?

8        A.    No.

9        Q.    What are you hoping to achieve with the

10  suit that you filed that brought us here today?

11       A.    I would like to be able to conceal carry

12  for public transport in Illinois.

13       Q.    When you use the term public transport

14  what do you mean by that term?

15       A.    Any transportation that receives public

16  funding through the State.

17       Q.    So you're not seeking to carry on any

18  transportation that does not have public funding

19  from the State?

20       MR. SIGALE:   I object as to the form of the

21  question, but you can go ahead and answer, Mark.

22       THE WITNESS:   No.

23  BY MR. JONES:

24       Q.    Is Metra a form of public transportation?

Page 16

1        A.    Yes.

2        Q.    Is the CTA a form of transportation as you

3    use the term?

4        A.    Yes.

5        Q.    Is Lyft, the ride service, a form of

6    public transportation as you use the term?

7        A.    No.

8        Q.    Is Amtrak a form of public transportation

9    as you use the term?

10       A.    Yes.

11       Q.    Is Greyhound, the bus service, a form of

12   public transportation as you use the term?

13       A.    No.

14       Q.    Can you list any other forms of public

15   transportation in Illinois that are included as you

16   use the term in the term public transportation?

17       MR. SIGALE:  I am going to object to the extent

18   that ultimately this is all legal conclusions if

19   something is public or it isn't.  But go ahead and

20   answer.

21       THE WITNESS:  No.

22   BY MR. JONES:

23       Q.    So you are not aware of any other forms of

24   public transportation that I haven't listed just

```
                                              Page 17
 1   now?
 2        A.    No.
 3        Q.    You are or you are not aware?
 4        A.    I am not aware.
 5        Q.    Is there anything else that you hope to
 6   achieve out of this lawsuit that we haven't covered
 7   yet?
 8        A.    No.
 9        Q.    Did you approve the filing of the
10   complaint in this lawsuit?
11        A.    Yes.
12        Q.    And you reviewed it before you approved
13   it, right?
14        A.    Yes.
15        Q.    And everything in there is true as far as
16   you know, right?
17        A.    Yes.
18        Q.    Who is Benjamin Schoenthal?
19        A.    I believe he is the originator of the
20   lawsuit and the named plaintiff.
21        Q.    Have you ever met Benjamin Schoenthal?
22        A.    I have not.
23        Q.    Have you ever spoken to Benjamin
24   Schoenthal?
```

```
                                                     Page 18
 1        A.    No.
 2        Q.    Have you to your knowledge been in the
 3   same room as Benjamin Schoenthal?
 4        A.    No.
 5        Q.    Have you communicated in any way in your
 6   life with Benjamin Schoenthal?
 7        A.    No.
 8        Q.    Who is Douglas Winston?
 9        A.    Another plaintiff in the case.
10        Q.    Have you met Douglas Winston?
11        A.    I have not.
12        Q.    Have you communicated in your lifetime in
13   any way with Mr. Doug Winston?
14        A.    I have not.
15        Q.    Do you know who Joseph Vessel is?
16        A.    I believe another plaintiff in the case.
17        Q.    Have you ever met Joseph Vessel?
18        A.    I have not.
19        Q.    Have you ever communicated in any way in
20   your lifetime with Joseph Vessel?
21        A.    I have not.
22        Q.    So you have never interacted in any way
23   with any of your coplaintiffs, is that right?
24        A.    Correct.
```

Page 19

1      Q.   Have you ever tried?

2      A.   No.

3      Q.   Have you ever wanted to?

4      A.   No.

5      Q.   Have you ever been convicted of a felony?

6      A.   No.

7      Q.   Have you ever been accused of a felony?

8      A.   No.

9      Q.   Have you ever been convicted of a

10   misdemeanor?

11     A.   No.

12     Q.   Have you ever been accused of a

13   misdemeanor?

14     A.   No.

15     Q.   Are you sure?

16     A.   Yes.

17     Q.   Did you pay the fee required to obtain a

18   FOID card?

19     A.   Yes.

20     Q.   When did you pay it?

21     A.   I believe my renewal came due in January

22   of 2023.

23     Q.   How much did you pay?

24     A.   I don't remember.

Page 20

1      Q.   Have you ever had a beer?

2      A.   Yes.

3      Q.   Have you ever had any other alcoholic

4   beverages?

5      A.   Yes.

6      Q.   Have you ever driven a car within an hour

7   of drinking an alcoholic beverage?

8      A.   Yes.

9      Q.   When did that happen?

10      A.   I don't remember.

11      Q.   Do you have a guess, an estimate?

12      MR. SIGALE:  Object as to form, but you could

13   answer.

14      THE WITNESS:  Three years ago.

15   BY MR. JONES:

16      Q.   Is that the only time in your life that

17   you've had an alcoholic beverage and then driven

18   within one hour?

19      A.   No.

20      Q.   What other times have you had an alcoholic

21   beverage and then driven within an hour?

22      A.   I don't remember.

23      Q.   Could you estimate when it might have

24   occurred?

Page 21

1        MR. SIGALE:  Objection.  Go ahead and answer if

2    you can.

3        THE WITNESS:  Prior to that, three years ago.

4    BY MR. JONES:

5        Q.    How many times do you think it occurred?

6        A.    Less than five.

7        Q.    Less than five, but more than three?

8        A.    No.

9        Q.    More than two?

10       A.    Yes.

11       Q.    So about two to three times to your memory

12   you've had an alcoholic beverage and then driven

13   within one hour?

14       A.    Yes.

15       Q.    Where did you drive?

16       A.    Back home.

17       Q.    From where?

18       A.    From a friend's house.

19       Q.    How many drinks had you had driving?

20       A.    None while driving.

21       Q.    Before driving, how many drinks had you

22   had?

23       A.    One.

24       Q.    Only one?

Page 22

1          A.    Yes.

2          Q.    On all of those occasions?

3          A.    Yes.

4          Q.    You recall that you are under oath right

5     now?

6          A.    Yes.

7          MR. SIGALE:  Objection.

8     BY MR. JONES:

9          Q.    Have you ever smoked marijuana?

10         A.    No.

11         Q.    Not in your entire life?

12         A.    No.

13         Q.    Have you ever used heroin?

14         A.    No.

15         Q.    Have you ever used cocaine?

16         A.    No.

17         Q.    Have you ever used any prescription

18    opioids?

19         A.    One time after a surgery.

20         Q.    Did you have a prescription for those

21    opioids at the time you took them?

22         A.    Yes.

23         Q.    Have you ever used methamphetamine?

24         A.    No.

Page 23

1     Q.   Have you ever used any other controlled

2  substance?

3     A.   No.

4     Q.   Have you ever been subject to an order of

5  protection or no contact or no stalking?

6     A.   No.

7     Q.   What was the opioid that you had a

8  prescription for?

9     A.   I don't remember.

10     Q.   When did that happen?  When did you have

11  that prescription, approximately?

12     A.   Around Memorial Day of 2015.

13     Q.   Have you ever been accused of battery,

14  assault, aggravated assault or the violation of an

15  order of protection?

16     A.   No.

17     Q.   I take it you have also never been

18  convicted of any of those things, right?

19     A.   Correct.

20     Q.   Have you been accused or convicted of

21  anything similar?

22     A.   No.

23     Q.   Are you a United States citizen?

24     A.   Yes.

Page 24

1      Q.    Were you born a United States citizen or
2  are you naturalized?
3      A.    I was born.
4      Q.    Have you ever failed a drug test of any
5  kind whether given by a government agency or an
6  employer?
7      A.    No.
8      Q.    Have you ever failed a drug test of any
9  kind other than the two that I just described?
10     A.    No.
11     Q.    Are you a fugitive from justice?
12     A.    No.
13     Q.    Good.  Have you ever been adjudicated as
14 mentally defective?
15     A.    No.
16     Q.    Have you ever been a patient in a mental
17 institution or a medical facility that provides
18 treatment for mental health issues?
19     A.    No.
20     Q.    Are you intellectually disabled?
21     A.    No.
22     Q.    Are you developmentally disabled in any
23 way?
24     A.    No.

Page 25

1      Q.   Have you ever been adjudicated by a court

2  as being mentally defective or ordered by a court to

3  participate in any treatment whatsoever for mental

4  health issues?

5      A.   No.

6      Q.   Have you ever been arrested?

7      A.   No.

8      Q.   Have you ever driven under the influence?

9      A.   No.

10     Q.   You shared a couple of minutes ago that on

11  approximately three occasions you had driven within

12  an hour of having a drink, and you don't consider

13  yourself to have been under the influence when you

14  did that?

15     A.   No.

16     Q.   Why not?

17     A.   I don't believe I would have been above

18  the legal limit while driving.

19     Q.   What is the basis for your belief?  Did

20  you take a test of any kind?

21     A.   No.

22     Q.   Did you inquire into that issue in any way

23  that was objective or it was your feeling that you

24  were not under the influence?

Page 26

```
 1        A.    Just a feeling.

 2        Q.    Did anyone witness you doing this?

 3        A.    Yes.

 4        Q.    What are their names?

 5        A.    Matt and Corey.

 6        Q.    What are their last names?

 7        A.    Matt Burkes and Corey Widecki.

 8        Q.    Where do they reside?

 9        A.    At the time, Chicago Ridge.

10        Q.    How do you know them?

11        A.    One I met through high school, and one I

12   met through working at the bike shop.

13        Q.    Can you share the most recent contact

14   information you know of for both of those

15   individuals?

16        A.    I can.

17        Q.    Can you do so right now?

18        A.    No, I don't remember their phone numbers

19   without my phone.

20        Q.    Are you subject to a pending arrest

21   warrant?

22        A.    No.

23        Q.    Have you ever been investigated for any

24   reason by a government office?
```

Page 27

1      A.    No.

2      Q.    Have you ever been to a residential

3  treatment program for alcoholism or alcohol use?

4      A.    No.

5      Q.    Have you ever gone to a residential

6  treatment program for drug use of any kind?

7      A.    No.

8      Q.    Have you ever been ordered to get

9  treatment for alcohol use or drug use?

10     A.    No.

11     Q.    Have you ever interacted with a law

12 enforcement officer?

13     A.    Yes.

14     Q.    When did you do that, most recently?

15     A.    2017.

16     Q.    What were the circumstances surrounding

17 that interaction?

18     A.    Traffic stop.

19     Q.    What was the purpose of the traffic stop

20 or what circumstances gave rise to, I presume, you

21 being stopped?

22     A.    Speeding.

23     Q.    What speed were you going?

24     A.    35.

1      Q.    What was the posted legal limit?

2      A.    I believe 25.

3      Q.    Did you get a ticket for that stop?

4      A.    Yes.

5      Q.    Did you pay the ticket?

6      A.    Yes.

7      Q.    You did not contest the ticket?

8      A.    No.

9      Q.    Have you ever taken firearm training?

10     A.    Yes.

11     Q.    What firearms training have you taken?

12     A.    The conceal carry class four, Illinois.

13     Q.    Can you share when that happened?

14     A.    I believe the most recent time was October

15  of 2022.

16     Q.    We will go back to that in one moment.

17  Can you share any other firearms trainings that you

18  participated in?

19     A.    That is the only one.

20     Q.    You said you've taken it multiple times or

21  did I mishear that?

22     A.    Yes, multiple times.

23     Q.    How many times have you taken it?

24     A.    I took it originally to get my license and

Page 29

1    then the renewal class.

2         Q.   You shared the most recent one was

3    approximately October of 2022.  Do you have an

4    approximate date for the first one?

5         A.   I believe that would have been around

6    2017.

7         Q.   Do you have an estimate of what month in

8    2017?

9         A.   I do not.

10        Q.   What information, what skills are covered

11   in these trainings or were covered in the trainings

12   you took?

13        A.   It was classroom, places you can carry.

14   Firearm safety.  What to do in case you had to use

15   your firearm.  And then after that, it was another

16   day of firearms range training.  I had to

17   demonstrate proficiency at five, seven, ten yards.

18        Q.   Who provided training?  Who was the

19   trainer, was it a company or individual?

20        A.   The original training the company was

21   known as Shoot Point Blank.  They have now become

22   Range USA.  And that is who provided the training.

23        Q.   Both of those trainings were provided by

24   the same entity, although it had changed its name?

Page 30

1      A.   Correct.

2      Q.   Do you recall who the specific trainer was

3  who trained you?

4      A.   I do not.

5      Q.   How many trainers were there?

6      A.   One for both, but it was a different

7  trainer.

8      Q.   So I take it I think I just heard you

9  share that it included a live fire component, right?

10      A.   Correct.

11      Q.   Do you recall about how many hours you

12  took those trainings was?

13      A.   I believe the original was 16, and the

14  renewal was 8.

15      Q.   And you completed all of those hours,

16  right?

17      A.   Correct.

18      Q.   Did you cover firearm safety?

19      A.   Yes.

20      Q.   Did both of them cover firearm safety?

21      A.   Both.

22      Q.   Did either or both training cover the

23  care, cleaning, loading and unloading of a firearm?

24      A.   Yes.

Page 31

1  Q. Both?

2  A. Both.

3  Q. Did either or both trainings cover the

4 applicable state and federal laws relating to

5 ownership, storage, carry and transport of a

6 firearm?

7  A. Yes, both.

8  Q. They both did, great.  And just to

9 clarify, did both contain a live fire component or

10 just one?

11  A. Yes, both.

12  Q. Did both trainings cover the lawful and

13 appropriate interactions with a law enforcement

14 officer by a person carrying a concealed firearm?

15  A. Yes, both.

16  Q. And I take it you successfully completed

17 boats trainings and were certified to complete both

18 trainings, is that correct?

19  A. Yes.

20  Q. I am going to go ahead and share a

21 document in a moment.  Let me know when you are able

22 to see it, okay, Mr. Wroblewski?

23  A. Yes.

24  Q. Are you able to see the document I'm

Page 32

1    sharing?

2         A.    Yes.

3         Q.    I am going to scroll.  Let me know if you

4    have trouble seeing it or if you need me to scroll

5    more slowly.

6              I'm going to scroll down to the bottom

7    and highlight some numbers.  Do you see that it's

8    labeled with a number ending in 15, this page?

9         A.    Yes.

10        Q.    I'm going to scroll back up.  Take all the

11   time you need to look at what I'm sharing.  What is

12   this?

13        A.    My FOID card application.

14        Q.    Looking at the FOID card application right

15   now, is everything here accurate or do you see

16   anything that is not accurate?

17        A.    It's all accurate.

18        Q.    You don't see anything here that is

19   incorrect?

20        A.    No.

21        Q.    I am scrolling down to the next page, the

22   one ending with a number ending in 16, do you see

23   that?

24        A.    Yes.

Page 33

1       Q.    Do you know what this is?

2       A.    That is the same information that is on

3   the back of my FOID card.

4       Q.    And it says here that it was digitally

5   signed by you.  Do you recall signing it?

6       A.    Yes.

7       Q.    And this appears to be the certification

8   you signed, is that correct?

9       A.    Yes.

10      Q.    I'm going to scroll down now a little

11  further.  Let me know if you are able to see it.  I

12  am going to share a document with you with a bates

13  stamp at the bottom ending in 18.

14            Do you see that?

15      A.    Yes.

16      Q.    And what is this?  Take the time you need.

17      A.    Other details of my FOID card application.

18      Q.    If I highlight at the top, do you see it

19  says CCL application?

20      A.    Yes.

21      Q.    So this is your concealed carry license

22  application.  Is that accurate?  Do you agree with

23  that?

24      A.    Yes.

Page 34

1          Q.    Taking a look at this, does everything

2     here appear to be accurate?

3          A.    Yes.

4          Q.    It says at the top here that your renewal

5     is under review.  Do you see that?

6          A.    Yes.

7          Q.    Has your renewal been completed?

8          A.    Yes.

9          Q.    How do you know that your renewal has been

10    completed?

11         A.    I got an e-mail from the Illinois State

12    Police as well as an updated FOID card.

13         Q.    Did you provide that e-mail in discovery?

14         A.    I did not.

15         Q.    Did you ever turn it over to your lawyer

16    to be provided in discovery?

17         A.    No.

18         Q.    Are there any other e-mails you've gotten

19    related to your applications that you have turned

20    over to your lawyer for production in discovery?

21         A.    No.

22         Q.    Are there any e-mails you've gotten that

23    you have not turned over to your lawyer for

24    production in discovery?

Page 35

1      A.   No.

2      Q.   So that is the only e-mail that you did

3  not provide to your lawyer for production in

4  discovery?

5      MR. SIGALE:  I am going to object.  I don't

6  recall off the top of my head at least that such a

7  thing was requested.  With that said, go ahead and

8  answer the question.

9      THE WITNESS:  Can you repeat the question.

10 BY MR. JONES:

11     Q.   Are there any other e-mails that you got

12 relating to your FOID or your CCL applications that

13 you didn't give to your lawyer for production in

14 discovery?

15     A.   No.

16     Q.   That is the only one?

17     A.   Correct.

18     Q.   Again, you have seen nothing on the

19 document I'm sharing with you right now that is

20 incorrect and, again, take the time you need to

21 double check.

22     A.   Correct.

23     Q.   Are you a medical marijuana patient

24 registry card holder?

Page 36

1     A.    No.

2     Q.    I am going to pause share.  Has that share

3  come down off of the screen or no?

4     A.    Yes.

5     Q.    Do you own any firearms?

6     A.    Yes.

7  ██  ███████████████████

8  ██  ███████████████████████

9  ██  ████████████████████████████

10    MR. SIGALE:  I object to the extent of

11  relevance anything that isn't a concealable firearm.

12       Beyond that, I'm going to invoke the

13  confidentiality of this case with regard to the

14  information that is given regarding Mr. Wroblewski's

15  firearms.

16       With that said, Mark, go ahead and answer the

17  question.

18    THE WITNESS:  Are you looking for manufacturer,

19  models?

20  BY MR. JONES:

21    Q.    Sure.  Why don't you list out what models

22  you own right now?

23    A.    ███████████████████████

██  ████████████████████████████



[redacted]

Page 38

1 ████████ ████████████ █████████████

2 ██████████████████████████

3     Q.   When did you acquire your first firearm

4 and which one of these was it, to the extent you

5 still own it?

6     A.   ██████████████████████████

7 ██████

8     Q.   Do you recall where you acquired it from?

9     A.   Mega Sports.

10     Q.   In which town?

11     A.   Plainfield.

12     Q.   ██████████████████████████

█ ████████████████████████████████

█ ████████████████████████████████

█     ██   █████████████

█     ██   █████████████████████

█     ██   ██████████████████████

█     ██   ██████████████████████

█ ██████████

█     ██   █████████████

█     ██   ████████████████████████

█ ███████████

█     ██   ███████████████████

█     ██   ██████████████████████

Page 39



```
 1        A.    My father.
 2        ██    ██████████████
 ██       ██    ████
 ██       ██    ██████████████████████████████████
 ██       ██    ██████████████████████████████████
 ██    ████████ ██████████████████████████████
 ██       ██    ███████████████████████████████████
 ██    ██████████████████████████████████
 9        A.    I believe before.
10        Q.    How long before?
11        A.    Maybe 2013.
12        Q.    ████████████████████████
 ██       ██    █████████████████
 ██       ██    ██████████████████████████████████
 ██    ██████████████████████
16        A.    Christmas.
17        Q.    For Christmas?
18        A.    Yes.
19        ██    ███████████████████████████████
 ██    ██████████████████████████████████████
 ██       ██    ██████████
 ██       ██    ███████████████████████████████
 ██    ██████████████████████████████
 ██       ██    █████████████████████
```

Page 40

8   Q.   How much do you make per year?

9   MR. SIGALE:  I am objecting to relevance.

10  BY MR. JONES:

11  Q.   Can you say that one more time, your

12  attorney was speaking when you said it?

13  MR. SIGALE:  The same objection.

14  THE WITNESS:  $88,000.

15  BY MR. JONES:

16  Q.   How long have you made that income?

17  A.   One year.

18  Q.   What did you make prior to a year ago?

19  A.   I believe $86,000.

20  Q.   How long had you made $86,000 for?

21  A.   One year.

22  Q.   Prior to that?

23  A.   I believe $83,000.

24  Q.   So generally correct me if I'm wrong.

Page 41

1   These steps have been what I'll characterize as sort

2   of annual cost of living increases for your

3   employment at Bosch.  Is that basically right?

4       A.   Correct.

5       Q.   And what was your starting employment when

6   Bosch first hired you as a nonintern, so as a full-

7   time employee?

8       A.   $60,000.

9       Q.   About $60,000?

10      A.   Yes.

11      Q.   Have you ever fired a firearm at someone

12  else?

13      A.   No.

14      Q.   Have you ever brandished a firearm at

15  someone else?

16      A.   No.

17      Q.   Have you ever considered due to feeling

18  that you were in a dangerous situation either

19  brandishing or firing a firearm at someone else?

20      A.   No.

21      Q.   Never?

22      A.   Correct.

23      Q.   A little bit ago, you shared that one of

24  the goals or the goal of this case was so that you

1  could bear a firearm on public transportation as you

2  understand it.  Is that about right?

3      A.   Correct.

4      Q.   Why do you want to bear a firearm on

5  public transportation?

6      A.   To provide an additional feeling of

7  security when using public transport.

8      Q.   Why do you need an additional feeling of

9  security while using public transport?

10      A.   What was that?

11      Q.   Why do you personally feel the need?  Why

12  do you feel that?

13      A.   Seeing news articles, things like that,

14  whether it's on the television or in social media of

15  people being attacked or robbed using public

16  transportation or being in the city.

17      Q.   So prior to seeing those news articles,

18  you had not felt the need to carry a firearm on

19  public transit?

20      A.   I guess I have always lived in the

21  suburbs, and the city has kind of always been known

22  as a more dangerous place to be.

23      Q.   What makes the city a more dangerous

24  place?

Page 43

```
 1      A.    Just the additional crime and tight
 2   borders of the city.
 3      Q.    So you don't feel that same fear in the
 4   suburbs, is that right?
 5      A.    Not to the same extent.
 6      Q.    To what extent do you feel it?
 7      A.    Enough that I feel the need to conceal
 8   carry.
 9      Q.    So you feel the need to conceal carry in
10   the suburbs too or just the city?
11      A.    Both.
12      Q.    What news articles -- you shared that news
13   articles have made you feel this way, though, right?
14      A.    Correct.
15      Q.    About the city or also about the suburbs?
16      A.    Both.
17      Q.    What makes you so afraid of the suburbs?
18   What is it about the suburbs that is giving you this
19   fear?
20      A.    Again, similar articles.  Especially, I
21   believe 2019 to 2020, those summers when there were
22   riots even in places like downtown Naperville.
23      Q.    And what riots in downtown Naperville are
24   you talking about?  Who were participating in those
```

Page 44

1  riots?

2      A.   I believe those were the riots in response

3  to the death of George Floyd and the BLM riots.

4      Q.   What about those riots was terrifying to

5  you?

6      MR. SIGALE:  I am going to object to the form

7  of the question.  You could answer.

8      THE WITNESS:  Just the fact that people were

9  rioting, threatening people, destroying public

10  property.

11  BY MR. JONES:

12      Q.   If they had been carrying firearms, would

13  you have felt better about those riots?

14      A.   If the rioters had been?

15      Q.   Yes, if they had been exercising their

16  Second Amendment rights?

17      A.   No.

18      Q.   Why not?

19      A.   Because they're clearly showing their

20  willingness to do harm against people not breaking

21  the law or that had done nothing to invoke that

22  response.

23      Q.   How were they showing that willingness

24  that you are describing?

Page 45

1      A.   Well, in that case they were not bearing

2  firearms, but by damaging public property, smashing

3  windows, burning cars.

4      Q.   Do you recall how many cars got burned?

5      MR. SIGALE:  Objection, speculation.

6  Foundation.  I don't even know what quote, unquote

7  riot we're even talking about.

8      MR. JONES:  Mr. Sigale, please stop coaching

9  your witness.  It was not speculation.  It was a

10  question about what he recalled about riots he

11  testified to.

12      MR. SIGALE:  I wasn't coaching him.  I was

13  stating an objection.  I told him he could answer.

14  BY MR. JONES:

15      Q.   Do you recall how many cars were burned in

16  those what you characterized as riots?

17      A.   No.

18      Q.   Do you recall if any cars were burned and

19  if so, where they were?

20      A.   I don't believe any were burned in

21  Naperville.  I don't know if any were burned in the

22  City of Chicago.

23      Q.   So you don't actually recall whether any

24  cars were burned, isn't that right?

Page 46

1      A.   Correct.

2      Q.   Who were participating in these events

3  that you were describing?  You said it was BLM,

4  right?

5      A.   Some of them and additional supporters.

6      Q.   What is BLM?

7      A.   Black Lives Matter.

8      Q.   And what is Black Lives Matter?

9      A.   It was just a group of people who wanted

10  to insure that the rights of black people in the

11  U.S. were respected as other races.

12      Q.   Do you have any problem with them

13  participating in these events?

14      A.   No.

15      Q.   And yet you specifically identify them as

16  the ones who were rioting, isn't that right?

17      A.   Yes.

18      Q.   Why did you make that identification then?

19      A.   They were the people rioting.

20      Q.   But you don't recall if they burned any

21  cars, right?

22      A.   Correct.

23      Q.   Then on what basis do you think they were

24  rioting?  What did they do?

Page 47

1      A.    The broken windows, damages to property.
2   Small businesses.
3      Q.    How do you know that BLM, as you say, was
4   the group that did any of that damage?
5      A.    News articles.
6      Q.    What news articles?
7      A.    I don't recall specifically.
8      Q.    Do you recall who published those news
9   articles?
10     A.    No.
11     Q.    So you don't really remember what basis
12  you have for thinking that BLM caused any of this
13  damage?
14     A.    Correct.
15     Q.    No basis at all that you could share with
16  us?
17     A.    I guess social media posts, but I can't
18  remember the specific people who published it.
19     Q.    Aside from fear of BLM rioting, do you
20  have any other reason that you would want to travel
21  on public transit while carrying a firearm?
22     A.    Yes.  The muggings, other shootings that
23  have happened within the city.  Violent attacks.
24     Q.    I'm going to share another document in a

Page 48

1    moment, Mr. Wroblewski.  If you could let me know

2    when you're able to see it.

3                    Is that coming through for you?

4         A.   Yes.

5         Q.   I'm going to scroll through it.  Do you

6    recognize what I'm showing you?

7         A.   Yes, that is my declaration.

8         Q.   And is that the declaration that you

9    shared a little bit ago that you had reviewed before

10   this deposition?  Is that the same one?

11        A.   Yes.

12        Q.   I'm going to scroll down.  Let me know if

13   you would like me to pause.  I'm happy to do that.

14   Is everything in this correct and accurate?

15        A.   Yes.

16        Q.   Is there anything in here that you would

17   want to let us know needs to be changed right now?

18        A.   No.

19        Q.   I'm on the third page of your declaration.

20   That is your signature, right?

21        A.   Yes.

22        Q.   You mentioned here that you ride Metra

23   from your home in the suburbs to Chicago a few times

24   per year.  That is still accurate, right?

Page 49

1    A.   Yes.

2    Q.   You don't have any plans to ride any other

3    public transit system, is that right?

4    A.   I would like to be able to use the bus and

5    Els in the city when I get there, but that is not

6    something I feel comfortable doing at the moment.

7    Q.   Aside from the buses and Els in the City

8    of Chicago and the Metra, do you have any intent to

9    ride any other public transit system?

10   A.   No.

11   Q.   I am going to take that off.  Has it come

12   down?

13   A.   Yes.

14   Q.   How did you get involved in this lawsuit?

15   A.   I saw a social media post from the Firearm

16   Policy Coalition asking for potential witnesses.

17   Q.   When did you see the social media post you

18   just referenced?

19   A.   Sometime in 2022.

20   Q.   Do you recall what portion of 2022 it was?

21   A.   I do not.

22   Q.   Was it early in 2022 or somewhat deeper

23   into the year?

24   A.   I don't recall.

Page 50

1      Q.   You do recall it was from FPC, the

2   Firearms Policy Coalition, right?

3      A.   Yes.

4      Q.   What did the post say?

5      A.   It was just asking for people who live in

6   Illinois that ride public transportation, if they

7   were willing to be a witness in this lawsuit.

8      Q.   And do you recall what social media

9   platform it was on?

10     A.   Instagram.

11     Q.   Did you see the same post anywhere else or

12  that is the only place you saw it?

13     A.   It's the only place I saw it.

14     Q.   What did you do next?

15     A.   I contacted FPC using the information they

16  provided.

17     Q.   Was it an e-mail or phone call?

18     A.   I believe e-mail.

19     Q.   What did you say to them?

20     A.   I live in Illinois.  I occasionally ride

21  public transportation, and I was willing to

22  participate.

23     Q.   What happened next?  Did they contact you?

24     A.   Yes.

Page 51

1      Q.    When did they contact you, about how long
2   after you sent that message did they contact you?
3      A.    I believe around a month.
4      Q.    Did you have a phone call or was there
5   another e-mail message?
6      A.    Phone call.
7      Q.    Do you remember who called you?
8      A.    I can't recall his name.
9      Q.    Do you recall it was a male, though?
10     A.    Yes.
11     Q.    Do you recall that person's job, if they
12  identified it?
13     A.    I do not.
14     Q.    What did that person tell you on that
15  call?
16     A.    He explained to me a little bit of what
17  FPC was trying to do, and he wanted to know a little
18  more about myself.
19     Q.    How did he explain?  What did he tell you
20  about what FPC was trying to do?
21     A.    Basically FPC felt that the rule in
22  Illinois or specifically Chicago about banning carry
23  on on public transport was unconstitutional, and
24  they would like to attempt to overturn that.

Page 52

1    Q.    Did he share with you anything else?

2    A.    No.

3    Q.    What did you share with him?

4    A.    My job.  Who I am.  That was all.

5    Q.    Any other details or that is really it?

6    A.    That was all.

7    Q.    And did you ever hear from him again after

8  that?

9    A.    I believe one more phone call.

10   Q.    When did that happen?

11   A.    I think a month after the first one as

12  well.

13   Q.    What was the content of that second phone

14  call?

15   A.    Just a little bit further details

16  explaining that they would like me to be a witness,

17  and the responsibilities and a little more

18  background information about myself.

19   Q.    And can you recall any more detail about

20  what they shared in that phone call?

21   A.    That was really all.

22   Q.    So what happened next in the process?

23   A.    I agreed and started with the proceedings.

24   Q.    Tell us a little more about what you mean

Page 53

1    by started with the proceedings.  What happened

2    next?

3          A.    I had to agree to be part of a lawsuit, so

4    sending me documents, things like that.  And after

5    that, it's providing the declaration and photos of

6    the FOID and driver's license along with a picture

7    of the concealed carry firearm I have.

8          Q.    You mentioned a second ago that you signed

9    documents, right?

10         A.    Yes.

11         Q.    What documents did you sign?

12         A.    I don't know that I can recall all of them

13   but the declaration.  I believe my agreement to meet

14   prior to the lawsuit.

15         Q.    The declaration we're talking about is, of

16   course, the one we just looked at?

17         A.    Correct.

18         Q.    And not any other declaration that you

19   remember?

20         A.    Correct.

21         Q.    You mentioned also the agreement to be

22   part of the lawsuit, right?

23         A.    Yes.

24         Q.    What does that agreement say?  Could you

Page 54

1  summarize the contents of that agreement?

2      A.   Just agreeing that I am aware of what I'm

3  doing.  I'm making a choice to be part of this

4  lawsuit on my own.  Not to talk with people outside

5  of the lawsuit.  I think that was the main points.

6      Q.   And the person you signed that agreement

7  with, is that David Sigale, the lawyer who is here

8  today or was it someone else?

9      A.   Yes, it was David.

10     Q.   Was anyone else a counter party to that

11  agreement or no?

12     A.   I don't recall.

13     Q.   Do you recall seeing any other signatures

14  besides David's upon the agreement?

15     A.   No.

16     Q.   So there was only one?

17     A.   Yes.

18     Q.   And he was signing as an attorney or in

19  some other capacity?

20     A.   As an attorney.

21     Q.   So you were hiring him with this

22  agreement, is that basically right?

23     A.   Yes.

24     Q.   Are you paying him?

Page 55

1       A.    No.

2       Q.    Why not?

3       A.    The lawsuit is going through the Firearms

4    Policy Coalition.

5       Q.    Can you say that one more time?

6       A.    The Firearms Policy Coalition is

7    sponsoring it.

8       Q.    What does that mean when you say the

9    Firearms Policy Coalition is sponsoring the lawsuit,

10   what does that mean?

11      A.    They are providing the funding for the

12   legal fees.

13      Q.    And they're covering all the funding?

14      A.    Yes.

15      Q.    You don't pay anything, right?

16      A.    Yes.

17      Q.    Could you ever pay something?  Is there

18   any circumstance in which you may have to pay any

19   fees associated with this lawsuit?

20      A.    If I knowingly do something that would

21   harm the case, and I get dismissed.

22      Q.    Knowingly do something that would harm the

23   case and say the last portion again?

24      A.    And be dismissed as a witness.

Page 56

1      Q.   Who decides if you are knowingly doing
2  something that could harm the case, is that
3  Mr. Sigale or someone else?
4      A.   No.  From my understanding, it would be
5  the court if I commit a felony or some other action
6  that would no longer allow me to carry a firearm.
7      Q.   So moving back a little bit, what does it
8  mean to you -- does the phrase knowingly do
9  something that would harm the case mean anything
10  else besides committing a felony or no?
11      A.   Not to my knowledge.
12      Q.   So if you refused to come to the
13  deposition today, would that be knowingly doing
14  something to harm the case or no?
15      A.   Yes.
16      Q.   So it's more than just committing a felony
17  I guess or what do you think?
18      A.   Yes.
19      Q.   What other actions do you think might fall
20  into that category?
21      MR. SIGALE:  I object as to calling for
22  speculation.  You could answer, Mark.
23      THE WITNESS:  I guess in that case, I had
24  already agreed to my cooperation to be part of this

Page 57

```
 1   case.  And an example, anytime I decide not to
 2   cooperate, even though I previously agreed.
 3   BY MR. JONES:
 4       Q.   What if you disagree about the case
 5   strategy?  What if you have a perspective on what
 6   the case strategy should be, but the Firearms Policy
 7   Coalition says it should be something else.
 8            Would that qualify?
 9       A.   I'm not an attorney.  So I am letting them
10   proceed.
11       Q.   Sure, but what do you think?
12       A.   No.
13       Q.   Why not?
14       A.   Because I think in that case if it's
15   something I disagree with that wasn't previously
16   brought up, I think we have a difference of opinion
17   and that is not something I intentionally did to
18   harm the case.
19       Q.   So if you tell David Sigale to do
20   something, and the Firearms Policy Coalition says he
21   shouldn't do it, who wins in your view?
22       MR. SIGALE:  Objection, calls for a conclusion.
23   Calling for speculation and form of the question.
24   You could answer.
```

```
 1        THE WITNESS:  I think in that instance, David.
 2   BY MR. JONES:
 3        Q.   You're talking about David Sigale, your
 4   attorney?
 5        A.   Yes.
 6        Q.   So is it fair to say that David Sigale can
 7   override your views?
 8        MR. SIGALE:  The same objections.
 9        THE WITNESS:  No.
10   BY MR. JONES:
11        Q.   Why not?
12        A.   Again, the same reasons.  If it's
13   something that wasn't previously known to me and it
14   wasn't my intention to harm this case, I think that
15   is fair that I be dismissed.
16        Q.   So under those circumstances you don't
17   think you should be the one who would cover the
18   fees, is that right?
19        MR. SIGALE:  The same objections.
20        THE WITNESS:  Right.
21   BY MR. JONES:
22        Q.   Let's say you have a disagreement about
23   that, Mr. Wroblewski.  Who decides who's right?
24        MR. SIGALE:  The same objections.  Go ahead and
```

Page 59

1   answer.

2       THE WITNESS:  I guess we would have to have

3   discussion and hopefully be able to work it out

4   there.

5   BY MR. JONES:

6       Q.   Did anyone explain to you before you

7   signed this agreement what the ramifications of this

8   clause were?

9       A.   They were explained in the contract I

10  signed, but I did not speak to any of them.

11      Q.   Did you seek legal advice from anyone else

12  concerning the ramifications of this clause?

13      A.   No.

14      Q.   Were you offered legal advice or advised

15  that you should seek legal advice regarding the

16  ramifications of this clause?

17      A.   No.

18      Q.   Are you an attorney?

19      A.   No.

20      Q.   Do you feel comfortable interpreting that

21  clause on your own?

22      A.   Yes.

23      Q.   Why?

24      A.   It seems fairly straightforwardly worded.

Page 60

1     Q.   Are you aware that your attorney has

2     refused to provide a copy of that clause to us?

3     A.   No.

4     Q.   Why do you think he may want to hide that?

5     MR. SIGALE:  Objection to the form.  Objection

6     to facts not in evidence.  Lack of foundation.  That

7     is offensive, Isaac.  You could answer, Mark, but

8     that's really inappropriate.

9     THE WITNESS:  I don't know.

10    BY MR. JONES:

11    Q.   Do you know if anyone else is paying for

12    this case besides FPC, the Firearms Policy

13    Coalition?

14    A.   As far as I'm aware, they're the only

15    ones.

16    Q.   So you don't know if anyone else is

17    paying?

18    A.   Correct.

19    Q.   Have you ever inquired as to whether

20    anyone else is paying?

21    A.   I have not.

22    Q.   I'm going to share my screen.  Let me know

23    when you're able to see the document that pops up.

24    Are you able to see this document?

Page 61

1    A.   Yes.

2    Q.   I'm going to represent to you that this is

3  a press release from the Second Amendment Foundation

4  that you can find online.  Give it a quick read.

5        MR. SIGALE:  Can you zoom it in?

6        MR. JONES:  I am not able.  I think that may

7  have happened on our end.

8        MR. SIGALE:  I can't do it either.

9  BY MR. JONES:

10   Q.   Mr. Wroblewski, are you able to see it?

11   A.   Yes.

12   Q.   Let me know when you had a chance to

13  review it.

14   A.   I've read it.

15   Q.   What does it say?

16   A.   Second Amendment Foundation is also

17  providing financial support.

18   Q.   You didn't know, though, that this was

19  going on, did you?

20   A.   No.

21   Q.   To your knowledge, only one organization

22  was providing financial support, is that correct?

23   A.   Correct.

24   Q.   Why are they providing financial support?

Page 62

1     MR. SIGALE:  Objection as to speculation and

2  foundation.  You could answer.

3     THE WITNESS:  Because they're another second

4  amendment foundation that feels it's an

5  unconstitutional law.

6  BY MR. JONES:

7     Q.   Did they check with you, though, before

8  arranging to do this?

9     A.   No.

10     Q.   Did anyone reveal to you that this fee

11  arrangement existed?

12     A.   No.

13     Q.   Did anyone reveal to you any details of

14  the fee arrangement, through which SAF and the

15  Firearms Policy Coalition, FPC, are providing

16  funding to support this?

17     A.   No.

18     Q.   Have you been asked to sign any conflicts

19  of interest waivers at all?

20     A.   No.

21     Q.   Have you actually signed any conflicts of

22  interest waivers at all?

23     A.   No.

24     Q.   Do you know if any of your attorneys have

Page 63

1    employment with SAF or FPC?

2         A.    I do not.

3         Q.    Has anyone revealed anything relating to

4    this issue to you before?

5         A.    No.

6         Q.    So no one has ever covered this, right?

7         A.    Correct.

8         Q.    I'm going to pull down my screen.  Can you

9    see my face again?

10        A.    Yes.

11        MR. JONES:  At this time I would like to take a

12   quick break.  My clock is showing 10:40.  If it's

13   okay with other counsel and the witness, why don't

14   we come back at 10:45, if that's okay.

15                 (Recess)

16   BY MR. JONES:

17        Q.    Did you speak to anyone during the break,

18   Mr. Wroblewski?

19        A.    No.

20        MR. JONES:  No further questions from me at

21   this time.  Thank you.

22

23

24

Page 64

1              CROSS-EXAMINATION

2              BY MR. BREMER:

3

4      Q.    My name is Edward Bremer.  I represent Kim

5    Foxx.  I do have some questions for you as well.

6              With the exception of your attorney,

7    Mr. Sigale, and the discussion you already told us

8    about, your initial communications with FPC, have

9    you talked about the specifics of this lawsuit with

10   anyone else?

11     A.    No.

12     Q.    You never spoke about it with your

13   parents?

14     A.    No.

15     Q.    Or your siblings?

16     A.    No.

17     Q.    Are you a member of FPC?

18     A.    Yes.

19     MR. SIGALE:  I'm going to object as to form.

20   Did you say SPC or FPC?

21     MR. BREMER:  I may have said FPC.  Let me ask

22   that again.

23   BY MR. BREMER:

24     Q.    Are you a member of the Firearms Policy

Page 65

1   Coalition?

2        A.   Yes.

3        Q.   When did you join?

4        A.   I don't recall specifically, but I want to

5   say it's been at least three years since I've been a

6   member.

7        Q.   Do you pay dues?

8        A.   Yes.

9        Q.   Approximately how much are your annual

10  dues to the Firearms Policy Coalition?

11       A.   Each year it was a one time donation of

12  $25.

13       Q.   Other than that one time donation, have

14  you ever given any money to the Firearms Policy

15  Coalition?

16       A.   No.

17       Q.   So best estimate, you've given them about

18  $75 over the course of your life?

19       A.   Correct.

20       Q.   Are you a member of the Second Amendment

21  Foundation?

22       A.   I don't remember.

23       Q.   Are you a member of any other firearms

24  related public policy organizations?

1      A.   Yes.

2      Q.   Can you list them, starting with the

3 first one and list any that you recall?

4      A.   So Firearms Policy Coalition, Gun Owners

5 of America.  I can't remember the exact name, but

6 the Illinois State Rifle Association.

7      Q.   Is that all?

8      A.   Yes.

9      Q.   Are you a dues paying member of the Gun

10 Owners of America?

11      A.   Yes.

12      Q.   How much are those dues?

13      A.   I believe those are $25 a year as well.

14      Q.   Did you also join that organization about

15 three years ago?

16      A.   I believe that one was about four.

17      Q.   How about the Illinois State Rifle

18 Association?

19      A.   That one was also around $25.  I have been

20 a member about a year.

21      Q.   You would estimate that you donate about

22 $75 a year to second amended related causes.  Is

23 that fair?

24      A.   Yes.

Page 67

1       Q.    Are you a member of the National Rifle
2   Association?
3       A.    I am not.
4       Q.    What do you get out of these memberships?
5       A.    I see these organizations do things that I
6   feel are beneficial to second amendment supporters.
7       Q.    Would you call yourself a second amendment
8   supporter?
9       A.    Yes.
10       Q.    And what specifically do these
11   organizations do that you find beneficial?
12       A.    I think things like this lawsuit have been
13   enabling people to exercise their second amendment
14   rights.
15       Q.    What does that mean to you, exercising
16   their second amendment right?
17       A.    To keep and bear arms.
18       Q.    That is a literal quote from the second
19   amendment, you would agree?
20       A.    What is that?
21       Q.    Would you agree that is a direct quote
22   from the second amendment, right?
23       A.    Correct.
24       Q.    What does it mean to you to keep and bear

Page 68

1    arms?  How do you understand that?

2         A.   To be able to purchase firearms, keep them

3    in your home and carry them as you see fit.

4         Q.   So to you it ought to be up to the

5    individual how to use firearms.  Is that a fair

6    statement?

7         A.   Correct.

8         Q.   Do you believe there should be any limits

9    on the ability to keep and bear arms?

10        A.   I think those limits are already defined

11   in the second amendment.

12        Q.   What do you believe those limits to be?

13        A.   I think people that have the intention of

14   protecting themselves and not doing harm to others

15   should be allowed to have those firearms.

16        Q.   Which firearms?

17        A.   Any.

18        Q.   I know you've told us that you have never

19   been forced to defend yourself with a firearm.  Is

20   that a fair statement?

21        A.   Yes.

22        Q.   If you were forced to defend yourself with

23   a firearm, how confident are you -- let me ask the

24   question again.

Page 69

```
 1          If you were forced to fire a firearm in

 2   self-defense, how confident are you that you would

 3   hit what you are aiming at?

 4       MR. SIGALE:  I object as to speculation.  Mark,

 5   go ahead and answer.

 6       THE WITNESS:  Confident.

 7   BY MR. BREMER:

 8       Q.   Would you say that you're 100 percent

 9   confident?

10       A.    Ninety-five.

11       Q.   Does that confidence go down at all if you

12   were forced to defend yourself on a crowded moving

13   train?

14       A.   No.

15       Q.   The live fire training that you've taken,

16   do those trainings involve firing while in a crowd?

17       A.   No.

18       Q.   Do those trainings include firing while on

19   a moving vehicle?

20       A.   No.

21       Q.   Have you ever trained in the type of

22   situation where you are standing in a crowd on a

23   moving vehicle?

24       A.   No.
```

Page 70

1     Q.    Why are you 95 percent confident that you
2  would still be able to hit your target under those
3  circumstances?
4     A.    I think that is a judgment call on my
5  part.  If I don't feel that I could confidently hit
6  what I was aiming and not hit anything else, that is
7  not something I would choose to do then.
8     Q.    You wouldn't fire, is that fair?
9     A.    That's fair.
10    Q.    If you arer 95 percent confident, that
11 means you are 5 percent let's say unconfident.  Is
12 that fair?
13    A.    Yes.
14    Q.    Is there a point at which your confidence
15 level would get low enough that you would not fire
16 your firearm in self-defense?
17    A.    I don't understand the question.
18    Q.    If you think there's a 5 percent risk that
19 you are going to hit someone or something that is
20 not your intended target, would you fire?
21    A.    If I felt that was my only option for my
22 safety.
23    Q.    If you thought you had another option,
24 like say to retreat, would you fire?

Page 71

1      A.    No.

2      Q.    You've mentioned social media several

3   times today.  What sites do you maintain a profile

4   on social media?

5      A.    Instagram and Twitter.

6      Q.    What is your Instagram handle?

7      A.    Wrobokram.

8      Q.    Is that K-r-a-n, as in Nancy?

9      A.    M as in mark.

10     Q.    What about your Twitter account?

11     A.    I don't recall the actual handle.  I think

12  the one that people can search is Wrobokram as well.

13     Q.    Is that your display name?

14     A.    Yes.

15     Q.    Is that different from your handle, if you

16  know?

17     A.    I believe so.

18     Q.    What is Wrobokram a reference to?

19     A.    It was a nickname from high school and

20  then the Wrobo is just the first four letters of my

21  last name with an O, and the Kram is Mark spelled

22  backwards.

23     Q.    Do you ever post on Instagram?

24     A.    Yes.

Page 72

1     Q.   How frequently would you say you post on a
2   given day?
3     A.   Once a month or so.
4     Q.   So you wouldn't call yoursel a frequent
5   poster?
6     A.   What was that?
7     Q.   You wouldn't call yourself a frequent
8   poster, is that fair?
9     A.   That is fair.
10    Q.   Do you recall the topic of your most
11  recent Instagram post?
12    A.   Yes.  That was riding dirt bikes.
13    Q.   Did you post a video of yourself riding a
14  dirt bike?
15    A.   Yes.
16    Q.   How about the one before that, do you
17  recall what you posted about?
18    A.   Also dirt bikes.
19    Q.   About dirt bikes?
20    A.   Yes.
21    Q.   Do you own one?
22    A.   Yes.
23    Q.   Have you ever posted about second
24  amendment issues on Instagram?

Page 73

1    A.   No.

2    Q.   Do you read or watch videos about other

3  people posting about second amendment issues on

4  Instagram?

5    A.   Yes.

6    Q.   Do you know how that is where you read or

7  watch videos -- let me ask the question again.

8         Do you know whose accounts those are that

9  you watch or read or post about second amendment

10  issues on Instagram?

11    A.   Yes.

12    Q.   Who is that?

13    A.   Firearm Policy Coalition, Gun Owners of

14  America.  Brownell's Primary Arms.  Corenthum.

15    Q.   Are those all organizational accounts or

16  is any individual?

17    A.   Some are individual.

18    Q.   Do you recall any of the recent posts that

19  you've seen or read?

20    A.   No.

21    Q.   But you know you have seen and write posts

22  on Instagram from those accounts?

23    A.   Yes.

24    Q.   How about on Twitter, do you ever post

                                                        Page 74

1    about second amendment related issues on Twitter?

2         A.    No.

3         Q.    Do you read posts about second amendment

4    issues?

5         A.    Yes.

6         Q.    From whom?

7         A.    Similar accounts, Corenthum, Firearm

8    Policy Coalition.  Gun Owners of America.

9    Brownells. Colion Noir  (phonetic).

10        Q.    Do you use any other social media accounts

11   other than the two we discussed?

12        A.    No.

13        Q.    Do you read without posting on any other

14   social media websites?

15        A.    Occasionally, I get sent links to Facebook

16   articles.

17        Q.    Who sends you links to Facebook articles?

18        A.    Friends.

19        Q.    What types of links do you get from

20   friends on Facebook?

21        A.    Sometimes it's second amendment things.

22   Typically it's just funny videos.

23        Q.    Were any of your friends second amendment

24   activists in your estimation?

Page 75

1      A.   I guess what would be a second amendment

2  activist?

3      Q.   Do you know any friends who feel strongly

4  about the right to keep arms?

5      A.   Yes.

6      Q.   How about friends who own their own

7  firearms?

8      A.   Yes.

9      Q.   You mentioned Corey and Matt as two

10  friends of yours.  Do either of them own firearms?

11      A.   Yes.

12      Q.   Both of them?

13      A.   Yes.

14      Q.   Do you know how many firearms Corey owns?

15      A.   I do not.

16      Q.   Is it more than one?

17      A.   Yes.

18      MR. SIGALE:  I am objecting as to relevance.

19  But he answered the question.

20  BY MR. JONES:

21      Q.   Is it more than five?

22      MR. SIGALE:  The same objection.

23      THE WITNESS:  I don't believe so.

24

Page 76

```
 1   BY MR. BREMER:
 2        Q.   How about Matt, does he own more than one
 3   firearm?
 4        MR. SIGALE:   The same objection.
 5        THE WITNESS:   Yes.
 6   BY MR. BREMER:
 7        Q.   Do you know if he owns more than five?
 8        MR. SIGALE:   The same objection.
 9        THE WITNESS:   He does not.
10        Q.   Do you have a Facebook account?
11        A.   I do not.
12        Q.   You're able to read things on Facebook
13   without having an account?
14        A.   Not all.
15        Q.   But the ones that we talked about just
16   now, you were able to read those even though you
17   don't have an account?
18        A.   Yes.
19        Q.   Where do you get your news?
20        A.   Typically through social media.  Mainly
21   Instagram.  And then after seeing posts there I try
22   and use Google to do more research.
23        Q.   Do you watch television?
24        A.   What do you consider television?
```

Page 77

1    Q.   Well, do you watch the Channel 9 WGN news?

2    A.   I do not.

3    Q.   Do you watch the Channel 5 news?

4    A.   I guess the definition of television is

5  cable news and things like that.

6    Q.   Cable and broadcast news is how I would

7  define television news.  So I will ask my question

8  again.  Do you watch the news on TV?

9    A.   No.

10   Q.   Never?

11   A.   Unless it's on at the gym, and I glance at

12  it.

13   Q.   It's not something you seek out, is that

14  fair?

15   A.   That's fair.

16   Q.   Is it ever on in your home when no one

17  else is watching it?

18   A.   No.

19   Q.   So to the best of your knowledge your

20  parents also cannot seek out television news?

21   A.   Correct.

22   Q.   What sites do you read for news other than

23  social media sites?

24   A.   CNN, Fox, New York Times.  Typically

Page 78

1    whatever Google comes up with in regards to a story,

2    I search for.

3         Q.   Do you have a paid membership to any news

4    sites?

5         A.   I do not.

6         Q.   Is there any one news site that you favor

7    over others?

8         A.   No.

9         Q.   ████████████████████████████████████

██  ██████████

11        A.   Yes.

12   ███ ██████████████████████████

13        MR. SIGALE:  This line of questioning is also

14   subject to the confidentiality provisions in the

15   protective order entered by the Court.  With that

16   said, go ahead and answer his question.

██    ████████████████  ██████████████████████

██  ██████████████████

██    ███ ██████████████

██    ███ ████████████████████████████████

██  ██████████

██    ███ ██████████████████████████████

██  ████████████

██    ███ ████████████████████████████████

Page 79



1    Q.   You keep it in your bedroom?

2    A.   Yes.

3    Q.   Do you keep it loaded?

4    A.   Yes.

```
                                              Page 80
1        Q.    Did you purchase that yourself or did
2   someone buy it for you?
3        A.    I purchased it.
4        Q.    Did you have a fire owner identification
5   card at the time?
6        A.    Yes.
7        Q.    From the State of Illinois?
8        A.    Yes.
9        Q.    Do you recall whether one or both of your
10  parents consented to your obtaining a firearm owner
11  ID card?
12       A.    Yes.
13       Q.    Who consented?
14       A.    My dad.
15       Q.    When was the last time you rode a public
16  bus?
17       A.    I have not ridden a public bus.
18       Q.    Ever?
19       A.    I did when I was at University of Illinois
20  in Champaign Urbana.
21       Q.    Were you there as a student or visiting?
22       A.    A student.
23       Q.    I don't think we talked about that.  When
24  were you at the University of Illinois in Champaign
```

Page 81

1    Urbana?

2        A.    2011 to 2013.

3        Q.    Did you obtain a degree from that

4    university?

5        A.    I did not.

6        Q.    Were you able to carry over some of those

7    credits to a different university where you did

8    obtain a degree?

9        A.    Yes.

10       Q.    Was that associate's degree or bachelors

11   degree?

12       A.    I believe it was my associates.

13       Q.    Have you ever ridden a CTA bus?

14       A.    Not that I recall.

15       Q.    Have you ever ridden a Pace bus?

16       A.    Not that I recall.

17       Q.    When was the last time you had ridden the

18   El?

19       A.    Probably ten years ago.

20       MR. BREMER:  I have nothing else.

21       MR. SIGALE:  Isaac, did you have anything

22   further?

23       MR. JONES:  Nothing more, David.  It's all

24   yours.

Page 82

1                    CROSS-EXAMINATION

2                    BY MR. SIGALE:

3       Q.   Mark, to clarify, you testified earlier in

4    this deposition counsel Mr. Jones asked you what you

5    hoped to get out of this.

6              And your answer, I'm paraphrasing, was

7    to be able to carry concealed on public

8    transportation.  Do you remember, paraphrasing, that

9    question and answer?

10      A.   Yes.

11      Q.   Why don't you carry concealed on public

12   transportation?  You articulated your concerns about

13   crime and so on and so forth.

14             So why don't you carry concealed on

15   public transportation?

16      A.   It's currently Illinois law that I cannot

17   legally do that.

18      Q.   And what's your understanding of what

19   would happen if you were to just violate that law

20   and get caught?

21      A.   Fines.  Potential jail time.  Loss of my

22   FOID card.

23      Q.   So if the Court were to declare the law,

24   the prohibition unconstitutional and you were able

```
                                          Page 83
 1    to carry concealed on public transportation, would

 2    that give you what you are looking for in this

 3    lawsuit?

 4         A.   Yes.

 5         Q.   Is that why you're here?  Is that why

 6    you're here?  Is that why you're a part of this

 7    lawsuit sitting here today?

 8         A.   Yes.

 9         Q.   Are you here today because of some

10    unarticulated threat of crossing FPC or harming the

11    case and so you don't really want to be here, but

12    you're sticking around because of that?  Is that

13    what's going on?

14         A.   No.

15         Q.   If I were to tell you that there's

16    actually nothing, there is no sanction, no

17    punishment for walking away from the case, you say I

18    don't want to be a part of this, and you could walk,

19    and nothing would happen to you.

20              Would you still be here as a participant

21    in the case?

22         A.   Yes.

23         MR. SIGALE:  That's all I have.

24         MR. JONES:  Unless anyone else has any
```

Page 84

1   furthers questions we would like to order a copy.

2   Mr. Sigale, are you reserving signature?

3       MR. SIGALE:  If counsel is ordering it, I'll

4   take a copy, and we'll go ahead and reserve

5   signature.

6           Mark, what that means is before the

7   transcript that Ms. Rocks, when she writes up the

8   transcript, which looks like a really boring movie

9   script before it becomes official for the court you

10  have the right to review it.  We'll figure out how

11  to get you a copy of it.

12          And you have the right to review it.  You

13  don't get to change your answers.  You just get to

14  fix typographical errors.  I didn't say bed, I said

15  bread, that kind of thing.

16           We'll reserve signature.  And since counsel

17  is ordering, we'll take a copy.

18      MR. BREMER:  We will take a copy.

19

20

21

22

23

24

Page 85

STATE OF ILLINOIS    )

                     ) ss:

COUNTY OF C O O K    )


5                I, VICTORIA D. ROCKS, C.S.R., Notary

Public, within and for the County of Cook, State of

Illinois, a Certified Shorthand Reporter of said

state, do hereby certify:

                That previous the commencement of the

examination of the witness, MARK WROBLEWSKI, was

first duly sworn to testify to the whole truth

concerning the matters herein;

                That the foregoing deposition

transcript was reported stenographically by me and

was thereafter reduced to typewriting via

computer-aided transcription under my personal

direction, and constitutes a true record of the

testimony given and the proceedings had;

                That the said deposition was taken

before me at the time and place specified;

                That the reading and signing by the

witness of the deposition transcript was not waived;

                That I am not a relative or employee of

attorney or counsel, nor a relative or employee of

Page 86

1   such attorney or counsel for any of the parties

2   hereto, nor interested directly or indirectly in the

3   outcome of this action.

4           IN WITNESS WHEREOF, I do hereunto set

5   my hand and affix my seal of office at Chicago,

6   Illinois this 25th day of September, 2023.

7

8                           *Victoria Rocks*

9                   VICTORIA D. ROCKS, C.S.R.

                    License No. 084-002692

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                     Page 87
 1                      Veritext Legal Solutions
                           1100 Superior Ave
 2                            Suite 1820
                         Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
     September 26, 2023
 5
     To: DAVID G. SIGALE
 6
     Case Name: Schoenthal, Benjamin, et al. v. Raoul, Kwame, etc., et al.
 7
     Veritext Reference Number: 6060583
 8
     Witness:  Mark Wroblewski      Deposition Date:  9/8/2023
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within 28 days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24   NO NOTARY REQUIRED IN CA
```

Page 88

```
 1                DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 6060583
 3        CASE NAME: Schoenthal, Benjamin, et al. v. Raoul, Kwame,
   etc., et al.
          DATE OF DEPOSITION: 9/8/2023
 4        WITNESS' NAME: Mark Wroblewski
 5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7        I have made no changes to the testimony
   as transcribed by the court reporter.
 8
   _____         _____
 9 Date                      Mark Wroblewski
10        Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
               Statement; and
14        Their execution of this Statement is of
               their free act and deed.
15
          I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
                 _____
18               Notary Public
19               _____
                 Commission Expiration Date
20
21
22
23
24
25
```

```
                                                    Page 89

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 6060583
3         CASE NAME: Schoenthal, Benjamin, et al. v. Raoul, Kwame,
    etc., et al.
          DATE OF DEPOSITION: 9/8/2023
4         WITNESS' NAME: Mark Wroblewski
5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9         I request that these changes be entered
    as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Mark Wroblewski
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 90

1                    ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2              ASSIGNMENT NO: 6060583
3     PAGE/LINE(S) /       CHANGE       /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____      _____
20    Date                   Mark Wroblewski
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24

                     _____
25                   Commission Expiration Date

**[084-002692 - acknowledge]**　　　　　　　　　　　　Page 1

| **0** |
| --- |

**084-002692**
　86:9

| **1** |
| --- |

**10/22**　37:8
**100**　69:8
■■■■　38:20
　39:5
**10:40**　63:12
**10:45**　63:14
**1100**　87:1
**12754**　86:8
**15**　32:8 37:9,10
　37:11,12 38:6
　79:19,23
**15s**　37:10
**16**　30:13 32:22
**17**　37:1,24
**18**　33:13 37:13
　79:24
**1820**　87:2
**19**　37:1,24
　38:17
**1911-22**　37:2
**1992**　11:23
**1oo**　2:13

| **2** |
| --- |

**20**　37:14 88:16
　89:22 90:22
**2011**　12:13
　38:7 81:2
**2013**　13:15
　39:11,12 81:2

**2015**　13:3,15,24
　23:12 39:5,8
**2017**　12:5 14:6
　27:15 29:6,8
**2019**　43:21
**2020**　14:8
　43:21
**2022**　28:15
　29:3 49:19,20
　49:22
**2023**　1:19
　19:22 86:9
　87:4
**216-523-1313**
　87:3
**22**　37:5,9
**22s**　37:3 38:1
　79:14
**24**　11:19
**25**　28:2 65:12
　66:13,19 78:9
**25th**　86:6
**26**　11:13 87:4
**28**　87:18

| **3** |
| --- |

**30**　11:21,23
**322**　37:5
**35**　27:24
**365**　36:23 38:1
**3:22**　1:6

| **4** |
| --- |

**40**　9:20
**43o**　2:3

**44114**　87:2

| **5** |
| --- |

**5**　70:11,18 77:3
**500**　2:7
**50326**　1:6

| **6** |
| --- |

**60,000**　41:8,9
**60187**　2:3
**60517**　11:1
**60601**　2:13
**60602**　2:8
**6060583**　87:7
　88:2 89:2 90:2
**63**　3:4
**64**　3:5
■■■■　37:4 38:17
　39:6

| **7** |
| --- |

**7**　3:4
**75**　65:18 66:22

| **8** |
| --- |

**8**　30:14
**81**　3:5
**82**　3:5
**83,000**　40:23
**84**　3:5
**86,000**　40:19,20
**88,000**　40:14
**8th**　1:19

| **9** |
| --- |

**9**　77:1
**9/8/2023**　87:8
　88:3 89:3

**925**　10:24
**95**　70:1,10

| **a** |
| --- |

**a.d.**　1:19
**a.m.**　1:19
**ability**　7:14
　68:9
**able**　15:11
　31:21,24 33:11
　48:2 49:4 59:3
　60:23,24 61:6
　61:10 68:2
　70:2 76:12,16
　79:8,9 81:6
　82:7,24
**above**　25:17
　87:17
**accordance**
　88:5 89:5
**account**　71:10
　76:10,13,17
**accounts**　73:8
　73:15,22 74:7
　74:10
**accurate**　32:15
　32:16,17 33:22
　34:2 48:14,24
**accurately**　6:1
　7:14
**accused**　19:7
　19:12 23:13,20
**achieve**　15:9
　17:6
**acknowledge**
　88:11 89:16

**acquire**  38:3
**acquired**  38:8
　38:12,13
**act**  88:14 89:20
**action**  37:9
　56:5 86:3
**actions**  56:19
**activist**  75:2
**activists**  74:24
**actual**  71:11
**actually**  45:23
　62:21 83:16
**additional**
　37:11 42:6,8
　43:1 46:5
**address**  10:23
　87:15
**adjudicated**
　24:13 25:1
　███  37:10
**advice**  59:11,14
　59:15
**advised**  59:14
**affix**  86:5
**affixed**  88:15
　89:21
**afraid**  43:17
**agency**  24:5
**aggravated**
　23:14
**ago**  10:1 11:17
　11:19 20:14
　21:3 25:10
　40:18 41:23
　48:9 53:8

66:15 81:19
**agree**  6:2 7:24
　33:22 53:3
　67:19,21
**agreed**  52:23
　56:24 57:2
**agreeing**  54:2
**agreement**
　53:13,21,24
　54:1,6,11,14,22
　59:7
**ahead**  6:6,15
　15:21 16:19
　21:1 31:20
　35:7 36:16
　58:24 69:5
　78:16 84:4
**aided**  85:16
**aim**  79:9
**aiming**  69:3
　70:6
**al**  1:4,8 4:15,16
　87:6,6 88:3,3
　89:3,3
**alcohol**  7:13
　27:3,9
**alcoholic**  20:3,7
　20:17,20 21:12
**alcoholism**
　27:3
**allow**  56:6
**allowed**  68:15
**amended**  66:22
**amendment**
　44:16 61:3,16

62:4 65:20
67:6,7,13,16,19
67:22 68:11
72:24 73:3,9
74:1,3,21,23
75:1
**america**  66:5
　66:10 73:14
　74:8
**amtrak**  16:8
**annual**  41:2
　65:9
**answer**  5:21
　6:6,14,16
　15:21 16:20
　20:13 21:1
　35:8 36:16
　44:7 45:13
　56:22 57:24
　59:1 60:7 62:2
　69:5 78:16
　82:6,9
**answered**
　75:19
**answering**  5:15
　6:22
**answers**  7:15
　7:19 84:13
**anybody**  10:19
**anytime**  57:1
**app**  8:4,16
**appear**  34:2
　88:11 89:15
**appearances**
　2:1

**appeared**  2:5,9
　2:15
**appears**  33:7
**appended**
　89:11,18
**applicable**  31:4
**application**
　32:13,14 33:17
　33:19,22
**applications**
　8:6,13 34:19
　35:12
**appropriate**
　31:13
**approve**  17:9
**approved**
　17:12
**approximate**
　29:4
**approximately**
　23:11 25:11
　29:3 37:13
　65:9 78:9
　███  37:9,10,10
　37:11,12 38:6
　79:19,23
**arer**  70:10
**armory**  37:12
**arms**  67:17
　68:1,9 73:14
　75:4
**arrangement**
　6:8,17 62:11
　62:14

**[arrangements - bottom]**

**arrangements**
7:2
**arranging** 62:8
**arrest** 26:20
**arrested** 25:6
█████ 37:10
**articles** 42:13
42:17 43:12,13
43:20 47:5,6,9
74:16,17
**articulated**
82:12
**aside** 37:19
47:19 49:7
**asked** 6:7,15,22
62:18 82:4
**asking** 5:15
49:16 50:5
**asks** 6:12
**assault** 23:14
23:14
**assignment**
88:2 89:2 90:2
**assistant** 2:12
4:6
**associate** 13:17
**associate's**
81:10
**associated**
55:19
**associates**
12:19 13:2,4
81:12
**association**
66:6,18 67:2

**assume** 6:6
**attached** 89:7
**attacked** 42:15
**attacks** 47:23
**attempt** 51:24
**attorney** 1:7
2:12 4:6 6:10
9:16,19,22
10:20 40:12
54:18,20 57:9
58:4 59:18
60:1 64:6
85:24 86:1
**attorney's** 4:12
**attorneys** 4:11
62:24
**audibly** 5:21
**authorize**
89:11
**automotive**
12:7 13:5
**available** 78:21
78:22
**ave** 87:1
**aware** 4:14
16:23 17:3,4
54:2 60:1,14

**b**

**bachelors** 12:2
12:3,19 81:10
**back** 13:8
21:16 28:16
32:10 33:3
56:7 63:14
87:15

**background**
52:18
**backwards**
13:6 71:22
**banning** 51:22
**based** 40:3
**basic** 10:4
**basically** 41:3
51:21 54:22
**basis** 25:19
46:23 47:11,15
**bates** 33:12
**battery** 23:13
**bear** 42:1,4
67:17,24 68:9
**bearing** 45:1
**bed** 84:14
**bedroom** 79:1
**beer** 20:1
**behalf** 2:5,9,15
**belief** 25:19
**believe** 10:5
12:5 13:3 14:7
17:19 18:16
19:21 25:17
28:2,14 29:5
30:13 37:7
38:6 39:5,9,13
40:19,23 43:21
44:2 45:20
50:18 51:3
52:9 53:13
66:13,16 68:8
68:12 71:17
75:23 81:12

**beneficial** 67:6
67:11
**benjamin** 1:4
4:9 17:18,21
17:23 18:3,6
87:6 88:3 89:3
**best** 5:17 65:17
77:19
**better** 44:13
**beverage** 20:7
20:17,21 21:12
**beverages** 20:4
**beyond** 36:12
**bike** 13:17
26:12 72:14
**bikes** 72:12,18
72:19
**birthday** 11:22
39:15
**bit** 41:23 48:9
51:16 52:15
56:7
**black** 46:7,8,10
**blank** 29:21
**blm** 44:3 46:3,6
47:3,12,19
**board** 9:10
**boats** 31:17
**borders** 43:2
**boring** 84:8
**born** 24:1,3
**bosch** 13:11,22
41:3,6
**bottom** 32:6
33:13

**[box - clarify]**

box  79:14
brandished
   41:14
brandishing
   41:19
bread  84:15
break  6:19,21
   6:23 63:12,17
breaking  44:20
bremer  2:7 3:5
   64:2,4,21,23
   69:7 76:1,6
   78:18 81:20
   84:18
briefly  9:15
broadcast  77:6
broken  47:1
brought  15:10
   57:16
brown  38:2
brownell's
   73:14
brownells  74:9
   ▌▌▌▌▌  37:2
   37:3
browser  8:11
buck  37:3 38:2
burkes  26:7
burned  45:4,15
   45:18,20,21,24
   46:20
burning  45:3
bus  16:11 49:4
   80:16,17 81:13
   81:15

buses  49:7
businesses  47:2
buy  80:2

**c**

c  85:3
c.s.r.  85:5 86:9
ca  87:24
cable  77:5,6
call  6:11 50:17
   51:4,6,15 52:9
   52:14,20 67:7
   70:4 72:4,7
called  1:13 7:7
   51:7
calling  56:21
   57:23
calls  57:22
capacity  15:7
   54:19
car  20:6
card  19:18
   32:13,14 33:3
   33:17 34:12
   35:24 80:5,11
   82:22
care  30:23
carry  10:8
   15:11,17 28:12
   29:13 31:5
   33:21 42:18
   43:8,9 51:22
   53:7 56:6 68:3
   78:20 81:6
   82:7,11,14
   83:1

carrying  31:14
   44:12 47:21
cars  45:3,4,15
   45:18,24 46:21
case  4:9,15
   18:9,16 29:14
   36:13 41:24
   45:1 55:21,23
   56:2,9,14,23
   57:1,4,6,14,18
   58:14 60:12
   83:11,17,21
   87:6 88:3 89:3
category  56:20
caught  82:20
caused  47:12
causes  66:22
ccl  33:19 35:12
center  2:7
certificate
   89:11
certification
   33:7 88:1 89:1
certified  31:17
   85:7
certify  85:8
champaign
   80:20,24
chance  61:12
change  84:13
   87:13,14 89:8
   90:3
changed  29:24
   48:17

changes  87:12
   88:7 89:7,9
channel  77:1,3
characterize
   41:1
characterized
   45:16
check  35:21
   62:7
chicago  2:8,13
   12:15 26:9
   45:22 48:23
   49:8 51:22
   86:5
choice  54:3
choose  70:7
christmas
   39:16,17
circumstance
   55:18
circumstances
   27:16,20 58:16
   70:3
citizen  23:23
   24:1
city  42:16,21
   42:23 43:2,10
   43:15 45:22
   47:23 49:5,7
civil  1:15 88:5
   89:5
clarification
   6:5
clarify  31:9
   82:3

**[class - correct]**

class  28:12
29:1
classroom
29:13
clause  59:8,12
59:16,21 60:2
cleaning  30:23
cleanly  5:24
clearly  44:19
cleveland  87:2
clock  63:12
close  8:7
closed  8:8,9,16
cnn  77:24
coaching  45:8
45:12
coalition  49:16
50:2 55:4,6,9
57:7,20 60:13
62:15 65:1,10
65:15 66:4
73:13 74:8
cocaine  22:15
colion  74:9
college  12:17
12:21,24
come  36:3
37:17 39:23
49:11 56:12
63:14
comes  78:1
comfortable
49:6 59:20
coming  48:3

commencem...
85:9
commencing
1:18
commission
88:19 89:25
90:25
commit  56:5
committing
56:10,16
communicate
6:1
communicated
18:5,12,19
communicati...
64:8
community
12:21,23
company  29:19
29:20
complaint  10:6
17:10
complete  31:17
completed
30:15 31:16
34:7,10 87:15
component
30:9 31:9
computer  8:14
8:17 85:16
conceal  15:11
28:12 43:7,9
78:20
concealable
36:11 37:21,23

concealed  10:8
31:14 33:21
53:7 82:7,11
82:14 83:1
concerning
59:12 85:12
concerns  82:12
conclusion
57:22
conclusions
16:18
confidence
69:11 70:14
confident  68:23
69:2,6,9 70:1
70:10
confidentiality
36:13 78:14
confidently
70:5
conflicts  62:18
62:21
consented
80:10,13
consider  25:12
37:20 76:24
considered
41:17
constitutes
85:17
contact  23:5
26:13 50:23
51:1,2
contacted
50:15

contain  31:9
content  52:13
contents  54:1
contest  28:7
continued
13:12
contract  59:9
controlled  23:1
conversation
9:18,21
convicted  19:5
19:9 23:18,20
cook  1:18 4:11
85:6
cookcountyil...
2:8
cooperate  57:2
cooperation
56:24
copies  9:6
coplaintiffs
18:23
copy  60:2 84:1
84:4,11,17,18
corenthum
73:14 74:7
corey  26:5,7
75:9,14
correct  8:12
9:3,5 12:10
13:20,21 14:12
14:15 18:24
23:19 30:1,10
30:17 31:18
33:8 35:17,22

**[correct - diesel]**

39:19,21 40:7
40:24 41:4,22
42:3 43:14
46:1,22 47:14
48:14 53:17,20
60:18 61:22,23
63:7 65:19
67:23 68:7
77:21 78:10
**corrections**
87:12 89:17
**cost** 41:2
**counsel** 63:13
82:4 84:3,16
85:24 86:1
**counter** 54:10
**counting** 37:13
**county** 1:17
4:11 85:3,6
88:10 89:15
**couple** 5:6 10:2
25:10
**course** 53:16
65:18
**court** 1:1 5:10
5:13 25:1,2
56:5 78:15
82:23 84:9
88:7
**courtroom** 4:22
4:23
**courts** 1:16
**cover** 30:18,20
30:22 31:3,12
58:17

**covered** 17:6
29:10,11 63:6
**covering** 55:13
**credits** 81:7
**crime** 43:1
82:13
**cross** 3:5,5 64:1
82:1
**crossing** 83:10
**crowd** 69:16,22
**crowded** 69:12
**csr** 1:17
**cta** 16:2 81:13
**currently** 82:16
**cv** 1:6
**cycles** 13:9,14
■ 37:18

**d**

**d** 1:16 3:1 85:5
86:9
**dad** 80:14
**daley** 2:7
**damage** 47:4
47:13
**damages** 47:1
**damaging** 45:2
**dangerous**
41:18 42:22,23
**date** 29:4 87:8
88:3,9,19 89:3
89:13,25 90:20
90:25
**david** 2:2,2
54:7,9 57:19
58:1,3,6 81:23

87:5
**david's** 54:14
**day** 1:19 23:12
29:16 72:2
86:6 88:16
89:22 90:22
**days** 87:18
**dear** 87:10
**death** 44:3
**debra** 11:5
**december**
10:13 11:23
**decide** 57:1
**decides** 56:1
58:23
**declaration**
10:10 48:7,8
48:19 53:5,13
53:15,18
**declare** 82:23
**deed** 88:14
89:20
**deemed** 87:19
**deeper** 49:22
**defective** 24:14
25:2
**defend** 68:19
68:22 69:12
**defendant** 2:9
2:15 14:23
**defendants**
1:10,13 4:8
**defense** 69:2
70:16

**define** 77:7
**defined** 68:10
**definition** 77:4
**degree** 12:2,3,6
13:2,4 81:3,8
81:10,11
**degrees** 12:16
12:17
**demonstrate**
29:17
**department**
87:22
**deposed** 4:14
**deposition** 1:12
5:3,9 6:20 8:2
8:22 9:13,23
10:3,17,20
48:10 56:13
82:4 85:13,19
85:22 87:8,11
88:1,3 89:1,3
**described** 24:9
**describing**
44:24 46:3
**desk** 8:19
**destroying** 44:9
**detail** 52:19
**details** 33:17
52:5,15 62:13
**development...**
24:22
**device** 8:5
**devices** 9:2
**diesel** 14:4,8

**[difference - except]**

**difference**
  57:16
**different**  30:6
  71:15 81:7
**digitally**  33:4
**direct**  3:4 7:10
  67:21
**direction**  85:17
**directly**  86:2
**directs**  6:14
**dirt**  72:12,14
  72:18,19
**disabled**  24:20
  24:22
**disagree**  57:4
  57:15
**disagreement**
  58:22
**discovery**
  34:13,16,20,24
  35:4,14
**discussed**  9:15
  74:11
**discussion**  59:3
  64:7
**dismissed**
  55:21,24 58:15
**display**  71:13
**district**  1:1,1
  1:16
**division**  1:2
**document**  10:9
  31:21,24 33:12
  35:19 47:24
  60:23,24

**documents**  9:7
  9:17 10:2,3,16
  53:4,9,11
**doing**  26:2 49:6
  54:3 56:1,13
  68:14
**donate**  66:21
**donation**  65:11
  65:13
**double**  35:21
**doug**  18:13
**douglas**  18:8
  18:10
**downtown**
  43:22,23
**drink**  25:12
**drinking**  20:7
**drinks**  21:19,21
**drive**  21:15
**driven**  20:6,17
  20:21 21:12
  25:8,11
**driver's**  53:6
**driving**  21:19
  21:20,21 25:18
**drug**  24:4,8
  27:6,9
**dsigale**  2:4
**due**  19:21
  41:17
**dues**  65:7,10
  66:9,12
**duly**  7:7 85:11
**duration**  8:21
  13:19

**e**

**e**  3:1 8:10 34:11
  34:13,18,22
  35:2,11 50:17
  50:18 51:5
**earlier**  82:3
**early**  49:22
**earn**  12:3 13:2
**eastern**  1:2
**easy**  5:7
**education**
  11:24
**edward**  2:7
  64:4
**either**  30:22
  31:3 41:18
  61:8 75:10
**el**  81:18
**els**  49:5,7
**email**  87:17
**employed**
  14:11
**employee**  41:7
  85:23,24
**employer**  24:6
**employment**
  13:7,20,23
  14:3,16,17
  41:3,5 63:1
**enabling**  67:13
**enclosed**  87:11
**enforcement**
  27:12 31:13
**engagement**
  9:16

**entered**  78:15
  89:9
**enters**  8:1
**entire**  11:10
  13:19 22:11
  88:5 89:5
**entity**  29:24
**errata**  87:13,18
  89:7,10,18
  90:1
**errors**  84:14
**especially**
  43:20
**estimate**  20:11
  20:23 29:7
  39:7 65:17
  66:21
**estimation**
  74:24
**et**  1:4,8 4:15,15
  87:6,6 88:3,3
  89:3,3
**events**  46:2,13
**evidence**  60:6
**exact**  66:5
**exactly**  5:16,18
**examination**
  1:14 3:4,5,5
  7:10 64:1 82:1
  85:10
**examined**  7:8
**example**  9:9
  57:1
**except**  4:10

**[exception - foundation]**

exception  64:6
excuse  10:6
    13:13
executed  89:10
execution
    88:14 89:19
exercise  67:13
exercising
    44:15 67:15
existed  62:11
exists  7:17
expiration
    88:19 89:25
    90:25
explain  51:19
    59:6
explained
    51:16 59:9
explaining
    52:16
extent  16:17
    36:10 38:4
    43:5,6

**f**

face  63:9
facebook  74:15
    74:17,20 76:10
    76:12
facility  24:17
fact  44:8
facts  60:6
failed  24:4,8
fair  6:8 58:6,15
    66:23 68:5,20
    70:8,9,12 72:8

72:9 77:14,15
    79:10
fairly  59:24
fall  56:19
far  17:15 60:14
father  39:1,4
favor  78:6
fear  43:3,19
    47:19
federal  1:15
    31:4
fee  19:17 62:10
    62:14
feel  42:11,12
    43:3,6,7,9,13
    49:6 59:20
    67:6 70:5 75:3
feeling  25:23
    26:1 41:17
    42:6,8
feels  62:4
fees  55:12,19
    58:18
felony  19:5,7
    56:5,10,16
felt  42:18 44:13
    51:21 70:21
ffl  40:4,5
figure  84:10
filed  15:10
filing  17:9
financial  61:17
    61:22,24
find  61:4 67:11
    87:11

fines  82:21
finish  6:22
fire  30:9 31:9
    69:1,15 70:8
    70:15,20,24
    79:8 80:4
firearm  28:9
    29:14,15 30:18
    30:20,23 31:6
    31:14 36:11
    38:3 41:11,14
    41:19 42:1,4
    42:18 47:21
    49:15 53:7
    56:6 68:19,23
    69:1 70:16
    73:13 74:7
    76:3 78:20
    79:12 80:10
firearms  28:11
    28:17 29:16
    36:5,7,9,15
    37:14,20 38:12
    44:12 45:2
    50:2 55:3,6,9
    57:6,20 60:12
    62:15 64:24
    65:10,14,23
    66:4 68:2,5,15
    68:16 75:7,10
    75:14 78:9
    79:19
fired  41:11
firing  41:19
    69:16,18

firm  2:2
first  5:9 7:7
    29:4 36:23
    38:3 41:6
    52:11 66:3
    71:20 85:11
fit  68:3
five  21:6,7
    29:17 69:10
    75:21 76:7
fix  84:14
floyd  44:3
foid  19:18
    32:13,14 33:3
    33:17 34:12
    35:12 53:6
    82:22
follows  7:9
forced  68:19,22
    69:1,12
foregoing
    85:13 88:13
    89:18
form  15:20,24
    16:2,5,8,11
    20:12 44:6
    57:23 60:5
    64:19
forms  16:14,23
forth  82:13
forward  87:15
foundation
    45:6 60:6 61:3
    61:16 62:2,4
    65:21

[four - highlight]

| | | | |
|---|---|---|---|
| **four** 28:12 66:16 71:20 | **g** | 13:7 16:17 27:23 31:20 | **h** |

**four** 28:12
66:16 71:20
**fox** 77:24
**foxx** 2:10 4:10
64:5
**fpc** 50:1,15
51:17,20,21
60:12 62:15
63:1 64:8,17
64:20,21 83:10
**free** 88:14
89:20
**freilich** 2:12
4:7
**frequent** 72:4,7
**frequently** 72:1
**friend's** 21:18
**friends** 74:18
74:20,23 75:3
75:6,10
**fugitive** 24:11
**full** 4:3 5:22
14:6,7 41:6
**fully** 6:7
**funding** 15:16
15:18 55:11,13
62:16
**funny** 74:22
**further** 33:11
52:15 63:20
81:22
**furthers** 84:1

**g** 2:2,2 87:5
**general** 1:7
2:12 4:6
**generally** 40:24
**george** 44:3
**gesture** 5:22
**gift** 38:14 39:15
**gifts** 38:15,16
38:18,19,21,22
38:24 39:14
**give** 7:15 8:14
35:13 61:4
83:2
**given** 4:16 5:2
24:5 36:14
65:14,17 72:2
85:18
**giving** 7:19
9:14 43:18
**glance** 77:11
▮▮▮ 37:1,1,24
37:24 38:17
39:6
**go** 5:6 6:6,15
15:21 16:19
21:1 28:16
31:20 35:7
36:16 58:24
69:5,11 78:16
84:4
**goal** 41:24
**goals** 41:24
**going** 5:14,16
5:17,19 6:6

13:7 16:17
27:23 31:20
32:3,6,10
33:10,12 35:5
36:2,12 44:6
47:24 48:5,12
49:11 55:3
60:22 61:2,19
63:8 64:19
70:19 83:13
**good** 4:2 24:13
**google** 76:22
78:1
**gotten** 34:18,22
39:8
**government**
24:5 26:24
**graduate** 12:11
12:12
**graduated** 12:8
13:8
**great** 31:8
**greyhound**
16:11
**ground** 5:6
**group** 14:5,9
46:9 47:4
**guess** 20:11
42:20 47:17
56:17,23 59:2
75:1 77:4
**gun** 66:4,9
73:13 74:8
**gym** 77:11

**hand** 86:5
**handle** 71:6,11
71:15
**happen** 20:9
23:10 52:10
82:19 83:19
**happened**
28:13 47:23
50:23 52:22
53:1 61:7
**happy** 48:13
**hard** 9:6
**harm** 44:20
55:21,22 56:2
56:9,14 57:18
58:14 68:14
**harming** 83:10
**head** 35:6
**health** 24:18
25:4
**hear** 52:7
**heard** 30:8
▮▮▮ 37:8
**hereto** 86:2
**hereunto** 86:4
**heroin** 22:13
**hide** 60:4
**high** 12:8,11,12
12:16 13:8
14:17 26:11
71:19
**highest** 11:24
**highlight** 32:7
33:18

**[hired - jones]**                                                    Page 10

| | | | |
|---|---|---|---|
| **hired**  14:6 41:6 | 85:1,7 86:6 | 76:21 | **invoke**  36:12 |
| **hiring**  54:21 | **impair**  7:14 | **instance**  58:1 | 44:21 |
| **history**  13:7 | **inappropriate** | **institution** | **involve**  69:16 |
| **hit**  69:3 70:2,5 | 60:8 | 24:17 | **involved**  15:5 |
| 70:6,19 | **include**  69:18 | **insure**  46:10 | 49:14 |
| **hold**  12:16 | **included**  16:15 | **intellectually** | **ipad**  8:24 9:1 |
| 14:14 | 30:9 87:13 | 24:20 | **isaac**  4:7 60:7 |
| **holder**  35:24 | **income**  40:16 | **intended**  70:20 | 81:21 |
| **home**  10:22 | **incorporated** | **intent**  49:8 | **issac**  2:12 |
| 21:16 48:23 | 89:12 | **intention**  58:14 | **issue**  25:22 |
| 68:3 77:16 | **incorrect**  32:19 | 68:13 | 63:4 |
| **hope**  17:5 | 35:20 | **intentionally** | **issues**  24:18 |
| **hoped**  82:5 | **increases**  41:2 | 57:17 | 25:4 72:24 |
| **hopefully**  59:3 | **indicating** | **interacted** | 73:3,10 74:1,4 |
| **hoping**  15:9 | 87:13 | 18:22 27:11 | **iv**  37:4 38:1 |
| **hour**  20:6,18 | **indirectly**  86:2 | **interaction** | |
| 20:21 21:13 | **individual** | 27:17 | **j** |
| 25:12 | 29:19 68:5 | **interactions** | |
| **hours**  30:11,15 | 73:16,17 | 31:13 | **j**  2:7 |
| **house**  21:18 | **individuals** | **interest**  62:19 | **jail**  82:21 |
| **huh**  5:23 | 26:15 | 62:22 | **january**  19:21 |
| | **influence**  7:12 | **interested**  86:2 | **job**  51:11 52:4 |
| **i** | 25:8,13,24 | **interfamilial** | **join**  65:3 66:14 |
| | **information** | 38:14 | **joining**  4:5 |
| **identification** | 26:14 29:10 | **intern**  14:4,5 | **jones**  2:12 3:4 |
| 46:18 80:4 | 33:2 36:14 | **internship** | 4:2,5,7,18,21 |
| **identified** | 50:15 52:18 | 13:11 | 5:2,5,21 6:4,10 |
| 51:12 | **initial**  10:5 | **interpreting** | 6:19 7:1,11 |
| **identify**  46:15 | 64:8 | 59:20 | 15:23 16:22 |
| **illinois**  1:1,8,18 | **inquire**  25:22 | **interrogatories** | 20:15 21:4 |
| 2:3,8,13 10:24 | **inquired**  60:19 | 7:8 | 22:8 35:10 |
| 13:10 15:12 | **instagram** | **interrupt**  5:18 | 36:20 40:10,15 |
| 16:15 28:12 | 50:10 71:5,6 | **investigated** | 44:11 45:8,14 |
| 34:11 40:1,4,6 | 71:23 72:11,24 | 26:23 | 57:3 58:2,10 |
| 50:6,20 51:22 | 73:4,10,22 | | 58:21 59:5 |
| 66:6,17 80:7 | | | 60:10 61:6,9 |
| 80:19,24 82:16 | | | 62:6 63:11,16 |

**[jones - mails]**

Page 11

63:20 75:20
81:23 82:4
83:24
**joseph**  18:15
18:17,20
**judge**  4:24
**judgment**  70:4
**june**  13:24
**juror**  15:6
**justice**  24:11

**k**

**k**  71:8 85:3
██████  37:12
**keep**  67:17,24
68:2,9 75:4
79:1,3,5,13
**kim**  2:10 4:10
64:4
**kind**  24:5,9
25:20 27:6
42:21 84:15
**know**  5:16,18
6:20 7:24 8:8
17:16 18:15
26:10,14 31:21
32:3 33:1,11
34:9 45:6,21
47:3 48:1,12
48:17 51:17
53:12 60:9,11
60:16,22 61:12
61:18 62:24
68:18 71:16
73:6,8,21 75:3
75:14 76:7

**knowingly**
55:20,22 56:1
56:8,13
**knowledge**
18:2 56:11
61:21 77:19
**known**  29:21
42:21 58:13
**kram**  71:21
**kwame**  1:7
2:15 87:6 88:3
89:3

**l**

**labeled**  32:8
**lack**  60:6
**lane**  10:24
**law**  2:2 27:11
31:13 44:21
62:5 82:16,19
82:23
**lawful**  31:12
**laws**  31:4
**lawsuit**  14:21
14:24 15:3,6
17:6,10,20
37:1 49:14
50:7 53:3,14
53:22 54:4,5
55:3,9,19 64:9
67:12 83:3,7
**lawyer**  34:15
34:20,23 35:3
35:13 54:7
**legal**  16:18
25:18 28:1

55:12 59:11,14
59:15 87:1
90:1
**legally**  82:17
**letter**  87:19
**letters**  71:20
**letting**  57:9
**level**  11:24
70:15
**lever**  37:9
**license**  28:24
33:21 53:6
86:9
**life**  18:6 20:16
22:11 65:18
**lifetime**  18:12
18:20
**limit**  25:18 28:1
**limits**  68:8,10
68:12
**line**  78:13
87:13 89:7
90:3
**links**  74:15,17
74:19
**list**  16:14 36:9
36:21 66:2,3
**listed**  16:24
89:7,17
**listing**  89:7
**literal**  67:18
**little**  33:10
41:23 48:9
51:16,17 52:15
52:17,24 56:7

**live**  30:9 31:9
50:5,20 69:15
**lived**  11:12
42:20
**lives**  46:7,8
**living**  41:2
**llc**  13:11,22
**loaded**  79:3
**loading**  30:23
**location**  11:7
11:10,13,16
**locked**  78:24
**long**  9:18 11:6
39:10 40:16,20
51:1
**longer**  56:6
**look**  32:11 34:1
**looked**  53:16
**looking**  32:14
36:18 83:2
**looks**  84:8
**loss**  82:21
**low**  70:15
**lower**  37:11,12
**lyft**  16:5

**m**

**m**  2:7 71:9
**madam**  87:10
**made**  40:16,20
43:13 88:7
**mail**  8:10 34:11
34:13 35:2
50:17,18 51:5
**mails**  34:18,22
35:11

main  54:5
maintain  71:3
maintained
  79:17
make  5:7,22
  40:8,18 46:18
makes  5:23
  42:23 43:17
making  54:3
male  51:9
management
  14:5
manager  14:7
  14:10
manual  10:7
  79:7
manufacturer
  36:18
marijuana  22:9
  35:23
marist  12:13,14
mark  1:12 3:3
  4:4,5 7:6 11:5
  15:21 36:16
  37:3,4 38:1
  56:22 60:7
  69:4 71:9,21
  82:3 84:6
  85:10 87:8
  88:4,9 89:4,13
  90:20
marketing  14:5
  14:8
marks  38:2

masters  2:6
matt  26:5,7
  75:9 76:2
matter  46:7,8
matters  85:12
mean  15:14
  52:24 55:8,10
  56:8,9 67:15
  67:24 78:23
means  70:11
  84:6
mechanic  13:17
media  42:14
  47:17 49:15,17
  50:8 71:2,4
  74:10,14 76:20
  77:23
medical  24:17
  35:23
medication
  7:13
meet  53:13
mega  38:9
member  64:17
  64:24 65:6,20
  65:23 66:9,20
  67:1
membership
  78:3
memberships
  67:4
memorial
  23:12
memory  21:11

mental  24:16
  24:18 25:3
mentally  24:14
  25:2
mentioned  10:1
  37:16 48:22
  53:8,21 71:2
  75:9
mercado  2:6
message  8:15
  51:2,5
met  17:21
  18:10,17 26:11
  26:12
methampheta...
  22:23
metra  15:24
  48:22 49:8
midwest  87:17
  90:1
mind  37:17
minutes  9:20
  25:10
misdemeanor
  19:10,13
mishear  28:21
mix  10:6
model  79:6
models  36:19
  36:21
moment  28:16
  31:21 48:1
  49:6
money  65:14

month  11:17
  29:7 51:3
  52:11 72:3
moraine  12:19
  12:21,23
morning  4:2,6
moved  11:17
movie  84:8
moving  56:7
  69:12,19,23
muggings
  47:22
multiple  28:20
  28:22 39:24

**n**

n  3:1 71:8
name  4:3,6
  13:13 29:24
  51:8 64:4 66:5
  71:13,21 87:6
  88:3,4,15 89:3
  89:4,21
named  17:20
names  11:4
  26:4,6
nancy  71:8
naperville
  43:22,23 45:21
naples  10:24
national  67:1
naturalized
  24:2
need  6:21 32:4
  32:11 33:16
  35:20 42:8,11

**[need - page]**

42:18 43:7,9
**needs** 48:17
**never** 18:22
23:17 41:21
64:12 68:18
77:10
**new** 77:24
**news** 42:13,17
43:12,12 47:5
47:6,8 76:19
77:1,3,5,6,7,8
77:20,22 78:3
78:6
**nickname**
71:19
**ninety** 69:10
**noir** 74:9
**nonintern** 41:6
**northern** 1:1
**notarized**
87:14
**notary** 1:17
85:5 87:24
88:10,18 89:15
89:23 90:23
**note** 87:12
**notes** 9:9,9
**notice** 1:14
4:16
**notification**
8:15
**number** 32:8
32:22 87:7,13
**numbers** 26:18
32:7 89:7

**o**

**o** 71:21 85:3,3
**o'clock** 1:19
**oath** 4:19,22,23
22:4
**object** 6:11
15:20 16:17
20:12 35:5
36:10 44:6
56:21 64:19
69:4
**objecting** 40:9
75:18
**objection** 21:1
22:7 40:13
45:5,13 57:22
60:5,5 62:1
75:22 76:4,8
**objections** 58:8
58:19,24
**objective** 25:23
**obtain** 19:17
81:3,8
**obtaining**
80:10
**occasion** 39:14
**occasionally**
50:20 74:15
**occasions** 22:2
25:11
**occurred** 20:24
21:5
**october** 28:14
29:3

**offensive** 60:7
**offered** 59:14
**office** 4:12
26:24 86:5
**officer** 27:12
31:14
**official** 84:9
88:15 89:21
**ohio** 87:2
**okay** 5:5,19
6:13,23 8:9
31:22 63:13,14
**old** 11:20 79:22
**once** 72:3
**ones** 37:23
38:16 46:16
60:15 76:15
**online** 61:4
**open** 8:4,6,10
8:11 9:2
**opinion** 57:16
**opioid** 23:7
**opioids** 22:18
22:21
**option** 70:21,23
**oral** 7:8
**order** 23:4,15
78:15 84:1
**ordered** 25:2
27:8
**ordering** 84:3
84:17
**organization**
61:21 66:14

**organizational**
73:15
**organizations**
65:24 67:5,11
**original** 29:20
30:13
**originally**
28:24
**originator**
17:19
**ought** 68:4
**outcome** 86:3
**outside** 54:4
**override** 58:7
**overturn** 51:24
**own** 10:8 36:5
36:7,22 38:5
54:4 59:21
72:21 75:6,6
75:10 76:2
79:20
**owner** 80:4,10
**owner's** 10:7
**owners** 66:4,10
73:13 74:8
**ownership** 31:5
**owns** 75:14
76:7

**p**

**p** 36:23 37:5
38:1
**pace** 81:15
**page** 32:8,21
48:19 87:13,15
89:7 90:3

**[paid - prior]**                                                    Page 14

**paid**  78:3
███████  37:12
**paraphrasing**
82:6,8
**parents**  11:3,9
11:13 64:13
77:20 80:10
**part**  53:3,22
54:3 56:24
70:5 83:6,18
89:9
**participant**
83:20
**participate**
25:3 50:22
**participated**
28:18
**participating**
43:24 46:2,13
**particular**  79:6
**parties**  86:1
**party**  54:10
**patient**  24:16
35:23
**pause**  36:2
48:13
**pay**  19:17,20
19:23 28:5
55:15,17,18
65:7
**paying**  54:24
60:11,17,20
66:9
**pc**  2:2

**pending**  26:20
**people**  42:15
44:8,9,20 46:9
46:10,19 47:18
50:5 54:4
67:13 68:13
71:12 73:3
**percent**  69:8
70:1,10,11,18
**period**  13:14
14:2
**person**  31:14
51:14 54:6
**person's**  51:11
**personal**  85:16
**personally**
42:11 88:11
89:15
**perspective**
57:5
**phone**  8:14,18
8:19,23 9:1
26:18,19 50:17
51:4,6 52:9,13
52:20 87:3
**phones**  8:21
**phonetic**  74:9
**photos**  36:24
53:5
**phrase**  56:8
**pick**  79:9
**picked**  40:5
**picture**  53:6
**pistol**  10:8

**pistols**  36:8
37:7,24
**place**  42:22,24
50:12,13 85:20
**places**  14:16
29:13 43:22
**plainfield**
38:11
**plaintiff**  2:5
4:10 14:20
17:20 18:9,16
**plaintiffs**  1:5
**plans**  49:2
**platform**  50:9
**please**  4:2 5:21
45:8 87:11,11
**plus**  37:5
**point**  7:4 29:21
70:14
**points**  54:5
**police**  34:12
**policy**  49:16
50:2 55:4,6,9
57:6,20 60:12
62:15 64:24
65:10,14,24
66:4 73:13
74:8
**pops**  60:23
**portion**  49:20
55:23
**possible**  5:8,24
**post**  49:15,17
50:4,11 71:23
72:1,11,13

73:9,24
**posted**  28:1
72:17,23
**poster**  72:5,8
**posting**  73:3
74:13
**posts**  47:17
73:18,21 74:3
76:21
**potential**  49:16
82:21
███████  37:6,6 38:2
38:2
**precision**  37:10
**preparation**
10:17
**prepare**  9:13
9:22 10:2
**preparing**
10:20
**prescription**
22:17,20 23:8
23:11
**press**  61:3
**presume**  27:20
**prevent**  7:18
**previous**  85:9
**previously**  9:17
10:4 57:2,15
58:13
**primary**  73:14
**prior**  12:9 21:3
40:18,22 42:17
53:14

[probably - receipt] Page 15

**probably** 81:19
**problem** 46:12
**procedure** 1:15
88:5 89:5
**proceed** 57:10
**proceedings**
52:23 53:1
85:18
**process** 52:22
**product** 14:5,7
14:9
**production**
34:20,24 35:3
35:13 87:15,17
87:22
**proficiency**
29:17
**profile** 71:3
**program** 8:10
8:11 27:3,6
**prohibition**
82:24
**property** 44:10
45:2 47:1
**protecting**
68:14
**protection** 23:5
23:15
**protective**
78:15
**provide** 34:13
35:3 42:6 60:2
**provided** 29:18
29:22,23 34:16
50:16

**provides** 24:17
**providing** 53:5
55:11 61:17,22
61:24 62:15
**provisions**
78:14
**public** 1:17
15:12,13,15,18
15:24 16:6,8
16:12,14,16,19
16:24 42:1,5,7
42:9,15,19
44:9 45:2
47:21 49:3,9
50:6,21 51:23
65:24 80:15,17
82:7,11,15
83:1 85:6
88:10,18 89:15
89:23 90:23
**published** 47:8
47:18
**pull** 63:8
**punishment**
83:17
**purchase** 39:22
68:2 80:1
**purchased**
39:20 79:22
80:3
**purchasing**
38:13
**purpose** 27:19
**purposes** 36:24

**pursuant** 1:14
1:14 4:16

**q**

**qualify** 57:8
**question** 5:15
6:6,7,15,16,22
6:22 15:21
35:8,9 36:17
44:7 45:10
57:23 68:24
70:17 73:7
75:19 77:7
78:16 82:9
**questioning**
78:13
**questions** 4:13
6:5,12 7:3 10:5
63:20 64:5
84:1
**quick** 61:4
63:12
**quickly** 79:9
**quote** 45:6
67:18,21

**r**

**r** 71:8
**races** 46:11
**ramifications**
59:7,12,16
**randolph** 2:13
**range** 29:16,22
**raoul** 1:7 2:15
4:9,15 87:6
88:3 89:3

**read** 61:4,14
73:2,6,9,19
74:3,13 76:12
76:16 77:22
88:5,6,12 89:5
89:6,17
**reading** 85:21
87:19
**really** 47:11
52:5,21 60:8
83:11 84:8
**reason** 7:17
26:24 47:20
87:14 89:8
90:3
**reasonable**
6:17
**reasons** 58:12
**recall** 22:4 30:2
30:11 33:5
35:6 38:8,16
39:6 45:4,15
45:18,23 46:20
47:7,8 49:20
49:24 50:1,8
51:8,9,11
52:19 53:12
54:12,13 65:4
66:3 71:11
72:10,17 73:18
80:9 81:14,16
**recalled** 45:10
**recalling** 39:20
**receipt** 87:18

**received** 8:15
**receives** 15:15
**recent** 26:13
  28:14 29:2
  72:11 73:18
**recently** 27:14
**recess** 63:15
**recognize** 48:6
**record** 4:3
  85:17 89:9
**reduced** 85:15
**reference** 71:18
  87:7 88:2 89:2
**referenced**
  49:18 88:11
  89:15
**refused** 56:12
  60:2
**regard** 36:13
**regarding**
  36:14 59:15
**regards** 78:1
**registry** 35:24
**related** 34:19
  65:24 66:22
  74:1
**relating** 31:4
  35:12 63:3
**relative** 85:23
  85:24
**relay** 6:1
**release** 61:3
**relevance**
  36:11 40:9
  75:18

**remainder**
  37:20
**remember** 7:14
  13:1 19:24
  20:10,22 23:9
  26:18 47:11,18
  51:7 53:19
  65:22 66:5
  82:8
**remembering**
  7:19
**remote** 1:12
**renewal** 19:21
  29:1 30:14
  34:4,7,9
**repeat** 35:9
**reported** 85:14
**reporter** 5:10
  5:13,24 85:7
  88:7
**represent** 61:2
  64:4
**represented**
  4:11
**representing**
  4:8
**request** 6:21
  89:9,11
**requested** 35:7
**required** 19:17
  87:24
**research** 76:22
**reserve** 84:4,16
**reserving** 84:2

**reside** 10:22
  11:2,15 26:8
**resided** 11:6,9
**residential** 27:2
  27:5
**residing** 11:18
**respected**
  46:11
**response** 44:2
  44:22
**responsibilities**
  13:19 14:1
  52:17
**retreat** 70:24
**returned** 87:18
**reveal** 62:10,13
**revealed** 63:3
**review** 10:16
  34:5 61:13
  84:10,12 87:12
  88:1 89:1
**reviewed** 9:16
  10:2 17:12
  48:9
**richard** 2:7
**ridden** 80:17
  81:13,15,17
**ride** 16:5 48:22
  49:2,9 50:6,20
**ridge** 26:9
**riding** 72:12,13
**rifle** 66:6,17
  67:1
**rifles** 36:8 37:8

**right** 7:21 8:1
  8:11 9:3,7,11
  12:1,9 14:11
  17:13,16 18:23
  22:4 23:18
  26:17 30:9,16
  32:14 35:19
  36:22 37:14
  39:20 41:3
  42:2 43:4,13
  45:24 46:4,16
  46:21 48:17,20
  48:24 49:3
  50:2 53:9,22
  54:22 55:15
  58:18,20,23
  63:6 67:16,22
  75:4 84:10,12
**rights** 44:16
  46:10 67:14
**riot** 45:7
**rioters** 44:14
**rioting** 44:9
  46:16,19,24
  47:19
**riots** 43:22,23
  44:1,2,3,4,13
  45:10,16
**rise** 27:20
**risk** 70:18
**river** 37:9 38:6
  79:23
**road** 2:3
**robbed** 42:15

**[robert - sigale]** Page 17

**robert** 13:11
**rock** 37:9 38:6
  79:23
**rocks** 1:17 5:12
  84:7 85:5 86:9
**rode** 80:15
**role** 14:13,14
**room** 7:21 8:1
  18:3 79:15
**roosevelt** 2:3
**roughly** 13:18
  ▇▇▇ 37:4,5,8
  38:1
**rule** 51:21
**rules** 1:15 5:6
  7:1 9:15 88:5
  89:5

**s**

**s** 37:6 38:2
  87:15 89:8,8
  90:3
**saf** 62:14 63:1
**safe** 78:17,24
  79:13,17
**safety** 29:14
  30:18,20 70:22
  79:5,7
**sales** 13:17
**sanction** 83:16
**saw** 49:15
  50:12,13
**says** 33:4,19
  34:4 57:7,20
**schoenthal** 1:4
  4:9,15 17:18

17:21,24 18:3
18:6 87:6 88:3
89:3
**school** 12:8,11
  12:12,17 13:8
  14:18 26:11
  71:19
  ▇▇▇▇ 37:18
**screen** 5:12 8:6
  36:3 60:22
  63:8
**script** 84:9
**scroll** 32:3,4,6
  32:10 33:10
  48:5,12
**scrolling** 32:21
**seal** 86:5 88:15
  89:21
**search** 71:12
  78:2
**second** 5:21
  10:1 44:16
  52:13 53:8
  61:3,16 62:3
  65:20 66:22
  67:6,7,13,16,18
  67:22 68:11
  72:23 73:3,9
  74:1,3,21,23
  75:1
**security** 42:7,9
**see** 5:12 31:22
  31:24 32:7,15
  32:18,22 33:11
  33:14,18 34:5

48:2 49:17
50:11 60:23,24
61:10 63:9
67:5 68:3
**seeing** 32:4
  42:13,17 54:13
  76:21
**seek** 59:11,15
  77:13,20
**seeking** 15:17
**seem** 37:14
**seems** 59:24
**seen** 35:18
  73:19,21
**self** 69:2 70:16
**sending** 53:4
**sends** 74:17
**sent** 51:2 74:15
**september** 1:19
  86:6 87:4
**service** 16:5,11
**set** 86:4
**seven** 29:17
**several** 71:2
**share** 13:6
  26:13 28:13,17
  30:9 31:20
  33:12 36:2,2
  47:15,24 52:1
  52:3 60:22
**shared** 7:2
  12:17 14:17
  25:10 29:2
  41:23 43:12
  48:9 52:20

**sharing** 32:1,11
  35:19
**sheet** 87:13
  89:7,10,18
  90:1
**shipped** 40:4
**shoot** 29:21
**shootings** 47:22
**shop** 26:12
**short** 6:21
**shorthand** 85:7
**shotguns** 36:8
  37:15,19
**showing** 44:19
  44:23 48:6
  63:12
**shown** 87:16
**siblings** 64:15
**side** 8:18
**sig** 37:5
**sigale** 2:2,2 3:5
  6:10 15:20
  16:17 20:12
  21:1 22:7 35:5
  36:10 40:9,13
  44:6 45:5,8,12
  54:7 56:3,21
  57:19,22 58:3
  58:6,8,19,24
  60:5 61:5,8
  62:1 64:7,19
  69:4 75:18,22
  76:4,8 78:13
  81:21 82:2
  83:23 84:2,3

87:5
**sigalelaw.com**
2:4
**sign** 5:23 53:11
62:18
**signature** 48:20
84:2,5,16 86:8
87:14
**signatures**
54:13
**signed** 33:5,8
53:8 54:6 59:7
59:10 62:21
88:13 89:18
**signing** 33:5
54:18 85:21
87:19
**similar** 23:21
43:20 74:7
**sincerely** 87:21
**sir** 87:10
**sister** 11:14,15
**site** 78:6
**sites** 71:3 77:22
77:23 78:4
**sitting** 4:23
7:22 83:7
**situation** 41:18
69:22
**siu** 12:5 13:10
**six** 11:8
**skills** 29:10
**slowly** 32:5
**small** 47:2

**smart** 8:18
**smashing** 45:2
**smith** 37:4
38:17
**smoked** 22:9
**social** 42:14
47:17 49:15,17
50:8 71:2,4
74:10,14 76:20
77:23
**solutions** 87:1
90:1
**somebody** 6:12
7:24
**somewhat**
49:22
**sort** 41:1
**sound** 5:19 6:8
6:16
**spc** 64:20
**speak** 10:19
59:10 63:17
**speaking** 40:12
**specific** 30:2
39:14 47:18
**specifically**
46:15 47:7
51:22 65:4
67:10
**specifics** 64:9
**specified** 85:20
**speculation**
45:5,9 56:22
57:23 62:1
69:4

**speed** 27:23
**speeding** 27:22
**spelled** 71:21
**spoke** 64:12
**spoken** 17:23
**sponsoring**
55:7,9
**sports** 13:9,14
38:9
**ss** 85:2
**stalking** 23:5
**stamp** 33:13
**standing** 69:22
**start** 5:15
11:18 13:23
**started** 14:4
52:23 53:1
**starting** 13:7
41:5 66:2
**state** 1:8,18 4:2
15:16,19 31:4
34:11 37:12
66:6,17 80:7
85:1,6,8 88:10
89:15
**state's** 4:12
**statement** 10:4
68:6,20 88:13
88:14 89:19,19
**states** 1:1,16
23:23 24:1
40:2,3
**stating** 45:13
**stenographic...**
85:14

**steps** 41:1
**sticking** 83:12
**stop** 27:18,19
28:3 45:8
**stopped** 27:21
**storage** 31:5
**store** 39:23
78:12
**stores** 39:23,24
40:1
**story** 78:1
**straightforwa...**
59:24
**strategy** 57:5,6
**street** 2:13
**strongly** 75:3
**student** 80:21
80:22
**style** 79:19
**subject** 23:4
26:20 78:14
**submitted** 9:17
10:7,10,11
36:24
**subscribed**
88:10 89:14
90:21
**substance** 7:13
23:2
**suburbs** 42:21
43:4,10,15,17
43:18 48:23
**successfully**
31:16

**suit** 15:10
**suite** 87:2
**summarize**
54:1
**summers** 43:21
**superior** 87:1
**support** 14:9
14:10 61:17,22
61:24 62:16
**supporter** 67:8
**supporters**
46:5 67:6
**sure** 19:15
36:21 57:11
**surgery** 22:19
**surrounding**
27:16
**switched** 14:8
**sworn** 4:1 7:8
85:11 88:10,13
89:14,18 90:21
**sylvia** 2:6
**sylvia.merca...**
2:8
**system** 49:3,9

**t**

**take** 4:22 5:13
6:19,23 12:8
23:17 25:20
30:8 31:16
32:10 33:16
35:20 49:11
63:11 84:4,17
84:18

**taken** 1:16 5:2
28:9,11,20,23
69:15 85:19
**talk** 54:4
**talked** 64:9
76:15 80:23
**talking** 10:10
43:24 45:7
53:15 58:3
**target** 70:2,20
**taurus** 37:5
**team** 14:8
**technical** 10:6
14:9
**technology**
12:7 13:5
**television** 42:14
76:23,24 77:4
77:7,20
**tell** 4:19 51:14
51:19 52:24
57:19 83:15
**ten** 29:17 81:19
**term** 15:13,14
16:3,6,9,12,16
16:16
**terms** 10:7
**terrifying** 44:4
**test** 24:4,8
25:20
**testified** 7:9
45:11 82:3
**testify** 85:11
**testifying** 7:18

**testimony**
85:18 88:6,7
89:6,9,12
**thank** 63:21
**thanks** 4:5
**theory** 79:8
**thing** 35:7
84:15
**things** 7:14
23:18 42:13
53:4 67:5,12
74:21 76:12
77:5
**think** 10:13
21:5 30:8
46:23 52:11
54:5 56:17,19
57:11,14,16
58:1,14,17
60:4 61:6
67:12 68:10,13
70:4,18 71:11
80:23
**thinking** 47:12
**third** 48:19
**thought** 70:23
**threat** 83:10
**threatening**
44:9
**three** 10:17
20:14 21:3,7
21:11 25:11
37:15,19 38:21
38:23 39:2,19
65:5 66:15

**thumbs** 5:22
**ticket** 28:3,5,7
**tight** 43:1
**time** 6:11,11,19
11:10 13:10,22
14:6,7 20:16
22:19,21 26:9
28:14 32:11
33:16 35:20
40:11 41:7
55:5 63:11,21
65:11,13 80:5
80:15 81:17
82:21 85:20
**times** 20:20
21:5,11 28:20
28:22,23 48:23
71:3 77:24
**today** 4:12,14
4:18 5:7 7:12
7:18 9:14
14:14 15:10
54:8 56:13
71:3 83:7,9
**today's** 5:9
**token** 5:17
**told** 45:13 64:7
68:18
**took** 22:21
28:24 29:12
30:12
**top** 33:18 34:4
35:6
**topic** 72:10

**[town - vicinity]**                                       Page 20

**town**  12:14,23
  38:10
**traffic**  27:18,19
**train**  69:13
**trained**  30:3
  69:21
**trainer**  29:19
  30:2,7
**trainers**  30:5
**training**  28:9
  28:11 29:16,18
  29:20,22 30:22
  69:15
**trainings**  28:17
  29:11,11,23
  30:12 31:3,12
  31:17,18 69:16
  69:18
**transcribed**
  88:7
**transcript**  84:7
  84:8 85:14,22
  87:11,12 88:5
  88:12 89:5,11
  89:17
**transcription**
  85:16
**transit**  42:19
  47:21 49:3,9
**transport**
  15:12,13 31:5
  42:7,9 51:23
**transportation**
  15:15,18,24
  16:2,6,8,12,15

16:16,24 42:1
  42:5,16 50:6
  50:21 82:8,12
  82:15 83:1
**travel**  47:20
**treatment**
  24:18 25:3
  27:3,6,9
**tried**  19:1
**trouble**  32:4
**true**  17:15
  79:19 85:17
**truth**  4:19
  85:11
**truthful**  7:15
  7:19
**try**  76:21
**trying**  6:1
  51:17,20
**turn**  8:20,24
  34:15
**turned**  34:19
  34:23
**tv**  77:8
**twenty**  11:8
**twitter**  71:5,10
  73:24 74:1
**two**  8:21 14:16
  21:9,11 24:9
  37:3,10 38:19
  74:11 75:9
  79:14
**tx**  37:5
**type**  4:23 69:21

**types**  74:19
**typewriting**
  85:15
**typically**  74:22
  76:20 77:24
**typographical**
  84:14

### u

**u.s.**  46:11
**uh**  5:23,23,23
**ultimately**
  16:18
**unarticulated**
  83:10
**unconfident**
  70:11
**unconstitutio...**
  51:23 62:5
  82:24
**under**  4:19
  7:12 22:4 25:8
  25:13,24 34:5
  58:16 70:2
  85:16
**understand**
  4:18,21 6:4 7:1
  7:5 42:2 68:1
  70:17
**understanding**
  5:7 56:4 82:18
**understood**  6:7
**united**  1:1,15
  23:23 24:1
**university**
  80:19,24 81:4

81:7
**unloaded**  79:14
**unloading**
  30:23
**unquote**  45:6
**updated**  34:12
**urbana**  80:20
  81:1
**usa**  29:22
**use**  15:13 16:3
  16:6,9,12,16
  27:3,6,9,9
  29:14 49:4
  68:5 74:10
  76:22
**used**  22:13,15
  22:17,23 23:1
**using**  5:21 42:7
  42:9,15 50:15

### v

**v**  87:6 88:3
  89:3
**valley**  12:20,21
  12:23
**vehicle**  69:19
  69:23
**veritext**  87:1,7
  90:1
**veritext.com.**
  87:17
**versus**  4:9,15
**vessel**  18:15,17
  18:20
**vicinity**  9:3,4

**[victoria - zoom]**                                                    Page 21

| | | | |
|---|---|---|---|
| **victoria** 1:16 | 24:23 25:22 | 60:9 62:3 | **wrong** 13:13 |
| 5:12 85:5 86:9 | 38:14 43:13 | 63:13 69:6 | 40:24 |
| **video** 72:13 | **weapon** 79:8 | 75:23 76:5,9 | **x** |
| **videos** 73:2,7 | **web** 8:11 | 78:17 85:10,22 | **x** 3:1 |
| 74:22 | **websites** 74:14 | 86:4 87:8,11 | **xl** 36:23 38:1 |
| **view** 57:21 | **wesson** 37:4 | 88:1,4,11 89:1 | **y** |
| **views** 58:7 | 38:17 | 89:4,15 | **yards** 29:17 |
| **violate** 82:19 | **wgn** 77:1 | **witnesses** 49:16 | **year** 10:14 40:8 |
| **violation** 23:14 | **whatsoever** | **witness'** 87:14 | 40:17,18,21 |
| **violent** 47:23 | 25:3 | **woodridge** | 48:24 49:23 |
| **visible** 9:7,10 | **wheaton** 2:3 | 10:24 | 65:11 66:13,20 |
| **visiting** 80:21 | **whereof** 86:4 | **worded** 59:24 | 66:22 |
| **vs** 1:6 | **white** 9:10 | **words** 5:22 | **years** 11:8,13 |
| **w** | **widecki** 26:7 | **work** 8:19,23 | 11:19 20:14 |
| **w** 2:3,13 | **willing** 8:20 | 59:3 | 21:3 65:5 |
| **waived** 85:22 | 50:7,21 | **worked** 13:9 | 66:15 81:19 |
| 87:19 | **willingness** | **working** 13:6 | **yesterday** 9:16 |
| **waivers** 62:19 | 44:20,23 | 13:12,14 26:12 | 9:19 |
| 62:22 | **windows** 8:5 | **worth** 13:10 | **york** 77:24 |
| **walk** 83:18 | 45:3 47:1 | **wrangler** 37:6 | **yoursel** 72:4 |
| **walking** 83:17 | **wins** 57:21 | **write** 73:21 | **z** |
| **walther** 37:6,6 | **winston** 18:8 | **writes** 84:7 | **zoom** 5:10 8:4 |
| **want** 42:4 | 18:10,13 | **wroblewski** | 61:5 |
| 47:20 48:17 | **witness** 3:3 4:1 | 1:13 3:3 4:4 | |
| 60:4 65:4 | 4:4,17,20 5:1,4 | 7:6 11:5,5 | |
| 83:11,18 | 5:20 6:3,9,18 | 31:22 48:1 | |
| **wanted** 19:3 | 6:24 7:5,7 15:2 | 58:23 61:10 | |
| 46:9 51:17 | 15:22 16:21 | 63:18 85:10 | |
| **warrant** 26:21 | 20:14 21:3 | 87:8 88:4,9 | |
| **watch** 8:18,21 | 26:2 35:9 | 89:4,13 90:20 | |
| 8:23 73:2,7,9 | 36:18 40:14 | **wroblewski's** | |
| 76:23 77:1,3,8 | 44:8 45:9 50:7 | 36:14 | |
| **watching** 77:17 | 52:16 55:24 | **wrobo** 71:20 | |
| **way** 15:6 18:5 | 56:23 58:1,9 | **wrobokram** | |
| 18:13,19,22 | 58:20 59:2 | 71:7,12,18 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.