**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

BENJAMIN SCHOENTHAL, *et al.*,

                Plaintiffs,

      v.

KWAME RAOUL, *et al.*,

                Defendants.

3:22-CV-50326

Hon. Iain D. Johnston

**STATE PARTIES' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Isaac Freilich Jones
Christopher G. Wells
Gretchen Elizabeth Helfrich
Office of the Illinois Attorney General
115 S. LaSalle St., 20th Floor
Chicago, Illinois 60603
Tel. 312-814-3000
isaac.freilichjones@ilag.gov
christopher.wells@ilag.gov
gretchen.helfrich@ilag.gov

# TABLE OF CONTENTS

I.    Plaintiffs lack standing to challenge restrictions applicable to "buildings, real property, and parking areas" controlled by public transit systems. ....................................................... 1

II.   Plaintiffs misrepresent the *Bruen* standard. ........................................................... 2

    A.  1791 is not the sole focus of the *Bruen* analysis—19th century history, standing alone, is sufficient to show a tradition of firearm regulation. ....................................................... 2

    B.  Plaintiffs misstate the requirements to establish a "representative" historical tradition. ................................................................................................... 4

    C.  Plaintiffs misstate the test for "relevant" similarity under *Bruen*. ..................................... 5

III.  The State Parties have shown that the Act is consistent with our Nation's history and tradition, and Plaintiffs' arguments to the contrary fail. ........................................................ 6

IV.   Defendants have shown that the Act is a constitutional "sensitive place" restriction. ........ 13

    A.  Public transit systems are analogous to historic sensitive places. ................................... 14

        1.   Plaintiffs' "security" theory of sensitive places is wrong. ......................................... 15

        2.   Public transit systems are analogous to the recognized sensitive places of the Colonial and Founding eras. ..................................................................................... 19

    B.  The Act is relevantly similar to Founding era sensitive place restrictions. ...................... 20

    C.  Even if Plaintiffs' "security" theory is accepted, Plaintiffs still cannot prevail. .............. 22

        1.   Modern public transit systems are protected by security exceeding that implemented at the sensitive places of the Colonial and Founding eras. ................. 22

        2.   Plaintiffs' "security" theory, if accepted, requires the dismissal of their facial challenge to the Act. ................................................................................................... 23

Conclusion ....................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ........................................................ 4, 13, 19

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) .......................................................5-6

*Cervantes v. Ardagh Grp.*, 914 F.3d 560 (7th Cir. 2019) ............................................................. 9

*Davis v. FEC*, 554 U.S. 724 (2008) ............................................................................................... 2

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................................. 3, 4, 9

*Frey v. Nigrelli*, 661 F. Supp. 3d 176 (S.D.N.Y. 2023)...................................................... 11, 20

*Johnson v. U.S. Office of Personnel Management*, 783 F.3d 655 (7th Cir. 2015) ........................ 2

*Kipke v. Moore*, 2023 U.S. Dist. LEXIS 174934 (D. Md. Sep. 29, 2023)............................. 11, 12

*Midwest Fence Corp. v. United States DOT*, 840 F.3d 932 (7th Cir. 2016)................................ 24

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................................................. passim

Plaintiffs' motion for summary judgment demands the Court enter an injunction allowing concealed firearms on all public transit in Illinois. The Court should reject their request. Off the bat, Plaintiffs concede they lack standing to challenge most of the areas covered by the Act,[1] requiring the Court to dismiss all claims to the extent they challenge restrictions applicable to buildings, real property, and parking areas owned or operated by public transit agencies. As to the merits, whether or not Plaintiffs' conduct is covered by the plain text of the Second Amendment, *See* Plfs.' Mem. in Support of their Motion for Summary Judgment ("Plfs.' MSJ Mem."), ECF 70, at 8–9, their motion for summary judgment must still be rejected. The State has already demonstrated that public transit systems are sensitive places where firearms may be prohibited, and that the Concealed Carry License Act's restrictions are consistent with the Nation's historical tradition of firearm regulation. Plaintiffs' claims to the contrary are based on a cribbed reading of applicable caselaw, and a distorted analysis of the historical record. For all of these reasons, and because there is no genuine dispute as to material fact, the State Parties respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment, grant the State Parties' motion for summary judgment, and enter final judgment in favor of Defendants.

## I.      Plaintiffs lack standing to challenge restrictions applicable to "buildings, real property, and parking areas" controlled by public transit systems.

Defendants' summary judgment briefing demonstrated that Plaintiffs lack standing to challenge restrictions on concealed carry applicable to buildings, real property, and parking areas controlled by public transit systems because they have no intent to visit such locations while carrying a concealed handgun. *See* State Parties' Mem. in Support of their Mot. for Summary Judgment ("State MSJ Mem."), ECF 65, at 5–7. Plaintiffs do not contest this point, and do not

---

[1] Defined terms used in this filing have the same meaning as in the State Parties' Mem. in Support of their Mot. for Summary Judgment, ECF 65.

1

claim to have standing to challenge restrictions on concealed carry that apply to these types of locations. *See* Plfs.' MSJ Mem., ECF 70, at 3, 4–7. Rather, Plaintiffs argue only that they have standing to challenge restrictions that apply to them when they "ride on public transportation." *Id.* at 5. Accordingly, Plaintiffs lack standing to challenge restrictions applicable to buildings, real property, and parking areas controlled by public transit systems, and may not proceed on any such claims. *See*, *e.g.*, *Davis v. FEC*, 554 U.S. 724, 734 (2008) (standing "is not dispensed in gross," and a plaintiff must demonstrate standing "for each claim he seeks to press" and "for each form of relief that is sought."); *Johnson v. U.S. Office of Personnel Management*, 783 F.3d 655, 663 (7th Cir. 2015) (A plaintiffs lacks standing to "attack a perceived problem that does not cause him injury, regardless of its organizational relationship to other provisions . . . that do cause him injury.").

## II.  Plaintiffs misrepresent the *Bruen* standard.

Plaintiffs say that a tradition of regulation can only be shown to exist if the State identifies analogous restrictions in effect in "many" states immediately surrounding 1791 that were implemented in the same "context." Plaintiffs also attempt to add elements to the test for "relevant similarity" with no basis in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *See* Plfs.' MSJ Mem., ECF 70, at 9–14. Their approach finds no support in *Bruen*, and must be rejected.

### A.  1791 is not the sole focus of the *Bruen* analysis—19th century history, standing alone, is sufficient to show a tradition of firearm regulation.

Plaintiffs contend that "the key" era in the *Bruen* analysis is "the Founding era, centering on 1791," and that evidence derived from later periods should carry little-to-no weight, except to the extent that it confirms Founding era practice. *See* Plfs.' MSJ Mem., ECF 70, at 9–13. In particular, Plaintiffs insist that under *Bruen*, "[r]estrictions on the right to keep and bear arms

adopted prior to or during the Reconstruction era may be confirmatory of earlier legislation but cannot alone provide the historical analogue required by *Bruen*." *Id.* at 13.

Plaintiffs' argument misleadingly portrays a *sufficient* method of demonstrating the existence of a history and tradition of regulation, recasting it as a *necessary* method despite *Bruen*'s own admonition to avoid such an interpretation. *Bruen* specifically acknowledged an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope," but did "not address this issue" because "the public understanding of the right to bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, 597 U.S. at 38. This statement makes clear that *Bruen*'s reliance on Founding era history is not, as Plaintiffs contend, an implicit statement that *only* Founding era history is relevant. Instead, it simply means that under certain circumstances, Founding era history is *sufficient* to show a well-established tradition of regulation.

This interpretation is confirmed by the record used in *Bruen* to reaffirm *Heller*'s determination that "schools" are sensitive places where firearms may be prohibited. The sources the Supreme Court relied on to reach this conclusion *did not identify a single Colonial or Founding era restriction on firearms in schools*.[2] Rather, *Bruen*'s recognition that schools are sensitive places was based on specific citations to three mid-19th century college rules and one late-19th century statute barring students from being armed on campus. *See* State MSJ Mem., ECF 65, at 10. Moreover, this absence of early sources in the Supreme Court record cannot be explained away

---

[2] *See Bruen*, 597 U.S. at 30 (citing (a) Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute); *see also* State MSJ Mem., ECF 65, at 10 (reviewing *Bruen*'s discussion of schools).

through an argument that schools were somehow "new" in the 19th century. Indeed, numerous schools of all types operated across the colonies before and during the Founding era.[3] *Bruen* and *Heller* therefore make clear that 19th century history can demonstrate an "enduring" and "well-established" tradition of regulation as to a type of location, even if (i) that type of location existed during the Founding and Colonial eras, and (ii) there are no examples of firearm regulations that applied to that sensitive place during the Founding and Colonial eras.

**B.    Plaintiffs misstate the requirements to establish a "representative" historical tradition.**

Plaintiffs say that historical analogues are only "representative" if "they are present in many states and therefore affect large swathes of the population." Plfs.' MSJ Mem., ECF 70, at 13–14. Plaintiffs' argument is inconsistent with the Colonial and Founding era record supporting *Bruen*'s conclusion that polling places, legislative assemblies, and schools are sensitive places. The Court's conclusion as to "legislative assemblies" was based on two Maryland colonial statutes (enacted in 1647 and 1650) barring weapons in the Maryland Assembly.[4] The Court's conclusion as to "courthouses" was based on a single Founding era 1786 Virginia statute.[5] And the Court's reaffirmation of *Heller*'s conclusion that "schools" are sensitive places was based on *no* Colonial or Founding era statutes, and only a single post-Reconstruction Mississippi statute (as well as a

---

[3] *See* State Parties' Combined Response to Plaintiffs' Statement of Material Facts and Statement of Additional Facts ("Additional Fact Statement") ¶ 42.

[4] *See Bruen*, 597 U.S. at 30 (citing Ex. 14, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 233 (2018) (citing Ex. 18, 1647 Md. Laws 216 and Ex. 19, 1650 Md. Laws 273)); SOF ¶ 18.

[5] *See Bruen*, 597 U.S. at 30 (citing Ex. 15, Brief for Independent Institute as Amicus Curiae at 12 (citing Ex. 20, 1786 Va. Acts 33, ch.21)); SOF ¶ 18. In addition to these Colonial and Founding era laws, the sources cited by the Supreme Court also referenced a small number of 19th century rules relating to courthouses, polling places and legislative assemblies. However, "*Bruen*'s analysis was independent of those laws." *Antonyuk v. Chiumento*, 89 F.4th 271, 304 n.11 (2d Cir. 2023). At most, they would have provided the Court with "confirmation of what the Court thought had already been established" by Colonial or Founding era law. *Bruen*, 597 U.S. at 37.

handful of rules enforced by specific colleges).[6] The documents cited by the Supreme Court did not include any reference to such restrictions in any other colonies. In other words, *Bruen* itself demonstrates that there are circumstances in which a restriction need not be present in "many states" during the Colonial and Founding eras in order to be "representative." *See* State MSJ Mem., ECF 65, at 9 (discussing Supreme Court's conclusion that legislative assemblies are sensitive places based on actions taken by a single state legislature).

### C.    Plaintiffs misstate the test for "relevant" similarity under *Bruen*.

Plaintiffs admit, as they must, that a historical restriction is analogous to a modern restriction if it (a) creates a comparable burden on the rights secured in the Second Amendment, and (b) was enacted for similar reasons. Plfs.' MSJ Mem., ECF 70, at 14; *see also Bruen*, 597 U.S. at 29 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry."). But Plaintiffs attempt to transform this legal framework by purporting to add an additional third requirement—that the historical regulation must not have been enacted in a "different context[]." Plfs.' MSJ Mem., ECF 70, at 14.

Plaintiffs' attempt to add this additional "context" element to the test for relevant similarity finds no support in *Bruen*, or the Seventh Circuit's subsequent binding caselaw. *See Bevis v. City*

---

[6] The two secondary sources cited in *Bruen*'s discussion of the history of sensitive places collectively provide specific citations to four sources as justifying restriction on carrying firearms in schools: Ex. 22, Meeting Minutes of University of Virginia Board of Visitors 4–5 Oct. 1824 at 5; Ex. 23, University of Nashville 1837 rule, 7 American Annals of Education and Instruction 185 (1837); Ex. 24, Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina ch. 5, § 13 (1838) at 11; and Ex. 25, 1878 Miss. Laws 176. SOF ¶ 23. One of the sources also asserted, without providing citations, references, or quotations, that Dickinson College, La Grange College, and Waterville College also imposed similar restrictions on students carrying firearms. *See* Ex. 15, Brief for Independent Institute as Amicus Curiae, at 14–16; SOF ¶ 24.

*of Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023) (A regulation is relevantly similar "if one can provide answers to two questions: (1) how, and (2) why, does a given regulation 'burden a law-abiding citizen's right to armed self-defense'?"). Indeed, it is *contrary* to *Bruen*. The Supreme Court explicitly recognized that a modern regulation need not be enacted in the same context as a historical regulation to be analogous when it cautioned that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27; *see also id.* at 30 (analogical reasoning under the Second Amendment is not "a regulatory straightjacket," and *Bruen* requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*"). In other words, *Bruen* itself recognizes that the contexts in which firearms may be constitutionally restricted can change over time as technology and societal concerns change. Plaintiffs' attempt to add a requirement that *Bruen* forecloses must be rejected.

### III. The State Parties have shown that the Act is consistent with our Nation's history and tradition, and Plaintiffs' arguments to the contrary fail.

The State Parties have shown that modern public transit systems are "new" types of sensitive places resulting from dramatic technological changes and presenting unprecedented societal concerns. *See* State MSJ Mem., ECF 65, at 14–16; Salzmann Report, ECF 64-1; Rivas Report, ECF 64-11. Consequently, *Bruen* requires the application of a more "nuanced approach" to the process of examining historical analogies. *Bruen*, 597 U.S. 1 at 27. Whether or not this "nuanced" approach applies, however, the State Parties have demonstrated that the Act fits within a long-standing tradition of firearm regulation stretching from "medieval England to Reconstruction America and beyond." *See* State MSJ Mem., ECF 65, at 26.

Plaintiffs ask the Court to ignore the law and this extensive record. Their central argument the lack of "laws banning firearms while individuals travelled," and the occasional practice of

travelling or attending public events while armed during the Colonial and Founding eras, is dispositive evidence the Act is unconstitutional. *See* Plfs' MSJ Mem., ECF 70, at 17–19, 25–26. In making this argument, Plaintiffs rely on *Bruen*'s statement that when "a general societal problem . . . has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem" or a history of "[a]ddress[ing] the societal problem" through means "materially different" from a modern statute is evidence that the modern statute is unconstitutional. *See Bruen*, 597 U.S. at 26–27.

This argument fails because the "general societal problem" driving occasional armed travel and armed public event attendance during earlier eras of American history was the insecurity and danger of life on the frontier.[7] Indeed, conflict (and often warfare) between European settlers and Native tribes was a persistent issue in frontier zones in the 17th and 18th centuries. *See* Additional Fact Statement ¶¶ 44–46. Dr. Rivas' expert report also points out that Plaintiffs rely on examples from eras when travel "involved . . . exposing oneself to predatory animals," and when "conflicts with neighboring Indian groups posed a serious threat to colonists." Additional Fact Statement ¶

---

[7] For example, Plaintiffs cite 17th century Virginia sources requiring that certain persons be armed while "abroad" or while at church *See* Plfs.' MSJ Mem., ECF 70, at 25–26 (citing Ex. 53 to ECF 72; Ex. 55 to ECF 72). The background of these sources, as shown in Dr. Rivas's report and Plaintiffs' own evidence, was the disorder, and insecurity, and conflict with Native nations that existed during the earliest days of European settlement in Virginia, and the need to guard against slave insurrection. *See* Rivas Report, ECF 64-11, at 37 ("Guns were mandated in church because slaveholders and neighboring whites feared that the large Sunday gathering might become a target for a revolt or uprising on the part of enslaved people."); Ex. 53 to ECF 72 (providing that "every dwelling house shall be pallizaded [sic] in for defence against the Indians," and that "there be dew watch kept by night."; Ex. 55 to ECF 72 (establishing day of thanksgiving "in commemoration of our deliverance from the Indians"). Similarly, Plaintiffs cite a 1639 Rhode Island source that required that "noe man shall go two miles from Towne unarmed," but fail to note that this requirement was implemented in the context the initial European settlement of Rhode Island, a process also attendant with significant insecurity and conflict. *See* Ex. 54 to ECF 72 (requiring travel with arms while outside town, and memorializing plan to seek permission from King of England to settle a new colony of Rhode Island); *see also* Additional Fact Statement ¶¶ 44–46.

45; Rivas Report, Ex. 64-11, at 34–35. The purpose of laws such as those cited by Plaintiffs was "related to serious concerns about war and vulnerability to attack by nearby enemies." Rivas Report, Ex. 64-11, at 34–35. Even *Plaintiffs'* briefing supports this conclusion, admitting that armed travel occurred because conditions were "likely dangerous due to the presence of wildlife, hostile Native American tribes, and more." Plfs' MSJ Mem., ECF 70, at 17.

But this "societal problem" has not "persisted" into modern times, and is completely different from the "societal problem" addressed by the Act. Today, a person travelling via bus or train through a public transit system faces no danger from either "hostile Native American tribes" or "wildlife." *See* Additional Fact Statement ¶ 45; Rivas Report, ECF 64-11, at 35 ("To travel then was altogether different from boarding a CTA bus or train in Chicago today."). Indeed, as the State Parties showed in their summary judgment papers, the Act was passed for the twin purposes of preventing the unlawful use of weapons, and ensuring that persons carrying concealed weapons do not pose a threat to public order or safety. *See* State MSJ Mem., ECF 65, at 25. Given the substantial differences between the societal problems addressed by the Act and those addressed by early American armed travel, Plaintiffs cannot prevail by relying on an absence of actions identical to the Act during earlier eras. *See Bruen*, 597 U.S. at 26–27.

Plaintiffs also contend that the State cannot rely on the fact that "modern transportation is more technologically advanced than the forms existing in the Colonial and Founding eras." Plfs' MSJ Mem., ECF 70, at 18–19. Plaintiffs' argument is inconsistent, however, with *Bruen*'s clear statement that a more "nuanced approach" applies to "cases implicating . . . dramatic technological changes." *Bruen*, 597 U.S. 1 at 27. Not only have Defendants' experts and summary judgment briefing have shown that this predicate is met, but Plaintiffs admit this to be the case when they

concede that the Founding generation "may not have imagined today's myriad modes of public transportation." *See* Plfs.' MSJ Mem., ECF 70, at 15.

Next, Plaintiffs say defendants "cannot support [the Act] merely by arguing that public transportation is a novel creation and may only be judged based on 19th and 20th century analogues." Plfs' MSJ Mem., ECF 70, at 19. But as Defendants have already shown, *Bruen* affirmed *Heller*'s determination that "schools" are sensitive places based citations to a record that included only 19th century precedent. Moreover, Plaintiffs argue against a strawman, because the State Defendants did far more than argue "based on 19th and 20th century analogues." Plfs.' MSJ Mem., ECF 70, at 19. Rather, the State Parties showed that the Act is part of the history and tradition stretching back to the Colonial era of excluding firearms from sensitive places, that public transit systems are analogous to recognized sensitive places, and that the Act is analogous to the restrictions that applied to those recognized sensitive locations. *See* State MSJ Mem., ECF 65, at 14–25. This is sufficient under *Bruen*, which states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30.

Plaintiffs' remaining historical assertions are equally flawed. Plaintiffs spend multiple pages pointing out that vehicles have been used to transport people and goods since at least the 16th century. *See* MSJ Mem., ECF 70, at 15–17. Perhaps so, but an argument framed at so high a level of generality does nothing to illuminate the issues now before the Court. *See Bruen*, 597 U.S. at 29 ("[e]verything is similar in infinite ways to everything else," and one therefore "needs some metric enabling the analogizer to assess which similarities are important and which are not"); *cf. Cervantes v. Ardagh Grp.*, 914 F.3d 560, 565 (7th Cir. 2019) ("These similarities occur, however, at far too high a level of generality."). Indeed, at Plaintiffs' proposed level of generality, one would

be forced to conclude that the communicating using the internet is not "new" because horse-drawn carriages conveyed letters between correspondents during the Colonial era. Moreover, if Plaintiffs' framing is followed to its logical conclusion, the Second Amendment would require that firearms be allowed on *all* forms of modern transportation vehicles and infrastructure, including aircraft and airports, a consequence Plaintiffs do their best to evade.[8] Plaintiffs' reliance on an analysis framed at such an excessively high level of generality must be rejected. In any event, the extent to which colonial governments regulated private transportation services contending with the risks of travel on the frontier during the Colonial era is not determinative of whether the Act's restrictions on firearms on modern public transit systems is constitutional. *See Bruen*, 597 U.S. at 27 (requiring a "nuanced" approach in cases "implicating unprecedented societal concerns or dramatic technological changes.").

Relying on citations to several colonial statutes, Plaintiffs' also misleadingly state that "many ferries during the Colonial and Founding eras were . . . publicly owned and operated." Plfs.' MSJ Mem., ECF 70, at 16 (citing to Ex. 12 to ECF 72; Ex. 13 to ECF 72; Ex. 14 to ECF 72; Ex. 15 to ECF 72). Plaintiffs' conclusion is in error, and caused by a failure to examine and understand the sources they cite. As Professor Salzman's report shows, "[p]rior to [the first half of the 20th century], transportation services were provided exclusively by private entities that usually received a charter or license to operate from a state or local government." Additional Fact Statement ¶ 47; Salzmann Report, ECF64-1, at 3; *see also* Rivas Report, ECF 64-11, at 24 ("Until the twentieth

---

[8] Plaintiffs attempt to distract the Court from this consequence of their argument through their "security" theory of sensitive places, suggesting that this result is foreclosed because areas with government provided comprehensive security are *ipso facto* sensitive places. *See* Plfs' MSJ Mem., ECF 70, at 19–25. But for the reasons addressed in Defendants' summary judgment papers and this opposition, this "security" theory cannot stand. *See* State MSJ Mem., ECF 65, at 19; disc. *infra*. Consequently, if Plaintiffs' argument as to transportation is accepted, it would apply to aircraft and airports to the same extent that it applies to subways and buses.

century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers."). Ferries, for example, were typically established by "[p]rivate entrepreneurs," with the "the sanction of local governing bodies." Additional Fact Statement ¶ 48; Salzmann Report, ECF 64-1, at 13. The permission to establish a ferry often came with various stipulations from government authorities including fees, assurances the operator would provide consistent service, and an agreement about the toll travelers had to pay. Agreements such as these go back to early days of British colonization. *See* Additional Fact Statement ¶ 49; Salzmann Report, ECF 64-1, at 13. Even though subject to regulation, these private entities were private corporations endowed with robust property rights, including the right to refuse service and the right to establish safety policies. *See* Additional Fact Statement ¶ 50; Rivas Report, ECF 64-11, at 38.

Read with this background in mind, it is clear that the statutes Plaintiffs cite did not establish "publicly owned and operated" transportation systems at all. Rather, they authorized private parties to do so, and regulated the manner in which such private entities were required to operate. Additional Fact Statement ¶¶ 47–50; Rivas Report, ECF 64-11, at 38; Salzmann Report, ECF 64-1, at 13. Plaintiffs' contrary interpretation is based on a superficial, ahistorical reading of the relevant documents, and has been consistently rejected by federal courts. *See Kipke v. Moore*, 2023 U.S. Dist. LEXIS 174934, at *31 (D. Md. Sep. 29, 2023) ("While there is no doubt that transportation existed at the time of the founding, almost all transportation was provided by private companies."); *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 205 (S.D.N.Y. 2023) ("[T]rain travel was provided by private transportation systems until the 20th century, sometimes operating under a government charter."). "[B]ecause State-operated transit barely existed at the founding, the Court

must take a more nuanced approach to the historical analysis." *Kipke*, 2023 U.S. Dist. LEXIS at *32.

Plaintiffs speciously rely on the fact that in some instances, state statutes allowed certain persons to travel while armed under certain conditions, including while on certain ferries. *See* Plfs.' MSJ Mem., ECF 70, at 17–18. Plaintiffs again fail to properly analyze the sources they cite. As Dr. Rivas's expert report shows, this so called "travel exception"

> was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors.

Rivas Report, ECF 64-11, at 21–22; *see also* Additional Fact Statement ¶¶ 51–52. Moreover, Plaintiffs' evidence suggests that the background understanding of members of the Colonial and Founding generations was that under normal circumstances travelers would *not* be armed, or allowed to use transit when armed. *See* Rivas Report, ECF 64-11, at 37. It took an act of legislation to authorize a departure from this underlying presumption, and allow persons to travel armed at certain times, and under certain circumstances, such as times of war or conflict. *Id.*

The problems with Plaintiffs' argument is well-illustrated through their reliance on an 1821 Tennessee statute, which Plaintiffs say "exempted [from firearm laws] 'any person that may be on a journey . . . .'" Plfs.' MSJ Mem., ECF 70, at 18 (citing 1821 Tenn. Acts 15, ch. 13). As Dr. Rivas has shown, however, Tennessee law narrowly defined this rule, rejecting the proposition that "a 'journey' meeting the standards of a travel exception 'should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties.'" Rivas Report, ECF 64-11, at 22; *see also id.* at 23–24. Because these types of rules were enacted to address different societal concerns than exist today, and did not apply to "the kind of travel associated with modern public transportation,"

Rivas Report, ECF 64-11, at 21, they say nothing about whether the Act constitutionally restricts firearms on modern public transportation.

Given the law and history described above, the evidence Defendants presented in their summary judgment papers plainly meets the *Bruen* standard. Defendants showed that our nation has a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." State MSJ Mem., ECF 65, at 26 (quoting *Antonyuk*, 89 F.4th at 356). Defendants also showed how, beginning in the 19th century, this unbroken tradition of firearm regulation began to be exercised in a new form of mass transportation that had only recently emerged—railroads. *Id.* Many of the most important railroads in the nation, including the North Pennsylvania Railroad Company, the Central Pacific railroad, the Union Pacific railroad, the International & Great Northern Railroad Company, and the Albany Railroad, barred passengers from carrying firearms. *Id.* at 26–29. This record meets the *Bruen* standard. Indeed, it is far more extensive than the record the Supreme Court relied on to affirm that schools, legislative assemblies, polling places, and government buildings are sensitive places where firearms may be constitutionally restricted.

In sum, Plaintiffs' evidence is presented in a distorted and ahistorical manner, and fails to create a triable dispute. The Court should recognize that the Act is consistent with our Nation's history and tradition of prohibiting firearms and other weapons in sensitive places, and deny Plaintiffs' motion for summary judgment.

## IV. Defendants have shown that the Act is a constitutional "sensitive place" restriction.

*Bruen* allows the State to demonstrate the Act is constitutional by showing (a) that public transit systems are "new" and analogous to the recognized sensitive places of earlier eras, and (b) that the Act is analogous to the restrictions on firearms that applied to those locations. *Bruen*, 597 U.S. at 30. The State Parties' Motion for Summary Judgment met that standard, showing that the

Act constitutionally prohibits firearms on public transit systems because (a) public transit systems are analogous to historical sensitive places such as government buildings, schools, legislative assemblies, courts, and polling places, and (b) the Act itself is relevantly similar to the prohibitions on firearms that applied in those places. *See* State MSJ Mem., ECF 65, at 17–25.

Plaintiffs do not (and cannot) dispute that the State Parties applied the proper standard. *See* Plfs.' MSJ Mem., ECF 70, at 19–25; *see also Bruen*, 597 U.S. at 30. Instead, Plaintiffs assert that the Act does not meet this standard for two reasons. First, they say that public transit systems are not analogous to historical sensitive places because they are protected by less government-provided security than existed at historical sensitive places. And second, they insist that the Act is not analogous to historic restrictions on firearms that existed at those locations because it sweeps too "broadly" by preventing concealed carry license holders from carrying firearms during journeys that pass through public transit systems. *See* Plfs.' MSJ Mem., ECF 70, at 19–25. Both of these attempts to distinguish public transit from its historic predecessors fail.

## A.    Public transit systems are analogous to historic sensitive places.

Plaintiffs rely primarily on one argument as to why public transit systems cannot be sensitive places. They assert that the "unifying feature" of sensitive places at the Founding was "comprehensive, government-provided security."  Plfs.' MSJ Mem., ECF 70, at 20; *see also* Compl., ECF 1, ¶ 63 ("The unifying feature of the historically accepted sensitive places where individuals were deprived of the right to bear arms was security."). Plaintiffs then contend that public transit systems cannot be considered sensitive places because they do not have such "comprehensive security" systems in the form of "armed guards," "metal detectors," and "controlled entry points."  *See* Plfs.' MSJ Mem., ECF 70, at 23.

Plaintiffs' argument fails because their "security" theory of sensitive places is unsupported by historical evidence. Moreover, even if the Court accepts Plaintiffs' "security" theory of

sensitive places (it should not), Defendants still prevail because public transit systems provide sufficient security, and because Plaintiffs cannot sustain their facial claim where the constitutionality of the Act as applied would depend on the specific security levels enforced on a given transit system.

### 1. Plaintiffs' "security" theory of sensitive places is wrong.

Plaintiffs' theory is based on a stunted record that fails to consider multiple types of sensitive places, and ignores the teaching in *Bruen*. *Bruen* expressly recognizes five types of sensitive places—schools, government buildings, legislative assemblies, polling places, and courthouses. *Bruen*, 597 U.S. at 30. *Bruen* instructs that it is "settled that these locations were 'sensitive places' where arms carrying could be prohibited" by government regulation, and that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* Plaintiffs' "security" theory of sensitive places, however, is based solely on a review of sources relating to legislative assemblies, polling places, and courthouses, while ignoring and omitting any historical analysis relating to government buildings or schools. *See* Plfs.' MSJ Mem., ECF 70, at 21–23.

This omission was no accident, because the history of security in government buildings and schools conclusively shows that security has never been the "unifying feature" of sensitive places. As the State Parties demonstrated in their summary judgment motion, key government buildings such as the President's Houses in New York and Philadelphia, the White House in Washington, Senate facilities, and the headquarters of the Departments of State, War, and Treasury were protected only by office clerks and door-keepers in the Founding era. *See* State MSJ Mem.,

ECF 65, at 20–22. None were protected by anything approaching the "comprehensive" security Plaintiffs suggest.

The history of security in schools likewise negates Plaintiffs' "security" theory. Scholars have only been able to trace the history of formal security measures in public schools back to the 1950s, and there is no evidence of the widespread use of such measures in public schools before the mid-20th century.[9] Moreover, nothing approaching the "comprehensive" security Plaintiffs' theory demands has *ever* been provided in the vast majority of public schools. According to some of the most recent data available, only about 6% of public schools provide the "metal detectors" that Plaintiffs say is the *sine qua non* of a modern sensitive place.[10] Less than a third of public schools have a full-time "school resource officer" responsible for security.[11] And even this level of security is a recent development.[12] This history demonstrates that Plaintiffs' assertion that "comprehensive" security is the "unifying feature" of sensitive places cannot be squared with the Supreme Court's determination that schools and government buildings are sensitive places.

Moreover, even the stunted record Plaintiffs do provide undercuts their claims. Plaintiffs purport to support their "security" theory through "examples" of security measures in place at "legislative assemblies, polling places, and courthouses." Plfs.' MSJ Mem., ECF 70, at 20–23. But many of Plaintiffs' citations, buried without analysis or explanation in string-cites, do not show what Plaintiffs say they do. Take, for example, Plaintiffs' nearly page-long string cite purporting to show that the legislatures of "Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law

---

[9] Additional Fact Statement ¶ 53.

[10] Additional Fact Statement ¶ 54.

[11] Additional Fact Statement ¶ 55.

[12] Additional Fact Statement ¶ 53.

16

enforcement to attend and provide security at their legislatures." Plfs.' MSJ Mem., ECF 70, at 21. A review of Plaintiffs' sources shows that Plaintiffs have mischaracterized their own record:

- **Delaware**—Plaintiffs cite to and attach a 1793 Delaware act "for regulating and establishing fees," but this act provides no evidence that law enforcement officers were compensated for providing security at the Delaware Assembly. Rather, the Delaware "sergeant at arms" was compensated *only for his time traveling to serve orders, take persons into custody, and attend on persons committed to his care while away from the General Assembly*. *See* Ex. 24 to ECF 72. In other words, there is no evidence in this 1793 act that the sergeant-at-arms was compensated for attending and securing the location of the Delaware Assembly itself. Rather, the houses of the Delaware Assembly appear to have been staffed by clerks, a single "bell-ringer," and one "door-keeper" in each house. *Id.*

- **South Carolina**—Plaintiffs cite to and attach a 1787 South Carolina act "for regulating and fixing the salaries of several officers," but this act also provides no evidence that law enforcement officers were compensated for providing security at the South Carolina Assembly. Rather, the cited act authorizes salaries for two clerks, several messengers, and two "door-keepers." *See* Ex. 26 to ECF 72. There is no discussion in this exhibit regarding any security afforded to the South Carolina Assembly. *Id.*

- **New York**—Plaintiffs cite to and attach an 1809 New York statute, but this statute has nothing to do with the New York Assembly. Rather, it provides for the regulation of the ranks and organization of New York militia units by, for example, providing that each "brigade" of the militia shall consist of four "regiments." *See* Ex. 27 to ECF 72. There is no discussion in this exhibit regarding any security afforded to the New York Assembly. *Id.*

17

- **Georgia**—Plaintiffs cite to and attach an 1807 Georgia appropriations statute, but this statute also does not show that any law enforcement protected the Georgia Assembly. Rather, the cited act authorizes salaries for several clerks, messengers, and door-keepers. *See* Ex. 28 to ECF 72. There is no appropriation for security afforded to the Georgia Assembly in this act. *Id.*

- **New Jersey**— Plaintiffs cite to and attach a 1770s New Jersey ordinance, but once again this statute also does not show that any law enforcement protected the New Jersey Congress. Rather, the cited ordinance authorizes salaries for several clerks, secretaries and messengers. *See* Ex. 29 to ECF 70. There is no appropriation for any security afforded to the New Jersey Congress in this act. *Id.*

- **Virginia**— Plaintiffs cite to and attach journal entries from a meeting of the Virginia Assembly in 1782 memorializing correspondence between the Assembly and Virginia officials and an examination conducted by the Virginia Assembly into expenditures made from certain accounts. *See* Ex. 30 to ECF 70. But again, this record does not show that any law enforcement officials protected the Virginia Assembly (although it does contain data on the process used to burn paper money during a period of apparently high inflation). *Id.*

And while three of the documents Plaintiffs cite and attach do record that fees were authorized for sheriffs and sergeants-at-arms for time spent attending three general assemblies, Plaintiffs present no evidence that those law enforcement officers *were ever actually present at assemblies*, or the level of security they would have provided had they attended. Rather, Plaintiffs only point out that those officials would have been compensated *if* they had been present. *See* Ex. 23 to ECF 72 (Rhode Island statute of 1798); Ex. 25 to ECF 72 (Pennsylvania Statute of 1789); Ex. 31 to ECF 72 (Vermont statute of unidentified year published in 1808).

In sum, Plaintiffs' argument that comprehensive government-provided security is the "unifying feature" of sensitive places in the Colonial and Founding periods is without support. There is no evidence of any comprehensive government-provided security at general government buildings, schools, or legislative assemblies during these eras. Rather than being a "unifying feature" of sensitive places overall, Plaintiffs' limited evidence shows it was, at most, a feature of some polling places and courthouses. *See* Plfs.' MSJ Mem., ECF 70, at 23. Their theory is therefore inconsistent with their own historical evidence, and must be rejected.

### 2. Public transit systems are analogous to the recognized sensitive places of the Colonial and Founding eras.

Not only is Plaintiffs' "security" theory wrong, but the State Parties have shown that modern public transit systems are analogous to recognized sensitive places because (i) they are crowded spaces in which vulnerable individuals are more exposed to harm from gunfire; (ii) they are publicly accessible; and (iii) they are publicly owned or operated. *See* State MSJ Mem., ECF 65, at 17–19. In an attempt to cast doubt on these core similarities, Plaintiffs cite to *Bruen*'s statement that "there is no historical basis" to find a place "sensitive" "simply because it is crowded." Plfs.' MSJ Mem., ECF 70, at 23 (citing *Bruen*, 597 U.S. at 31). As an initial matter, authority subsequent to *Bruen* have made clear that Plaintiffs misread *Bruen*. For example, the Second Circuit has recognized "a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 89 F.4th at 356. Beyond that, the State Parties' argument did not rely on crowding alone to show that modern public transit systems are analogous to historical sensitive places. Rather, Defendants argued and showed that modern public transit systems, like historic sensitive places, are publicly owned and operated, publicly accessible, *and* crowded spaces in which vulnerable individuals are more exposed to harm from gunfire. *See* State

MSJ Mem., ECF 65, at 17–19; *see also Frey*, 661 F. Supp. 3d at 205 (recognizing public transit is "government owned and operated"). Consequently, Plaintiffs' argument does nothing to cast doubt on the proposition that public transit infrastructure is analogous to the recognized sensitive places of the Colonial and Founding eras.

    **B.**    **The Act is relevantly similar to Founding era sensitive place restrictions.**

Plaintiffs' only argument distinguishing the burden of the Act from the burden of historic sensitive place prohibitions is that the Act sweeps too "broadly." Plfs.' MSJ Mem., ECF 70, at 19. In other words, Plaintiffs say that the restriction on carrying a handgun in or on public transit systems is not comparable to historic sensitive place restrictions because it inherently prevents a person from carrying a handgun *to* public transit, and from carrying a handgun *after departing* public transit. *See* Plfs.' MSJ Mem., ECF 70, at 3 (the Act "effectively bars carrying before the journey, during the journey, and after the journey for all individuals that use public transit"); *see also id.* at 19–20, 23, 24.

At the outset, Plaintiffs misrepresent the Act to suggest it imposes a burden beyond what it actually requires. Plaintiffs assert that "Illinoisans who drive their cars to the train station [and subway station or bus station] and park before riding cannot have a readily operable firearm in their car." Plfs.' MSJ Mem., ECF 70, at 19. Plaintiffs are wrong. The Act specifically provides that "any licensee prohibited from carrying a concealed firearm into the parking area of a prohibited location [such as a public transit system]. . . shall be permitted to carry a concealed firearm on or about his or her person within a vehicle into the parking area and may store a firearm or ammunition concealed in a case within a locked vehicle or locked container out of plain view within the vehicle in the parking area." 430 ILCS 66/65(b). Moreover, a "licensee may carry a concealed firearm in the immediate area surrounding his or her vehicle within a prohibited parking lot area" for the "limited purpose of storing or retrieving a firearm within the vehicle's trunk." *Id.*

20

As a result, and contrary to Plaintiffs' claims, a person driving to a public transit system need not disarm prior to commencing their trip at all. *Id.*

That aside, the burden of the Act is no greater than the burden of the historical regulations that applied at sensitive places such as courthouses, legislative assemblies, and polling places. *See Bruen*, 597 U.S. at 30 (court should compare modern regulations to regulations applicable to sensitive places where it is "settled" that "arms carrying could be prohibited"). As the State Parties showed in their motion for summary judgment, firearms were prohibited in courthouses, legislative assemblies, and polling places under constitutional sensitive place restrictions enacted during the Colonial and Founding eras. *See* State MSJ Mem., ECF 65, at 23–24; *see also Bruen*, 597 U.S. at 30. A person travelling to a courthouse in which the possession of firearms was prohibited during the Founding era was therefore prevented from carrying a firearm for the entirety of their journey, unless that person had a place to lawfully store their firearm during the period in which they were physically in that courthouse. The same would be true of trips passing through schools, journeys to petition a legislative assembly in person, journeys to visit the President's House, or trips to polling places to exercise the right to vote. In each case, anyone wishing to pass through each sensitive place would have a choice between either (a) finding a place to store their firearm during the period in which they were in the sensitive location, or (b) disarming during the trip to and from that sensitive place.

Just like these historical regulations, the Act prohibits firearms in a sensitive place—public transit systems. *See* 430 ILCS 66/65(a)(8). Also like these historical regulations, a person cannot pass through the sensitive place in question carrying a firearm, and must either store it during their time in the sensitive place, or disarm before their trip. *Id.* There is therefore no distinction between the burden imposed by the Act, and the burdens associated with historic prohibitions on firearms

21

applicable at sensitive places during the Colonial and Founding eras. *See* State MSJ Mem., ECF 65, at 23–24.

In sum, modern public transit systems are analogous to government buildings, schools, courthouses, legislative assemblies, and polling places, and the restrictions imposed by the Act are "historical twins" of the restrictions imposed in the sensitive places of the Colonial and Founding Eras. The State has therefore borne its burden of demonstrating that the Act is constitutional.

**C.** **Even if Plaintiffs' "security" theory is accepted, Plaintiffs still cannot prevail.**

Even if the Court accepts Plaintiffs' "security" theory of sensitive places (it should not), their claims still fail for at least two reasons. *First*, the public transit systems at issue here plainly impose security levels far in excess of those implemented at the sensitive places of the Colonial and Founding eras. *Second*, the constitutionality of the Act could then only be evaluated on an as-applied, location-by-location basis, requiring the dismissal of Plaintiffs' facial challenge.

**1.** **Modern public transit systems are protected by security exceeding that implemented at the sensitive places of the Colonial and Founding eras.**

As described above and in Defendants' motion for summary judgment briefing, the typical sensitive places that existed during the Colonial era, the Founding era, and through the mid-19th century were protected exclusively through whatever security the clerks and door-keepers attending that location might provide. *See* State MSJ Mem., ECF 65, at 20–22 (discussing level of security at the President's home, Congress, and headquarters of the Departments of State, War, and Treasury); disc. *supra* (discussing level of security provided in colonial state assemblies).

Given this record, Plaintiffs cannot plausibly justify their claim that "metal detectors," armed guards, and "controlled entry points" are necessary for a modern place to be secured in a manner analogous to the sensitive places of the Colonial and Founding eras. *See* Plfs.' MSJ Mem., ECF 70, at 25 ("[T]he closest thing to the comprehensive security provided at the Founding . . . is

the armed guards and metal detectors."). Rather, a modern location with only a single part-time "door-keeper" would be providing at least as much security as there was at the President's home, Congress, and headquarters of the Departments of State, War, and Treasury during the Founding era. *See* State MSJ Mem., ECF 65, at 20–22. Today's public transit systems, by contrast, are far more protected than even Congress and the President's house were during the Early Republic. *See* State MSJ Mem., ECF 65, at 22 (summarizing modern transit security). As a result, even if Plaintiffs' "security" theory is accepted, the public transit systems at issue in this case qualify as sensitive places.

2. **Plaintiffs' "security" theory, if accepted, requires the dismissal of their facial challenge to the Act.**

If Plaintiffs' "security" theory is correct (it is not), then Plaintiffs cannot prevail on their facial challenge at all—rather, they would only be able to prevail to the extent they were bringing an as-applied challenge to the enforcement of the Act in specific transit lines with (in their view) inadequate security levels. To illustrate, under Plaintiffs' theory the extent to which the Act might be constitutionally enforced would depend on a fact-intensive analysis of the security measures that exist at specific public transit facilities. Security levels, however, vary by location. For example, the O'Hare Airport Transit System has little if any security—it is available directly from O'Hare parking lots, and is outside of the O'Hare Airport security perimeter.[13] By contrast, the Chicago Transit Authority's elevated rail lines have controlled entry points, patrols by law enforcement, numerous security cameras, and more. *See* State MSJ Mem., ECF 65, at 22. Other Illinois public transit systems have different types of security in place. *See*, *e.g.*, *id.* (discussing security on public transit in and around East St. Louis). If Plaintiffs' theory were correct, the

---

[13] This system provides local transportation at between O'Hare Airport Airport's multiple terminals, parking areas, and the O'Hare multi-modal facility. *See* Additional Fact Statement ¶ 56.

constitutionality of the Act as applied to each location would differ, based on the specifics of the security levels implemented at the place of enforcement. *See Midwest Fence Corp. v. United States DOT*, 840 F.3d 932, 941 (7th Cir. 2016) ("A facial challenge ordinarily requires a plaintiff to show there is no set of circumstances under which the challenged statutes or regulations can operate constitutionally."). Here, however, Plaintiffs have brought a facial challenge, not an as-applied challenge. *See* Compl., ECF 1, at Prayer for Relief. Under Plaintiffs' theory that facial challenge must be rejected, because there is plainly *some* attainable level of security around public transit systems that would allow the Act to be constitutionally applied. In other words, even if the Court accepts Plaintiffs' legal theory (it should not), the Court would still be obligated to reject their claim.

## CONCLUSION

For all of these reasons, and for the reasons stated in Defendants' Motion for Summary Judgment and its supporting papers, the State Parties respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment, and enter final judgment in favor of Defendants.

March 25, 2024

Isaac Freilich Jones
Christopher G. Wells
Gretchen Elizabeth Helfrich
Office of the Illinois Attorney General
115 S. LaSalle St., 20th Floor Chicago,
Illinois 60603
Tel. 312-814-3000
isaac.freilichjones@ilag.gov
christopher.wells@ilag.gov
gretchen.helfrich@ilag.gov

Respectfully submitted,

Defendants KWAME RAOUL, RICK AMATO,
ROBERT BERLIN, and ERIC RINEHART

KWAME RAOUL,
Illinois Attorney General

By: */s/ Isaac Freilich Jones*
*One of the Attorneys for the State Defendants*

24

## CERTIFICATE OF SERVICE

      The undersigned certifies that on March 25, 2024 they caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record.

                                    */s/ Isaac Freilich Jones*
                                    Assistant Attorney General