**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

BENJAMIN SCHOENTHAL, *et al.*,

                Plaintiffs,

    v.

KWAME RAOUL, *et al.*,

                Defendants.

No. 3:22-CV-50326

Hon. Iain D. Johnston

**DEFENDANT FOXX'S RESPONSE IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT</u>**

# TABLE OF CONTENTS

I.   **Plaintiffs' Motion for Summary Judgment Fails on Procedural Grounds** ………… 1

    A.  **Portions of Plaintiffs' "Attachment A – Historical Appendix" Must Be Disregarded** …………………………………………………………………… 1

    B.  **Plaintiffs' 56.1 Statement Violates the Local Rules and Portions Should Be Disregarded** …………………………………………………………………… 7

    C.  **Plaintiffs' Undisclosed Experts, Referenced for the First Time in Their Brief, Should Be Disregarded** …………………………………………………………9

II.  **The Statute Does Not Violate the Second Amendment**………………………………... 11

    A.  **Plaintiffs Have No Second Amendment Right to Carry Firearms on Private Property** …………………………………………………………………….... 11

    B.  **Plaintiffs' Conduct is Not Covered by the Plain Text of the Second Amendment Where the Statute Does Not Infringe on Plaintiffs' Right to Keep and Bear Arms** ……………………………………………………………………  13

        i.    **Plaintiffs fail to show that the Statute infringes upon their right**……… 13

        ii.   **Discharging a firearm while aboard a confined vehicle is fundamentally incompatible with lawful self-defense**………………… 15

    C.  **The Statute is Consistent with the Nation's Historical Treatment of Firearms** ……………………………………………………….………… 16

        i.    **The Supreme Court has not determined that 1791 is the only relevant time period to consider** ……………………………………………………… 16

        ii.   **Analogous regulations existed restricting the time and place of carrying firearms** ……………………………………………………………… 17

        iii.  **Other provisions of the Bill of Rights provide relevant historical analogues** …………………………………………………………………… 20

    D.  **Plaintiffs' Preemptive Rebuttal of a Sensitive Places Argument Does Not Refute Defendants' Historical Analysis** …………………………………………….. 22

        i.    **The sensitive places doctrine exists outside *Bruen*'s historical tradition framework and is not solely a source for potential historical analogues** . 22

        ii.   **Plaintiffs' analysis of sensitive places as a poor source of historical analogues is unavailing** …………………………………………………..  24

CONCLUSION………………………………………………………………………………. 25

**TABLE OF AUTHORITIES**

Cases                                                                                                    Pages

*Anderson v. Milwaukee County*, 433 F.3d 976 (2006) ……………………………………21, 22

*Agency for International Development v. Alliance for Open Society International, Inc.*,
    570 U.S. 205 (2013) …………………………………………………………………….. 12

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ……………………………………… 17

*Barth v. Village of Mokena*, 2006 WL 862673 (N.D. Ill. 2006) ……………………….......... 5

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) …………………………………….. 17

*Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 2000 U.S. App. LEXIS 29027
    (7th Cir. 2000) …………………………………………………………………….......... 7

*Buttron v. Sheahan*, 2003 U.S. Dist. LEXIS 13496 (N.D. Ill., August 4, 2003) ………………… 9

*Butts v. Aurora Health Care, Inc.*, 387 F. 3d 921 (7th Cir. 2004) ……………........................ 7, 8

*Cady v. Sheahan*, 467 F. 3d 1057 (7th Cir. 2006) ………………………………………… 9

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ………………………………………… 21

*Carr v. State*, 34 Ark. 448 (1879) ……………………………………………………… 20

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ……………………………………... 17

*District of Columbia v. Heller*, 544 U.S. 570 (2008) ………………………………… 13, passim

*Darby v. State*, 23 Tax. Ct. App. 407 (1887) ……………………………………………20

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) ………………………………………..12

*Eslava v. State*, 49 Ala. 355 (1873) ……………………………………………………… 20

*Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554 (N.D. Ill. Mar. 19, 1993) …. 15

*Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 607 (N.D. Ill. December 19, 2011) ………………5

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) …………………………..11

*Gentleman v. Massachusetts Higher Educ. Assistance Corp.*, 2019 U.S. Dist. LEXIS 135684
    (N.D. Ill. August 12, 2019) ……………………………………………………………….7

*Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007) ………………………………………………11

*Hague v. Committee for Indus. Org.*, 307 U.S. 496 (1939) …………………………………… 21

*International Society for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992) ……………...... 21

*Johal v. Little Lady Foods, Inc.,* 434 F.3d 943 (7th Cir. 2006) ………………………………… 7

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F. 3d 371
   (7th Cir. 2008) …………………………………………………………………………….. 9

*Karum Holdings LLC v. Lowe's Cos.*, 895 F. 3d 944 (7th Cir. 2018) ………………………..  2

*Kirsch v. Brightstar Corp.*, 78 F. Supp. 676 (N.D. Ill. 2015) …………………………….…  5

*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) ……………………………………… 21

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) …………………………………………….  11

*Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill., 2000) ……………………………..................... 5, 9

*Markham v. White,* 172 F.3d 486, 490 (7th Cir. 1999) ………………………....................... 7

*McDonald v. City of Chicago*, 561 U.S.742 (2010) ………………………......................... 23

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ……………………… 4, passim

*Palmer v. Marion County,* 327 F. 3d 588 (7th Cir. 2003) ………………………................... 7

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981) ………………………… 12

*People v. Morgan*, 719 N.E.2d 681 (Ill. 1999) ………………………........................... 15

*People v. Nunn*, 541 N.E.2d 182 (Ill. App. 1989) ………………………........................... 15

*Pfeil v. Rogers,* 757 F.2d 850 (7th Cir. 1985) ………………………....................... 8

*Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962
   (7th Cir. 2012) …………………………………………………………………………….. 12

*Salamanca v. Robert Half Corp.,* 2003 U.S. Dist. LEXIS 5602 (N.D. Ill. Apr. 4, 2003) ………..9

*Sledge v. Comcast ABB Mgmt., LLC*, 2012 U.S. Dist LEXIS 85832 (N.D. Ill., June 20, 2012) …9

*Smith v. State*, 50 Tenn. 511 (1872) …………………………………………………………..20

*Stilly v. State*, 27 Tex. Ct. App. 445 (1889) …………………………………………………… 20

*Uncommon, LLC v. Spigen, Inc.*, 926 F. 3d 409 (7th Cir. 2019) ………………………….. 2

*United States v. Rettenger*, 344 F.3d 702 (7th Cir. 2003) …………………………………10

Rules

F.R.C.P. 26 ………………………………………………………………………… 2, 3, 5

F.R.C.P. 37 ………………………………………………………………… 2, passim

F.R.C.P. 56 …………………………………………………………………... 7, 11

F.R.E. 702 ……………………………………………………………………… 10

F.R.E. 801 ……………………………………………………………………… 10

F.R.E. 802 ………………………………………………………………………10

F.R.E. 901 ……………………………………………………………………… 6

F.R.E. 902 ……………………………………………………………………… 6

L.R. 56.1…………………………………………………………………………6, passim

Statutes

720 ILCS 5/24-1-1.5………………………………………………………… 16

720 ILCS 5/24-1.2 ………………………………………………………….. 16

Other Sources

A DICTIONARY OF THE ENGLISH LANGUAGE: A DIGITAL EDITION OF THE 1755 CLASSIC BY SAMUEL JOHNSON …………………………………………………………………13, 14

English Black Act 9 Geo. 1(1723) …………………………………………………….. 19

4 William Blackstone, Commentaries On The Laws Of England 183–84 (1769) …………….. 15

William Hawkins, 1 A TREATISE OF THE PLEAS OF THE CROWN 73 (4th ed. 1762) ….. 19

J.W. Jones, A Translation Of All The Greek, Latin, Italian & French Quotations Which Appear In Blackstone's Commentaries 116 (T. & J.W. Johnson & Co. 1889) …………………………… 15

Defendant Kimberly M. Foxx, in her official capacity as Cook County State's Attorney ("Defendant"), and through her assistant Jessica M. Scheller, hereby responds to Plaintiffs' Motion for Summary Judgment:

## **ARGUMENT**

Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston ("Plaintiffs") flaunt the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Illinois in what amounts to a "summary judgment by ambush." Plaintiffs rely largely on documents that were never produced, witnesses who were never disclosed, and arguments masquerading as "facts" set forth in their Rule 56.1(a)(2) Statement of Undisputed Facts ("Plaintiffs' Rule 56.1"). Defendant Cook County States Attorney ("Defendant") was not afforded the opportunity to challenge any of this evidence and saw it for the first time when it was filed with Plaintiffs' motion for summary judgment. For this reason alone, Plaintiffs' dispositive motion should be deemed unsupported by evidence in the record. Substantively, Plaintiffs fair no better. They have failed to establish that the Second Amendment is implicated in this case. And even if they had made such a showing, Plaintiffs fail to rebut Defendant's showing that Section 65 of the Illinois Firearm Concealed Carry Act (hereafter, the "Statute") is consistent with the historical tradition of firearm regulation in this country. For these reasons, Plaintiffs' motion for summary judgment fails.

## I.     **Plaintiffs' Motion for Summary Judgment Fails on Procedural Grounds.**

On February 5, 2024, Plaintiffs moved for summary judgment. Dkt. 69-72 ("Plaintiffs' Motion".) Plaintiffs filed a document titled "Attachment A – Historical Appendix", comprised of academic or legal journal articles and copies of various statutes and public records. Dkt. 72. Plaintiffs also filed a Statement of Undisputed Facts which they maintain entitles them to summary

judgment. Dkt. 71. Plaintiffs' Attachment A violates Plaintiffs' obligations to disclose documents under the Federal Rules of Civil Procedure and violates Local Rule 56.1. Plaintiffs' Attachment A is inadmissible in its entirety and must be disregarded by this court in ruling on summary judgment. Likewise, portions of Plaintiffs' Statement of Undisputed Facts rely on undisclosed documents and witnesses, make use of inadmissible hearsay, and violate Local Rule 56.1. Those alleged undisputed facts, identified below, must also be disregarded by this court. Finally, Plaintiffs cite directly to several journal articles in their memorandum in support of summary judgment, Dkt. 70. Plaintiffs' use of those sources likewise violates both the rules of civil procedure and the rules of evidence, as well as Local Rule 56.1, and must be disregarded.

### A. Portions of Plaintiffs' "Attachment A – Historical Appendix" Must Be Disregarded.

A party who fails to disclose information in response to an interrogatory or request to produce is generally not allowed to use that information as evidence. Fed. R. Civ. P. 37(c)(1) (citing Fed. R. Civ. P. 26(e)). Exclusion of non-disclosed information in discovery is mandatory under Rule 37(c)(1) unless the plaintiff's failure was harmless or justified. *Karum Holdings LLC v. Lowe's Cos.*, 895 F. 3d 944, 951-52 (7th Cir. 2018). The court weighs four factors in determining whether to excuse a plaintiff's violation of Rule 37(c)(1): "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Uncommon, LLC v. Spigen, Inc.*, 926 F. 3d 409, 417 (7th Cir. 2019).

In support of Plaintiffs' attempts to affirmatively rebut a history and tradition of analogous firearms regulation, Dkt. 70 at 15, Plaintiffs filed a 244-page tranche of materials which they had

not previously disclosed. Each Plaintiff was served with Requests for Production which requested all documents which Plaintiffs intended to use to support their claims and use in support of any motion for summary judgment. *See* Requests for Production, ¶2, 3, attached here as Group Exhibit A. Fact discovery closed on September 22, 2023, all discovery closed on November 20, 2023, and Plaintiffs never moved to re-open discovery. Dkt. 49. Plaintiffs' Attachment A includes purported periodicals (exh. 1-4) with no citations, newspaper clippings (exh. 5-9, 16, 19), as well as copies of excerpts of statutes. Dkt. 72. Plaintiffs rely on these materials to argue against a history and tradition of firearms regulation which is analogous to the challenged statute. Plaintiffs did not disclose these documents under either Rule 26(a)(1) or Rule 26(e) and their failure to disclose should not be excused. Instead, these documents should be disregarded as a sanction under Rule 37(c).

By Plaintiffs' admission, the periodicals produced are "new" sources not previously disclosed. Dkt. 70, at 2, titled "APPENDIX OF NEW HISTORICAL SOURCES". Plaintiffs did not produce any of these records affirmatively under Rule 26(a)(1), or in response to the Requests for Production which was served on all Plaintiffs and specifically requested all documents that Plaintiffs may use to support their claims in this case. (*See* Exh. A). Notably, the newspaper clippings in exhibits 5-8 contain watermarks dated November 15, 2023, a full five days before the close of discovery, and yet these items were never produced to Defendants. (exh. 5-8). Further, the scans of purported statutes in exhibits 20, 21, and 22 indicate they were downloaded on May 24, 2023, months before the close of fact discovery. (exh. 20-22).

These sources should be excluded unless Plaintiffs can show their failure was harmless or justified. Plaintiffs did not attempt to make such a showing anywhere in their motion, nor could they. The prejudice to the Defendant is undeniable. When a regulation burdens the rights secured

3

by the Second Amendment, as Plaintiffs contend is the case here, the government must show that its regulation is consistent with the nation's history and tradition of firearms regulation. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). Here, Plaintiffs attempt to preempt such a showing by the Defendant, using sources which were withheld from the Defendant during discovery, preventing the Defendant from studying or attempting to refute them with its own evidence. Nor can Plaintiffs cure their error. Discovery is closed and this matter has reached the summary judgment stage. No new information may be sought or used as evidence at this point, and even if the rules permitted Defendant to search for records to refute Plaintiffs' newly disclosed sources, there is no time to do so. Even if this court were to pause summary judgment briefing in order to afford the Defendant time to perform new historical research, that would necessarily delay both summary judgment and any future trial, which would in turn further prejudice Defendant because Plaintiffs will have additional time to study and prepare responses to Defendant's own motion for summary judgment. Finally, this court may conclude that Plaintiffs' actions were intentional. Plaintiffs' Historical Appendix is carefully organized and constructed and this court can reasonably conclude that Plaintiffs had these sources available prior to the beginning of briefing on summary judgment.

In sum, all four of the Seventh Circuit's factors weigh against excusing Plaintiffs' failure to disclose these sources. Instead, this court should find that Plaintiffs have violated Fed. R. Civ. P. 37(c)(1), and that these sources must be disregarded as sanction for their failures.

Even if this court excuses Plaintiffs' failure to disclose these sources under Rule 26 and Rule 37, Plaintiffs' Attachment A should also be disregarded because it violates Local Rule 56.1. Local Rule 56.1(a)(3) requires the moving party to file a statement of material facts it contends there is no genuine issue, which must include (A) a description of the parties, and (B) all facts

supporting venue and jurisdiction in the court. U.S. Dist. Ct. N. D. Ill. Local Rule 56.1(a)(3). The local rule furthers requires the movant's statement to consist of short-numbered paragraphs with specific references to the materials relied upon in preparing the statement of material facts. L. R. 56.1(a)(1). The local rule does not countenance the filing of a separate historical appendix. *See* generally L.R. 56.1.

"The Seventh Circuit has repeatedly held that a district court is entitled to expect strict compliance with L.R. 56.1." *See Barth v. Village of Mokena*, 2006 WL 862673, at *1 (N.D. Ill. 2006). Courts in this district have repeatedly affirmed the importance of strict compliance with Rule 56.1. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill., 2000) (holding that the penalty for failure to strictly comply with L.R. 56.1 is usually summary judgment.) On summary judgment, the court limits its analysis of the facts to those in the parties' Rule 56.1 statement. *Kirsch v. Brightstar Corp.*, 78 F. Supp. 676, 697 (N.D. Ill. 2015). Courts do not abuse their discretion by disregarding facts on summary judgment in a fashion which violates Local Rule 56.1. *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 607 (N.D. Ill. December 19, 2011).

Plaintiffs contend in their brief that the facts disclosed in their Attachment A support summary judgment in their favor, but they did not comply with any of Rule 56.1's requirements in presenting those facts. For example, Plaintiffs argue that public transportation existed at the time of the founding, and dates back to pre-independence England. Dkt. 70, at 15. That purported fact is not referenced in Plaintiffs' Rule 56.1 statement, but instead as Exhibit 1 to their Attachment A. *Id.* Plaintiffs did not prepare a short, plain statement of that fact, and make no specific reference to Exhibit 1 to their Attachment A. *Id.* Plaintiffs argue the significance of this purported fact, without directly asserting that this fact is material or undisputed. *Id.* And because this statement does not correspond to a Rule 56.1 statement, Defendant does not have the opportunity to file a concise

response to this fact, as required by Local Rule 56.1(b)(3). These purported facts belonged in Plaintiffs' Rule 56.1 Statement.

All of Plaintiffs' Attachment A exhibits 1-9, 16, and 19 violate Rule 56.1 in the same fashion. Plaintiffs argue these alleged facts support their argument against analogous historical firearms regulations, Dkt. 70 at 15-16, but none of them appear in Plaintiffs' Rule 56.1 Statement. This court should therefore disregard them and afford them no weight in determining summary judgment.

Finally, Exhibit 1 to Attachment A should be disregarded because it is not authenticated and therefore inadmissible. Documents which purport to be newspapers or periodicals are self-authenticating. Fed. R. Evid. 902(6). However, it is unclear from this document what exactly Exhibit 1 is, or where it comes from. Plaintiffs do not disclose an author, a periodical, a time, or any information as to when or where Exhibit 1 was purportedly published. Dkt. 72 at 2, 6; Dkt. 70 at 15. That information is absent from the face of the document. *Id.* Because Exhibit 1 does not purport to be a newspaper or periodical article, it is not self-authenticating and Plaintiffs have not offered evidence to authenticate it. *See* generally, Dkt. 70, 72. Thus, this court cannot rely on the purported facts presented therein. Fed. R. Evid. 901(a) Instead, Exh.1 to Plaintiffs' Attachment A is inadmissible and should be disregarded.

The records produced in Plaintiffs' Attachment A – Historical Analysis violate the Federal Rules of Civil Procedure, the Federal Rules of Evidence, this court's scheduling order (Dkt. 49), and Local Rule 56.1. As a result, this court should disregard this material in weighing summary judgment.

6

**B.**     **Plaintiffs' 56.1 Statement Violates the Local Rules and Portions Should Be Disregarded**

The local rules that structure the summary judgment process "assist the court by organizing evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admitted evidence." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 2000 U.S. App. LEXIS 29027, **6 (7th Cir. 2000); *quoting Markham v. White,* 172 F.3d 486, 490 (7th Cir. 1999).

Evidence in summary judgment must be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). "Affidavits submitted in opposition to summary judgment must (1) be made on personal knowledge; (2) set forth facts in admissible form; and (3) show the affiants are competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e); *Palmer v. Marion County,* 327 F. 3d 588, 595 (7th Cir. 2003). "Self-serving statements in affidavits without factual support in the record carry no weight on summary judgment." *Butts v. Aurora Health Care, Inc.*, 387 F. 3d 921, 925 (7th Cir. 2004). Rule 56 affidavits must present concrete facts; mere conjecture or speculation is insufficient. *Johal v. Little Lady Foods, Inc.,* 434 F.3d 943, 947 (7th Cir. 2006). Likewise, the movant's speculation or hunches in deposition testimony may not form the basis for an award of summary judgment. *Gentleman v. Massachusetts Higher Educ. Assistance Corp.*, 2019 U.S. Dist. LEXIS 135684 (N.D. Ill. August 12, 2019) (citations omitted).

Plaintiffs' 56.1 statement repeatedly relies on improper self-serving statements from their written and oral testimony to assert speculative claims regarding their personal safety on public transportation, and their corresponding need to possess a loaded firearm for self-defense on public transportation. For instance, all four Plaintiffs assert some version of the following:

> Without a handgun while on public transportation, Plaintiff Vesel cannot meaningfully defend himself in case of confrontation. Ex. H ¶ 14. Dkt. 71 at ¶30.

7

This assertion is pure speculation, based upon an imagined future confrontation while using transit. None of the Plaintiffs testified to having engaged in armed self-defense while using transit, or that they have ever felt a need to engage in the same. *See* Def. Foxx's Resp. Pl.'s 56.1 SOF at ¶14, 22, 30, 40. Instead, most of the Plaintiffs discussed the importance of resolving conflict without resorting to armed self-defense, which they largely characterized as a last resort in case of imminent violence. *Id.* The assertions that Plaintiffs cannot meaningfully defend themselves without a handgun while on public transportation are not facts at all within the meaning of Local Rule 56.1. Rather, these statements rely entirely on the unsupported and self-serving testimony of the Plaintiffs themselves. Accordingly, they are entitled to no weight in determining summary judgment. *Butts*, 387 F. 3d at 925.

Plaintiffs likewise use their Rule 56.1 statement to make improper legal argument. Plaintiffs open their Rule 56.1 statement with a footnote, in which they assert an exclusively legal argument regarding the admissibility of Plaintiffs' assertions which they maintain are "legislative facts." Plaintiffs offer no facts in footnote 1 and cite to no facts in the record to support their statement of law. A Rule 56.1 statement of undisputed material facts is, axiomatically, a statement of facts. Plaintiffs' legal theories belong in their brief, but there is no whiff of this argument there. *See* generally Dkt. 70. Footnote 1 is improper legal argument and this court should disregard it.

Plaintiffs all attest that they intend to "exercise [their] right to keep and bear a handgun on public transportation in Illinois." *See*, e.g., Dkt. 71 at ¶10. That framing assumes the outcome of this lawsuit and constitutes improper legal argument. No "right" to possess a loaded firearm on Illinois public transit has been determined and defendant contests that such a right exists.

Legal arguments are "not a recitation of a 'fact' to which an affiant is competent to testify" and therefore do not belong in a Local Rule 56.1 statement. *Pfeil v. Rogers,* 757 F.2d 850, 862

(7th Cir. 1985); *see also Salamanca v. Robert Half Corp.,* 2003 U.S. Dist. LEXIS 5602, at *5-6 (N.D. Ill. Apr. 4, 2003) (Conlon, J.) (striking legal argument in Local Rule 56.1 statement). The role of the Rule 56.1 statement is to identify relevant undisputed evidence supporting the movant's claim for summary judgment. *Cady v. Sheahan*, 467 F. 3d 1057, 1060 (7th Cir. 2006). The Rule 56.1 statement is not a forum for legal argument. *Malec*, 191 F.R.D. at 583. Rule 56.1 statements must be composed of short paragraphs containing material facts, L.R. 56.1(a), but legal argument in a 56.1 statement is not fact at all. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F. 3d 371, 382 n.2 (7th Cir. 2008). Thus, Plaintiffs' paragraphs 10, 18, 26, and 37 should be disregarded as self-serving statements of law which have no place in a Rule 56.1 statement.

Finally, Plaintiffs omit critical information from their 56.1 statement, which is required by the local rule, and which bears on whether this matter belongs in this court. Local Rule 56.1 obligates each movant to include in any Rule 56.1 statement "(B) all facts supporting venue and jurisdiction in this court." Local Rule 56.1(a)(1)(B). Plaintiffs skipped this step and there is no statement of the grounds for jurisdiction or venue in their Rule 56.1 statement. *See* generally Dkt. 71. Failure to submit facts establishing jurisdiction and venue are grounds for denial of Plaintiffs' motion. *Buttron v. Sheahan*, 2003 U.S. Dist. LEXIS 13496 at *20 (N.D. Ill., August 4, 2003). While courts have discretion to excuse this omission, *Sledge v. Comcast ABB Mgmt., LLC*, 2012 U.S. Dist LEXIS 85832 at *3 fn1 (N.D. Ill., June 20, 2012), Plaintiffs' omission is material given that defendant disputes the Western Division as the proper venue for this lawsuit. Dkt. 68 at p. 18-19. This court should find for the Defendant on that point and dismiss this action for lack of venue.

> C. **Plaintiffs' Undisclosed Experts, Referenced for the First Time in Their Brief, Should Be Disregarded.**

Plaintiffs surprised the Defendant by their reliance on the unsworn word of multiple newly disclosed witnesses, who have not been subject to cross-examination in this case, have not offered summaries of their opinions or their methods, have not disclosed whether they are retained, and whose subject-matter expertise has never been tested under Fed. R. Evid. 702 and the *Daubert* standard. For instance, Plaintiffs cite Nicholas J. Johnson, et al., for the proposition that colonial stagecoach guards and travelers were typically armed. Dkt. 70, at 16. Plaintiffs did not disclose Nicholas J. Johnson as a witness, whether expert or otherwise (nor have they identified the "et al." authors of his article), denied the Defendant any means of probing or challenging Nicholas J. Johnson's qualifications, methods, or conclusions, and have not even provided a copy of the text they purport to rely on. Plaintiffs repeat their wrongful reliance on the undisclosed expert testimony of authors David B. Kopel and Joseph G.S. Greenlee (Dkt. 70, at 20, 26), Eugene Volokh (Dkt. 70, at 24), Mark W. Smith (Dkt. 70, at 24) David Thomas Konig, et al. (Dkt. 70, at 24), Clayton E. Kramer (Dkt. 70 at 26), and Benjamin Boyd (Dkt. 70, at 26.) None of these authors have been disclosed, their writings have not been produced, they have not given sworn testimony under oath, and their methods and conclusions have not been subjected to scrutiny under Fed. R. Evid. 702. Any one of these failings is individual grounds for this court to sanction Plaintiffs under Rule 37(c)(1). Even if Plaintiffs' repeated reliance on undisclosed experts is an oversight, the prejudice to Defendant is overwhelming, cannot be cured at this late stage of litigation, or is certain to delay this matter if Defendant is permitted to conduct expert discovery on these individuals. This court must disregard these so-called experts, their conclusions, and any argument or conclusions drawn by Plaintiffs in reliance on these authors. Fed. R. Civ. P. 37(c)(1).

Finally, these out of court statements, relied upon by Plaintiffs to prove facts which are directly germane to their case, are classic hearsay for which there is no exception on point. Fed. R.

Evid. 801(c)-802; *United States v. Rettenger*, 344 F.3d 702 (7th Cir. 2003). Plaintiffs' failure to produce these so-called experts to testify to their conclusions under oath means that their claims are inadmissible and cannot be considered at summary judgment. Fed. R. Civ. P. 56(c)(2). Accordingly, even if Plaintiffs had disclosed these authors as witnesses, their conclusions are still hearsay and therefore barred from consideration on summary judgment. This court should disregard these authors, their conclusions, and any argument or conclusion Plaintiffs derive thereof.

## II.     The Statute Does Not Violate the Second Amendment.

### A.     Plaintiffs Have No Second Amendment Right to Carry Firearms on Private Property.

Plaintiffs proclaim that since they are licensed to carry firearms in Illinois and desire to carry their firearms on public transportation, they have a constitutional right to do so. However, Plaintiffs ignore the fact that private property owners are well within their rights to prohibit the carrying of firearms on their property, and Plaintiffs have no right to be on the premises of the CTA, Metra, Pace Bus, or any other transit line, unless they follow those entities' internal rules and regulations. Here, the CTA, Pace Bus, and the railroad lines upon which Metra operates have internal rules forbidding the carry of firearms. Dkt. 66, ¶¶ 9, 10, 19-21. The Second Amendment does not grant an individual the right to carry a firearm on the private property of another if that owner forbids it. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012). Further, property retains its private character even where the public is generally open to use it for specific purposes. *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 569 (1972) (Finding the First Amendment's free speech protections do not extend to uninvited guests on private property.).

11

Like private property owners, the government may also enforce its right to manage and preserve property under its control. *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007). The Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (cleaned up). Therefore, riding public transportation does not mean that Plaintiffs can ignore the rules and regulations placed by the property owner, even where public funds are concerned.

The Government's right to manage its own property extends beyond real property and applies when the Government acts as proprietor of its own funds. The federal government "may fix the terms on which it shall disburse federal money," *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), so long as those restrictions are within "the limits of the government spending program—those that specify the activities Congress wants to subsidize" rather than "conditions that seek to leverage funding to regulate [constitutional activity] outside the contours of the program itself." *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 214-15 (2013). Restrictions on funding are appropriate when they reflect the government's inherent proprietary interest in the use of the funds being disbursed, rather than a plain attempt to achieve indirectly by coercion what cannot be achieved directly by legislation. *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012).

Here, the Statute restricts the carrying of firearms on transit systems paid for in whole or in part by public funds. It constitutes a funding restriction that advances the State's interest in providing funds to transit providers who promote public safety by limiting the presence of firearms

12

on crowded trains and buses. Moreover, this condition on the use of funding does not seek to regulate the keeping or bearing of arms outside the property owned and operated by publicly-funded transit systems, making it narrowly focused and subject to rational basis review. The Statute would easily pass rational basis review considering the obvious safety concern for prohibiting firearms on crowded buses and trains, where unplanned egress may be dangerous or impossible. Because the Statute passes constitutional muster without even reaching the *Bruen* analysis, Plaintiffs' motion for summary judgment fails.

**B.      Plaintiffs' Conduct is Not Covered by the Plain Text of the Second Amendment Where the Statute Does Not Infringe on Plaintiffs' Right to Keep and Bear Arms.**

**i.      Plaintiffs fail to show that the Statute infringes upon their right.**

It is Plaintiffs' burden to show the plain text of the Second Amendment covers their desired conduct. Plaintiffs spend little time on this step, focusing only on the words "the people," "arms," and "to bear" and concluding that their desired conduct falls squarely within the plain text. But Plaintiffs ignore the term "infringed," and fail to show how the Statute infringes on their right to keep and bear arms. The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen* did not define the term, likely because the regulations at issue in those cases— prohibiting the ownership of handguns in the home and prohibiting the carry of firearms in public but for demonstrating special need, infringed on the right to bear arms regardless of how the term is defined.

Here, however, the Statute does not contemplate the complete prohibition of firearms in or outside the home. The term "infringed," therefore, demands further definition, focusing on the meaning of the "text, as informed by history." *Bruen*, 597 U.S. at 23. Comparing the language used in the first two amendments to the Constitution suggests that "infringed" was intended to

13

have a particular meaning. The First Amendment prohibits "abridging" certain rights, which members of the founding generation would have understood to mean "diminish." *See* Abridge, A DICTIONARY OF THE ENGLISH LANGUAGE: A DIGITAL EDITION OF THE 1755 CLASSIC BY SAMUEL JOHNSON, https://johnsonsdictionaryonline.com (last visited March 17, 2024). Conversely, the Second Amendment requires the right to bear arms not be "infringed." The word "infringe" was known in the time of the founding to mean violate or destroy. *See* Infringe, JOHNSON DICTIONARY, https://johnsonsdictionaryonline.com. The use of different terms suggests the Founders sought to prohibit regulations which destroy the right to bear arms, but not prohibit regulations which merely diminish the right to bear arms.

Seen another way, the Second Amendment does not prohibit all regulations of firearms but rather those which effectively destroy the right to bear arms. This meaning of the term "infringed" is consistent with *Heller* and *Bruen* where the regulations broadly prohibiting firearms in the home and outside the home were struck down. Notably, the Supreme Court in both cases recognized the existence of certain "sensitive places" where the right to bear arms can be lawfully prohibited. In *Heller*, the Supreme Court specifically warned that "nothing in [its] opinion should be taken to cast doubt on longstanding . . . laws forbidding the carrying of firearms in sensitive places such schools and government buildings..." 554 U.S. at 626. Likewise, the Court in *Bruen* affirmed the existence of traditional sensitive places where firearms could be constitutionally forbidden and recognized the possibility that "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. The Supreme Court would not have considered these regulations favorably if the meaning of the term "infringed" included any burden on the right to bear arms, further supporting the definition of "infringe" as destroy. Far from destroying the right to keep and bear firearms, the Statute restricts only the

14

carry of firearms on transit systems which are funded by public money. Therefore, the Statute does not "infringe" on the right to bear arms and falls outside the plain text of the Second Amendment.

### ii. Discharging a firearm while aboard a confined vehicle is fundamentally incompatible with lawful self-defense.

The text of the Second Amendment allows the government to regulate individuals' ability to possess and keep firearms, so long as those regulations are not so extreme as to effectively destroy the right to keep and bear firearms for a lawful purpose, such as self-defense. As Blackstone explains, historically, the acts that constitute excusable homicide end at "the bounds of moderation, either in the manner, the instrument, or the quantity," so an act otherwise permissible by the law becomes "manslaughter at least, and in some cases (according to the circumstances) murder" if a person uses a weapon in a manner unsuited for an otherwise-lawful task. 4 William Blackstone, Commentaries On The Laws Of England 183–84 (1769). As Blackstone summarized the controlling rule, "immoderate suo jure utatur, tunc reus homicidii sit," *id*. at 184, meaning if "he use his right beyond the bounds of moderation, then he is guilty of homicide," J.W. Jones, A Translation Of All The Greek, Latin, Italian & French Quotations Which Appear In Blackstone's Commentaries 116 (T. & J.W. Johnson & Co. 1889). Indeed, as Blackstone later explains, such "excessive" actions "could not proceed but from a bad heart" and are thus "equivalent to a deliberate act of slaughter." Blackstone at 200–201.

Reflecting the longstanding principles on the limits of self-defense, Illinois law does not readily accept a claim of self-defense when the defendant "uses force greater than necessary to ward off the imminent danger." *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) (Pallmeyer, J.) (emphasis added); *accord People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999) (explaining Illinois law requires proof that "the kind and amount of force actually used was necessary"). A non-aggressor has a duty not to become the aggressor.

15

*People v. Nunn*, 541 N.E.2d 182, (Ill. App. 1989).  Given the crowded nature and confined space within public transportation vehicles, there are few if any circumstances under which one could safely discharge a firearm without knowingly or unknowingly endangering the bodily safety of a third party.  Thus, carrying a weapon on public transportation is patently incompatible with basic principles of moderate self-defense. Such conduct that endangers a third party also gives rise to a separate criminal charge under Illinois law. *See*, *e.g.*, 720 ILCS 5/24-1-1.5. Similarly, a person can be charged with aggravated discharge of a firearm when he or she "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2.  The Statute does not infringe on the right to carry arms for self-defense – it merely restricts the carry of firearms on government-funded property designed specifically to contain and transport masses of people.

### C.     The Statute is Consistent with the Nation's Historical Treatment of Firearms.

Even if the plain text of the Second Amendment protected the conduct at issue here, the Statute does not violate the constitution because it is consistent with this nation's history and tradition of firearm regulations. *Bruen's* second step requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 23-24 (cleaned up). "[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 27-28. In such cases, "history [will] guide our consideration of modern regulations that were unimaginable at the founding" but the "historical inquiry that courts must conduct will often involve reasoning by analogy" to ascertain "whether the two regulations are 'relevantly similar.'" *Id*. at 28.

16

### i. The Supreme Court has not determined that 1791 is the only relevant time period to consider.

Plaintiffs assert that the key starting point when determining whether an analogous historical tradition of regulation exists is 1791, when the Second Amendment was ratified. But rather than being a starting point, Plaintiffs stop there, arguing at length that only Founding era regulations are determinant. However, *Bruen* did not limit historical considerations only to the Founding era. Indeed, in *Atkinson v. Garland*, upon which Plaintiffs rely, the Seventh Circuit recognized that "post-Founding history may also play a role in guiding 'our interpretation of an ambiguous constitutional provision.'" *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) *citing Bruen* at 36. And the Seventh Circuit in *Bevis v. City of Naperville* again recognized that the relevant time period would be 1791 and "perhaps as late as 1868" when the Fourteenth Amendment was ratified. 85 F.4th 1175, 1199 (7th Cir. 2023).

It follows then, that there is no reason to foreclose later regulations, especially when dealing with an issue such as mass transit which did not exist in a similar way in the Founding era, therefore representing an unprecedented societal concern and technological change. Notably, the right of exclusion has been part of a private property owners' "bundle of sticks" since before the time of the founding and, as Blackstone recognized, exclusion is part of the very idea of property. *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). Regardless of the relevant time period, defendant has sustained her burden in establishing historical analogues exist that show the Statute falls within the historical tradition of firearm regulation.

### ii. Analogous regulations existed restricting the time and place of carrying firearms.

According to Plaintiffs, public transportation existed at the time of the founding and there was no historical tradition of firearm regulation. In support, they cite various publications and

17

sources that were never produced in discovery in this case, despite specific requests for production, and are instead included in an improperly filed Appendix. For the reasons stated above in section I, these sources should be disregarded in full. Even were these sources allowed to stand, they do not discredit the historical analogues defendant has identified in her own motion for summary judgment. Dkt. 68.

Defendant has sustained her burden in demonstrating that the Statute is consistent with the Nation's historical tradition of firearm regulation. Plaintiffs dispute that this case should be considered under a nuanced approach, as set forth in *Bruen*, because the Founding era had stagecoaches and transportation on various types of boats. But even by Plaintiffs' metrics, transit in the Founding era was limited to private horsepower and private boats. Prior to the 1820s, no American city possessed a land-based mass transit system. Dkt. 66, ¶ 71. Railroads did not appear until well into the 19th century, and the development and expansion of rail coincided with a rise in both violence and weapons carrying in America. Dkt. 66, ¶ 72-73. Modern mass transit did not begin to emerge until the end of the 19th century, and government funded and operated transit systems like CTA and Metra appeared post-World War II. Dkt. 66, ¶ 82-83, 85-86. The problem of ensuring the security of hundreds of millions of train and bus commuters was not one the Founders considered when the Second Amendment was crafted. These dramatic technological changes, which in turn gave rise to the modern phenomenon of mass public transportation, require this regulation to be analyzed under the nuanced approach.

In cases calling for a nuanced approach, "history [will] guide our consideration of modern regulations that were unimaginable at the founding" but the "historical inquiry that courts must conduct will often involve reasoning by analogy" to ascertain "whether the two regulations are 'relevantly similar.'" *Bruen*, 597 U.S. at 28. While the Court declined to "provide an exhaustive

18

survey of the features that render regulations relevantly similar under the Second Amendment," it did identify at least "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29-30. Because self-defense is a "central component" of the Second Amendment right, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id*. at 29 (quotation marks omitted).

Here, there are two different historical analogues which establish the challenged regulation passes constitutional muster. First, time and place restrictions on the carrying of firearms have existed for centuries and entered American law through its English forebears. As early as 1328, the Statute of Northampton specifically prohibited the carrying of arms in "fairs" and "markets." 2 Edw. 3, ch. 3 (1328). The carrying of weapons in forests and on roads if the bearer's face was "blackened, or being otherwise disguised" was forbidden under the English Black Act. Act 9 Geo. 1 c. 22 (1723). This reflects that the English treated the law of self-defense, the core right with which our Second Amendment is concerned, *Heller*, 554 U.S. at 630, differently depending on whether one was in a town or on the road, by creating:

> a Distinction between an Assault in the Highway and an Assault in a Town; for in the first Case it is said, That the Person assaulted may justify killing the other without giving back at all: But that in the second Case, he ought to retreat as far as he can without apparently hazarding his Life, in respect of the Probability of getting Assistance.

1 William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 73 § 25 (4th ed. 1762).

The distinction between the lawfulness of bearing arms where help is likely to arrive, versus where help is unavailable, entered American law and is reflected in the concealed carry exception of the Traveler. Dkt. 66, ⁋ 94. The exception held that, while concealing a weapon was generally unlawful, Travelers, who were far from home and without access to the safety of their

communities, could lawfully carry a concealed weapon while on their travel. Dkt. 66, ⁋ 88-89. These statutes existed in multiple jurisdictions in the 19th Century, including the states of Texas, Arkansas, and Tennessee. Dkt. 66, ⁋ 88. Contemporary courts construed these statutes narrowly. In *Smith v. State*, 50 Tenn. 511 (1872), the Tennessee Supreme Court held that an individual who crossed into a neighboring county 12-miles-away, did not constitute a "journey" within the meaning of the state's Traveler exception. *Id*. at 513. In 1887, the Court of Appeals of Texas held that a journey of 18 miles from one county to another with the intention of returning the following day did not invoke the Traveler exception. *Darby v. v. State*, 23 Tax. Ct. App. 407, 408 (1887). Likewise, an individual who carried a concealed weapon into town while on a journey ceased to be a Traveler and was required to set aside his concealed weapon until his journey resumed. *Carr v. State*, 34 Ark. 448, 449 (1879). The Alabama Supreme Court reached a similar conclusion in *Eslava v. State*, 49 Ala. 355 (1873). And in 1889 the Court of Appeals of Texas held that a Traveler lost the protection of the exception when his purpose changed from business to recreation, and he was not permitted to "idly stroll" through town for entertainment while armed. *Stilly v. State*, 27 Tex. Ct. App. 445 (1889).

This establishes a historical tradition of regulating the place and manner of the bearing of concealed arms, dating back prior to the founding of this country to the English Common Law, and continuing through the reconstruction period. The founding generation would have been well-aware of the Statute of Northampton and its descendants and could not have intended for the Second Amendment to impose a blanket ban on the regulation of concealed carry on government property. That principle extends to modern public transportation systems. Since Defendant has met her burden of establishing historically analogous laws to the challenged regulation, Plaintiffs are not entitled to summary judgment.

20

### iii. Other provisions of the Bill of Rights provide relevant historical analogues.

Beyond the Second Amendment, *Heller* instructs that the other provisions of the Bill of Rights can be understood to have a fixed meaning according to their historical understanding. *Heller*, 544 U.S. at 582. Specifically, comparing the Second Amendment's application to modern bearable arms and the First Amendment's application to modern form of communications is illuminating. *See*, e.g., *Heller*, 554 U.S. at 582; *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016); *Bruen*, 597 U.S. at 28. Because the First and Second Amendment must be interpreted using the same analytical lens, *Heller*, 554 U.S. at 582, a reasonable analogy can be drawn between modern and historical restrictions on the speech of travelers to the regulation in question, and to uphold the regulation on that basis. There is a wealth of case law holding that government is not required to permit limitless speech on property it owns, and that those restrictions do not offend the First Amendment. *See, e.g., Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992).

Instructive here is the Seventh Circuit case *Anderson v. Milwaukee,* where the court upheld a rule barring distribution of literature on a public bus where it found that the interior of a city-operated transit vehicle is a nonpublic forum, meaning "public property which is not by tradition or designation a forum for public communication." *Anderson v. Milwaukee County*, 433 F.3d 975, 979 (7th Cir. 2006) *citing Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974). In upholding the regulation, the court reasoned that bus passengers were a "captive audience" who cannot avoid or escape from a speaker, therefore the government's interest in protecting its passengers outweighed the Plaintiff's interest in engaging in protected speech. *Id.* at 980.

The decision in *Anderson* does not represent a new concept in the application of the First Amendment and the Supreme Court has recognized that the state's ability to impose regulations on speech in public places for the benefit of the public has existed since ancient times. *See Hague*

*v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939) (holding that the rights of Americans to engage in protected speech in public is not absolute, but instead relative to the general welfare of the public, and that this principle is historically well established.). Just as the bus passengers in *Anderson* had no real ability to escape the speech of their fellow rider, train or bus passengers on a vehicle with an armed passenger have no ability to escape and face the threat of grave personal injury or death. Dkt. 66, ⁋ 66. As a further analogue, the Plaintiffs here seek to exercise their constitutional right on privately-owned and government funded property, as was the case in *Anderson*. Dkt. 66, ⁋ 13, 29, 36, 47, 54. Considering the government analogy need not be a "dead ringer" for the challenged regulation, *Bruen*, 597 U.S. at 30, the regulation barring protected speech on public transit is sufficiently analogous to a regulation against carrying guns on public transit, such that the regulation must be upheld. Because Defendant has established a historical tradition of regulation, Plaintiffs' motion for summary judgment must be denied.

> **D.** **Plaintiffs' Preemptive Rebuttal of a Sensitive Places Argument Does Not Refute Defendants' Historical Analysis.**

> **i.** **The sensitive places doctrine exists outside *Bruen*'s historical tradition framework and is not solely a source for potential historical analogues.**

First, Plaintiffs offer their sensitive places argument preemptively to counter an argument they anticipated from defendants, but Defendant Foxx asserts her historical tradition argument without basing their historical analogues on sensitive places. The court need not consider whether the public transportation in question falls within the sensitive places category and can rule on other grounds. See Section II(C).

Moreover, courts have varied widely in their understanding and application of the sensitive places doctrine, and this circuit has not yet undertaken a sensitive places analysis post-*Bruen*. Absent any further guidance from the Supreme Court, the doctrine of sensitive places exists

22

separately from, but in conjunction with, the historical tradition test. Defendant does not, and need not, show that public transportation is a sensitive place in order to establish a historical tradition of regulation.

In their preemptive sensitive places rebuttal, Plaintiffs do away with any boundary between a sensitive places analysis and a *Bruen* step-two analysis. Plaintiffs minimize the sensitive places doctrine by alluding to "*Bruen*'s suggestion that carry can be restricted in 'sensitive places.'" Dkt. 70, p. 19. *Bruen* does not "suggest" this concept; it is well established that the carrying of firearms can be restricted in sensitive places. 597 U.S. 1 at 30. The sensitive places doctrine predates *Bruen*'s historical tradition test, and the idea of sensitive places existed long before that. The Supreme Court acknowledged in *Heller* that prohibition on the possession of firearms in sensitive places was "longstanding" and one of the "presumptively lawful" categories of regulation. *Heller*, 554 U.S. 570 at 626. The Court reaffirmed this concept in *McDonald*. *McDonald v. City of Chicago*, 561 U.S.742, 786 (2010). In its discussion of sensitive places, *Bruen* noted that a modern sensitive place law could be analogized to historical sensitive place laws in order to justify its restriction. 570 U.S. 1 at 30. But the Court used this as an example of how to conduct a historical analogue analysis and did not actually attempt to analogize New York's law to historical sensitive places laws. Instead, it rejected outright the idea that the law was a sensitive place restriction because finding otherwise would amount to expanding the category of sensitive places far too broadly. 597 U.S. 1 at 31. The *Bruen* Court considered the propriety of expanding sensitive places, rather than whether the historical tradition of sensitive places included areas like those restricted by New York's law. *Bruen* therefore offers little instruction in how to identify a sensitive place or how to analogize a modern sensitive place restriction to a historical regulation. *See* 597 U.S. 1 at 114 (Breyer, J., dissenting) (noting the majority's lack of guidance on modern locations with no

23

obvious historical analogues, including subways). It certainly does not limit either the areas that can be sensitive places or the historical regulations that can potentially be analogues, as Plaintiffs seem to suggest.

> **ii. Plaintiffs' analysis of sensitive places as a poor source of historical analogues is unavailing.**

Despite the Supreme Court having "no occasion to comprehensively define 'sensitive places'" in *Bruen*, Plaintiffs nevertheless rely heavily on *Bruen* for their discussion of sensitive places. *Bruen* at 30; ECF 70, p. 17-18.

Plaintiffs acknowledge that *Bruen* only briefly touched on three sensitive places and explicitly did not intend to exhaustively list locations that are or could be considered sensitive places. Yet in their analysis of sensitive places, Plaintiffs focus solely on the three sensitive places mentioned in *Bruen*, and one characteristic those places share, although they admit other sensitive places, with other bases for being deemed sensitive, exist. The three places Plaintiffs discusses include legislative assemblies, polling places, and courthouses. Dkt. 70, p. 20. Plaintiffs first inaccurately posit these places as the only possible analogous sensitive places, a proposition *Bruen* does not hold. *Id*. Next, Plaintiffs attempt to distinguish these sensitive places from the transportation in question by arguing that public transportation is not protected by "comprehensive, government-provided security," an important characteristic, in Plaintiffs' view, shared by sensitive places. Dkt. 70, p. 20. Plaintiffs' singular focus on security available at certain sensitive places fails to acknowledge perhaps the most significant characteristic of the trains and buses of the Metra and CTA: the fact that they are enclosed, non-escapable, moving vehicles. Public transportation does not need to be akin to a polling place, courthouse, or legislative assembly in order to be a sensitive place. While there is no definite list of sensitive places, a sensitive place analysis of public

transportation must take into consideration the nature of transportation vehicles, not just whether security is present.

Plaintiffs next seek to emphasize that the Statute prohibits transportation riders from carrying their weapons to transportation or at their eventual destination. Dkt. 70, p. 24. This argument carries little weight because the same could be said of any sensitive place. If a person is prohibited from carrying their firearm into a courthouse, then that ban effectively keeps them from carrying it on the way to and from the courthouse if they do not travel in their personal car. If they do drive, the ban keeps them from carrying their weapon as they walk from their car to the courthouse. The logistics of carrying a weapon on the way to, from and around an area is immaterial to whether that area is a sensitive place.

As noted above, the court need not find trains and buses to be sensitive places in order to hold that the Statute complies with the Second Amendment. In their preemptive rebuttal to a sensitive places argument, however, Plaintiffs point to no authority that precludes public transportation from being considered a sensitive place, and their argument is therefore unavailing.

## CONCLUSION

For each of the foregoing reasons, Defendant respectfully requests that this Honorable Court deny Plaintiffs' motion for summary judgment and instead enter judgment in her favor.

Dated March 25, 2024

KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendant*

By s/ Jessica M. Scheller
JESSICA M. SCHELLER
Deputy Chief; Civil Actions Bureau
PRATHIMA YEDDANAPUDI,

Supervisor; Advice, Transactions &
Complex Litigation Section
SILVIA MERCADO MASTERS
EDWARD M. BRENER
MEGAN HONINGFORD
Assistant State's Attorneys
Jessica.Scheller@cookcountysao.org
Prathima.Yeddanapudi@cookcountysao.org

**CERTIFICATE OF SERVICE**

I, Jessica M. Scheller, hereby certify that on March 25, 2024 I caused a true and correct copy of the Defendant Foxx's Response to Plaintiffs' Motion for Summary Judgment be sent via e-filing to all counsel of record in accordance with the rules regarding the electronic filing and service of documents.

*/s/ Jessica M. Scheller*
Jessica M. Scheller
Cook County Assistant State's Attorney
50 W. Washington, 5th Floor
Chicago, Illinois 60602
(312) 603-6934
Jessica.Scheller@cookcountysao.org

26