**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, | |
| *Plaintiffs*, | No. 3:22-cv-50326 |
| v. | |
| KWAME RAOUL, *et al.*, | Honorable Iain D. Johnston |
| *Defendants.* | |

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 3

    I.     Plaintiffs Have Article III Standing ........................................................................ 3

         A.  Plaintiffs Have Standing to Challenge Firearms Restrictions at Buildings, Real Property, and Parking Areas Controlled by Public Transportation Systems ............ 3

         B.  Plaintiffs' Constitutional Injuries are Redressable Against Defendants ................. 5

    II.    Government Proprietorship Provides No Exception to the Second Amendment ......... 7

    III.   The Public Transportation Carry Ban Is Unconstitutional ........................................... 11

         A.  Plaintiffs Can Properly Bring a Facial Challenge ................................................... 11

         B.  Plaintiffs' Conduct is Covered by the Plain Text of the Second Amendment ...... 13

         C.  Controlling Methodological Considerations for Historical Analysis Under *Bruen* ......................................................................................................................... 17

         D.  Public Transportation is Not Analogous to a Recognized Sensitive Place ............ 25

         E.  Defendants' Historical Analogues Do Not Form A National Historical Tradition Supporting the Transportation Carry Ban ................................................................ 31

            1.  English Statutes .................................................................................................. 31

            2.  Founding-era Statutes ........................................................................................ 32

            3.  Mid-to-Late 19th Century Statutes ................................................................... 36

         F.  Restrictions on Speech and Those Imposed By Private Parties Are Not Proper Historical Analogues Under *Bruen* ....................................................................... 40

         G.  Public Transportation in Illinois Is Not Comprehensively Secured ..................... 42

         H.  Venue is Proper in this Court and Transfer At This Stage Would Be Inefficient ................................................................................................................. 45

i

CONCLUSION.................................................................................................................47

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page**

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................5, 6

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d. Cir. 2023) ...............................................28, 29, 32

*Arce v. Chi. Transit Auth.*,
    193 F. Supp. 3d 875 (N.D. Ill. 2016) .................................................6

*Atkinson v. Garland*,
    70 F.4th 1018 (7th Cir. 2023) ...........................................................22

*Bittner v. United States*,
    598 U.S. 85 (2023) ...........................................................................30

*Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of
    Mass./R.I., Inc.*, 507 U.S. 218 (1993) .............................................8, 9

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) .........................................................................16

*California v. Texas*,
    593 U.S. 659 (2021) ....................................................................... 5, 6

*Carr v. State*,
    34 Ark. 448 (1879) .....................................................................39, 40

*Chi. Gun Club, LLC v. Vill. of Willowbrook, Ill.*,
    No. 17-cv-6057, 2018 WL 2718045 (N.D. Ill. June 6, 2018) ...........36

*Christian v. Nigrelli*,
    642 F. Supp. 3d 393 (W.D.N.Y. 2022) .............................................18

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) .........................................................................12

*Coffey v. Van Dorn Iron Works*,
    796 F.2d 217 (7th Cir. 1986) ...........................................................45

*Craik v. Boeing Co.*,
    37 F. Supp. 3d 954 (N.D. Ill. 2013) .............................................45, 46

*Darby v. State*,
    5 S.W. 90 (Tex. Ct. App. 1880) ........................................................39

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................13, 14, 15, 16, 18, 23, 36

*Duncan v. Bonta*,
    No. 17-cv-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) .........22

*Engquist v. Or. Dep't of Agric.*,
    553 U.S. 591 (2008) ...........................................................................9

*Eslava v. State*,
    49 Ala. 355 (1873) ..................................................................................................39

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ................................................................4, 5, 11, 12, 13

*Fraser v. ATF*,
    672 F. Supp. 3d 118 (E.D. Va. 2023) ....................................................................14

*Frein v. Pa. State Police*,
    47 F.4th 247 (3d Cir. 2022) ..............................................................................14, 15

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ..............................................................................11

*Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*,
    570 F.3d 811 (7th Cir. 2009) ....................................................................................6

*In re Nat'l Presto Indus., Inc.*,
    347 F.3d 662 (7th Cir. 2003) ..................................................................................46

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ..................................................................................................9

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ..................................................................................16

*Kipke v. Moore*,
    No. 23-cv-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ................................11

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1960) ..................................................................................................15

*Koons v. Platkin*,
    673 F. Supp. 3d 515 (D.N.J. 2023) ............................................8, 9, 11, 18, 26, 29, 37, 44

*Lara v. Comm'r Pa. State Police*,
    91 F.4th 122 (3d Cir. 2024) ..............................................................................19, 20, 22

*Lugar v. Edmondson Oil Co., Inc.*,
    457 U.S. 922 (1982) ..................................................................................................6

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................................5

*May v. Bonta*,
    No. 23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023) ........10, 11, 18, 27, 29, 42

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010) ....................................................................................20

*Md. Shall Issue, Inc. v. Moore*,
    86 F.4th 1038 (4th Cir. 2023) ..................................................................................14

*Md. Shall Issue, Inc. v. Moore*,
    No. 21-2017, 2024 WL 124290 (4th Cir. Jan. 11, 2024) ........................................14

iv

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ..................................................................22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).........................................................1, 3, 8, 9, 10, 11, 13,
    15, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 34, 36, 37, 38, 39, 40, 41, 43, 44

*Nunn v. State*,
    1 Ga. 243 (1846) ..................................................................................14

*Paquet v. Pace, Suburban Bus Div. of Reg'l Transp. Auth.*,
    156 F. Supp. 2d 761 (N.D. Ill. 2001) ............................................6, 7

*People v. Burns*,
    79 N.E.3d 159 (Ill. 2015) ....................................................................12

*Reeves, Inc. v. Stake*,
    447 U.S. 429 (1980) ...............................................................................8

*Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*,
    626 F.3d 973 (7th Cir. 2010) ....................................................45, 46, 47

*Siegel v. Platkin*,
    653 F. Supp. 3d 136 (D.N.J. 2023) ...........................................10, 11, 18

*Smith v. State*,
    50 Tenn. 511 (1872)...............................................................................39

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ..................................................8

*State v. Chandler*,
    5 La. Ann. 489 (1850)...........................................................................34

*State v. Huntley*,
    25 N.C. 418 (N.C. 1843).......................................................................33

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..............................................................................5, 6

*Stilly v. State*,
    11 S.W. 458 (Tex. Ct. App. 1889) .......................................................39

*Sturgeon v. Frost*,
    587 U.S. 28 (2019) ...............................................................................30

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014).................................................................................4

*Sweeney v. Raoul*,
    990 F.3d 555 (7th Cir. 2021) ..................................................................4

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)..................................................................................3

*U.S. v. Salerno*,
    481 U.S. 739 (1987)...............................................................................12

*United States v. Ayala*,
No. 8:22-cr-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) ...................9, 11, 16, 18, 29

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) ........................................................................................12

*United States v. Stevens*,
559 U.S. 460 (2010)......................................................................................................13

*Vandermyde v. Cook County*,
No. 1-23-0413, 2024 WL 685617 (Ill. App. Ct. Feb. 20, 2024) .................................14, 15

*White v. Mass. Council of Constr. Emps., Inc.*,
460 U.S. 204 (1983).......................................................................................................8

*Wolford v. Lopez*,
No. 23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)...................9, 10, 11, 24, 29

*Worth v. Harrington*,
666 F. Supp. 3d 902 (D. Minn. 2023).......................................................................19, 22

**Statutes**

28 U.S.C. § 1391(b)(2) ........................................................................................................45

720 ILCS 5/24-1.9 ...............................................................................................................13

**Other Authorities**

1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY (Nathaniel B.
Shurtleff ed., 1853) ......................................................................................................34

ARCHIVES OF MARYLAND (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885)..........34

1 STATUTES AT LARGE OF VIRGINIA (William Waller Hening ed., 1823) ....................................34

1 RECORDS OF THE COLONY OF RHODE ISLAND (John Russell Bartlett ed., 1856)..................34, 35

1812 KY. ACTS 100–01, ch. 89, § 1 ......................................................................................35

1819 IND. ACTS 39, ch. 23, § 1 .............................................................................................35

1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES (1803)................................................14

1801 TENN. LAWS 260–61, § 6 ..............................................................................................32

1821 TENN. ACTS 15, ch. 13 .................................................................................................35

1837 ARK. REV. STAT. 280 ....................................................................................................37

A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA
(Newbern: James Davis, 1752) .....................................................................................33

9 GEO 1 c.22 (1723) ............................................................................................................32

John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS
ONLINE, https://bit.ly/35FCuRh .....................................................................................26

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*,
8 LIBERTY UNIV. L. REV. 653 (2014) ................................................................................26

Clayton E. Cramer, *Colonial Firearm Regulation*,
16 J. FIREARMS & PUB. POL'Y 1 (2016) ............................................................26

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms:* Young v. Hawaii (9th Cir. 2021),
SSRN (Aug. 10, 2021), https://bit.ly/3QyFZA5 .............................................33

Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, forthcoming 133 YALE L.J. (forthcoming 2024) (manuscript at 15),
https://bit.ly/43dBd0y ....................................................................................41

THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK (2019)....................................27

NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2d ed. 2017) ............26

SAMUEL JOHNSON, 1 DICTIONARY OF ENGLISH LANGUAGE (1825) .........................................13, 14

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018).........................19, 20, 26, 43

Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State,* 1836-1930 (2019) (Ph.D. dissertation, Texas Christian University), https://bit.ly/3TJKJ8I ....................................................................38

Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209
(2010) ............................................................................................................12

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS
(2012) ............................................................................................................30

Mark W. Smith*, Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*,
HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD ..........22

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71 (2020) ......................................................................27

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ...........................14

*Ridership Data*, METRA, https://bit.ly/3TqV8EH (last visited Mar. 19, 2024)............................43

*Facts at a Glance*, CHI. TRANSIT AUTH., https://bit.ly/3x9raxv (last updated Jan. 2024) ............43

François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* (Newbern: The Editor's Press, 1792).........................................33

JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA
(Edenton: Hodge & Wills, 1791) ......................................................................33

Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston respectfully submit this combined brief in opposition to Defendants' Motions for Summary Judgment.[1]

## INTRODUCTION

As emphasized in Plaintiffs' initial brief, the first question to ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 17 (2022). If it does, that conduct is "presumptively protect[ed]" by the Second Amendment. *Id.* Then, it becomes Defendants' burden to demonstrate that the restrictions imposed on the exercise of that conduct are consistent with "this Nation's historical tradition of firearm regulation" so as to fall outside of the Second Amendment's "unqualified command." *Id.* (cleaned up). Here, Defendants cannot. As Plaintiffs show, multiple modes of public transportation existed at the Founding. Yet there were no laws banning firearm carry on any of them. Indeed, precisely the opposite was true; at least some modes of transportation expressly permitted carry.

Defendants do not meaningfully contend with this well-established history. Instead, they raise a host of unpersuasive threshold arguments, likely to obfuscate the fact that they can offer no persuasive legal history from the Founding era supporting their ban. Each of Defendants' arguments fail. First, Plaintiffs show Article III standing sufficient to support declaratory and injunctive relief because they allege that they would take public transportation in the near future but for the challenged Ban. That specific future intent to take public transportation necessarily

---

[1] Defendants Raoul, Amato, Berlin, and Rinehart submitted a combined motion for summary judgment. *See* State's Mem. in support of Mot. for Summary Judgment, Doc. No. 65 (Jan. 29, 2024) ("State MSJ"). Defendant Kimberly M. Foxx submitted her own motion. *See* Def. Mem. in support of Mot. for Summary Judgment, Doc. No. 68 (Jan. 29, 2024) ("Foxx MSJ"). References to "Defendants" encompass all parties.

includes passing through the facilities and parking lots of public transportation facilities. Moreover, the Ban inflicts a constitutional injury by depriving Plaintiffs of their Second Amendment rights and is redressable by a declaration that it is unlawful and an injunction prohibiting Defendants from enforcing it. That the operators of various transit systems have their own policies against carry does not diminish the relief this Court could award against the named Defendants, and Plaintiffs would carry while taking Pace buses and Metra trains if Illinois' ban were enjoined.

Second, Defendant Foxx fails to show that firearms may be banned everywhere that the State provides funding to maintain. Illinois does not act as a "proprietor" in enforcing the Ban, but as a sovereign. Even if the State were a proprietor, that status is ultimately irrelevant under the *Bruen* test, which requires Illinois to affirmatively demonstrate that the Ban is consistent with this Nation's historical tradition of firearms regulation. Third, Plaintiffs can properly bring a facial challenge because the Ban indisputably refers to firearms generally, not any specific category of arms that could potentially have been restricted, had the legislature sought to do so. Fourth, moving to the *Bruen* analysis, Plaintiffs' conduct is covered by the plain text of the Second Amendment because Plaintiffs seek to carry handguns in public for self-defense. Because the Ban hinders their ability to do so, Plaintiffs satisfy *Bruen*'s threshold inquiry and the burden shifts to Defendants. Fifth, Defendants fail to meet the burden *Bruen* places on them to marshal widespread, relevantly similar analogues rooted in the Founding era supporting the Ban. Defendants commit several overarching methodological errors and their analogues are unpersuasive even when assessed on their own terms. Sixth, State Defendants fail to show that all public transportation and associated facilities throughout the State qualify as comprehensively secured locations. Seventh, and finally,

Defendant Foxx fails to show that venue is improper or that a venue transfer is warranted at this late stage in the case.

Defendants' Motions for Summary Judgment should be denied, and Summary Judgment should be entered in Plaintiffs' favor.

## ARGUMENT

### I.     Plaintiffs Have Article III Standing

Defendants argue that Plaintiffs lack standing. The State parties claim that Plaintiffs lack standing to challenge carry restrictions applicable to buildings, real property, and parking areas controlled by public transit systems because they allege no intent to visit such locations while carrying. *See* State MSJ at 5–6. Defendant Foxx argues that Plaintiffs' injuries are not redressable because transit operators also ban firearms. *See* Foxx MSJ at 6–7. Both arguments should be rejected.

#### A.   Plaintiffs Have Standing to Challenge Firearms Restrictions at Buildings, Real Property, and Parking Areas Controlled by Public Transportation Systems

As set forth in Plaintiffs' initial briefing, *see* Pls.' Mem. in Support of Mot. for Summary Judgment, Doc. No. 70 at 4–7 (Jan. 29, 2024) ("Pls.' MSJ"), and in their supplemental memorandum, *see* Doc. No. 27 (Dec. 13, 2022), Article III standing requires an injury that is "concrete, particularized, and actual or imminent," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). And the denial of Plaintiffs' Second Amendment right to carry for self-defense "outside the home" is one such injury in fact. *Bruen*, 597 U.S. at 10. Nonetheless, the State parties argue that Plaintiffs have not sufficiently alleged prior visits to buildings, real property, or parking areas controlled by public transportation systems, or any intent to visit such places in the future. *See* State MSJ at 6.

3

But as all Defendants impliedly concede, Plaintiffs *do* sufficiently show that they either used public transportation in the past, but stopped because they now have to disarm, or would intend to use public transportation in the immediate future if permitted to carry for self-defense. SUF ¶¶ 12, 20, 27, 37–38. This is an important concession. For it defies logic to say that Plaintiffs could take *any* form of public transportation—including Pace buses, CTA, Metra, and more— without passing through associated real property such as stations, parking lots, and the like. After all, the real property associated with public transit systems is where fares are collected, and the State parties cannot (and do not) argue that one can simply board a CTA car or a Metra train without passing through a fare gate, standing on a platform, or walking through the parking lot. Similarly, if Plaintiffs took a public bus, they would need to stand at the bus stop, which is real property associated with public transportation. In other words, Plaintiffs' allegations that they have taken various forms of public transportation in the past and intend to do so in the future necessarily includes the predicate activity of passing through associated real property, including buildings and parking lots. SUF ¶¶ 12, 20, 27, 37–38. The key question is whether Plaintiffs show a sufficient "'intention to engage in a course of conduct arguably affected with a constitutional interest'" related to public transportation. *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Babbit v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)).

The State parties' standing argument glosses over the key fact that Plaintiffs bring a pre-enforcement challenge to the Transportation Carry Ban. As such, they "need not violate the [Ban] and risk prosecution in order to challenge it." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to" "threatened enforcement of a law," then "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). As the Seventh Circuit has

recognized, the "very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Ezell*, 651 F.3d at 695–96 (cleaned up). Because Plaintiffs show that they intend to take public transportation in the future if they could carry firearms for self-defense, and Illinois has not disclaimed enforcement of the Ban, this Court has jurisdiction to decide the entirety of Plaintiffs' facial challenge to it.

### B. Plaintiffs' Constitutional Injuries are Redressable Against Defendants

Defendant Foxx argues that Plaintiffs' injuries are not redressable because Plaintiffs have not "affirmatively shown" that the operators of modes of transportation they intend to use allow firearms. Foxx MSJ at 6–8. This is beside the point. When a suit "challeng[es] the legality of government action" the key question is "whether the plaintiff is himself an object of the action . . . at issue." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "If he is, there is ordinarily little question . . . that a judgment preventing . . . the action will redress it." *Id.* at 561–62; *see also id.* at 561 (Plaintiffs need only show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (cleaned up)). And redressability turns on the "connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Here, as just discussed, the Transportation Carry Ban inflicts a constitutional injury by depriving Plaintiffs of their general Second Amendment right to carry firearms in public for self-defense while taking public transportation. That injury is redressable by a declaration that the Public Transportation Carry Ban is unconstitutional and an injunction barring Defendants and their subordinates from enforcing it prospectively. Enjoining specific parties from specific action is "an acceptable Article III remedy" that redresses Plaintiffs' "cognizable Article III injury." *Steel Co. v.*

*Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *accord California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies . . . operate with respect to specific parties" (cleaned up)).

Regardless, all Plaintiffs state that they would carry on Metra and Pace buses if Illinois' ban on carry in public transportation is enjoined, despite the transit operators' policies barring firearms. Suppl. Decl. of Benjamin Schoenthal ¶ 4 (Mar. 24, 2024), attached as Ex. A ("Suppl. Schoenthal Decl."); Suppl. Decl. of Joseph Vesel ¶ 2 (Mar. 24, 2024), attached as Ex. B ("Suppl. Vesel Decl."); Suppl. Decl. of Mark Wroblewski ¶ 2 (Mar. 24, 2024), attached as Ex. C ("Suppl. Wroblewski Decl."); Suppl. Decl. of Douglas Winston ¶ 2 (Mar. 24, 2024), attached as Ex. D ("Suppl. Winston Decl."). If any of those transit operators continued to enforce their no-carry policies after a judgment in Plaintiffs' favor, Plaintiffs could seek to enjoin the policies if the operators took adverse action against them. Suppl. Schoenthal Decl. ¶ 7; Suppl. Vesel Decl. ¶ 5; Suppl. Wroblewski Decl. ¶ 5; Suppl. Winston Decl. ¶ 5.

While not directly relevant to the disposition of this lawsuit, Defendant Foxx is also incorrect that the various transit companies Plaintiffs frequent "are not subject to the Second Amendment." Foxx MSJ at 7. Under the state action doctrine, private actors may be sued for constitutional violations if the private actor's conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). The Seventh Circuit applies a flexible test to decide whether private actors qualify, which includes whether the state "controls a nominally private entity" and "delegates a public function to a private entity." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 815–16 (7th Cir. 2009) (cleaned up). In any subsequent lawsuit, these factors support the finding that the operators of the transportation Plaintiffs intend to use are state actors. *Accord, e.g.*, *Arce v. Chi. Transit Auth.*, 193 F. Supp. 3d 875, 893 (N.D. Ill. 2016) (explaining that CTA can be sued under 42 U.S.C. § 1983 because it is a state actor); *Paquet*

*v. Pace, Suburban Bus Div. of Reg'l Transp. Auth.*, 156 F. Supp. 2d 761, 767 (N.D. Ill. 2001) (entertaining § 1983 suit for violations of constitutional rights against Pace buses). Defendant Foxx arguably concedes as such in arguing elsewhere in her brief that the Ban "*only* regulates transportation systems that utilize State funds" as distinguishable from those that are "[p]urely private." Foxx MSJ at 3. In any event, none of this disturbs the conclusion that the precise relief Plaintiffs seek—a declaration that the Ban is unconstitutional and an injunction preventing the named Defendants from enforcing it—is redressable by a favorable decision from this Court.

## II.    Government Proprietorship Provides No Exception to the Second Amendment

Defendant Foxx raises the additional threshold objection that the Second Amendment does not apply to the Ban at all. *Id.* at 3–5. Reaching that conclusion entails a few analytical steps. First, Defendant Foxx argues that owners of private property have an "absolute right to exclude others from that property." *Id.* at 3. She next extrapolates that principle to the government, arguing that it too can exclude anyone it wants, so long as it is "acting as proprietor, to manage its internal operations." *Id.* at 4 (cleaned up). She then concludes that whenever the government is acting as proprietor, its actions need only satisfy rational basis review. *See id.* Finally, she argues that the government acts as proprietor not only with respect to physical property, but also anytime it disburses funds. *Id.* at 3, 5. In other words, Defendant Foxx argues that anywhere the government acts as proprietor—including by disbursing funds—it may ban the exercise of constitutional rights it disfavors so long as a rational basis exists.

That cannot be the rule. For there is no "government proprietor" exception to the Second Amendment, or to any other constitutional right. The State also "owns"—and provides funding to maintain—sidewalks, streets, and other public places, but it cannot bar the exercise of constitutional rights there based solely on its status as proprietor. Even pre-*Bruen*, that the

7

government owned a location was irrelevant to the constitutionality of its carry bans there. *See, e.g.*, *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 694, 703 (N.D. Ill. 2021). Surely Defendant Foxx would not advocate that the government—acting as proprietor and seeking to ensure safety within places it funds—could decree that there was no right against unreasonable search and seizure within public transportation facilities. The same must be true for the Second Amendment, because it is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion))); *see also id.* at 17 n.3 (The Second Amendment "is not the only constitutional right that has controversial public safety implications." (quoting *McDonald*, 561 U.S. at 783 (2010) (plurality opinion))).

Most fatally for Defendant Foxx's argument, Illinois does not act as a "proprietor" in enforcing the Transportation Carry Ban, but as a sovereign. *Accord Koons v. Platkin*, 673 F. Supp. 3d 515, 600–01 (D.N.J. 2023); *Solomon*, 559 F. Supp. 3d at 694. The challenged provisions are part of the State's criminal code and are backed by criminal penalties, which a normal proprietor cannot enact or enforce, and they directly regulate constitutional conduct, which no normal proprietor has the power to do. That makes this case different in kind from cases where "a state or local government enters the market as a participant," *White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 208 (1983); *see also Reeves, Inc. v. Stake*, 447 U.S. 429, 439 (1980), or where the government engages in "private conduct" on its own property, *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc*., 507 U.S. 218, 227–29 (1993)—in other words, from the cases at the foundation of Defendant Foxx's argument, *see* Foxx MSJ at 4–5. Illinois does not act as a market participant when it criminalizes the exercise of constitutional rights.

The First Amendment cases Defendant Foxx cites are especially inapposite. *See id.* at 4. Government regulation of First Amendment rights on government property can be subject to varying levels of means-end scrutiny. *See, e.g.*, *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). But *Bruen* explicitly rejected that kind of judicial interest balancing in the Second Amendment context. *See* 597 U.S. at 26. Nor is there a government proprietorship exception "across the spectrum of constitutional rights" as Defendant Foxx argues. Foxx MSJ at 4. As the Supreme Court has recognized, "there is a crucial difference, with respect to constitutional analysis" when the State exercises "the power to regulate or license" versus when it acts "as proprietor, to manage its internal operation." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (cleaned up); *accord Bldg. & Constr. Trades Council*, 507 U.S. at 227. The Transportation Carry Ban is clearly an instance where the State is using its power to regulate citizens' conduct. It is akin to Illinois passing a law giving police unfettered discretion to stop and frisk anyone walking through the subway system without probable cause simply because they are on property owned by the government or funded with public monies. Both exercises of the State's sovereign authority to restrict individuals' constitutional rights are equally impermissible.

Regardless, the State's purported status as proprietor of public transportation facilities is ultimately irrelevant. In the Second Amendment context, the State cannot ban firearms in a location without affirmatively demonstrating that its restriction "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also Koons*, 673 F. Supp. 3d at 603 (Even "where the government is acting as a[] . . . proprietor or market participant, allegations of government infringement are nevertheless resolved according to the applicable analytic framework." (cleaned up)); *United States v. Ayala*, No. 8:22-cr-369, 2024 WL 132624, at *14 (M.D. Fla. Jan. 12, 2024) (similar); *Wolford v. Lopez*, No. 23-cv-00265, 2023 WL 5043805, at *20

9

(D. Haw. Aug. 8, 2023) (rejecting government proprietor argument as irrelevant under *Bruen*'s test); *May v. Bonta*, No. 23-cv-01696, 2023 WL 8946212, at *17 (C.D. Cal. Dec. 20, 2023) (same). In other words, "before a state's regulation can pass constitutional muster, it must satisfy *Bruen* regardless of whether the Government is the proprietor." *Siegel v. Platkin*, 653 F. Supp. 3d 136, 155 (D.N.J. 2023). To pass muster under *Bruen*, Defendants must support their restriction with persuasive legal history in the form of "relevantly similar" laws measured by "how and why" they "burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. The key question is thus not whether the government owns and operates a location, but whether the location resembles the "relatively few" places historically deemed sensitive—legislative assemblies, polling places, and courthouses—in a specific way. *See id.* at 30. As described in Plaintiffs' moving papers, that requires assessing whether the government comprehensively secures the location at issue, because comprehensive security allowed these locations to be deemed sensitive in the Colonial and Founding eras. *See* Pls.' MSJ at 20–23. And because the State fails to show that public transportation, associated real property, or parking lots are so secured, it cannot designate them sensitive and bar carry by law-abiding licensees there.

One final note. The argument that State proprietorship provides blanket authority to infringe on Second Amendment rights would make a hash of *Bruen*'s identification of *specific* government buildings, namely legislative assemblies and courthouses, where firearms may be prohibited, as well as *Bruen*'s instruction for courts to analogize from those specific locations when assessing other "sensitive-place" restrictions. *See* 597 U.S. at 30; *see also Wolford*, 2023 WL 5043805, at *20. If *Bruen* stood for the proposition that the government may prohibit firearm-carry in *any* government-owned location, that is what it would have said. This Court should join the many others that have rejected any government proprietorship exception to the Second

10

Amendment. *See, e.g.*, *Ayala*, 2024 WL 132624, at *14–15; *Siegel*, 653 F. Supp. 3d at 155; *Wolford*, 2023 WL 5043805, at *20; *May*, 2023 WL 8946212, at *17. The great weight of authority thus cuts against the lone post-*Bruen* case Defendant Foxx identifies as creating a government proprietorship exception to the Second Amendment. *See Kipke v. Moore*, No. 23-cv-1293, 2023 WL 6381503, at *9 (D. Md. Sept. 29, 2023). Even the *Kipke* court ultimately held that Maryland failed to show that it *acts* as a proprietor in regulating firearms in parks, even if such an exception exists in the first place. *See id.* And Defendant Foxx's citation to the pre-*Bruen* case *GeorgiaCarry.Org, Inc. v. Georgia*, *see* Foxx MSJ at 4, can be easily dismissed for a variety of reasons. First, this case was cited by *Bruen* as a case that employed the incorrect—and hence no longer valid—approach to the Second Amendment. 597 U.S. at 19 n.4. Second, the portion of the case that Defendant Foxx highlights echoes only the well-established principle that *private* persons have the right to exclude from their premises. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022). The case says nothing about a *government* proprietorship exception to Second Amendment analysis, even under the now-invalid two-step test that *Bruen* rejected.

In sum, "the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property." *Koons*, 673 F. Supp. 3d at 601. Defendants still must satisfy *Bruen*'s requirements to prevail.

## III. The Public Transportation Carry Ban Is Unconstitutional

### A. Plaintiffs Can Properly Bring a Facial Challenge

Defendant Foxx argues that Plaintiffs cannot properly bring a facial challenge to the Ban following the Seventh Circuit's decision in *Bevis v. City of Naperville*, which held that so called "assault weapons" are unprotected by the Second Amendment. Foxx MSJ at 8–9. Not so. It is well-

settled that "[i]n a facial constitutional challenge, individual application facts do not matter." *Ezell*, 651 F.3d at 697. Once Plaintiffs establish standing, "the claimed constitutional violation inheres in the terms of the statute[.]" *Id.* at 698. Here, the statute indisputable refers generally to "firearms," not specifically to the category of arms *Bevis* held are unprotected. In *Heller*, the Supreme Court did not pause to ask whether the District of Columbia's handgun ban potentially applied to some dangerous and unusual handguns before declaring it facially unconstitutional. *See City of Los Angeles v. Patel*, 576 U.S. 409, 416 (2015) (identifying *Heller* as a facial challenge). Similarly, in *People v. Burns*, the Illinois Supreme Court rejected the State's argument that its prior flat ban on carrying handguns in public was constitutional as applied to felons because, even if felons have forfeited Second Amendment rights, "an unconstitutional statute does not 'become constitutional' simply because it is applied to a particular category of persons who could have been regulated, had the legislature seen fit to do so." 79 N.E.3d 159, 165–66 (Ill. 2015). The same principle applies here: Illinois' Transportation Carry Ban does not "become constitutional" simply because it could be applied to a particular (hypothetical) category of arms which could have been regulated, had the State seen fit to do so.

Defendant Foxx's reliance on *United States v. Salerno* is also misplaced. *See* Foxx MSJ at 9. As the Seventh Circuit has noted, the "*Salerno* principle has been controversial," and it does not apply to all facial challenges. *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (en banc); *Ezell*, 651 F.3d at 698 n.8; *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1233 & n.74 (2010) (collecting cases ignoring or casting doubt on *Salerno*'s stated rule). Additionally, even *Salerno* recognized that the fact that a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid[.]" 481 U.S. 739, 745 (1987). The key question is thus whether the statute *on its*

12

*face* violates the Second Amendment. *See, e.g.*, *Ezell*, 651 F.3d at 697–98; *United States v. Stevens*, 559 U.S. 460, 472 (2010) (characterizing the "typical facial attack" as inquiry into whether "the statute lacks any plainly legitimate sweep[.]" (cleaned up)). This Court can answer that question despite *Bevis*. Moreover, Plaintiffs only contend that they should be allowed to carry firearms that Illinois does not ban on public transportation. SUF ¶¶ 10, 18, 26, 37 (explaining desire to carry "handgun[s]" on public transportation but for Illinois' ban). Plaintiffs do not challenge any other state restrictions, such as Illinois' separate ban on so-called "assault" weapons. *See* 720 ILCS 5/24-1.9. Because the firearms they seek to carry on public transportation are not those *Bevis* found impermissible, that decision presents no bar to Plaintiffs' facial challenge.

### B. Plaintiffs' Conduct is Covered by the Plain Text of the Second Amendment

Defendant Foxx next argues that Plaintiffs' conduct does not fall within the plain text of the Second Amendment. *See* Foxx MSJ at 9–11. This is incorrect. Plaintiffs show that they intend and desire to keep and bear arms on public transportation for self-defense. SUF ¶¶ 12, 20, 27, 37–38. This conduct resembles what the plaintiffs in *Bruen* alleged; namely, carrying handguns in public for self-defense. *See Bruen*, 597 U.S. at 32.

As explained in Plaintiffs' moving papers, the Supreme Court has already defined the Second Amendment's key terms. *See* Pls.' MSJ at 8. "The people" includes "all Americans"; "arms" includes "all instruments that constitute bearable arms," including handguns; and, to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 32–33. Declining to quibble with these already-defined terms, Defendant Foxx instead seizes on the term "infringe" to argue that Plaintiffs fail to meet their burden at the plain text stage.

True, the Supreme Court has not yet authoritatively defined the term "infringe" in the Second Amendment. However, during the Founding era, when the Second Amendment was

ratified, "infringe" meant "to violate," "to destroy," *or* "to hinder." *Infringe*, SAMUEL JOHNSON, 1 DICTIONARY OF ENGLISH LANGUAGE (1773), https://bit.ly/3SJu0lR; *see also* NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3vqNceQ (defining "infringe" as "[t]o destroy or hinder"); 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES 143 n.40 (1803) ("The right of the people to keep and bear arms shall not be infringed . . . and this without any qualification as to their condition or degree[.]"); *Nunn v. State*, 1 Ga. 243, 251 (1846) (cited in *Heller*, 554 U.S. at 612) (using "infringed" synonymously with "curtailed, or broken in upon[] in the smallest degree"). These broad definitions of "infringe" have persisted from the Founding era to today. *See Fraser v. ATF*, 672 F. Supp. 3d 118, 128–29 (E.D. Va. 2023).

Defendant Foxx adopts a blinkered view of "infringe," stating that it can only mean to "violate" or to "destroy" the right. Foxx MSJ at 10. But as just explained, Founding-era sources define the term more broadly, in a way that encompasses even small incursions on the exercise of the right. So too Circuit courts. The Third and Fourth Circuits recently adopted Plaintiffs' reading of infringe, relying on many of the same sources just cited. *See Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (citing Johnson and Webster for the proposition that infringe means to "hinder" and concluding that "the Supreme Court recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded justification"); *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044–45 & n.8 (4th Cir. 2023) (calling the same definition of infringe that Defendant Foxx advances "stilted" and without "grounding in original meaning, history, and *Bruen* itself"), *reh'g en banc granted*, No. 21-2017, 2024 WL 124290 (4th Cir. Jan. 11, 2024). Additionally, the Illinois Appellate Court recently agreed with Plaintiffs' definition of "infringe" in the Second Amendment.

*Vandermyde v. Cook County*, No. 1-23-0413, 2024 WL 685617, at *8 (Ill. App. Ct. Feb. 20, 2024).[2] In the course of rejecting the same arguments Defendant Foxx raised here, the Illinois Appellate court also noted that the Fourth Circuit in *Maryland Shall Issue* "compellingly took apart the dissent's position that 'infringe' for purposes of the Second Amendment [] encompasses only a complete destruction of the right to bear arms." *Id.* at *7.

In short, Plaintiffs' definition makes sense because when protecting constitutional rights, courts must "scrutinize not only total bans but also lesser restrictions and burdens." *Frein*, 47 F.4th at 254. If Defendant Foxx were correct about the meaning of "infringe," New York would have prevailed in *Bruen* because its "good cause" regulation did not entirely destroy the Second Amendment right, but merely made it more difficult to exercise. *See* 597 U.S. at 12–13. And Illinois could charge citizens for exercising free speech rights with impunity so long as they do not bar speech altogether. Neither action is constitutional.

Next, Defendant Foxx suggests that because the First Amendment uses "abridge," "infringe" must take a narrower meaning. Foxx MSJ at 10. But the Supreme Court in *Heller* used "infringe" and "abridge" interchangeably when discussing the "ancient right of individuals to keep and bear arms." 554 U.S. at 599. Indeed, the Supreme Court has expressly stated that the Second Amendment contains a "command" that is "equally unqualified" as the First Amendment's. *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1960); *Bruen*, 597 U.S. at 17 (citing this language). Because the Second Amendment "is not a second-class right," *Bruen*, 597 U.S. at 70 (cleaned up), its terms must be interpreted consonant with the protection afforded other constitutional rights. On Defendant Foxx's own telling therefore, the Second Amendment, akin to

---

[2] Because this Order was filed under Illinois Supreme Court Rule 23 and is unpublished, Plaintiffs cite it as persuasive authority only.

the First Amendment, must also "prohibit[] any diminishment of the rights its protects." Foxx MSJ at 10. Finally, Defendant Foxx's arguments about the Second Amendment's prefatory clause can be easily dismissed, *see id.* at 10–11, because "infringe" is not an ambiguous term. Moreover, that the Second Amendment refers to a "well-regulated militia," *see id.*, has no bearing on the meaning of the term "infringe" at the Founding.

Defendant Foxx next invokes language from *Heller* about "longstanding" sensitive place laws. *See id.* at 11–12. But this language was dicta, and *Heller* identified such laws only as "presumptively lawful[.]" 554 U.S. at 626–27 n.26; *Ayala*, 2024 WL 132624, at *11–12 (persuasively explaining why this language is dicta, namely because it was not "necessary to the reasoning of either case"); *Kanter v. Barr*, 919 F.3d 437, 453–54 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022) (calling *Heller*'s language identifying presumptively lawful regulatory measures "dictum"). To the extent they are relevant at all, understanding the applicability of those presumptively lawful measures involves historical analysis. The mere fact that *Heller* assumed that such laws are permissible neither implicates *Bruen*'s threshold plain text analysis, nor alters the requisite textual interpretation of "infringe." Moreover, Defendant Foxx's citation to *Caetano v. Massachusetts* also does not support her unduly narrow definition of infringe. *See* Foxx MSJ at 11. Simply because the Supreme Court has invalided some laws that outright (or effectively) ban a particular arm, *see, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam); *see also Heller*, 554 U.S. at 628, does not mean that carry regulations are automatically *valid* so long as they do not completely destroy the underlying right. In any event, Defendant Foxx's position boils down to semantics. *Caetano* could be described as evaluating either a hindrance on the exercise of Second Amendment rights (a bar on the possession of one type of arm) or a destruction of the right (a complete ban on

16

possession of a protected arm). The same could be said for *Heller*'s handgun ban. So too the Transportation Carry Ban, which could be described as a destruction of the right to carry on public transportation, not merely a mere hindrance of Plaintiffs' Second Amendment rights.

In sum, Plaintiffs sufficiently show that the Public Transportation Carry Ban infringes— i.e., hinders—their right to keep and bear arms. Their conduct—carrying firearms in public for lawful purposes—is thus "presumptively protected" by the Second Amendment and the burden shifts to Defendants to present persuasive legal history refuting that result. *See Bruen*, 597 U.S. at 31–32.

### C. Controlling Methodological Considerations for Historical Analysis Under *Bruen*

Defendants stumble at the threshold of their historical presentation by committing several methodological errors. Before analyzing each of Defendants' proffered legal analogues, Plaintiffs unpack these overarching errors.

*First*, as described in Plaintiffs' moving papers, *see* Pls.' MSJ at 13–14, a historical "tradition" requires proof of "well-established and representative" historical analogues, *Bruen*, 597 U.S. at 30. While *Bruen* did not expressly define these terms, its reasoning reveals their meaning. Analogues are sufficiently well-established and representative if they are present in many states and therefore affect large swaths of the population. For example, *Bruen* dismissed one state statute and two state court decisions as not representative. *See id.* at 65. Similarly, the Supreme Court doubted that "*three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 46. And in rejecting reliance on territorial restrictions, *Bruen* found them unpersuasive in part because "miniscule" populations would have lived under them. *Id.* at 67. Thus, after analyzing the relevant census data the Court stated: "Put simply, these western restrictions were irrelevant to more than 99% of the American population." *Id.* In other

words, laws existing in only a few jurisdictions or applying to a small percentage of people are historical "'outliers'" that should be disregarded. *Id.* at 30 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d. Cir. 2021)); *see also Koons*, 673 F. Supp. 3d at 622 (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient); *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y. 2022) ("[T]he notion of a 'tradition' is the opposite of one-offs, outliers, or novel enactments."); *Siegel*, 653 F. Supp. 3d at 153 ("Six cities do not speak for, what was by 1893, 44 states"); *May*, 2023 WL 8946212, at *13 (rejecting government's reliance on three late 19th-century laws as not sufficiently representative).

State Defendants resist these clear teachings from *Bruen*, arguing that a historical tradition can be based on only a few analogues. *See* State MSJ at 9–10, 12 & nn.5–10. They reach this conclusion by suggesting that *Bruen* identified courthouses, polling places, and legislative assemblies as sensitive places by relying on sources that cited only a few historical laws. *See id.* They contend the same for schools, arguing that *Bruen* found them sensitive based on a few 19th-century statutes. *See id.* at 12. State Defendants' reasoning suffers from multiple flaws.

For starters, *Bruen* did not "recognize" courthouses, polling places, legislative assemblies, and schools as sensitive places based on "the historical record." *See id.* at 9; *see also Heller*, 554 U.S. at 626–27 n.26 (noting that the locations it identified are "presumptively lawful" and conducting no historical analysis). Rather, *Bruen* "assume[d] it settled" (in dicta) that the first three locations were sensitive and carry could be barred there. 597 U.S. at 30; *see also Ayala*, 2024 WL 132624, at *11–12 (persuasively explaining why both *Bruen* and *Heller*'s language about sensitive places is dicta, namely because it was not "necessary to the reasoning of either case"). In other words, because *Bruen* had "no occasion to comprehensively define 'sensitive

18

places[,]'" it merely commented that these three locations are *likely* sensitive based on prior precedent. 597 U.S. at 30. It did not apply the analogical test that it had just announced. *See id.*

As for schools, *Bruen* noted *Heller*'s dicta on this point but went on to say that "the historical record yields relatively few 18th- and 19th-century 'sensitive places'" and mentioned only legislative assembles, polling places, and courthouses as the starting point for analogical reasoning. *Id.* Moreover, far from endorsing schools as sensitive places, *Bruen* approvingly referenced carry by black Americans at Freedmen's schools before the Fourteenth Amendment's ratification. *See id.* at 61. *Bruen* was correct to decline to suggest that schools are sensitive places. For the historical record reveals that early colleges banned only *students* (not faculty or visitors) from carrying weapons. *See, e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 247–48 (2018) (describing the University of Virginia's ban on students carrying firearms as response to the students' "spoiled and violent behavior"); Amicus Br. of the Ctr. for Hum. Liberty at 20–22, *Antonyuk v. Nigrelli*, No. 22-2908 (2d. Cir. Feb. 9, 2023), Doc. No. 313 (summarizing various Colonial and Founding era bans on student carriage on campus).[3] These bans were rooted not in students' vulnerability, but rather in the schools' ability to exercise *in loco parentis* authority over them. *See, e.g.*, *Worth v. Harrington*, 666 F. Supp. 3d 902, 921–23 (D. Minn. 2023) (explaining this historical fact); *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 144–45 (3d Cir.

---

[3] Restrictions summarized in this Brief are (1) the University of Virginia's 1825 ban on student possession; (2) Harvard's 1655 ban on students keeping guns; (3) Yale's 1795 ban on students keeping or firing guns; (4) North Carolina's 1799 ban on students keeping and using guns; (5) Rhode Island College (now Brown University)'s 1803 restriction on students keeping guns; (6) the University of Georgia's 1810 restriction on students keeping guns; and (7) Columbian College (now George Washington University)'s ban on students keeping firearms. None of these laws extended to school staff or visitors to campus.

2024) (Restrepo, J., dissenting) (recognizing that Founding-era restrictions by schools on student firearm possession "[were] not predicated on or justified by the student's presence at a sensitive location," but rather on the schools' "authority standing *in loco parentis*."). The problem for Defendants is that historical exercises of *in loco parentis* authority do not support restricting firearm carry by anyone not subject to that sort of authority.[4] It therefore follows that analogies from schools to places where other allegedly vulnerable people gather lack any historical grounding. Even assuming firearm restrictions on campuses could be probative, they are not relevantly similar to broader bans on carry by law-abiding adults. "How" they restricted the right is more limited because they disarmed only students, and "why" they did so was in reaction to students' behavior with firearms. *See, e.g.*, Kopel & Greenlee, *supra*, at 247–48. In sum, to the extent *Bruen*'s dicta endorsed *Heller*'s dicta, it did so only with respect to legislative assemblies, polling places, and courthouses.

Additionally, State Defendants' argument that *Bruen* both found all of these locations sensitive based on a thin historical record, *see* State MSJ at 9–11, would render the rest of *Bruen*'s reasoning about widespread and representative analogues self-defeating. If the Court truly believed that a few analogues were sufficient to uphold New York's proper-cause requirement, it would have said so. It would have also saved the Court much ink because none of its thorough historical analysis would have been necessary. This is so because *Bruen* recognized that New York *had* presented a few analogues that did tend to support its regulation. *See* 597 U.S. at 46 (noting that New York had identified three restrictions on public carry); *id.* at 65 (noting that New

---

[4] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, they are no longer understood to have that authority. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010). These historical laws would accordingly not justify firearm bans on college students today.

York had identified one statute and pair of state-court decisions). While State Defendants cite *Antonyuk v. Chiumento* to support their argument, *see* State MSJ at 9, the Second Circuit's decision is not binding on this Court and is in severe tension with *Bruen* for all the reasons just discussed.

*Second*, for many of the same reasons just discussed, State Defendants are incorrect to argue that schools, government buildings, legislative assemblies, polling places, and courthouses "are the floor, not the ceiling, of the categories of places in which governments can restrict firearms." State MSJ at 11. This conclusion is devoid of any historical or precedential support. Moreover, it ignores *Bruen*'s language treating only Founding-era legislative assemblies, polling places, and courthouses as presumptively (not definitively) sensitive. 597 U.S. at 30. Indeed, *Bruen* explained that courts "can use analogies to *those* historical regulations of 'sensitive places'"—i.e., those pertaining to the three locations just mentioned—"to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* Nowhere did *Bruen* suggest that governments could extrapolate from historically sensitive places without any recognition of why these places were historically deemed sensitive to begin with. As described in Plaintiffs' moving papers, that requires assessing whether the government comprehensively secures the location at issue, because comprehensive security allowed these locations to be deemed sensitive in the Colonial and Founding eras. *See* Pls.' MSJ at 20–23.

*Third*, State Defendants argue in passing that because *Bruen* "designat[ed]" schools as sensitive based on sources citing 19th century regulations, a restriction can be consistent with this Nation's history and tradition "based solely on evidence from the 19th century." State MSJ at 12. This too is error. As just discussed, *Bruen* neither adopted *Heller*'s dictum about schools nor

21

undertook the searching historical analysis required to decide if, and on what historical basis, firearm carry can be banned in schools. Moreover, as Plaintiffs explain at length in their moving papers, the key starting point for this Court's historical analysis must be the Founding era, centering on 1791, when the Second Amendment was ratified. *See* Pls.' MSJ at 9–13 (collecting authorities and explaining theory). State Defendants cite no other authority for their suggestion that a tradition can start decades after the Founding and even after the Fourteenth Amendment's ratification. Nor could they, for decades of precedent from both the Supreme and lower courts interpreting the scope of incorporated rights cuts against them. *See, e.g.*, *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("The pertinent question, the [*Bruen*] Court explained, is what the Founders understood the Second Amendment to mean."); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning"); *Lara*, 91 F.4th at 134 (holding that "to maintain consistency in our interpretation of constitutional provisions," 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds); *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at \*20 (S.D. Cal. Sept. 22, 2023) ("*Bruen* teaches the most significant historical evidence comes from 1791[.]"); *Worth*, 666 F. Supp. 3d at 919 (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"); *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.

 *Fourth*, State Defendants err by arguing that a place can be deemed sensitive even "when historical analogues are inconsistent about whether firearms were historically restricted there." State MSJ at 12. This does not jive with *Bruen*'s instructions that analogues must be

widespread and representative, as just discussed. *See supra*; *see also* 597 U.S. at 34. The existence of one or two analogues that are inconsistent with the broader practice of regulation should be deemed "outliers" and dismissed under *Bruen*'s reasoning, not employed to designate a location sensitive. *See, e.g.*, 597 U.S. at 65. Moreover, *Bruen* noted in discussing one particular piece of historical evidence (*Sir John Knight's Case*), that when there are "multiple plausible interpretations" of the history, courts should "favor the one that is more consistent with the Second Amendment's command." *Id.* at 44 n.11. In other words, to the extent there are inconsistencies or ambiguities in the historical record, the tie goes to protecting Second Amendment rights.

*Fifth*, both Defendants stumble by asserting that the "nature of [*Bruen*'s] historical inquiry depends on the societal ill or problem at issue[,]" and this case therefore merits a more "nuanced approach." Foxx MSJ at 12–13; *see also* State MSJ at 13–14. While *Bruen* suggested—in dicta—that cases involving "unprecedented societal concerns or dramatic technological changes" may merit a "more nuanced" approach, the Court did not hold that the analogical inquiry changes. Society is always changing, but the societal concerns motivating Illinois' law—gun violence and associated dangers—were known to the Framers. *See* 597 U.S. at 26. Indeed, "gun violence" as a societal "problem" has existed since the Founding. *Heller*, 554 U.S. at 636. Thus, the new societal concern emphatically cannot be gun violence.

Perhaps recognizing this fact, Defendants argue that public transportation has undergone dramatic technological changes. *See* Foxx MSJ at 13; State MSJ at 13–15. But this ignores the fact that several types of transportation in existence today also existed at the Founding. *See* Pls.' MSJ at 15–19. These included stagecoaches, horse-drawn omnibuses, ferries, and other boats. *See id.* Even Defendants' own experts discuss transportation that existed in early America. *See, e.g.*,

23

State's Statement of Facts, Doc. No. 64, Ex. 11, Rivas Rep. at 9 (Jan. 29, 2024) ("State SUF") (discussing ferries and packet ships "that moved goods, passengers, and letters to port cities" in the early 1800s); *see id.* at 9–10 (discussing development of horse-drawn omnibuses in Philadelphia in the 1830s); State SUF, Ex. 1, Expert Rep. of Prof. Joshua Salzmann at 13 (discussing ferries' "centrality to travel in colonial and early America"). It is thus historically inaccurate to say that *all* transportation has undergone dramatic technological changes. While the Founding generation may not have imagined today's myriad modes and systems of public transportation, public transportation in some forms undoubtedly existed at the Founding. *See* Pls.' MSJ at 15–19. Regardless, Plaintiffs do not bear the burden to identify "historical twin" locations to those challenged here. *Bruen*, 597 U.S. at 30 (emphasis omitted). For "*Bruen* does not direct courts to look at when a historical place became akin to the modern place being regulated. Rather, the focus is on 'determining whether a historical regulation is a proper analogue[.]'" *Wolford*, 2023 WL 5043805, at *21 (cleaned up). Indeed, *Bruen* itself did not apply a different analogical test even though downtown Manhattan today (and other parts of New York State) have undergone great technological and societal change since the Founding era. On the contrary, *Bruen* stated that the historical analogies "here and in *Heller* are relatively simple to draw," distinguishing those cases from others "implicating unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27. The same should hold true for public transportation.

Moreover, the fact that a location has gone through a technological change does not obviate *Bruen*'s instructions that Defendants must nonetheless present representative, relevantly similar historical analogues supporting their carry restrictions in public transportation. As the Court explained, "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were

unimaginable at the founding." *Id.* at 28; *see also id.* (noting that the Second Amendment's "historically fixed meaning applies to new circumstances[,]" just as do other Amendments in our modern world). *Bruen* then explained that analyzing history requires analogical reasoning—in other words, a comparison of a historical to a modern regulation grounded in "why" and "how" each burdens Second Amendment rights. In other words, as both Defendants ultimately seem to realize given that they present historical laws, even if public transportation in all its forms has experienced dramatic technological change (it has not), representative and relevantly similar analogues are still required.

### D.  Public Transportation is Not Analogous to a Recognized Sensitive Place

The State Defendants next attempt to analogize the Public Transportation Carry Ban to "recognized" sensitive places, which it claims are "courthouses, legislative assemblies, polling places, schools, and government buildings." State MSJ at 17. But again, *Bruen* mentioned only three such locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *See* 597 U.S. at 30. Accordingly, this Court may analogize to "*those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (first emphasis added). For all the reasons discussed *supra* in Part I.C, courts must evaluate the underlying and unifying principle as to *why* this subset of government buildings was historically sensitive. Plaintiffs posit that it is because they were protected by heightened, government-provided security, greatly reducing the public's need for individual weapons. *See* Pls.' MSJ at 20–23 (collecting authorities).

For their part, State Defendants suggest other unifying features of sensitive places, namely that they are crowded, frequented by vulnerable people, publicly accessible, and government

owned and operated. But State Defendants fail to ground these categories in history. Moreover, *Bruen* expressly stated that the crowded nature of a place cannot be the determining factor for whether a place is sensitive: "there is no historical basis for New York to effectively declare [a location] a 'sensitive place' simply because it is crowded[.]" 597 U.S. at 31. This *must* be the case, lest every crowded city in America become suddenly "sensitive." Additionally, as Plaintiffs argue in their initial brief, there is a long tradition of permitting (and sometimes requiring) firearm carry in crowded places of public assembly, even where vulnerable groups were present. *See* Pls.' MSJ at 25–26; *see also Koons*, 673 F. Supp. 3d at 628 ("The colonial generation required the settlers to carry weapons during public assemblies to defend against hostilities[.]"); Kopel & Greenlee, *supra*, at 232 n.108, 233–34, 244; Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2016); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014); NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT 183–85 (2d ed. 2017) (summarizing laws from Virginia in 1619, 1632, and 1665; Connecticut in 1643 and 1644; Massachusetts Bay in 1637 and 1643; Rhode Island in 1639; Maryland in 1642; South Carolina in 1740 and 1743; and Georgia in 1770). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence[.]" John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh.

In sum, there is a robust historical tradition exactly *contrary* to the one Defendants conjure out of thin air. And that history reveals that the Colonial and Founding era tradition was to *require*

the bearing of arms around vulnerable people, because disarming the vulnerable and their caretakers makes them *more vulnerable*, not less. As the Founders well knew, violent criminals are unlikely to meticulously follow restrictions on public carry, and therefore "[s]uch laws make things worse for the assaulted and better for the assailants[.]" Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment Thinker Cesare Beccaria, who was critical of gun control laws for this reason); THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (2019) (quoting Beccaria on this point). One federal district court recently concluded as much. *See May*, 2023 WL 8946212, at *11 ("Rather than delivering children to the state (sometimes with armed officers) for protection, at playgrounds parents and caregivers remain responsible for their children's safety without any immediate support[,]" and California's "prohibition on CCW permitholders carrying firearms at playgrounds and youth centers eviscerates their ability to defend themselves and their children against attack"). That Defendants present expert testimony on the dangers of gunfire in crowded spaces, *see* State MSJ at 18; Foxx's Statement of Facts, Doc. No. 66, ¶ 64 ("Foxx SUF"), has no bearing on the *Bruen* analysis, which eschewed all such interest balancing and replaced it with an analysis of historical analogues, *see* 597 U.S. at 18–19, 28–29.

Finally, State Defendants' contention that all "publicly accessible" and "government owned and operated" spaces are automatically sensitive is similarly untethered from history. The category of "publicly accessible" spaces is hopelessly broad and thus violates *Bruen*'s prohibition against "expanding the category of 'sensitive places' simply to all places of public congregation." *Id.* at 31. Allowing all publicly accessible spaces to be deemed sensitive surely "eviscerate[s] the general

27

right to publicly carry arms for self-defense" that the Second Amendment guarantees. *Id.* And for all the same reasons Plaintiffs discuss regarding Defendant Foxx's alleged government proprietor exception, *see supra* Part II, that the government owns and operates a location is not sufficient to render it sensitive. As Plaintiffs explain, sensitivity is not a matter of government fiat, but depends on whether the government protects individuals in that location by comprehensively securing it. *See* Pls.' MSJ at 20–23.

State Defendants compound their error of improperly analogizing to recognized sensitive places by misinterpreting *Bruen*'s "how" and "why" instructions for analogical reasoning. *See* State MSJ at 23–24. They contend that because historical regulations of the "recognized" sensitive places just discussed "consisted of outright bans," their outright ban on concealed carry in public transportation is also acceptable. *Id.* at 23. As Plaintiffs just unpacked, the sensitive locations *Bruen* identified (in dicta) as presumptively lawful have *not* been authoritatively held to be sensitive based on any analysis of the historical record. *See supra*. Even assuming that legislative assemblies, courthouses, and polling places *are* sensitive places where carry can be restricted, State Defendants also err in contending that public transportation is analogous to these locations, *see* State MSJ at 23–24, for all the reasons just discussed. It is not enough to say that both locations include vulnerable individuals, are generally crowded, or are owned by the government. Simply because there appear to be a few outright bans on firearms at those locations during the Colonial and Founding eras, *see id.* at 23, does not mean that outright bans on firearms at other, *dissimilar* locations such as buses and subways are acceptable. Plaintiffs are aware of no court that has endorsed such logical leaps. Rather, in sensitive places cases following *Bruen*, courts have generally looked to whether relevantly similar arms bans existed throughout history (with special focus on the Founding) in locations *akin to* the one being regulated today. *See, e.g.*, *Antonyuk v.*

28

*Chiumento*, 89 F.4th 271, 355–63 (2d. Cir. 2023) (looking to historical restrictions on carry in parks to evaluate modern ban on carry in parks); *Ayala*, 2024 WL 132624, at *5, 9–10 (rejecting same analogues State Defendants cite and noting that post offices have existed since the Founding, but carry bans there have not); *Wolford*, 2023 WL 5043805, at *13–26 (analyzing carry bans in modern locations with reference to carry bans in similar historical locations); *May*, 2023 WL 8946212, at *6–17 (same); *Koons*, 673 F. Supp. 3d at *627–57 (same).

Even if this Court agrees with none of the above, State Defendants still falter because they fail to show that the restrictions in legislative assemblies, courthouses, and polling places were motivated by a similar "why" to their restrictions on carry in public transportation. *Bruen*, 597 U.S. at 29. While State Defendants contend that these early restrictions "were passed for the purpose of maintaining order or preventing violence[,]" their reasoning suffers from a level-of-generality problem. State MSJ at 24. They fail to show that any of the restrictions they cite were passed to prevent violence within *public transportation* or associated facilities. *See id.* at 24–25. Again, under *Bruen*, it is Defendants' burden to identify widespread, relevantly similar analogues supporting their restriction. *See* 597 U.S. at 29. It is not enough to say that because old laws may have the purpose of preventing gun violence, all modern laws with the same aim are acceptable. This overgeneralization eschews the careful historical inquiry that *Bruen* requires.

Examining the plain text of the restrictions State Defendants cite reveals that their purpose was narrower than preventing violence. For example, two of the provisions existed to ensure that no violent actors could hinder citizens from voting on election day. *See* State SUF, Ex. 16, Del. Const. of 1776 art. 28; State SUF, Ex. 17, 1787 N.Y. Laws 345. This is a narrower purpose, geared toward specific locations on specific days of the year. These laws cannot reasonably be construed to have the purpose of preventing violence writ large, especially at disanalogous locations such as

29

public transportation. Another restriction State Defendants cite punished "affrays,"—i.e., going armed to terrify others, *see* State SUF, Ex. 20, 1786 VA. ACTS 33, ch. 21, which *Bruen* explained is disanalogous to restrictions on peaceable carry, *see* 597 U.S. at 47.

Finally, to derive the purpose of the 1650 Maryland law, State Defendants point to material appearing before the enacted text of the law, not anything in the Act itself. *See* State MSJ at 24. They present no evidence that the language preceding the Act ("Orders made & agreed uppon [sic] by the Assembly for the better ordering of Both Howses.") is anything other than a phrase inserted by the compiler of the enacted statutes. *Id.* Even if this language were enacted, such titles and statements of purpose are used only as "appropriate guide[s]" to the "meaning of the [statute's] operative provisions[,]"—to clarify ambiguous statutory language, for example. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 218 (2012); *cf. id.* at 222 ("[A] title or heading should never be allowed to override the plain words of a text" and should only be consulted when "there is any uncertainty in the body of an act[.]"). In other words, even if the language State Defendants cite is an enacted statement of purpose, it "cannot override a [statute's] operative language." *Id.* at 220; *see also Sturgeon v. Frost*, 587 U.S. 28, 56–57 (2019) (rejecting reliance on statements of purpose when they conflicted with the statutory text). Because the 1650 Maryland law says nothing about *why* guns were barred from the legislature, the material preceding the Act cannot supply meaning where there is none in the enacted provision itself. *Cf. Bittner v. United States*, 598 U.S. 85, 99 (2023) (looking to statement of purpose only as "further evidence" of what is already contained in the statute's plain text). State Defendants' approach to the 1647 Maryland law is even more egregious, as they simply assume that it carried the same purpose as the 1650 law, even where it contains *no* language that could even be construed as a

30

statement of purpose. *See* State MSJ at 24. In sum, State Defendants fail to show that any of these analogues have a similar "why" to the Public Transportation Carry Ban.

### E. Defendants' Historical Analogues Do Not Form A National Historical Tradition Supporting the Transportation Carry Ban

#### 1. English Statutes

Even taking Defendants' historical evidence on its own terms, it falls short of forming a national historical tradition under *Bruen*. First, Defendants point to the 1328 Statute of Northampton, which forbade the carrying of arms in fairs and markets. Foxx MSJ at 15; State MSJ at 26. But *Bruen* unequivocally held that that "the Statute of Northampton . . . has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. First, the Court explained that it is too old to inform the meaning of the Second Amendment at the Founding. *See id.* Second, it noted that its prohibition on going or riding armed centered on large weapons used in combat because handguns were not yet invented. *See id.* at 41–42. Third, the Court reasoned that the Statute of Northampton confirmed and echoed the common law "affray" tradition that individuals cannot go armed with evil intent to terrify others. *See id.* Fourth, *Bruen* held that by the Founding, this statute and American statutes modeled after it were understood to bar carry in fairs, markets, and other public places only when individuals carried to terrify others. *See id.* at 49–51. For all these reasons, the Statute of Northampton is not a viable analogue to laws prohibiting carry by the law-abiding, such as the Transportation Carry Ban.

Next, Defendant Foxx cites the 1723 English Black Act, which forbade the carrying of weapons in forests and on roads if the bearer's face was "blackened" or "otherwise disguised." She claims that this statute supports differing levels of self-defense "depending on whether one was in a town or on the road[.]" Foxx MSJ at 15. But this Act is a dubious analogue at best. For starters, it does not bar carry by those without blackened or disguised faces—a category

31

encompassing Plaintiffs here as well as the law-abiding public in general. Moreover, Defendant Foxx provides no evidence that it crossed the Atlantic to the colonies or persisted past the American Revolution. Moreover, on its face it only pertains to "his Majesty's subjects[.]" 9 GEO 1 c.22 (1723). Additionally, there are indications that it was a statute aimed at preventing trespassers from hunting on certain lands. *See id.* (proscribing armed individuals in disguise or with blackened faces from appearing anywhere where deer or hares are kept, and outlawing hunting in various locations); *see also id.* (preamble to Act discusses the issue of unlawful hunting by disguised individuals). Finally, the preamble to the Act suggests that it is similar to Northampton in that it proscribes conduct with firearms that is "to the great terror of his Majesty's peaceable subjects." *See id.* Neither the Statute of Northampton nor the English Black Act is probative.

### 2. Founding-era Statutes

Defendants invoke just a few Founding era restrictions. *See* Foxx SUF ¶¶ 88, 91 (referencing 1801 Tennessee and 1813 Louisiana laws); State MSJ at 26 & nn.23, 24 (referencing Virginia's Founding-era Northampton analogue, and a putative North Carolina Northampton analogue). None are persuasive analogues. Start with the 1786 Virginia law, which "replicated" the 1328 Statute of Northampton. State MSJ at 26. Because it is essentially a carbon copy of Northampton, which *Bruen* rejected as not probative for many reasons, *see supra*, it can be quickly dismissed. Moreover, as the Second Circuit recognized, the Virginia law included an express "terror" element. *Antonyuk*, 89 F.4th at 357 n.74. So too the 1801 Tennessee law that Defendant Foxx's expert references. 1801 TENN. LAWS 260–61, § 6. But *Bruen* conclusively dismissed these very same statutes as "requir[ing] something more than merely carrying a firearm in public"—a specific intent to terrorize others—that Plaintiffs here, all law-abiding citizens, do not harbor. 597 U.S. at 50; SUF ¶¶ 7, 15, 23, 31.

Next consider the putative North Carolina law that State Defendants cite. *See* State MSJ at 26 n.23 (referencing 1792 compendium of North Carolina statutes). But the cited "law" was *never* passed by the North Carolina legislature. As the references to the King in the statute indicates, it is merely a copy of the 1328 Statute of Northampton. And it appears in a 1792 publication drafted by a private lawyer who was merely surmising what British laws remained in force in North Carolina. "Later compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws that were never in force.[5] Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii* (9th Cir. 2021) at 21, SSRN (Aug. 10, 2021), https://bit.ly/3QyFZA5 (citing "Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855)). Indeed, when the North Carolina General Assembly passed an Act to enact English Statutes in 1749, it omitted the Statute of Northampton. *See* A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA 293, 295 (Newbern: James Davis, 1752). Moreover, James Iredell (who later became a Supreme Court Justice) was commissioned by the North Carolina General Assembly to revise and compile all laws that remained in force in the state following the Declaration of Independence.[6] He too did not include the Statute of Northampton. *See id.* To the extent the cited statute was *ever* in effect in North Carolina, it ceased to have any force as of January 1838. *See State v. Huntley*, 25 N.C. 418, 420 (N.C. 1843) (noting that the Revised Statutes of England ceased to be of force and effect in North Carolina as of January 1, 1838, and questioning

---

[5] The author of the compilation even conceded in the preface that this work was neither edited by others nor approved by the legislature: "no act of Assembly afforded it, and . . . many, even among the most respectable, professors of the law disagree in regard to the applicability of a number of British statutes . . . ." François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* at iii (Newbern: The Editor's Press, 1792).

[6] JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton: Hodge & Wills, 1791).

whether the Northampton copycat had ever been in force). And even if this law was ever in effect at the Founding, it would still not be a probative analogue because the North Carolina Supreme Court held that it was understood to require bearing arms to the terror of others. *See id.* This putative analogue must be rejected too.

Next, Defendant Foxx references an 1813 Louisiana law. Foxx SUF ¶ 91. But *Bruen* explained that it was only upheld because it banned concealed carry, not carry altogether. 597 U.S. at 53; *see also State v. Chandler*, 5 La. Ann. 489, 490 (1850) (Louisiana's 1813 carry prohibition "interfered with no man's right to carry arms (to use its words) 'in full open view[.]'"). Because this law banned only concealed carry, "how" it burdens Second Amendment rights differs from the Public Transportation Carry ban, rendering it an inapt analogue. Without the Virginia, North Carolina, Tennessee, and Louisiana laws, Defendants cite no probative Founding era evidence to ground their historical tradition. Plaintiffs could prevail based on this fact alone.

There exists yet another probative historical tradition, favorable to Plaintiffs, that Defendant Foxx fails to distinguish. She admits that travelers were often lawfully permitted to conceal carry for self-protection. *See* Foxx MSJ at 15; Foxx SUF ¶¶ 95–96. Her top-line admission is in accord with the history Plaintiffs have already submitted, which shows that travelers during the Colonial era were sometimes *required* to carry arms when traveling even short distances from their homes. *See* Pls.' MSJ at 25 ("Colonial Massachusetts, Maryland, Virginia, and Rhode Island all *required* individuals to carry arms when traveling away from their homes. *See* 1 Records of the Governor and Company of the Massachusetts Bay 85 (Nathaniel B. Shurtleff ed., 1853) (1636 law requiring travelers going one mile from their homes to carry arms); Archives of Maryland 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) (1642 law, similar); 1 Statutes at Large of Virginia 127 (William Waller Hening ed., 1823) (1623 law, similar); 1

RECORDS OF THE COLONY OF RHODE ISLAND 94 (John Russell Bartlett ed., 1856) (1639 law requiring travelers going more than two miles from town to carry arms)). Defendant Foxx's argument also comports with Plaintiffs' evidence showing that travelers were exempt from generally-applicable firearm carry regulations during the Founding era (to the extent such regulations even existed). *See, e.g.*, 1812 KY. ACTS 100–01, ch. 89, § 1 ("[A]ny person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, *unless when travelling on a journey*, shall be fined...." (emphases added)); 1819 IND. ACTS 39, ch. 23, § 1 ("That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor . . . Provided however, that this act *shall not be so construed as to affect travelers*." (emphases added)); 1821 TENN. ACTS 15, ch. 13 (exempting "any person that may be on a journey to any place out of his county or state").

Perhaps recognizing that these statutes support Plaintiffs' position, not her own, Defendant Foxx attempts to limit these statutes to travelers "far from home and without access to the safety of their communities." Foxx MSJ at 15–16. But she offers no valid historical evidence for the contention that travelers going on long-distance journeys—however that may be defined—were the *only* individuals allowed to carry firearms. Indeed, the Colonial era laws just discussed required carry when individuals were traveling one to two miles from their homes. *See supra*. And the Founding era laws Plaintiffs present largely did not draw distinctions based on the length of a traveler's journey. *See supra*. The only law of the three that mentions distance is the 1821 Tennessee law, but even that exempts individuals traveling outside their "county," which Plaintiffs here indisputably seek to do. SUF ¶¶ 7, 11 (Plaintiff Schoenthal would travel from DeKalb County into Chicago); SUF ¶¶ 15, 19 (Plaintiff Wroblewski would travel from DuPage County to

Chicago). In any event, as a factual matter, some of the journeys Plaintiffs wish to undertake here take them quite far from their homes, so it is unclear how this argument about distance helps Defendant Foxx. SUF ¶¶ 7, 11 (Plaintiff Schoenthal would use public transportation to travel from his residence in DeKalb County to Chicago, which is over 50 miles away); SUF ¶¶ 15, 19 (Plaintiff Wroblewski lives in DuPage County and rides public transportation to visit Chicago, which is about 30 miles away).[7]

In sum, Defendants are left with no probative Colonial or Founding era evidence, and instead must admit that numerous statutes from those periods permitted or required carry by travelers. These historical facts doom their claims.

### 3. Mid-to-Late 19th-Century Statutes

Defendants' later analogues are similarly unpersuasive. *See* Foxx MSJ at 15 (citing expert report referencing 1837 Arkansas and 1871 Texas laws); State MSJ at 26 n.24 (citing 1869 Tennessee, 1870 Texas, 1883 Missouri laws, plus two territorial restrictions. These analogues can be dismissed for any (or all) of the following reasons.

*First*, these laws come too late to be probative under *Bruen*. *See* Pls.' MSJ at 9–13 (collecting authorities and explaining why the analysis must start in, and pay special attention to, the Founding era under both Supreme Court and Seventh Circuit precedent); *supra* Part III.C (same). The State cannot start its historical tradition decades removed from "when the people adopted" the Second Amendment, *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35)

---

[7] While Plaintiffs did not submit evidence about the mileage of their journeys, this Court can take judicial notice of the fact that several Plaintiffs live far from the areas they intend and desire to visit on public transportation. *See, e.g.*, *Chi. Gun Club, LLC v. Vill. of Willowbrook, Ill.*, No. 17-cv-6057, 2018 WL 2718045, at *8 nn.1, 3 (N.D. Ill. June 6, 2018) (using Google maps to calculate distances and taking judicial notice of the same because "the distance between two [locations] is a fact that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" (cleaned up)).

(emphasis deleted)—i.e., the Founding era. To the extent Defendants present history post-dating the Founding era, such evidence can serve only to confirm an already extant tradition. *See* Pls.' MSJ at 13. And as discussed, the Colonial and Founding era generations often required or exempted travelers from carry restrictions. Thus, because Defendants' restrictions originate in the late 19th century, they are later history "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public" while traveling and are not probative. *Bruen*, 597 U.S. at 65–66 (cleaned up).

*Second*, the laws Defendants cite are not sufficiently widespread. *Bruen* made clear that a smattering of regulations is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *See, e.g.*, *id.*. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted)); *id.* at 67 (rejecting regulations applying to only 1% of the population). In other words, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (cleaned up); *see also Koons*, 673 F. Supp. 3d at 622 (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient).

Begin with the 1837 Arkansas law Defendant Foxx cites. By its terms, this law only prohibited concealed carry and it affirmatively exempted travelers. *See* 1837 ARK. REV. STAT. 280 ("Every person who shall wear any pistol, dirk, butcher, or large knife, or a sword in a cane, concealed as a weapon, *unless upon a journey*, shall be adjudged guilty of a misdemeanor[.]" (emphases added)). As such, it fits comfortably with the tradition just discussed that favors Plaintiffs' ability to carry while journeying on public transportation.

Next consider Texas' 1870 and 1871 laws. *See* Foxx MSJ at 15; State MSJ at 26 n.24. The 1871 law is not relevantly similar to the Transportation Carry Ban because "how" it burdens the right to self-defense is much different. As Defendant Foxx's expert describes, this law exempted those who carried pistols and knives and allowed those in wagons to keep the pistols within arm's reach. Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State,* 1836-1930 at 108–110 (2019) (Ph.D. dissertation, Texas Christian University), https://bit.ly/3TJKJ8I; *see also id.* at 108 n.51 ("The 1871 deadly weapons ban originally prohibited the carrying of specified weapons, with certain exceptions. Some of these exceptions, including the one for travelers, came in the form of a proviso: 'provided that this section shall not be so construed as to prohibit . . . persons traveling in the State from keeping or carrying arms with their baggage.'"). Moreover, *Bruen* discounted Texas' 1871 concealed carry prohibition and the state courts' interpretation of its related constitutional provision as "outliers" that "therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 65. The 1870 Texas statute barring carry in public assemblies that State Defendants cite could be dismissed on those same grounds. In any event, this statute (along with the similar 1883 Missouri law that State Defendants cite) is an outlier that contradicts the broader Colonial and Founding era tradition already discussed that permitted carry in public assemblies. *See supra* Part III.D. Under *Bruen*, they are thus not probative. *See* 597 U.S. at 65–66 ("[W]e will not stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public." (cleaned up)).

State Defendants are left with an 1870 Tennessee and two territorial laws. *See* State MSJ at 26 n.24. But the 1870 Tennessee law only forbids citizens to "privately carry any dirk, large knife, pistol or any other dangerous weapon, *to the fear or terror of any person*," rendering it a version of the Statute of Northampton. For all the reasons already discussed, such analogues tell us nothing about bans on carry by peaceable persons. *See supra* Part III.E.1. The territorial laws referenced by the State Defendants, *see* State MSJ at 26 n.24 (citing 1889 Arizona and 1890 Oklahoma laws) are not probative either (even assuming two laws suffices to support a tradition, which is not the case). For *Bruen* afforded territorial laws—including the exact same 1889 and 1890 Oklahoma statutes cited here—"little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." 597 U.S. at 67–69; *see also supra* Part III.C; Pls.' MSJ at 14. The same reasoning applies here.

Nor can Defendant Foxx rest on contemporary courts construing the statutes just discussed. She points to *Smith v. State*, 50 Tenn. 511 (1872), *Darby v. State*, 5 S.W. 90 (Tex. Ct. App. 1880), *Carr v. State*, 34 Ark. 448 (1879), *Eslava v. State*, 49 Ala. 355 (1873), and *Stilly v. State*, 11 S.W. 458 (Tex. Ct. App. 1889). But *Darby* and *Stilly*—both from Texas—can be dismissed because the *Bruen* Court expressly discounted Texas' 1871 concealed carry prohibition and the state courts' interpretation of its related constitutional provision as "outliers" that "therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 6. *Smith* from Tennessee is also not probative. The Supreme Court explained in *Bruen* that Tennessee's prohibition of concealed carry was permissible only because open carry was allowed. "[W]hen the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would

39

'violat[e] the constitutional right to keep arms.'" 597 U.S. at 54 (quoting *Andrews v. State*, 50 Tenn. 165, 187 (1871)). The exact same was true of Alabama, *see id.* & 53 n.18, so *Eslava* can be discounted as well. Finally, *Carr* from Arkansas is not probative. As *Bruen* noted, an earlier decision upheld Arkansas' prohibition on concealed carry, but did so without a majority rationale. *See* 597 U.S. at 53 n.20. In any event, *Carr* explained that Arkansas' law exempting travelers from concealed carry restrictions exists "to enable travelers to protect themselves on the highways, or in transit through populous places[.]" 34 Ark. at 449. To the extent this decision is probative at all given its distance from the Founding era, it supports Plaintiffs' position that there is a historical tradition of permitting carry by travelers in transit throughout populous areas.

### F. Restrictions on Speech and Those Imposed By Private Parties Are Not Proper Historical Analogues Under *Bruen*

Defendant Foxx also attempts to argue that "modern" restrictions on "the speech of travelers" are proper analogues to the Transportation Carry Ban, and that the First and Second Amendments "must be interpreted using the same analytical lens[.]" Foxx MSJ at 16–17. This argument has several flaws. First, it is false that the tiers of scrutiny have any applicability to the Second Amendment context, *see id.* at 16, because *Bruen* rejected all other frameworks in favor of text, history, and tradition, *see* 597 U.S. at 19–20. Second, while *Bruen* stated that analogues need not be "dead ringer[s]," *id.* at 30, it nowhere said or even implied that 21st century cases interpreting different constitutional amendments could be probative analogues, *see* Foxx MSJ at 17–18. On the contrary, it held that laws from the 20th century are categorically entitled to little or no weight. *See* 597 U.S. at 66 n.28. The same principle is true for judicial decisions—especially those in an entirely different constitutional context. This argument is borderline frivolous, and Plaintiffs know of no court that has accepted it. To be sure, the Supreme Court has said that the Second Amendment must be treated just like other rights, and not relegated to second-class status.

*See id.* at 70. But that does not mean the standards from First Amendment jurisprudence have any relevance in assessing whether a *historical tradition* underlies Illinois' Transportation Carry Ban.

For their part, State Defendants argue that 19th and 20th century restrictions imposed by private railroads are also probative analogues that contribute to the relevant historical tradition. *See* State MSJ at 26–29. Not so. The internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, 597 U.S. at 46–49 (analyzing laws and judicial decisions interpreting those laws); *see id.* at 69 (analogues must form part of an "enduring American tradition of *state* regulation" (emphasis added)). Even if these restrictions were probative, they come too late for all the reasons already discussed. *See supra* Part III.C; *see* Pls.' MSJ at 9–13. It is especially unclear what relevancy 20th century practices have on the *Bruen* analysis, which requires Defendants to present persuasive legal history with a special focus on the Founding era. *See* Pls.' MSJ at 9–13. To the extent State Defendants purport to rely on late 19th and 20th century restrictions by private parties, they can be disregarded entirely just as state restrictions from those time periods were dismissed. *Bruen*, 597 U.S. at 66 n. 28.

Finally, these restrictions are not sufficiently widespread. As one of State Defendants' sources confirms, these regulations do not create "a unanimous consensus that railroad corporations enacted public-carry restrictions." Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 Yale L.J. (forthcoming 2024) (manuscript at 15), https://bit.ly/43dBd0y. Moreover, State Defendants' expert, Professor Joshua Salzmann, noted in a case similar to this one (challenging California's carry restrictions in public transportation and other locations) that of the seventy rule books by train companies he examined from the mid-19th century to the late 20th century, most "do not

41

mention firearms at all." Decl. of Joshua Salzmann ¶ 70, *May v. Bonta*, No. 8:23-cv-1696 (C.D. Cal. Nov. 3, 2023), Doc. No. 21-10. Indeed, he "found mentions of firearms in approximately fifteen percent" of those sources. *Id.* Such facts bolster the conclusion that restrictions by private rail companies—even if they were probative—are not sufficiently widespread.

Another district court recently rejected the argument that the actions of private companies could be probative. In *May v. Bonta*, the Central District of California noted that "the restrictions the government cites are gun-carriage policies of private rail companies[.]" 2023 WL 8946212, at *9. As such, the court reasoned that "a handful of private companies' rules do not establish an 'enduring American tradition of state regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 69). This Court should hold the same here.

### G. Public Transportation in Illinois Is Not Comprehensively Secured

State Defendants make several points about Plaintiffs' comprehensive security theory. First, they contend that Plaintiffs' theory cannot account for the Supreme Court's "conclusion" that schools were historically sensitive. *See* State MSJ at 19. Second, they argue that public transportation qualifies as "sensitive" under Plaintiffs' own comprehensive security test. *See id.* Both arguments are unpersuasive.

On the first point, Plaintiffs have already explained that (1) the Supreme Court did not "conclude" anything about schools (or any other sensitive places for that matter). *See supra* Part III.C. On the contrary, it mentioned only legislative assemblies, polling places, and courthouses as locations where firearms could presumptively be banned. *See id.* Moreover, carry by only *students* at schools could be historically banned because of the schools' *in loco parentis* authority over students, not because those locations were comprehensively secured. *See id.* And these carry bans did not extend to faculty, staff, or other visitors to campus. *See id.*

As for the second argument, State Defendants fail to show that Illinois comprehensively secures all modes of public transportation and associated facilities. Because the fundamental purpose of the Second Amendment is to ensure that Americans can be "armed and ready" for "ordinary self-defense needs," *Bruen*, 597 U.S. at 32, 60 (cleaned up), the government must go to great lengths to secure a location and protect those in it before it can ban firearms there. While State Defendants claim that CTA, Metra, and Metrolink facilities have security guards and cameras, State MSJ at 22, this is insufficient to protect law-abiding citizens. They provide no evidence that armed guards are present at entry and egress points, on every CTA car, or on the platforms where people wait for these modes of transportation which may be vulnerable to crime. *See, e.g.*, Kopel & Greenlee, *supra*, at 290 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."). Moreover, the number of guards State Defendants suggest police these facilities is woefully inadequate given the number of existing locations. The CTA, for example, serves 35 suburbs and the city of Chicago. *See Facts at a Glance*, CHI. TRANSIT AUTH., https://bit.ly/3x9raxv (last visited Mar. 21, 2024). It has 1,868 buses that stop at 10,633 bus stops, and 1,480 rail cars that make about 1,888 trips each day between the 145 stations. *See id.* Similarly, the Metra system serves more than 100 communities at 242 rail stations. *See Ridership Data*, METRA, https://bit.ly/3TqV8EH (last visited Mar. 21, 2024). Each weekday, 692 trains are scheduled, with 454 each weekend. *See id.* Even hundreds of guards could not adequately—let alone comprehensively—secure all of these locations. And because Illinoisans are forced to disarm *before* entering real property associated with public transportation, such as parking lots, the Transportation Carry Ban also deprives them of their ability to self-defend on the journey to such modes of transportation. *See* Pls.' MSJ at 24–25.

43

In any event, the security measures that State Defendants discuss differ from those present in Founding era legislatures, polling places, and courthouses, which had security present at entry points and even within particular judicial proceedings. *See id.* at 21–23 (collecting laws). A modern day analogue is federal courthouses, which require everyone entering to pass through metal detectors staffed by armed guards, and often have marshals or court security officers within the particular judicial proceeding itself to maintain order. *Cf. Koons*, 673 F. Supp. 3d at 648 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."). It is not enough, as *Bruen* itself recognized, to cite a general police presence in a crowded location to decree a location sensitive. *See* 597 U.S. at 31 ("Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department."). Nor can State Defendants rely on the presence of security cameras. *See* State MSJ at 22. While these may assist in finding criminals after the fact, they do nothing to help law-abiding citizens protect themselves from attack.

Regardless, State Defendants' rebuttal to Plaintiffs' comprehensive security theory falters because State Defendants say nothing about the security on modes of public transportation other than CTA, Metra, and Metrolink. Other modes of public transportation exist that State Defendants do not discuss. And even if they had discussed other modes, State Defendants do not even contend that every CTA bus, bus stop, Chicago El station, individual El cars, associated parking lots, and more are protected by police (or even security cameras). So too for numerous other modes of public transportation throughout the state. State Defendants thus fall far short of identifying a

unifying principle of comprehensive security characterizing public transportation and associated facilities in Illinois.

### H. Venue is Proper in this Court and Transfer At This Stage Would Be Inefficient

Defendant Foxx concludes her brief by arguing that venue is improper in this Court. Foxx MSJ at 18–19. Venue is proper wherever "a substantial part of the events or omissions giving rise to the claim[s] occurred[.]" 28 U.S.C. § 1391(b)(2). As Defendant Foxx concedes, Plaintiff Schoenthal is a resident of DeKalb County, which is located within the Western Division of the Northern District of Illinois. Foxx MSJ at 18. Though he may board the train in a county outside of DeKalb, he indisputably must begin his journey (disarmed due to the Transportation Carry Ban) to public transportation in DeKalb County. SUF ¶¶ 7, 11. Indeed, there is a public bus route originating in DeKalb that Plaintiff Schoenthal would take if accessing Metra. Suppl. Schoenthal Decl. ¶ 2. This is why Plaintiffs have also named the DeKalb County State's Attorney as a Defendant. As such, venue is proper in this Court in the first instance.

Defendant Foxx also asks this Court to transfer the case to the Eastern Division of the Northern District of Illinois. But she fails to establish—as she must as the moving party—that "the transferee forum is *clearly* more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219–20 (7th Cir. 1986) (emphasis added). In evaluating a motion to transfer venue under 18 U.S.C. § 1404, "courts consider five factors: (1) the plaintiff's choice of forum, (2) the *situs* of material events, (3) the relative ease of access to sources of proof, (4) the convenience of the witnesses, and (5) the convenience to the parties of litigating in the respective forums." *Craik v. Boeing Co.*, 37 F. Supp. 3d 954, 959 (N.D. Ill. 2013). In addition, courts are to consider the interest of justice, by looking to the efficient administration of the court system, including factors such as (1) the likely time to trial in the respective forums and (2) judicial economy. *Rsch. Automation, Inc. v. Schrader-*

*Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). Defendant Foxx makes an argument about only one of these factors: the location of material events. She contends that three of the four plaintiffs and three of the four defendants reside in the Eastern Division, so that division has a stronger relationship to the dispute. *See* Foxx MSJ at 19.

Defendant Foxx fails to satisfy her burden that a venue transfer is appropriate. On the first factor, Plaintiffs obviously selected this forum, and that choice is entitled to deference. The Seventh Circuit has held that a "'plaintiff's choice of forum should rarely be disturbed.'" *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663–64 (7th Cir. 2003) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)); *see also Craik*, 37 F. Supp. 3d at 960 ("A district court grants an automatic degree of deference to a plaintiff's chosen forum for filing a suit such that unless the balance strongly favors transfer, the plaintiff's choice of forum should not be disturbed." (cleaned up)). So too here.

The third, fourth, and fifth factors also favor Plaintiffs. Defendant Foxx makes no argument that the Eastern division is more convenient than the Western division. Such an argument would be strange, as this is not a case where the two venues are states apart from one another, or where there are reams of evidence located far away from this Division. *Cf. Craik*, 37 F. Supp. 3d at 961 (noting substantial amount of physical discovery located in or close to Seattle, Washington, as opposed to within Illinois). Defendant Foxx also makes no argument that transfer is more convenient for witnesses, a factor that some courts have called "the singular most important undertaking in many transfer analyses." *Id.* at 962. The distance between this division and the

Eastern division is minimal, and Plaintiffs are the key witnesses in any event. Defendant Foxx fails to meet her burden as to any of these three factors.

Finally, the interests of justice—which "may be determinative" of the venue transfer question—favor Plaintiffs. *Rsch. Automation*, *Inc.*, 626 F.3d at 978. As the Court is aware, this case has been pending since September 20, 2022. *See* Compl., Doc. No. 1 (Sept. 20, 2022). And the Court now has before it summary judgment motions from both parties. Transfer at this eleventh hour would surely delay the prompt disposition of this matter because this Court is already familiar with the issues at bar. *See, e.g.*, Minute Order, Doc. No. 20 (Nov. 4, 2022) (ordering supplemental briefing on Plaintiffs' standing). Defendant Foxx has not met her burden to show that the interests of justice favor transfer.

## CONCLUSION

For all these reasons, Defendants' motions for summary judgment should be denied and this Court should not transfer the case to a different venue.

Dated:  March 25, 2024                    Respectfully submitted,


/s/ David G. Sigale
*Attorney for Plaintiffs*


David G. Sigale (Atty. ID # 6238103)
Law Firm of David G. Sigale, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David G. Sigale_____
*Attorney for Plaintiffs*

David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiff*

48