**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, | |
| Plaintiffs, | No. 3:22-CV-50326 |
| v. | Hon. Iain D. Johnston |
| KWAME RAOUL, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS'**
**STATEMENTS OF MATERIAL FACT**

Pursuant to Federal Rule of Civil Procedure 56 and Northern District of Illinois Rule 56.1(b)(2), Plaintiffs submit the following combined response to Defendant Foxx's and the State Defendants' Statements of Material Fact.

Plaintiffs note at the outset that every fact asserted by Defendants other than those facts pertaining to Plaintiffs' standing is a "legislative fact" and not an "adjudicative fact." *See* FED. R. EVID. 201, 1972 Advisory Committee's Note to Subdivision (a). Legislative facts are not party-specific facts that need to be established for purposes of resolving this dispute, but rather general facts about the world that "have relevance to legal reasoning . . . in the formulation of a legal principle or ruling by a judge or court." *Id.*; *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). They are not, therefore, the types of facts that are found at a trial, and they are facts that may be equally well discussed in the argument section of a brief. *See Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008). For those few facts below that bear any relevance to the legal inquiry under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court has clearly stated that such facts are part of the *legal* analysis performed by courts. *See id.* at 25 n.6. While Plaintiffs respond to each of the facts asserted by Defendants, they primarily analyze the relevance and importance of

1

the asserted facts in their legal brief.

## I. RESPONSES TO DEFENDANT FOXX'S STATEMENT OF MATERIAL FACTS

### PARTIES, JURISDICTION AND VENUE

1. Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, Douglas Winston are, at all times relevant to this lawsuit, residents of the Northern District of Illinois. Ex. 1.

**Plaintiffs' Response to No. 1:** Admit.

2. Defendant Kimberly M. Foxx is the State's Attorney for the County of Cook, Illinois. Ex. 5, at ¶ 21.

**Plaintiffs' Response to No. 2:** Admit.

3. This Court has jurisdiction over Plaintiff's claims, except for those related to the Chicago Transit Authority ("CTA"), pursuant to 28 U.S.C. § 1331 and 1343. Ex. 5 at. 23.

**Plaintiffs' Response to No. 3:** Dispute. This Court has jurisdiction over all of Plaintiffs' claims, including those related to the Chicago Transit Authority, for the reasons stated in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

### EXPERT WITNESSES

4. James Yurgealitis is a consultant and technical advisor in the field of Firearms, Forensics and their practical application in criminal cases as well as their impact and application to local state, federal law and public policy. Ex. 6 at 1(II).

**Plaintiffs' Response to No. 4:** Plaintiffs lack knowledge and on that basis, do not dispute at this time.

5. Dr. Brennan Rivas holds a Ph. D in history from Texas Christian University, and his area of scholarship includes a focus on historical weapons regulations in the United States. Ex. 7 at 1(II).

**Plaintiffs' Response to No. 5:** Plaintiffs lack knowledge and on that basis, do not dispute at this time.

6. Dr. Joshua Salzmann holds a Ph. D in U.S. History and his area of scholarship focuses on the history of cities, urban economies, public policy, and the built environment. Ex. 8 at 1(II).

**Plaintiffs' Response to No. 6:** Plaintiffs lack knowledge and on that basis, do not dispute at this time.

## FACTS SPECIFIC TO MODERN NORTHEAST ILLINOIS TRANSIT AND DEMOGRAPHICS

7. The CTA is a municipal corporation authorized by the Metropolitan Transit Authority Act of the State of Illinois, and created by ordinance of the Chicago City Council. Ex. 9 at Foxx 003329 at Preamble.

**Plaintiffs' Response to No. 7:** This is not a "fact" but rather a statement of the law. The cited City Ordinance speaks for itself.

8. The CTA is granted authority to own and operate a transit system within the city of Chicago and adjacent suburbs. Ex. 9 at Fox 003231, Section 2 Par. A.

**Plaintiffs' Response to No. 8:** This is not a "fact" but rather a statement of the law. The cited City Ordinance speaks for itself.

9. The CTA independently bans possession or carrying of guns on its property, except as authorized by statute. Ex. 10 at FOXX 003225 at (28).

**Plaintiffs' Response to No. 9:** This is not a "fact" but rather a statement of the law. The cited City Ordinance speaks for itself.

10. Pace Bus ("Pace") independently bans firearms on its buses. Ex. 11 at Foxx 000298 Par. B(k).

**Plaintiffs' Response to No. 10:** Admit.

11. If a passenger violates Pace's firearms ban, he can be ejected from the bus, and the driver may call Pace dispatch to take further action against that passenger. Ex. 11 at Foxx 000299.

**Plaintiffs' Response to No. 11:** Admit.

12. Illinois state law requires CTA, Metra, and Pace to provide free or reduced fare programs for seniors and disabled persons. Ex. 12 at 16.

**Plaintiffs' Response to No. 12:** This is not a "fact" but rather a statement of the law. The State's law speaks for itself.

13. Illinois pays reimbursement to the RTA to offset the costs of those state mandated free or reduced fare programs. Ex. 12 at 16.

**Plaintiffs' Response to No. 13:** Admit.

14. The Chicago-Naperville-Elgin Metropolitan Statistical Area population is 9,618,502 people as of the 2020 census. Ex. 12.

**Plaintiffs' Response to No. 14:** Admit, with the clarification that this information appears in

Exhibit 13.

15. The Lake County-Kenosha County, IL-WI Metropolitan Statistical Area population is 883,507 as of the 2020 census. Ex. 13.

**Plaintiffs' Response to No. 15:** Admit.

16. The Chicago-Naperville-Elgin Metropolitan Statistical Area includes the Illinois counties of Cook, DeKalb, DuPage, Grundy, Kane, Kendall, McHenry, and Will. Ex. 13.

**Plaintiffs' Response to No. 16:** Admit.

17. The Lake County-Kenosha County, IL-WI Metropolitan Statistical Area includes the Illinois county of Lake, and the Wisconsin county of Kenosha. Ex. 14.

**Plaintiffs' Response to No. 17:** Admit.

18. In 2022, CTA ridership was approximately 243.5 million rides. Ex. 15.

**Plaintiffs' Response to No. 18:** Admit.

19. The Canadian National Railway Company does not allow firearms on its property. Ex. 16.

**Plaintiffs' Response to No. 19:** Admit.

20. The Burlington Northern Santa Fe Railroad Company bans firearms on its property. Ex. 17 at ¶ 7.

**Plaintiffs' Response to No. 20:** Admit.

21. The Union Pacific Railroad bans firearms on its property. Ex. 18 at ¶ 2.9.

**Plaintiffs' Response to No. 21:** Dispute. The cited source is entitled "Contractor Minimum Safety Requirements" and its instructions on their face apply only to employees and contractors of the Union Pacific Railroad. *See, e.g.*, Ex. 18 at ¶ 2.5 (specifying the clothing and footwear employees must wear); *Id*. ¶ 2.6 (banning contractor personnel from using electronic devices while on duty).

## PLAINTIFF-SPECIFIC FACTS

22. Plaintiffs Schoenthal, Wroblewski, Vesel, and Winston want to carry firearms on public transportation in Illinois. Ex. 27 at 20:10-20; Ex. 28 at 15:9-12; Ex. 3 at ⁋ 11; Ex. 30 at 86:14-20.

**Plaintiffs' Response to No. 22:** Admit.

23. Plaintiffs Schoenthal, Wroblewski, Vesel, and Winston are aware that transit agencies in Illinois may have related internal policies or procedures banning the carrying of firearms.

Ex. 19-22, Par. 4.

**Plaintiffs' Response to No. 23:** Dispute. The cited sources do not support the assertion that Plaintiffs Schoenthal, Wroblewski, Vesel, and Winston may be aware of the internal policies of transit agencies in Illinois, or that those policies regulate firearms.

24. Plaintiff Schoenthal primarily uses Metra when he travels on public transportation. Ex. 27 at 21:1-3.

**Plaintiffs' Response to No. 24:** Dispute. Plaintiff Schoenthal primarily uses Metra as public transportation when he is traveling "downtown or to Central DuPage." Ex. 27 at 21:1-3. Admit insofar as this fact suggests that Plaintiff Schoenthal has used Metra in the past and intends to do so again in the future.

25. Plaintiff Schoenthal typically boards Metra at the Elburn station, located in Kane County, Illinois. Plaintiff Schoenthal cannot board Metra in DeKalb County because the line he rides terminates at the Elburn station. Ex. 27 at 82:10-18.

**Plaintiffs' Response to No. 25:** Admit.

26. The Elburn station is on the Metra Union Pacific-West line. Ex. 31.

**Plaintiffs' Response to No. 26:** Admit.

27. The last stop on the Metra UP-W line is Elburn, located at 43 W. 166 Keslinger Rd., Elburn, IL 60119. Ex. 31.

**Plaintiffs' Response to No. 27:** Admit.

28. Elburn, Illinois is located in Kane County. Ex. 39.

**Plaintiffs' Response to No. 28:** Admit.

29. The Metra Union Pacific-West line runs on track owned by the Union Pacific Railroad and is operated and dispatched by the Union Pacific Railroad. Ex. 32.

**Plaintiffs' Response to No. 29:** Admit.

30. Plaintiff Schoenthal does not ride other forms of public transportation. Ex. 27 at 21:9-14.

**Plaintiffs' Response to No. 30:** Dispute. Metra is the only form of public transportation Plaintiff Schoenthal "currently use[s]." Ex. 27 at 21:10.

31. Plaintiff Schoenthal testified that he does not typically ride public buses, and that it had been at least a year since he rode a Pace bus. Ex. 27 at 23:18-22, 84:10-14.

**Plaintiffs' Response to No. 31:** Admit, noting that Plaintiff Schoenthal would "utilize public

transportation more frequently" if he were not prohibited from carrying a firearm in self-defense. Ex. 1 ¶ 7.

   32. Plaintiff Schoenthal cannot recall the last time he rode public transportation in Chicago. Ex. 27 at 83:19-22.

**Plaintiffs' Response to No. 32:** Dispute. Plaintiffs dispute the relevancy of whether Plaintiff Schoenthal can recall the last time he rode public transportation in Chicago. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. *See* Resp. to Statement 31.

   33. Plaintiff Wroblewski resides in Woodridge, Illinois. Ex. 28 at 10:24.

**Plaintiffs' Response to No. 33:** Admit.

   34. The closest Metra station to Plaintiff Wroblewski's home is the Lemont station. Ex. 33.

**Plaintiffs' Response to No. 34:** Admit.

   35. The Lemont Metra station is on the Metra Heritage Corridor line. Ex. 34.

**Plaintiffs' Response to No. 35:** Admit.

   36. The Metra Heritage Corridor runs on tracks owned by the Canadian National Railway Company. Ex. 35.

**Plaintiffs' Response to No. 36:** Admit.

   37. Plaintiff Wroblewski sometimes rides Metra into and out of Chicago. Ex. 28 at 48:22-24, 49:1.

**Plaintiffs' Response to No. 37:** Admit.

   38. Plaintiff Wroblewski does not currently ride CTA. Ex. 28 at 49:2-6.

**Plaintiffs' Response to No. 38:** Admit. Plaintiff Wroblewski "would intend to ride public transportation more" if he could carry for self-defense. Ex. 4 ¶ 8.

   39. Plaintiff Wroblewski last rode the El approximately ten years ago. Ex. 28 at 81:17-19.

**Plaintiffs' Response to No. 39:** Dispute. Plaintiffs dispute the relevancy of the last time Plaintiff Wroblewski rode the El. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. *See* Resp. to Statement 38.

   40. Plaintiff Wroblewski does not ride public buses in Northern Illinois. He has never used CTA or Pace buses. Ex. 28 at 80:15-22, 81:13-16.

**Plaintiffs' Response to No. 40:** Dispute. Plaintiffs dispute the relevancy of the fact that Plaintiff Wroblewski does not ride public buses. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. *See* Resp. to Statement 38.

    41. Plaintiff Wroblewski has never trained to use his firearms in a crowd. Ex. 28 at 69:15-17.

**Plaintiffs' Response to No. 41:** Dispute. Plaintiff Wroblewski's possession of a license to carry a handgun pursuant to Illinois law renders his competency with a firearm here irrelevant: it was already taken into account when Plaintiff obtained the license. Competency with a firearm beyond that required to obtain a license is not material to the *Bruen* analysis. To Plaintiffs' knowledge, no state requires training of this sort to obtain a carry license.

    42. Plaintiff Wroblewski has never trained to use his firearms on a moving vehicle. Ex. 28 at 69:18-20.

**Plaintiffs' Response to No. 42:** Dispute. *See* Resp. to Statement 41.

    43. Plaintiff Vesel resides in Cook County, Illinois. Ex. 29 at 38:16-23.

**Plaintiffs' Response to No. 43:** Admit.

    44. Specifically, Plaintiff Vesel resides in La Grange, Illinois. Ex. 3 at ¶ 8.

**Plaintiffs' Response to No. 44:** Admit.

    45. Plaintiff Vesel resides .4 miles from a Metra stop. Ex. 3 at ¶ 8.

**Plaintiffs' Response to No. 45:** Admit.

    46. The Burlington Northern Santa Fe Metra line stops in La Grange. Ex. 36.

**Plaintiffs' Response to No. 46:** Admit.

    47. The Burlington Northern Santa Fe Metra line runs on tracks owned by the Burlington Northern Santa Fe Railroad and is operated by the Burlington Northern Santa Fe Railroad. Ex. 37 at 3.

**Plaintiffs' Response to No. 47:** Admit.

    48. Plaintiff Vesel cannot recall when he last rode Metra, and has not ridden Metra for at least two years. Ex. 29 at 49:16-24, 50:7-11.

**Plaintiffs' Response to No. 48:** Dispute. Plaintiffs dispute the relevancy of the last time Plaintiff Vesel rode Metra. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. Plaintiff Vesel "would intend to ride public transportation, including Metra and the CTA" if he were permitted to carry a

firearm for self-defense. Ex. 3 ¶ 11.

49. Plaintiff Vesel last rode Metra to come into Chicago. Ex. 29 at 50:7-15.

**Plaintiffs' Response to No. 49:** Admit.

50. Plaintiff Vesel has not ridden Pace, the El, or a CTA bus in at least five years. Ex. 29 at 50:24, 51:1-6.

**Plaintiffs' Response to No. 50:** Dispute. Plaintiffs dispute the relevancy of the last time Plaintiff Vesel rode Pace, the El, or a CTA bus. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. Plaintiff Vesel "would intend to ride public transportation, including Metra and the CTA" if he were permitted to carry a firearm for self-defense. Ex. 3 ¶ 11.

51. Plaintiff Winston resides in Lake County, Illinois. Ex. 30 at 14:23-24, 15:1.

**Plaintiffs' Response to No. 51:** Admit.

52. Specifically, Plaintiff Winston resides in Waukegan, Illinois. Ex. 30 at 14:24.

**Plaintiffs' Response to No. 52:** Admit.

53. The Metra Union Pacific-North line stops in Waukegan. Ex. 38.

**Plaintiffs' Response to No. 53:** Admit.

54. The Metra Union Pacific-North line runs on track owned by the Union Pacific Railroad and is operated and dispatched by the Union Pacific Railroad. Ex. 32.

**Plaintiffs' Response to No. 54:** Admit.

55. Plaintiff Winston rarely rides public transit. Ex. 30 at 65:7-10.

**Plaintiffs' Response to No. 55:** Dispute. Plaintiffs dispute the relevancy of the last time Plaintiff Winston rode public transit. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. Plaintiff Winston "would intend to ride public transportation more with [his] family" if he were permitted to carry a firearm for self-defense. Ex. 4 ¶ 8.

56. Plaintiff Winston last rode a public bus in approximately 1988. Ex. 30 at 100:7-8.

**Plaintiffs' Response to No. 56:** Dispute. Plaintiffs dispute the relevancy of the last time Plaintiff Winston rode a public bus. What is relevant to the standing inquiry is whether he intends to ride public transit in Illinois in the future. Past inaction is in no way indicative of future action. Plaintiff Winston "would intend to ride public transportation more with [his] family" if he were permitted to carry a firearm for self-defense. Ex. 4 ¶ 8.

57. Plaintiff Winston had no intent to ride public transit over the previous year. Ex. 30 at 66:1-3.

**Plaintiffs Response to No. 57:** Dispute. Plaintiffs dispute the relevancy of the last time Plaintiff Winston rode public transit. What is relevant to the standing inquiry is whether he has a specific intent to do so in the future. Past inaction is in no way indicative of future action. Plaintiff Winston "would intend to ride public transportation more with [his] family" if he were permitted to carry a firearm for self-defense. Ex. 4 ¶ 8.

58. Plaintiff Winston's intent to ride public transit in the future is speculative. Ex. 30 at 66:4-7.

**Plaintiffs' Response to No. 58:** Dispute. Plaintiff Winston intends to ride public transportation more on trips to Evanston and Chicago but is prevented from doing so by the prohibition on carrying a firearm. Indeed, Plaintiff has taken the Metra to Chicago's Ogilvie Station. Ex. 4 ¶¶ 8–9, 11.

59. Plaintiff Winston has never resided in Dekalb County, Illinois or ridden public transit in Dekalb County. Ex. 30 at 104:10-15.

**Plaintiffs' Response to No. 59:** Admit.

## EXPERT REPORT FACTS

60. Dynamic shooting, or shooting 'while on the move', is a skill which requires training and repetition to maintain proficiency and marksmanship. Ex. 6 at 2.

**Plaintiffs' Response to No. 60:** Dispute. It is unclear what "dynamic shooting" encompasses and this fact is in no way relevant to the *Bruen* inquiry. In any event, Plaintiffs have gone through Illinois' mandated 16 hours of firearm training to obtain their concealed carry license, which suffices to prove to the state of Illinois that they are competent to carry and use firearms. *See Concealed Carry License*, ILL. STATE POLICE, https://bit.ly/3vhj6KM; *see also* 430 ILCS 66/75(b).

61. Static shooting and dynamic shooting require vastly different skillsets, and the basic Illinois concealed carry qualification course does not include a dynamic training or qualification component. Ex. 6 at 2.

**Plaintiffs' Response to No. 61:** Dispute. It is unclear what "dynamic shooting" encompasses and this fact is in no way relevant to the *Bruen* inquiry. In any event, Plaintiffs have gone through Illinois' mandated 16 hours of firearm training to obtain their concealed carry license, which suffices to prove to the state of Illinois that they are competent to carry and use firearms. *See Concealed Carry License*, *supra*; *see also* 430 ILCS 66/75(b). No state requires concealed carry holders to be trained to shoot on moving vehicles, so this point is not persuasive. Additionally, the expert's reference to "the unpredictable movements (random or intentional) of the assailant" is a possibility in any self-defense situation, not just one on or around public transportation. Ex. 6 at 2–3.

62. Firing a firearm on a moving transit vehicle involves movements that are beyond the scope of static shooting training, which does not account for the random movements of the vehicle and the transmittal of that movement to the passengers. Ex. 6 at 2.

**Plaintiffs' Response to No. 62:** Dispute. *See* Resps. To Statements 60, 61.

63. Static shooting training does not address the unpredictable movements of an assailant on transit, or the added difficulty of firing while moving into a confined space such as the inside of a rail car. Ex. 6 at 3.

**Plaintiffs' Response to No. 63:** Dispute. *See* Resps. To Statements 60, 61.

64. Firing a gun in a congested, confined space such as a rail car involves significant elevated risk of unintended harm to third party riders. Ex. 6 at 3. Passengers may be struck by gunfire both because of the unpredictability of movement of the transit car, and because there may be little to no space to hide or retreat from the situation. Ex. 6 at 3.

**Plaintiffs' Response to No. 64:** Dispute. Additionally, this expert report does not purport to use any reliable methodology to reach its conclusions. The author relies solely on his own experiences with shooting at moving targets to reach the conclusion that Defendant Foxx cites. The expert also provides no reason to think that public transportation is always congested. Subway cars and buses traveling late at night may be much emptier than at the "rush hour" times the expert references, rendering individuals even more vulnerable to criminal attack. Moreover, public transportation is not always in motion, and the real property associated with it never is.

Moreover, one of the primary driving forces behind unintended casualties, according to the County's expert, is "[l]ack of familiarity and competency" with a firearm. Ex. 6 at 2. But Plaintiffs have gone through Illinois' mandated 16 hours of firearm training to obtain their concealed carry license, which suffices to prove to the state of Illinois that they are competent to carry and use firearms. *See Concealed Carry License*, *supra*; *see also* 430 ILCS 66/75(b).

Additionally, the risks the County's expert names could be present in a multitude of self-defense situations and are not unique to public transportation. For example, discharging a firearm in a public gathering also risks unintended harm to third party individuals. However, Plaintiffs present historical laws displaying that carry was both permitted, and sometimes required, in such assemblies. Also, when a victim is being attacked—even in a crowd—the range for self-defense is often point-blank, minimizing the risk that someone other than the attacker will be injured.

Finally, the alleged danger to bystanders of firing a gun on public transportation is irrelevant to the *Bruen* analysis. *Bruen* emphatically excised all interest-balancing from Second Amendment analysis.

65. Until the 20th century, American transit was owned and operated by private companies vested with the authority to make their own rules and regulations for customers. Ex. 7 at 24; Ex. 8 at 33.

**Plaintiffs' Response to No. 65:** Dispute. The internal rules and policies of private companies are

irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws).

Additionally, the phrase "American transit" is ambiguous, and Plaintiffs dispute that public transportation was privately owned and operated. There are numerous examples of state-owned, state-funded, and/or state-operated transportation in the Colonial and Founding eras. Stagecoach services providing shared transportation to passengers "began in several areas of the colonies in the early eighteenth century." Ron Vineyard, *Stage Waggons and Coaches* at 4, COLONIAL WILLIAMSBURG FOUND. (2002), https://bit.ly/3RH6l4D ("Vineyard"); *see also* G.A. THRUPP, THE HISTORY OF COACHES 124 (London, Kerby & Endean 1877), https://bit.ly/41k1Wrg (noting that hackney coaches were being built in American factories by 1790) ("Thrupp"); Ex. 7, Expert Rep. of Dr. Brennan Rivas at 9–10 (Oct. 23, 2023) ("Rivas Rep.") (discussing development of horse-drawn omnibuses in Philadelphia in the 1830s). Early in the 1700's, stage lines connected cities in New Jersey, Boston to Rhode Island, and New York to Philadelphia. *See id.*; *see also* Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q. J. OF N.Y. STATE HIST. ASS'N 231, 232–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia[.]") ("Holmes"). Some of these stage lines used a combination of boats and coaches as the topography demanded. *See* Vineyard at 4. Stagecoach services offering to carry goods and passengers were even advertised in various states' newspapers during the Founding era to attract patrons.[1] And "Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols." NICHOLAS J. JOHNSON ET AL., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021).

Additionally, the public used various boats to travel during the Founding. Virginia, for example, established numerous ferries to be kept "constantly" running. 1 STATUTES AT LARGE OF VIRGINIA 152 (Samuel Shepherd ed., 1835). So too South Carolina, which established a public ferry as early as 1725. 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (David J. McCord ed., 1841). Many ferries during the Colonial and Founding eras were also publicly owned and operated. *See* Act for Regulating Ferries of 1797, ch. 42, *in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 74–76 (1896) (Massachusetts law providing that local government would operate the ferry and threatening fines for towns that did not provide free ferriage); Act for Regulating Ferries of 1791, *in* ACTS AND LAWS OF CONNECTICUT 405–06 (1791) (Connecticut law licensing towns to operate ferries and allowing them to receive all fares and profits). Similar laws existed in New York and Georgia. *See* An Act to Regulate the Ferry Between the City of New York and The Island of Nassau (1732) (New York City owned ferry and was entitled to receive fares); DIGEST OF THE LAWS OF GEORGIA 283–84 (Robert & George Watkins eds., 1800) (establishing a public ferry in Augusta and directing profits to a public school). Another option for river and canal travel were packet boats. These smaller vessels carried domestic mail, goods, and passengers between cities during the Founding era. *See, e.g.*, *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794). Large vessels capable of weathering the ocean also existed and transported passengers. Contemporary newspaper advertisements show that many transported passengers between ports on the East Coast, and even abroad. *See* Charles Christopher Crittenden, *Ships and Shipping in North Carolina, 1763–1789* at 10–13, *in* 8 THE NORTH

---

[1] *Thursday Paper* at 4, THE PA. GAZETTE (Apr. 30, 1761); *Tuesday Paper* at 3, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768); *Saturday Paper* at 4, INDEP. GAZETTEER (Aug. 31, 1782); *Wednesday Paper* at 4, POUGHKEEPSIE J. (Apr. 18, 1787); *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794).

CAROLINA HISTORICAL REVIEW (Jan. 1931) ("Crittenden"). Indeed, by 1800, passengers could travel up and down the East Coast in a matter of days. *See id.* at 11–12; *see also* Rivas Rep. at 9 (discussing ferries and packet ships "that moved goods, passengers, and letters to port cities" in the early 1800s); Ex. 8, Expert Rep. of Prof. Joshua Salzmann at 13 (Oct. 21, 2023) ("Salzmann Rep.") (discussing ferries' "centrality to travel in colonial and early America").

Nor was early transportation gun-free. South Carolina mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses" on its public ferry. 9 STATUTES AT LARGE OF SOUTH CAROLINA, *supra*, at 61; *see also* GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 153 (Williamsburg, William Parks 1736) (men attending militia training could ride ferry for free). Similarly, guns were considered "baggage" on public conveyances such as steamboats and were "usually carried." *See Hawkins v. Hoffman*, 6 Hill 586, 589–90 (N.Y. Sup. Ct. 1844); *Woods v. Devin*, 13 Ill. 746 (Ill. 1852) (baggage on common carriers includes guns carried for protection). And the packet boats traversing the Ohio River were "well armed against any Indian attempt." *Monday Paper* at 3, AURORA GEN. ADVERTISER (Dec. 2, 1793).

66. Those private transit companies would have had the authority to regulate the carrying of weapons by customers aboard their vehicles and within their stations. Ex. 7 at 24.

**Plaintiffs' Response to No. 66:** Dispute. The internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Additionally, Plaintiffs dispute that American transit companies were entirely private. *See* Resp. to Statement 65.

67. America's urban/transportation history may be divided into four distinct periods: The Pre-Industrial era (1600 – 1800s); the Canal and Steamboat era (1800 – 1830s); the Industrial Railroad era (1840s to 1920s); and the era of the Modern Automotive City (1920s to 2020s). Ex. 8 at 5.

**Plaintiffs' Response to No. 67:** Plaintiffs lack knowledge and on that basis, do not dispute at this time.

68. For long distance travel, early Americans traveled by horseback, a small boat, a wagon, or by walking. Ex. 8 at 6.

**Plaintiffs' Response to No. 68:** Dispute. It is unclear what time period "early Americans" encompasses. And other modes and methods of public transportation existed in America as early as the Colonial and Founding eras, some of which were used for long-distance travel. *See* Resp. to Statement 65. Moreover, this statement, like many of the others in this section, relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as

part of its legal analysis.

69. For short distance travel, well-off early Americans could hire wagons, or take their own wagons or horses. Ex. 8 at 6.

**Plaintiffs' Response to No. 69:** Dispute. It is unclear who the category of "well-off early Americans" encompasses, and public transportation in the Colonial and Founding eras was available for all classes of citizens. *See* Resp. to Statement 65. Moreover, other modes and methods of public transportation existed in America as early as the Colonial and Founding eras beyond those mentioned here, some of which were used for short-distance travel. *See id.* Moreover, this statement, like many of the others in this section, relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting Baude & Sachs, *supra*, at 810–11)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

70. At the time of the founding, Philadelphia was America's second largest city, with a population of approximately 28,000 people. Ex. 8 at 4.

**Plaintiffs' Response to No. 70:** Admit.

71. Prior to the 1820s, no American city possessed a land-based mass-transit system. Ex. 8 at 6.

**Plaintiffs' Response to No. 71:** Dispute. Numerous land-based modes of public transportation existed in the Colonial and Founding eras. *See* Resp. to Statement 65. And as *Bruen* noted, determining whether a historical analogue can be properly compared to a modern regulation "requires a determination of whether the two regulations are 'relevantly similar.'" 597 U.S. at 29 (citation omitted). Similarly with the modern situation of a land-based mass-transit system, it is only relevant whether the Founders had a conception of a transit system that operated analogously to transit systems today, i.e., by transporting the public from one location to another. Whether that transit took place on land, or was a comprehensive "system," is not as relevant. Additionally, this statement, like many of the others in this section, relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See id.* at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting Baude & Sachs, *supra*, at 810–11)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

72. Through the 19th century, chartered railroad corporations collaborated with Wall Street investors, states, and the federal government to construct a massive network of passenger and freight railroads. Ex. 8 at 22-23.

**Plaintiffs' Response to No. 72:** Admit, noting that railroads were available for passenger travel in

13

the early 1800s. Salzmann Rep., *supra*, at 22, 24.

73. The development and expansion of America's rail system during this period coincided with a rise in violence and weapons carrying. Ex. 7 at 24-25.

**Plaintiffs' Response to No. 73:** Admit as to the fact that the carrying of weapons was prevalent in the mid-nineteenth century. Rivas Rep., *supra*, at 24. Dispute as to the fact that "violence" around this time was anything new or different than had been present in earlier eras. It is unclear what metric "violence" is measured by, or that it was firearms-related. Moreover, the Colonial and Founding eras certainly had their own share of civil unrest and violence as early Americans shook off British rule. *See, e.g.*, Ron Rosenbaum, *The Shocking Savagery of America's Early History*, SMITHSONIAN MAG. (Mar. 2013), https://bit.ly/49UxCXQ.

74. Regulation of firearms by railroads during this period was not uncommon. The Union Pacific and Central Pacific, North Pennsylvania Railroad, South Carolina Canal and Railroad Company, International and Great Northern Railroad Company, and Albany Railway had specific gun-carriage policies during the nineteenth century. Ex. 7 at 26.

**Plaintiffs' Response to No. 74:** Dispute. The actions of private railroad companies are irrelevant to the *Bruen* analysis. *See* Resp. to Statements 66. And as a source from the State Defendants' states, these regulations do not create "a unanimous consensus that railroad corporations enacted public-carry restrictions." Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L.J. (forthcoming 2024) (manuscript at 15), https://bit.ly/3PuEmn0.

75. Some contemporary railroads established commuter rail service in and around the nation's largest cities, including New York, Philadelphia, and Chicago. Ex. 8 at 24.

**Plaintiffs' Response to No. 75:** Dispute. The actions of contemporary railroads are irrelevant to the *Bruen* analysis. *See* Resps. to Statements 66, 71. Moreover, it is unclear what era "contemporary" encompasses. The cited source discusses the fact that railroads were available and provided commuter services from the early 1800s to 1900. Salzmann Rep., *supra*, at 24.

76. The new commuter rail service spurred suburban real estate development. Ex. 8 at 24.

**Plaintiffs' Response to No. 76:** Dispute. It is unclear what "new commuter rail service" references. The cited source discusses the fact that railroads were available and provided commuter services from the early 1800s to 1900. Salzmann Rep., *supra*, at 24. And it mentions that one effect of railroad expansion in the mid-1800s was to "fuel a suburban real estate boom." *Id.* In any event, this fact is irrelevant to the *Bruen* analysis. *See* Resps. to Statements 66, 71. Assuming Defendants are using "new" synonymously with "contemporary," it is especially unclear what relevance that has to the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

77. Inter and intra-city rail service also allowed for the development of industrial cities, such as Chicago's Union Stockyards. Ex. 8 at 26.

**Plaintiffs' Response to No. 77:** Dispute. Industrial cities existed before the development of city rail services. *See* Salzmann Rep., *supra*, at 26. The source supports only the fact that railroads sometimes allowed an industry to concentrate its production of a good in a single city. *See id*. It is unclear what relevance this fact has to the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

78. Early industrial transit companies used omnibuses, large horse-drawn cars pulled by horses, which anyone could board for a fare. Ex. 8 at 29.

**Plaintiffs' Response to No. 78:** Dispute. *See* Resps. to Statements 65, 71.

79. Starting in the 1830s and 1840s, omnibuses began being replaced by horsecars, horse drawn cars on rails, through major cities. Ex. 8 at 29.

**Plaintiffs' Response to No. 79:** Dispute. *See* Resps. to Statements 65, 71.

80. Transit companies began to transition away from horse power with the development of the cable car, whose heyday lasted from the 1880s through the 1910s. Ex. 8 at 30-31.

**Plaintiffs' Response to No. 80:** Dispute. *See* Resps. to Statements 65, 71. It is especially unclear what relevancy late 19th century practices have on the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

81. Eventually electric street cars largely replaced cable cars. Ex. 8 at 31.

**Plaintiffs' Response to No. 81:** Admit, noting that it is especially unclear what relevancy late 19th century practices have on the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

82. Through the late 19th and early 20th century, Chicago, Boston, New York City and Philadelphia began construction on electric railway systems using a combination of grade level, subway, and elevated "El" lines. Ex. 8 at 33.

**Plaintiffs' Response to No. 82:** Admit, noting that it is especially unclear what relevancy late 19th century practices have on the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

83. Unlike earlier transit systems, these new heavy rail lines were constructed and operated by a combination of private and public institutions, and therefore became the first true public transportation systems in America. Ex. 8 at 33.

**Plaintiffs' Response to No. 83:** Dispute. These were not the first "true" public transportation modes in America. *See* Resps. to Statements 65, 71. Moreover, it is especially unclear what relevancy late 19th century practices have on the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

84. Due to the proliferation of private automobiles, transit usage peaked in the 1920s before

beginning to decline. At that time, buses began replacing street cars because they were more cost effective for transit companies. Ex. 8 at 38-39.

**Plaintiffs' Response to No. 84:** Admit, noting that it is especially unclear what relevancy the late 19th century transit practices of individuals has on the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

85. As private transit companies struggled, municipal governments began to take over their local transit systems. Ex. 8 at 40.

**Plaintiffs' Response to No. 85:** Dispute to the extent Defendant suggests that the only transportation providers were private until this time. *See* Resps. to Statements 65, 71. It is especially unclear what relevancy 20th century practices have on the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era. To the extent Defendant purports to rely on late 19th and 20th century laws, they can be disregarded entirely. *Bruen*, 597 U.S. at 66 n.28.

86. Chicago took control of its rail lines, known as the El, in the 1930s. Those lines were consolidated under the control of the Chicago Transit Authority in 1947. Ex. 8 at 40.

**Plaintiffs' Response to No. 86:** Admit, noting that it is especially unclear what relevancy this fact has to the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

87. Today the CTA is the nation's second largest transportation system after the New York City Transit Authority. Ex. 8 at 46.

**Plaintiffs' Response to No. 87:** Admit, noting that it is especially unclear what relevancy the size of the CTA has to the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

88. Nineteenth-century statutes, such as laws in Texas, Arkansas, and Tennessee, restricted who could conceal carry and when, when away from home. Ex. 7 at 21-22.

**Plaintiffs' Response to No. 88:** This is not a statement of fact, but rather one of law. These laws speak for themselves and their text is the best evidence of their content. At any rate, these statutes come too late to be probative under *Bruen* because they are not rooted in the Founding era, when "the people adopted" the Second Amendment. 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

Each of these laws is also unpersuasive on its own terms. Texas' 1871 law exempted those who carried pistols and knives and allowed those in wagons to keep the pistols in reach:

> [t]he text of the law exempted travelers who carried knives or pistols "with their baggage." Those in wagons or buggies could keep pistols within arm's reach, but not in their hands. Horseback riders were not permitted to carry a pistol in a hip holster, on the saddle, or in their saddlebags. The passage of the Penal Code of 1879 changed these somewhat draconian rules for travelers because the phrase "in the

16

baggage" was dropped from the text.

Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 at 108 (2019) (Ph.D. dissertation, Texas Christian University), https://bit.ly/3TJKJ8I. The law thus regulated only specified weapons and exempted pistols.

> The 1871 deadly weapons ban originally prohibited the carrying of specified weapons, with certain exceptions. Some of these exceptions, including the one for travelers, came in the form of a proviso: "provided that this section shall not be so construed as to prohibit . . . persons traveling in the State from keeping or carrying arms with their baggage."

*Id*. at 108 n.51. Moreover, *Bruen* discounted Texas' 1871 concealed carry prohibition and the state courts' interpretation of its related constitutional provision as "outliers" that "therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 65.

One of the Tennessee laws the expert cites to only forbids citizens to "privately carry any dirk, large knife, pistol or any other dangerous weapon, *to the fear or terror of any person*," *id*. at 50 (citation omitted) (emphasis added), a version of the Statute of Northampton which the Supreme Court held in *Bruen* did not prohibit carrying of weapons unless the carrying was done in such a way as to seek to terrify the people or for some other "wicked purpose." *See id*. at 51–52 (quoting *State v. Huntly*, 25 N.C. 418, 422–23 (N.C. 1843)); 1801 TENN. LAWS 260–61, § 6, https://bit.ly/3vmFlz2. As to the expert's reference to an 1871 Tennessee Circuit Court decision that upheld restrictions on concealed carry, the Supreme Court explained in *Bruen* that this was permissible only because open carry was allowed. "[W]hen the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would 'violat[e] the constitutional right to keep arms.'" *Bruen*, 597 U.S. at 54 (quoting *Andrews v. State*, 50 Tenn. 165, 187 (Tenn. 1871)).

Defendant's expert also cites an 1837 Arkansas law. But by its terms, this law only prohibited concealed carry and it affirmatively exempted travelers. *See* 1837 ARK. REV. STAT. 280 ("Every person who shall wear any pistol, dirk, butcher, or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor[.]") (quoted in Rivas Rep., *supra*, at 21 n.59).

> 89. The purpose of these statutes was to reduce the needless carrying of weapons in public while permitting the traveler to protect himself from dangers on the road. Ex. 7 at 23.

**Plaintiffs' Response to No. 89:** Admit insofar as the statement suggests that travelers were permitted to carry weapons to protect themselves from dangers on the road. Dispute insofar as the statement attempts to assert the purpose of these statutes. Any statement about the purpose of a statute (its "why" under the *Bruen* analysis) relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a legal one. See *Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary

principles and default rules' to resolve uncertainties." (quoting Baude & Sachs, *supra*, at 810–11)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

90. An early Tennessee law, drawing on the Statute of Northampton, barred the private carrying of weapons "to the fear or terror of any person." Ex. 7 at 20.

**Plaintiffs' Response to No. 90:** This is not a statement of fact, but rather a statement of law. This law speaks for itself. *See also* Resp. to Statement 88.

91. An 1813 Louisiana statute barred the carrying of concealed weapons. Ex. 7 at 21.

**Plaintiffs' Response to No. 91:** This is not a statement of fact, but rather a statement of law. This law speaks for itself. Moreover, *Bruen* explicitly discounted this and other similar statutes as probative analogues to general restrictions on the right to public carry. *See* 597 U.S. at 52–53 & n.16. The Court explained, "[a]s we recognized in *Heller*, 'the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.' Respondents unsurprisingly cite these statutes— and decisions upholding them—as evidence that States were historically free to ban public carry. In fact, however, the history reveals a consensus that States could *not* ban public carry altogether." *Id.* (quoting *Heller*, 554 U.S. at 626). This is so because opinions interpreting these statutes—including in Louisiana—"agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.*

92. An 1837 statute of Arkansas barred the carrying of a concealed weapon, "unless upon a journey". Ex. 7 at 21.

**Plaintiffs' Response to No. 92:** This is not a statement of fact, but rather a statement of law. This law speaks for itself. *See also* Resp. to Statement 91.

93. A Texas statute even required exempted travelers to place their weapons in their baggage. Ex. 7 at 21.

**Plaintiffs' Response to No. 93:** This is not a statement of fact, but rather a statement of law. This law speaks for itself. *See also* Resp. to Statement 88. Moreover, *Bruen* discounted Texas' 1871 concealed carry prohibition and the State's interpretation of its related constitutional provision as "outliers" that "therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 65.

94. "Travelers" were permitted to conceal carry only when they ventured "outside of one's community sphere." Ex. 7 at 22.

**Plaintiffs' Response to No. 94:** Dispute. *Bruen* recognized that there is a general right to publicly carry arms for self-defense absent prohibitions to the contrary. *See, e.g.*, 597 U.S. at 30–31; *see also id.* at 17 ("Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" (citation omitted)). "[C]ommunity sphere" is also far too vague a phrase to permit a response. Rivas Rep., *supra*, at 22. Defendant's expert also notes that "to venture outside one's

community sphere" rendered travelers "vulnerable to dangers such as robbers and predatory animals." *Id*. In such circumstances, the need for self-defense with a firearm is particularly acute. *Accord Bruen*, 597 U.S. at 78 (Alito, J., concurring) (noting the heightened need for self defense at the Founding era when "there were no police departments, and many families lived alone on isolated farms or on the frontiers"). To the extent such a "traveler exception" exists at the Founding and thereafter, it supports Plaintiffs' view that there is a historical tradition of allowing travelers to carry weapons while taking modes of transportation.

95. The Traveler Exception was restricted to long-distance travel and did not apply to commuting within a city or a metro area. Ex. 7 at 24.

**Plaintiffs' Response to No. 95:** Dispute. There is no "traveler exception"; travelers had a general right to publicly carry arms for self-defense just like any other American absent prohibitions to the contrary, which Defendant has not presented. *See* Resp. to Statement 94. Moreover, there were not "metro areas" in early America as that phrase is understood today, so even if this exception existed it could not have applied to metro areas. Additionally, Defendant's expert fails to establish a relevantly similar tradition of restricting travelers' ability to carry. *See* Resps. to Statements 88, 90–93. To the extent such a "traveler exception" exists at the Founding and thereafter, it supports Plaintiffs' view that there is a historical tradition of allowing travelers to carry weapons while taking modes of transportation.

96. State appellate courts of the time applied the Traveler Exception narrowly, and variously excluded individuals who crossed into a contiguous county, or journeyed from one county 18 miles to a neighbor, with the expectation of returning the following day. Ex. 7 at 22.

**Plaintiffs' Response to No. 96:** Dispute. There is no "traveler exception"; travelers had a general right to publicly carry arms for self-defense just like any other American absent prohibitions to the contrary, which Defendant has not presented. *See* Resp. to Statement 94. To the extent such a "traveler exception" exists at the Founding and thereafter, it supports Plaintiffs' view that there is a historical tradition of allowing travelers to carry weapons while taking modes of transportation.

Defendants' expert discusses the following decisions: *Smith v. State*, 50 Tenn. 511 (Tenn. 1872), *Darby v. State*, 5 S.W. 90 (Tex. Ct. App. 1880), *Carr v. State*, 34 Ark. 448 (Ark. 1879), *Eslava v. State*, 49 Ala. 355 (Ala. 1873), and *Stilly v. State*, 11 S.W. 458 (Tex. Ct. App. 1889). *Darby* and *Stilly*—both from Texas—can be dismissed because the *Bruen* Court expressly discounted Texas' 1871 concealed carry prohibition and the state courts' interpretation of its related constitutional provision as "outliers" that "therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen*, 597 U.S. at 65.

*Smith v. State* from Tennessee is also not probative. The Supreme Court explained in *Bruen* that Tennessee's prohibition of concealed carry was permissible only because open carry was allowed. "[W]hen the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would 'violat[e] the constitutional right to keep arms.'" *Bruen*, 597 U.S. at 54 (quoting *Andrews*, 50 Tenn. at 187) (citation omitted). The exact same was true of Alabama, *see id.* at 53 & n.18, so that decision can be discounted as well.

Finally, *Carr* from Arkansas is not probative. As *Bruen* noted, an earlier decision upheld Arkansas' prohibition on concealed carry, but did so without a majority rationale. *See id.* at 53 n.20. In any event, *Carr* explained that Arkansas' law exempting travelers from concealed carry restrictions exists "to enable travelers to protect themselves on the highways, or in transit through populous places." 34 Ark. at 449. To the extent this decision is probative at all given its distance from the Founding era, it supports Plaintiffs' position that there is a historical tradition of permitting carry by travelers in transit throughout populous areas.

97. Another contemporary appellate court held that an individual who carried a concealed firearm for reasons other than travel along a dangerous road did not constitute a "traveler" within the meaning of the exception. Ex. 7 at 23.

**Plaintiffs' Response to No. 97:** Dispute. *Stilly v. State* is not probative. *See* Resp. to Statement 96.

## II. RESPONSES TO THE STATE PARTIES' STATEMENT OF MATERIAL FACTS[2]

1. Public transit systems in Illinois are most heavily concentrated in Chicago and its surrounding counties. See Expert Report of Professor Joshua Salzmann ("Salzmann Report"), Ex. 1, at 46–47.

**Plaintiffs' Response to No. 1:** Admit.

2. The Chicago Transit Authority ("CTA"), which serves the Chicago region, is the nation's second largest transportation system—according to the Illinois Department of Transportation, the CTA transports more than 545 million riders per year on approximately 140 bus routes and 242 miles of rapid transit railroad track. *Id.*

**Plaintiffs' Response to No. 2:** Admit, noting that it is especially unclear what relevancy the current size of the CTA has to the *Bruen* analysis, which requires Defendants to present persuasive legal history, with a special focus on the Founding era.

3. The Metra commuter rail agency, which serves the six-county Chicago region and extends into Wisconsin, has 11 lines, 241 stations, and an annual ridership of more than 81 million. *Id.*

**Plaintiffs' Response to No. 3:** Admit. *See* Resp. to Statement 2.

4. Illinois has an extensive, economically-significant public transit system beyond Chicagoland: sixty-three different public transit agencies operate in Illinois, together serving 95 of 101 counties other than Cook. Id.

---

[2] All cross-reference citations in this Section relate only to Responses to State Defendants' Statement of Material Facts.

**Plaintiffs' Response to No. 4:** Admit. *See* Resp. to Statement 2.

5. These agencies, which generally provide bus service, are integral to the economies and transit systems of communities across Illinois—in 2022, for instance, Peoria's 18 bus routes carried 1.7 million riders, Springfield's 17 routes transported 1.1 million riders, and Rockford's 19 lines carried 941,000 riders. Id.

**Plaintiffs' Response to No. 5:** Admit. *See* Resp. to Statement 2.

6. Plaintiff Benjamin Schoenthal is a resident of DeKalb County, Illinois. Declaration of Benjamin Schoenthal, Ex. 2, at ¶¶ 2–5.

**Plaintiffs' Response to No. 6:** Admit.

7. Plaintiff Mark Wroblewski is a resident of DuPage County, Illinois. Declaration of Mark Wroblewski, Ex. 3, at ¶¶ 2–5.

**Plaintiffs' Response to No. 7:** Admit.

8. Plaintiff Joseph Vesel is a resident of Cook County, Illinois. Declaration of Joseph Vesel, Ex. 4, at ¶¶ 2–5.

**Plaintiffs' Response to No. 8:** Admit.

9. Plaintiff Douglas Winston is a resident of Lake County, Illinois. Declaration of Douglas Winston, Ex. 5, at ¶¶ 2–5.

**Plaintiffs' Response to No. 9:** Admit.

10. Defendant in his official capacity Kwame Raoul is the Attorney General of the State of Illinois, and has statutory duties as defined in 15 ILCS 205/4. See Answer of Raoul et al., Ex. 6, ¶ 18.

**Plaintiffs Response to No. 10:** Admit.

11. Defendant in his official capacity Rick Amato is the State's Attorney of DeKalb County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. See Answer of Raoul et al., Ex. 6, ¶ 19.

**Plaintiffs' Response to No. 11:** Admit.

12. Defendant in his official capacity Robert Berlin is the State's Attorney of DuPage County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. See Answer of Raoul et al., Ex. 6, ¶ 20.

**Plaintiffs' Response to No. 12:** Admit.

13. Defendant in her official capacity Kimberly M. Foxx is the State's Attorney of Cook County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. See Answer of Raoul et al., Ex. 6, ¶ 21.

**Plaintiffs' Response to No. 13:** Admit.

14. Defendant in his official capacity Eric Rinehart is the State's Attorney of Lake County, Illinois, and has statutory duties as defined in 55 ILCS 5/3-9005. See Answer of Raoul et al., Ex. 6, ¶ 22.

**Plaintiffs' Response to No. 14:** Admit.

15. Plaintiffs assert that a State-law restriction on carrying concealed firearms on public buses and trains violates the Second Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, and that they would ride buses and trains while carrying concealed firearms if they were able to do so without fear of prosecution. See Schoenthal Decl., Ex. 2, at ¶¶ 7–8; Wroblewski Decl., Ex. 3, at ¶¶ 7–8; Vesel Decl., Ex. 4, at ¶¶ 8–11; Winston Decl., Ex. 5, at ¶¶ 8–11.

**Plaintiffs' Response to No. 15:** Admit in part. Plaintiffs assert that a State-law restriction on carrying firearms on public transportation violates the Second Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, and they would ride public transportation while carrying firearms if they were able to do so without fear of prosecution. Plaintiffs do not challenge separate State law requiring firearms carried in public to be concealed.

16. Plaintiffs have asserted no intention to travel to or visit any buildings, real property, or parking area under the control of a public transportation facility, and no intention to do so while carrying a concealed firearm. *See* Schoenthal Decl., Ex. 2, at ¶¶ 7–8 (asserting prior use of "the Metra Union Pacific West line" and an intention to "ride Metra more" if allowed to carry a concealed handgun); Schoenthal Dep., Ex. 7, at 56:8–57:4 (confirming accuracy of declaration); Wroblewski Decl., Ex. 3, at ¶¶ 7–8 (asserting prior use of "the Metra" and an intention to "ride public transportation more, such as Metra" if allowed to carry a concealed handgun); Wroblewski Dep., Ex. 8, at 48:12–49:10 (confirming accuracy of declaration); Vesel Decl., Ex. 4, at ¶¶ 8–11 (asserting he would use "bus" or "rail" transit options if allowed to carry a concealed handgun); Vesel Dep., Ex. 9, at 49:5–7 (confirming accuracy of declaration); Winston Decl., Ex. 5, at ¶¶ 8– 11 (asserting an intention to "ride public transportation more" if allowed to carry a concealed handgun); Winston Dep., Ex. 10, at 64:4–65:5 (confirming accuracy of declaration).

**Plaintiffs' Response to No. 16:** Dispute. The sources the State cites reveal that Plaintiffs assert an intention to take public transportation more often if they could carry a firearm there. As such, Plaintiffs must necessarily use buildings, real property, or parking areas under the control of a public transportation facility. It defies logic to say that Plaintiffs could take *any* form of public transportation—including buses, CTA, Metra, and more—without passing through real property operated by the public transit provider or a parking lot. After all, the real property associated with public transit systems is where fares are collected, and the State parties cannot (and do not) argue

that one can simply board a CTA car or a Metra train without passing through a fare gate, standing on a platform, or passing through the parking lot. In other words, Plaintiffs' allegations that they have taken various forms of public transportation in the past and intend to do so in the future necessarily includes the predicate activity of passing through associated real property, including buildings and parking lots. SUF 12, 15, 20, 23, 29, 30, 39, 41. The key question is whether Plaintiffs show a sufficient "intention to engage in a course of conduct *arguably* affected with a constitutional interest" related to public transportation. *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)) (emphasis added).

17. In concluding that polling places, courthouses, and legislative assemblies are "sensitive" places, the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen* cited to two secondary sources: (a) Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute 11–17. 597 U.S. 1, 30 (2022).

**Plaintiffs' Response to No. 17:** Admit that *Bruen* cited to those two secondary sources when discussing polling places, courthouses, and legislative assemblies. Dispute that *Bruen* "conclud[ed]" that polling places, courthouses, and legislative assemblies are "sensitive places." Rather, the Court simply "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. But *Bruen* did not conduct the analogical reasoning it held is required to study the history—if any—supporting these restrictions. *See id.* To truly determine their constitutionality, a comprehensive analysis under the *Bruen* test must be undertaken. *See id.* at 31 ("Like *Heller*, we 'do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.'" (citation omitted)).

18. Those two sources, in turn, specifically cited to five Colonial or Founding era regulations restricting firearms at these locations:
    a.    Ex. 16, Del. Const. of 1776 art. 28.
    b.    Ex. 17, Act of Jan. 26, 1787 N.Y. Laws 345.
    c.    Ex. 18, 1647 Md. Laws 216.
    d.    Ex. 19, 1650 Md. Laws 273
    e.    Ex. 20, 1786 Va. Acts 33, ch.21

**Plaintiffs' Response to No. 18:** Admit.

19. The sources cited by the Supreme Court also purported to identify an additional 1676 Virginia statute relating to courthouses, which required persons to attend court while armed. See 597 U.S. at 30 (citing Ex. 14, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 232 n.109 (2018) (referencing 2 Hening 126 as a "1676 Virginia law that "all people" be "required to goe armed" to church and court "for their great security")).

**Plaintiffs' Response to No. 19:** Admit.

20. This statute is incorrectly cited in the Supreme Court's source—contrary to Kopel and Greenlee's citation to 2 Hening 126, this Virginia statute actually appears at 2 Hening 333 (attached as Ex. 21).

23

**Plaintiffs' Response to No. 20:** Admit.

21. It is unclear whether this statute was passed in 1674 or 1676. Ex. 21, 2 Hening 326.

**Plaintiffs' Response to No. 21:** Dispute. The first page discussing this Act states that it was ratified in 1674. *See* 2 Hening 326.

22. In concluding that schools are "sensitive" places, *Bruen* cites to two secondary sources: (a) Ex. 14, D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute 11–17. 597 U.S. 1, 30 (2022). See Bruen, 597 U.S. at 30; Heller, 554 U.S. at 626–27.

**Plaintiffs' Response to No. 22:** Dispute. *Bruen* cited to *Heller*'s discussion of "longstanding" laws in discussing carry bans in schools, not the two law review articles the State cites. *Heller* in turn noted that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us"—underscoring that it did not decide that schools are sensitive places. 554 U.S. at 635. Notably, *Bruen* did not include schools in its list of "sensitive places" where the Court assumed it settled that carry could be prohibited. *See* 597 U.S. at 30. Indeed, *Bruen* cited approvingly an example of a Freedmen's school that required teachers to be armed for protection against racially-motivated violence. *Id*. at 61–62.

23. Those two sources, in turn, specifically cited to no Colonial or Founding era regulations, and four 19th century regulations, relating to these locations:

a. Ex. 22, Meeting Minutes of University of Virginia Board of Visitors 4–5 Oct. 1824, https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA- print-04-02-02-4598.
b. Ex. 23, University of Nashville 1837 rule, 7 American Annals of Education and Instruction 185 (1837), https://babel.hathitrust.org/cgi/pt?id=iau.31858033351408&view=1up&seq=1 91.
c. Ex. 24, Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina ch. 5, § 13 (1838) at 11, https://docsouth.unc.edu/true/ncga/ncga.html.
d. Ex. 25, 1878 Miss. Laws 176.

**Plaintiffs' Response to No. 23:** Dispute. The source also cites "Meeting Minutes of University of Virginia Board of Visitors," which is dated to 1824. Thomas Jefferson and James Madison were on the Board of Visitors at the time these restrictions were enacted. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 248 & n.162 (2018) ("Kopel & Greenlee").

24. These two sources also asserted that Dickinson College, La Grange College, and Waterville College also imposed restrictions on students carrying firearms, but provided no citations or references to, or quotations from, any restrictions that may have been implemented by these schools. See Ex. 14, D. Kopel & J. Greenlee, The "Sensitive Places"

Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); and (b) Ex. 15, Br. of Amicus Curiae Independent Institute 11–17.

**Plaintiffs' Response to No. 24**: Dispute. The State conflates the two sources it cites: in their article "*The 'Sensitive Places' Doctrine*," Kopel and Greenlee do not discuss Dickinson, La Grange, or Waterville Colleges. *See* Kopel & Greenlee, *supra*.

25. "Public transportation dates to the first half of the 20th century." See Salzmann Report, Ex. 1, at 3–4.

**Plaintiffs' Response to No. 25**: Dispute. There are numerous examples of state-owned, state-funded, and/or state-operated transportation in the Colonial and Founding eras.

Stagecoach services providing shared transportation to passengers "began in several areas of the colonies in the early eighteenth century." Vineyard, *supra*, at 4; *see also* THRUPP, *supra*, at 124 (noting that hackney coaches were being built in American factories by 1790); Rivas Rep. at 9–10 (discussing development of horse-drawn omnibuses in Philadelphia in the 1830s). Early in the 1700's, stage lines connected cities in New Jersey, Boston to Rhode Island, and New York to Philadelphia. *See id.*; *see also* Holmes, *supra*, at 231–33 ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia[.]"). Some of these stage lines used a combination of boats and coaches as the topography demanded. *See* Vineyard at 4. Stagecoach services offering to carry goods and passengers were even advertised in various states' newspapers during the Founding era to attract patrons.[3] And "Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols." JOHNSON ET AL., *supra*, at 2195.

Additionally, the public used various boats to travel during the Founding. Virginia, for example, established numerous ferries to be kept "constantly" running. 1 STATUTES AT LARGE OF VIRGINIA, *supra*, at 152. So too South Carolina, which established a public ferry as early as 1725. 9 STATUTES AT LARGE OF SOUTH CAROLINA, *supra*, at 61. Many ferries during the Colonial and Founding eras were also publicly owned and operated. *See* Act for Regulating Ferries of 1797, *supra* (Massachusetts law providing that local government would operate the ferry and threatening fines for towns that did not provide free ferriage); Act for Regulating Ferries of 1791, *supra* (Connecticut law licensing towns to operate ferries and allowing them to receive all fares and profits). Similar laws existed in New York and Georgia. *See* An Act to Regulate the Ferry Between the City of New York and The Island of Nassau, *supra* (New York City owned ferry and was entitled to receive fares); DIGEST OF THE LAWS OF GEORGIA, *supra*, at 283–84 (establishing a public ferry in Augusta and directing profits to a public school). Another option for river and canal travel were packet boats. These smaller vessels carried domestic mail, goods, and passengers between cities during the Founding era. *See, e.g.*, *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794). Large vessels capable of weathering the ocean also existed and transported passengers. Contemporary newspaper advertisements show that many transported passengers between ports on the East Coast, and even abroad. *See* Crittenden, *supra, at*

---

[3] *Thursday Paper* at 4, THE PA. GAZETTE (Apr. 30, 1761); *Tuesday Paper* at 3, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768); *Saturday Paper* at 4, INDEP. GAZETTER (Aug. 31, 1782); *Wednesday Paper* at 4, POUGHKEEPSIE J. (Apr. 18, 1787); *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794).

10–13. Indeed, by 1800, passengers could travel up and down the East Coast in a matter of days. *See id.* at 11–12; *see also* Rivas Rep., *supra*, at 9 (discussing ferries and packet ships "that moved goods, passengers, and letters to port cities" in the early 1800s); Salzmann Rep., *supra*, at 13 (discussing ferries' "centrality to travel in colonial and early America").

Early transit was by no means gun-free. South Carolina mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses" on its public ferry. 9 STATUTES AT LARGE OF SOUTH CAROLINA, *supra*, at 61; *see also* WEBB, *supra*, at 153 (men attending militia training could ride ferry for free). Similarly, guns were considered "baggage" on public conveyances such as steamboats and were "usually carried." *See Hawkins*, 6 Hill at 589–90; *Woods*, 13 Ill. at 746–51 (baggage on common carriers includes guns carried for protection). And the packet boats traversing the Ohio River were "well armed against any Indian attempt." *Monday Paper* at 3, AURORA GEN. ADVERTISER (Dec. 2, 1793).

26. Prior to the 20th century, "transportation services were provided exclusively by private entities that usually received a charter or license to operate from a state or local government." *Id.*; see also Expert Report of Dr. Brennan Rivas ("Rivas Report"), Ex. 11, at 24 ("Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers."); Ex. 12, Brian J. Cudahy, Cash Tokens and Transfers 128–29 (1982) (first truly publicly owned and operated municipal mass transit service started in 1905).

**Plaintiffs' Response to No. 26:** Dispute. *See* Resp. to Statement 25. Additionally, the internal rules and regulations of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws).

27. Modern public transit systems are the result of dramatic technological changes when compared to the transportation infrastructure and vehicles of 1791 and 1868. *See* Salzmann Report, Ex. 1, at 3–4 (comparing and contrasting the four "eras" of transportation throughout American history).

**Plaintiffs' Response to No. 27:** Dispute. At least some of the public transportation existing in the Colonial and Founding eras resembles modes of public transportation used today. *See* Resp. to Statement 25. Additionally, it is not the technological similarity between eras that is important, but rather whether public transportation (and corresponding arms bans) have Founding-era roots. Just as *Heller* held that the Second Amendment does not only protect Founding-era arms, *Heller*, 554 U.S. at 582, so too can it protect carry in public spaces not precisely like those that existed when the Framers were alive.

28. "Technology has enabled the creation, maintenance, and expansion of light rail, bus, and other systems that far surpass what was possible, or even thinkable, in 1791." Rivas Report, Ex. 11, at 4.

**Plaintiffs' Response to No. 28:** Dispute. *See* Resp. to Statement 27. The Founders may not have imagined modern forms of communication, such as the internet, but the First Amendment nonetheless protects them. *See, e.g.*, *Reno v. ACLU*, 521 U. S. 844, 849 (1997). Additionally, this

26

statement, like many of the others in this section, relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a legal one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting Baude & Sachs, *supra*, at 810–11)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

29. During the Colonial and Founding eras "[m]anmade infrastructure was limited to a fragmented network of rough roads constructed, in various turns, by individuals, corporations, and local governments." Salzmann Report, Ex. 1, at 3.

**Plaintiffs' Response to No. 29:** Dispute. The State adopts a limited view of "infrastructure", especially given that stagecoach lines and ferries connected various locations during the Colonial and Founding eras. *See* Resp. to Statement 25.

30. Until the late 19th and 20th centuries there were no publicly owned and operated passenger trains, electric- or gasoline- powered buses, parking lots, elevated lines, subways, or any of the other infrastructure, technology, and machinery that comprise modern mass transit systems. *See* Salzmann Report, Ex. 1, at 15–37.

**Plaintiffs' Response to No. 30:** Dispute. *See* Resp. to Statement 25. Additionally, this statement, like many of the others in this section, relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a legal one. See *Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting Baude & Sachs, *supra*, at 810–11)). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

31. The canals, steamboats, omnibuses, horse-carts, wagons, and coal- and steam- powered engines of the 19th Century used different technology than is used by public transit systems today. *Id*.

**Plaintiffs' Response to No. 31:** Dispute. *See* Resps. to Statements 25, 30.

32. The canals, steamboats, omnibuses, horse-carts, wagons, and coal- and steam- powered engines of the 19th Century served different economic and societal roles than the modern public transit systems of today. *Id*.

**Plaintiffs' Response to No. 32:** Dispute. *See* Resps. to Statements 25, 30.

33. It was not until the late 1800s that technologies and systems anticipating those used by public transit systems today came into wider use, including streetcars, trolleys, cable cars, electricity, internal combustion, and intracity railroads. *Id*.

**Plaintiffs' Response to No. 33:** Dispute. *See* Resps. to Statements 25, 30.

34. "According to 1753 tax records, the entire colony [of Massachusetts] contained just 6 coaches. Massachusetts also had 18 chariots, 339 chaises, and 992 chairs and calashes—the vast majority of which were located in Boston." *Id*. at 11.

**Plaintiffs' Response to No. 34:** Dispute insofar as State Defendants suggest these were publicly-owned coaches. The cited source notes that "carriages were concentrated in the hands of well-to-do residents of seaport cities" and then discusses the 1753 tax records. Salzmann Rep., *supra*, at 11.

35. Travel during the Colonial and Founding eras was expensive, and long-distance travel through stage-coaches and other vehicles was usually used by persons such as bankers, foreign travelers, and merchants. *Id*. at 11–13.

**Plaintiffs' Response to No. 35**: Dispute. Public transportation in the Colonial and Founding eras, including ferries and other forms of transit, was available to all classes of citizens. *See* Resp. to Statement 25.

36. The American cities of the Colonial and Founding eras were small. Philadelphia, one of the largest of them, was home to 2,000 people in 1700, and 62,000 in 1800. *See id*. at 6.

**Plaintiffs' Response to No. 36:** Admit the second sentence. Dispute the first sentence to the extent it extends beyond the second sentence, because the second sentence is the only support given for it.

37. "Popular CCW handgun calibers such as 9mm or .40 S&W can easily penetrate glass vehicle windows and sheet aluminum, plastic seats and seat cushioning / foam (common public transit vehicle component materials)." Expert Report of James E. Yurgealitis ("Yurgealitis Report"), Ex. 13, at 3.

**Plaintiffs' Response to No. 37:** Dispute. It is unclear what relevance the penetration ability of popular handgun calibers have to the *Bruen* analysis. If anything, the "popular[ity]" of these calibers suggests that their broad use is protected. *Heller*, 554 U.S. at 629.

38. In 1789, prior to the establishment of the system created by the new Constitution, the public governmental facilities of the Confederation Congress (including the Confederation Congress itself, the Department of the Treasury, the Department of War, and the Department of Foreign Affairs) were each staffed by a "door-keeper," several of whom also doubled as messengers—no personnel to provide security of these government facilities existed beyond the doorkeepers assigned to certain Departments. See Ex. 26, "Schedule I: Estimate of the Expenditure for the Civil List of the United States for the year 1789, 19 September 1789," Founders Online, National Archives, https://founders.archives.gov/documents/Hamilton/01-05-02-0162- 0002. [Original source: The Papers of Alexander Hamilton, vol. 5, June 1788 – November 1789, ed. Harold C. Syrett. New York: Columbia University Press, 1962, pp. 381–388.] (summarizing final civil list expenditures of Confederation Congress).

**Plaintiffs' Response to No. 38:** Admit insofar as that source reveals that each of the Departments was staffed by a door-keeper. Disputed insofar as the State contends that the source stands for the proposition that door-keepers were the *only* security personnel in these locations.

> 39. Besides the House of Representatives, which appointed a "sergeant-at-arms," during the early years of the Republic, the other organs of the executive and legislative branches of the new government established by the Constitution had no personnel responsible for security apart from clerks, door-keepers, and office-keepers. *See, e.g., id*. (summarizing initial civil list of government established by Constitution in 1789); Ex. 27, "Enclosure: Schedule I, [9 January 1790]," Founders Online, National   Archives, https://founders.archives.gov/documents/Hamilton/01-06-02-0076-0002-0010. [Original source: The Papers of Alexander Hamilton, vol. 6, December 1789 – August 1790, ed. Harold C. Syrett. New York: Columbia University Press, 1962, pp. 129–136.] (summarizing civil list of 1790); Ex. 28, "Report on the Estimate of Expenditures for 1792, 4 November 1791," Founders Online, National Archives, https://founders.archives.gov/documents/Hamilton/01-09-02-0326. [Original source: The Papers of Alexander Hamilton, vol. 9, August 1791 – December 1791, ed. Harold C. Syrett. New York: Columbia University Press, 1965, pp. 456–475.] (summarizing civil list of 1792).

**Plaintiffs' Response to No. 39:** Disputed insofar as the State contends that the sources stand for the proposition that door-keepers were the *only* security personnel in these locations. Due to the lack of comprehensive security at these places, people were typically permitted to carry firearms: members of Congress were well-armed in the 19th century and occasionally brandished their arms within the Capitol. Joanne B. Freeman, *When Congress Was Armed and Dangerous*, N.Y. TIMES (Jan. 11, 2011), https://nyti.ms/43oDmqk.

> 40. Prior to 1827 the Capitol Building was guarded by a "lone watchman, John Golding." See Ex. 29, United States Capitol Police, Our History (Jan. 24, 2024), available at https://www.uscp.gov/the-department/our-history.

**Plaintiffs' Response to No. 40:** Dispute. *See* Resps. to Statements 38, 39.

> 41. During the period in which Charles Dickens visited in the White House, in 1842, it was possible to enter the White House and approach the office of the President without encountering security beyond that which could be provided by clerks, a "master of ceremonies," and/or other visitors. Ex. 30, CHARLES DICKENS: AMERICAN NOTES 702–04 (John W. Lovell Company Ed., 1883) (1842).

**Plaintiffs' Response to No. 41:** Dispute. The cited source does not support the claim that the types of security mentioned by Dickens were the only ones available. In fact, guards were posted at the White House "gates and front doors and the White House grounds were patrolled by a day guard and [] night watchmen" since the beginning of the White House's operation, which was before 1842. Joel D. Treese, *Secret Service and the Presidents*, WHITE HOUSE HIST. ASS'N (Oct. 20, 2015), https://bit.ly/3IyysgS.

42. During the Civil War a force of several policemen was assigned to protect the White House for the first time. Ex. 31, PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, Appendix 7 at 508–09 (1964), available at https://www.archives.gov/research/jfk/warren-commission-report/appendix7.html.

**Plaintiffs' Response to No. 42:** Dispute. *See* Resp. to Statement 41.

43. More comprehensive protection (in the form of an expanded, 27-person police force and protection by the Treasury Department's Secret Service) would not be provided to the White House until the mid-1890s. *Id*.

**Plaintiffs' Response to No. 43:** Admit that an expanded police force and protection by the Treasury Department's Secret Service was provided to the White House in the mid-1890s.

44. CTA facilities and riders are protected by hundreds of CTA security guards, more than 33,000 security cameras, and patrols by personnel from the Chicago Police Department, as well as the police departments of other municipalities served by the CTA. Ex. 32, Security, CTA (Jan. 24, 2024) at 2, available at https://www.transitchicago.com/security/.

**Plaintiffs' Response to No. 44**: Dispute the claim that CTA facilities and riders are "protected." Security guards, patrols, and most certainly security cameras will be of little help in the critically small amount of time during which people are attacked. Moreover, such protections are not available everywhere people might go on or in public transportation. The CTA serves 35 suburbs in addition to the city of Chicago. *See Facts at a Glance*, CHI. TRANSIT AUTH., https://bit.ly/3x9raxv (last visited Mar. 20, 2024). It has 1,868 buses that operate 127 routes covering 1,514 miles and stopping at 10,633 bus stops. *Id*. The CTA also has 1,480 rail cars that make about 1,888 trips each day between the 145 stations. *Id*. Given the sprawling nature of the CTA, even the presence of "hundreds" of guards would be woefully inadequate to protect citizens and does not come close to approaching comprehensive security.

Moreover, "[w]hereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders," transportation stops may be comparatively "remote" and "the intervention of society on [individuals'] behalf may be too late to prevent injury." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. 2017) (internal quotation marks omitted). Attacks on the CTA frequently happen before security guards or patrols can intervene. In one case, an attacker moved from one victim to assault another when he couldn't be stopped by an armed citizen. Suzanne Le Mignot, *Crisis Responder Says He Witnessed Suspect Attack Three People on CTA*, CBS NEWS (Dec. 21, 2023), https://cbsn.ws/3IJeNuJ. Attacks can happen frequently on a single line, and police are still unable to protect citizens. Stephanie Wade, *CTA Riders Express Concerns After Several Passengers Beaten, Robbed on Red Line Trains Recently*, ABC7 CHI. (Apr. 9, 2023), https://abc7.ws/3x2gKjk.

45. Metra maintains a force of "more than 140 sworn officers and civilian support staff who are responsible for the security of Metra passengers, employees, equipment, yards, stations and other Metra property." Ex. 33, Metra Police Department, Metra (Jan. 24, 2024), available at https://metra.com/metra-police-department.

**Plaintiffs' Response to No. 45**: Dispute, insofar as the State suggests these officers and civil staff are sufficient to protect individuals riding public transportation. *See* Resp. to Statement 44. The Metra system is comprised of 11 separate lines radiating out from Chicago's Loop and serves more than 100 communities at 242 rail stations. *See Ridership Data*, Metra, https://bit.ly/3TqV8EH (last visited Mar. 20, 2024). There are 855 trailer and cab coaches, and 186 electric cars. *Id*. Six hundred and ninety-two trains are scheduled every weekday, and 454 every weekend. *Id*. Even a force of more than 140 officers is woefully inadequate to protect citizens and does not come close to approaching comprehensive security.

46. Metrolink, serving Illinoisans in the St. Louis area, is policed by more than 40 officers from St. Louis County and St. Clair County. Ex. 34, Special Operations, St. Louis County Police (Jan. 19, 2024) at 2, available at https://stlouiscountypolice.com/who-we-are/divisions- bureaus/division-of-special-operations/.

**Plaintiffs' Response to No. 46:** Dispute, insofar as the State suggests these officers and civil staff are sufficient to protect individuals riding public transportation. *See* Resps. to Statements 44, 45. Metrolink has 11 stations in Illinois. *See System Profile: Statistics and Information from Fiscal Year 2023*, Metro St. Louis, https://bit.ly/3TsW7EJ (last visited Mar. 20, 2024). Thus, even 40 officers (some of whom presumably are in the St. Louis Metrolink locations) is inadequate to protect citizens and does not come close to approaching comprehensive security. MetroLink is also no stranger to violent, armed attacks against defenseless, unarmed citizens. *See* Kevin S. Held, *Two people wanted for MetroLink crimes*, Fox2Now (Dec. 24, 2023), https://bit.ly/3x3S7Tu.

47. Blackstone defines "Affrays (from affraier, to terrify)" as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects." Ex. 35, William Blackstone, 4 Commentaries 145 (Sharswood Ed., J.B Lippincott Company 1893) (1769).

**Plaintiffs' Response to No. 47:** Blackstone speaks for itself and its text is the best evidence of its contents.

48. All Chicago public schools, and at least 199 non-public schools, distribute fare cards, known as Ventra cards, to enrolled students. Ex. 36, CTA Student Ventra Card Distribution Schools.

**Plaintiffs' Response to No. 48:** Admit.

49. CTA has published materials encouraging elementary and high school students to use CTA public transit infrastructure to ride to and from school, to work, and for shopping, food, events, libraries, parks, and more. Ex. 37, Info for Elementary & High School Students, available at https://www.transitchicago.com/for-students/ (Jan. 27, 2024).

**Plaintiffs' Response to No. 49:** Admit.

50. CTA has made students eligible for a student reduced fare for CTA services. Ex. 38, Student Reduced Fare, available at https://www.transitchicago.com/students/ (Jan. 27, 2024).

**Plaintiffs' Response to No. 50:** Admit.

51. In 1328 the Statute of Northampton was enacted, forbidding going or riding "armed by night []or by day, in fairs, markets" Ex. 39, Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.).

**Plaintiffs' Response to No. 51:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents.

52. In 1786 Virginia enacted a law forbidding persons from going or riding armed "by night []or day, in fairs or markets." Ex. 40, 1786 Va. Acts 35, Ch. 49; see also Ex. 20, 1786 Va. Acts 33, ch.21.

**Plaintiffs' Response to No. 52:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents. Indeed, the State selectively quotes it, removing the terror element: "nor go nor ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the Country*," 1786 Va. Acts 33, ch. 21 (emphasis added).

53. In 1792 there was in force in North Carolina a law forbidding person from going or riding armed "by night []or day, in fairs, markets." Ex. 41, Francois Xavier Martin, Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60-61, ch. 3 (F. Martin Ed. 1792) (North Carolina Statute), excerpt available at https://firearmslaw.duke.edu/laws/francois-xavier-martin-a-collection-of-statutes-of-the-parliament-of-england-in-force-in-the-state-of-north-carolina-60-61-newbern-1792.

**Plaintiffs' Response to No. 53:** Dispute. There is no evidence that this putative "law" was ever passed by the North Carolina legislature. As the references to the King in the statute indicates, it is merely a copy of the 14th Century Statute of Northampton. It appears in a 1792 publication drafted by a private lawyer who was merely surmising what British laws remained in force in North Carolina. "Later compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws that were never in force. Stephen P. Halbrook, Faux Histoire *of the Right to Bear Arms:* Young v. Hawaii (9th Cir. 2021) at 21, SSRN (Aug. 10, 2021), https://bit.ly/3QyFZA5 (citing "Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855)). The author also conceded in the preface that this work was neither edited by others nor approved by the legislature: "no act of Assembly afforded it, and . . . many, even among the most respectable, professors of the law disagree in regard to the applicability of a number of British statutes . . . ." FRANÇOIS-XAVIER MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA at iii (Newbern, The Editor's Press 1792).

Indeed, when the North Carolina General Assembly passed an Act to enact English Statutes in 1749, it omitted the Statute of Northampton. *See* A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA 293, 295 (Newbern, James Davis 1752). Moreover, James Iredell (who later became a Supreme Court Justice) was commissioned by the North Carolina General Assembly to revise and compile all laws that remained in force in the state following the Declaration of Independence. *See* JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton, Hodge & Wills 1791). He too did not include the Statute of Northampton. *See id.* To the extent the statute

was *ever* in effect in North Carolina, it ceased to have any force as of January 1838. *See Huntley*, 25 N.C. at 420 (emphasizing the terror element implicit in the Statute of Northampton, even though the Court doubted it was ever adopted). Without the North Carolina law, State Defendants are utterly bereft of any Founding-era statute barring carry in places at all analogous to parks without a terror element.

> 54. In the years after the Civil War Tennessee enacted a law providing that "it shall not be lawful for any person to publicly or privately carry a dirk, sword, cane, Spanish stiletto, belt or pocket pistol or revolver." Ex. 42, 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Pace and Prevent Homicide, Ch. 13, Section 1,available at https://firearmslaw.duke.edu/laws/1869-1870-tenn-pub-acts-2d-sess-an-act-to-preserve-the-peace-and-prevent-homicide-ch 13-c2a7-1.

**Plaintiffs' Response to No. 54:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents. Moreover, as *Bruen* noted, this law was only held constitutional because it still permitted a form of carry: "when the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would 'violat[e] the constitutional right to keep arms.'" 597 U.S. at 54 (quoting *Andrews*, 50 Tenn. at 187) (citation omitted).

> 55. In 1870 Texas enacted a statute barring firearms at numerous types of locations, including "any . . . public assembly." Ex. 43, 1870 Tex. Gen. Laws 63, ch. 46, available at https://firearmslaw.duke.edu/laws/1870-tex-gen-laws-63-an-act-regulating-the-right-to-keep- and-bear-arms-chap-46-c2a7-1#:~:text=1870%20Tex.,Gen.,46%2C%20%C2%A7%201.

**Plaintiffs' Response to No. 55:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents. Moreover, this statute comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted). As Plaintiffs show in their Brief in Opposition, this statute and others like it were *inconsistent* with the Founding era tradition of not prohibiting, and sometimes requiring, carry in places of public assembly. Finally, *Bruen* dismissed this same law from postbellum Texas as an outlier and refused to give it weight. *See id*. at 64–65.

> 56. In 1883 Missouri barred the carry of firearms at numerous types of locations, including "any . . . public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state." Ex. 44, 1883 Mo. Sess. Laws 76, excerpt available at https://firearmslaw.duke.edu/laws/1883-mo-laws-76-an-act-to-amend-section-1274- article-2-chapter-24-of-the-revised-statutes-of-missouri-entitled-of-crimes-and-criminal- procedure-c2a7-1#:~:text=1883%20Mo.-,Laws%2076%2C%20An%20Act%20To%20Amend%20Section%201274%2C%20Article%202,Criminal%20Procedure%2C%E2%80%9D%20%C2%A7%201.&text=Category%3A,Irresponsi ble%2C%20Sensitive%20Places%20and%20Times.

**Plaintiffs' Response to No. 56:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents. Moreover, this statute comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted). As Plaintiffs show in their Brief in Opposition, this statute and others like it were *inconsistent* with the Founding era tradition of not prohibiting, and sometimes requiring, carry in places of public assembly.

> 57. In 1889 Arizona enacted a statute providing for penalties for most persons who "shall carry on or about his person, saddle, or in his saddlebags, any pistol," or who carry a pistol into any place where people are assembled. Ex. 45, 1889 Ariz. Sess. Laws 16-18, available at https://firearmslaw.duke.edu/laws/act-of-mar-18-1889-1889-ariz-sess-laws-16-17.

**Plaintiffs' Response to No. 57:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents. Additionally, this statute comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted). As Plaintiffs show in their Brief in Opposition, this statute and others like it were *inconsistent* with the Founding era tradition of not prohibiting, and sometimes requiring, carry in places of public assembly. Moreover, *Bruen* discounted historical evidence from territories for multiple reasons, including that they were too short-lived, covered miniscule populations, and were rarely subject to judicial scrutiny. *See id.* at 67–69.

*Bruen* also notes that the "Arizona law … exempted those who have 'reasonable ground for fearing an unlawful attack upon his person.' 1889 Ariz. Terr. Sess. Laws no. 13, § 2, p. 17." *Id.* at 66 & n.29.

> 58. In 1890 Oklahoma enacted a statute barring most persons from carrying concealed pistols and revolvers. Ex. 46, 1890 Okla. Terr. Stats., Art. 47, § 7, excerpts available at https://firearmslaw.duke.edu/laws/1890-okla-laws-495-art-47.

**Plaintiffs' Response to No. 58:** This is not a "fact" but rather a statement of the law. The law speaks for itself and its text is the best evidence of its contents. Additionally, this statute comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted). As Plaintiffs show in their Brief in Opposition, this statute and others like it were *inconsistent* with the Founding era tradition of not prohibiting, and sometimes requiring, carry in places of public assembly. Moreover, *Bruen* discounted historical evidence from territories for multiple reasons, including that they were too short-lived, covered miniscule populations, and were rarely subject to judicial scrutiny. *See id.* at 67–69.

> 59. "[R]ecords are no longer extant for most historical transportation service providers." Rivas Report, Ex. 11, at 28–29.

**Plaintiffs' Response to No. 59:** Plaintiffs lack knowledge and on that basis, do not dispute at this time.

34

60. In 1875, the North Pennsylvania Railroad Company required its conductors to "see that … passengers do not take into the cars guns, dogs, valises, large bundles or baskets," barring all firearms from their train cars. Ex. 47, Josh Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L. J. (forthcoming in 2024) (manuscript at 17).

**Plaintiffs' Response to No. 60:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

61. North Pennsylvania served Philadelphia and its surrounding counties, then (as now) one of the nation's largest and most populous metropolitan areas. *Id*.

**Plaintiffs' Response to No. 61:** Admit.

62. In 1882, the Central Pacific railroad issued rules providing that only guns "in cases and not loaded . . . may be carried in day or sleeping cars without charge." *Id*. at 18.

**Plaintiffs' Response to No. 62:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

63. Central Pacific rules also banned firearms from baggage—"[g]uns . . . are not baggage, and must not, under any circumstances, be checked." *Id*. at 23.

**Plaintiffs' Response to No. 63:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

64. In the 1880 census Central Pacific was recorded as carrying the fourth highest number of passengers over the third-most aggregate miles among American railroads. *Id*. at 18.

**Plaintiffs' Response to No. 64:** Plaintiffs lack knowledge and on that basis, do not dispute at this time.

65. In 1884, the Union Pacific railroad issued rules providing that "Guns in cases may be carried by passengers in the coaches without charge, or they will be checked free by

baggage- agents as part of the usual baggage allowance. Guns uncased will be carried in baggage car only." *Id*. at 18.

**Plaintiffs' Response to No. 65:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

66. Updated rules in 1898 "mirrored this language." *Id*.

**Plaintiffs' Response to No. 66:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

67. By 1886, the International & Great Northern Railroad, an important regional railroad in the Southwest, had a practice of restricting passengers from carrying firearms on trains, but did allow them to check their firearms into baggage. *Id*. at 19.

**Plaintiffs' Response to No. 67:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

68. By 1900 at the latest, the Albany Railroad, which operated a passenger trolley service, had implemented rules that were held to ban passengers from riding with firearms. *Id*. at 19–20.

**Plaintiffs' Response to No. 68:** Admit, noting that the internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks only to duly enacted regulations by governments. *See, e.g.*, *Bruen*, 597 U.S. at 46–49 (analyzing Colonial and Founding era laws). Even if private regulations were probative, this one comes too late to be probative under *Bruen* because it is not rooted in the Founding era, when "the people adopted" the Second Amendment. *Id*. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis omitted).

69. By 1860 there were 246 colleges in the United States. Ex. 47, Josh Hochman, The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation, 133 YALE L. J. (forthcoming in 2024) (manuscript at 35).

**Plaintiffs' Response to No. 69:** Admit.

70. Pursuant to the standing orders of this Court, a copy of *Frey v. Nigrelli*, an unpublished case available through Lexis, is attached to this filing as Exhibit 48. 2023 U.S. Dist. LEXIS 42067 (S.D.N.Y. March 13, 2023).

**Plaintiffs' Response to No. 70:** Admit.

71. Pursuant to the standing orders of this Court, a copy of *Kipke v. Moore*, a case that is expected to be published but has not yet been published and is available through Lexis, is attached to this filing as Exhibit 49. 2023 U.S. Dist. LEXIS 174934 (D. Md. Sept. 29, 2023).

**Plaintiffs' Response to No. 71:** Admit.

Dated:  March 25, 2024

Respectfully submitted,
/s/ David G. Sigale
Attorney for Plaintiffs

David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ David G. Sigale_____

*Attorney for Plaintiffs*


David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiff*