# ATTACHMENT 1-
Additional Sources Cited In Response to Defendants' Statements of Material Fact

Exh. "A"

## TABLE OF CONTENTS

| Exhibit | Citation | Fact Response # |
|---|---|---|
| A. | *Concealed Carry License*, ILL. STATE POLICE, https://bit.ly/3vhj6KM | 60 |
| B. | Ron Vineyard, *Stage Waggons and Coaches* at 4, COLONIAL WILLIAMSBURG FOUND. (2002), https://bit.ly/3RH6l4D | 65 |
| C. | G.A. THRUPP, THE HISTORY OF COACHES 124 (London, Kerby & Endean 1877), https://bit.ly/41k1Wrg | 65 |
| D. | Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q. J. OF N.Y. STATE HIST. ASS'N 231, 232–33 (1931) | 65 |
| E. | NICHOLAS J. JOHNSON ET AL., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) | 65 |
| F. | 1 STATUTES AT LARGE OF VIRGINIA 152 (Samuel Shepherd ed., 1835) | 65 |
| G. | 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (David J. McCord ed., 1841) | 65 |
| H. | Act for Regulating Ferries of 1797, ch. 42, *in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETS 74–76 (1896) | 65 |
| I. | Act for Regulating Ferries of 1791, *in* ACTS AND LAWS OF CONNECTICUT 405–06 (1791) | 65 |
| J. | DIGEST OF THE LAWS OF GEORGIA 283–84 (Robert & George Watkins eds., 1800) | 65 |
| K. | *Tuesday Paper* at 4, AM. DAILY ADVERTISER (Sept. 16, 1794) | 65 |
| L. | Charles Christopher Crittenden, *Ships and Shipping in North Carolina, 1763–1789* at 10–13, *in* 8 THE NORTH CAROLINA HISTORICAL REVIEW (Jan. 1931) | 65 |
| M. | *Thursday Paper* at 4, THE PA. GAZETTE (Apr. 30, 1761) | 65 |
| N. | *Tuesday Paper* at 3, SOUTH-CAROLINA GAZETTE; AND COUNTRY J. (Nov. 22, 1768) | 65 |

| | | |
|---|---|---|
| O. | *Saturday Paper* at 4, INDEP. GAZETTEER (Aug. 31, 1782) | 65 |
| P. | *Wednesday Paper* at 4, POUGHKEEPSIE J. (Apr. 18, 1787) | 65 |
| Q. | GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 153 (Williamsburg, William Parks 1736) | 65 |
| R. | *Monday Paper* at 3, AURORA GEN. ADVERTISER (Dec. 2, 1793) | 65 |
| S. | Ron Rosenbaum, *The Shocking Savagery of America's Early History*, SMITHSONIAN MAG. (Mar. 2013), https://bit.ly/49UxCXQ | 73 |
| T. | Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 at 108 (2019) (Ph.D. dissertation, Texas Christian University), https://bit.ly/3TJKJ8I | 88 |
| U. | 1801 TENN. LAWS 260–61, § 6, https://bit.ly/3vmFlz2 | 88 |
| V. | 1837 ARK. REV. STAT. 280 | 88 |
| W. | Joanne B. Freeman, *When Congress Was Armed and Dangerous*, N.Y. TIMES (Jan. 11, 2011), https://nyti.ms/43oDmqk | 39 |
| X. | Joel D. Treese, *Secret Service and the Presidents*, WHITE HOUSE HIST. ASS'N (Oct. 20, 2015), https://bit.ly/3IyysgS | 41 |
| Y. | *Facts at a Glance*, CHI. TRANSIT AUTH., https://bit.ly/3x9raxv (last visited Mar. 20, 2024) | 44 |
| Z. | *Attack Three People on CTA*, CBS NEWS (Dec. 21, 2023), https://cbsn.ws/3IJeNuJ | 44 |
| AA. | Stephanie Wade, *CTA Riders Express Concerns After Several Passengers Beaten, Robbed on Red Line Trains Recently*, ABC7 CHI. (Apr. 9, 2023), https://abc7.ws/3x2gKjk | 44 |
| BB. | *Ridership Data*, METRA, https://bit.ly/3TqV8EH (last visited Mar. 20, 2024) | 45 |
| CC. | *System Profile: Statistics and Information from Fiscal Year 2023*, METRO ST. LOUIS, https://bit.ly/3TsW7EJ (last visited Mar. 20, 2024) | 46 |

| DD. | Kevin S. Held, *Two people wanted for MetroLink crimes*, FOX2NOW (Dec. 24, 2023), https://bit.ly/3x3S7Tu | 46 |
|---|---|---|
| EE. | A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA 293, 295 (Newbern, James Davis 1752) | 53 |
| FF. | JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton, Hodge & Wills 1791) | 53 |

# EXHIBIT A

isp.illinois.gov /Foid/Ccl

# Concealed Carry License

---

- FIREARMS SERVICES
- CONCEAL CARRY LICENSE
- INSTRUCTOR INFORMATION
- FAQs
- CCL REVOKED
- LIVESCAN

On July 9, 2013, Public Act 98-63, the Firearm Concealed Carry Act became state law (430 ILCS 66). This law requires an Illinois Concealed Carry License to carry a concealed firearm in Illinois.

**Please Note:** If you possess a Medical Marijuana License, are a caregiver pursuant to the Compassionate Use of Medical Cannabis Pilot Program Act, and/or otherwise use cannabis consistent with Illinois law, your FOID card or CCL will not be revoked nor will your application(s) denied. Medical Marijuana Licenses are state-issued and cannot result in the denial of any right or privilege. However, under Federal law, you are subject to restrictions that prohibit you from acquiring or possessing firearms and firearms ammunition. These restrictions are pursuant to the Gun Control Act of 1968, specifically 18 U.S.C. §922 and remain in effect until the revocation or relinquishment of your medical cannabis card or until one year after you last used cannabis, whichever is later.

Need to send us your new training certificate because YOUR CCL INSTRUCTOR HAD HIS OR HER CERTIFICATION REVOKED? Please send it to: isp.ccw.illinois@illinois.gov.

APPLY FOR A CCL

Apply

- Am I eligible?

- Checklist prior to applying

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 7 of 223 PageID #:3884

- Find an authorized firearms instructorOpens in new window

CHECK APPLICATION STATUS

Sign in

# EXHIBIT B

research.colonialwilliamsburg.org /DigitalLibrary/view/index.cfm

# Colonial Williamsburg Digital Library

## Stage Waggons and Coaches**Stage Waggons and Coachees**

Ron Vineyard

August 2000

Colonial Williamsburg Foundation Library Research Report Series - RR0380

Colonial Williamsburg Foundation Library

Williamsburg, Virginia

August, 2002

## STAGE WAGGONS AND COACHEES

Ron Vineyard

Colonial Williamsburg Foundation

Williamsburg, Virginia

August 2000

| Number | Page |
|---|---|
| 1 English Road Waggon | 10 |
| 2 Early American Stage Waggon | 13 |
| 3 Sketch of Stage Waggon by Pavel Svinin | 17 |
| 4 Sketch of Stage Waggon for Colonial Williamsburg | 18 |
| 5 Reproduction Stage Waggon | 19 |
| 6 Stage Waggon, ca. 1810 | 20 |
| 7 Floating Bridge across the Schuylkill | 25 |
| 8 Oval-bodied Stagecoach, ca. 1820 | 38 |
| 9 American Stagecoach, ca. 1830. | 41 |
| 10 Coachee at the Smithsonian Institution | 53 |
| 11 Wilkinson Coachee. Date Unknown | 57 |
| 12 Wilkinson Coachee, ca. 1985 | 58 |
| 13 Right Side of Wilkinson Coachee | 59 |

Page

StageWaggon

Introduction

| General | 1 |
|---|---|
| Early Travel | 3 |
| Early Stage Waggons | 9 |
| Later Stage Waggons | 13 |
| Stage Travel | 22 |
| Stage Drivers | 27 |
| Travel Perils | 31 |

| | |
|---|---|
| Stagecoaches | 38 |
| Operating costs | 43 |
| Coachee | 47 |
| General | 50 |
| Definitions | 57 |
| Wilkinson Coachee | 64 |
| Coachees in Virginia | 67 |
| Notes | 64 |
| Index | 67 |

## INTRODUCTION

This report traces development of stage travel from the early road wagon in England to the American Stage Coach of the nineteenth century. The Stage Wagon of the late eighteenth and early nineteenth centuries was very similar, if not identical, to the Coachee of the same period. Both of these two styles, therefore, are included in this report. Additionally, these two styles, the Stage Waggon and Coachee are considered by most to be among the first American carriage styles developed by American artisans. Later styles such as the Stage Coach and Buggy, better known by most today, appear to have been derived from these early vehicles. Improvements in the Stage Wagon led to development of the American Stage Coach, and refinement of the Coachee style led to development of various styles including the American Buggy.

Included in this document are descriptions of the Stage Wagon and Coachee, observations by travelers concerning both vehicle and drivers and details of operating a stage line in the late eighteenth century. This information has been drawn from a variety of sources, including the works of Paul Downing contained in articles for *The Carriage Journal*, Don Berkebile in his *Dictionary of Carriage Terminology*, and Laszlo Tarr in his *History of the Carriage*. An additional source, which proved invaluable, was *Stagecoach East* written by Oliver W. Holmes and Peter Rohrbach. Also, various eighteenth and nineteenth century county records, account books, and the Woolfolk Family Papers in the collections of the Swem Library at The College of William of Mary provided interesting and valuable data.

ii

The purpose of this document is to collect and present relevant information on these two important vehicle styles, the Stage Wagon and the Coachee, in order to better understand their development and importance to our country in its formative years. It is hoped the information contained in this report will aid in providing accurate, in-depth interpretation of these vehicles at Colonial Williamsburg.

1

## STAGE WAGGONS

**General**

The term, Stage, as associated with Stagecoaches and Stage Waggons is believed derived from the fact that vehicles used for public transportation accomplished their journeys in stages, after each of which the horses, and perhaps the vehicle itself, were changed. During the early eighteenth century, the terms, Stagecoach and Stage Waggon, were commonly used in an indiscriminate and synonymous manner. The term, Stage Waggon appears to have been the preferred usage during the later decades of the eighteenth century; with the term, Stagecoach, returning to common with development of the Concord and Troy style coaches of the nineteenth century.

In the American colonies, stagecoach service started in the early eighteenth century with limited routes between several major population centers. There was only a modest amount of staging in the East during the fifty years before the Revolution War, but after that conflict, stage travel experienced rapid growth. The stagecoach network, with its special culture of stagecoach taverns and stagecoach customs, continued to develop through the early nineteenth century, reaching its golden years in the East during the two decades from 1820 to 1840. [1]

In 1785 Congress passed legislation allowing stagecoaches to carry the mail on established stage routes, thereby giving them quasi-public status as an arm of the General Post Office. For the next sixty years the stagecoach was the main carrier of the mail in the United States, and until railroads and the telegraph became common in the 1840s it was the nation's 2 principal communications mode. Contributions by stage lines to the fledging Republic, in its often uncertain early days, were therefore enormous.

Stage lines in the East had a generous policy toward publishers of newspapers, allowing them low rates and free printers' exchanges. This encouraged a healthy and expanding newspaper industry, and thanks in large part to the stages, the American people of the nineteenth century became the largest newspaper-reading population in history up to that point. Again, that contribution to molding the thinking of the Republic's citizens is almost incalculable. [2]

3

**Early Travel**

Travel in colonial days in North America, when not by water or on foot, was chiefly on horseback. Even after carriages of various sorts were introduced, many people continued to prefer horse and saddle for their traveling. In many areas outside the towns, the roads were practically

impassable for carriages during much of the year. Horse and rider, encountering unexpected obstructions, could act with more freedom and therefore move with greater speed and certainly than a vehicle. Also, horseback travel was less expensive—a weighty consideration for ordinary people of limited means. [3]

In Virginia during the eighteenth century, four-wheeled carriages such as the coach and chariot became the fashionable vehicle of the gentry, and two-wheeled carriages such as riding chairs and chaises were commonly owned by gentry and working people alike. However, most people, of the common sort, had no access to traveling vehicles whatsoever. [4]

Carriage ownership for the State of Virginia, as reflected in the Personal Property Tax Records of 1790, was only 3.3 carriages per 1000 population. This figure varied significantly depending upon the many factors associated with the particular area being examined. In the Tidewater area the average was 6.1 carriages per 1000 population. In the Shenandoah Valley and the areas beyond the Allegheny Crest the averages were 0.6 and 0.04 per 1000 population respectively. The counties of Accomack and Northampton on the Eastern Shore of Virginia present an interesting example that is considered an anomaly. In these two counties carriage ownership (primarily two-wheeled carriages) was 13 per 1000 population, more than double the 4 next highest area, the Tidewater area. In general, these figures suggest private carriage ownership in Virginia was quite low during the late eighteenth century. [5]

Stage service began in several areas of the colonies in the early eighteenth century. Hugh Huddy was awarded a patent by the State of New Jersey in 1706 allowing him to establish a stage line between Burlington and Perth Amboy. In the Boston area, stage service was established in 1716 with "*once a fortnight service between the Orange-Tree in Boston to Newport in Rhode-Island* ". [6]

By mid-eighteenth century, stage lines were established connecting New York and Philadelphia with "stage-boats" providing service over the rivers and other bodies of water. Stage lines from Philadelphia, augmented with "stage-boats", offered somewhat limited service as far south as Wilmington, North Carolina in 1761. [7]

On November 3, 1737, the *Pennsylvania Gazette* contained the following advertisement:

"*Notice is hereby given that the Post Office in Philadelphia is now kept at B. Franklin's in Market Street, and that Henry Pratt is appointed riding Post Master for all the stages between Philadelphia and Newpost in Virginia, who sets out about the beginning of each month and returns in 24 days, by whom Gentlemen, Merchants and others, may have their letters, etc., carefully conveyed and business faithfully transacted, he having given good security for the same to the Hon. Col. Spotswood, Post Master General of all his Majesty's Dominions in "America.*"

On April 28, 1738, the *Virginia Gazette* supplemented this notice with a more expanded announcement: 5

> "*Alexander Spotswood, Esq., Sole Deputy Post-Master-General of America, having formed a new regulation for carrying on the several Post Stages with greater expedition and certainty than hitherto, this is to advertise the Publik thereof; and that by this regulation the several Stages will be performed as follows, viz: The Post is to set off from the General Post Office at New Post on Wednesdays, the 26th . Inst. To cross over Potowmack that night, and arrive at Annapolis on the Friday: there he is to make some stop and then proceed to Susquehanna, where he is to arrive on Saturday night; and exchange Mails with the Philadelphia Rider, who is there to meet him; The Monday following he is to return to Annapolis, and arrive at Patowmack on Tuesday night, from whence the Mail is to be brought to New Post on the Wednesday, and the next morning to set out for Williamsburg where he is to arrive on Saturday.*
>
> *...And in order to extend the Post Office Still further to the Southward, Col. Spotswood has been pleased to grant a commission to William Parks, the Printer of this paper to carry on a Stage from Williamsburg to Edenton, in North Carolina, which is to be performed once a month, Summer and Winter. The Stage is already begun, and the Post is to set out again from Williamsburg on Monday the 8th of May, to go over Hog Island Ferry: from thence to Nansemond court House; thence to Norfolk Town; and from thence to Edenton...* "

On June 22, 1739 an advertisement announced continuation of the southern stage routes from Edenton to Charles-Town in South Carolina by way of Cape Fear. With this extension, there was:

> "*Now a communication..., by post, all the way from Piscataway and Boston in New England, through the principal towns and places in New York, Pennsylvania, Maryland, Virginia and North Carolina to Charles-Town in South Carolina, and from thence there are frequent opportunities to Georgia.* "[(8)]

However, a letter from George Washington to Sir Edward Newenham, dated March 20, 1785 stated:

> "*From the Southern parts of this State (Virginia), say from Norfolk, thro' Hampton, Richmond, Fredericksburg, and Alexandria which is within a few miles of this place (Mount Vernon), there is a regular Stage which passes thrice every week, it is neither of the best or worst kind. From Alexandria thro' the Metropolis of every State, Annapolis in Maryland 6 excepted, which is a little to the right of the Post Road which goes thro' Baltimore. There is also a regular Stage to Portsmouth in New Hampshire, they are of a similar kind, and pass as often as those first mentioned; so that not more than three intervening days can happen between one Stage day and another. A person may therefore, at any time between the first of April and first of December, travel from Richmond (the metropolis of this State) to Boston, in ten or twelve days; and return in the same time. Between this State and Charleston, South Carolina no*

*Stages are as yet established, and the country for the most part being poor and thinly inhabited, accommodations of every kind, I am told are bad. So much for public convenience; and I do not think I should deceive you much, was I to add that Sir Edwd. Newenham would find no difficulty to be accommodated, in this and some other States, with horses and carriages of private gentlemen, from place to place where inclination or business might induce him to go.*"

In 1784 the General Assembly of Virginia granted Nathaniel Twining the exclusive privilege of operating a stage line between Alexandria and Richmond. The act also allowed Twining to charge passengers "*five pence per mile, and five pence per mile for every one hundred and fifty pounds weight of baggage*". Later that year the General Assembly granted John Hoomes the exclusive privilege of operating a stage line between Richmond, Petersburg, Hampton, Norfolk, and Portsmouth. Again the fares were set the same as for Nathaniel Twining. [9]

John Hoomes was granted exclusive rights to the Alexandria to Fredericksburg and the Fredericksburg, Richmond and Hampton routes by the General Assembly in 1787. The set fares for these routes were "*three pence, three farthings per mile for both passengers and 150 pounds of baggage*". Also that year, Richard Towns and John Woolfolk were awarded exclusive rights to the Richmond and Petersburg, and the Petersburg and Portsmouth routes. Rates were the 7 same as specified for John Hoomes for his routes from Alexandria, Fredericksburg, Richmond and Hampton. [10]

The Richmond to Petersburg route, formerly granted to Richard Towns and John Woolfolk, was awarded to William Pennock in 1789. The fare was established as three pence per mile. That same year Joseph Wilsey of North Carolina, James Rosekrans of New York, and Robert Twiford of Accomack were granted exclusive privilege of running a stage waggon from Northammpton court House to the line of Maryland. These same men were awarded the right to establish one or more "packet boats" for the purpose of conveying their stage passengers across the Chesapeake Bay from the Eastern Shore to the towns of Norfolk and Portsmouth. Rates for the packet boat trips were established at fifteen shillings per passenger and fifteen shillings for each horse. [11]

Early stage travel in New England is described by Allan Forbes and Ralph M. Eastman in their *Taverns and Stagecoaches of New England* written in 1954. They wrote that in the Boston area:

"*...the first stagecoach line, operating on a regular schedule, seems to have been the one established by Bartholomew Stayers, with headquarters at the Sign of the Lighthouse in the North End of Boston, not far from Old North Church. The rout was between Boston and Portsmouth, New Hampshire and the year was 1761. The reason given was 'for the encouragement of trade between the two places.' The first vehicle used was what Stayers described as `a large stage chair' drawn by two horses and guaranteed to seat four passengers. In less than six weeks, such was the success of the venture, conveyances to accommodate five people were put into use. In May of 1763 the `Portsmouth flying Stagecoach' was launched, carrying six passengers inside...*

8

*The great increase in travel and business following the peace of 1763 which abolished our French frontier and threw the 'Eastward' open to American settlers, encouraged Stayers to employ a coach-and-four which he boasted was always on time and never lost a passenger or package. When needs demanded, he put six horses to his coach, and so regular was his service that it attracted what the law required should be sent by mail.*

*The Stayers coaches appear to have been built by Adino Paddock of Boston. He and Stayers were loyalists and when the Revolution came both went to England to live.*"

Adino Paddock was one of the premier coach makers in Boston. A native of Boston, he began his business as a "Chaisemaker" in a shop near the Common in 1758. Paddock's business was extensive. He made carriages and sleighs of all kinds, he performed work for other Boston chaisemakers whose establishments were not large enough to undertake all operations, and he kept his sizable force of tradesmen busy building vehicles for a variety of customers up and down the New England coast.

Born into a solid yeoman family from Harwich, he came to Boston with his widowed mother about 1736 and was bound out as an apprentice to learn the trade of chaisemaking. He became senior warden of St. John's Masonic Grand lodge in 1759, and rose to the same position in the Master's Lodge in 1761. Entering the militia, he soon displayed those talents of leadership and good fellowship so necessary for advancement in rank. Profiting by instruction from the British officers at Castle William, he developed the skills necessary for promotion. He held the rank of major in 1771, and by 1775 he had been promoted to Colonel and placed in charge of the colony's artillery.

9

Always a tireless and willing worker for the community, Adino Paddock was chosen fire-warden annually for ten years. In 1769 he was placed with such local worthies as John Scollay, John Rowe, John Hancock, Samuel Adams, Thomas Dawes, and William Cooper on the important Boston Committee on the State of Public Affairs. By 1772 he is referred to as "Esquire" in city and county records. However, stigmatized as a

Tory, he departed Boston with General Howe for Halifax and his property, valued at £3,151, was confiscated. [12]

**Early Stage Waggons**

Early Stage Waggons were a very primitive type of public traveling carriage used in England and America during the eighteenth and early nineteenth centuries. The earliest form of the Stage Waggon in the Colonies was nothing more than an ordinary covered road waggon with several transverse benches inside. The benches had no backs or padding and the bodies were set directly on the running gear without benefit of springs or thoroughbraces, so that riding was most uncomfortable. Likewise, in England the Stage Waggon presented a rather depressing picture at the beginning of the eighteenth century. It was generally a clumsy, quadrangular structure, carrying a number of passengers huddled together on its wooden benches. These older vehicles used as stages in England were little different from the ordinary carriers' or road waggons. [13]

Others described the early Stage Waggon as a "*lumbering passenger and freight waggon, its bow-like canvas cover supported on hoops or tilts*". Although mainly for boxes, barrels and packages, a number of passengers crouched between items of merchandise. There were neither



springs nor brakes and many found it more comfortable to walk part of the journey on foot. On 10 Illustration 1. English road wagon by Thomas Rowlandson, ca. 1795 English Stage Waggons wheels were well-dished with broad treads, helping to level out the ruts for other traffic. A team of eight or more heavy horses was controlled by a waggoner who walked or rode on a separate horse beside the waggon. [14]

An advertisement from *The Boston Newsletter*, September 4, 1721. Carried the following:

> "*This to give notice, that Peter Belton at the sign of the Rhode Island and Bristol Carrier in Newbury Street at the South end of Boston has a Road Waggon for carrying goods, men, women and children between Boston, Bristol and Rhode Island once every week; sets out on Thursday next, and so every Tuesday, to return on Saturday; where all persons may be accommodated on reasonable terms; as also with goods, lodging and entertainment for men and horses*."

11

A Road Waggon of the eighteenth century was just that — an ordinary waggon of the period with some fitted out for road travel; these, with the exception of the techniques of manufacture, were structurally little different from the farm waggons. The bodies or beds were unsuspended — that is, they were set directly on the transom or bolsters, as they came later to be called, of their carriages without benefit of springs or even thoroughbraces. Thus, there was little riding comfort on the un-backed wooden benches placed crosswise of the body. These benches were probably removable, should the demand for space for carrying "goods" exceed that for carrying persons. An ad for the northerly route between Trenton and New Brunswick in 1734 stated the Stage Waggon "*will be fitted up with benches, and covered over, so that passengers may sit easy and dry*." [15]

As previously stated, these early Stage Waggons were typically drawn by four or six horses. Sometimes a single leader was used, making a five or seven horse team. These horses were the large, sturdy draft animals, selected for their strength and durability rather than speed and elegance. The pair of horses nearest the front of the wagon was called the "Wheel Horses" or "Wheel Team." The left wheel horse was often called the "near wheel horse" and the right member of that team was called the "off wheel horse". The second pair of horses in a six-horse team was called the "Swing Team", with the left horse called the "near swing horse" and the right horse called the "off swing horse." The lead pair was referred to as the "Lead Horses" or the "Lead Team." Likewise, the left and right horses in this pair were called "near" and "off" respectively. In the case of a single leader, that horse was simply called the "leader." With four-horse teams the pairs were called the wheel horses and the lead horses.

12

Wheel horses were usually the largest and most dependable since they had the responsibility of not only drawing the wagon, but also turning the wagon by moving the pole from side to side, pivoting the front axle assembly. In addition, the wheel horses provided the power for backing the wagon and the only braking action was supplied by these horses as well. Thus, strong animals with well-developed hindquarters were selected for these positions. The lead horse or horses were generally the lightest of the team, the most intelligent, and most highly trained. In England, the wheel horses drew from two pairs of shafts, while in America the wheel horses drew from either side of a central draft pole. In many cases, the driver rode the near wheel horse in the same manner as wagons hauling freight.

Harness for horses used to draw these early Stage Waggons is believed to be much the same style as that used on freight waggons. In October 1808, John Woolfolk purchased three sets of harness for his Petersburg to Portsmouth Stage from James Shiphard at a cost of £10 per set. Three years later in 1811, he bought two additional sets of Stage Wagon harness at a cost of $50 per set.

13

**Later Stage Waggons**

The importance of lightening vehicles and therefore decreasing draft had long been the goal of vehicle makers. American Coachmakers led the way in this effort, and in the later decade of the eighteenth century developed vehicles which were the lightest known in



Illustration 2. Early American Stage Waggon from a plate by Isaac Weld, ca. 1796 proportion to their load carrying capacity. This lightening of construction was logical and greatly encourages by increased travel and demand for greater speed over improving roads. 14 Stages being produced were specifically designed for passengers, with the older, heavier waggons relegated to transportation of merchandise and other products. In 1800 the two types were separately listed for toll charges on the Lamberton, New Jersey Ferry, as indicated by the *New Jersey Gazette* for March 18, 1800. Stage Waggons (the newer style) with four horses were charged 2 Shillings, 10 Pence. The old type, referred to as "Common Travelling Waggons", with four horses were charged 2 Shillings, 9 Pence. [16]

Using this new and developing technology, a gradual improvement took place in the construction of the Stage Waggon during the last third of the eighteenth century. The seats were sometimes placed on springs, and eventually, the bodies were suspended on thoroughbraces. Bow-supported cloth tops gave way to permanent standing tops supported by eight slender pillars, leaving the sides open, with rolled curtains that could be let down in inclement weather. Only a few of these Stage Waggons had doors, therefore, passengers had to crawl in, with difficulty, through the open front of the vehicle, over the driver's seat, the latter being under the same roof and on the same level as the passenger seats. The driver often shared his seat with one or two passengers.

Late in the century the body profile began to depart slightly from the straight lines of the wagon body, and became somewhat curved, so as to resemble a Coach body. With the installation of side doors for entry, some Stage Waggons had the foremost passenger seat facing the rear. This style remained the preferred vehicle for public transportation until development of the oval-body stage coaches, known as Concord and Troy stagecoaches, about 1820. [17]

15

Several descriptions of this late eighteenth century style called the Stage Waggon are remarkably similar. The following description is from the Diary of Charles W. Janson, who traveled in America during the period, 1793 to 1806:

"*I now mounted for the first time, an American Stage, literally a kind of Light Waggon. While I attempt to describe this clumsy and uncomfortable machine, I cannot suppress the wish to being possessed of one of them, with horses, harness, and driver, just as we set off in order to convert them into an exhibition in London.*

*This vehicle which is on the same construction throughout the country is calculated to hold twelve persons, who all sit on benches placed across, with their faces toward the horses. The front seat holds three, one of whom is the driver, and as there are no doors at the sides, the passengers get in over the front wheels, and take their seats as they enter; the first, of course, gets seats behind the rest. This is the most esteemed seat because you can rest your shaken frame against the back part of the waggon. Women are therefore generally indulged with it, and it is often laughable to see them crawling to their seats; and if they happen to be late, they have to straddle over the men who are seated farther in front. It is covered with leather, and instead of windows there are flaps of that article, which in bad weather are let down, and secured by buckles and straps. In summer these flaps are folded up, and this is some alleviation from the repeated shocks you receive in going over the roads, many of which are never repaired.*"

Francis Bailey wrote in his *Journal of a Tour in Unsettled Parts of North America*, in 1796-1797:

"*From Baltimore to Philadelphia are ninety-eight miles; between which places there is no want of conveyance, as there are three or four stages run daily. In one of these I place myself on the morning of March 3, 1796. A description of them perhaps would be amusing. The body of the carriage is closed in, about breast high; from the sides of which are raised six or eight small perpendicular posts, which support the covering — so that it is in fact a kind of open coach. Form the top are suspended leather curtains, which may be either drawn up in fine weather, or let down in rainy or cold weather; and which button at the bottom. The inside is fitted up with four seats, placed one before the other; so that the whole of the passengers face the horses; each seat will contain three passengers; and the driver sits on the foremost, under the same cover with the rest of the company. The whole is suspended on springs; and the way to get into it is 16 in front, as if you were getting into a covered cart. This mode of traveling, and which is the only one used in America, is very pleasant, as you enjoy the country much more agreeably than when imprisoned in a close coach, inhaling and exhaling the same air a thousand time over, like a cow chewing the cud; but then it is not quite so desirable in disagreeable weather.*"

In his 1807 *Notes & Reminiscences*, Thomas Twining described the Stage Waggon in the following manner:

"*The vehicle was a long car with four benches. Three of these in the interior held nine passengers, and a tenth passenger was seated by the side of the driver in the front bench. A light roof was supported by eight slender pillars, four on each side. Three large leather curtains suspended on the roof one at each side and the third behind, were rolled up or lowered at the pleasure of the*

passengers. There was no place nor space for luggage, each person being expected to stow his things as best he could under his seat or legs. The entrance was in front, over the driver's bench. Of course the three passengers in the back seat were obliged to crawl across the other benches to get to their places. There were no backs to the benches to support & relieve us during the rough and fatiguing journey over a newly and ill made road. It would be unreasonable to expect perfection in the arrangements of a new country; but though this rude conveyance was not without its advantages, and was really more suitable to the existing state of American roads than an English stagecoach would have been, it might have been rendered more convenient in some respects without much additional expense. Thus a mere strap behind the seats would have been a great comfort, and the ponderous leather curtains, which extended the whole length of the waggon, would have been much more convenient divided into two or three parts, and with a glass, however small, in each division to give light to the passengers in bad weather, and enable them to have a glimpse of the country. The disposal of the luggage also was extremely incommodious, not only to the owner, but to his neighbors."

Although most Stage Waggons of the period held twelve passengers on four bench seats, other vehicles used for staging were smaller. The diary of Robert Hunter, Jr., *Quebec to Carolina in 1785-1786*, contains the following description of these smaller Stage Waggons.

"*June 8, 1786 — We set off again from Smithfield (Virginia) with a fresh set of horses a quarter after four and drove to Sleepy Hole. The road is so 17 swampy and muddy in many places that I have very near fallen asleep in getting to it. Here we crossed the Nansemond River, which empties itself into the James River. We waited some time at Kammel 's for the Edenton (North Carolina) stage. Here Mr. Story and Mr. Cuthbert got into the Portsmouth stage, and we in one of (Nathaniel) Twining 's new ones, for Suffolk. They are upon a different construction from the northward stages, being much lighter, smaller and upon excellent springs, which renders the traveling infinitely more agreeable. There are only three seats, which holds six people with the driver, two in each.*"


Illustration 3. Sketch of Stage Waggon near Trenton, New Jersey by Pavel Svinin, ca. 1810.

Some have taken Hunter's description of Twining's Stage Waggon as justification to conclude that Southern Stage Waggons were generally smaller than those used in the more northern areas. In general that conclusion may be correct; however, smaller Stage Waggons 18 were used in Massachusetts as evidenced by the following quote from Brissot de Warville's *New Travels in the United States of America*, of his travels through Spencer, Massachusetts in 1788.

"*At this place a new proprietor, and a new carriage. A small light carriage, well suspended and drawn by two horses took (the) place of our heavy wagon. We could not conceive how five of us could fit in this little Parisian chariot, and demanded another. The conductor said he had no other; that there were so few travellers in this part of the road, that he could not afford to run with more than two hoarse; that most of the travellers from New York stopped in Connecticut, and most of those from Boston at Worchester. We were obliged to submit. We started like lightning; and arrived in an hour and a quarter, at Springfield, ten miles.*"

Illustration 4. Original sketch by Paul Downing of Stage Waggon for Colonial Williamsburg.

From the previous statement, it appears smaller Stage Waggons were used in those areas where there were fewer passengers, and larger vehicles used where there were more passengers. 19 In many less-populated areas of the South, the smaller Stage Waggon may have been more economical in transporting fewer passengers, while in the more populated North the larger vehicles proved to be more profitable.

Illustration 5. Reproduction Stage Waggon at Colonial Williamsburg.

Many writers of the period commented on the lack of doors in these eighteenth century Stage Waggons. However, an advertisement by Coachmaker, Conrad Scnider of Philadelphia in *The Pennsylvania Gazette* for February 23, 1764 shows this feature was available at an early date. He offered for sale:

"*A compleat, neat new Waggon, ornamented with Brass Nails, finished after the fashion of a coach, with the Door in the side thereof and leather curtains all round, except in the front, also a neat Coach Harness for a Pair of Horses.* "

20 This new, light Stage Waggon designed for transporting passengers required horses capable of greater speeds. The large draft horses used with the lumbering road wagons were replaced with smaller, swifter horses. Brissot de Warville wrote in 1788,"The horses used in these carriages (Stage Waggons) are neither handsome nor strong; but they travel very well." Although these animals were sometimes referred to as "small" and "spirited", few specifics of their character are known. Certainly they were agile and swift but they were not the quality and breeding of fine coach horses. The lighter, improved Stage Waggon of the late eighteenth century was typically drawn by two or four horse teams with the larger vehicles using four horses and the smaller ones using two horses. Harness for these small, spirited horses is believed to be lighter than that used on earlier, heavier wagons, but not as fine and highly decorated as that seen on the better carriages of the period. For both horse and harness, the emphasis was on function and economy rather than style and elegance.

Illustration 6. Stage Waggon, ca. 1810.

21

As mentioned previously, John Woolfolk and Richard Towns operated the Petersburg & Portsmouth Stage as early as 1787. A ledger for this line, contained in the Woolfolk Papers held by the Swem Library at the College of William and Mary, lists purchase of a new stage wagon. On December 24, 1788, payment of £30 for "a new stage wagon from Philadelphia" is recorded. John Hoomes, a partner in the Petersburg and Portsmouth Stage who later purchased this route for £369, also bought two stage wagons in March 1791. The ledger entry shows £60 paid for the two stage wagons.

The Day Book of Amos Stiles, Carriage Maker of Morrestown, New Jersey, is in the collections of the Pennsylvania Historical Society, Philadelphia, Pennsylvania. This account book contains the following estimate, dated July 1817, provided to Paul Lanning for building a Stage Waggon.

"Paul Lanning
To a Stage Waggon except ironwork to run on wooden springs in the common way, would cost $80.00
 Extras:
 Spring inside                3.00

| | |
|---|---|
| Ruff back | 5.00 |
| Three cushions | 11.00 |
| Back to Seat | 3.75 |
| Baggage behind | 4.50 |
| Putting on inside curtains | 3.00 |
| Two Braces | 2.50 |
| Swelled sides to Body | 1.50 |
| Total | $114.25" |

(18)

22

## Stage Travel

Any journey of significant length involved long hours of travel over inferior roads interrupted only by short stops for food and rest. John Quincy Adams wrote the following of his trip from Boston to New York in 1770.

"We generally reached our resting place for the night if no accidents intervened at ten o'clock and after a frugal supper, went to bed with a notice that we should be called at three in the morning which generally proved to be half past two, and then whether it snowed or rained the traveler must rise and make ready, by the help of a horned lantern and a farthing candle and proceed on his way over bad road sometime getting out to help the coachman out of a quagmire or rut. Finally arriving at New York after a hard weeks' travel wondering at the ease and the expedition with which our journey was affected."(19)

The New York Coachmaker's Magazine of August, 1869 included the reprint of an unidentified writer's comments on early stage travel:

"*The term, stages, is associated with a long catalogue of calamities, inconveniences and horrors, almost insupportable. A stage is a heavy, unwieldy vehicle, generally drawn by four jaded horses, urged along by a vulgar, insolent driver. There are some exceptions, some drivers being respectable, and some stages are mere lumber wagons.*

*In stage-riding it is peculiarly true that it is the first night that costs. It is more intolerable than the succeeding half-dozen, were the journey prolonged for a week; the breaking-in is fearful, the prolongation is bearable. The air gets cold; the road grows dusty and*

*chokes, or rough and alarms you; the legs gets stiff and numb; the temper edges; everybody is overcome with sleep, but can stay asleep — the struggle of contending nature racks every nerve, fires every feeling; everybody flounders and knocks about against everybody else in helpless despair; perhaps the biggest man in the stage will really get asleep, which doing, he involuntarily and with irresistible momentum spreads himself legs, boots, arms and head, over the whole inside of the coach; the girls screech; the profane swear, some lady wants a smelling-bottle out of her bag, and her bag is somewhere on the floor — nobody knows where — but found it must be; everybody's back hair comes down, and what is nature and what is art in costume and character revealed — and then, hardest trial of all, 23 morning breaks upon the scene and the feelings — everybody dirty, grim, faint, 'all to pieces '', cross — such a disenchanting exhibition!"*[20]

Passengers of all positions in life were found on Stage Waggons, as Brissot de Warville wrote of his travels in 1788:

"*You find in these stages men of all positions. They succeed each other with rapidity. One who goes but twenty miles, yields his place to one who goes farther. The mother and daughter mount the stage to go ten miles to dine; another stage brings them back. At every instance, then, you are making many new acquaintances. The frequency of these carriages, the facility of finding places in them and the low and fixed price, invite the Americans to travel. These carriages have another advantage, they keep up the idea of equality. The member of Congress is placed by the side of the shoemaker who elected him; they fraternize together and converse with familiarity. You see no person here taking upon himself those important airs, which you often meet with in France. In that country, a man of condition would blush to travel in a diligence, it is an ignoble carriage; one knows not with whom he may find himself. Besides, it is in style to 'run post'; this style serves to humiliate those who are condemned to a sad mediocrity.*" [21]

Charles William Janson wrote of the poor roads he encountered during his travels in New Jersey in 1793.

"*Several miles before you enter Trenton, the road is so very bad in some places that the driver, with whom I chose to sit, the better to view the country, told me that the last time he passed, his horses stalled, that is, they were for some time unable to drag the waggon through the worst places. He also said, that the road there had not been repaired in his memory, and he did not cease cursing and swearing till we entered the city of Trenton, which was late in the evening, a distance of sixty-six miles. This day's journey was rendered more disagreeable by a heavy rain falling in the very worst part of the road, and being myself as I have already observed, in front, I was wet to the skin, which threw me into a fever on my arrival in Philadelphia. Those seated farther back were in a situation not much better; the leather sides being an indifferent shelter.*"[22]

24

Crossing rivers and streams could be a hazardous adventure, especially when the water was high due to recent heavy rains. Stage Waggons were often upset while attempting to ford a swollen stream, and where bridges were available, crossing them was also quite risky. The earliest bridges were generally constructed by laying loose poles across two or three logs that had been thrown across the stream. They were usually intended to serve only in cases of high water. Consequently, they were often neglected and therefore out of repair when high water came. A stage driver would often have to halt to rearrange or replace the poles before he could take his team and wagon across. Passengers usually preferred to get out and walk while the driver cautiously led his team across, fearful that one of the sixteen hooves might get caught between the treacherous poles. Even when planks came to be used as bridge floors, they were often left un-nailed and floated away with the first flood unless they had been previously removed. James Silk Buckingham mentioned, in his America, that as late as 1838 in traveling through Vermont, his coach came to many bridges from which the loose planks had been removed, "but the driver, with great humour and alacrity, set to work himself to place the planks across again in their proper places." [23]

Another form of bridge was the floating bridge. Thomas Twining describes this type of bridge in the following manner.

> "*We soon reached he Schuylkyl (River), a small river which descends from the Kittatany mountains, in the back part of Pennsylvania, and enters the Delaware river miles below Philadelphia, after a course of about 120 miles. We crossed it upon a floating bridge, constructed of logs of wood placed by the side of each other upon the surface of the water, and the planks nailed across them. Although this bridge floated when not charged, or charged lightly, the weight of our wagon depressed it several inches below the surface, the horses splashing through the water, so that a 25 foot passenger passing at the same time would have been exposed to serious inconvenience.*"[24]



Illustration 7. "The Floating Bridge Across the Schuylkill" by Edward L. Henry from the cover of *The Carriage Journal*, Volume 15, Number 3.

The above illustration depicts such a floating bridge over the Schuylkill River. The Stage Wagon in this illustration was taken from a drawing in "Mellish's Travels in North America", an illustrated early nineteenth century work. This bridge over the Skuylkill River near Philadelphia was made of logs floating on the river, covered with wooden planks, being anchored to prevent it moving with the current. Generally it sank somewhat when a heavy weight, such as a Stage 26 Wagon, passed over it, causing the water to run over the bridge and the rims of the wheels. When

vessels wished to pass up or down the river, the bridge was unfastened at one end and allowed to drift downstream with the current, afterwards it was hauled back into position and secured. [25]

Traveling during this period was difficult at best. Long hours were spent on roads which were not well maintained, in stage wagons providing little comfort. There was limited time for passengers to rest and stretch their limbs during stops. Stages on the well-established routes were usually between ten and fourteen miles, but farther apart in the less populated areas. Food at taverns was often poor and expensive, and the rooms dirty and crowded. It was a welcome relief to finally reach one's destination.

27

**Stage Drivers**

Drivers of Stage Waggons were true American originals -- colorful characters of the road who exuded an air of daring, bravery, and authority. English travelers soon discovered the American Stage Waggon driver was quite different than the "coachman" of England, who tended to be viewed as a lackey or servant. Here, the driver ruled -- it was his vehicle, his route, and his passengers. Many Englishmen, accustomed to the servility of their coachmen, considered these American drivers to be astonishingly independent and sometimes even surly. One factor that contributed to the independent attitude of the American driver was the common practice of not accepting tips or gratuities from passengers.

An English traveler, Richard Parkinson, in his book entitled *A Tour of America in 1798,1799 and 1800* made certain remarks concerning stage drivers. He wrote:

> "*The drivers of coaches (Stage Waggons) are in general sober men, and it is not usual for the passengers to give the coachman money at the end of the stage, as in England. Indeed he considers himself equal to any one, and seemingly, it would be an offense to offer him money. He will drink a glass with you as a companion, but in no other way. The coachman drive but one stage, from fourteen to twenty miles, and take care of their own horses, which is one cause of their good appearance.*"

Though he may have been sometimes careless in his dress and inattentive to his passengers, the American driver won nothing but praise for his driving skills. Bad roads only served to highlight this skill. Writing of the road from Saratoga to Lake George, J. R. Godley wrote:

> "*the road is execrable, nothing but the most wonderful dexterity on the part of the driver, and the strength and steadiness of a team, that would 28 have done no dishonor to the Tantivy in the days when England was a coach country, could have brought us through.*"

An Englishman's view of the American Stage Waggon driver was contained in the popular, Retrospections of America, written by John Bernard

who traveled here from 1797 to 1811. After describing the stout, well-bundled and muffled, reticent driver of his native England, he went on to say:

> "*The very opposite of all this was the New England 'driver'. He was usually a thin, wiry, long-backed, leather-skinned fellow, sharing the front seat with the company, and flying in and out of the vehicle. No one more abhorred a superfluity of clothes...Placed upon their level, he sympathized with all his company, yet not intrusively. He was a general book of reference, almanac, market list, and farmer 's journal; a daily paper published every morning, a focus; which by some peculiar centralpetality, (attraction) drew all things toward it.*"[(26)]

Many foreign travelers commented on the hair-raising custom of the American driver in giving rein to his horses going down hill. G. Combe wrote, "*The youth who drove us ascended the numerous hills which we traversed very leisurely, but dashed down the other side with extraordinary rapidity*." Thomas Twining wrote, after mentioning that the stage was not provided with a drag, that:

> "*at first our rapidity on these occasions, with a steep declivity, without rail or fence of any sort on one side, seemed to be attended with no trifling degree of danger; but I soon found that the driver managed his four active little horses with all the skill of an English coachman, although he had little appearance of one.*"

Mechanical brakes were not yet in existence. A driver using a drag was required to get down from the vehicle to lock his rear wheels with a chain or place a drag under them, but it was 29 tedious in hilly country and the act of descending from the box to do so was not in itself unaccompanied by danger, especially if the team was a spirited one. Such driving was surprisingly common on the long descents of the Allegheny ridges in Maryland and Pennsylvania. One passenger wrote of driving in this area:

> "*The practice is for the team to be put on a run the moment they gain the summit of a hill, and if all things hold out, this is kept up until the bottom is reached: the horses are excellent, and rarely fail. On my asking the coachman, -- by whom I rode as much as possible, -- what he did in the event the wheel-horse coming down in a steep pass, he replied 'Why, I keep driving ahead, and drag him along,' — an accident which he assured me had occurred more than once to himself when the roads were encrusted with ice and snow.*"

(27)

The Stage Driver is further described by James O. Lyford in his History of Concord, New Hampshire. He wrote:

> "*Along the countryside the 'stageman' was regarded as holding a good place among worthies of the time. He could tell to loitering*

*villagers news and gossip from taverns firesides in the larger lower towns. Perhaps Daniel Webster, Jeremiah Mason, Ichabod Bartlett or George Sullivan had sometime been passengers in his coach, and he had spoken with familiarity with those great men, or he had exchanged polite salutations with Dudley Leavitt, Professor Edwin D. Sanborn or the governor of the state. Judges going up to hold court sat beside him and held the reins while baggage was landed at wayside inns. Perchance he had clinked the social glass with Philip Carigain, Esquire, and wished him success in his errand at Hanover. On the slightly highest seat of his yellow coach rustic beauties, going home from service or from school, with handsomer faces than those depicted by the skillful hand of the Concord painter on the panels of the coach, perched where the long whiplash made its surprising whirl past their sun bonnets before it shot forward to make its still more surprising crack behind the ears of the leaders on the six-horse team. School-boys by the roadside swung their caps to the driver, and echoed his cheery whistle to the horses. The village blacksmith and saddler came to the fore wheel to take his orders when he drew rein. All the countrymen deemed it worth while to be on good terms with him, because he knew about their horses, and from his opinion as to what a likely animal would bring at Concord or Portsmouth there was no appeal. 30 Tact, patience and endurance were necessary (for the stage driver). So was punctuality. Sandeman Marden went over his route to Portsmouth so regularly that people set their clocks when he drove past. Exposure to rude winters on bleak roads was a condition not to be lightly regarded. The mid-winter defenses of the driver were a long, buffalo-skin coat with a girdle at the waist, deep boots, a thick, knit woolen hood drawn closely over his ears and neck, and 'leggins' of the same material and make. What kept his gloved hands from freezing is one of the mysteries of history.*"

Although there were several variations, drivers usually worked in one of two different ways. Those drivers who worked for the larger companies, drove for several stages with the horses changed at most stops. By 1800, some companies set limits for the distances and number of stages a driver could drive. One of the lines between Boston and New York limited the mileage a driver could drive in a given day to forty miles in the winter and sixty in the summer. With the drivers usually driving three or four stages a day, each stage might cover from 10 to 20 miles. Drivers for these larger lines drove teams provided to them at each "relay station." In this mode of operation, a driver would drive a number of teams in a given day. Also, because these drivers incurred lodging costs, they were usually paid the highest wages.

Some drivers preferred to drive only one stage of 10 to 20 miles, rest their horses, and drive back to their home station with passengers from a stage wagon coming from the opposite direction, thus driving 20 to 40 miles each day. In this case, drivers did not have to spend the night away from home and pay lodging expense. Another advantage of this method of operation was that each driver was made wholly responsible for the care of his team and his vehicle. However in this situation, passengers had to change vehicles after each stage. .

31

**Travel Perils**

During the period of rapid development in American staging, there were serious hazards involved with travel. Principally, these perils consisted of breakdowns, accidents, robberies and the weather.

The breakdown most frequently faced by stage travelers was the breaking of one of the thoroughbraces. The thoroughbrace was one of the heavy, layered, leather straps that passed under the bottom of the Stage Waggon body, supporting it and providing some degree of springing. An English traveler wrote that the experience of riding on these thoroughbraces made the carriage "dance in the air like a balloon," swinging forward or backward or sideways as the wheels passed over obstructions or dropped in ruts. The thoroughbraces permitted the body of the carriage to swing to counteract the jolting of the undercarriage, but in performing this function on the notoriously rough American roads, they were subjected to continuous stresses, which varied according to the weight of the driver, passengers, and baggage. Even though the thoroughbraces were made of many layers of heavy leather, they eventually wore, and on occasion they broke from a sudden or unusual stress. [28]

There was a remedy that seemed common to drivers when a thoroughbrace gave way. John Melish, an English traveler writing in 1812, wrote that:

> "*The defect was supplied by breaking down an honest man's fence, and thrusting a rail under the body of the carriage, while the passengers stood almost up to the ankles in the mud, holding it up.*"

Another English traveler in 1819, John Duncan, described this remedy as follows: 32

> "The road through which we drove (it was literally through) had shaken our wagon, that after nine hours of jolting one of the straps gave way, and we were brought to a stand by the carriage sinking down upon the pole. Americans are not easily disconcerted. There was a rail fence by the road side, from which the driver selected a stout rafter long enough to reach from the footboard in front to the after axle, the body of the wagon was hove up by our united efforts, and the wooden substitute was thrust under it. We then resumed our seats and jolted on, quite unconscious of any additional inconvenience from riding on a rail."

When such a problem occurred in a remote area where no suitable rails were available, a variation to the remedy was often used. This method was described by Tyrone Power in 1836.

> "We broke (a thoroughbrace) by a sudden plump, into a hole, that would have shaken a broad-wheeled wagon into shavings. Our driver did not approve of any of the fence-rails in the vicinity, so plunged into the wood, accompanied by one of my western companions; and in ten minutes they returned, bearing a young hickory pole, that the driver assured us was 'as tough as Andrew Jackson himself and as hard to break, though it might give a little under a heavy load.' This was shoved under the body of the carriage, and rested on the fore and hind axles; it was lashed fast, and the spare part of the spar was left sticking out behind, like the

Colonial Williamsburg Digital Library
about:blank

> end of the main boom of a smack. The coach body when rested upon this, was found to have a considerable list to port...[but] the driver was enabled by this ingenious substitute for a carriage spring to 'go ahead '. "

Fence-rails and the muscles of passengers were also called into service when the "king bolt" in the front axle-tree broke, provided the driver was fortunate enough to have a substitute. The rails were thrust under the body, which was then raised off its bolster so that the spare bolt could be inserted.

Next to the thoroughbraces, the wheels were subjected to the greatest stress. The constant jolting sometimes loosened the iron tyres until the entire woodwork collapsed, often 33 causing extremely dangerous accidents. Charles J. Latrobe related an instance in 1835 where at the top of a hill:

> "a fore-wheel broke, and an instant overturn followed, at the head of a fearful chasm...[passengers) had toes, ribs, and noses damaged, and one poor fellow a fearful wound in the forehead."

Captain Frederick Marryat wrote that the Americans possessed great resourcefulness in making temporary repairs to wheels:

> "...*the Americans are never at a loss when they are in a 'The fix'. The passengers borrowed an axe; and in a short time wedges were cut from one of the trees at the road-side, and the wheel was so well repaired that it lasted us the remainder of the journey'.* "

Despite such ingenuity, stage drivers were not always able to repair all types of breakdowns, and on occasion the passengers had to walk to the next town.

Apparently few persons who traveled to any extent went through life without meeting with one or more stage overturnings, and few also went on any long journey without some such experience. In 1828, Bernhard, Duke of Saxe-Weimar-Eisenach, recorded being overturned eight times in two years of travel in this country, though his stage journeys did not exceed four thousand miles. Another traveler in that same year protested publicly in a New York newspaper against the nine upsets he had received in a journey from New York to Cincinnati and back to Philadelphia. Six of these were on the way to Cincinnati, a trip of scarcely a thousand miles. A fellow passenger in Ohio informed the geologist Sir Charles Lyell during the 1840s that "in the course of the last three years he had been overturned thirteen times between Cincinnati and Cleveland."

34

Perhaps the primary reason for these accidents was the extremely poor condition of all but the best roads over which the stages traveled. Captain Marryat, quoted earlier, wrote that:

> "*The drivers are very skillful... and if you are upset, it is generally more the fault of the road than the driver. No one thinks anything of an upset in America...these mischances must be expected in a new country.*"

The roadways of the day were narrow and hilly with many sharp curves, soft-bottomed and without proper drainage, and with dangerous stream crossings. Stages were frequently overturned after dark by striking stumps and ends of fallen logs either on or close to the edge of the road. Even skillful drivers could hardly expect to take a heavy stage with four horses, day in and day out, in all seasons, over such roads without occasional accidents.

Another cause of accidents was racing between stages of opposition lines. Drivers usually shared their employers' bitter antagonisms, especially when a route was not likely to support two competing lines and one was doomed to fail. Drivers' jobs depended on victory for their line. If one believed the rival advertisements in the newspapers, the stages of each line arrived at their destination before those of the other. To fit into the elaborate connection arrangements for cross lines and continuing lines, starting times for rival stages had to be at about the same hour, thus bringing them into competition along the wage. One stage was not likely to be permitted to pass another without a dangerous race on the narrow roads. Occasionally, locked wheels resulted, and instances occurred where wheels were knocked off one of the fast-traveling stages. Sometimes the driver of the winning stage, as it drew ahead, 35 swung too rapidly into the single-tracked road, whether deliberately or in his eagerness to gain safer ground, thus forced the losing stage to the side of the road and into a ditch. [29]

Races between rival stages sometimes took place on city streets, to the great danger of other persons as well as to the passengers on the vehicles. Frequently, public indignation was aired in the newspapers, while some states found it necessary to enact laws against such racing. Eventually, proprietors found it necessary to reassure the public in their advertisements. An advertisement in 1825 by the Exchange Line operating between New York and Philadelphia read:

> "*On account of the contention between the Union and Exchange Lines, the proprietors are induced to change the hour of leaving the city to 5:30, in order to avoid that opposition, so disagreeable to passengers.*"

[30]

Robberies of stages were more rare than accidents, but posed a more serious threat. One of the lesser types of robberies of the day was the petty theft of baggage from the rear of the stage. There was comparatively little danger of detection if a robber crept up behind a coach as it was proceeding slowly through sand or climbing a hill and quickly cut the straps that held a trunk or two on the small rear platform. The ordinary rumble of a vehicle moving over the road usually covered any small noise the robber made, and the discovery that the baggage was missing often did not occur until the stage halted at the next station. Very rarely were the perpetrators of this crime caught. Since the mail was seldom

involved, the power of the federal government was not thrown into the chase. Only if there were repeated robberies along some stretch of road would efforts be made to discover the thieves. [31]

36

Since large sums of money regularly passed over the road in unprotected stages, it is surprising that there were relatively few holdups. The "great Mail" pouches often contained between $50,000 and $100,000 in bank notes and other transferable paper, particularly on roads that led into important commercial and financial centers. In addition, the passengers usually carried substantial sums. There were no modern facilities where passengers could renew their supplies of cash or credit at intervals along the way. The amount of money necessary for the entire trip had to be carried from the beginning. Most passengers, too, were businessmen — merchants, attorneys, land buyers, speculators -- who had with them funds needed for their activities. A Cincinnati businessman, Gorham Worth, wrote about setting off in a stage for Pittsburgh in 1817:

> "*I had with me a large sum of money, too large indeed to be mentioned with prudence even now, and which in those days, when human habitations and mile stones were wide apart, it was desirable to keep as much in the shade and as for from the eye of suspicion as possible.*"

[32]

The harsh Post Office law was possibly a deterrent to stage holdups. The Act of 1792 made robbery of the mail punishable by death. The Act of 1799 modified the sentence to forty lashes plus imprisonment not exceeding ten years for the first offense but retained the death penalty either for a second offense or for cases where, in effecting the robbery, the life of the driver was jeopardized by the use of dangerous weapons. Actually, only few highway robberies could be committed without the display of weapons since such threats were necessary to bring the stage to a stop. [33]

One or two spectacular robberies each year along the lines in the East continued to furnish excitement until the railroads replaced the stages as carriers of mail. The full course of a 37 cycle had been run in the fifty years since it had been argued that a stage and passengers would provide greater security for carrying the mail than would the long post-rider on his horse. Nevertheless, the Post Office Department established an excellent record in capturing highwaymen who robbed the stages. The Postmaster General from 1814 to 1823, a gentleman with the unusual name of Return J. Meigs, Jr., was able to boast in 1818 that:

> "*Since I have been at the head of this Department not one instance of a violent robbery of the mail has occurred, where the perpetrators have escaped apprehension, conviction, and punishment.*"[34]

38

## Stagecoaches

As previously stated, vehicles used for public transportation began to change dramatically about 1820. The Stage Waggon of the late eighteenth century and early nineteenth century evolved into an oval-bodied, rounded top Stagecoach with at least one door on the side. This body was suspended by thoroughbraces on a three-perch running gear. The driver sat on a seat outside the body. This initial oval-body Stagecoach further



evolved into the American Illustration 8. Oval-bodied Stagecoach, ca. 1820. Mail Coach known as the Concord, Albany or Troy Coach. This general style known as the Stagecoach was described in the *Boston American Traveller* in 1825 as follows:

> "*The finest vehicles in the world without any dispute, are stage-coaches. Your sulkys were made for physicians or single gentlemen; your carriage for old maids (or, to be fashionable, 'for single ladies advanced',) and old women; your carioles for young children and their nurses; and your gigs, your landaus, and your curricles for fops, dandies and exquisites of both sexes; but your stage-coaches — your downright, modern, well-built stagecoaches — were made for no particular class in society, but for the young, old, the rich and the poor, the great and the small, male and female, of all ranks, and conditions; and whether we ride for health, for pleasure, or for business, we almost invariably prefer one of these carry-alls to any other travelling machine now in vogue.*"

[35] 39 (The corrected reference to "old maids" shows "political correctness" was alive and well in 1825.)

Concord Coaches were built by the Abbot, Downing Company of Concord, New Hampshire, who referred to them as Mail Coaches. The first of this type was built by J. Stephens Abbot — then an employee of Lewis Downing, but later he became a partner. Production of this style continued until early in the twentieth century. Abbot has been credited with design of this style vehicle, yet there is evidence the style actually developed somewhat earlier in both Albany and Troy, New York and known as the Albany or Troy Coach. Although made famous by Abbot, Downing, this style was copied by several other carriage makers. [36]

The Concord Coach was built in six, nine, and twelve passenger sizes, though company records reveal that a few four passenger and sixteen passengers sizes were built between 1858 and 1864. Passengers were seated on two transverse, facing seats, in the usual coach fashion, and on one or two additional benches between the fixed seats. Suspended on the three-perch, thoroughbrace running gear, the body could

accommodate a large amount of baggage, for there was a rack on top, another at the rear, and space in the front boot for that purpose. These Stagecoaches were painted in bright colors, and then highly decorated with painted scrollwork, oil paintings, ornate lettering, and gold leaf. The most common color was a red body on a pale yellow running gear, but varied combinations of green, red, orange, white, blue, yellow, olive, black maroon, etc., were also used. The last named colors were more commonly used on Hotel Coaches, while the red-yellow combination was fairly standard for Stagecoaches made for the 40 road. Concord Coaches were widely used, not only in most parts of the United States, but in South America, South Africa, and Australia. [37]

Less expensive types of passenger carrying vehicles were made by the firm of Abbot, Dowing, but these should not properly be called Concord stagecoaches. The bodies of these lesser vehicles were most often square-box in shape, many having no doors, but open sides, with curtains to roll down in bad weather. Nearly all had luggage racks on the rear, but only the heavier ones had racks on top. Such terms as Passenger Wagon, Overland Wagon, Mud Wagon and Mountain Wagon were generally applied to these cheaper vehicles. [38]

The Albany coach, manufactured by James Goold and Company of Albany, New York was introduced in the 1820s, and soon became widely known. Goold, a native of Connecticut, established his factory in 1813 and later took Walter R. Bush and J.N. Cutler as partners. He specialized in heavy work, and Stagecoaches became a featured product of his factory. By 1830 Albany coaches were found as far south as Baltimore and Washington where they were known as the "*Splendid Red Coaches*" of the Union line. Albany coaches were soon eclipsed in fame by those made in the neighboring city of Troy, where manufacturers adopted whatever improvements the Albany coaches offered and added others of their own. In pattern, the two coaches were basically the same, so that in distant parts of the country no distinction between them was made. In 1827, the *Troy Sentinel* contrasted "*our light, elegant and convenient stagecoaches, with spring seats and easy motion*" with "*the lumbering vehicle which were in use for the purpose some twelve or fifteen years ago.*" [39]

41


Illustration 9. American Stagecoach, ca. 1830.

The Troy Coach was a popular style of Stagecoach built by several different firms in Troy, New York. This type Stagecoach was apparently nearly identical to the Concord Coach, and seems to predate the Concord. The Troy Coach is known to have been built as early as May 1827,

while the earliest Concord is documented later that year. Two Troy companies, operated by Charles Veazie and Orsamus Eaton competed in manufacturing Troy Stagecoaches. It appears Veazie of Troy made the first improvements to the style by including a roof railing for luggage, while Eaton later added a roof seat. In 1830 these two Troy factories together employed about sixty men and turned out about fifty Stagecoaches. [40]

42

An item in the *United States Gazette* in 1831 described a "splendid" coach owned by Mr. Reeside, made in Troy, New York by Messrs. Eaton and Gilbert, & Charles Veasie. It read:

""[41]

*The coach was painted red, and beautifully lined with red morocco. The whole appliances of the carriage were suited to the elegance of the body, and bespoke the liberality of the enterprising owner. Mr. Reeside ordered a number of these carriages to be built for the new line that is to commence running between Baltimore and Pittsburgh, by the way of Chambersburg, on the 1st of October.*

Troy Stagecoaches were soon used throughout the South. In 1825, the line from Wythe Court House, Virginia to Greensboro, North Carolina boasted, "*The coaches are made at Troy, N. Y, good and comfortable.*" The line between Georgetown and Charleston, South Carolina gave notice in 1837 that they "*have placed upon their route an entire new set of Troy built coaches*," and the following year the routes from Augusta, Georgia, via Macon and Columbus to Montgomery and Mobile, Alabama were "*furnished with the best Troy built coaches.*" In 1838, the line from Nashville to the Mississippi River advertised they had "*selected superior Troy coaches*," and the lines between Vicksburg and Jackson and between Jackson and Grand Gulf were stocked with coaches "*of the best Troy manufacture.*" [42]

Available information suggests the firm of Eaton & Gilbert built more of these Stagecoaches than Abbot, Downing & Company, but the former gave up their construction much earlier, in order to concentrate on manufacture of railway cars. [43]

43

**Operating Costs**

The Woolfolk Family Papers held by the Swem Library at the College of William and Mary in Williamsburg, Virginia offer limited but valuable information concerning costs of operating a stage line during the late eighteenth century. An account book, covering the period June 1794 to

August 1796, lists general expenses for the operation at Cross Roads, which was located near Bowling Green, Caroline County, Virginia. Pages for March and April 1796 are missing, and only wage costs are found for August 1794. This particular line operated between Cross Roads and Portsmouth, Virginia, by way of Richmond, Petersburg and Suffolk.

Feed constituted the major portion of expenditures. Specifically, items of feed for horses included corn, oats, bran, fodder and hay. Monthly expenses for feed vary significantly, which may suggest items of feed were purchased in quantity, perhaps when prices were lower. Also, payment of a specific account for feed was often made in part over several months. This practice contributed to the variation in monthly expensed recorded in the ledgers.

Wages seem to be primarily for drivers, but some wages appear to be for those who manned the various stations along the route.

Repair costs include expenses incurred for the stage wagon and harness for the horses. During 1795 and 1796 the coachmaking firm of Badger and Atkins in Petersburg performed significant repair service for the Cross Roads stage operation. Specific repair items listed in the account book include axle and wheel work, curtains for the body, and harness repair.

44

Driver's expenses include food and board for drivers at the various stops.

Miscellaneous items include grease for axles, oil for harness, rope, and clothing, to include shoes, for what appears to be slave stage drivers.

During the time frame covered by the account books, at least 12 horses were purchased at costs which varied from £6 to £26. As with feed, horse expenses were not always paid in full at the time of purchase, therefore smaller sums are listed for various months.

Significant amounts of money were listed as paid during certain months but the reasons for these payments are not explained. Following are examples of these payments:

| July 1794 | Willis Everett | £40.19,00 |
| May 1795 | Jamison Johnson | £68.02.08 |
| May 1795 | Willis Everett | £91.07.09 |
| May 1795 | Levis Caffery | £81.12.00 |
| May 1795 | Richard Taylor | £30.00.00 |
| November 1795 | Peter Innis | £50.08.11 |

December 1795 Everett Wilkinson  £46.11.10

December 1795 Jeremiah Stokes   £23.04.00

December 1795 Alexander McRae  £24.00.00

45

**Cross Roads Stage**

**Expenses**

| 1794 | June | July | August | September |
|---|---|---|---|---|
| Feed | £10.13.00 | £23.26.07 | -- | £39.02.00 |
| Wages | 3.00.00 | 3.03.10 | 0.12.0 | -- |
| Repairs | 1.05.00 | 1.04.00 | -- | 1.03.09 |
| Driver's Expense | 0.08.06 | 0.09.06 | -- | 0.10.09 |
| Misc. | 1.04.00 | 0.01.06 | -- | 0.10.09 |
| Horses | -- | -- | -- | -- |

| 1794 | October | November | December |
|---|---|---|---|
| Feed | £29.05.00 | £41.04.00 | £10.01.00 |
| Wages | 9.17.00 | 13.09.00 | 13.00.00 |
| Repairs | 0.08.00 | 0.03.00 | 0.12.00 |
| Driver's Expense | 1.15.09 | 0.13.00 | 1.00.00 |
| Misc. | 1.15.09 | 0.13.00 | 0.08.06 |
| Horses | 9.01.09 | 6.00.00 | 21.00.04 |

| 1795 | January | February | March | April |
|---|---|---|---|---|
| Feed | £29.08.02 | £37.05.00 | £36.08.00 | £45.00.00 |
| Wages | 12.05.00 | 10.10.00 | 7.16.00 | 4.16.00 |
| Repairs | 2.14.00 | 1.07.00 | 0.12.00 | 0.12.00 |

| | | | | |
|---|---|---|---|---|
| Driver's Expense | 1.07.00 | 1.02.00 | 0.15.00 | 8.14.06 |
| Misc. | 1.01.00 | 6.16.00 | -- | 0.12.00 |
| Horses | | | 25.00.00 | 7.00.00 |

| 1795 | May | June | July | August |
|---|---|---|---|---|
| Feed | £25.12.06 | £47.08.00 | £29.10.06 | £ 16.15.00 |
| Wages | 18.01.04 | 3.03.00 | 10.00.02 | 1.04.00 |
| Repairs | 0.07.06 | 0.10.00 | 1.10.00 | 1.16.00 |
| Driver's Expense | 0.08.00 | 37.09.07 | 9.08.00 | 0.17.00 |
| Misc. | 0.18.00 | 0.12.05 | 0.16.06 | 0.02.00 |
| Horses | 38.07.06 | 76.10.00 | | 26.00.00 |

46

| 1795 | September | October | November | December |
|---|---|---|---|---|
| Feed | £57.04.02 | £53.11.07 | £63.11.06 | £77.08.04 |
| Wages | 0.12.00 | 13.10.03 | 6.14.08 | 48.10.00 |
| Repairs | 1.16.00 | 1.07.00 | 1.12.06 | 1.10.09 |
| Driver's Expense | 0.17.00 | 1.08.02 | 0.12.06 | 1.04.02 |
| Misc. | 0.17.00 | 3.02.07 | 1.00.03 | -- |
| Horses | | | 6.05.11 | 36.11.08 |

| 1796 | January | February | March | April |
|---|---|---|---|---|
| Feed | £43.18.08 | £23.10.01 | -- | -- |
| Wages | 6.13.05 | 1.16.09 | -- | -- |
| Repairs | 1.11.02 | 1.07.09 | -- | -- |
| Driver's Expense | 1.04.00 | 1.16.09 | -- | -- |
| Misc. | 3.13.01 | 25.02.05 | -- | -- |
| Horses | -- | 6.12.00 | -- | -- |

| 1796 | May | June | July | August |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Feed | £ 19.09.08 | £37.08.09 | £28.06.04 | £81.14.02 |
| Wages | -- | -- | 2.09.00 | -- |
| Repairs | 2.15.06 | 4.04.00 | 5.05.02 | 3.00.00 |
| Driver's Expense | 0.05.00 | 3.07.00 | 0.10.06 | 2.04.06 |
| Misc. | 7.18.04 | 13.07.07 | 0.14.06 | 7.08.00 |
| Horses | -- | -- | -- | 3.18.09 |

47

## COACHEE

### General

By mid-eighteenth century, the goal of lightening draft had long been a goal of vehicle makers. Reducing the effort of draft animals provided improved efficiency in that heavier loads could be moved faster or greater distances. The *Boston News-Letter* of January 25, 1753 contained the following quotation from *The Pennsylvania Gazette*.

> "*For the Encouragement of Industry in the counties of Newcastle, Kent, and Sussex in the Territories of Pennsylvania; the following Premiums will be given by the Subscriber, viz...to the Person that makes the neatest and lightest wagon in Draught, Six Pounds...The Persons entitled to any of the above Premiums, will receive them the first Tuesday in November 1754, that being the time appointed to decide who deserves them and a Free Entertainment given by the Subscribers and the Premiums will be increased in the future years, according to the Improvements made in the different things proposed.* [43]

Light Waggons, which were commonly used as Stage Waggons, also were used as Family Waggons. They were comparatively light, plain, low in cost, and could be used as a light carrier of merchandise. Unlike more elaborate carriages such as Coaches and Chariots, they required no servants as coachman or attendants. The term, waggon, originally implied only a work vehicle, but, by this time in America, came to denote a combination vehicle that carried both goods and passengers. This terminology is significant, in that a most important family of American pleasure carriages were called waggons. It is this association of the Light Waggon with carrying passengers that resulted in this incongruous but popular misuse of the generic English term. An interesting fact is that all of these vehicles had bodies much like earlier wagons, even those made by our most fashionable coach makers. [44]

48

Popularity of the Light Waggon is clearly indicated by the number of advertisements in which they were mentioned. William Cooper, Coach Maker of Elizabethtown, New Jersey, advertised on April 21, 1763 that he make "*new fashioned light Waggons.*" Another advertisement illustrating improvements in the design is from *The Pennsylvania Gazette*, dated February 23, 1764, by Conrad Snider, Coach Maker of Philadelphia. He offered:

> "*A compleat, neat new Waggon, ornamented with Brass Nails, finished after the fashion of a coach, with the door in the side thereof the Leather Curtains all round, except in the Front.*

(45) On November 1, 1764 the following advertisement appeared in *The Pennsylvania Gazette*.

> "*To be SOLD, A light covered Waggon, that will carry twelve People, and should answer for a Stage or private Family…For Terms apply to John Buckingham, at the Sign of the Coach and Horse, in Race Street, the corner of Third Street, Philadelphia.*"

(46)

These new, light wagons were referred to by a variety of terms. A "*New Model…Light Travelling Waggon*" was advertised in New Jersey in 1767. The *South Carolina Gazette* carried an advertisement in 1773 for "*a Caravan or Family Waggon, very light and runs easy.*" A "Genteel Waggon" was offered for sale in New Jersey in 1779. George Bringhurst, coach maker from Philadelphia advertised he had "*two Family Waggons entirely new, and of the newest fashion*" for sale. Robert Sutcliff wrote of "*open carriages... called wagons... the best of then Jersey wagons.*" The term, "*coachee*" is seen in Maryland by 1789. (47)

The Light Wagon and Coachee are described by Isaac Weld, an Englishman who traveled in this country and Canada during 1795-1797. He wrote: 49

> "*The coachee is a carriage peculiar, I believe, to America: The body of it is rather longer than that of a coach, but of the same shape. In the front it is left quite open down to the bottom, and the driver sits on a bench under the roof of the carriage. There are two seats in it for the passengers, who sit with their faces towards the horses. The roof is supported by small props, which are placed at the corners. On each side of the doors, above the pannels, it is quite open, and to guard against bad weather there are curtains, which are made to let down from the roof and fasten to buttons placed for the purpose on the outside. There is also a leathern curtain to hang occasionally between the driver and passengers.*

> *The light waggons are on the same construction, and are calculated to accommodate from four to twelve people. The only difference between the small (light) waggon and a coachee is that the latter is better finished, has varnished pannels, and doors at the side.*

> *The former has no doors, but the passengers scramble in the best way they can, over the seat of the driver. These waggons are use universally as stage Carriers.*[48]

Another writer, John Harriott, described the coachee in the following manner.

> "Some of these coachees are tolerably convenient for warm climates but there is a material difference in them. The best are like covered wagons, shaped a little, and painted to look like a coach, having double curtains of leather & woolen to furl or let down at pleasure. Some are hung on springs & travel easily, others quite the reverse. They have more, or fewer benches, according to the number of passengers they engage to carry."[49]

Paul Downing wrote of this new, light, dual-purpose vehicle:

> "Toward the end of the (eighteenth) century these public carriers appear to have gradually divided into three types — the main group continuing to become more coach-like, emerged as the efficient Stage of the 19 century. The smaller form which assumed springs, and which had come to be used as family carriages, developed into the Coachee. The third group, shed their tops and became the one and two-seated Pleasure Wagon or the Dearborn Wagon.[50]

50

**Definitions**

The following descriptions and definitions of the various forms of light waggons may be helpful in distinguishing the most important characteristics of each.

The *Boulster Wagon* is an unidentified type of wagon built by Amos Stiles, a carriage builder from Morristown, New Jersey from 1812 to 1821. There is no reason, however, to believe he was the only builder. The Boulster wagon was evidently a specialty of Stiles, for his daybooks mentions 140 of them during these years. It appears to have been a light passenger wagon, with as many as three seats, and equipped with shafts or pole. It had a standing top, and was frequently "paneled up behind," sometimes with glass in the rear, either sliding or fixed. A few had a rear door, but most appear to have had none. Generally the inside was trimmed to some extent, and some were almost entirely trimmed. Seats were made both with and without cushions, and frequently, though not always, with backs. Bodies were sometimes made with swelled sides, and moldings, and in some instances varnished. Most often the vehicles were plainly and simply trimmed and finished. They were equipped with curtains, and often an apron was provided. In no case do the entries in Stiles' daybook indicate the vehicle was mounted on springs or braces,

and the name seems to indicate the body sat on bolsters. Otherwise, the vehicle appears to have been very much like the Coachee or Jersey Wagon.

Another style of wagon built by Stiles was the Jack Wagon. The main distinguishing feature between the Boulster and Jack Waggons is that the latter was mounted on braces suspended from upright jacks. Otherwise, it was quite similar to the Boulster Wagon. [51]

51

After study of the Amos Stiles Accounts in 1991, Richard E. Powell, Jr. offered the following comments on the Boulster Wagons made by Stiles.

"*The most conspicuous vehicles in the Stiles account are "boulster wagons," a name apparently unique to this carriage maker. Between 1812 and 1821, one hundred twenty-eight boulster wagon entries occur, including at least eighty-eight citations for vehicles sold new and complete. The cheapest of this kind sold for $90.67 in July of 1812, and the most expensive were two sold for $155 each in October of 1817: the average price for the eighty-eight wagons was $116.50. In most cases the more expensive examples are described in greater detail, suggesting added costs for optional features. Review of all entries indicates that the wagons were light, as three were built for a single horse and six were supplied with shafts and a tongue, while only ten specify pair equipment only: Nothing suggests a larger equipage. Boulster wagons were at least partially enclosed with tops, curtains or glass, and in one case with a rear door. Eight wagons are listed with one seat `only' and seem to be the exception in that regard. Twenty-one have double springs inside, however external suspensions or sprung bodies are not implied. About twenty percent of the entries mention painting and striping. The axles noted are about equally divided between those of iron and those of wood or wood with sheathings of skeins or clouts.*

*The boulster wagon is clearly a light passenger vehicle finished with relatively modest features that include some decoration and provisions for passenger comfort. Ironically, the cost of this four-wheeled style is less than that of most two-wheeled vehicles in the account. Boulster wagons do not seem to be in a class of the coachee at $495 (p. 227), the C-spring carriage at $339 (p. 244), or the Chariotee at $285 (p. 156); as to stage wagons, one cost a comparable $114.25 (p. 194), the other $250 (p. 156). It is probable that the term, "boulster wagon ", was Stiles's name for a vehicle we call differently, perhaps the carryall, which was typically a one-horse carriage; a pleasure wagon, which would agree with the swelled sides and painting but not the enclosure; or Jersey Wagons, which were a lighter two-horse version of the coachee.*[52]

[52]

The *Caravan* is a type of family wagon used in the American colonies late in the eighteenth century. It was drawn by either two or four horses. There is the possibility this little-known carriage may have been similar, if not identical, to the Coachee, and the name is nothing more than a regional term used to denote the same vehicle. [53]

52

The Coachee is an American vehicle, generally used as a family carriage that appears to have developed late in the eighteenth century. Several surviving Coachees of the early nineteenth century correspond with Isaac Weld's description, and some of these differ by having a single door in the rear. Suspension is on thoroughbraces secured to jacks in several instances, while the example at the Smithsonian Institution employs thoroughbraces and wooden C-shaped springs. Other references have been found which seem to indicate a rather broad usage of the term Coachee. Several early nineteenth documents in the Smithsonian reference collection indicate such features as a hammercloth and a front boot, neither of which apply to the type of vehicle Weld described, but seem to suggest a vehicle that was more nearly line the coach, but probably lighter in weight.

There is evidence indicating a number of terms were used rather synonymously to describe the same type of vehicle. The descriptions of Amos Stile's Boulster Wagons in New Jersey seem to agree, somewhat, with that of the Coachee. Robert Sutcliff describes and illustrates vehicles that must be nearly identical to the Coachee, yet he refers to them as Jersey Wagons. A Dictionary of American English quotes early references which indicate the terms Jersey, Dearborn and Carryall were used synonymously, assigning the various words to different sections of the country, yet no descriptions have been found to justify that synonymous usage of the last two terms with Coachee. Thus, while similarity undoubtedly existed between the Coachee and Jersey Wagon, and also between the latter and the Dearborn and Carryall, it seems likely that the Coachee differed too greatly from the Dearborn and Carryall to warrant use of theses terms synonymously.

53

Illustration 10. Coachee at the Smithsonian Institution, ca. 1810.

By mid-nineteenth century the term was being applied to a vehicle that might be compared to a light-weight, curtain-quarter coach. Some of these had a detached driver's seat while others had a seat framed to the body. The upper quarters were closed by leather or fabric curtains.

Suspension was variously on c-springs and braces, or on elliptic springs. These carriages were used throughout the East, but were especially popular in the Southern states until about 1860, when their use began to decline. (See *The World on Wheels*, by Ezra Stratton, pages 434 and 441.)

54

Due to the fact that the driver and passengers were under the same roof, many consider the Coachee the ancestor of the Rockaway. [54]

The *Dearborn Wagon* is a light square-box wagon with two seats and a standing top. It was often drawn by a single horse. This carriage was developed early in the nineteenth century, and is said to have acquired its name because General Henry Dearborn used one in the field. During the 1820s a number of Dearborns were used to carry freight over the Santa Fe Trail. Their adaptability to this use seems questionable due to their small size. No accurate description of the early Dearborns has been found, but it is believed they were heavier than the later types.

Later Dearborns had a body about six feet in length, suspended on two elliptic springs. The standing top was supported by eight slender pillars, except for one variety in which the two front pillars were omitted to give the vehicle a lighter appearance. Each side was closed by three curtains, while a single curtain closed the rear. The rear end-gate was sometimes hinged, and the seats were often made to slide in either direction, making the Dearborn useful for carrying both passengers and baggage.

In the nineteenth century the terms, Dearborn Wagon, Jersey Wagon and Carryall were often used somewhat synonymously. [55]

The Germantown, or Germantown Rockaway, is a style carriage believed to have been first built in 1816 by C.J. Junkurth, of Germantown (now a part of Philadelphia). A very marked influence of the Coachee, also a product of the Philadelphia area, can be seen in the 55 Germantown. This vehicle appears to be the successor to the Coachee. The body displays nearly identical lines, having side doors, and pillars supporting the roof that provides protection to passengers and driver alike. Seating for six passengers differs slightly from the Coachee, the seats arranged with the center seat facing toward the rear. The Germantown frequently had a storm hood attached to the front of the roof to assist in protecting those passengers on the front seat. [56]

The *Jersey Wagon* is a type of traveling wagon used in America during the late eighteenth and early nineteenth centuries, the term apparently being almost synonymous with the earlier form of Coachee. Most common in the New Jersey-Philadelphia area, though it later migrated to more distant parts. They are made very light, hung on springs with leather braces, and travel very pleasantly. They are covered at the top with painted canvas. On the sides, there are three rows of curtains and those in the outer rows are likewise of painted canvas. Those in the middle row are of linen, and the inside curtains are generally green baize. Numerous references indicate this was a very popular type of carriage. [57]

The *Pleasure Wagon* is a light carriage common to New England, developed during the early nineteenth century from the light work-wagon. It had a modified square-box body with raved-side construction, and a slightly curved bottom line. In some instances the body was mounted directly on the running gear, but in other cases was suspended on either thoroughbraces or springs. The seat, usually untrimmed, was mounted on wooden cantilevered supports which provided most of the riding comfort. The entire seat-unit could be readily lifted out, so that the 56 wagon could be used to transport light items. These carriages were generally painted bright colors, and panels were frequently decorated with floral designs. [58]

The *Rockaway* is a four-wheeled, covered carriage with either paneled or curtained sides, having a driver's seat that is included in the body proper (and on a level with the other seats), and a common roof that projects over the driver's seat. The carriage was drawn by either one or two horses, depending on its size and weight.

The Rockaway is a distinctive American style of carriage which is believed descended from the late eighteenth-century Coachee, through the Germantown. Gradual improvements, such as the addition of curtains, panels, doors, windows, and better suspension resulted by mid-century in the fully developed Rockaway, though continued styling changes frequently altered its appearance. They were built in a profusion of styles, and a variety of names was applied to them. [59]

Although efforts to lighten draft and construction were made in England and Europe, the greatest advances in this area were found in the work of American coach makers. Continuing the pursuit of lightness in construction and resulting lower cost, the Rockaway, and to a lesser extent the Pleasure Wagon, gave way to the wide array of light, owner-driven vehicles of the mid to late-nineteenth century called Buggies. Thus, the American development of light-waggons, led to further development of a wide assortment of vehicle styles including the improved Stage Waggon, Stage Coach, Family Waggon, Coachee, Dearborn, Germantown, Jersey Wagon, Pleasure Wagon, Rockaway, and finally the American Buggy.

57

**The Wilkinson Coachee**

The Wilkinson Coachee was owned by Jemima Wilkinson (1707-1818), who founded the Universal Friend religious society in Western New York. The carriage is owned by the Ontario County Historical Society and on loan to The Granger Homestead Carriage Museum in Canandaigua, New York where it is on exhibition. This coachee was built for Jemima Wilkinson by a coach maker in Canandaigua about 1810.

Colonial Williamsburg Digital Library

about:blank


Illustration 11. Wilkinson Coachee Showing Door on Left Side. Date Unknown.

Carriage authorities who have examined this carriage include Don Berkebile, Merri Ferrell, Tom Ryder and George Isles. These authorities have not challenged the date of ca. 1810 58 for the vehicle, but some have suggested the undercarriage might be older than the body. A brake assembly was added to the undercarriage at some later date.

The coachee has two passenger seats lined with tan fabric in addition to the wooden driver's seat. The coach-shaped body has a fixed top is supported with eight pillars and a door on the left side. The interior of the top is covered with light-weight blue floral fabric, and the interior of the sides are lined with blue velvet, which may not be original. The body appears to be painted blue, with a six-pointed star and cross painted on the side and end panels.


Illustration 12. Wilkinson Coachee, ca. 1985.

59

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 48 of 223 PageID #:3925



Illustration 13. Right Side of Body Showing Star.

60

*Extras*

| | |
|---|---|
| If glasses in the doors | £ 7.10.0 |
| If blinds & glasses | 10.10.0 |
| Of a boot on the fore part of the carriage | 3.0.0 |
| If paneled up behind with a glass | 5.0.0 |
| A step for the footman & holders | 1.17.6 |
| Ornaments on the doors | 1.10.0 |
| The body close before & a coachman seat & hammercloth with fringes, etc. | 15.0.0 |
| If a circular seat | 1.10.0 |
| Pannel & glasses in the fore part | 12.0.0 |
| Open quarters & blinds | 27.0.0 |
| If the mouldings are gilded | 4.10.0 |

On May 16, 1803, George Lewis, Esq. ordered a coachee from John Feneyhough, Coachmaker of Fredericksburg, Virginia described as follows:

| | |
|---|---|
| To a new coachee with one door | £75.0.0 |
| Additional expense of one door and step | 5.0.0 |
| To a sett of steel springs instead of jacks | 6.0.0 |
| To a new boot to forepart of carriage covered with neats leather | 4.10.0 |
| Total | £90.10.0 |

Judge St. George Tucker of Williamsburg ordered a Coachee from N. & J. Tichenor, Coach Makers of Richmond, and delivered on May 27, 1818. The Tichenor Shop was located on "the south side of H Street, near the theatre," where they not only manufactured Coachees, but offered for sale those made by Thomas Ogle of Philadelphia. Judge Tucker's carriage is described as follows:

> "*Estimate of a Coachee for Judge Tucker*
> *The Body Upper back pannel with Glass*
> *Glass in the Doors partition front with Glasses*
> *Venetian blinds in the Quarters With upper curtains for*
> *Winter, the linings best Blue Morrocco, Lace Trimmings &c. best Quality*

62

**Coachees in Virginia**

Personal Property Tax Records for Virginia indicate Coachees became very popular after the early 1790s. The earliest found to date is 1791, owned by Beverly Randolph in Henrico County. By 1810, a total of 60 coachees were taxed in Henrico County.

Makers of the extremely popular coachee and related styles were numerous in Virginia. Alexander Quarrier, Coachmaker of Richmond, Virginia offered "Light Waggons for families" in his advertisement in the January 23, 1788 issue of The Virginia Independent Chronicle. On June 5, 1794, Flemming Russell, Coachmaker of Richmond, offered "A nice Family Carriage" for sale, and on May 30, 1797, he offered Coachees for sale. An inventory, dated December 11, 1794, of the estate of Francis Brown, Coachmaker of Petersburg, Virginia listed an unfinished Coachee undercarriage valued at 90 shillings and an unfinished Coachee body valued at 60 shillings. Also, Joshua West , Coachmaker of Richmond offered Coachees for sale in December 1808.

Alexander Penman, Coachmaker of Philadelphia, sent an estimate of costs for a Coachee to Samuel Love, Esq. of Newgate, Virginia. The copy in the Smithsonian Institution is undated; however, Penman built the Chew Coach in 1788 and is listed in the Philadelphia city Directory as late as 1793. This Coachee is described as follows:

A neat light Coachee hung on warranted steel springs, lined with cloth at 22/6 per yard, and suitable laces, painted any color and clear varnished, the mouldings picked out fashionably with harness, bridles and reins complete for a pair of horses £100.0.0

61

| | |
|---|---|
| The Carriage part, Boot & Arms (?), the perch plated on the Sides with Iron, hung on Slings (thoroughbraces) Woodwork of the body | $100.00 |
| Carriage and Wheels | 50.00 |
| Iron Work, Perch plated on the Sides | 130.00 |
| Boot | 10.00 |
| Painting | 50.00 |
| Body Locks (loops?) | 12.00 |
| Slings, pole pieces, Whippletree Straps & Steady Do | 20.00 |
| Stuffing pole | 3.00 |
| 4 Quarter Venitian blinds | 40.00 |
| 1 pair of 3 fold steps | 20.00 |
| Leather for Do | 6.00 |
| Leather for covering rackes (?) | 2.00 |
| Leather for roof | 12.00 |
| Leather for trimming front of body 6.00 | |
| Carpet | 2.50 |
| 11½ yds Bombazette | 5.75 |
| 20 "Fringe | 4.00 |
| 60 " Narrow Lace | 12.00 |

| | |
|---|---|
| 25 "Broad " | 25.00 |
| 11 Tassels | 5.50 |
| 18 Skins of Morrocco | 75.00 |
| Curled hair and Moss | 12.00 |
| Inside lining, Tacks, tread & c | 8.00 |
| 5 Glasses (of the very first Quality) | 12.00 |
| 2 ½yrds Ca_____(?) for covering glass frames | 7.50 |
| Labour lining the body | 35.00 |
| Plated Door and Commode (?) Handles | 13.00 |
| 18 feet of be(a)ding round roof | 5.00 |
| 18 " round Waist | 4.00 |
| 3 Doz. Knobs | 2.00 |
| 1 pair plated footman's staples | 0.50 |
| 2 pair Glass string rollers | 2.00 |
| 1 Sett plated bands | 8.00 |
| 2 pair of check Turrets | 4.00 |
| Cover | 20.00 |
| Harness | 170.00 |
| Total | $938.75" |

(60)

63

In Philadelphia, the Account Book of William Hunter contains an order, dated June 16, 1790, for a Coachee to be built for Major William Ward Burrows. The order reads:

"Major Wm. Ward Burrows
To a new Coachee hung on Steel springs, screwed axles, double folding steps, glasses in door &front, with spring Curtain.

A coachman's seat & harness for a pair of horses £120.00.0

To a new cover for Coachee 1.10.0

£ 121.10.0

(61)

67

# INDEX

A
B
C
D
E

Early Stage Waggons,
9

Early Travel,
3

Eastern Shore,
3, 7

Eastman, Ralph,
7

Eaton, Orsamus,
41

Edenton, North Carolina,
5, 17
68

Elizabethtown, New Jersey,
48

Exchange Line,
35

F

G

H

I

    Isles, George,

        57

J

L

M

N

    69

O

P

    Paddock, Adino,

        8, 9

    Passenger Wagon,

        40

    Penman, Alexander,

        60

    Pennock, William,

        7

    Personal Property Tax Records,

        3, 60

    Perth Amboy,

        4

    Petersburg, Virginia,

        6, 7, 21, 43, 60

    Philadelphia, Pennsylvania,

        4, 5, 15, 19, 21, 23, 24, 25, 33, 35, 48, 54, 55, 60, 61, 63, 6465, 66

    Pillars,

    Piscataway,

5

Pittsburgh, Pennsylvania,

36, 42

Pleasure Waggon,

49, 55, 56

Portsmouth stage,

17

Portsmouth, New Hampshire,

Post Master,

4

Post Office,

1, 4, 5, 36, 37

Potomac River,

5

Powell, Richard E., Jr.,

51

Power, Tyrone,

32

Q

R

S

Saratoga,

27

Schuylkill River,

25

Scnider, Conrad,

19, 48

Scollay, John,

9

Seats,

Seats, Bench,

11, 16

Seats, Passenger's,

14, 58

Shafts,

12, 50, 51

Shenandoah Valley,

3

Sleepy Hole,

16

Smithfield, Virginia,

16

South Africa,

40

South America,

40

Southern Stage Waggons,

17

Spencer, Massachusetts,

18

Spotswood, Alexander,

4, 5

Springfield, Massachusetts,

18

Springs,

St. John's Masonic Grand Lodge,

8

Stage,

*Stage Coaches*,

Stage Driver,

*Stage Drivers*,

27

*Stage Travel*,
　　22

Stage Waggons,

Stayers, Bartholomew,
　　7, 8

Stiles, Amos,
　　21, 50, 51, 64

Stratton, Ezra,
　　53

Sutcliff, Robert,
　　48, 52

T

U

Universal Friend,
　　57

V

W

71

EXHIBIT C

This is a reproduction of a library book that was digitized by Google as part of an ongoing effort to preserve the information in books and make it universally accessible.



https://books.google.com

ase: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 59 of 223 PageID #:39



COACH OF THE TIME OF CHARLES II.



Scaffale E

Palchetto 1

6

Digitized by Google

# THE

# HISTORY OF COACHES

BY

George Athelstan

## G. A. THRUPP.

" O, then, I see Queen Mab has been with you,
Drawn with a team of little atomies,
Her Waggon spokes made of long spinners' legs :
Her Chariot is an empty hazel-nut,
Made by the joiner squirrel, or old grub,
Time out o' mind the Fairies' Coachmakers."
*Romeo and Juliet,* Act I. Scene 4.

*WITH NUMEROUS ILLUSTRATIONS.*

## LONDON:

### KERBY & ENDEAN, 190 OXFORD STREET.

### NEW YORK: THE "HUB" PUBLISHING COMPANY.

### 1877.

Digitized by Google

LONDON :

KERBY & ENDEAN, 190 OXFORD STREET,

*Printers and Publishers.*

Digitized by Google

124          AMERICAN COACHMAKING.

The company builds for its own use about thirty 'busses each year; the average weight of an omnibus is 24 cwt. Most of the vehicles are now provided with brake retarders, which are set in action by the foot of the driver, and check the speed down hill, or help to stop the omnibus to take up a passenger without so much strain upon the horses as formerly.

In Vienna the public omnibuses are longer, and are divided into two compartments, entered by separate doors; they carry twelve inside and six outside. The speed is rather slow and the appearance of most very shabby. In summer other omnibuses are also used, which are constructed without sides or windows, and in hot weather are agreeable from the free admission of air without draught.

American stage coaches began in 1786. As early as 1697 an innkeeper, named John Clapp, at the Bowery, New York, kept a hackney coach for the accommodation of the public; and in 1699 a law was made forbidding fast driving of " slees " through the streets of New York. The first private coach owned there appears to have been in 1745 by a Lady Murray. In 1786 there were but three Coachmakers' factories in New York: Mr Steel, in Pine Street, Mr Jones, and James and Charles Warner, in Broadway.

In 1789 six more factories had been opened in the coach trade, and five livery yards had begun to keep hackney coaches. In 1790 a coach was built in Philadelphia for eight hundred dollars, and there were eight Coachbuilders in that city. But the usual vehicle was a sort of wheel chair upon wooden springs, and

Digitized by Google

# EXHIBIT D



THE STAGE-COACH BUSINESS IN THE HUDSON VALLEY

Author(s): Oliver W. Holmes

Source: *The Quarterly Journal of the New York State Historical Association* , JULY, 1931, Vol. 12, No. 3 (JULY, 1931), pp. 231-256

Published by: Fenimore Art Museum

Stable URL: https://www.jstor.org/stable/43565350

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Fenimore Art Museum* is collaborating with JSTOR to digitize, preserve and extend access to *The Quarterly Journal of the New York State Historical Association*

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:02 +00:00
All use subject to https://about.jstor.org/terms

# THE STAGE-COACH BUSINESS IN THE HUDSON VALLEY*

Transportation is a major theme in the history of New York State, influencing and interpreting all other phases of its life and growth. Indeed the position which the Empire State today holds is due very largely to its fortunate situation in respect to natural routes of trade and travel. It is therefore but right that in chronicling its history we should have much to say of steamboats, canals, railroads, terminals, harbors, ocean shipping, lake tonnage, highways and airports. Not only should their factual history be detailed, but attention should be directed to the subtle and far-reaching changes, the social and economic shiftings which accompany changes in transportation. For all great inventions and innovations to a degree create a characteristic civilization of their own, since they force readjustments in all departments of life. Few innovations produce more far-reaching reverberations than those which improve man's means of getting about and of sending his word to others. Before words were hitched to electricity it will be remembered that communication was dependent upon transportation, so that the latter served a dual role. Even yet, travel and transport facilities, necessary as they are for the exchange of first hand contacts and experiences as well as more material things, remain a major index of the character of a civilization.

In all America, and therefore in New York State, there has been first an era of travel by foot, next a period of horse and rider, and afterwards in succession a stage-coach age, railroad age, and motor age, with an age of air travel apparently full upon us. We who have witnessed the introduction of the automobile and the airplane have first hand knowledge of the widespread transformation in economic, social, and even cultural life which these agencies have brought about. The future historian will consider them among the profoundly significant causative factors of the age. The railroads at the time of their introduction produced changes no less revolutionary, changes which no historian has yet adequately analyzed. The stage-coach and the horse and rider symbolize earlier stages of development so well because they in great measure helped to produce the conditions of life which existed. Each type

*Paper read before the New York State Historical Association at Newburgh, September 25, 1930.

231

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:02 +00:00
All use subject to https://about.jstor.org/terms

232        *OLIVER W. HOLMES*

of communication directly determined the tempo of American life for the period of years in which it was dominant. Consider the stage-coach then, not as an antiquarian curiosity, but as a living, creative agent, shuttling back and forth across the face of our state, carrying news, mails, packages and people into nearly every community and binding all communities together into a patterned civilization partly of its own determining.

The first important stage line to be established in New York was set up in June 1785 along the east side of the Hudson River between New York City and Albany. The proprietors were Isaac Van Wyck, John Kinney and Talmadge Hall, tavern-keepers respectively of Fishkill, Kinderhook and New York.[1] Staging had

---

[1]Their first advertisement, dated Apr. 17, 1785, appeared in the New York *Packet* for Apr. 25, 1785. According to this advertisement the stage was "to commence running the 2d day of June next."

Isaac Van Wyck (1755–1811), the leading proprietor, was a worthy representative of a well-known Fishkill family. He was an ardent patriot, signing the Articles of Association in 1775, and serving several terms in the Revolutionary army, the second time with rank of captain. A part of the army, while encamped at Fishkill, was quartered on his farm. After the war, in addition to being a tavern-keeper and stage-coach proprietor, he served as postmaster at Fishkill until the Postmaster General in 1793 decided that it was improper for one person to be both a mail contractor and postmaster. He was a leading incorporator of the Highland Turnpike Company (*post*), and between 1794 and 1811 served four terms in the State Assembly. He is described as a "medium size man, very social, pleasing and popular in his manners, and held in much respect in the community." [T. V. Brinckerhoff], *Historical Sketch and Directory of the Town of Fishkill* (1866), p. 95. See also A. Van Wyck, *Descendants of Cornelius Barentse Van Wyck* (1912), pp. 51, 77, 87, 122, and the *Postmaster General's Letter Books* (in Federal Post Office Building, Washington, D. C.), letters to Col. Bauman, Mar. 4, 1793, and to Egbert Benson, Mar. 8, 1793.

Talmadge Hall, a native of New Fairfield, Conn., had a long and adventurous career in the Revolutionary army, winning the rank of lieutenant, and being twice wounded in the storming of Stony Point under Wayne. In October 1784 Hall became proprietor of the New York end of the newly established New York and Boston stage line. The next May he announced that he had taken "the elegant House on Haerlem Heights of Isaac Ledyard, Esq., for the accomodation of his eastern and northern stages" and "provided himself with ready and obedient servants, and the best fare the country affords." This house, then known as the Roger Morris Mansion, had been alternately the headquarters of both Washington and the British General Clinton during the Revolutionary fighting on Manhattan, and was destined to become further famous as the home of the merchant Jumel, and later of his widow. When advertised for sale in 1788 the mansion and outbuildings were described as "probably not exceeded in this State, for elegance and spaciousness, and the prospect from the house is the most commanding on the island." See adv. in the New York *Packet*, Mar. 18, 1788; see also W. H. Shelton, *The Jumel Mansion* (1916). Financial difficulties seemingly forced Hall to give up the Morris Mansion early in 1787, for in June he was located at "no. 49 Cortlandt St., leading from Oswego Market, to Powles-Hook ferry, being the first brick house on the left hand from Broadway." (Adv. in the New York *Journal*,

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:02 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 68 of 223 PageID #:3945

developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia, but not in New York, although mention should be made of lines running across New Jersey between New York City and Philadelphia.[2] The reason is, probably, that in all other directions there existed excellent facilities for water transport connecting New York City with nearly every town of importance in the colony. No better highway for serving the state could have been made to order than the broad, deep Hudson, extending far inland through the heart of the settled area of that period.

Yet the Hudson was frozen in winter when mails and passengers must journey by land. Even when the river was open the sloops of the day must not be thought as swift and comfortable as the steamboats of a later generation. With luck a passage to Albany could be made in two days but four days was the average, while a journey might at times extend to a week.[3] Nor was the trip in the small vessels, often heavily laden with freight, without its dangers in case of sudden squalls on the river. To the timid it

----

June 21, 1787). By September 1787, he had given up his stage lines and in December he was forced to sell his tavern and make an assignment to his creditors, after which he disappears from sight. His tavern was taken by Christopher Beekman, and in 1789 Beekman was succeeded by Mrs. Fraunces, who ran this house while her husband was steward in the President's household. The tavern remained the starting point of both the Boston and Albany stages, and Cortlandt Street remained the staging center of New York City until the 1850's. For Hall's connections with the Boston line see O. W. Holmes, "Levi Pease, the Father of New England Stage-coaching" in *Journal of Economic and Business History* (Feb. 1931), 3:241–63.

Of John Kenney nothing further is known.

[2] For movements across New Jersey to Philadelphia in colonial times see W. H. Benedict, "Travel Across New Jersey in the Eighteenth Century," in *New Jersey Historical Society Proceedings*, new series (1922), 7:97–119. There were two colonial stage lines on Long Island, one to Jamaica, advertised in the New York *Mercury*, June 8, 1767, and the other to Sag Harbor, advertised in the New York *Journal*, May 28 and July 9; 1772. It is not known whether these lines existed in other years, but these were the only notices found in going through files of the *Mercury*, *Journal*, and other newspapers for the decade previous to the Revolution. There was also an attempt in 1772 to set up a stage line between New York and Boston, which failed after making several journeys. See advertisements in the New York *Journal*, Mar. 5 and June 25, 1772; Boston *Gazette*, June 1, 1772; Boston *Evening Post*, July 6, 1772; and S. A. Drake, *Old Boston Taverns*, p. 68.

[3] John Maude, who made the journey by sloop in 1800 wrote in his *Visit to the Falls of Niagara* (1826), p. 19: "Our passage of four days may be considered a long one, at this season of the year. . . The shortest passage ever made on this River was by this same Sloop and Captain; he made it in sixteen hours and six minutes. . . The passage often takes a fortnight to perform it. . . ." Fare for the trip was usually $2. Passengers paid extra for bed and board, the charge in Maude's case being $4.50.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:02 +00:00
All use subject to https://about.jstor.org/terms

# EXHIBIT E

ASPEN CASEBOOK SERIES

*JOHNSON*
*KOPEL*
*MOCSARY*
*O'SHEA*

# FIREARMS LAW AND THE SECOND AMENDMENT
## Regulation, Rights, and Policy



Wolters Kluwer
Law & Business

greatly in the eighteenth century, but even the main English highways were not safe after dark. Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols.[32] The muzzle of the blunderbuss flared outward slightly, like a bell. This made it easier to load while bouncing in stagecoach, or on a swaying ship.[33] One military use was by sailors to repel boarders.[34] In the American Revolution, Americans found it most useful for "street control, sentry duty and as personal officer weapons."[35]

For centuries England had been a backwater for firearms manufacture, and most firearms, other than basic military matchlocks, were imported. By the early eighteenth century, that had changed, and far more handguns were manufactured in England than anywhere else.[36]



British navy blunderbuss made about 1760.

### 4.   *Breechloaders and Repeaters*

The blunderbuss, the Brown Bess, fowlers, and the vast majority of other firearms were *muzzleloaders.* To load or reload the gun, the user would pour a

---

32.  George, at 80, 91, 98.
33.  Brown, at 143.
34.  George, at 59.
35.  Neumann, at 20.
36.  Harold L. Peterson, Arms and Armor in Colonial America 1526-1783, at 212 (Dover 2000) (1956) (handguns); Held, at 51 (no one in England could make a good matchlock before 1660, or repair one before 1600; before 1620, only "crude military matchlocks" and cannons were manufactured in England).

# EXHIBIT F



# STATUTES AT LARGE

OF

# VIRGINIA,

FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, INCLUSIVE,

## IN THREE VOLUMES,

(NEW SERIES,)

BEING A CONTINUATION OF HENING.

## VOL. I.

BY SAMUEL SHEPHERD.

RICHMOND:

PRINTED BY SAMUEL SHEPHERD.

1835.

UNIV. OF MICH. LAW LIBRARY

Digitized by Google

*brought for her lands.*

render the wife's lands in any suit instituted against the husband and wife for lands which are her inheritance during the coverture, then the wife may come at any time before judgment, and defend her right.

*When the reversioner may defend a suit brought against the tenant for life.*

3. If tenant in dower, tenant by the curtesy, or otherwise for term of life, or by gift, where the reversion is reserved, do make default, or will give up, the heirs or they unto whom the reversion belongeth, shall be admitted to their answer if they come before judgment; and if upon such default or surrender, judgment happen to be given, then the heir, or they unto whom the reversion belongeth, after the death of such tenants, shall in no wise be injured by such default or surrender.

*When the dying seized of a disseisor shall not take away the right of entry.*

4. The dying seized hereafter of any disseisor having no right or title, shall not be such descent in law as to take away the right of entry from such as, at the time of the death of the disseisor, had lawful title of entry, except such disseisor hath had peaceable possession five years next after the disseisin committed without entry, or continual claim of such as have lawful title.

*Husband's conveyance of his wife's lands not to prejudice her or her heirs.*

5. No feoffment, or other conveyance, or other act or acts hereafter to be made, suffered or done by the husband only, of any lands, tenements or hereditaments, being the inheritance or freehold of his wife, during the coverture between them, shall in any wise be, or make any discontinuance thereof, or be prejudicial or hurtful to the said wife or her heirs, or to such as shall have right, title, or interest to the same, by the death of such wife; but the said wife or her heirs, and such other to whom such right shall appertain after her decease, shall and may then lawfully enter into all such lands, tenements and hereditaments, according to their rights and titles therein; any such feoffment, or other conveyance or act to the contrary notwithstanding.

*Repealing clause.*

6. All and every statute and act, or clause and clauses of any statute or act, coming within the purview of this act, shall be, and the same are hereby repealed : *Provided nevertheless,* That nothing herein contained shall be construed to affect any right which may have accrued, or been vested before the commencement of this act.

*Proviso.*

*Commencement.*

7. This act shall commence in force from and after the passing thereof.

CHAP. 52.—An ACT reducing into one the several acts for the settlement and regulation of ferries.

(Passed December 26, 1792.)

*Public ferries established.*

1. *Be it enacted by the general assembly,* That ferries be constantly kept at the places hereafter mentioned, and at the rates annexed to each ferry, that is to say :

*Over the bay of Chesapeake.*

*Over the bay of Chesapeake.*

From York, Hampton and Norfolk towns, to the land of the heirs of John Bowdoin, deceased, on Hungar's river, for a man or horse passing singly, three dollars and thirty-three cents; for a man and horse, or if there be more, for each, two dollars and fifty cents.

| | For a Man. Cents. | For a Horse. Cents. |
|---|---|---|
| *Over the Patowmac river and its branches.* | | |
| From Henry Ashton's to Cedar Point Maryland, | 42 | 42 |
| From Thomas Rowe's to Cedar Point, | 42 | 42 |
| From Hooe's to Cedar Point, | 33 | 33 |

*Over Patowmac river and its branches.*

EXHIBIT G

THE

# STATUTES AT LARGE

OF

## SOUTH CAROLINA;

EDITED, UNDER AUTHORITY OF THE LEGISLATURE

BY

DAVID J. McCORD.



VOLUME THE NINTH,

CONTAINING THE ACTS RELATING TO ROADS, BRIDGES AND FERRIES,

WITH AN APPENDIX,

CONTAINING THE MILITIA ACTS PRIOR TO 1794.

COLUMBIA, S. C.
PRINTED BY A. S. JOHNSTON.
1841.

Google

Original from
NEW YORK PUBLIC LIBRARY

OF SOUTH CAROLINA. 61

*Acts relating to Roads, Bridges and Ferries.*  A. D. 1795.

I. *And be it enacted*, by his Excellency Francis Nicholson, Esq., Go- Ferry over vernor, by and with the advice and consent of his Majesty's Honorable Pon Pon, at Council and the Assembly of this Province, and by the authority of the Wrixam's. same, That a public ferry be, and is hereby, established at the plantation of the said James Wrixam, deceased, in Colleton county, across Pon Pon river, which shall be, and is hereby, vested in Mr. Henry Jackson, Mr. John Bull, and Mr. Christopher Smith, commissioners, for the space of ten years next ensuing the ratification of this Act, who are hereby empow- ered to agree with any person or persons who shall undertake the looking after the said ferry ; and there shall be found and provided a good and suf- ficient ferry boat, for which there shall be paid fifty pounds by the public, and no more, which ferry boat shall be able to carry over four horses at the least ; and the person or persons so to be appointed by the said commission- ers, shall find and provide two able servants or slaves, who shall constantly attend the said ferry, at all hours, as well by night as by day, to carry over passengers, their horses, servants and slaves.

II. *And be it further enacted* by the authority aforesaid, That the Rates of Ferri- person so to be appointed by the said commissioners, shall be allowed for ferriage the several rates and prices following, that is to say : for a white age. man, fifteen pence ; for a slave, fifteen pence ; for a horse, fifteen pence ; for cattle, six pence per head, that shall be swam over, and fifteen pence per head if carried in the ferry boat ; for sheep and hogs, per head, seven pence half penny.

III. *And be it further enacted* by the authority aforesaid, That the per- son who shall have the charge of the said ferry, shall keep the said ferry Penalty for boat in good and sufficient repair, from time to time and at all times, during neglect. the said term of ten years, and shall cause constant attendance to be given at the said ferry at all times of the day and night as aforesaid, under the several penalties and forfeitures following, that is to say :—for non-attend- ance the first half hour, ten shillings ; for an hour, twenty shillings ; for every hour after, forty shillings. And every justice of the peace in the said county, upon information made to him upon oath, in writing, of such neglect, by any person who shall be delayed thereby, shall be, and is here- by, empowered to levy such forfeitures by warrant of distress under his hand and seal, directed to any adjacent constable, and sale of the default- er's goods ; and in case of no goods to be found, against the body of the defaulter ; the monies arising by such defaults to be to the use of the poor of the parish.

IV. *And be it further enacted* by the authority aforesaid, That Mr. Hen- ry Jackson, Mr. John Bull, and Mr. Christopher Smith, be, and are hereby Commissioners appointed, commissioners for inspecting into the said ferry, and to appoint persons, from time time, to look after the same ; and to remove such per- son or persons upon notorious neglects, and others in his and their stead again to constitute, as they shall see necessary.

V. *And be it further enacted* by the authority aforesaid, That all per- sons under arms in times of alarms and expresses, shall have their ferriage free, themselves, servants, and horses.

VI. *And be it further enacted* by the authority aforesaid, That there shall be, and is hereby established, a scout consisting of seven men and an offi- Scout esta- cer, to scout on the out settlements of Ponpon, for the better security of the blished. inhabitants, and to prevent their being surprised by Indians, who shall be under the command of a field officer, to be nominated by his Excellency the Governor, or commander-in-chief for the time being, for that purpose ; and

Digitized by Google

Original from NEW YORK PUBLIC LIBRARY

# EXHIBIT H

# ACTS AND RESOLVES

OF

## MASSACHUSETTS.

## 1796-97.

[PUBLISHED BY THE SECRETARY OF THE COMMONWEALTH, UNDER AUTHORITY OF CHAPTER 104, RESOLVES OF 1889.]

# ACTS

AND

# LAWS

OF THE

# COMMONWEALTH

OF

# MASSACHUSETTS.

BOSTON:

PRINTED BY YOUNG & MINNS,

PRINTERS TO THE HONORABLE THE GENERAL COURT OF THE COMMONWEALTH,
AT THEIR PRINTING OFFICE, STATE STREET.

M,DCC,XCVI.

Reprinted by WRIGHT & POTTER PRINTING COMPANY, State Printers.

1896.

Incorporated.

the Islands contained within the lines described on the plan of number Six, drawn by Osgood Carleton and deposited in the Secretary's Office ; together with the Inhabitants within said lines & on said Islands, be & hereby are incorporated into a Town by the name of Addison ; with all the privileges & immunities which other Towns in this Commonwealth do or may possess or enjoy.

D. Merrit, Esq. to issue warrant.

*And be it further Enacted by the authority aforesaid,* that Daniel Merrit Esqr. be and he hereby is authorized and directed to issue his Warrant to some principal Inhabitant of the said Town of Addison, requiring him to warn the Inhabitants thereof to assemble at some proper time & place to be expressed in said Warrant, for the purpose of choosing such Town Officers, as Towns are by law empowered to choose in March or April annually.

*Approved February 14, 1797.*

## 1796. — Chapter 42.

[January Session, ch. 9.]

### AN ACT FOR REGULATING FERRIES.

Ferrymen to be licensed.

SECT. 1. *Be it Enacted by the Senate & House of Representatives in General Court assembled and by the authority of the same,* that no person or persons whatever shall keep a Ferry within this Commonwealth, so as to demand or receive pay, without a special licence first had and obtained from the Court of General Sessions of the Peace of the County wherein such Ferry may be ; and the said Court is hereby empowered to grant such licences to such person or persons as shall be judged suitable for

Fare regulated.

such service by the same Court ; and to state the Fare or Ferriage at each Ferry, for Passengers, Horses & other Creatures, Carriages, Waggons, Carts, Teams and other things there transported, always having regard to the breadth and situation of, and the more or less passing

Bond to be required.

at, any Ferry ; in all cases taking bond, with sufficient sureties, of each Ferryman, for the faithful performance of

Exception.

the duties and services of his place, excepting however all such Ferries as are already stated and settled by the Court or Town to whom they appertain.

Ferrymen to keep boats.

SECT. 2. *Be it further Enacted,* that all ferrymen at the several ferries in this Commonwealth, as well those stated and settled as aforesaid, as others, shall keep a good Boat or Boats in good repair, suitable to the water they

are to ferry over, and give ready and due attendance on
Passengers on all occasions, for the times and according to
the regulations established at any Ferry; and the keeper
or keepers of each Ferry, for every neglect of such attend-
ance shall forfeit and pay one Dollar; and for every *Penalties for neglect.*
neglect in keeping such a Boat, Twenty Dollars; one
moiety thereof in each case, to the use of the Common-
wealth, and the other moiety to him or them who shall
inform and sue for the same; and be further liable, to pay
in an Action on the case, all such special damages as any
person shall sustain by such neglect.

SECT. 3. *Be it further Enacted*, that if any person or *Unauthorized persons not to*
persons shall keep a Ferry or transport Passengers over *officiate as*
or across any stated Ferry, so as to demand or receive *Ferrymen.*
pay, having no right or authority so to do, he shall forfeit
and pay for every such offence, Four Dollars; one moiety
thereof to the Commonwealth, and the other to him or
them who shall inform and sue for the same; and be
further liable in a special action on the case, to pay such
damages as may or shall accrue to the person or persons
assigned and authorized to keep any such stated Ferry or
Ferries.

SECT. 4. *Be it further Enacted*, that whenever the *Towns to pro-*
Court of General Sessions of the Peace of any County in *vide Ferrymen under certain*
this Commonwealth shall judge it necessary, to set up a *circumstances.*
ferry for the convenience of passing any river or waters,
and no person shall appear to keep the same for the
stated profits thereof, the Town or District wherein such
Ferry may be, shall take effectual care to provide suitable
person or persons to keep and attend the same at such
place and in such times of the year as the said Court
shall judge necessary; which person or persons shall be
licensed by such Court as aforesaid. And the said Court
shall take bonds with sureties of such persons for the
faithful performance of the duties and services of their
places; and state the fare or ferriage to be demanded
and received at such Ferry; having regard to the breadth
& situation of, and the more or less passing at the same.
And the person or persons so appointed Ferrymen at any
Ferry so set up, shall keep a good boat or boats in good
repair, suitable to the waters they are to ferry over; and *Penalties for neglect of*
on failure, at any time, so to do, shall forfeit & pay *Ferrymen.*
Twenty Dollars for each neglect; and shall also give
ready and due attendance on all passengers; and for each

76                    ACTS, 1796. — CHAPTER 43.

neglect so to do, shall forfeit & pay one Dollar — one moiety thereof in each case to the Town or District wherein such Ferry may be, and the other moiety to him or them who shall inform and sue for the same.

*Towns each side a river alternately to provide Ferrymen.*

SECT. 5.  *Be it further Enacted*, that if any such Ferry so judged necessary shall be over any river or water, when one Town or District joins thereto on one side, & another Town or District on the other side; in such case the said Towns and Districts shall, either jointly or alternately, provide such person or persons to keep such Ferry as the said Court shall order.

*Penalty for neglect to provide Ferrymen.*

SECT. 6.  *Be it further Enacted* that any Town or District neglecting to provide suitable persons to keep ferries as aforesaid, shall forfeit & pay Forty Dollars for each month's neglect; one moiety thereof to the use of the Commonwealth, and the other moiety to him or them who shall inform and sue for the same.   And all the forfeitures aforesaid which may be incurred, shall be recoverable in an action of Debt, with costs of suit, before a Justice of the Peace or Court of Common Pleas of the County wherein the Ferry may be, according to the amount of the Forfeitures to be recovered.

*Former laws repealed.*

SECT. 7.  *Be it further Enacted* that this Act shall take effect, and be in force on and after the first day of July next; and that three Acts relating to the subject matter of this Act; one passed A.D. Sixteen hundred & ninety four for regulating Ferries; another in addition thereto, A.D. Seventeen hundred & twenty-six, and a third A.D. Seventeen hundred & sixty relating to Ferries & continued in force to the first day of November next, shall on & after the said first day of July next be repealed, and cease to operate — excepting, however, they shall remain in force for the purpose of recovering any forfeitures that may accrue by virtue of them.

*Approved February 14, 1797.*

### 1796. — Chapter 43.

[January Session, ch. 10.]

AN ACT TO INCORPORATE JOSHUA THOMAS ESQR. AND OTHERS FOR THE PURPOSE OF CONVEYING FRESH WATER BY PIPES IN THE TOWN OF PLIMOUTH.

*Be it enacted by the Senate and House of Representatives in General Court assembled, & by the authority of the same*, that Joshua Thomas, William Davis, James

*Persons incorporated.*

EXHIBIT I

*ACTS AND LAWS.*



# ACTS and LAWS,

Made and paffed by the General Court or Affembly of the State of Connecticut, in America, holden at Hartford, in faid State, on the fecond Thurfday of May, Anno Domini, 1791.

An Act to exclude certain perfons, holding Offices under the authority of the United States, from being Members of the Legiflature of this State.

**B**E it enacted by the Governor, Council and Reprefentatives in General Court affembled, and by the authority of the fame, That from and after the fecond Thurfday of May next, no perfon holding an Office under the authority of the United States, which would render him incapable of being a Member of the Congrefs of the United States, fhall, while holding faid Office, be a Member of the Legiflature of this State.

*Perfons holding offices under the United States, not eligible, &c.*

An Act, in addition to, and explanation of an Act, entitled, "An Act for fecuring the Rights of Confcience, in matters of religion, to Chriftians of every denomination in this State."

**B**E it enacted by the Governor, Council and Reprefentatives in General Court affembled, That to give legal effect to any Certificate which fhall hereafter be given to any perfon who claims to be a Diffenter from the ecclefiaftical Societies eftablifhed by Law within this State, it fhall be neceffary that fuch Certificate be figned by two of the Civil Authority living in the town where fuch Diffenter dwells, or by one only, in cafe but one fuch officer lives in fuch town; which authority fhall duly examine the claims of fuch Diffenters; and if he or they fhall judge the fame well founded, he or they fhall give to fuch perfon a Certificate of the following import, viz.

*Certificates to be given to diffenters from, &c. by whom.*

"*We, having examined the claims of ———, who fays he is a Diffenter from the ecclefiaftical Society of ———, and hath joined himfelf to a Church or Congregation of the name of ———; and that he ordinarily attends upon the public worfhip of fuch Church or Congregation; and that he contributes his fhare or proportion towards fupporting the public worfhip and miniftry thereof, do upon examination find that the above facts are true. Dated* Juftices of Peace."

*The form.*

R r r                    Which

*A C T S  A N D  L A W S.*

## Oath.    Cities.    Ferries.                405

An Act, for repealing a Law of this State, entitled, "An Act enjoining an Oath of Fidelity to this State."

*BE it enacted by the Governor, Council and House of Representatives in General Court assembled,* That the said Act be, and the same is hereby repealed.

*Act repealed.*

An Act, in addition to the Powers of the several Incorporated Cities within this State.

*BE it enacted by the Governor and Council, and Representatives in General Court assembled,* That the Mayor, Aldermen and Common Council of each Incorporated City within this State, shall have power, and the same is hereby given to them, to make Bye-Laws relative to restraining Horses, Cattle and Sheep from going at large in the streets and highways within the limits of their respective Cities; and that said Bye-Laws when approved of and published as is provided by Law in respect to the Bye-Laws of said Cities shall have the full force and effect of the Bye-Laws of their said Cities respectively.

*Cities power to make laws for restraining horses, &c from going at large.*

An Act, in addition to an Act, entitled, " An Act for regulating Ferries.

*BE it enacted by the Governor, Council and Representatives in General Court assembled,* That the town of Milford, in the County of New-Haven, have licence and authority, and licence and authority are hereby granted to said town to have, use and keep the Ferry on Ousatonuck or Stratford river, between said town, and the town of Stratford, in the County of Fairfield, commonly called Stratford Ferry, on the east side of said river, and to take and receive all the emoluments, profits and fare which may arise from the transportation of passengers, and of any and ever thing necessary to be transported across said Ferry, from the east side of said river, to the west side thereof; to the sole use and benefit of said town of Milford, for, and during the space of fifteen years, from the rising of this Assembly; and after the expiration of said fifteen years, during the pleasure of the General Assembly. And that said town of Stratford have licence and authority, and licence and authority are hereby granted to said town, to have, use and keep said Ferry, on the west side of said river, and to take and receive all the emoluments, profits and fare which may arise from the transportation of passengers, and of any and every thing necessary to be transported across said Ferry, from the west side of said river, to the east side thereof; to the sole use and benefit of said town, for, and during the space of fifteen years, from the rising of this Assembly, and after the expiration of said fifteen years, during the pleasure of the General Assembly.

*Stratford ferry regulated.*

And that the fare for the aforesaid transportation from the east side of said river, to the west side thereof, shall be the same as is now established by law, for such transportation : And that the Fare for the aforesaid transportation from the west side of said river, to the east side thereof, shall be as follows, viz. For man, horse and load, *six-pence,* for a man, *three-pence,* for a led horse, *four-pence,* for an ox or other neat kine, *eight-pence,* and for sheep, swine or goats, *one-penny-half-penny.* And that the Fare for every two wheel carriage, with one man and draft horse, shall be double, and for every four wheel carriage, one man and draft horse, treble the Fare, for a man, horse, and load, as stated as aforesaid, and that for every additional person or horse, or other beast, the Fare shall be the same as stated as aforesaid, for such single person, horse or other beast.

*Fare stated.*

*Always*

**Provifo.**

*Always provided*, And it is to be underſtood that the aforeſaid licence or authority to ſaid towns reſpectively, is to be on the following conditions, viz. That in addition to the boats already required by law, ſaid towns do jointly, and at equal expence, in a reaſonable and convenient time, build a good flat or ſcow, fit and proper for the tranſportation of wheel carriages, and all ſorts of neat kine, as well as every other thing beſt adapted to be tranſported in each flat or ſcow, acroſs ſaid Ferries. And that they furniſh ſaid flat or ſcow, with oars, and other neceſſary implements for the aforeſaid tranſportation. And that ſaid town of Milford do keep and maintain a dwelling-houſe near ſaid ferry place, on the eaſt ſide of ſaid river, in good repair: and that ſaid town do alſo accommodate ſaid houſe to the good entertainment and reception of travellers. And that in reaſonable and convenient time, ſaid town do repair the two wharves on the eaſt ſide of ſaid river, and make ſteps or ſtairs to the ſame, ſo as to make it convenient to go on board of any boat, flat or ſcow, from ſaid wharf or wharves, and to land from any boat, flat or ſcow on the ſame.

**Flats or ſcows to be built, & furniſhed with oars &c.**

**Dwelling-houſe for entertainment of travellers, to be kept E. ſide the river, wharves to be repaired, & ſteps or ſtairs to be made, &c.**

And that ſaid town of Stratford, do in a reaſonable and convenient time repair the wharf, on the weſt ſide of ſaid river, and the path way or highway leading to the ſame: And that ſaid town do raiſe ſaid wharf and way, to ſuch a height in every part of the ſame, as not to be overflowed by the tides: And that when the ſame ſhall have been raiſed as aforeſaid, that ſaid town do keep the ſame in good repair: And that ſaid town do build and provide ſteps or ſtairs to ſaid wharf, ſo as to make it convenient to go on board of any boat, flat or ſcow from the ſame, and to land from any ſuch boat, flat or ſcow on the ſame. And that if ſaid towns reſpectively ſhall not in ſuch reaſonable and convenient time as the General Aſſembly ſhall determine, perform each and every part of ſaid condition as belongs to ſaid towns reſpectively to perform; ſaid licence, authority or grant, and every and all former licences, authorities or grants to them, to keep ſaid Ferry, ſhall ceaſe and be void, ſo far as reſpects ſaid town, which ſhall fail to perform that part of ſaid condition which belongs to ſaid town to perform as aforeſaid.

**Weſt ſide, wharf and highway to be raiſed, and kept in repair.**

**Licence, &c. to ceaſe, if the above regulations are not complied with.**

### An Act, in alteration of an Act, entitled, " An Act for regulating Ferries."

*BE it enacted by the Governor, Council and Repreſentatives in General Court aſſembled, and by the authority of the ſame,* That the Fare of Derby Ferry, at the Narrows, formerly called Stratford Ferry, at the Narrows, for the future ſhall be as follows, viz. For a man, horſe and load, *three-pence,* footman, *one penny,* led horſe *one-penny-half-penny,* an ox, or any other neat kine, *four-pence,* ſheep, ſwine or goats, *one half-penny,* for every two wheeled carriage, with one man and draft horſe, *ſix-pence,* for every four wheeled carriage, one man and draft horſe, *nine-pence,* and for every additional perſon, horſe or other beaſt, the ſame as is above ſtated in like caſes, for every ox-team and load, *one ſhilling* and *ſix-pence,* and for a waggon, horſes and load, *one ſhilling.*

**Fare of Derby Ferry at the narrows, regulated.**

# EXHIBIT J

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 89 of 223 PageID #:3966

*Augustus S. Clayton*

*Presented March 1 180,*

# A
## DIGEST
### OF THE
# L A W S
### OF THE
# State of Georgia.

*FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN
TO THE YEAR 1798, INCLUSIVE,*

### AND THE

## PRINCIPAL ACTS OF 1799:

#### IN WHICH

Is comprehended the declaration of Independence; the State Constitutions of 1777 and 1789, with the alterations and amendments in 1794.

#### ALSO THE

### *Constitution of* 1798.

#### IT CONTAINS

As well all the Laws in force, as those which are deemed useful and necessary; or which are explanatory of existing Laws; together, with the

## *TITLES OF ALL THE OBSOLETE AND OTHER ACTS.*

#### AND CONCLUDES

WITH AN APPENDIX containing the original Charters and other Documents, ascertaining and defining the Limits and Boundary of the State; all the Treaties with the southern tribes of Indians; the articles of Confederation and perpetual union; the Constitution of the United States, and a few Acts of Congress.

Together with a copious Index to the whole.

*BY*

## *ROBERT & GEORGE WATKINS.*

Philadelphia:

PRINTED BY *R. AITKEN*, Nº. 22, MARKET STREET.

......................

## 1800.

LAWS OF GEORGIA.

283

*An Act for the laying out the reserve land in the town of Augusta into acre lots, the erecting an academy, or seminary of learning, and for other purposes therein mentioned.*

A. D. 1783.

No. 282.

WHEREAS the legislature taking into consideration the advantages that must necessarily result to the State from the encouragement of the town of Augusta, did, in January session one thousand seven hundred and eighty pass an act for the laying out the reserve of the public land in and near the said town into acre lots, and directed the same to be sold at public outcry, under such restrictions as were therein particularly set down and mentioned : *And whereas* the said lots were laid out and sold, but the said restrictions not being complied with, the said sales are become null and void, and the lands are again vested in the State : *And whereas* the same reasons continue for the encouragement and enlargement of the said town of Augusta, *Be it therefore enacted by the representatives of the freemen of the State of Georgia in general assembly met, and it is hereby enacted by and with the authority of the same,* That, from and immediately after the passing of this act, George Walton, Joseph Pannel, Andrew Burns, William Glascock and Samuel Jack, Esquires, who are hereby declared and empowered as commissioners for carrying the same into execution, shall and they are hereby required to cause the said lands reserved as aforesaid to be again laid out in acre lots, and to proceed to the sale of the same by public auction to the highest bidder, the said commissioners first giving three months notice of such sale, under such restrictions and terms as are hereafter particularly laid down and mentioned.

Preamble.

Augusta.

The terms of sale of public lots under act of 1780 not being fulfilled, such lots reverted in the State.

Commmissioners named and appointed again to lay off and sell the same.

II. *And be it further enacted,* That the terms on which such lots shall be sold and disposed of shall be, one fourth of the purchase money cash, one fourth payable in one year, and the other two fourths payable within three years thereafter, such purchaser giving bond and security for payment of principal and the interest from the date, at the rate of seven *per cent. per annum,* with proper mortgages of such lots in case of failure in payment as aforesaid.*

Terms of sale, one fourth cash, one fourth payable in one year, two fourths in three years; purchasers to give bond and security for principal and interest 7 per cent. and mortgage.

III. *And whereas* the settlement of the said town is a great object with the legislature, *Be it further enacted,* That every such purchaser as aforesaid shall, and he is hereby required, as part of the terms aforesaid, within the space of two years, to build, or cause to be built a tenantable brick, stone, or frame house not less than sixteen feet by twenty-four, on such lot or lots he may become possessed of by such sale, and in default whereof such lot or lots shall, and they are hereby declared to revert to and become again the property of the State.

And to build thereon in two years, or forfeit the lots, which shall again become the property of the State.

IV. *And whereas* a seminary of learning is greatly necessary for the instruction of our youth, and ought to be one of the first objects of attention, after the promotion of religion, *Be it further enacted,* That after the said commissioners have reserved one of the first lots for the building a church or house of worship to the *Divine Being,* by whose blessing the independence of the United States has been established ; and a reserve of ten other principal lots for public uses, the monies arising from such sales, after defraying the charges of the building said church, shall be, and they hereby are vested.

Public seminary of learning.

One lot to be reserved for a church, and ten for public uses.

* Further time allowed for payment, see act of 1786, No. 352.

A. D. 1783.
No. 232.
The monies arifing from the fales vefted in the commiffioners or truftees for the ufe of the church and academy, and to their heirs and fucceffors in office for ever.

Truftees to make titles, receive fuch monies, and may make loans thereof at intereft, &c.

vefted in the hands and power of the faid commiffioners named as aforefaid, as truftees for the purpofe of carrying into execution the intentions of this law, and for erecting an academy or feminary of learning as aforefaid, their heirs and fucceffors in office for ever, in truft for the fole ufe of the faid church and accademy or feminary.

V. *And be it further enacted,* That the faid commiffioners, on the fales and reftrictions aforefaid being complied with, fhall be, and they are hereby authorized and empowered to give titles as amply and fully to fuch purchafers, as truftees aforefaid, as the faid State poffibly could or might do, and in their name, and the name of their fucceffors in office, to receive fuch monies, both principal and intereft, arifing from fuch fales, or the loan, of any part thereof, and the fame to lend out again at intereft, or otherwife difpofe thereof, as the faid commiffioners, or a majority, their fucceffors, or a majority of them, fhall think moft advantageous to the fund of the faid church, and academy or feminary.

The faid commiffioners or truftees to render an account of their proceedings annually to the executive; may be difplaced for mal-practice.

VI. *And be it further enacted,* That the faid commiffioners or truftees fhall yearly, and every year, render a juft and true account of the fund of the faid feminary to his honor the governor and executive council for examination; and if found by them guilty of mal-practice, fuch offending commiffioner or commiffioners fhall be difplaced, and others appointed for that purpofe in his or their room.

Empowered to erect an academy, and to make all neceffary rules and regulations.

VII. *And be it further enacted,* That the faid commiffioners fhall be, and they are hereby authorized and empowered to erect on one of the faid lots, or purchafe from the fales of the fame, fome fpot convenient for that purpofe, a building commodious and proper to anfwer the intentions of this act, as an academy or feminary as aforefaid, and to enter into fuch contracts for erecting the fame as may be thought moft advantageous for the faid fund by a majority of the faid commiffioners; and further to procure and agree with proper mafters and profeffors for the ruling the fame, and to inftitute fuch bye laws, for the increafing the faid fund, and better governing the faid feminary, as to the faid commiffioners may appear beft adapted.

Public ferry under direction of the commiffioners fubject to regulations of the legiflature.

VIII. *And be it further enacted by the authority aforefaid,* That the public ferry at the town of Augufta, fhall be under the direction of the commiffioners aforefaid, fubject to fuch regulations as are or fhall be eftablifhed by the legiflature.

Town of Wafhington in Wilkes county. Commiffioners named and appointed to lay out and to fell the reverted lots in the faid town on the fame terms and in like manner as thofe of Augufta.

The monies arifing vefted in them and their fucceffors in office as truftees to be applied towards erecting a free fchool for the faid county and a church.

IX. *And whereas,* in and by the faid law, paffed at Augufta as aforefaid, a town was ordered and actually laid out in the county of Wilkes, at a place called *Wafhington,* under fuch reftrictions as were likewife therein laid down, but the fame was not complied with, and the faid lots are in like manner reverted; *Be it further enacted,* That Stephen Heard, Micajah Williamfon, Robert Harper, Daniel Coleman, and Zachariah Lamar, Efquires, fhall be and they are hereby appointed commiffioners for carrying the intentions of the legiflature in that inftance into execution; and they are hereby required to caufe to be laid and admeafured out, likewife in the faid town, acre lots as aforefaid, to be fold on fuch terms as are herein before contained and laid down for the lots in the faid town of Augufta, and to receive fuch monies for fuch fales into their hands, or the hands of their fucceffors in office, and apply the fame towards a free fchool for the faid county, and to erect a proper building for the faid fchool in the faid town, and the overplus, after erecting a church, to be referved and applied as a fund for the faid fchool, in the hands of the faid commiffioners

EXHIBIT K

EXHIBIT L

SHIPS AND SHIPPING IN NORTH CAROLINA, 1763-1789

Author(s): Charles Christopher Crittenden

Source: *The North Carolina Historical Review*, January, 1931, Vol. 8, No. 1 (January, 1931), pp. 1-13

Published by: North Carolina Office of Archives and History

Stable URL: https://www.jstor.org/stable/23515998

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



is collaborating with JSTOR to digitize, preserve and extend access to *The North Carolina Historical Review*

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

# THE NORTH CAROLINA
# HISTORICAL REVIEW

VOLUME VIII    .    JANUARY, 1931    NUMBER 1

## SHIPS AND SHIPPING IN NORTH CAROLINA,
## 1763-1789

### BY CHARLES CHRISTOPHER CRITTENDEN

Although North Carolina was handicapped by a dangerous sea-coast and by a lack of safe, deep harbors, the great majority of the vessels of the eighteenth century found it possible to put into her waters. As early as 1689 there were on the high seas merchant vessels of as many as 1,300 tons, and one hundred years later there was launched a merchantman whose tonnage was no less than 1,612; but most of the ships of the period were much smaller. A study of *Lloyd's Register of Shipping* for the years 1764-1800 makes it clear that by far the greater portion of British trading vessels were of not more than 300 registered tons.[1] Since ships as large as this could put into the Cape Fear River, and since those of 250 registered tons or more could sail through Oracoke Inlet and even through the Swash, North Carolina was not as isolated from the main routes of ocean commerce as might be thought.

The types of vessels which entered North Carolina ports were the schooner, the sloop, the brig or brigantine, the snow, and the ship. Of them all, by far the most common were the first two. The schooner of that date, noted for being a fast sailer, was a vessel with only two masts, whose main and fore-sails were suspended by gaffs, reaching from the mast toward the stern. The sloop, although similarly fore-and-aft rigged, differed mainly in that she had only one mast.[2] The size of most of these craft, judged even by contemporary standards, was small. The average tonnage of schooners clearing from Port

[1] E. K. Chatterton, *The Ship Under Sail*, pp. 121-122.
[2] Unless otherwise noted, descriptive matter about these and other vessels is taken from William Falconer, *A New Universal Dictionary of the Marine*, or from J. A. H. Murray (editor), *A New English Dictionary*.

[1]

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Roanoke (Edenton) during the three months ending September 9, 1788, was only twenty-three, the largest registering sixty-one tons, the smallest only six tons; while of the sloops the average tonnage was forty-two, the largest registering one hundred twenty-four tons, the smallest ten tons.[3] Clearing from Port Brunswick (the district of the Cape Fear) during the three months ending September 9, 1767, the schooners averaged thirty tons, the sloops, twenty-seven tons.

Such little vessels almost never attempted to cross the Atlantic, but rather carried their cargoes up and down the coast or, more rarely, to the West Indies. Of the seventy-one schooners and sloops clearing from Port Roanoke during the period mentioned above, sixty-three made coasting voyages, and eight went to the West Indies. All but nine of the twenty-six schooners and sloops clearing from Port Brunswick, July 4-October 3,[4] 1789, sailed up or down the coast, the others all going to the West Indies. Particularly tiny were the craft which in 1788 were plying between Albemarle Sound and regions to the north. During the three months ending September 9, 1788, there sailed from Port Roanoke for Virginia, five schooners of an average size of nineteen tons, and five sloops of an average size of forty-four tons; for Maryland, fifteen schooners averaging twelve tons each, and three sloops averaging nineteen tons each; and for Philadelphia, three schooners averaging fourteen tons each, and one sloop of sixty tons. Sailing for New York or regions beyond, vessels of these types tended to be heavier.

Only a very limited crew was required to man such small craft. Of the schooners clearing from Port Brunswick during the three months ending September 9, 1767, the average number of the crew was four; and of the sloops, four. Dangerous must have been the work of the sailors on such vessels as the fifteen-ton schooner *Betsey,* which with a crew of four set sail from the Cape Fear for Boston; or the ten-ton sloop *Two Brothers,* which, manned by only three men, set out for Currituck; or of the fifteen-ton schooner *Betsey,* which with a crew of only two started for Bath, North Carolina. One little

---

[3] Unless otherwise noted, all items about vessels entering and clearing North Carolina ports are taken from the customs records in the archives of the North Carolina Historical Commission. The figures for tonnage given in these records and used in this article are those which were registered, and are smaller than those for true tonnage. In order to determine the latter it is necessary to add from one-third to one-half more. See *Colonial Records of North Carolina,* VI, 969 (hereafter cited as *C. R.*); John Lord Sheffield, *Observations on the Commerce of the American States* (sixth edition, 1784), p. 96.

[4] These dates, and all others of the kind given in this article, are inclusive.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

sloop of twenty tons, appropriately named the *Patience,* cleared on July 13, 1767, for Philadelphia, with only one man to operate her.

But even the smallest of these vessels could carry a cargo of fair size. There sailed, for example, from the town of Beaufort during the year ending June 12, 1787, such vessels as the twenty-ton schooner *Dandy,* which went to New York with seventy barrels of rosin, twenty-five barrels of spirits of turpentine, twenty-three barrels of turpentine, and twenty thousand shingles; the fifteen-ton schooner *Jack,* which set out for Hispaniola (Haiti) with two barrels of tobacco, four barrels of apples, and "a quantity" of live stock; and the sloop *Charlotte* of eighteen tons which cleared for New York with 180 barrels of naval stores and 150 bushels of potatoes. It is difficult for a landsman to understand how it was possible for these craft to stow away such cargoes and still keep afloat.

Usually larger than the schooner or the sloop was the brig, or brigantine.[5] She was a two-masted vessel, her fore-mast carrying square sails like those of a ship, but her main mast being partly square- and partly fore-and-aft rigged. The average size of the brigs which cleared from Port Roanoke, June 10-September 9, 1788, was 92 tons, the largest registering 145 tons, and the smallest, 64 tons. The average tonnage of those clearing from the town of New Bern during the three months ending October 3, 1787, was 103, that of the largest being 178, while that of the smallest was 70. But from Port Brunswick, June 10-September 9, 1767, the brigs clearing averaged only 45 tons, the largest registering 50 tons, the smallest, 38 tons.

Brigs were rarely used for the coasting trade, but were rather employed for voyages to the West Indies or to the British Isles. Of the five which sailed from New Bern during the period mentioned above, four went to the West Indies, one to Glasgow, and none up or down the coast. Of the eight which cleared from Port Brunswick, July 4-October 3, 1789, two sailed for the West Indies, four for England, and two for Scotland, while not one went on a coasting voyage.

------

[5] Originally "brig" was merely an abbreviation for "brigantine." Later each word came to signify a distinct type of vessel. Both terms were used in the terminology of eighteenth-century North Carolina, but both apparently referred to the same kind of vessel. If there was any difference in meaning, it probably was that "brig" was the more comprehensive of the two, and that "brigantine" meant merely a particular type of brig.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 99 of 223 PageID #:3976

Particularly well adapted were brigs for use in time of war. During the Revolution the rebels equipped many of them to serve as state-owned war vessels or as privateers, or to carry on trade with France, Spain, and the West Indies. There were, for instance, the armed brig *Washington,* owned by the state of North Carolina;[6] the *Joseph,* which was sent to Spain;[7] and the *Buckskin,* whose owners planned to dispatch her on a voyage to France.[8]

For its size the brig carried crew and cargo about in proportion to those carried by other small vessels. The crews of the four brigs which cleared from Port Brunswick during the three months referred to above averaged seven men. From the customs records of Port Brunswick, July 4-October 3, 1789, may be illustrated the size of the cargoes. The *Hannah,* of eighty tons, set sail for Penzance, England, with 606 barrels of tar, 163 casks of turpentine, and 10,164 barrel staves. The seventy-eight-ton *Mary Ann* set out for Hull, England, with 51 hogsheads of tobacco, 281 barrels of turpentine, and 6,000 white oak barrel staves; the *Sally,* of one hundred ninety-two tons, started for Kingston, Jamaica, with 70,000 feet of boards, plank, and scantling, 298,000 cypress shingles, 38 barrels of tar, and 6 tierces of rice.

Largest of all the commercial vessels which put into North Carolina waters were the ship and the snow. The ship,[9] so well known as hardly to require description, was a square-rigged vessel of three masts, each of these being composed of a lower mast, a topmast, a topgallant mast, and sometimes a royal mast.[10] The snow was equipped with two masts resembling the main and fore-masts of a ship, and had in addition, just abaft the main mast and fixed in a wooden block or in a kind of step upon the deck, a third small mast which carried a try-sail, similar to a ship's mizzen, extending toward the stern of the vessel.[11] Clearing from Port Brunswick during the three months ending September 9, 1767, the ships averaged 140 tons, the largest registering 200 tons, the smallest, 80 tons; while the average tonnage of the snows was 125, that of the largest being 160, and of

---

[6] *North-Carolina Gazette* (New Bern), Dec. 26, 1777.
[7] *C. R.,* X, 996-997.
[8] *State Records of North Carolina,* XI, 358-359 (Hereafter cited as *S. R.*).
[9] The word "ship" may be used loosely to mean any kind of ocean-going vessel, or it may be used more narrowly to mean only one particular kind of vessel. In different places in this study the word is employed in both senses, but in all cases the context makes clear which meaning is intended.
[10] John Robinson and George F. Dow, *Sailing Ships of New England,* p. 32.
[11] The snow, never common even before the Revolution, had by 1789 almost entirely disappeared from North Carolina waters.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 100 of 223 PageID #:3977

the smallest, 100. Ships or snows of lesser tonnage than 100, or of greater tonnage than 200, only rarely appeared in North Carolina ports.

As might be expected, ships and snows carried crews and cargoes larger than those of schooners, sloops, and brigs. On the ships clearing from Port Brunswick during the period mentioned above the average number of the crew was eleven; on the snows, the average number was ten. The cargoes of some of the vessels clearing from Port Brunswick were these: the snow *Charley,* of 120 tons, set out for Portsmouth with 104 barrels of pitch, 1,018 barrels of tar, 28 barrels of turpentine, and 800 staves; the 120-ton ship *Caser* sailed for the same port with 42 barrels of pitch, 1,064 barrels of tar, 742 barrels of turpentine, 3,200 feet of lumber, 8,000 staves, 6 hogsheads and 8 bundles of deerskins, 30 cedar posts, and 4 hogsheads of tobacco. From Port Roanoke, on August 21, 1788, was cleared for Liverpool the ship *Polly and Nancy* of 250 tons, an unusually large vessel for North Carolina, with a cargo of 594 barrels of naval stores, 2,700 pipe staves, 8,575 hogshead staves, 90 hogsheads of tobacco, and 59 logs of black walnut.

Nearly always ships and snows were employed for voyages across the Atlantic, rather than up and down the coast, or even to the West Indies. Every one of the ten vessels of these types which cleared from Port Brunswick, June 10-September 9, 1767, went to some port in the British Isles. Extremely rare was a coasting voyage of a ship such as the 200-ton *Grace,* which, with a cargo of naval stores and tobacco, in 1786 set sail from the town of Beaufort for Philadelphia.

As a rule, the more shallow and dangerous the inlet, the smaller were the vessels which dared to put in. Since Ocracoke Inlet, through which passed most of the vessels bound to Edenton, Washington, Bath, and New Bern, was treacherous, and since the channels leading thence through the sounds were shallow, the vessels which went in there tended to be small. The average tonnage of all vessels clearing Port Roanoke during the three months ending September 9, 1788, was only thirty-nine; while that of all vessels clearing from the town of New Bern during the period July 4-October 3, 1787, was only fifty-four. The mouth of the Cape Fear River was deeper and safer, and thus the vessels that put in there tended to be larger.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 101 of 223 PageID #:3978

The average size of those clearing Port Brunswick, July 4-October 3, 1789, was sixty-nine tons, this being greater than for any other port in North Carolina.[12]

Likewise, the more shallow and dangerous the inlet, the larger was the percentage of schooners and sloops, and the smaller the proportion of brigs, ships, and snows. Of the vessels which cleared during the year 1786 from Port Currituck (the region of Currituck Sound), nearly all of which passed either through New Currituck Inlet or else through Ocracoke Inlet, both of which were shoal and treacherous, 194 were schooners and 43 were sloops, while there were only five brigs and one ship, no snows being listed. Clearing from Port Roanoke, June 10-September 9, 1788, and for the most part passing through Ocracoke Inlet, were thirty-eight schooners and thirty-three sloops, but only six brigs, one ship, and no snows. But from Port Brunswick, on the other hand, the proportion of brigs, snows, and ships was larger. During the three months ending September 9, 1767, fourteen of the twenty-six vessels clearing belonged to these types.[13]

Again, the better an inlet's facilities for navigation, the longer as a rule were the voyages of the vessels which cleared. Of the seventy-eight vessels leaving Port Roanoke during the three months ending September 9, 1788, the great majority of which passed through dangerous Ocracoke, only four went across the ocean and only eight to the West Indies, while all the others sailed up or down the coast. Of the twenty-seven vessels which cleared from the town of New Bern, July 4-October 3, 1787, all of which probably put out through Ocracoke, only one sailed across the Atlantic and only eleven to the West Indies, all the others going on coasting voyages. But from the comparatively safe Cape Fear, on the other hand, not less than twelve of the vessels which cleared during the three months ending September 9, 1767, crossed the Atlantic, and not less than five sailed to the West Indies, while only nine went up or down the coast. At this time, if not later, the lower Cape Fear was in closer touch with Great Britain than was any other section of the province. Clearances

[12] Judging by the depth and comparative safety of Old Topsail Inlet, one would think that the average size of vessels entering there would be large. But, while it is true that sizable vessels found it possible to put in, they found little advantage in doing so because the town of Beaufort lacked suitable communications with the interior. The average size of the few vessels which cleared during the year ending June 12, 1787, was only thirty-eight tons.
[13] By 1789 the situation, it is true, had changed in some degree, the proportion of little vessels clearing Port Brunswick being greater than before; but even then the proportion was not as large as in any other North Carolina port.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 102 of 223 PageID #:3979

from Port Brunswick after the Revolution, it is true, showed a larger percentage of vessels engaged in the coastal trade, but even then the proportion was not as large as that of any other North Carolina port.

Shipbuilding in North Carolina was on a much smaller scale than in most of the British continental colonies. Within her borders in the year 1769 were constructed only twelve vessels of an aggregate tonnage of 607; in 1770, five vessels whose total tonnage was 125; and in 1771, eight, with a tonnage of 241. The tonnage for North Carolina in 1769 was only one-fourth that for New Hampshire, one-thirteenth that for Massachusetts, and one-half that for Virginia; while of all the colonies from New Hampshire to Georgia, inclusive, only two built less shipping than North Carolina.[14]

Nevertheless, shipbuilding was an industry of fair importance in North Carolina, even before the Revolution. Among the vessels clearing Port Roanoke during the year ending April 5, 1772, no less than twenty-one, with an aggregate tonnage of 1,070, had been constructed in the colony.[15] Shipyards were to be found, especially in the Albemarle. Sir Nathaniel Duckenfield, a wealthy planter of that region, possessed one on his estate in Bertie County;[16] while Thomas Macknight, a merchant, declared that on the North River, between Currituck and Pasquotank counties, he had "the most commodious, and . . . best shipyard in the province."[17]

The Revolution gave an added impetus to shipbuilding. In the *North-Carolina Gazette* (New Bern), especially during the year 1778, appeared a number of advertisements of newly constructed vessels for sale. For example, a certain number of that paper carried a notice that there was "for sale at the town of *Beaufort*, Carteret county, a new vessel on the stocks, well calculated for a fast sailer, and will be completely finished by the 15th of *May* next.[18] Her dimensions are 55 feet keel strait rabber, 11 feet rake forward, 18 and a half feet beak, and 7 feet and a half hold."[19]

[14] Sheffield, p. 96.
[15] Library of University of North Carolina, registers of shipping of Port Roanoke, 1771-1776. A vessel clearing twice or more has been counted only once. It should be said, however, that during the whole year ending April 5, 1768, only six of the vessels clearing Port Brunswick had been built in North Carolina. The aggregate tonnage of five of these vessels was only 142, while that of the sixth cannot be ascertained due to the mutilation of the record.
[15] This is shown on a map, Audit Office 13: bundle 118. All of the material from the Public Record Office which has been used for this article is to be found, in the form of either transcripts or photostats, in the archives of the North Carolina Historical Commission.
[17] Audit Office 13: bundle 121.
[18] That is, May 15, 1778.
[19] *North-Carolina Gazette* (New Bern), May 15, 1778. See also *ibid.*, June 13, 20, 1778.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

This increased interest in the construction of ships continued after 1783. Many advertisements of new vessels for sale still were printed in the newspapers.[20] Into the county records were written various items about shipbuilding,[21] most valuable of which were the apprenticeship papers. Only a few of these papers have been preserved, the best set for the period under consideration being that of Craven County, in which is located the town of New Bern. The Craven apprenticeship papers show that during the years 1778-1789 no less than seventeen boys were apprenticed to twelve different masters to learn the art of a "ship carpenter,"[22] or a "ship builder," or a "ship wright," or a "sail maker."[23] Similarly, to a greater or lesser extent the inhabitants of all the counties near the coast probably were occupied in shipbuilding. The exact number and tonnage of the vessels built in the whole state during the years immediately following the Revolution cannot be ascertained, but it is evident that the industry by that time was of considerably more importance than during the colonial period. Of the seventy-eight ships clearing Port Roanoke during the three months ending September 9, 1788, no less than forty-four had been constructed in North Carolina.[24]

Ships built in North Carolina, most of which were made of the live oak that grew near the coast, were among the best constructed in America. It was said, however, that before the Revolution in the southern provinces the cost of building was £5 10s. sterling per ton, and the expense of equipping from £4 10s. to £5 more—costs higher than in the other colonies.[25] John Ross, a shipbuilder in Wilmington, claimed that as a loyalist in the Revolution he lost, along with other property, a vessel of about 100 tons, apparently not completed, which he had on the stocks and which he valued at £400 sterling; and also live oak and red cedar plank and timber worth £100 sterling, sufficient to build another vessel about the same size.[26] The anchors, cables, canvas, rigging, cabin furniture, and other articles imported

[20] See, for example, *Edenton Intelligencer* [sic], Apr. 9, 1788.
[21] See, for instance, note of Thomas Benbury to Capt. Richard Mitchell, North Carolina Historical Commission, Chowan County Papers, April, 1782-Sept., 1805.
[22] This phrase referred to a person who built ships, rather than to one who was a member of a ship's crew.
[23] North Carolina Historical Commission, Craven Apprenticeship Papers, 1748-1779, 1781-1799. It is possible that some of these papers have been lost, and thus that the number of boys apprenticed to learn the art of seamanship was larger than has been indicated.
[24] Of the vessels clearing Port Roanoke during this period, the average size of those which had been built in North Carolina was smaller than the average size of those constructed elsewhere.
[25] Sheffield, p. 138 n.
[26] Audit Office 12: 36.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 104 of 223 PageID #:3981

in 1774 for a vessel on the stocks on the Cape Fear River were worth more than £561 sterling.[27]

But whatever the exact cost of a small ocean-going vessel, it was certainly not beyond the means of a man in moderate circumstances. Henry Eustace McCulloh, a London merchant, wrote in 1769 to James Iredell, collector of the customs in Edenton: "If my schooner can be sold for a bill of £100 sterling (good) payable here, I would have you do it."[28] A little "Sloop called the Dolphin with all her Riggin Sails Anchors and Cables and all other the Appurtenances thereunto" was sold in Pasquotank County in 1765 for "54 pounds current money of the Province of New York, or proclamation money in lieu thereof."[29]

Although North Carolina never became a maritime region of first importance, nevertheless seafaring played some part in the life of her inhabitants. During the proprietary period, indeed, probably only a very small proportion of her people engaged in this pursuit;[30] but as the years passed the number increased. Thomas Campbell, who was the son of James Campbell of Wilmington and who grew up about the middle of the eighteenth century, was bred to the sea and came to command different vessels sailing out of Port Brunswick.[31] Apprenticeship papers for the latter part of the century indicate that numerous boys undertook to learn the art of "a navigator," or of "a seaman," or of "a mariner."[32] Especially was it true during the Revolution that many men and boys became sailors. Advertisements in the *North-Carolina Gazette* during the years 1777 and 1778 offered both bounties and high wages for those who would volunteer to serve on blockade runners and privateers.[33] In 1780 a petition of the "few remaining Inhabitants" of Carteret County stated that "nearly all the young and able-bodied men belonging to the said County have gone to Sea."[34]

On a coast as dangerous as that of North Carolina it is not surprising that many vessels came to grief. Of the numerous accounts

[27] *C. R.*, IX, 1103.
[28] G. J. McRee, *Life and Correspondence of James Iredell*, I, 43
[29] North Carolina Historical Commission, Pasquotank Inventories, &c., 1762-1825. See also *C. R.*, IX, 957-958.
[30] See Robert Dinwiddie's "Account of the present State of the British Islands, & Colonies in America," August, 1743, C. O. 5: 5; *C. R.*, VI, 968-969; *Annual Register*, 1769, p. 215. None of these references gives the exact information which is wanted here.
[31] N. M. Tiffany (editor), *Letters of James Murray, Loyalist*, p. 105.
[32] North Carolina Historical Commission, Craven Apprenticeship Papers, 1748-1779, 1781-1799; Chowan County Papers, various volumes, 1767-1805.
[33] See, for example, the issue of this paper for Aug. 8, 1777. See also advertisement in *Virginia Gazette*, Aug. 9, 1776, reprinted in "Historical Notes," *North Carolina Historical Review*, IV, 113.
[34] *S. R.*, XV, 146.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 105 of 223 PageID #:3982

of such disasters a few examples may be given. A newspaper of 1765 contained this narrative: "Newbern, January 18. The Snow Dorothy, Capt. Graham, who loaded here lately for Europe, and had been sailed about 19 Days, is ashore at Core-Sound; chief of the Cargo will be saved. There are also cast away on Cape Hatteras, two Briggs, one from Boston, and the other from New-York, both bound in here: A Vessel has been sent to their Assistance, and 'tis imagined chief of their Cargoes will be saved."[35] Peleg Greene, the master of a vessel plying between North Carolina and the West Indies, wrote of a storm at Ocracoke in April, 1774, so terrific that "there was fourteen sail of vessells drove on shore, and five of which will be entirely lost, and one drove over the South breakers and gone to see [sea] and every soul perished."[36] In February, 1784, after a vessel had got aground at the mouth of the Cape Fear, her hands left her, and at flood tide she went off "God knows where."[37]

As is shown in contemporary newspaper advertisements, many of these vessels had accommodations for passengers.[38] But conditions were often anything but pleasant. Illuminating on this subject is the diary of a group of sixteen Moravians who in 1762 went from Bethlehem, Pennsylvania, to Wachovia, the Moravian settlement in piedmont North Carolina, making by water that part of their trip from Philadelphia to the Cape Fear River. On April 25 they went on board the *Elisabeth,* a small sloop of twenty-three tons which was to take them to Wilmington, North Carolina. This vessel, says their diary, "has a tiny cabin in which at a pinch six Sisters can sleep, but the rest, including the Captain and two sailors, must do the best they can in the hold, on top of the barrels and boxes." At four in the afternoon they sailed—only to learn to their chagrin that, before making the voyage, their captain would be forced to visit a little town situated on a small stream flowing into Delaware Bay. While trying to enter this stream the sloop stuck fast on a sandbank, and there remained for two days. After getting afloat again and reaching the little town, they were detained by wind and tide for three days more. Finally, on May 2, a week after leaving Philadelphia, they succeeded in getting under way and putting out to sea.

[35] *North-Carolina Magazine; or, Universal Intelligencer,* Jan. 11-18, 1765.
[36] *Commerce of Rhode Island, 1726-1800,* I (Massachusetts Historical Society, *Collections,* Seventh Series, IX), 489-490.
[37] *S. R.,* XVII, 129-130.
[38] See, for example, *North-Carolina Gazette* (Wilmington), Feb. 12, 26, 1766; *Cape Fear Mercury,* Dec. 29, 1773.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

But their troubles had only begun. On May 4, when they were not far from Cape Hatteras, a heavy northeast wind sprang up and came near driving them on shore. "It was indeed a trying day, for it rained, it was as cold as February, and the waves beat on us from every side, and our resting place in the hold was wet, for the deck leaked. Nothing worried us as much as the poor children, who had to stay in the dark, wet hold all day, with nothing warm to eat, and those who took care of them could hardly hold up their own heads on account of seasickness and the tossing of the sloop." The next day the weather cleared, but on May 6 another storm arose, "and our sloop was tossed now here now there, and what effect this has on seasickness is well known!" At dawn on May 8 they sighted land, but the captain "soon saw that the wind had brought us to shore too soon, but he decided to run closer and anchor in the hopes that the wind would change. But it only blew harder, and fearing he would lose his anchor he decided to sail back sixty miles to the harbor of Cape Lookout." Here they stayed until May 11, when the weather had so moderated that they could set sail again. On the following day "at two in the afternoon we reached the sandbank called the Frying Pan. . . . There were only five feet of water on the bank and our sloop drew four feet eight inches, but the light wind served us at need, and with help from on high we crossed it safely in an hour,[39] and ran into the long desired Cape Fear River."[40]

But passengers were not always uncomfortable. Janet Schaw, a Scots woman sailing early in 1775 from St. Kitts to the Cape Fear in the fifty-ton brig *Rebecca,* found everything "neat, clean and commodious." The captain, she wrote, gave up to her party "the cabin and state room which are both very near, and furnished with every necessary. In the State room we found a number of books. They consisted chiefly of Novels and poetry." No storms were encountered, the weather for the greater part of the trip was pleasant, and an abundance of excellent food was provided.[41]

The duration of an ocean voyage between any two ports varied according to weather, type and age of the vessel, weight of the cargo, skill of the captain and crew, and other similar factors. As

---

[39] Instead of going around the shoals, they crossed them through the shallow channel just south of Cape Fear.
[40] A. L. Fries (editor), *Records of the Moravians in North Carolina,* I, 255-259.
[41] E. W. and C. M. Andrews (editors), *Journal of a Lady of Quality,* pp. 133-143.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

a rule trips up and down the coast could be made more quickly by water than by land. As early as 1735 it was possible to sail from Charlestown to the Cape Fear in only two days,[42] while after the Revolution the trip took only twelve or fourteen hours. Since after 1783 there were frequent sailings between the two towns, Charleston[43] and Wilmington were brought into close touch with each other.[44] Between North Carolina and New York it was likewise possible to travel in a brief space of time. In 1766 a vessel reached Cape Lookout after a voyage of nine days from that city,[45] while a few years later Governor Josiah Martin wrote that it was possible to sail all the way from New York to New Bern in four or five days.[46] After the Revolution Timothy Bloodworth, one of the North Carolina representatives in Congress, sailed from Wilmington to New York in only eight days.[47] Frequently, however, coastwise voyages required much longer. In the fall of 1787 a little vessel took eleven days to bring William Attmore, a Philadelphia merchant, from his home city to Ocracoke Bar;[48] while James Murray, an inhabitant of the Cape Fear region, sailing from Boston in 1749, reached home only after a voyage of thirty-two days.[49]

To or from the West Indies a voyage might be made in short order. The *North-Carolina Gazette* (New Bern), November 28, 1777, mentions "a Vessel in thirteen Days from the West Indies to our Bar [Ocracoke]." In 1760 a sloop, having left North Carolina on March 10, found herself thirteen days later off the eastern end of the island of Hispaniola (Haiti).[50] Although voyages often took longer,[51] the seaports of North Carolina could with comparative speed and ease get into touch with these islands.

The length of time necessary to cross the Atlantic varied considerably. In 1775 a vessel seems to have sailed from the Cape Fear to Cork, Ireland, in no more than twenty-one days.[52] But such a trip was most unusual, six or eight weeks ordinarily being required. In

[42] *Letters of James Murray*, p. 24.
[43] "Charlestown" was shortened to "Charleston" in 1783.
[44] *S. R.*, XVI, 936, 943, 971, and *passim*; XVIII, 534 and *passim*.
[45] *North-Carolina Gazette* (Wilmington), Feb. 26, 1766.
[46] *C. R.*, IX. 16.
[47] *S. R.*, XVIII, 601.
[48] "Journal of a Tour to North Carolina by William Attmore, 1787," *James Sprunt Historical Publications*, XVII, No. 2, pp. 7-12.
[49] *Letters of James Murray*, pp. 70-75.
[50] *C. R.*, VI, 239.
[51] See, for examples, various letters from Peleg Greene to Aaron Lopes during the years 1773 and 1774, *Commerce of Rhode Island*, I, *passim*.
[52] Lord Harcourt, Lord Lieutenant of Ireland, to the Earl of Rocheford, Oct. 4, 1775, C. O. 5: 138.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 108 of 223 PageID #:3985

1764 the schooner *Sally and Betsey* took about seven weeks to go from Bristol to New Bern;[53] in 1775 the brig *John and William* reached New Bern only after a passage of eight weeks from London;[54] and the same year another vessel, the *Peggy,* required seven weeks to reach Spithead on a voyage from the Cape Fear.[55]

That North Carolina's development was hindered by her lack of safe harbors there can be no doubt. Travel by water was unusually hazardous, communication with the outside world was difficult, rates of insurance on shipping and the cost of imported products were high, and the prices paid for native products were low. Largely as a result of this situation, the inhabitants of the back country found it advantageous to do much of their business with Virginia and South Carolina, while even the people of the Albemarle frequently preferred to face the difficulties of overland transportation to Chesapeake Bay or its tributaries, rather than to carry on their trade via the tedious water passage which led to Ocracoke Inlet. Obviously North Carolina could not hope to develop an overseas commerce comparable to that of New York, Pennsylvania, South Carolina, or other more favored regions.

But in the past too much stress has been laid upon the difficulties of navigation, while not enough attention has been paid to the accomplishments which were made in spite of those difficulties. Most of the vessels of the period were able to put into North Carolina waters, and the people of North Carolina succeeded, in spite of all obstacles, in developing a commerce of sizable proportions. Not until the nineteenth century, when larger and still larger ships came to sail the oceans, did the lack of adequate harbors fully make itself felt.

[53] *North-Carolina Magazine; or, Universal Intelligencer,* Oct. 12-19, 1764.
[54] *North-Carolina Gazette* (New Bern), July 14, 1775.
[55] C. O. 5: 148.

This content downloaded from
198.91.37.2 on Tue, 06 Feb 2024 18:55:46 +00:00
All use subject to https://about.jstor.org/terms

EXHIBIT M

Newspapers
by ancestry

https://www.newspapers.com/image/39390647

The Pennsylvania Gazette (Philadelphia, Pennsylvania) · Thu, Apr 30, 1761 · Page 4

Downloaded on Nov 15, 2023

**PHILADELPHIA:** Printed by B. FRANKLIN, Post-Master, and D. HALL, at the New Printing-Office, near the Market.

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers
.com

# EXHIBIT N

Newspapers
by ancestry

The South-Carolina Gazette; and Country Journal (Charleston, South Carolina) · Tue, Nov 22, 1768 · Page 3

https://www.newspapers.com/image/605387416

Downloaded on Nov 15, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™

EXHIBIT O

Newspapers
by ancestry
https://www.newspapers.com/image/39983270

## POET'S CORNER

## BALTIMORE

## HAYM SALOMON

### BROKER'S OFFICE by ISAAC FRANKS,

### The Ship SOUTH-CAROLINA

WILLIAM POYNTELL

### NONES and COHEN, BROKERS

### PHILIP THOMPSON, Upho.

PHILADELPHIA: Printed by E. OSWALD, at his Printing-Office, next Door to the Coffee-House, in Market-Street, where Subscriptions, at Three Dollars per Annum, Essays, Articles of Intelligence, &c. for this Paper, are gratefully received.——Advertisements of no more Length than Breadth, are inserted the first Three Weeks for one Dollar, and for every Continuance after, one-third of a Dollar; those according a Square are inserted in the same Proportion.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers.com ™

EXHIBIT P

Newspapers
by ancestry

Poughkeepsie Journal (Poughkeepsie, New York) · Wed, Apr 18, 1787 · Page 4

https://www.newspapers.com/image/114453304

Downloaded on Nov 15, 2023



Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers
.com

EXHIBIT Q

# THE

## Office and Authority

### O F  A

# Justice of Peace.

### AND ALSO

The Duty of Sheriffs, Coroners, Church-
wardens, Surveiors of Highways, Con-
stables, and Officers of Militia.

### Together with

Precedents of Warrants, Judgments, Execu-
tions, and other legal Process, issuable by
Magistrates within their respective Jurisdic-
tions, in Cases Civil or Criminal.

### A N D

The Method of Judicial Proceedings, before
Justices of Peace, in Matters within their Cognisance
out of Sessions.

Collected from the Common and Statute Laws
of *England*, and Acts of Assembly, now in Force; And
adapted to the Constitution and Practice of *Virginia*.

●

*By* GEORGE WEBB, *Gent. One of His Majesty's
Justices of Peace of the County of* New-Kent.

*WILLIAMSBURG:*

Printed by WILLIAM PARKS. M,DCC,XXXVI.

(1736)

Digitized by Google

## Ferries.

County Courts may appoint Ferries at Landings oppofite to thofe fettled by Act of Affembly; May licence Ferry-Keepers, and direct the Boats and Hands to be kept at each Ferry; upon Complaint of Neglect, &c. may difcharge any Ferry-keeper, and appoint another: Shall take Bond and Security in 20 l. Sterling, of every Perfon appointed to keep Ferry, for due keeping fuch Ferry, and giving Paffage to Public Expreffes.

The Men attending fuch Ferry-Boats, free from Public and County Levies, Mufters, Conftable's Office, Clearing Highways or Rivers, Impreffment, &c. and Ferry Licences fhall be granted without Fee.

County Courts may licence Ordinaries to be kept at Ferries, altho' there be other Ordinaries fufficient within the fame County: No other fhall be kept or allow'd within 5 Miles, except at the County Court-Houfe, or in a Town: Ferry-keeper fhall pay only Half the Governor's Fee for his Ordinary Licence, but fhall give Bond, and be fubject to the Regulations required of other Ordinary-keepers.

If any other Perfon takes Fee or Reward for Ferriage over any River, whereon a lawful Ferry is kept, he forfeits 5 l. for every Offence, to be divided between the neareft Ferryman, and the Informer; if the Ferry-keeper informs, he fhall have the whole Penalty.

County Courts may appoint a Ferry within the County, where neceffary for Tranfportation of the Militia, on Mufter Days, and may raife an Allowance to fuch Ferry-keeper, in the County-Levy: But this muft be within the fame County, and not to another.

Expreffes fent by the Governor, Secretary, a Councillor, Sheriff, Colonel, Lieutenant-Colonel, or Major of the Militia, or Clerk of the Council, directed to any Perfon; or fent by Officers of Militia to give Notice of Enemies Approach; or coming from beyond Sea, directed to the Governor, or Commander in Chief; fhall be accounted Public Expreffes, and Ferry free: But muft be directed for His Majefty's Service, and upon the Superfcription fign'd by the Perfon by whom they are fent.

Public Meffengers fhall be paid by the Receiver-General, Four Pence per Mile, for Man and Horfe, carrying fuch Exprefs, and Five Shillings per Day for Attendance, upon producing from the Superfcriber of the Exprefs, a Certificate of the Name of the Meffenger, and the Diftance of Miles; and from the Governor, or Clerk of the Council, how many Days he hath attended. For Expreffes fent by Water, Fifteen Pence per Day, for Boat-hire, and Two Shillings per Day, for each Man. 4 Anne, cap. 53.

County

# EXHIBIT R

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 121 of 223 PageID #:3998

General Advertiser (Philadelphia, Pennsylvania) · Mon, Dec 2, 1793 · Page 3

https://www.newspapers.com/image/584918388

Downloaded on Jan 9, 2024

**PHILADELPHIA.**

**VIGILANT FIRE COMPANY.**

**EIGHT DOLLARS REWARD.**

**Four Dollars Reward.**

**SALES AT AUCTION**

**ON SATURDAY NEXT,**

**GOOD INTENT.**

**FOR BOSTON,**

**UNITED STATES LOTTERY.**

**BOARDING AND LODGING.**

**PRINTING.**

**DANCING ACADEMY.**

Copyright © 2024 Newspapers.com. All Rights Reserved.

EXHIBIT S

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 123 of 223 PageID #:4000

**HISTORY**

# The Shocking Savagery of America's Early History

Bernard Bailyn, one of our greatest historians, shines his light on the nation's Dark Ages



**Ron Rosenbaum**

**March 2013**

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 124 of 223 PageID #:4001



The "peaceful" Pilgrims massacred the Pequots and destroyed their fort near Stonington, Connecticut, in 1637. A 19th-century wood engraving (above) depicts the slaughter. The Granger Collection, NYC



It's all a bit of a blur, isn't it? That little-remembered century—1600 to 1700—that began with the founding (and foundering) of the first permanent English settlement in America, the one called Jamestown, whose endemic perils portended failure for the dream of a New World. The century that saw all the disease-ridden, barely civilized successors to Jamestown slaughtering and getting slaughtered by the Original Inhabitants, hanging on

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 125 of 223 PageID #:4002

by their fingernails to some fetid coastal swampland until Pocahontas saved Thanksgiving. No, that's not right, is it? I said it was a blur.

Enter Bernard Bailyn, the greatest historian of early America alive today. Now over 90 and ensconced at Harvard for more than six decades, Bailyn has recently published another one of his epoch-making grand narrative syntheses, *The Barbarous Years*, casting a light on the darkness, filling in the blank canvas with what he's gleaned from what seems like every last scrap of crumbling diary page, every surviving chattel slave receipt and ship's passenger manifest of the living and dead, every fearful sermon about the Antichrist that survived in the blackened embers of the burned-out churches.

Bailyn has not painted a pretty picture. Little wonder he calls it *The Barbarous Years* and spares us no details of the terror, desperation, degradation and widespread torture—do you really know what being "flayed alive" means? (The skin is torn from the face and head and the prisoner is disemboweled while still alive.) And yet somehow amid the merciless massacres were elements that gave birth to the rudiments of civilization—or in Bailyn's evocative phrase, the fragile "integument of civility"—that would evolve 100 years later into a virtual Renaissance culture, a bustling string of self-governing, self-sufficient, defiantly expansionist colonies alive with an increasingly sophisticated and literate political and intellectual culture that would coalesce into the rationale for the birth of American independence. All the while shaping, and sometimes misshaping, the American character. It's a grand drama in which the glimmers of enlightenment barely survive the savagery, what Yeats called "the blood-dimmed tide," the brutal establishment of slavery, the race wars with the original inhabitants that Bailyn is not afraid to call "genocidal," the full, horrifying details of which have virtually been erased.

"In truth, I didn't think anyone sat around erasing it," Bailyn tells me when I visit him in his spacious, document-stuffed study in Harvard's Widener Library. He's a wiry, remarkably fit-looking fellow, energetically jumping out of his chair to open up a file drawer and show me copies of one of his most-prized documentary finds: the handwritten British government survey records of America-bound colonists made in the 1770s, which lists the name, origin, occupation and age of the departing, one of the few islands of hard data about who the early Americans were.

"Nobody sat around erasing this history," he says in an even tone, "but it's forgotten."

"Conveniently?" I ask.

"Yes," he agrees. "Look at the 'peaceful' Pilgrims. Our William Bradford. He goes to see the Pequot War battlefield and he is appalled. He said, 'The stink' [of heaps of dead bodies] was too much."

Bailyn is speaking of one of the early and bloodiest encounters, between our peaceful pumpkin pie-eating Pilgrims and the original inhabitants of the land they wanted to seize, the Pequots. But for Bailyn, the mercenary motive is less salient than the theological.

"The ferocity of that little war is just unbelievable," Bailyn says. "The butchering that went on cannot be explained by trying to get hold of a piece of land. They were really struggling with this central issue for them, of the advent of the Antichrist."

Suddenly, I felt a chill from the wintry New England air outside enter into the warmth of his study.

The Antichrist. The haunting figure presaging the Apocalypse from the Book of Revelation plays an important

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 127 of 223 PageID #:4004

part in Bailyn's explanation of the European settlers' descent into unrestrained savagery. The key passage on this question comes late in his new book when Bailyn makes explicit a connection I had not seen before: between the physical savagery the radical dissenting Protestant settlers of America wreaked on the original inhabitants, and the intellectual savagery of their polemical attacks on the church and state authorities they fled from in Europe—and the savagery of vicious insult and vile denunciation they wreaked upon each other as well.

"The savagery of the [theological] struggle, the bitterness of the main contenders and the deep stain it left on the region's collective memory" were driven by "elemental fears peculiar to what was experienced as a barbarous environment—fears of what could happen to civilized people in an unimaginable wilderness...in which God's children [as they thought of themselves] were fated to struggle with pitiless agents of Satan, pagan Antichrists swarming in the world around them. The two [kinds of struggle, physical and metaphysical] were one: threats from within [to the soul] merged with threats from without to form a heated atmosphere of apocalyptic danger."

***

Bernard Bailyn made his reputation when he took upon himself the leviathan task off cataloging the store of pre-Revolutionary War-era pamphlets, the denunciations and speculations and accusations privately published by surprisingly literate gentlemen farmers, Greek- and Roman-quoting tradesmen—"the Ebenezers," as I think of them—most of whose colorful and thoughtful works had not been read for two centuries. He drew on that knowledge base to write *The Ideological Origins of the American Revolution*, which won him the first of his two Pulitzers after it was published in 1967.

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 128 of 223 PageID #:4005

\*\*\*

Bailyn could have coasted on that success, researching and publishing on the multitude of controversies still raging over the meaning of the Revolution and the Declaration and the Constitution. Going forward, the way most historians have done.

But instead, he did something unusual: He stepped backward, not just in time but in spatial perspective. He had what he would call his "cosmic eye" on a grand vision of the massive westward movement from Europe and Africa to North and South America that began before 1492, and he chronicled it in his subsequent book, *Voyagers to the West*. In examining the interactions of four continents bordering the Atlantic, and seeing them as a single, mutually interacting whole, he reshaped the modern history profession and helped create what is now known as "Atlantic history."

"From 1500," he wrote in an earlier book, "it has involved the displacement and resettlement of over fifty million people and it has affected indirectly the lives of uncountable millions more."

But Bailyn's "cosmic eye" saw even deeper. He wanted to capture not just physical movements but also "the interior experiences, the quality of their culture, the capacity of their minds, the patterns of their emotions." He wanted to look inside heads and read minds. Bailyn's voyage was a monumentally ambitious project, a voyage through unmapped oceans of data analogous to the Columbus-era explorers setting out on a vast uncharted ocean.

The opening section of his new book stands out for his profoundly sensitive appreciation of the sensibility of the original inhabitants whom he introduces simply as "Americans" rather than "Native Americans."

He captures that sensibility as well as any attempt I've read: "Their world was multitudinous, densely populated by active, sentient and sensitive spirits, spirits with consciences, memories and purposes, that surround them, instructed them, impinged on their lives at every turn. No less real for being invisible...the whole of life was a spiritual enterprise...the universe in all its movements and animations and nature was suffused with spiritual potency."

In person, Bailyn expresses an almost poetic admiration for this sort of spirituality.

"All the world was alive!" he exclaims. "And the wind is alive! The mountains are alive!"

Then, he adds: "But it's not a terribly peaceful world. They were always involved in warfare, partly because life would become imbalanced in a way that needed justification and response and reprisal. And reprisals, within their lives, are very important. But partly the onus is on the threats that they're under."

"Would both civilizations have been better off had they not been forced into contact," I ask, "or if all the colonies on the verge of failing had, in fact, failed and the two civilizations continued separately, merely as trading partners?"

"Well, the Indians were not genocidal on the whole. Their effort, even the 1622 massacre [which he calls "genocidal" in his book], was not to wipe the Europeans off the face of the map. It's the English after the massacre who write these letters saying 'wipe them off the map.'

"But the Indians had the view they wanted to use them [the Europeans]. They wanted the English there on the fringe so they would have the benefit of their treasure, their goods, even their advanced weapons. They wanted

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 130 of 223 PageID #:4007

that, but under their control." It didn't exactly work out that way.

Bailyn does not let either of the two adversary cultures off the hook. He recounts little vignettes of the original inhabitants' behavior such as this: Following the ambush of four Dutch traders, Bailyn quotes a report, one "had been eaten after having [been] well roasted. The [other two] they burnt. The Indians carried a leg and an arm home to be divided amongst their families."

And, on the other side, consider that fixture of grade school Thanksgiving pageants, Miles Standish, an upstanding, godly Pilgrim stalwart who does not at all seem the sort of man who would have cut off the head of a chief and "brought it back to Plymouth in triumph [where] it was displayed on the blockhouse together with a flag made of a cloth soaked in the victim's blood." (Happy Thanksgiving!)

"What happened," Bailyn continues, "is a legacy of brutality in intercultural relations developed through this period of which, of course, the overwhelming legacy was slavery." Bailyn points out that although there were only "a few thousand" slaves in the colonies toward the end of King Philip's War in the 1670s, when he concludes *The Barbarous Years*, "The rules for chattel slavery were set."

And so the legacy of the barbarous years continued beyond the white male liberation of the Revolution.

Bailyn is fascinating when he speaks of questions of value. The day we talked was the peak of the fevered notion that the American government should settle its national debt by minting a platinum coin arbitrarily given a "trillion dollar" valuation. And it made me think of wampum, the original inhabitants' currency. I'd always wondered how you could found an entire centuries-long economics on beads and shells as these "Americans" did. And yet, isn't that what we've done since, basing our economics on shiny metal objects that have a declared,

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 131 of 223 PageID #:4008

consensus value unrelated to their worth as a metal?

So I asked Bailyn why wampum was accepted in exchange for an obviously more highly valuable commodity, such as furs.

Bailyn: "They're little shells."

Me: But why should people massacre each other over these little shells?

Bailyn: Because they had great value.

Me: Because of their beauty?

Bailyn: No, because they're hard to make and they don't exist everywhere. You ever see how this was done?

Me: No.

He picks up an imaginary shell from his desk and says:

"OK, they have a shell like this and then they have to bore a hole all the way down through the middle of the thing in order to hitch it to the next one and do it with certain color regularities. It's hard to do! And it becomes of value."

Me (thinking of home-beading kits my mother had): Doesn't it seem arbitrary?

Bailyn concedes he's not up on "wampum literature."

"There's wampum literature?" I asked. "You think I'm kidding. There are wampum experts and they don't fool around!"

Our wampum discussion leads to the fascinating "fair price" controversy in the Puritan communities, the argument over how much profit a pious person should make on a given transaction.

Free market theory dictates there should be only one motive in economic culture: getting the max. But early colonists integrated piety and humility into their economic lives. Spiritual considerations. One of his favorite stories is about the English merchant who couldn't stop confessing the sin of overcharging.

"Robert Keayne," he recalls, "was a very, very proper Puritan tradesman from London who made it big and set up trade here and then got caught for overpricing."

"The guy who made a big apology?" I ask, recalling the peculiar episode from his book.

"He wrote endlessly, compulsively," of his remorse, Bailyn replies.

"50,000 words or so, right?"

"Unbelievable!," he exclaims, "A 50,000-word will which explores the whole business of revaluing, of cheating and so forth. And I published his will, the whole thing, 158 pages in the original. And the question is whether you could be a proper Christian and make money. See, they were caught in a double bind. Max Weber started all this out [with *The Protestant Ethic and the Spirit of Capitalism*]."

Weber argued that Protestants were driven to make money and create urban centers of wealth to display it

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 133 of 223 PageID #:4010

because these were an external sign that one had been saved, chosen by God to enter into his grace and be redeemed. But in fact most of the Protestant heretics who settled America believed that salvation was a matter between God and the individual, no matter what their bank balance—and that too much wealth could signify the exact opposite of sanctification: greed and spiritual degradation. Thus the "fair price" controversy and what British economic historian R. H. Tawney called the Puritan "double bind," a theory Bailyn has adopted. "They were against exhibitionism," Bailyn tells me. "There were moral prohibitions against making as much as you possibly could—that's not good! You have to do it within constraints. There's a big literature about this."

It makes you think of the contrast with our hedge fund wealth-worshiping culture, our conflicted attitude toward the "1 percent"—envy and moral disapproval. Perhaps judges should sentence insider traders to write 50,000-word apologies while in prison.

Speaking of price made me think of the overarching question of early America: whether the barbarism, torture, murder, massacre—the ethnic cleansing—that Bailyn describes in The Barbarous Years was the inevitable price we had to pay for the civilization that followed.

When I ask the question of whether there could have been another way for the races to interact than mutual massacre, he brings up one of the few figures who emerges with honor from his chronicle of this savage period: Roger Williams.

"There were people who tried to have amicable race relations," he says, "but it broke down again and again."

I had always admired Roger Williams for his belief in religious toleration, which was realized in his Rhode Island colony, a place where all the dissenters and the dissenters from the dissenters could find a home to worship the

way they wanted. And I'd admired him for standing as a reminder to certain contemporary zealots that America was a refuge for people who believed there should be a separation between church and state—and that both church and state were better off for it, sentiments that entered into the First Amendment.

But in Bailyn's account, Williams becomes a great American character as well. Not only was he close to the original inhabitants, he could speak some of their languages and had the humility to recognize he could learn from them.

I told Bailyn what an admirable character his Williams came across as.

"Well, the people at the time didn't think he was. He was a perfectionist. And no form of Christianity was good enough for him. He started out in the Church of England. He was a very strange man. He was a zealot.

" "But didn't his zealotry lead to tolerance?"

"It did, but this was not the big issue for him. He was trying to find out the proper form of Christianity. He started with the Church of England and that was full of trouble. Then he became a Baptist and that was no good. He kept taking off all the clothes of organized Christianity till nothing was left. And he ended up in a church of his own with his wife and a few Indians. He's a zealot who went all the way!"

"But he wasn't a zealot who persecuted others."

"No, he was not. That's why they hated him...he was complicated. He was well educated, he was a gentleman— but he was a nut case! They didn't know what to do with him. Among his views, first of all, was that you do not seize Indian land. You don't own it, you don't take it. And you treat people civilly and there is no purity in any

stage of Christianity, hence toleration."

"What's nutty about that?" I asked

"You don't live in the 17th century."

"So you're not saying he's a nut case from the perspective of the 21st century?"

"No, certainly not. He became properly famous for all this—later. At the time people hated him. Because he was breaking up the unity of Christianity. One of his contemporaries had a wonderful phrase for him. Namely, he is 'unlamb-like.' No lamb, this guy. He sure wasn't. But he got close to the Indians, knew them well, lived with them."

Bailyn's description of the many contradictory aspects of Williams' character stayed with me. A zealot, but tolerant. An outcast, but a self-outcast. Willing to be seen as a "nut case" in his time. A visionary sense of the way to a better future in that dark century. So much of the American character, like Williams, emerges from the barbarous years. And that century has left its stamp on us. Not the "zealous nut case" part, though that's there. I'm thinking of that compound word Bailyn likes about Williams: "unlamb-like." That's us.



DESTRUCTION OF THE PEQUOTS

**1** / 2

The "peaceful" Pilgrims massacred the Pequots and destroyed their fort near Stonington, Connecticut, in 1637. A 19th-century wood engraving (above) depicts the slaughter. The Granger Collection, NYC



Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 139 of 223 PageID #:4016



**2** / 2

Historian Bernard Bailyn. Photograph by Jared Leeds

Get the latest **History** stories in your inbox?

Email Address                                    **SIGN UP**

Click to visit our Privacy Statement.



### Ron Rosenbaum

Ron Rosenbaum is the author of seven books of nonfiction, including *The Shakespeare Wars: Clashing Scholars, Public Fiascoes, Palace Coups*, and *How the End Begins: The Road to a Nuclear World War III*. An updated edition of his book, *Explaining Hitler: The Search for the Origins of His Evil* is being published by DaCapo/Perseus Books.

**Filed Under:** Native American History

EXHIBIT T

THE DEADLY WEAPON LAWS OF TEXAS: REGULATING GUNS, KNIVES, AND

KNUCKLES IN THE LONE STAR STATE, 1836-1930

by

BRENNAN GARDNER RIVAS

Bachelor of Arts, 2010
Oklahoma State University
Stillwater, Oklahoma

Master of Arts, 2013
Texas Christian University
Fort Worth, Texas

Submitted to the graduate faculty of
AddRan College of Liberal Arts
Texas Christian University
in partial fulfillment of the requirements
for the degree of

Doctor of Philosophy

May 2019

THE DEADLY WEAPON LAWS OF TEXAS:
REGULATING GUNS, KNIVES, & KNUCKLES IN THE LONE STAR STATE, 1836-1930

By

Brennan Gardner Rivas

Thesis approved:

Gregg Cantrell

Major Professor

Alan Gallay

Rebecca Sharpless

Todd M Kerstetter

PETER WORTHING

For the College of Liberal Arts

Copyright by
Brennan Nicole Rivas
2019

simply picked up a pistol lying on a table in front of him. He did not own it, nor did he carry it with him or use it in a threatening manner. "Such handling of the pistol was perhaps through mere idle curiosity, and without any intent whatever to violate the law. It would be a perversion of reason and justice, it seems to us, to hold that the law intends that punishment shall be visited upon an act of this character."[49]

Just as "about the person," "having," "holding," and "carrying" caused ample confusion in Texas courts, so too did "traveler." The deadly weapons ban failed to provide a definition for this term, which foisted a serious problem onto the judiciary. In one of the cases previously mentioned, *Waddell* (1873), the court defined it as a person "living remote from their county seats or market towns, where a day's journey going and coming is required, and where often, from the necessities of business, even a portion of the night is used."[50] But between 1871 and 1879, Texas travelers had to follow strict rules about how and where they could stow their deadly weapons while on the road. The text of the law exempted travelers who carried knives or pistols "with their baggage." Those in wagons or buggies could keep pistols within arm's reach, but not in their hands. Horseback riders were not permitted to carry a pistol in a hip holster, on the saddle, or in their saddlebags. The passage of the Penal Code of 1879 changed these somewhat draconian rules for travelers because the phrase "in the baggage" was dropped from the text.[51]

---

[49] *Brooks v. State of Texas*, 15 Tex. Cr. App. 88 (1883).

[50] *Waddell v. State of Texas* (1872).

[51] The 1871 deadly weapons ban originally prohibited the carrying of specified weapons, with certain exceptions. Some of these exceptions, including the one for travelers, came in the form of a proviso: "provided that this section shall not be so construed as to prohibit . . . persons traveling in the State from keeping or carrying arms with their baggage." The law was transmuted into the Penal Code under Articles 318, 319, and 320 of Chapter 4, Title IX. There, all exemptions were grouped together in Article 319: "The preceding article shall not apply to . . . persons traveling . . . ." The requirement that those travelers keep their deadly weapons stowed away in the baggage disappeared. See Tex. Penal Code §319 (1879). The relevant cases are: *Maxwell v. State of Texas*, 38 Tex. 156 (1873); *Woodward v. State of Texas*, 5 Tex. Cr. App. 295 (1878); *Lewis v. State of Texas*, 2 Tex. Cr. App. 26 (1877). The *Lewis* decision received some abuse from Stephen P. Halbrook, who called it "contradictory" for affirming both

EXHIBIT U

( 259 )

grants, deeds, or mesne conveyances not being proved and registered within this state, it shall and may be lawful for such person or persons to prove and register his, her, or their grants, deeds, or mesne convey- ances.

Sec. 2. Be it enacted, That this act shall be in force until the end of the next stated session of the general assembly.

## C H A P.   XXI.

An ACT to amend an act, entitled, " An act to ascertain the boundaries of land, and for perpetuating testimony.—PASSED NOVEMBER 6, 1801.

BE it enacted by the General Assembly of the State of Tennessee, That all the privileges, benefits, and advantages arising under or accruing to others, by virtue of an act, entitled, " An act to ascertain the boundaries of land, and for perpetuating testimony, passed at Knoxville in the year 1799, shall extend to the citizens resident south of French Broad and Holston, and between the rivers Big Pigeon and Tennessee, holding or claiming, or that may hold or claim land by right of occupancy, so far as may respect their rights to, or the conditional or boundary lines of their respective claims or rights of occupancy and pre-emption in that tract of country, any thing in the proviso to the fourth section of said recited act to the contrary notwithstanding.

## C H A P.   XXII.

An ACT for the restraint of idle and disorderly persons.—PASSED NOVEMBER 13, 1801.

WHEREAS it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons :

Section 1. BE it enacted by the General Assembly of the State of Tennessee, That any person or persons who have no apparent means of subsistence, or neglect applying themselves to some honest calling for the support of themselves and families, every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful for any justice of the peace of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and cause him to be brought before said justice, who is hereby empowered, on conviction, to demand security for his good behaviour, and in case of refusal or neglect, to commit him to the goal of the county, for any term not exceeding five days, at the expiration of which time he shall be set at liberty if nothing criminal appears against him, the said offender paying all charges arising from such imprisonment; and if such person shall be guilty of the like offence from and after the space of thirty days, he, so offending, shall be deemed a vagrant, and be subject to one month's imprisonment, with all costs accruing thereon, which if he neglects or refuses to pay, he may be continued in prison until the next court of the county, who may proceed to try the said offender, and if found guilty by a verdict of a jury of good and lawful men, said court may proceed to hire the offender for any space of time not exceeding six months, to make satisfaction for all costs, but if such person or persons so offending, be of ill fame, so that he or they cannot be hired for the costs, nor give sufficient security for the same and his future good behaviour, in that case it shall and may be lawful for the said court to cause the offender to recive not exceeding thirty nine lashes, on his bare back, after which he shall be set at liberty, and the costs arising thereon shall become a county charge ; which punishment may

Digitized from Best Copy Available

( 260 )

be inflicted as often as the person may be guilty, allowing thirty days between the punishment and the offence.

Sec. 2. *Be it enacted*, That it shall not be lawful for any person or persons of ill fame or suspicious character, to remove him or themselves from one county to another in this state, without first obtaining a certificate from some justice of the peace of said county or captain of his company, setting forth his intention in removing, whether to settle in said county or if travelling, to set forth his business and destination, and if such traveller should be desirous to stay in any county longer than ten days, he shall first apply to some justice of said county for leave, and obtain a certificate for that purpose, setting forth the time of his permission, and if such person shall be found loitering in said county after the expiration of his permit, or fail to obtain the same agreeable to the true intent and meaning of this act, such person or persons so offending, may be apprehended by any person or persons, and carried before some justice of the peace, who may enquire into his character and business; and fine him at his discretion, not exceeding ten dollars; but if said traveller shall be found on examination, to be a person of ill fame, and there is reason to suspect he is loitering in said county for evil purpose, attempting to acquire a living by gambling, or other bad practices, such justice shall have power to commit any person of like character, until he shall find good and sufficient security for his good behaviour, for any time not exceeding ten days, and said justice of the peace or court of the county shall proceed against such offender, in the same manner as is heretofore prescribed for vagrants.

Sec. 3. *Be it enacted*, That all and every keeper or keepers, exhibitor or exhibitors, of either of the gaming tables commonly called A. B. C. or E. O. tables, or faro bank, or of any other gaming cloth table, or bank of the same, or like kind, under any denomination whatever, shall be deemed and treated as a vagrant, and moreover it shall be the duty of any judge or justice of the peace, by warrant under his hand, to order such gaming table or cloth to be seized and publicly burned or destroyed; said warrant shall be directed to some one constable within the county, whose duty it shall be, forthwith to execute the same: *Provided*, That nothing herein contained, shall be so construed as to extend to billiard tables.

Sec. 4. *Be it enacted*, That it shall not be lawful for any house keeper to harbor any idle person of the character aforesaid, for any longer time than is heretofore specified, under the penalty of twenty dollars for every such offence, to be recovered by warrant before any justice of the peace of the county where the offence is committed.

Sec. 5. *Be it enacted*, That it shall be the duty of each justice of the peace, on information being made on oath to him or them, that there is a person or persons of the aforesaid description, loitering in his or their county, then and in that case he or they shall issue his or their warrant against such person or persons agreeable to this act : *And provided*, he or they shall neglect or refuse so to do, it shall be deemed a misdemeanor in office, for which he or they shall be impeachable, and on conviction be removed from office.

Sec. 6. *Be it enacted*, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his

Digitized from Best Copy Available

( 261 )

own view, or upon the information of any other perfon on oath, to bind fuch perfon or perfons to their good behaviour; and if he or they fail to find fecurities, commit him or them to goal; and if fuch perfon or perfons fhall continue fo to offend, he or they fhall not only forfeit their recognizances, but be liable to an indictment, and be punifhed as for a breach of the peace, or riot at common law.

Sec. 7. Be it enacted, That if any perfon or perfons fhall unlawfully cut out or difable the tongue, put out an eye, flit a nofe, bite or cut off a nofe, ear or lip, or cut off or difable any limb or member, or ftab any perfon whatfoever, in doing fo, to maim, wound or disfigure in any of the manners before mentioned, fuch perfon or perfons fo offending their counfellors, aiders and abettors, knowing of, and privy to the offence, fhall be and are hereby declared to be felons, and fhall fuffer as in cafe of felony: Provided neverthelefs, he or they fhall be entitled to benefit of clergy, and be further liable to an action of damages to the party injured.

Sec. 8. Be it enacted, That all fines inflicted by this act, fhall be one half to him that will fue for the fame, and the other half to the ufe of the county.

Sec. 9. Be it enacted That all laws and parts of laws, which come within the meaning and purview of this act, are hereby repealed.

## CHAP. XXIII.

An ACT to authorife the feveral county courts of pleas and quarter feffions to remit and mitigate fines and forfeitures on recognizances as therein mentioned —(PASSED OCTOBER 12, 18...)

Section 1. BE it enacted by the General Affembly of the State of Tennessee, That the feveral courts of pleas and quarter feffions in this ftate, fhall have power to remit or mitigate all fines by them inflicted, and all forfeitures on recognizances, previous to entering final judgment thereon: Provided, a majority, or any number no lefs than nine of the juftices of faid county be prefent when fuch remittance or mitigation fhall be made.

Sec. 2. Be it enacted, That fo much of any other act as comes within the purview and meaning of this act is hereby repealed.

## CHAP. XXV.

An ACT concerning adminiftrations granted on the eftates of perfons dying inteftate, therein mentioned :—(PASSED NOVEMBER 10, 1801.)

WHEREAS heretofore the courts of pleas and quarter feffions, during the being of the temporary government called Franklin, granted adminiftrations on the eftates of perfons who died inteftate, and have iffued letters of adminiftration accordingly, in virtue and by authority of which, the perfons fo adminiftering, have proceeded to adminifter upon the goods and chattels, rights and credits of their inteftates refpectively: And whereas it will contribute to the peace and quiet of families, that adminiftrations on fuch eftates, fo as aforefaid granted, be deemed and declared valid,

Sec. 1. BE it enacted by the General Affembly of the State of Tennessee, That all adminiftrations granted by any of the faid courts of pleas and quarter feffions, and letters of adminiftration by any of the aforefaid courts iffued, on the eftate or eftates of any perfon who died inteftate, and all proceedings in virtue of fuch letters of adminiftration had and done, of, and concerning any fuch eftate, agreeably to, and in conformi-

Digitized from Best Copy Available

# EXHIBIT V

This is a reproduction of a library book that was digitized by Google as part of an ongoing effort to preserve the information in books and make it universally accessible.

 

https://books.google.com

# REVISED STATUTES

**OF**

# THE STATE OF ARKANSAS.

Digitized by Google

# REVISED STATUTES

OF

# THE STATE OF ARKANSAS,

ADOPTED

AT THE OCTOBER SESSION

OF THE

GENERAL ASSEMBLY OF SAID STATE, A. D. 1837,

IN THE YEAR OF OUR INDEPENDENCE THE SIXTYSECOND, AND OF THE

STATE THE SECOND YEAR.

———————

REVISED BY WILLIAM McK. BALL AND SAM. C. ROANE

NOTES AND INDEX BY ALBERT PIKE.

PUBLISHED BY AUTHORITY OF THE GENERAL ASSEMBLY.



## BOSTON:

WEEKS, JORDAN AND COMPANY, PUBLISHERS.

1838.

Digitized by Google

*ı*

ENTERED according to Act of Congress, on the 10th day of March, A. D. 1838, in the
Clerk's Office, for the State of Arkansas.

——————————————

BOSTON:
TUTTLE, DENNETT AND CHISHOLM, PRINTERS,
No. 17 School Street.

Digitized by Google

SEC. 12.   Every person who shall be convicted of any misdemeanor, the punishment of which is not defined in this or some other statute, shall be punished by imprisonment, not exceeding one year, or by fine not exceeding two hundred and fifty dollars, or by fine and imprisonment both.

SEC. 13.   Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

ART. II.—LIBEL.

SECTION
1. Definition of.
2. Punishment of.
3. The truth of the libel may be given in evidence.
4. Proclaiming a person a coward, for not fighting a duel, &c.

SECTION
5. Publisher or printer required to testify.
6. Punishment of publisher or printer refusing to testify.
7. Their testimony not to be used against themselves.

SEC. 1.   A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, veracity, virtue or reputation, or to publish the natural defects, of one who is living, and thereby expose him to public hatred, contempt and ridicule.

SEC. 1.   Every person, whether writer, printer or publisher, convicted of the crime of libel, shall be fined in any sum not exceeding five thousand dollars, and may also be imprisoned, not exceeding one year, at the discretion of the jury who shall pass on the case ; and when any such case shall be decided without the intervention of a jury, then at the discretion of the court.

SEC. 3.   In all prosecutions for libel, under the provisions of the preceding sections, the truth thereof may be given in evidence in justification.

SEC. 4.   If any person shall, in any newspaper, handbill or other advertisement, written or printed, publish or proclaim any other person as a coward, or use any other opprobrious or abusive language, for not

# EXHIBIT W

The New York Times | https://www.nytimes.com/2011/01/12/opinion/12freeman.html

OP-ED CONTRIBUTOR

# When Congress Was Armed And Dangerous

**By Joanne B. Freeman**

Jan. 11, 2011

New Haven

THE announcement that Representatives Heath Shuler of North Carolina and Jason Chaffetz of Utah are planning to wear guns in their home districts has surprised many, but in fact the United States has had armed congressmen before. In the rough-and-tumble Congress of the 1830s, 1840s and 1850s, politicians regularly wore weapons on the House and Senate floors, and sometimes used them.

During one 1836 melee in the House, a witness observed representatives with "pistols in hand." In a committee hearing that same year, one House member became so enraged at the testimony of a witness that he reached for his gun; when the terrified witness refused to return, he was brought before the House on a charge of contempt.

Perhaps most dramatic of all, during a debate in 1850, Senator Henry Foote of Mississippi pulled a pistol on Senator Thomas Hart Benton of Missouri. (Someone eventually took it from his hand.) Foote had decided in advance that if he felt threatened, he would grab his gun and run for the aisle in the hope that stray shots wouldn't hit bystanders.

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 158 of 223 PageID #:4035

Most famously, in 1856, Representative Preston Brooks of South Carolina caned Senator Charles Sumner of Massachusetts on the Senate floor so brutally that Sumner had to be virtually carried from the chamber and did not retake his seat for three years. Clearly, wielded with brute force, a cane could be a potent weapon.

By the 1850s, violence was common in Washington. Not long after Sumner's caning, a magazine told the story of a Michigan judge who traveled by train to the nation's capital: "As he entered the main hall of the depot, he saw a man engaged in caning another ferociously, all over the room. 'When I saw this,' says the judge, 'I knew I was in Washington.'"

In Congress, violence was often deployed strategically. Representatives and senators who were willing to back up their words with their weapons had an advantage, particularly in the debate over slavery. Generally speaking, Northerners were least likely to be armed, and thus most likely to back down. Congressional bullies pressed their advantage, using threats and violence to steer debate, silence opposition and influence votes.

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 159 of 223 PageID #:4036



Jonathan Twingley

In 1842, Representative Thomas Arnold of Tennessee, a member of the Whig Party, learned the hard way that these bullies meant business. After he reprimanded a pro-slavery member of his own party, two Southern Democrats stalked toward him, at least one of whom was armed with a bowie knife  a 6- to 12-inch blade often worn strapped to the back. Calling Arnold a "damned coward," his angry colleagues threatened to cut his throat "from ear to ear." But Arnold wasn't a man to back down. Ten years earlier, he had subdued an armed assassin on the Capitol steps.

As alarming as these outbursts were, until the 1840s, reporters played them down, in part to avoid becoming embroiled in fights themselves. (A good many reporters received beatings from outraged congressmen; one nearly had his finger bitten off.) So Americans knew relatively little of congressional violence.

That changed with the arrival of the telegraph. Congressmen suddenly had to confront the threat  or temptation  of "instant" nationwide publicity. As Senator John Parker Hale of New Hampshire reminded his colleagues within minutes of the Foote-Benton clash, reports were "already traveling with lightning speed over the telegraph wires to the remotest borders of the Republic." He added, "It is not impossible that even now it may have been rumored in the city of St. Louis that several senators are dead and weltering in their blood on the floor of the Senate."

Violence was news, and news could spawn violence. Something had to be done, but what? To many, the answer was obvious: watch your words. As one onlooker wrote to the speaker of the House shortly after Sumner's caning, "gentlemen" who took part in the debate over slavery should "scrupulously avoid the utterance of unnecessarily harsh language." There was no other way to prevent the "almost murderous feeling" that could lead to "demonstrations upon the floor, which in the present state of excitement, would almost certainly lead to a general melee and perhaps a dozen deaths in the twinkling of an eye."

Unfortunately, such admonitions had little effect. The violence in Congress continued to build until the outbreak of the Civil War.

Today, in the wake of an episode of violence against a member of Congress, we're again lamenting the state of political rhetoric, now spread faster than ever via Twitter, Web sites, text messaging and e-mail. Once again, politicians are considering bearing arms  not to use against one another, but potentially against an

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 161 of 223 PageID #:4038

angry public.

And once again we're reminded that words matter. Communication is the heart and soul of American democratic governance, but there hasn't been much fruitful discourse of late  among members of Congress, between the people and their representatives or in the public sphere. We need to get better at communicating not only quickly, but civilly.

Joanne B. Freeman, a professor of history at Yale, is at work on a book about violence in Congress.

A version of this article appears in print on , Section A, Page 23 of the New York edition with the headline: When Congress Was Armed And Dangerous

EXHIBIT X

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 163 of 223 PageID #:4040

www.whitehousehistory.org /secret-service-and-the-presidents

# Secret Service and the Presidents



Main Content

Rubenstein Center Scholarship

- Joel D. Treese Senior Historian

# Gallery

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 164 of 223 PageID #:4041



1 of 8

A plainclothes guard at the White House east gate during the Civil War.

Library of Congress



- 

Show Me More

2 of 8

A White House policeman standing at the North Entrance of the White House, c. 1890.

Library of Congress

Show Me More



- 

Show Me More

3 of 8

Secret Service Chief John Wilkie in his office, c. 1910.

Library of Congress

Show Me More



- Show Me More

4 of 8

U.S. Secret Service agents Edmund Starling (left, directly behind First Lady Grace Coolidge) and James "Jim" Haley (right, behind President Calvin Coolidge) as they leave Congregational Church in Washington, D.C.

Library of Congress, National Photo Collection

Show Me More



- 

Show Me More

5 of 8

A military guard directs pedestrian traffic away from the Northwest entrance of the White House during World War II.

D.C. Public Library

Show Me More



- Show Me More

6 of 8

Military guards march outside the White House gates during World War II.

D.C. Public Library

Show Me More



- 

Show Me More

7 of 8

The White House Police Force was created in 1922, placed under the supervision of the Secret Service in 1930, and later renamed the Executive Protective Service in 1970. It was renamed the Secret Service Uniformed Division in 1977. President Barack Obama addresses officers before a group photo at the South Portico of the White House, 2011.

Official White House Photo by Pete Souza

Show Me More

- 

Show Me More

8 of 8

A U.S. Secret Service agent prepares to open the door to the Oval Office for President Barack Obama in 2009.

Official White House Photo by Pete Souza

Show Me More

Historian William Seale has described presidential protection as a learning process, with presidents and their families and the Secret Service sometimes straining to adjust to one another.

Although from the beginning guards were posted at the White House gates and front doors and the White House grounds were patrolled by a day guard and a night watchmen, it was not until 1842 that the first permanent security force for the White House was established—an auxiliary guard of a captain and three other men. The proposal to create the force had met opposition in Congress; Sen. John J. Crittenden of Kentucky warned "it might be metamorphosed into a political guard for the executive … it would not be entirely safe to organize such a corps. It was a little

sort of stand guard, which might eventually become a formidable army."[1]

Crittenden's fears went unrealized, and in 1853 Franklin Pierce became the first president to have a full-time bodyguard, and also introduced the two-level security arrangement that characterizes presidential protection today. A guarded outer perimeter securing the Executive Mansion itself, and an inner perimeter—the bodyguard to protect the person of the president.

During the Civil War there were heightened security fears in Washington that Confederates just across the Potomac in Virginia could easily slip across and attack President Abraham Lincoln at the White House. Metropolitan Police guarded the Executive Mansion but Lincoln did not want the house to take on the characteristics of an armed camp. Guards inside the Mansion (the doormen) dressed in civilian clothes and concealed their firearms. Uniformed, armed sentries were posted at the gates to the grounds and at the doors to the Executive Mansion itself.

During the Theodore Roosevelt administration (1901-1909), the Secret Service assumed full-time responsibility for protecting the President. President Roosevelt was guarded by at least two Secret Service men. Roosevelt chafed under the safeguard. "He did not like restraint," one observer recalled. "Always free and active in his manner of life, he found the vigilance of the secret service men irksome and their constant presence irritating." To frustration of his Secret Service detail, Roosevelt would sometimes secretly slip off the White House grounds and go for an invigorating hike or horseback ride in Rock Creek Park.[2]

His successor, William Howard Taft, followed the same mischievous tradition. At 4:30 on Christmas Eve afternoon 1911, the president and first lady secretly left the White House on foot in a rainstorm to call on friends as a surprise. When the Secret Service discovered their absence, there was widespread panic. Chief John Wilkie and his men scurried all over town searching for them. Two hours after their departure a soaked and dripping first couple returned to the White House, smiling broadly.[3]

Edmund W. Starling, who would become chief of the White House Secret Service detail in the 1920s, frequently saw presidents in unguarded moments. When the widowed President Woodrow Wilson was courting the widowed Mrs. Edith Galt, he would often walk back from her home on 20th Street to the White House with Starling. The agent found it difficult to believe the president was 58 years old, for "We walked briskly, and the president danced off the curbs and up them when we crossed streets."[4]

Starling was a particular favorite of President Calvin Coolidge, who often tried to outwit his protector. "Sometimes … he would try to sneak out the East or the West entrance, just to fool me. … One day I turned the tables on him and hid in the police box on the East side. He came out of the engine room, up the East steps, and passed right by me. I fell into position behind him. When he reached the gate he turned around with a look of glee on his face. 'Good morning, Mr. President,' I said. He turned and headed for F Street without saying a word."[5]

Following the United States' entry into World War II, the Secret Service changed the White House grounds forever, banning casual visitors and setting up sentry boxes manned by agents and members of the White House police force. "No more throngs of Congressional constituents being escorted along the beautiful, stately grand corridor … from the East Room to the State Dining Room," the first lady's good friend Lorena Hickok remembered, "No more government clerks hurrying through the grounds … in the late afternoon on their way home from work … No more Sunday tourists feeding the squirrels, taking snapshots and hanging around the portico hoping someone interesting would come out."[6]

President Franklin Roosevelt objected to security plans by the Secret Service and the military to cover the White House skylights, paint the White House in camouflage, place machine gun turrets on the roof, or to build barricades or station a group of tanks around the mansion, feeling that the public would be alarmed unnecessarily. The first lady shared some of the president's irritation with the safety measures. "Mrs. Roosevelt is very much annoyed today with Secret Service …" her personal secretary Malvina "Tommy" Thompson noted nine days after Pearl Harbor, "because they insisted she could not have 350 foreign students in the White House for tea. … In exasperation, Mrs. Roosevelt asked if they were going to take down the Washington monument because an enemy could measure the distance between it and the White House."[7]

Since World War II the degree of Secret Service protection for the president and family has increased significantly, and the relationship can be, as President Harry S. Truman's daughter Margaret wrote in 1972, "often hectic, but never unfriendly." The Secret Service agents guarding her and her parents, she concluded, were "probably the finest, most dedicated group … I have ever met."[8]

This article was originally published on October 20, 2015

## Footnotes & Resources

1. Congressional Globe, 27th Congress, 2nd Session, August 6, 1842, 854
2. Arthur Wallace Dunn, From Harrison to Harding: A Personal Narrative, Covering a Third of a Century, vol. 1 (G.P. Putnam's Sons, 1922), 360
3. "President Gives His Guardians the Slip," Albuquerque (N.M.) Journal, December 25, 1911
4. Edmund W. Starling with Thomas Sugrue, Starling of the White House (Simon and Schuster, Inc., 1946), 56
5. Starling, Starling of the White House, 208
6. "The War Years at the White House," Chapter 13 in "The Unpublished Autobiography of Lorena Hickok," Hudson River Valley Review 26 (Autumn 2009), 99
7. Doris Kearns Goodwin, No Ordinary Time: Franklin and Eleanor Roosevelt: The Home Front in World War II (Simon and Schuster, 1994), 298-299

8. Margaret Truman, Harry S. Truman (Morrow, 1972), 201

# You Might Also Like



- Podcast

## Dinner with the President

Featuring Alex Prud'homme, bestselling author and great-nephew of cooking legend Julia Child



Collection

## The 2023 White House Christmas Ornament

Every year since 1981, the White House Historical Association has had the privilege of designing the Official White House Christmas Ornament. These unique collectibles — honoring individual presidents or specific White House anniversaries — have become part of the holiday tradition for millions of American families. In this collection, explore the history behind our 2023 design and learn more about President Gerald R. Ford. Buy

- 

Podcast

### America's Irish Roots

Featuring Geraldine Byrne Nason, Ambassador of Ireland to the United States

- 
Collection

## The Ford White House 1974 - 1977

Gerald Rudolph Ford Jr., the nation's only unelected president and vice president, served thirteen terms in Congress before rising to national attention in 1973, when President Richard Nixon nominated him as vice president. Less than a year later, Ford became president, following President Nixon's resignation from office. The Fords made and celebrated history during their time in the White House, fr

- 

Podcast

## Becoming FDR: The Personal Crisis That Made a President

Featuring Jonathan Darman, author of "Becoming FDR: The Personal Crisis That Made a President"



Podcast

## 250 Years of American Political Leadership

Featuring Iain Dale, award-winning British author and radio and podcast host



Podcast

## The History of Wine and the White House

Featuring Frederick J. Ryan, author of "Wine and the White House: A History" and member of the White House Historical Association's National Council on White House History



Collection

### The Johnson White House 1963 - 1969

On November 22, 1963, about two hours after the assassination of President John F. Kennedy, Vice President Lyndon Baines Johnson took the Oath of Office, becoming the thirty-sixth President of the United States. Prior to serving as vice president, Johnson had represented his home state of Texas for more than twenty years in both the House of Representatives and the Senate. As



Podcast

## Freemasons and the White House

Featuring Jason Van Dyke, Director of Communications, Grand Lodge of Washington, DC, and Chris Ruli, Historian & Librarian, Grand Lodge of Washington, DC



Collection

## Olympic Celebrations

Honoring some of the greatest moments in sports history has become a tradition at the White House. Presidents and their families have long recognized athletes as well as the cooperation, competition, and national pride displayed during the summer and winter Olympic and Paralympic Games. Over the years, this has taken on a variety of forms from opening the games to

- 
  Podcast

## A Discussion with the Voices of Lafayette Park

Featuring Hilary West, Executive Director for Federal Government Relations at JPMorgan Chase, and Royce L. Dickerson, MBA Candidate at the University of Alabama's Manderson Graduate School of Business

- 

Collection

## The 2021 White House Christmas Ornament

Every year since 1981, the White House Historical Association has had the privilege of designing the Official White House Christmas Ornament. These unique collectibles — honoring individual presidents or specific White House anniversaries — have become part of the holiday tradition for millions of American families. In this collection, explore the history behind our 2021 design and learn more about President Lyndon B. Johnson.Buy

- 
- 
- 
- 

EXHIBIT Y



# Facts at a glance

*Updated January 2024*

# Service overview

The Chicago Transit Authority (CTA) operates one of the nation's largest public transportation systems. On an average weekday, 765,566 rides are taken on CTA. The CTA is a regional transit system that serves 35 suburbs, in addition to the City of Chicago, and provides 81 percent of the public transit trips in the six-county Chicago metropolitan area either with direct service or connecting service to Metra and Pace.

CTA has 1,868 buses that operate 127 routes and 1,514 route miles. Buses make about 15,943 trips a day and serve 10,633 bus stops.

On the rapid transit system, CTA's 1,480 rail cars operate eight routes and 224.1 miles of track. CTA trains make about 1,888 trips each day and serve 145 stations.

Chicago is one of the few cities in the world that has rail service to two major airports. CTA's Blue Line 'L' can take customers to O'Hare International Airport. Orange Line trains, which operate clockwise on the Loop 'L' structure, travel to Midway Airport.

CTA also provides around-the-clock service on certain routes. During late night and early morning hours, major rail lines and some of CTA's bus

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 188 of 223 PageID #:4065

routes offer "Night Owl" service, much of it with connecting schedules and routing.

# Organization

Chicago Transit Authority is an independent governmental agency created by state legislation. CTA began operating on Oct. 1, 1947, after it acquired the properties of the Chicago Rapid Transit Company and the Chicago Surface Lines. On Oct. 1, 1952, CTA became the predominant operator of Chicago transit when it purchased the Chicago Motor Coach system.

# Governance & oversight

The governing arm of CTA is the Chicago Transit Board. Lester L. Barclay serves as chairman. The board consists of seven members, four appointed by the Mayor of Chicago and three by the Governor of Illinois.

The Mayor's appointees are subject to the approval of the Governor and the Chicago City Council; the Governor's appointees are subject to the approval of the Mayor and the Illinois State Senate. CTA's day-to-day operations are directed by Dorval R. Carter, Jr., president.

CTA generates revenue from both farebox collections and non-farebox revenues, and also receives supplemental funding for operating expenses through the Regional Transportation Authority (RTA).

The RTA was established in 1974 to oversee local transportation operators in the six-county Chicago metropolitan area. Illinois state law requires the three RTA service. boards—CTA, Metra (the suburban rail system) and Pace (the suburban bus system)—to recover collectively at least 50 percent of operating costs from farebox and other system revenues.

# Statistics & information

## Service area

| Area served by CTA | Chicago and 35 suburbs |
|---|---|
| Service population | 3.2 million |
| 2024 Operating budget | $1.996 billion |

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 189 of 223 PageID #:4066

| 2024 Capital budget | $3.61 billion |
|---|---|

# Ridership

| Average Weekday (2022) | |
|---|---|
| Bus | 445,445 |
| Rail | 317,118 |
| **Total system** | **762,564** |

| Annual (2022) | |
|---|---|
| Bus | 140.0 million |
| Rail | 103.5 million |
| **Total system** | **243.5 million** |

# Route statistics (2023)

| | |
|---|---|
| Bus route miles | 1,514 |
| Bus miles traveled per day | 137,132 |
| Rail track miles | 224.1 |
| Rail miles traveled per day | 198,844 |
| Miles of elevated structure | 35.8 |
| Miles of 'L' at grade level | 35.0 |
| Miles of 'L' embankment, etc. | 20.6 |

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 190 of 223 PageID #:4067

| Miles of subway | 11.4 |
|---|---|
| Clearance range of 'L' structure in the Loop | 13'3"-19'4" |

## Number of... (2023)

| Buses | 1,868 |
|---|---|
| Bus routes | 127 |
| Bus stops | 10,633 |
| Rail cars | 1,496 |
| Rail lines | 8 |
| Rail stations | 145 |
| Employee positions | 10,588 |

## Important transit dates in Chicago

| Horse car service began | Apr. 25, 1859 |
|---|---|
| Cable car service began | Jan. 28, 1882 |
| First electric streetcars | Oct. 2, 1890 |
| First rail line | June 6, 1892 |
| Loop Elevated opened | Oct. 12, 1897 |
| First motor bus service | Mar. 25, 1917 |
| Trolley bus service began | Apr. 17, 1930 |
| State Street Subway opened | Oct. 17, 1943 |

Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 191 of 223 PageID #:4068

| | |
|---|---|
| CTA became operating entity | Oct. 1, 1947 |
| Dearborn Subway opened | Feb. 25, 1951 |
| Last streetcar ran | June 21, 1958 |
| Skokie Swift service began | Apr. 20, 1964 |
| Expressway median operation: | |
|   - Congress (Eisenhower) | June 22, 1958 |
|   - Dan Ryan | Sept. 28, 1969 |
|   - Kennedy | Feb. 1, 1970 |
| Rail service to O'Hare | Sept. 3, 1984 |
| Rail service to Midway | Oct. 31, 1993 |
| Rail line names switched to colors | Feb. 21, 1993 |
| Fare Cards introduced | August 18, 1997 |
| Pink Line service began | June 25, 2006 |
| Ventra fare system completed | July 1, 2014 |

©2024 Chicago Transit Authority

Phone: 1-888-YOUR-CTA
TTY: 1-888-CTA-TTY1 or 711 (relay)
Email: feedback@transitchicago.com

# EXHIBIT Z

www.cbsnews.com /chicago/news/crisis-responder-suspect-attack-cta/

# Crisis responder says he witnessed suspect attack three people on CTA

Suzanne Le Mignot ⋮⋮ 12/21/2023



Local News ▾

Crisis responder says he ensured CTA attack suspect was arrested

▶ Crisis responder says he ensured CTA attack suspect was arrested 02:48

**CHICAGO (CBS)** -- Devonte Jones is accused of attacking CTA passengers and an employee – and actions have even been caught on CTA surveillance cameras.

As CBS 2's Suzanne Le Mignot reported, crisis responder Andrew Holmes said he made a point of ensuring that Jones was taken into custody. Holmes said he witnessed Jones attack three people over the course of two days, and called 911.

Prosecutors say Jones, 28, punched a 59-year-old man in the face, at the Chicago Transit Authority Green Line station here at Central Avenue and Lake Street in South Austin on Thursday, Dec. 14.

Police said the man was a transit employee. Prosecutors said he was putting money on his Ventra card at a kiosk when he was attacked.

"Can you imagine, just passengers and CTA workers are getting hit in the face, unexpected -- and bleeding," said Holmes.

Holmes said the CTA put out an alert with images of Jones taken from surveillance video. Holmes saw the flyer on Monday of this week, and recognized Jones when he was about to board a train.

"So I called 911 and informed them this individual was on the train, and that he was wanted," Holmes said.

Holmes said he followed Jones on the train to the Clark and Lake station downtown and witnessed Jones carry out the unimaginable.

"He stepped off the train, he sucker-punched a senior right in the face -- and went downstairs, and ran across another individual, and sucker punched that individual in the face," Holmes said.

Holmes lost sight of Jones, who got away, But Holmes went back to Lake and Central on Tuesday, and so did Jones.

"So I informed the 911 Center that we needed a car or two over here. I contacted the deputy of Chicago Police Department," Holmes said. "I was determined to not let this guy get away again. So by that time, the officer pulled up, went inside a building that he went in. Two more cars arrived, and they placed him into custody."

CBS 2's Le Mignot spoke to a man by phone who filed a misdemeanor complaint against Jones. Edward Boyce said Jones punched him in the

face and caused him to fall down a flight of stairs. Boyce was delivering a pizza to a building on the 500 block of North Central Avenue in South Austin.

Boyce said on the phone of Jones: "He should remain in jail for what he did to me. I'm 77 years old. They have him bond in my case, and he was out to hurt other people."

A judge ordered Jones detained because of a warrant. He is to appear in court on Tuesday of next week.

## More from CBS News



Man dies in Chicago motorcycle crash after running red light



20-year-old stabbed during attempted robbery on CTA platform in The Loop



12 injured in weekend shootings across Chicago



Boy charged in Chicago shooting that caused rollover crash in Auburn Gresham



Parole board chair and board member resign amid controversy over case of suspect in Edgewater stabbing, murder

In:

- Chicago Transit Authority

Suzanne Le Mignot



Suzanne Le Mignot serves as CBS2 Chicago's weekend news morning anchor and weekday reporter.

## Featured Local Savings

EXHIBIT AA

abc7chicago.com /chicago-cta-crime-red-line-train/13107614/

**CTA riders express concerns after several passengers beaten, robbed on Red Line trains recently**

Stephanie Wade ｜ 4/9/2023



- CTA

ByStephanie Wade

Sunday, April 9, 2023

-
-
-
-
-
-



Several passengers have been beaten and robbed recently on the CTA Red Line, according to police.

CHICAGO (WLS) -- Several passengers have been beaten and robbed recently on the Red Line, according to police.

One of those incidents happened just off the Chinatown Red Line stop, where many riders expressed their concerns.

Officials released multiple community alerts Sunday trying to find who is terrorizing the CTA.

"Just a lot of people bothering you, like won't take no for an answer and you're trying to mind your business," said CTA rider Brode Boyd.

RELATED: Disturbing details of hour-long attack by CTA employee in Blue Line stairwell revealed in court

Mass Transit Detectives are asking for the public's help in finding these three female suspects who, police say, beat and robbed someone while on a Red Line train at the 79th Street Station around 8:15 p.m. Friday.



Chicago police are searching for these three women who allegedly robbed a passenger on a CTA Red Line train Friday night.

"What is the safest way to get around because I don't have a car here -- I don't want to drive here. We are in the city, so obviously we take public transportation but if I can't even rely on that, I don't even know what I'm to do," said CTA rider Estela Romero.

That isn't the only incident police are trying to solve.

On Tuesday, they say two suspects held a knife up to a victim on the Red Line that was heading northbound, and took their cell phone and backpack.



On Tuesday, they say two suspects held a knife up to a victim on the Red Line that was heading northbound, and took their cell phone and backpack.

And on March 28, a victim was followed by a suspect after leaving the Cermak/Chinatown train station around 7:45 a.m., punching the victim in the face and knocking them to the ground.



On March 28, a victim was followed by a suspect after leaving the Cermak/Chinatown train station around 7:45 a.m., punching the victim in the face and knocking them to the ground.

"It's crazy. I think we should travel in a group instead of traveling alone. That's what I'm trying to do with my friends, too," said CTA rider Hai Truong.

Each are all terrifying incidents that had left riders hesitant to ride the CTA at any hour.

RELATED: 15-year-old boy charged after man beaten, critically injured in attack on CTA Red Line platform: CPD

"It's jarring to know that it's happening at any point in time now," said CTA rider Pooja Menon.

Menon said she has felt a heightened presence by patrol officers recently but still, it's hard not to be worried when you hear of crimes like these taking the CTA every day.

"I just keep seeing more CTA security personnel, but also CPD and canine units in general," she said. "Even in the mornings, all throughout the whole day, I just see at least two officers in the station at all times."

RELATED: Woman fatally stabbed on CTA platform in Loop, police say

"Just hopefully things get better soon and hopefully things don't escalate, crime doesn't escalate as it gets warmer," said CTA rider Adarsh Menon.

If you do recognize any of the suspects, police ask you to contact them immediately.

**INTERACTIVE SAFETY TRACKER** Track crime and safety in your neighborhood



**Get ABC7 breaking news delivered to your inbox**

Sign up for our breaking newsletter

Yes! I would like to receive the Breaking News Newsletter. By creating an account, you agree to our Terms of Use and acknowledge that you have read our Privacy Policy and US State Privacy Rights Notice.

*Required Fields

Report a correction or typo

Copyright © 2024 WLS-TV. All Rights Reserved.

# EXHIBIT BB


(/)

Train
Tracker

Maps &
Schedules

Service
Alerts

Contact
Us

Search

Main menu

# Ridership Data

Find more in  **Ridership Data**  ⌄

Jump to

**Weekday Ridership and Service Levels**

**Other Metra Statistics**

Metra oversees all commuter rail operations in northeastern Illinois region, with responsibility for day-to-day operations, fare and service levels, capital improvements and planning. The Metra system is comprised of 11 separate lines radiating out from Chicago's Loop, and serves more than 100 communities at 242 rail stations.

Fares and Other Rider Information


(/)

# Weekday Ridership and Service Levels

| | Route Miles | # of Trains | Avg. Weekday Ridership |
|---|---|---|---|
| **BNSF** | **37.5** | **97*** | **63,000*** |
| **Metra Electric (University Park, Blue Island, South Chicago)** | **40.6** | **155*** | **28,100*** |
| **Heritage Corridor (Joliet)** | **37.2** | **7*** | **2,600*** |
| **Milwaukee North (Fox Lake)** | **49.5** | **63*** | **22,100*** |
| **Milwaukee West (Elgin)** | **39.8** | **58*** | **20,600*** |
| **North Central Service (Antioch)** | **52.8** | **20*** | **5,600*** |
| **Rock Island (Joliet, Blue Island)** | **46.6** | **68*** | **26,900*** |
| **SouthWest Service (Manhattan)** | **40.8** | **30*** | **9,600*** |
| **Union Pacific North (Kenosha, WI)** | **51.6** | **70*** | **34,600*** |

Fares and Other RTA Information

Metra (/)

| | Route Miles | # of Trains | Avg. Weekday Ridership |
|---|---|---|---|
| **Union Pacific Northwest (Harvard, McHenry)** | **70.5** | **65\*** | **40,100\*** |
| **Union Pacific West (Elburn)** | **43.6** | **59\*** | **27,900\*** |
| **Total** | **487.5** | **692\*** | **281,100\*** |

**\*Numbers are pre-COVID-19**

# Other Metra Statistics

| | |
|---|---|
| **2022 On-Time Performance** | **95.4%** |
| **Route Miles** | **487.5** |
| **Track Miles** | **1,155** |
| **Average Weekday Passengers** | **281,100\*** |
| **Average Weekend Passengers** | **93,200\*** |
| **Trains Scheduled per Weekday** | **692\*** |
| **Trains Scheduled per Weekend** | **454\*** |
| **Diesel Locomotives** | **163** |

| | |
|---|---|
| **Trailer & Cab Coaches** | **855** |
| **Metra Electric Cars** | **186** |
| *Numbers are Pre-COVID-19* | |

# Talk to Metra

## Customer Service

(312) 322.6777 (tel:
312-322-6777)
**Weekdays** 8 a.m. - 5 p.m.
Contact Us (/contact-
us#Report_an_Issue)

*For urgent Safety or security
concerns, contact the Metra
Police Department at (312)
322.2800 or via the Metra COPS
(/metraCOPSapp) mobile phone
app. For other public safety
concerns, contact Metra Safety at
(312) 322.6900 x7233 or email
safetyreporting@metrarr.com
(mailto:safetyreporting@metrarr.com).*

## RTA Travel Information

## Center

(312) 836.7000 (tel:
312-836-7000)
Monday - Saturday 6 a.m. - 7
p.m.

Fares and Other Rider Information

 (/)

# Hear from Metra



f (https://www.facebook.com/
MetraRail/)

instagram (https://www.instagram.com/
metrarail/)

in (https://www.linkedin.com/
company/metra)

x (https://twitter.com/Metra)

youtube (https://www.youtube.com/metra)

Sign up to receive passenger magazine and other
news

| Email Address | SUBMIT |

Webpage translation    Select Language

Accessibility (/
accessibility)

My Metra (https://
ridertools.metrarail.com/
mymetra)

Chicago Transit
Authority (https://
www.transitchicago.com/)

Fares and Ov...  Rider Information

Title VI of Civil Rights
Act (/title-vi-civil-

My Metra for Business
(...) (/)

Pace Bus (https://
www.pacebus.com/)



Case: 3:22-cv-50326 Document #: 89-1 Filed: 03/26/24 Page 208 of 223 PageID #:4085

rights-act)

ridertools.metrarail.com/
mymetra/business)

©2024 Commuter Rail
Division of the Regional
Transportation Authority

Careers (/careers-
employment)

Vendors/Suppliers
(https://
ridertools.metrarail.com/
about-metra/metra-
business)

RTA (https://
www.rtachicago.org/)

Office of Diversity &
Business Enterprise (/
office-diversity-
business-enterprise)

Privacy Policy (/
privacy-policy)

Terms of Use (/terms-
and-conditions)

Fares and O▮▮▮Rider Information

 (/)

EXHIBIT CC

www.metrostlouis.org /metro-transit-system-profile/

# System Profile



TOOLS

Statistics and information from Fiscal Year 2023



# General Information

**Total Passenger Boardings:** 19,664,400

**Rolling Stock:**

- 75 MetroLink vehicles
- 261 MetroBus vehicles
  - 14 60-foot battery-electric articulated buses
  - 10 40-foot battery-electric buses
  - 237 35- and 40-foot low-emission diesel buses
- 123 Metro Call-A-Ride vans

## MetroLink

- 46 miles of light rail
- 38 MetroLink stations
  - 27 stations in Missouri
  - 11 stations in Illinois
- Two MetroLink lines
  - Red Line – Operates from Lambert-St. Louis International Airport to Scott Air Force Base
  - Blue Line – Operates from Shrewsbury, Mo. to Fairview Heights, Ill.
- 6,829,700 boardings in FY2023

## MetroBus

- 59 MetroBus routes
  - 46 Missouri routes
  - 13 Illinois routes
- 12,508,400 boardings in FY2023

## Metro Call-A-Ride

- 296,100 passenger boardings in FY2023

## Metro Transit Facts

- Based on passenger surveys, 84 percent of Metro transit riders use the system to get to work, and 20 percent to get to school.
- Studies show that every $1 invested in public transportation produces approximately $4 in economic returns.
- Since 2011, more than $11 billion in commercial development has been announced, is under construction or completed within a half-mile radius of MetroLink stations.

EXHIBIT DD

fox2now.com /news/illinois/sheriffs-department-releases-images-of-metrolink-armed-robbery-suspect/

# Two people wanted for MetroLink Crimes

Kevin S. Held ; ; 12/24/2023

by: Kevin S. Held

Posted: Dec 24, 2023 / 03:55 PM CST

Updated: Dec 25, 2023 / 10:16 AM CST

BELLEVILLE, Ill. – The St. Clair County Sheriff's Department is asking for the public's help in identifying a suspect and person of interest in connection with multiple armed robberies and attacks involving a firearm that happened at MetroLink locations.



In each of the crimes, the sheriff's department claims the description of the suspect has remained consistent, leading investigators to believe the suspect is the same individual.

The first armed robbery happened on Dec. 20 at 7 p.m. Deputies met with a victim who claimed a man on a westbound train approached him, displayed a handgun, and took personal items and money from him before departing the train.

On Dec. 21 around 10:30 p.m., deputies met with another victim who reported a similar robbery.

Around 11:50 p.m. on Dec. 23, deputies received word that a man had been shot at the Belleville MetroLink Station. The victim's injury was not life-threatening and they were taken to a local hospital.

Deputies described the suspect as a Black man in a face mask. The person of interest is a Black woman wearing a black-hooded jacket and black hat.

Statement from Metro Security:

"Metro Transit Public Safety is assisting the St. Clair County Sheriff Department in this matter. The Metro Transit system moves millions of people each year and our state-of-the-art Real Time Camera Centers technology allows us to provide the images released to law enforcement."

Anyone with information on the identity or whereabouts of the individuals pictured are asked to call CENCOM Dispatch at 618-825-2051.

## Suggest a Correction

Copyright 2024 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

SPONSORED CONTENT
Privacy PolicyPrivacy Policy
TruthFinder
Locate Almost Anyone By Entering Their Name (This Is Addicting!)TruthFinder
Undo
SmartAsset
The 6 Mistakes People Make When Hiring A Financial AdvisorSmartAsset
Undo
YourPennySaver
12 "Ridiculous" Benefits Seniors Are Entitled To In March That Have Republicans FuriousYourPennySaver
Undo
YourPennySaver
Seniors on SS Are Now Entitled To These 12 "Kickbacks" In March (Tap For Full List)YourPennySaver
Undo
primenutritionsecrets.com
MD: Building Muscle After 60 Comes Down To This 1 Thingprimenutritionsecrets.com

EXHIBIT EE

# COLLECTION

### OF

## All the PUBLIC

# ACTS OF ASSEMBLY,

### OF

## The PROVINCE of

# *NORTH-CAROLINA:*

## Now in FORCE and USE.

Together with the TITLES of all fuch LAWS as are Obfolete, Expir'd, or Repeal'd.

And alfo, an exact TABLE of the Titles of the ACTS in Force.

REVISED *by Commiffioners appointed by an Act of the GENERAL ASSEMBLY of the faid Province, for that Purpofe; and Examined with the Records, and Confirmed in full Affembly.*



*NEWBERN:* Printed by JAMES DAVIS, M,DCC,LI.

L A W S of NORTH - CAROLINA. 293



## Anno Regni

# GEORGII II,

### Regis, *Magnæ Britanniæ, Franciæ,* & *Hiberniæ,* Viceſſimo Tertio.

At a General ASSEMBLY, held at *Newbern,* the GABRIEL JOHNSTON, Eſq; Governor. Sixteenth Day of *October,* in the Year of our Lord One Thouſand Seven Hundred and Forty Nine.

### C H A P. I.

*An Act, to put in Force in this Province, the ſeveral Statutes of the Kingdom of* England, *or South-Britain, therein particularly mentioned.*

I. WHEREAS many of the Statute Laws of the Kingdom of *England,* Preamble. or *South-Britain,* by Reaſon of the different Way of Agriculture, and the different Productions of the Earth of this Province, from that of *England,* are altogether uſeleſs, and many others, which otherwiſe are very apt and good, either by Reaſon of their Limitation to particular Places, or becauſe in themſelves they are only executive by ſuch nominal Officers as are not in, nor ſuitable for the Conſtitution of this Government, are thereby become impracticable here :

II. *BE it therefore Enacted, by his Excellency* Gabriel Johnſton, *Eſq; Gover-* Statutes enforced *nor, by and with the Advice and Conſent of his Majeſty's Council, and General Aſ-* here. *ſembly of this Province, and it is hereby Enacted, by the Authority of the ſame,* That the ſeveral Statutes, and the ſeveral Paragraphs or Sections of the ſeveral Statutes of the Kingdom of *England,* intituled as followeth, and made and en-acted in ſuch Years of the Reigns of the Kings and Queens of *England* as before the Titles of the ſeveral Statutes, as in this Act ſet down, are, and are hereby to be in as full Force, Power, and Virtue, as if the ſame had been ſpecially En-acted and made for this Province, or as if the ſame had been made and Enacted therein, by any General Aſſembly thereof : That is to ſay ;

E 4

M A G-

|    | 37 | No Diſtreſs ſhall be taken, but by Bailiffs, known and | *A. D.* 1749 |
|    |    | ſworn. | |
|    | 40 | A Woman's Suit ſhall not be deferred by the Minority | |
|    |    | of the Heir. | |

### ARTICULI SUPER CHARTAS.

| 28 *Ed.* I. Chap. | 10 | The Remedy againſt Conſpirators, falſe Informers, and |
|    |    | Embracers of Juries. |
|    | 11 | Nothing ſhall be taken to maintain any Matter in Suit. |
|    | 12 | What Diſtreſs ſhall be taken for the King's Debt, and |
|    |    | how it ſhall be uſed. |
|    | 16 | What ſhall be done with them that make falſe Return |
|    |    | of Writs. |

### STATUTE the Second.

33 *Ed.* I.  Who be Conſpirators, and who be Champartors.

### STATUTE the Third.

The Puniſhment of ſuch as commit Champarty.

### STATUTE the Fourth.

| 34 *Ed.* I. Chap. | 1 | The King, or his Heirs, ſhall have no Tallage or Aid, |
|    |    | without Conſent of Parliament. |
|    | 4 | All Laws, Liberties, and Cuſtoms, confirmed. |

### STATUTE the Second.

| 1 *Ed.* II. |  | In what Caſe it is Felony to break Priſon, and what not. |
| 1 *Ed.* III. Chap. | 7 | Inquiry ſhall be made of Goalers, which by Dureſs, |
|    |    | compel Priſoners to appeal. |
|    | 6 | Juſtices ſhall have Authority to puniſh Breakers of the |
|    |    | Peace. |
|    | 8 | No Commands under the King's Seal ſhall diſturb or |
|    |    | delay Juſtice. |
| 4 *Ed.* III. Chap. | 2 | The Authority of Juſtices of Aſſize, Goal Delivery, |
|    |    | and of the Peace. |
|    | 7 | Executors ſhall have Action of Treſpaſs for a Wrong |
|    |    | done to their Teſtator. |
|    | 9 | Sherifs, Bailifs of Hundreds, and Eſcheator, ſhall have |
|    |    | ſufficient in the County. |
|    | 10 | Sherifs and Goalers ſhall receive Offenders without any |
|    |    | Thing taken. |
|    | 11 | Juſtices of Aſſize, &c. ſhall enquire of Maintainers, |
|    |    | Conſpirators, and Champartors. |
| 5 *Ed.* III. Chap. | 9 | None ſhall be attached, or forejudged, contrary to the |
|    |    | Great Charter, or the Law. |
|    | 10 | The Puniſhment of a Juror that is ambidexter, and |
|    |    | taketh Money. |
|    | 11 | Proceſs againſt thoſe that be appealed, indicted, or out- |
|    |    | lawed, in one County, and remain in another. |
|    | 14 | Night Walkers, and ſuſpected Perſons, ſhall be ſafely |
|    |    | kept. |
| 10 ——— Chap. | 2 | Pardons ſhall not be granted contrary to the Statute of 2 |
|    |    | *Ed.* 3, Chap. 2. |
| 10 ——— Chap. | 4 | None ſhall maintain any Quarrels but their own. |
|    | 6 | Juſtices |

EXHIBIT FF



# L A W S

OF THE

# S T A T E

OF

# NORTH-CAROLINA.

PUBLISHED, ACCORDING TO ACT OF ASSEMBLY,

BY J A M E S  I R E D E L L,

NOW ONE OF THE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE UNITED STATES.

*E D E N T O N:*

PRINTED BY H O D G E & W I L L S,

PRINTERS TO THE STATE OF NORTH-CAROLINA.

M,DCC,XCI.

LLMC DIGITAL

*A. D. 1741.*

Conftable's oath.  **Y**OU *fhall fwear, That you will and truly ferve our Sovereign Lord the King, in the Office of a* Conftable; *you fhall fee and caufe his Majefty's Peace to be well and duly preferved and kept, according to your Power; you fhall arreft all fuch Perfons as, in your Sight, fhall ride or go armed offenfively, or fhall commit or make any Riot, Affray, or other Breach of his Majefty's Peace; you fhall do your beft Endeavour, upon Complaint to you made, to apprehend all Felons and Rioters, or Perfons riotoufly affembled; and if any fuch Offenders fhall make Refiftance, with Force, you fhall make Hue and Cry, and fhall purfue them according to Law; you fhall faithfully, and without Delay, execute and return all lawful Precepts to you directed; you fhall well and duly, according to your Knowledge, Power, and Ability, do and execute all other Things belonging the Office of a* Conftable, *fo long as you fhall continue in this Office.* So help you God.

Conftables power  III. *A N D be it further enacted by the Authority aforefaid,* That each and every Conftable, fo appointed, nominated, and fworn, is, and they are hereby invefted with, and may execute the fame Power and Authority, to all Intents and Purpofes, as the Conftables within the Kingdom of *England* are by Law invefted with and execute.

Conftable neglecting to qualify in 10 days after notice, to forfeit 50s.  IV. *A N D be it further enacted by the Authority aforefaid,* That if any Perfon or Perfons, nominated and appointed Conftable by the Court of any of the Counties within this Government, fhall neglect or refufe to qualify himfelf, according to the Directions of this Act, within ten Days after Notice of his Nomination and Appointment as aforefaid, without he can fhew fufficient Caufe for his Neglect, to be admitted of by the Juftices, who fhall or may grant their Warrant to recover the Penalties in this Act mentioned, he fhall forfeit the Sum of fifty Shillings, Proclamation Money; to be recovered by a Warrant from two Juftices of the Peace in the County where fuch Perfon was appointed Conftable, and applied to the Ufe of the County where fuch Conftable is appointed; provided fuch Notice be in Writing, figned by the Clerk of the Court, and ferved by the Sheriff of the County, or preceding Conftable, on fuch Conftable or Conftables as fhall be appointed according to the Directions of this Act.

Perfons exempt from ferving as Conftable.  V. *P R O V I D E D always,* That no Perfon in Commiffion of any Office, civil or military, or Member of Affembly, for the Time being, nor any one who has ferved in any fuch Station, nor any other who has ferved as Conftable, within the Space of five Years before, nor any Perfon who is exempt, by the Laws of *England,* fhall be obliged to ferve in the Office of Conftable; any Law, Ufage, or Cuftom, to the contrary, notwithftanding.

Juftice to adminifter the oath.  VI. *A N D be it further enacted,* That any one Juftice of the Peace of the County, fhall, and he is hereby impowered, to adminifter to the feveral Conftables hereafter to be appointed in his County, the Oath directed by this Act for their Qualification.

On death or removal of Conftables, Juftices to appoint others, till the next court; when they may continue them, or appoint others.  VII. *A N D be it further enacted by the Authority aforefaid,* That upon the Death or Removal of any Conftable out of the Diftrict for which he was appointed, Conftable, it fhall and may be lawful for the Juftices of the County Court, in which fuch Diftrict fhall be, or any one of them, to appoint and fwear another Perfon, to be Conftable in the Room and Stead of the Conftable dead or removing out of his Diftrict as aforefaid, who fhall act until the next County Court; the Juftices of which Court fhall then either continue the Perfon appointed as aforefaid, or nominate and appoint a new one.

Conftable refufing to ferve precepts, to be fined, at the difcretion of the court.  VIII. *A N D be it further enacted by the Authority aforefaid,* That if any Conftable to whom any Precept is directed, by any Juftice of the Peace, fhall refufe or neglect to ferve fuch Precept, he fhall, for every fuch Offence, on Complaint of the Party profecuting, be fined, at the Difcretion of the Court of which fuch Juftice is a Member; to be paid to the Complainant.

IX. AND

LLMC DIGITAL