IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

BENJAMIN SCHOENTHAL, *et al.*,

    *Plaintiffs*,

 v.

KWAME RAOUL, *et al.*,

    *Defendants*.

No. 3:22-cv-50326

Honorable Iain D. Johnston

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO DEFENDANTS'
OPPOSITIONS TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

    I.    Plaintiffs Have Article III Standing ................................................................1

    II.    Plaintiffs State *Bruen*'s Standards Correctly...................................................2

    III.    The Transportation Carry Ban Violates the Second Amendment ...................5

        A.  There Is No Government Proprietorship Exception to the Second Amendment .....5

        B.  Plaintiffs' Conduct is Covered by the Second Amendment's Plain Text .................6

        C.  No Historical Tradition Exists Supporting the Ban .................................................7

    IV.    Public Transportation Is Not Analogous to Presumptively Sensitive Places ...............11

    V.    Public Transportation Is Not Comprehensively Secured ..............................13

    VI.    Plaintiffs' Motion is Procedurally Proper .....................................................14

CONCLUSION....................................................................................................................15

## TABLE OF AUTHORITIES

**Cases** **Page**

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) .................................................................................................9

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..............................................................................................2, 4, 6, 15

*Lara v. Commissioner of Pennsylvania State Police*,
    91 F.4th 122 (3d Cir. 2024) .................................................................................................3

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ...............................................................................................2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ......................................................2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15

*Sweeney v. Raoul*,
    990 F.3d 555 (7th Cir. 2021) ...............................................................................................2

*United States v. Arroyo*,
    310 F. App'x 928 (7th Cir. 2009) .....................................................................................14

*Wolford v. Lopez*,
    No. 23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023) ...........................................8

**Other Authorities**

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*,
    Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://bit.ly/3RRRSmD ...........2, 3

N.D. Ill. Local Rules, https://bit.ly/4cQd0C2 ...............................................................................15

Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston respectfully submit this combined Reply Brief in support of their motion for summary judgment and in response to Defendants' Oppositions to Plaintiffs' motion for summary judgment.

## INTRODUCTION

Illinois' Public Transportation Carry Ban cannot stand unless it is consistent with the historical tradition of firearms regulation at the time of the ratification of the Second Amendment. It is abundantly clear that Defendants cannot meet their burden to show that it is. Defendants fail to offer *any* probative Founding-era evidence supporting their ban, preferring to rest on disanalogous laws from England in the 1300s and American laws from the late 19th century. Moreover, as Plaintiffs show, multiple modes of public transportation existed at the Founding, and yet, there were no laws banning firearm carry on any of them. Indeed, precisely the opposite was true; some modes of transportation expressly permitted carry, and (as Defendants recognize) travelers were often exempt from general carry restrictions. While Defendants continue to press a host of unpersuasive threshold arguments, they cannot avoid the fact that their law lacks any historical basis. Summary Judgment should be entered in Plaintiffs' favor.

## ARGUMENT

### I. Plaintiffs Have Article III Standing

State Defendants are incorrect to assert that Plaintiffs lack standing to challenge restrictions on carry at buildings, real property, and parking areas controlled by public transit systems. *See* State Opp'n Br., Doc. No. 84 at 1–2 (Mar. 25, 2024) ("State Opp'n"). As Plaintiffs explain, their expressed intent to take public transportation—including Pace buses, CTA, Metra, and more— necessarily includes passing through the real property associated with such modes of transportation. *See* Pls.' Combined Br. in Opp'n to Defs.' Cross-Mots. for Summ. J., Doc. No. 87

1

at 3–5 (Mar. 25, 2024) ("Pls.' Opp'n"). For the real property associated with public transit systems is where fares are collected, and the State parties cannot (and do not) argue that one can simply board a CTA car or a Metra train without passing through a fare gate, standing on a platform, or walking through the parking lot. Similarly, if Plaintiffs took a public bus, they would need to stand at the bus stop, which is real property associated with public transportation. The key question for standing purposes is whether Plaintiffs show a sufficient "'intention to engage in a course of conduct arguably affected with a constitutional interest'" related to public transportation. *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The extensive briefing on standing shows that Plaintiffs unequivocally do, despite State Defendants' hairsplitting distinctions. *See* Pls.' Opp'n at 3–5; Pls.' Mem. in Supp. of Mot. for Summ. J., Doc. No. 70 at 4–7 (Jan. 29, 2024) ("Pls.' MSJ"); Pls.' Mem. in Supp. of Standing, Doc. No. 27 (Dec. 13, 2022).

## II.  Plaintiffs State *Bruen*'s Standards Correctly

Defendants next argue that Plaintiffs misrepresent *Bruen*'s standards. *See* State Opp'n at 2–6; Def. Foxx's Resp. in Opp'n to Pls.' Mot. for Summ. J., Doc. No. 86 at 17 (Mar. 25, 2024) ("Foxx Opp'n"). But it is Defendants who misread *Bruen* in three key ways. *First*, it is vital that the Government present historical analogues from the Founding era. This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is crucial. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 37 (2022); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022),

2

https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative. *Bruen*, 597 U.S. at 35–37. And laws from the 20th-century are categorically entitled to little or no weight. *Id*. at 66 n.28.

While State Defendants are correct that *Bruen* acknowledged a "scholarly" debate about the weight evidence from the period surrounding the Fourteenth Amendment's ratification in 1868 might carry in the Second Amendment analysis, *id.* at 37, nowhere did *Bruen* suggest a focus on the Founding era should be "avoid[ed]," State Opp'n at 3. Nor did it suggest, as all Defendants imply, that governments can defend their laws by exclusively citing old English and late 19th-century history. *See id.*; Foxx MSJ at 17. On the contrary, after the Court noted that "[s]trictly speaking, [states are] bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second[,]" it explained that it "ha[s] made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37. And the Court then noted that it has generally assumed that the scope of such rights "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* As the final nail in the coffin, *Bruen* relied on two recent incorporation decisions that both looked to the Founding era when analyzing the scope of the right. *See id.* (citing *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) and *Timbs v. Indiana*, 139 S. Ct. 682 (2019)); Pls.' MSJ at 10–11. Many other courts, including the Third Circuit in *Lara v. Commissioner of Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), have concluded based on all this evidence that historical analogues from the Founding era are key and must be presented if the government is to prevail under *Bruen*. *See* Pls.' MSJ at 12–13 (collecting cases). Here, the complete *absence* of Founding-era restrictions on the right on early forms of transportation—coupled with laws exempting travelers from carry

3

restrictions—means that Defendants' Ban is unconstitutional under the Second Amendment.

While State Defendants argue that their interpretation is "confirmed" by the lack of Founding-era analogues *Bruen* cited "to reaffirm *Heller*'s determination that 'schools' are sensitive places," State Opp'n at 3, this argument suffers from multiple flaws. First, neither *Bruen* nor *Heller* determined that schools are sensitive places where firearms could be banned. As explained, *see* Pls.' Opp'n at 19–21, *Heller* merely noted that firearm restrictions in such locations are "presumptively lawful," *Heller*, 554 U.S. at 626–27 n.26, and *Bruen* (while noting *Heller*'s dicta) only "assume[d] it settled" that courthouses, polling places, and legislative assemblies are sensitive places where firearms could be banned, 597 U.S. at 30. Indeed, *Bruen* approvingly referenced carry by Black Americans at Freedmen's schools before the Fourteenth Amendment's ratification. *See id.* at 61. Moreover, because *Bruen* was not a sensitive places case, the Court noted that it was not attempting to "comprehensively define" the scope of the sensitive places doctrine. *Id.* at 30. Thus, State Defendants' point about *Heller* and *Bruen* not discussing any Founding-era analogues for schools and citing a few articles that relied on various 19th-century sources falls flat.

Compounding this error, State Defendants also mistakenly argue that analogues can be "representative" if they are present only in a few states. State Opp'n at 4–5. They reach this conclusion by suggesting that *Bruen* identified courthouses, polling places, legislative assemblies, and schools as sensitive places by relying on sources that cited only a few historical laws. *See id.* But again, as just explained, *Bruen* did not definitively "recognize" any of these places as sensitive locations where firearms can be banned. Worse, State Defendants' argument would render the rest of *Bruen*'s reasoning about widespread and representative analogues self-defeating. If the Court truly believed that a few analogues were sufficient to uphold New York's proper-cause requirement, New York would have prevailed because it identified a handful of analogous

4

restrictions. *See* 597 U.S. at 46, 65. *Bruen*'s instructions about representative analogues are clear: they must be present in many states and therefore affect large swaths of the population. *See id* at 46 (doubting that "*three* colonial regulations could suffice to show a tradition of public-carry regulation"); *id.* at 67 (rejecting territorial restrictions because "miniscule" populations would have lived under them and they are thus "irrelevant to more than 99% of the American population"). Numerous courts have agreed. *See* Pls.' Opp'n at 17–18 (collecting cases).

State Defendants also accuse Plaintiffs of adding an additional requirement to *Bruen*'s test for relevant similarity. *See* State Opp'n at 5–6. Not so. Plaintiffs were merely elaborating on the Supreme Court's instruction that relevant similarity is defined based on "how and why" two laws burden a law-abiding citizen's right to armed self-defense. 597 U.S. at 29; Pls.' MSJ at 14. For example, a law such as the Black Act which Defendant Foxx cites, is not relevantly similar because, as evidenced by its plain text, it was "aimed at preventing trespassers from hunting on certain lands." Pls.' Opp'n at 32. Saying that law was enacted in the context of preventing trespassers from hunting helps explain the "why" behind the law, which *Bruen* noted must align with the "why" of the modern regulation if the historic law is to be a valid analogue.

### III. The Transportation Carry Ban Violates the Second Amendment

#### A. There Is No Government Proprietorship Exception to the Second Amendment

Defendant Foxx again argues that Plaintiffs cannot claim a Second Amendment right to carry firearms on private property. Foxx Opp'n at 11. This misses the point. Plaintiffs claim that they have a Second Amendment right to carry on modes of *public* transportation—operated by entities that are state actors in the relevant constitutional sense. *See* Pls.' MSJ at 5–7; Pls.' Opp'n at 7–10. While these entities may have internal policies banning firearms, Plaintiffs would carry on Pace and Metra despite the operators' policies if the Transportation Carry Ban is enjoined,

assuming the operators continue to maintain them despite a declaration that they are unconstitutional. *See* Pls.' Opp'n at 6 (citing Supplemental Declarations).

Nor does the fact that Illinois funds public transportation entities absolve it from complying with the Constitution. *See* Foxx Opp'n at 12–13. The State also provides funding to maintain sidewalks, streets, and other public places, but it cannot bar the exercise of constitutional rights there based solely on its status as proprietor. Most fatally for Defendant Foxx's argument, Illinois does not act as a "proprietor" in enforcing the Transportation Carry Ban, but as a sovereign. The challenged provisions are part of the State's criminal code and are backed by criminal penalties, which a normal proprietor cannot enact or enforce, and they directly regulate constitutional conduct, which no normal proprietor has the power to do. *See* Pls.' Opp'n at 8–9. In any event, this argument is ultimately irrelevant because the State's carry ban cannot stand unless it is consistent with the Nation's historical tradition of firearms regulation.

### B. Plaintiffs' Conduct is Covered by the Second Amendment's Plain Text

Defendant Foxx also claims that Plaintiffs fail to show that the Ban "infringes" their Second Amendment rights. Foxx Opp'n at 13. According to Defendant Foxx, only a "complete prohibition" of firearms satisfies the definition of "infringe." *See id.* at 13–14. This is false. Dictionary definitions and other Founding-era sources confirming that "infringe" means *both* "to destroy" and "to hinder." Pls.' Opp'n at 14. Both the Third Circuit and a panel of the Fourth Circuit agree. *See id.* (collecting cases). All Defendant Foxx points to is the fact that other amendments use "abridg[e]" which means to "diminish[,]" Foxx Opp'n at 14, but she ignores the fact that *Heller* used "infringe" and "abridge" interchangeably when discussing the "ancient right of individuals to keep and bear arms." 554 U.S. at 599. Additionally, because the Second Amendment "is not a second-class right," *Bruen*, 597 U.S. at 70 (cleaned up), its terms must be interpreted consonant

6

with the protection afforded to other constitutional rights. If Defendant Foxx's definition of infringe is correct, New York would have prevailed in *Bruen* because its regulation did not destroy the exercise of the right, but rather made it more difficult for individuals to exercise it.

Defendant Foxx next suggests that discharging a firearm while on "crowded" and "confined" public transportation is incompatible with the Second Amendment's plain text because of the potential danger to third parties. Foxx Opp'n at 15–16. This argument rests on a fundamental misreading of *Bruen*, which excised all such policy considerations from the Second Amendment analysis. *See* 597 U.S. at 19–20. Regardless, there is no guarantee that public transportation or associated real property is crowded or confined. Plaintiffs' needs for self-defense may be most acute when they are traveling in a sparsely populated Metra train or standing at a Pace bus stop at night. In any event, Plaintiffs are law-abiding citizens who seek to carry arms for self-defense, and they have passed the state requirements to obtain a concealed carry license, including the requirement to be trained in the use of firearms.

### C. No Historical Tradition Exists Supporting the Ban

Defendants claim that because public transportation did not exist prior to the late nineteenth century, the historical tradition may start then. State Opp'n at 6–7; Foxx Opp'n at 18. For all the reasons discussed above and in Plaintiffs' prior filings, *see* Pls.' MSJ at 9–14; Pls.' Opp'n at 22–25, that approach is flawed and Defendants cannot prevail if they do not root their historical tradition in widespread restrictions present during the Founding era. And this Court should not credit Defendants' historical claim that public transportation did not emerge until the late 19th century or that it was exclusively run by private entities, *e.g.*, Foxx Opp'n at 18; State Opp'n at 6, 10–11, as even Defendants' experts point to modes that existed before then, *see* Pls.' Opp'n at 24–25; State Defs.' Ex. 11, Expert Rep. of Brennan Rivas, Doc. No. 64 at 9 (Jan. 29, 2024); State

7

Defs.' Ex. 1, Expert Rep. of Joshua Salzmann, Doc. No. 64 at 13 (Jan. 29, 2024), and Plaintiffs refute the notion that all public transportation was privately owned and operated, *see* Pls' Resp. to Defs.' Statements of Material Fact, Doc. No. 88 at 25–26 (Mar. 25, 2024).[1] Because the analogical reasoning that *Bruen* requires is "a commonplace task" for lawyers and judges, *Bruen*, 597 U.S. at 28, this Court can sift the historical evidence presented by both sides without relying on academics to filter and characterize the sources. Nor does *Bruen*'s dicta about a "nuanced" approach for cases involving dramatic technological or societal changes obviate the need for Defendants to present analogues that are relevantly similar to the challenged ban, as defined by "how" and "why" they burden Second Amendment rights. *Bruen* itself did not apply a different analogical test even though downtown Manhattan today (and other parts of New York State) have undergone great societal change since the Founding era. *See id.* at 27 (noting that the analogies "here and in *Heller* are relatively simple to draw"). Regardless, *Bruen* does not ask "courts to look at when a historical place became akin to the modern place being regulated[,]" but rather whether a law is a relevantly-similar analogue. *Wolford v. Lopez*, No. 23-cv-00265, 2023 WL 5043805, at *21 (D. Haw. Aug. 8, 2023).[2]

  Even taken on its own terms, Defendants' historical evidence is insufficient to form the requisite tradition. References to medieval English regulations such as the Statute of Northampton and early American copycats, Foxx Opp'n at 19; State Opp'n at 6, are unpersuasive for myriad

---

[1] Even if some public transportation was privately owned and operated, the key historical facts are that it was open to the public and there were no bans on arms carrying there during the Foudning era.

[2] State Defendants are incorrect to say that Plaintiffs' logic would allow arms to be carried on "*all* forms of modern transportation vehicles and infrastructure, including aircraft and airports." State Opp'n at 10. On the contrary, Plaintiffs specifically explain that arms are properly banned in the secured areas of airports because the government has taken steps to comprehensively secure those areas. Pls.' MSJ at 23. If Illinois were to install TSA-like security for its subways, buses, or trains, then it could constitutionally ban firearms at those locations.

8

reasons, chief among them that they codified the common law "affray" tradition barring arms carrying to terrify others, not peaceable carry by law-abiding citizens. *See* Pls.' Opp'n at 31–32. After discussing these analogues, Defendants cite only a few Founding-era restrictions. But the Virginia law they cite replicated the Statute of Northampton and included an express "terror" element—barring only carry by those with a specific intent to frighten others. *See Antonyuk v. Chiumento*, 89 F.4th 271, 357 n.74 (2d Cir. 2023). The same is true for the 1801 and 1870 Tennessee laws that Defendants' expert cites. *Bruen* explicitly dismissed any probative value of such statutes when assessing those barring carry by law-abiding citizens, such as Plaintiffs here. *Bruen*, 597 U.S. at 50.[3]

Defendants also discuss analogues related to carry while traveling, some of which existed during the Founding era. State Opp'n at 7–8 & n.7; Foxx Opp'n at 19–20. To the extent Defendants describe such statutes as creating a "traveler exception" based on "where help is likely to arrive, versus where help is unavailable," Foxx Opp'n at 19–20, or that applies only when a person is far from home, State Opp'n at 12, that logic favors Plaintiffs, not Defendants. For it is entirely unclear whether "help is likely to arrive" at an isolated bus stop, on Metra, or on a CTA car, especially given the breadth of areas that these providers serve and the times at which they operate (some of which are at night or early in the morning). *See* Pls.' Opp'n at 43. Similarly, the statutes discussing carry by travelers are not geographically limited in the way State Defendants suggest. Indeed, of the analogues Defendants present, only the 1821 Tennessee law mentions distance, and it exempts individuals traveling outside their "county" from generally applicable carry restrictions, which Plaintiffs here indisputably seek to do. *See id.* at 35. Defendants then turn to mid-to-late 19th-

---

[3] Defendants' alleged Founding-era North Carolina Northampton analogue is not persuasive either, for the reasons already discussed. *See* Pls.' Opp'n at 32–34.

9

century statutes and territorial restrictions. *See* Foxx Opp'n at 19–20; State Opp'n at 9. But those analogues can be dismissed for a variety of independent reasons, including that they are too late in time and that they are insufficiently widespread. *See* Pls.' Opp'n at 37.

Defendants' (much later) historical evidence also flies in the face of the numerous laws Plaintiffs cite that permitted (and sometimes required) carry in crowded spaces where vulnerable people gathered and those that required travelers to carry arms. *See* Pls.' MSJ at 25–26; Pls.' Opp'n at 26–27, 35. Plaintiffs present this evidence to show that there is history that Defendants either ignore or mischaracterize, but it is not Plaintiffs' burden to affirmatively prove that arms could historically be carried when traveling on public transportation. Contrary to Defendant Foxx's assertions, all of this evidence is properly before the Court, as will be explained *infra* in Part VI. Defendants also attempt to dismiss Plaintiffs' colonial and Founding-era analogues related to carry while traveling or carry while in public assemblies as products of the general "disorder" at the time and a desire to prevent "conflict with Native nations." State Opp'n at 7–8 & n.7. As Defendants' expert concedes, these were not the only rationales behind these laws. Ex. 8 to State Defs.' Opp'n, Doc. No. 83 at 34–35 (Mar. 25, 2024) (discussing threats from highwaymen and wildlife). In any event, Defendants' logic implicitly concedes that the statutes Plaintiffs cite were targeted at protecting people from assailants when they assembled. And what those statutes show is that the early American tradition was to *arm* individuals when they might be vulnerable, not disarm them. That the threat faced on today's public transportation might be from gangs or other violent criminals rather than native tribes does not diminish the probative value of Plaintiffs' analogues.

Nor can Defendants rely on the actions of private companies or comparisons to First Amendment restrictions on travelers' speech. *See* State Opp'n at 13; Foxx Opp'n at 21–22. The internal rules and policies of private companies are irrelevant to the *Bruen* analysis, which looks

10

only to duly enacted regulations by governments. *See, e.g.*, 597 U.S. at 46–49, 69. Even if these restrictions were probative, they are too late in time to be probative. *See* Pls.' Opp'n at 22; Pls.' MSJ at 9–13. Similarly, speech restrictions and 20th-century court cases interpreting them are even more inapt analogues given that government regulations of First Amendment rights are currently subject to varying levels of means-end scrutiny, while *Bruen* abandoned that form of analysis for restrictions implicating the Second Amendment. *See* 597 U.S. at 26; Pls.' Opp'n at 9.

### IV. Public Transportation Is Not Analogous to Presumptively Sensitive Places

State Defendants dispute Plaintiffs' unifying theory behind the locations that the Supreme Court identified as presumptively sensitive on the grounds that Plaintiffs ignore the Court's mention of government buildings and schools. State Opp'n at 15. But as explained, *see supra* Part II; Pls.' Opp'n at 18–19, neither *Bruen* nor *Heller* can be read as endorsing all laws banning firearms in schools. And the historical record reveals that early colleges banned only students from possessing firearms, not individuals writ large, and did so through an exercise of *in loco parentis* authority over them. *See* Pls.' Opp'n at 19–20. The key historical unifying feature behind the three locations (courthouses, polling places, and legislative assemblies) where the Court has "assume[d] it settled" that firearms can be banned is that the government took steps to comprehensively secure such locations in early America. *See* Pls.' MSJ at 20–24. While State Defendants take issue with the fact that Plaintiffs' sources reference individual law enforcement officers providing security or fail to show that such officers were "*actually present*" at legislative assemblies, *see* State Opp'n at 17–18, the overarching principle holds true that governments plainly took steps to secure the presumptively sensitive locations that *Bruen* mentioned beyond what was typical at the time.[4] And

---

[4] State Defendants also argue that two of Plaintiffs' primary sources do not relate to the provision of security. *See* State Opp'n at 17–19. Plaintiffs' source citations in the body of their

Plaintiffs' sources must be contrasted with the numerous other historical laws around the same time that *required* arms to be carried in other places of public assembly. Finally, even if Plaintiffs' sources are completely ignored, Defendants still fail to meet their burden to justify their restrictions because they fail to present a widespread Founding era (or even Reconstruction era) tradition that would justify restricting carry on public transportation, and they carry the ultimate burden.

State Defendants' arguments as to why public transportation is analogous to presumptively sensitive places—that both are crowded, filled with vulnerable people, and publicly accessible, owned, and operated—fall flat. *See* State Opp'n at 20–22. Indeed, State Defendants do not even attempt to ground these categories in history, and several are flatly inconsistent with *Bruen*. *Bruen* expressly stated that the crowded nature of a place cannot be the determining factor for whether a place is sensitive. *See* 597 U.S. at 31. Additionally, as discussed, Plaintiffs cite numerous statutes from early America permitting (and sometimes requiring) firearm carry in crowded places of public assembly, even around the vulnerable. *See* Pls.' MSJ at 25–26; Pls.' Opp'n at 26. Finally, State Defendants' category of "publicly accessible" spaces is hopelessly broad and thus violates *Bruen*'s prohibition again "expanding the category of 'sensitive places' simply to all places of public congregation." 597 U.S. at 31. And for all the same reasons already discussed, that the government owns and operates a location is not sufficient to render it sensitive. *See supra* Part III.A; Pls.' Opp'n at 7–11.

For her part, Defendant Foxx puzzlingly states that public transportation need not be deemed a sensitive place for firearms to be restricted there. Foxx Opp'n at 22–24. Plaintiffs know of no other Second Amendment doctrine allowing firearms to be banned in specific locations, and

---

brief were correct, but they inadvertently omitted a relevant page for each source in their historical appendix. The corrected primary source documents are attached to this brief as Exhibits A and B.

12

in any event *Bruen*'s test for relevantly similar analogues applies regardless of whether the location regulated is, or closely resembles, one of the presumptively sensitive places the Supreme Court has identified. Additionally, Defendant Foxx errs by stating that *Bruen* "offers little instruction" into how to identify a sensitive place or how to analogize a modern sensitive place restriction to a historical regulation. *See id.* at 23. On the contrary, *Bruen* identified legislatures, polling places, and courthouses as presumptively sensitive places from which analogies can be drawn when considering modern restrictions and explained that analogues are measured based on whether they have a similar "how" and "why" to the challenged restriction. 597 U.S. at 29–30.

## V. Public Transportation Is Not Comprehensively Secured

Nor is public transportation sufficiently secured, as State Defendants argue. Because the fundamental purpose of the Second Amendment is to ensure that Americans can be "armed and ready" for "ordinary self-defense needs," *Bruen*, 597 U.S. at 32, 60, the government must secure a location and protect those in it before it can ban firearms there. While State Defendants claim that CTA, Metra, and Metrolink facilities have security guards and cameras, State Mem. in Supp. of Mot. for Summ. J., Doc. 65 at 22 (Jan. 29, 2024) ("State MSJ"), a "general[]" police presence is insufficient, *see Bruen*, 597 U.S. at 31. This is especially true given the breadth of public transportation facilities in Illinois. *See* Pls.' Opp'n at 43. And State Defendants acknowledge that some public transportation facilities have little to no security. *See* State MSJ at 22.[5]

State Defendants also err in stating that Plaintiffs can defend themselves with firearms in the parking lot of public transportation facilities. *See* State Opp'n at 20–21. As State Defendants

---

[5] Contrary to State Defendants' suggestion, that security varies by location in Illinois does not mean that Plaintiffs cannot bring a facial challenge to the Act. *See* State Opp'n at 23. The challenged statute does not mandate security, and in any event State Defendants have not established that a *single* mode of public transportation has the degree of security (comparable to TSA at the airport) that would actually secure it.

13

acknowledge, on its face the Ban requires firearms to be locked within the vehicle in a case and can only carry the firearm outside of the car for the "limited purpose" of storing it or retrieving it from the trunk. *Id.* at 20. This is woefully insufficient to allow Plaintiffs to defend themselves.

### VI. Plaintiffs' Motion is Procedurally Proper

Perhaps to obfuscate the lack of probative historical evidence supporting the Transportation Carry Ban, Defendant Foxx devotes over ten pages of her opposition to perceived procedural issues with Plaintiffs' motion. Foxx Opp'n at 1–11. All of these arguments can be easily dismissed.

*First*, Defendant Foxx claims that Plaintiffs' historical appendix must be disregarded because Plaintiffs did not produce the historical laws and sources on which they rely in discovery. *See id.* at 2–3. Plaintiffs are under no obligation to present *any* historical sources; that burden rests solely on the government. *See Bruen*, 597 U.S. at 17. Regardless, all such sources are those that Defendants could have easily uncovered and cited because the contents of historical laws are all legislative facts. *See, e.g.*, *United States v. Arroyo*, 310 F. App'x 928, 929 (7th Cir. 2009) ("Statutes are considered legislative facts[.]"); *see* Pls.' Rule 26(a)(1) Disclosures at 3–4, attached as Ex. C.

Further, there is no prejudice to Defendants because they have had two opportunities to respond to these sources in briefing. *See, e.g.*, State Opp'n at 17–18 (discussing Plaintiffs' security statutes). And Defendants submitted various expert reports discussing some of the very same laws on which Plaintiffs rely—including those exempting travelers from generally applicable concealed carry restrictions. As *Bruen* explained, analysis of the contents of these laws is part of the *legal* analysis performed by courts, *see* 597 U.S. at 25 n.6; they do not contain adjudicative facts into which discovery is required or warranted. At bottom, Plaintiffs filed these sources for the convenience of the Court and the Defendants. Plaintiffs would have been well within their rights to simply cite the various statutes on which they rely without producing the primary sources in an

14

appendix, as did Defendants at times. *See, e.g.*, Foxx MSJ at 19 (citing the Black Act without providing a primary source). Relatedly, Defendant Foxx is incorrect that Plaintiffs are relying on "experts" when they cite secondary sources such as law review articles and a legal textbook. Foxx Opp'n at 9–11. On the contrary, Plaintiffs have never taken the position that experts are relevant to the issues at bar. Again, *Bruen*'s inquiry—and the analogical reasoning it requires—is a legal inquiry properly done by lawyers and courts. *See* 597 U.S. at 25 n.6. And once again, there is no prejudice because Defendants can simply review these law review articles and counter them with legal argumentation if desired. Indeed, the Supreme Court in both *Heller* and *Bruen* cited to similar sources on a motion-to-dismiss record. *See, e.g.*, 554 U.S. at 587, 597; *Bruen*, 597 U.S. at 29–30.

*Second*, Defendant Foxx argues that Plaintiffs improperly rely on self-serving statements regarding their safety on public transportation. Foxx Opp'n at 7. Again, this is irrelevant because Plaintiffs prove that they are law-abiding citizens who desire to keep and bear arms for self-defense on public transportation. Nothing more is required to shift the burden to the government.

*Third*, Defendant Foxx accuses Plaintiffs of violating Local Rules "56.1(a)(3)" and "56.1(a)(1)(B)," which she claims requires "a description of the parties" and "all facts supporting venue and jurisdiction in the court." *Id.* at 5, 9. Plaintiffs are unsure which copy of the Local Rules Defendant Foxx has in her possession, but the version posted on the Northern District of Illinois' website contains no such requirement (indeed there is no Local Rule 56.1(a)(1)(B)). *See generally* N.D. Ill. Local Rules, https://bit.ly/4cQd0C2. Even if this requirement exists (though it seems to have existed only in earlier, since amended, versions of L.R. 56.1), Plaintiffs describe themselves, where they live, and Defendants in their Statement. *See* Pls.' L.R. 56.1(a)(2) Statement of Undisputed Facts, Doc. No. 71 (Jan. 29, 2024).

## CONCLUSION

For all these reasons, summary judgment should be entered in Plaintiffs' favor.

Dated: April 17, 2024                                  Respectfully submitted,


                                                       /s/ David G. Sigale_____

                                                       *Attorney for Plaintiffs*


                                                       David G. Sigale (Atty. ID # 6238103)
                                                       LAW FIRM OF DAVID G. SIGALE, P.C.
                                                       55 West 22nd Street, Suite 230
                                                       Lombard, IL 60148
                                                       630.452.4547
                                                       dsigale@sigalelaw.com
                                                       *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

    I hereby certify that on April 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                      /s/ David G. Sigale

                      *Attorney for Plaintiffs*

David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiff*