**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

BENJAMIN SCHOENTHAL, *et al.*,

            *Plaintiffs*,

    v.

KWAME RAOUL, *et al.*,

            *Defendants*.

No. 3:22-cv-50326

Hon. Iain D. Johnston

**PLAINTIFFS' RESPONSE TO STATE PARTIES'**
**STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Northern District of Illinois Rule 56.1(c)(2), Plaintiffs submit the following response to the State Parties' Rule 56.1(b)(3) statement of additional material facts.

Plaintiffs note at the outset that every fact asserted by Defendants other than those facts pertaining to Plaintiffs' standing is a "legislative fact" and not an "adjudicative fact." *See* FED. R. EVID. 201(a), 1972 Advisory Committee Note. Legislative facts are not party-specific facts that need to be established for purposes of resolving this dispute, but rather general facts about the world that "have relevance to legal reasoning . . . in the formulation of a legal principle or ruling by a judge or court." *Id.*; *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). They are not, therefore, the types of facts that are found at a trial, and they are facts that may be equally well discussed in the argument section of a brief. *See Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008). For those few facts below that bear any relevance to the legal inquiry under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court has clearly stated that such facts are part of the *legal* analysis performed by courts. *See id.* at 25 n.6. While Plaintiffs respond to each of the facts asserted by Defendants, they primarily analyze the relevance and importance of the asserted

1

facts in their legal brief.

## I.  RESPONSES TO STATE PARTIES' STATEMENT OF ADDITIONAL MATERIAL FACTS

42.     Numerous schools of all types and levels operated throughout the colonies before and during the Founding era. *See* Ex. 6, EDWIN GRANT DEXTER, PH.D., A HISTORY OF EDUCATION IN THE UNITED STATES 38–39, 94 (1906).

**Plaintiffs' Response to No. 42:** Admit.

43.     Multiple institutions of higher education were founded in what would become the United States during the Colonial period. *Id.* at 48, 64, 73.

**Plaintiffs' Response to No. 43:** Admit.

44.     Conflict between European settlers and Native nations was a persistent issue in frontier zones in the 17th century. *See* Ex. 7, J. Frederick Fausz, Fighting "Fire" With Firearms: The Anglo-Powhatan Arms Race in Early Virginia, American Indian Culture and Research Journal 3:4 33, 33 (1979).

**Plaintiffs' Response to No. 44:** Dispute. It is unclear what State Defendants mean by "frontier zones" and the source does not support the proposition for which it is cited—that conflict in such zones among native nations and settlers was a "persistent issue." The cited source primarily discusses conflicts between a specific tribe (the Powhatans) and settlers in Virginia. It mentions only in passing that the Iroquois in the West were well-armed but does not discuss conflicts in that area.

45.     During early eras in American history travel "involved . . . exposing oneself to predatory animals." Additionally, "conflicts with neighboring Indian groups posed a serious threat to colonists." Ex. 8, Rivas Report, at 34–35.

**Plaintiffs' Response to No. 45:** Dispute the first sentence because the source says that traveling "in an eighteenth-century context usually involved sleeping away from home (sometimes outside) for one or more nights and exposing oneself to predatory animals and highwaymen." Ex. 8, Rivas Report, at 34 . The source does not support the claim about "early eras" because it mentions only the 18th century, and the additional context that individuals were also exposed to "highwaymen" who endangered them while traveling was selectively omitted. Admit the second sentence insofar as the quoted material appears in the Report.

46.     Laws requiring certain person to be armed while travelling, or while attending certain events or gatherings, were driven by the disorder, insecurity, and conflict with Native nations that existed during the earliest days of European settlement, or the need to guard against slave insurrection. *See* Ex. 8, Rivas Report, at 37 ("Guns were mandated in church because slaveholders and neighboring whites feared that the large Sunday gathering might become a target for a revolt or uprising on the part of enslaved people."); Ex. 53 to ECF 72 (providing that "every dwelling house shall be pallizaded [sic] in for defence against the Indians," and that "there be dew watch kept by night."; *see also* Ex. 55 to ECF 72 (establishing day of thanksgiving "in commemoration of our deliverance from the Indians"); Ex. 54 to ECF 72 (requiring travel with arms while outside town, and memorializing plan to seek permission from King of England to settle a new colony of Rhode Island); Ex. 7, Frederick Fausz, *Fighting "Fire" With Firearms: The Anglo-Powhatan Arms Race in Early Virginia*, American Indian Culture and Research Journal 3:4 33, 33 (1979). Today, a person travelling via bus or train through a public transit system faces no danger from either "hostile Native American tribes" or "wildlife." *See* Rivas Report, ECF 64-11, at 35 ("To travel then was altogether different from boarding a CTA bus or train in Chicago today.").

**Plaintiffs' Response to No. 46:** Dispute. The first sentence is incorrect insofar as it suggests that conflicts with Native nations or slave insurrections were the only reasons why people were required to be armed while traveling or at public gatherings in the Founding era or early colonies. As the expert report indicates, threats from wildlife and highwaymen were also present. Ex. 8 at 34–35. Moreover, the quoted laws speak for themselves and are the best evidence of their contents. Indeed, many of the laws Plaintiffs cite do not say explicitly why individuals were required to be armed when traveling or attending public gatherings. *See, e.g.*, ECF No. 72, Exs. 51, 52, 54, 55. The narrow purpose behind these laws that State Defendants' expert asserts is therefore unsupported by the record. Additionally, that individuals could be armed to stave off potential attacks—regardless of their origin—while traveling and in crowded spaces supports Plaintiffs' argument that there is no historical tradition of regulating carry in such locations. Finally, Plaintiffs dispute the relevance of the expert's contention that people traveling on public transit do not face attacks from wildlife or Native Americans. The point is that Plaintiffs could face attacks from potential assailants, such as the highwaymen whom the expert mentions, while on public transportation. That public transportation is dangerous, *see* Pls. SUF ¶ 41 (collecting attacks by violent criminals on public transportation), bolsters Plaintiffs' stated desire to carry while within those locations, rather than diminishes it.

47.     Prior to the first half of the 20th[th] century, transportation services were generally provided exclusively by private entities that usually received a charter or license to operate from a state or local government. *See* Ex. 9, Salzmann Report, at 3; *see also* Ex. 8, Rivas Report, ECF 64- 11, at 24 ("Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers.").

**Plaintiffs' Response to No. 47:** Dispute. This fact was included in State Defendants' original statement of material facts, *see* ECF No. 64 ¶ 26, and as Plaintiffs explained, there were state-owned, state-funded, and/or state-operated transportation modes in the Colonial and Founding eras, *see* ECF No. 88 at 25–26 (responding at length to the claim that transportation services were provided by private entities and collecting primary sources).

48.     During the Colonial and Founding eras ferries were established by "[p]rivate entrepreneurs," with the "the sanction of local governing bodies." Ex. 9, Salzmann Report, at 13.

**Plaintiffs' Response to No. 48:** Dispute. As Plaintiffs have explained, there were state-owned, state-funded, and/or state-operated transportation modes in the Colonial and Founding eras. *See* ECF No. 88 at 25–26 (collecting primary sources). And regardless, the key fact is that such modes of transportation were open to the public for their use, not who owned them.

49.     The permission to establish a ferry often came with various stipulations from government authorities including fees, assurances the operator would provide consistent service, and an agreement about the toll travelers had to pay. These agreements go back to early days of British colonization. *Id.*

**Plaintiffs' Response to No. 49:** Dispute. *See* Resps. to Statements 47–48. Moreover, the expert cites only one primary source reflecting a ferry in Massachusetts Bay Colony to support this fact. Thus, the source fails to show that the permission to establish a ferry "often" came with stipulations from government authorities. Moreover, Plaintiffs cite several laws establishing ferries that do not contain such stipulations and those laws speak for themselves and are the best evidence of their contents. *See* ECF No. 88 at 25–26.

50.     Even though subject to regulation, these private entities "were private corporations endowed with robust property rights. This included the right to refuse service and the right to establish safety policies." Ex. 8, Rivas Report, at 38.

**Plaintiffs' Response to No. 50:** Dispute insofar as the fact suggests that public transportation was owned and/or operated solely by private entities in the Colonial and Founding eras. *See* Resps. to Statements 47–48; ECF No. 88 at 25–26.

51.     The so-called "travel exception" was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. *See* Ex. 8, Rivas Report, at 21–22.

**Plaintiffs' Response to No. 51:** Dispute. As Plaintiffs explained in response to a similar fact offered by Defendant Foxx, *see* ECF No. 88 at 19–20, there is no so-called "traveler exception"; travelers had a general right to publicly carry arms for self-defense just like any other American absent prohibitions to the contrary. To the extent such a "traveler exception" exists at the Founding and thereafter, it supports Plaintiffs' view that there is a historical tradition of allowing travelers to carry weapons while taking modes of transportation.

Defendants' expert discusses the following decisions: *Smith v. State*, 50 Tenn. 511 (Tenn. 1871), *Darby v. State*, 5 S.W. 90 (Tex. Ct. App. 1887), *Carr v. State*, 34 Ark. 448 (Ark. 1879), *Eslava v. State*, 49 Ala. 355 (Ala. 1873), and *Stilly v. State*, 11 S.W. 458 (Tex. Ct. App. 1889). *Darby* and *Stilly*—both from Texas—can be dismissed because the *Bruen* Court expressly discounted Texas' 1871 concealed carry prohibition and the state courts' interpretation of its related constitutional provision as "outliers" that "therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen*, 597 U.S. at 65.

*Smith v. State* from Tennessee is also not probative. The Supreme Court explained in *Bruen* that Tennessee's prohibition of concealed carry was permissible only because open carry was allowed. "[W]hen the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, … the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would 'violat[e] the constitutional right to keep arms.'" *Bruen*, 597 U.S. at 54 (quoting *Andrews v. State*, 50 Tenn. 165, 187 (1871)) (citation omitted). The exact same was true of Alabama, *see id.* at 53 & n.18, so that decision can be discounted as well.

Finally, *Carr* from Arkansas is not probative. As *Bruen* noted, an earlier decision upheld Arkansas' prohibition on concealed carry, but did so without a majority rationale. *See id.* at 53 n.20. In any event, *Carr* explained that Arkansas' law exempting travelers from concealed carry restrictions exists "to enable travelers to protect themselves on the highways, or in transit through populous places." *Carr*, 34 Ark. at 449. To the extent this decision is probative at all given its distance from the

Founding era, it supports Plaintiffs' position that there is a historical tradition of permitting carry by travelers in transit throughout populous areas.

52.     Tennessee law, for example, narrowly defined the travel exception, rejecting the proposition that "a 'journey' meeting the standards of a travel exception 'should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties.'" Ex. 8, Rivas Report, at 22; *see also id.* at 23–24.

**Plaintiffs' Response to No. 52:** Dispute. *See* Resp. to Statement 51.

53.     Scholars have only been able to trace the history of formal security measures in public schools back to the 1950s. Ex. 11, Larry Burgan and Robert Rubel, *Public school security, yesterday, today, and tomorrow*, Contemporary Education 52:1 (fall) p. 13–17.

**Plaintiffs' Response to No. 53:** Dispute. The source states that school systems in a few large cities instituted "some form of security operation" in the "early 1960s." Ex. 11 at 14. The source does not support the fact that no security existed in schools prior to that time.

54.     Only about 6% of public schools are secured by metal detectors. Ex. 12 at p.13, Wang, K., Kemp, J., and Burr, R. (2022). *Crime, Violence, Discipline, and Safety in U.S. Public Schools in 2019–20: Findings From the School Survey on Crime and Safety* (NCES 2022-029). U.S. Department of Education. Washington, DC: National Center for Education Statistics. Retrieved Feb. 14, 2024 from http://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2022029.

**Plaintiffs' Response to No. 54:** Admit, noting that State Defendants' other source states that "by the early 1970s, virtually all school systems serving cities larger than 100,000 people had implemented some form of school security in response to criminal and violent student behavior." Ex. 11 at 14. Additionally, the cited source notes that 97.1% of school buildings have "controlled access" as a safety and security measure. Ex. 12 at 13.

55.     Less than a third of public schools have a full-time "school resource officer" responsible for security. *Id.* at 18.

**Plaintiffs' Response to No. 55:** Admit, noting that the cited source also discusses other law enforcement officers and security personnel beyond school resources officers that are present. Ex. 12 at 18 (noting that 49.2% of all public schools have school resource officers, 12.9% have "[o]ther sworn law enforcement officers" and 26.3% have "[s]ecurity officers or security personnel").

56.     The O'Hare Airport Transit System, which provides local transportation at between O'Hare Airport Airport's multiple terminals, parking areas, and the O'Hare multi-modal facility, is outside of the O'Hare Airport security perimeter. *See* Ex. 10, *Airport Transit System*, O'Hare International Airport (March 22, 2024), https://www.flychicago.com/ohare/ServicesAmenities/services/Pages/transitupdate.aspx.

**Plaintiffs' Response to No. 56:** Admit, noting that it is unclear what relevance this fact has to the *Bruen* analysis, which requires Defendants to present persuasive legal history with a special focus on the Founding era.

Dated:  April 17, 2024                             Respectfully submitted,

                                                   /s/ David G. Sigale
                                                   *Attorney for Plaintiffs*

                                                   David G. Sigale (Atty. ID # 6238103)
                                                   LAW FIRM OF DAVID G. SIGALE, P.C.
                                                   55 West 22nd Street, Suite 230
                                                   Lombard, IL 60148
                                                   630.452.4547
                                                   dsigale@sigalelaw.com
                                                   *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David G. Sigale
*Attorney for Plaintiffs*

David G. Sigale (Atty. ID # 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com
*Attorney for Plaintiff*

8