# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

BENJAMIN SCHOENTHAL, *et al.*,

                Plaintiffs,

     v.

KWAME RAOUL, *et al.*,

                Defendants.

3:22-CV-50326

Hon. Iain D. Johnston

## STATE PARTIES' REPLY MEMORANDUM IN FURTHER SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Isaac Freilich Jones
Christopher G. Wells
Gretchen Elizabeth Helfrich
Office of the Illinois Attorney General
115 S. LaSalle St., 20th Floor
Chicago, Illinois 60603
Tel. 312-814-3000
isaac.freilichjones@ilag.gov
christopher.wells@ilag.gov
gretchen.helfrich@ilag.gov

# TABLE OF CONTENTS

ARGUMENT ............................................................................................................................ 2

I.   Plaintiffs' response to Defendants' statements of facts violates the rules of civil procedure
     and this Court's local rules, and fails to rebut Defendants' factual record. ............................. 2

II.  Plaintiffs' attempt to revive their standing as to buildings, real property, and parking
     areas fails. ................................................................................................................................ 6

III. Plaintiffs misrepresent the analysis required by *Heller* and *Bruen*. ......................................... 8

IV.  Public transit systems are sensitive places where public carry may be prohibited. ................ 14

     A.  Public transit systems are analogous to the recognized sensitive places of the Colonial
         and Founding eras. ............................................................................................................ 15

     B.  The Act is analogous to the "prohibitions" on firearms that applied in the recognized
         sensitive places of the Colonial and Founding eras. ........................................................ 15

         1.  The burden imposed by the Act is a "dead ringer" for the burdens imposed by
             historic constitutional sensitive place restrictions. ..................................................... 16

         2.  The reasons for the Act's enactment are comparable to the reasons for the enactment
             of historic constitutional sensitive place restrictions. .................................................. 16

V.   The Act is part of a longstanding and well-established tradition of regulation. ...................... 20

VI.  Plaintiffs' security theory, if accepted, requires the rejection of their facial challenge to
     the Act. ...................................................................................................................................... 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ............................................................ *passim*

*Baron v. City of Highland Park*, 195 F.3d 333 (7th Cir. 1999) ...................................................... 3

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ............................................... 13, 16, 18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................................... 10

*Frey v. Nigrelli*, 661 F. Supp. 3d 176 (S.D.N.Y. 2023) .............................................................. 24

*Grant v. Trs. of Ind. Univ.*, 870 F.3d 562 (7th Cir. 2017) ........................................................ 2, 5

*Lojuk v. Quandt*, 706 F.2d 1456 (7th Cir. 1983) ....................................................................... 19

*Midwest Fence Corp. v. United States DOT*, 840 F.3d 932 (7th Cir. 2016) ................................ 25

*N. Assurance Co. of Am. v. Summers*, 17 F.3d 956 (7th Cir. 1994) .............................................. 2

*New York State Rifle Association v. Bruen*, 597 U.S. 1 (2022) ............................................. *passim*

*Smith v. Lamz*, 321 F.3d 680 (7th Cir. 2003) .............................................................................. 3

*Spuhler v. State Collection Serv.*, 983 F.3d 282 (7th Cir. 2020) .............................................. 6, 7

*Sweeney v. Raoul*, 990 F.3d 555 (7th Cir. 2021) ......................................................................... 7

*United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998) ............................................................... 14

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ............................................................... 14

The State Parties have shown that the Act's[1] restriction on concealed carry in public transit systems is valid under *Bruen* and *Heller*. *First*, the Act is constitutional because modern public transportation systems are analogous to the "sensitive places" recognized in *Bruen* and *Heller*, and the regulations at issue here are analogous to the "prohibitions" that applied to firearms at those locations during the Colonial and Founding eras. *Second*, the Act is constitutional because it is consistent with the well-established and representative tradition of firearm regulation existing in a "long, unbroken line, beginning from medieval England and extending beyond Reconstruction[.]" *Antonyuk v. Chiumento*, 89 F.4th 271, 358 (2d Cir. 2023). Each of these is showings is separately sufficient to demonstrate the constitutionality of the Act.

At core, Plaintiffs say the Act is unconstitutional because "multiple modes of public transportation existed at the Founding," but "there were no laws banning firearm carry on any of them." Plaintiff's' Opp., ECF 87, at 1. But Plaintiffs fail to dispute Defendants' central historical showings through valid citations to the evidentiary record, requiring that these facts be deemed admitted. Plaintiffs' arguments also distort the history of "sensitive place" regulations, and ignore what *Bruen* and *Heller* say about how to use that history in analogical reasoning. While they insist that transportation technology and societal concerns have not significantly changed since the 1790s, the undisputed record shows something different—public transit systems are a "new" type of location implicating unprecedented societal concerns and dramatic technological changes, and meet the *Bruen* standard under the "nuanced" analysis that applies here. Plaintiffs attempt to impose a heightened standard, but their assertions find no support in *Bruen*'s reasoning, and would impose the very "regulatory straightjacket" that *Bruen* rejects. In sum, Plaintiffs' arguments are

---

[1] Defined terms in this Reply have the same definition as in the State Parties' Memorandum in Support of Motion for Summary Judgment, ECF 65.

inconsistent with the Nation's history and tradition of regulation, and invite legal error. Moreover, the undisputed facts show that Plaintiffs have no intention to carry firearms in buildings, real property, and parking areas under the control of a public transportation facility, and that they lack standing to challenge restrictions as to such areas. The Court should reject their arguments, and enter final judgment in favor of Defendants.

## ARGUMENT

I. **Plaintiffs' response to Defendants' statements of facts violates the rules of civil procedure and this Court's local rules, and fails to rebut Defendants' factual record.**

A party opposing summary judgment is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks omitted). "[A] bare contention that an issue of fact exists is insufficient to raise a factual issue." *N. Assurance Co. of Am. v. Summers*, 17 F.3d 956, 961 (7th Cir. 1994). Moreover, a response to a statement of facts "may not assert legal arguments except to make an objection." Local Rule 56.1(e)(2). Ignoring this, Plaintiffs open their Combined Response to Defendants' Statements of Material Fact, ECF 88 (the "Fact Response") with a legal argument that "every fact asserted by Defendants other than those facts pertaining to Plaintiffs' standing is a 'legislative fact' and not an 'adjudicative fact.'" *Id.* at 1. Plaintiffs baselessly say they do not have to comply with any rules of evidence or procedure in presenting the "legislative facts" they say support their position, or in disputing facts they say are "legislative facts." *Id.* at 1–2.

Plaintiffs are wrong. The Local Rules of this Court as to summary judgment do not distinguish between "legislative facts" and "adjudicative facts." *See* Local Rule 56.1. Rather, the Local Rules require that each party moving for or opposing summary judgment must submit statements of "*material* facts," and require that "[e]ach asserted fact must be supported by citation

to the specific evidentiary material, including the specific page number, that supports it." *Id.* (emphasis added). The Seventh Circuit holds that "'material facts' are defined as those that might affect the outcome of the suit." *Baron v. City of Highland Park*, 195 F.3d 333, 337 (7th Cir. 1999). In other words, the Seventh Circuit *also* makes no distinction between "legislative" and "adjudicative" facts at the summary judgment stage—both must be included in a statement of material facts or response to a statement of material facts, and both must be supported through citations to the evidentiary record. *Id.* Consequently, Plaintiffs cannot rely on "legislative facts" to support their own case unless they include those facts in a statement of that complies with Local Rule 56.1(d). Likewise, they cannot dispute Defendants' proffered facts unless they do so through a Response to Defendants' Statement of Facts that complies with Local Rule 56.1(e).

Citing a footnote in *Bruen*, Plaintiffs suggest that "legislative facts" are exempt from the rules of evidence because "[legislative] facts are part of the legal analysis performed by courts." Fact Statement, ECF 88, at 1 (citing *New York State Rifle Association v. Bruen*, 597 U.S. 1, 25 n.6 (2022)). Plaintiffs present this quote out of context. After stating that "the job of judges . . . is to resolve *legal* questions," *Bruen actually* holds that this "job" "relies on various evidentiary principles and default rules to resolve uncertainties." *Id.* (cleaned up). In other words, this footnote reaffirms that "evidentiary principles and default rules"—such as the Federal Rules of Evidence and Local Rule 56.1—*do* apply to the "historical inquiry" *Bruen* prescribes. *Id.*

As the Seventh Circuit, the Local Rules, and this Court's individual practices make clear, "a failure to respond by the nonmovant as mandated by the local rules results in an admission." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also* Local Rule 56.1(e)(3); Standing Order of Hon. Iain Johnson. Here, Plaintiffs have failed to respond adequately to the following facts, which should be deemed admitted:

• The State Parties demonstrated that "Plaintiffs have asserted no intention to travel to or visit any buildings, real property, or parking area under the control of a public transportation facility." State's Statement of Facts, ECF 64, ¶ 16. Plaintiffs purport to dispute this fact, but do not cite to any sources in the record in which Plaintiffs assert such an intention. *See* Plaintiffs' Fact Response, ECF 88, at 22.

• The State Parties demonstrated that "public transportation dates to the first half of the 20th century," and "prior to the 20th century, transportation services were provided exclusively by private entities that usually received a charter or license to operate." State's Statement of Facts, ECF 64, ¶¶ 25, 26 (cleaned up). Plaintiffs purport to dispute these facts, but do not cite to any sources in the record showing the existence of any public transit systems paid for in whole or in part with public funds, as the term is used in the Act, prior to the 20th century. *See* Plaintiffs' Fact Response, ECF 88, at 25–26. The sources Plaintiffs cite merely mention transportation generally, and/or regulate or grant charters to *private* parties allowing *them* to establish or fund transportation services. *Id.*

• The State Parties demonstrated that "[m]odern public transit systems are the result of dramatic technological changes when compared to the transportation infrastructure and vehicles of 791 and 1868;" that "[t]echnology has enabled the creation, maintenance, and expansion of light rail, bus, and other systems that far surpass what was possible, or even thinkable, in 1791;" that "[u]ntil the late 19th and 20th centuries there were no publicly owned and operated passenger trains, electric- or gasoline-powered buses, parking lots, elevated lines, subways, or any of the other infrastructure, technology, and machinery that comprise modern mass transit systems;" and that the "canals, steamboats, omnibuses, horse-carts, wagons, and coal- and steam-powered engines of the 19th century" used "different technology" and served "different economic and

societal roles" than "the modern public transit systems of today." *See* State's Statement of Facts, ECF 64, ¶¶ 27, 28, 30, 31, 32. Plaintiffs purport to dispute these facts, but do not cite any sources demonstrating that the technologies in use today are the same as those used in 1791 and 1868, or that the technologies of today were anticipated or possible in 1791. *See* Fact Response, ECF 88, at 26. The sources Plaintiffs cite merely mention transportation generally.

- The State Parties demonstrated that security at Congress, Federal department headquarters, and the President's house during the Confederation Congress and Founding eras was generally limited to whatever security could be provided by a small number of door-keepers and clerks. *See* State's Statement of Facts, ECF 64, ¶¶ 38–41. Plaintiffs purport to dispute that this was the only security provided at all of these locations, but do not cite any sources at all demonstrating that any additional security was provided. *See* Fact Response, ECF 88, at 28–30. Plaintiffs' disputation must be rejected, because in the absence of admissible evidence contradicting the State's source, they are "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant*, 870 F.3d at 568.

- The State Parties demonstrated that as late as 1842 it was possible to approach the office of the President without encountering any security beyond that which could be provided by clerks, a master of ceremonies, and other visitors. *See* State's Statement of Facts, ECF 64, ¶ 41. In response, Plaintiffs dispute a *different* fact than the one the State proffered, asserting there was some security available at the White House. *See* Fact Response, ECF 88, at 29. But the State Parties never asserted that in 1842 there was no security at all at the White House—only that it was possible for a visitor to reach the President's office without encountering security. *See* State's Statement of Facts, ECF 64, ¶ 41.

- The State Parties demonstrated that public transit systems in Illinois are protected by

5

various levels of security. *See* State's Statement of Facts, ECF 64, ¶¶ 44–46. Plaintiffs dispute whether this security is sufficient, but do not dispute that this public transit security does actually exist. *See* Fact Response, ECF 88, at 30–31.

Plaintiffs' attempts to dispute these points are legally and factually insufficient, and each of these facts should therefore be deemed admitted.

## II.     Plaintiffs' attempt to revive their standing as to buildings, real property, and parking areas fails.

A plaintiff bears the burden of demonstrating standing at the summary judgment stage by "setting forth by affidavit or other evidence specific facts that, taken as true, support each element of standing." *Spuhler v. State Collection Serv.*, 983 F.3d 282, 285 (7th Cir. 2020) (cleaned up). As the State Parties showed in their summary judgment motion and opposition to Plaintiffs' cross-motion for summary judgment, Plaintiffs have not met this burden with respect to "building[s], real property, and parking area[s] under the control of a public transportation facility." 430 ILCS 66/65(a)(8). Plaintiffs do not dispute that the only evidence in the record through which they could meet this burden is their affidavits and deposition testimony. *See* Fact Response, ECF 88, at 22–23. Yet, they do not and cannot show that these affidavits and transcripts contain "specific facts" showing an intention to visit "building[s], real property, and parking area[s] under the control of a public transportation facility." *Id.*; *see also* Plaintiffs' Opp., ECF 87, at 3–5. Rather, Plaintiffs base their standing argument on a generalized "intention to take public transportation more often if they could carry a firearm there," Fact Response, ECF 88, at 22–23, and because "it defies logic to say that Plaintiffs could take *any* form of public transportation . . . without passing through associated real property such as stations, parking lots, and the like." Plaintiffs' Opp., ECF 87, at 4.

The problem for Plaintiffs is that the Act does not apply to "building[s], real property, and parking area[s]" that are "associated" with public transportation. By its terms, the Act specifically

6

applies to "building[s], real property, and parking area[s] *under the control of* a public transportation facility," including offices (such as the CTA and RTA headquarters located in downtown Chicago), and bus and train repair facilities operated by Illinois transit agencies. *See* 430 ILCS 66/65(a)(8) (emphasis added). Plaintiffs plainly fail to establish their standing to challenge the Act as applied to such facilities. Plaintiffs' assertion that using public transportation services *necessarily* requires them to visit "building[s], real property, and parking area[s]" has no basis in the record, and should therefore be rejected for lack of compliance with binding Seventh Circuit caselaw and Local Rule 56.1. *See* Fact Response, ECF 88, at 22–23; *Spuhler*, 983 F.3d at 285 (standing must be demonstrated "by affidavit or other evidence"). Moreover, it does not "defy logic" that Plaintiffs could use public transit services without accessing or using "building[s], real property, and parking area[s] under the control of a public transportation facility." *See* 430 ILCS 66/65(a)(8). Plaintiffs could, for example, use a bus that picks passengers up by the side of the public road, completely avoiding any buildings, real property, and parking areas "under the control of a public transportation facility." *Id.*

As backup, Plaintiffs also say the State Parties' standing argument "glosses over the key fact that Plaintiffs bring a pre-enforcement challenge." Plaintiffs' Opp., ECF 87, at 4–5. The State's argument does nothing of the sort. As even Plaintiffs admit, a plaintiff bringing a pre-enforcement challenge is still required to demonstrate an "intent" to engage in a course of conduct "arguably affected with a constitutional interest." Plaintiffs' Opp., ECF 87, at 4 (quoting *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021)). Here, Plaintiffs fail to demonstrate standing because they present no evidence of any such intent, and the fact that Plaintiffs bring a pre-enforcement challenge cannot change this result. *Sweeney*, 990 F.3d at 559.

In sum, Plaintiffs present no cognizable evidence that they intend to visit "building[s], real

property, and parking area[s]," or that using public transit necessarily requires them to visit such locations. They also fail to dispute Defendants' statement that they do not have any intent to visit such locations through citations to evidence as required by Local Rule 56.1. The Court should therefore accept the State Parties' statement as true, reject Plaintiffs' arguments to the contrary, and find that Plaintiffs' lack Article III standing to challenge the Act as applied to "building[s], real property, and parking area[s] under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8).

III.    **Plaintiffs misrepresent the analysis required by *Heller* and *Bruen*.**

Plaintiffs admit (as they must) that the sources cited by the Supreme Court in its discussion of schools, courthouses, polling places, and legislative assemblies identified only five total Colonial or Founding era regulations that applied at schools, government buildings, polling places, legislatures, and courts. *See* Fact Response, ECF 88, at 23. They admit that the Court's citations relating to "polling places" referenced only (a) the 1776 Delaware Constitution, and (b) a 1787 New York statute; the Court's citations relating to "legislative assemblies" referenced only two Maryland colonial statutes (enacted in 1647 and 1650) barring weapons in the Maryland Assembly; and the Court's citations relating to "courthouses" referenced only a single 1786 Virginia statute. *See* Fact Response, ECF 88, at 23. Plaintiffs do not dispute that *Bruen*'s citations in its discussion of sensitive places did not identify any Colonial or Founding era statutes restricting firearms in schools, and instead only specifically cited three mid-19th century college rules and one late-19th Century statute barring students from being armed. *See* Fact Response, ECF 88, at 24. Despite these admissions, Plaintiffs tie themselves in knots asserting that *Bruen*'s discussion of these locations is "dicta" the Court must ignore. Plaintiffs' Opp., ECF 87, at 17–25. Plaintiffs are wrong, and their faulty analysis invites legal error.

*First*, Plaintiffs assert that *Bruen* did not "recognize" courthouses, polling places,

8

legislative assemblies, and schools as sensitive places based on "the historical record." Plaintiffs' Opp., ECF 87, at 18. This assertion contradicts Plaintiffs' own argument in their initial summary judgment motion, in which they described "courthouses, legislative assemblies, and polling places" as "recognized Founding Era sensitive places." Plaintiffs' First MSJ Mem., ECF 33, at 11. It also contradicts Plaintiffs' assertion in their second summary judgment motion, which presents *pages* of argument detailing why *Bruen* "deemed" legislative assemblies, polling places, and courthouses to be "sensitive at the Founding." Plaintiffs' MSJ Mem., ECF 70, at 20. The Court should not allow Plaintiffs to deny in their opposition to the State's motion what they asserted in support of their own summary judgment motions.

*Second*, Plaintiffs insist that *Bruen*'s recognition that schools, government buildings, polling places, legislative assemblies, and courthouses are "sensitive places" is "dicta." Plaintiffs' Opp., ECF 87 at 18–19. Wrong again. As Plaintiffs admit elsewhere, ECF 70 at 20, in *Bruen* the Supreme Court established a rule of decision under which lower courts can find that "new" regulations applying to "new" sensitive places are constitutional by analogizing those "new" regulations and places to historical ones. *See Bruen*, 597 U.S. at 30. *Bruen* specifically listed the regulations and places lower courts should analogize to—"'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,'" and "18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Id.* The Supreme Court specifically cited a prior Supreme Court decision—*Heller*—and two documents discussing the history of firearm regulation as support for its statements regarding those locations. *Id.* It defies reason to think that the Supreme Court would expressly direct lower courts to measure the constitutionality of a modern statute by comparing it to specific historical statutes applying to specific sensitive places, unless it was

9

*absolutely certain* (based on the historical and legal record it cited) that the statutes and locations it identified as comparators *actually complied with the constitution*.

*Third*, Plaintiffs compound their error by stating that the Supreme Court "did not apply the analogical test it had just announced" in its discussion of historic sensitive places. *See* Plaintiffs' Opp., ECF 87, at 19. Plaintiffs' argument defies logic and the plain text of *Bruen*. The paragraph immediately preceding *Bruen*'s discussion of sensitive places states that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 597 U.S. at 30. It goes on to state that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* It is only at this point that the Supreme Court invites the reader to "consider *Heller*'s discussion of longstanding laws forbidding the carrying of firearms at schools and government buildings," and the "18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses." *Id.* After citing to two compendia of historical laws, *Bruen* concluded that "[w]e therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment." *Id.* In other words, the Supreme Court *expressly applied* the test it had just announced. *Id.*

*Fourth*, Plaintiffs say that *Bruen* never really considered the extent to which schools might be sensitive places, and therefore never intended lower courts to examine potential analogies between "new" sensitive places and regulations and schools. Plaintiffs' Opp., ECF 87, at 19–20. Again, this (mis)reading of *Bruen* strains credulity. As addressed above, *Heller* specifically observed that laws establishing "prohibitions" on firearms in schools and government buildings are "longstanding." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). *Bruen* went out of

its way to quote this language, while also citing two research papers that cataloged historic firearms regulations that applied in schools and various types of government buildings. *Bruen*, 597 U.S. at 30. *Bruen* then instructed that lower courts could analogize "new" sensitive places and regulations to "those" historical places and regulations. *Id.*[2] Plaintiffs' attempt to excise schools from *Bruen*'s list of sensitive places is baseless.

*Fifth*, Plaintiffs say that the State's "argument … would render the rest of *Bruen*'s reasoning about widespread and representative analogues self-defeating." Plaintiffs' Opp., ECF 87, at 20–21. But there is no tension between the methods used to reach (a) *Bruen*'s conclusion that firearms could be validly prohibited in government buildings, schools, legislative assemblies, polling places, and courthouses, and (b) *Bruen*'s decision to strike down the New York proper cause carry licensing requirement. Rather, when read together these analyses demonstrate what the Supreme Court elsewhere expressly stated—"[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 597 U.S. at 25. In other words, *Bruen* itself makes clear there is no strict minimum number of analogous historical regulations that must be identified for a defendant to show the existence of a "well-established and representative historical analogue." *Id.* at 30. In the case of New York's "proper cause" requirement, the Supreme Court concluded that the restrictions on public carry New York had identified were insufficient to show the constitutionality of that statute. By contrast, the Supreme Court concluded that polling places are sensitive based on two Founding era laws; that courthouses are sensitive based on a single 1786

---

[2] Plaintiffs' speculative digression regarding who they believe was authorized to bear arms in the schools of the Founding, ECF 87 at 19–20, is irrelevant to this question, and does nothing to suggest that courts may not analogize to schools in determining whether a "new" type of location qualifies as a sensitive place.

Virginia Statute; that legislative assemblies are sensitive based on two Maryland Colonial era statutes from the mid-17th century; and that schools are sensitive based on three mid-19th century college rules and one late-19th century statute barring students from being armed. *See* State MSJ Mem., ECF 65, at 9–10. All of these were examples of the "nuanced judgments" *Bruen* expressly requires. Moreover, given the "unprecedented societal concerns or dramatic technological changes" implicated by modern public transit systems, the Supreme Court's "nuanced judgments" with respect to government buildings, schools, legislative assemblies, polling places, and courthouses are particularly instructive here. *Bruen*, 597 U.S. at 25, 27, 30.

*Sixth*, Plaintiffs contest that "schools, government buildings, legislative assemblies, polling places, and courthouses are the 'floor, not the ceiling, of the categories of places in which governments can restrict firearms." Plaintiffs' Opp., ECF 87, at 21. Plaintiffs' assertion is befuddling, since the Supreme Court expressly held that firearms can be constitutionally prohibited in "new" and "analogous" sensitive places. *Bruen*, 597 U.S. at 30. Plainly, this means that *other* types of locations can also be sensitive, and that the five types of places listed in *Bruen* as being "sensitive" are, as the State pointed out, the floor, not the ceiling, of types of sensitive places. *Id.*

*Seventh*, Plaintiffs insist that a place cannot be "deemed sensitive even when historical analogues are inconsistent about whether firearms were historically restricted there." Plaintiffs' Opp., ECF 87, at 22–23 (cleaned up). In other words, Plaintiffs assert that a regulation must be struck down unless historical regulations are uniformly analogous to it. *Id.* But this assertion clashes with *Bruen*'s recognition that "courthouses" are sensitive places where firearms can be prohibited based on two cited Colonial and Founding era sources, one of which prohibited firearms and courthouses, and the second of which *required* that firearms be carried at courthouses. *See Bruen*, 597 U.S. 30; State MSJ Mem., ECF 65, at 9. The Supreme Court's "nuanced judgment"

could only have been that the single Founding Era prohibition on firearms in courthouses in its citations was "well-established and representative," and that the single requirement to *require* firearms in courthouses mentioned in its citations was not. *See Bruen*, 597 U.S. at 30. Plaintiffs' assertion that uniformity is required under *Bruen* should therefore be rejected.

*Eighth*, Plaintiffs assert that the constitutionality of firearm prohibitions on public transportation does not merit a more "nuanced" analysis, but their arguments in support of this assertion are meritless. It was not mere "dicta," as Plaintiffs claim, when the Supreme Court stated that "cases involving 'unprecedented societal concerns or dramatic technological may merit a more nuanced approach." Plaintiffs' Opp., ECF 87, at 23 (quoting *Bruen*, 597 U.S. at 28). Rather, the Seventh Circuit has made clear that this *is* a holding of *Bruen*. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1191 (7th Cir. 2023) ("[C]ases implicating unprecedented societal concerns or dramatic technological changes … may require a more nuanced approach.") (*quoting Bruen*, 597 U.S. at 27). Plaintiffs are also wrong to assert that public transportation "has not" "experienced dramatic technological change" since the Colonial era. *See* Plaintiffs' Opp., ECF 87, at 23–25. Plaintiffs' basis for this assertion is that "several types of transportation in existence today also existed at the Founding," including "stagecoaches, horse drawn omnibus, ferries, and other boats." *Id.* at 23. While Plaintiffs appear to be arguing that the shift away from the human- and animal-powered transportation of the Founding era is insufficiently "dramatic," the undisputed evidence in the record shows otherwise—today's public transit systems use modern trains and buses powered by internal combustion, electricity, and other modern energy sources that have revolutionized American society and the American economy. *See* State MSJ Mem., ECF 65, at 15–16. Plaintiffs err again when they say that the "societal problem" addressed by the Act "has existed since the Founding." Plaintiffs' Opp., ECF 87, at 23–24. But the specific "societal

problem" addressed by the provision of the Act challenged here is not, as Plaintiffs insist, generalized "gun violence." *Id.* Rather, *it is potential gun violence in a specific place where the potential harm (intended and unintended) from such violence is particularly acute*—public transit systems. *See* 430 ILCS 66/65(a)(8). And that problem plainly could not have existed at the Founding, a time at which modern public transit did not exist. *See* State MSJ Mem., ECF 65, at 14–15.

*Finally*, even if the Supreme Court's discussion of sensitive places is dicta as Plaintiffs claim (it is not), binding precedent holds that it must still be followed because "it is a considered expression by the Court supported by earlier cases … and is not incompatible with any decision before or since." *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998). As the Seventh Circuit has explained:

> It would ill serve the interests of litigants and the judicial system as a whole to row against the tide of such statements. The Supreme Court often articulates positions through language that an unsympathetic audience might dismiss as dictum … and it expects these formulations to be followed. The Court can hear only a small portion of all litigated disputes; it uses considered dicta to influence others for which there is no room on the docket. Appellate courts that dismiss these expressions and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving the litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.

*Id.* (cleaned up). Indeed, the Seventh Circuit has already applied this principle to demand "respect" for portions of *Heller* that litigants had argued were non-precedential dicta. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*Heller* dicta are "the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings."). Plaintiffs' misstatements regarding *Bruen* must therefore be rejected.

**IV.    Public transit systems are sensitive places where public carry may be prohibited.**

## A. Public transit systems are analogous to the recognized sensitive places of the Colonial and Founding eras.

The State Parties briefing showed that modern public transit systems are analogous to recognized historical sensitive places because (i) they are crowded spaces in which vulnerable individuals are more exposed to harm from gunfire; (ii) they are publicly accessible; and (iii) they are publicly owned or operated. *See* State MSJ Mem., ECF 65, at 17–19. Plaintiffs attempt to dispute these showings with rhetorical sleight of hand, arguing that each of these three factors is insufficient *by itself* to make a place "sensitive." Plaintiffs' Opp., ECF 87, at 25–28. But the State Parties never argued that these factors are individually sufficient to render a place sensitive. Rather, they showed that *in combination* they render a place analogous to the sensitive places of the Founding and Colonial eras. *See* State MSJ Mem., ECF 65, at 17–19. It therefore does nothing for Plaintiffs to point out that the Supreme Court held that all of Manhattan cannot be a sensitive place merely because it is a crowded area of a city, that sometimes arms were occasionally used during the Colonial era to protect "vulnerable" people, or that not every "government owned" facility is automatically a sensitive place. *See* Plaintiffs' Opp., ECF 87, at 25–27. Nor does the State Parties' analysis somehow create a situation in which "every crowded city in America suddenly becomes 'sensitive.'" Plaintiffs' Opp., ECF 87, at 26. To the contrary, only a small slice of modern cities would be sensitive under the State's analogic test. Finally, contrary to Plaintiffs' assertions, the State Parties' showing as to these points is certainly "ground[ed] in history," as it is based on the detailed, comprehensive expert reports of Dr. Rivas and Professor Salzmann. *See* State MSJ Mem., ECF 65, at 17–19.

## B. The Act is analogous to the "prohibitions" on firearms that applied in the recognized sensitive places of the Colonial and Founding eras.

Next, Plaintiffs insist that the historical regulations that prohibited firearms in schools, government buildings, polling places, legislative assemblies, and courthouses are not analogous to

the Act's restriction on firearms in modern public transit systems. *See* Plaintiffs' Opp., ECF 87, at 28–32. While Plaintiffs do not dispute that a modern regulation is analogous to a historical regulation if it imposes an analogous burden, and was enacted for analogous reasons, they do assert that the Act's restrictions on firearms in public transit systems do not meet this test. *Id.* Their arguments fall short.

>    **1.**    **The burden imposed by the Act is a "dead ringer" for the burdens imposed by historic constitutional sensitive place restrictions.**

Plaintiffs admit that the historical sensitive place prohibitions identified by *Bruen* "consisted of outright bans" on carrying firearms at specified locations. Plaintiffs' Opp., ECF 87, at 28–29. Ignoring the consequences of this admission, they argue by misdirection, rehashing their assertion that modern public transit systems are not analogous to recognized sensitive places. *Id.* But these warmed-over arguments are not only wrong for the reasons addressed above, but also because they have nothing to do with the question of whether the *burden* of the Act is analogous to the burdens of historic sensitive places regulations. Plaintiffs provide no legitimate reason why the "prohibition" imposed by the Act is more burdensome than the "prohibitions" on firearms that applied to historic sensitive places. *See Bruen*, 597 U.S. at 30. Nor could they have made such an argument had they tried—the burden imposed by the Act is "a dead ringer" for the burdens imposed by those recognized historic regulations. *Id.*

>    **2.**    **The reasons for the Act's enactment are comparable to the reasons for the enactment of historic constitutional sensitive place restrictions.**

Plaintiffs do not dispute that the Seventh Circuit has expressly held that a court conducting a *Bruen* analysis discerns the purpose of a firearm-related regulation from "the text of the legislation," including from "an introductory Statement of Purpose, which many bills contain, or in some other prefatory provision." *Bevis*, 85 F.4th at 1200. The Act meets this standard. As the State Parties showed in their summary judgment briefing, in 1650 the Maryland legislature stated

that the purpose of barring firearms in the houses of the assembly was "for the better ordering of Both Howses." ECF 64-19, 1650 Md. Laws 273. The nearly-identical 1647 statute passed by the Maryland legislature contained no such explicit statement of purpose, but there is no reason to think its purpose was any different. ECF 64-18, 1647 Md. Laws 216. The 1776 Delaware Constitution barred firearms from "elections" for the purpose of "prevent[ing] any violence or force being used." ECF 64-16, Del. Const. of 1776 art. 28. A 1787 statute barring arms at polls was enacted so that "all elections shall be free"—impliedly, free of violence that might taint an election. ECF 64-17, Act of Jan. 26, 1787 N.Y. Laws 345. And Virginia's ban on firearms in courts was for the purpose of "forbidding and punishing affrays." ECF 64-20, 1786 Va. Acts 33, ch.21. These laws reflect the same purpose as the Act's restriction on firearms in public transit facilities— to protect order and safety at a given sensitive location. *See* State MSJ Mem., ECF 65, at 24–25.

Despite this evidence, Plaintiffs contend that the reasons for the enactment of the Act are not comparable to the reasons for which recognized historical sensitive place regulations were enacted. *See* Plaintiffs' Opp., ECF 87, at 29–31. They argue that the *only* historic legislation that could be analogous to the Act would be a regulation "passed to prevent violence within public transportation or associated facilities," and that any prohibitions on firearms that apply to other sensitive places (such as courthouses and colonial assemblies) are *ipso facto* not comparable. *See id.* at 29. This assertion cannot be squared with *Bruen*, because it would mean no analogies could *ever* be drawn between regulations applying to "new" sensitive places, and regulations that applied to those that existed in prior eras. *Bruen*, 597 U.S. at 30. This is not and cannot be the law, because the Supreme Court has expressly determined that firearms may be prohibited at "*new* and analogous" sensitive places. *Id.*

Plaintiffs' attempts to distinguish the purposes of the historic sensitive place regulations

from the Act fail for other reasons as well. Plaintiffs say the Delaware Constitution of 1776 barred firearms from polling places "to ensure that no violent actors could hinder citizens from voting on election day." Plaintiffs' Opp., ECF 87, at 29. That is not, however, what the text of the 1776 Delaware Constitution says. Rather, the express purpose of its "sensitive place" provision is to "prevent *any* violence or force being used at the said elections" (emphasis added), not merely to prevent violence that might "hinder citizens from voting." Del. Const. of 1776 art. 28. Similarly, the purpose of New York's sensitive place provision as to polls was that "all elections shall be free"—impliedly, of violence that might taint an election. ECF 64-17, Act of Jan. 26, 1787 N.Y. Laws 345. Plaintiffs' argument must be rejected as inconsistent with the Seventh Circuit's instructions in *Bevis*, under which the best evidence of statutory intent under *Bruen* is "the text of the legislation." 85 F.4th at 1200.

Plaintiffs suggest that the express stated purpose of the 1650 Maryland statute barring firearms from the state assembly—"for the better ordering of Both Howses"—should be disregarded, because they speculate that it might have been "inserted by the compiler of the enacted statutes." Plaintiffs' Opp., ECF 87, at 30. But Plaintiffs point to nothing in the record (or outside of it) that would support their position, which is made up out of whole cloth, and should be rejected. *See* ECF 64-19, 1650 Md. Laws 273. Next, Plaintiffs insist that even if this language *does* reflect the Assembly's views, it should be ignored because it would only be relevant to "clarify ambiguous language." Plaintiffs' Opp., ECF 87, at 30. But again, the Court must reject this argument as inconsistent with binding Seventh Circuit caselaw in *Bevis*. 85 F.4th at 1200 (purpose in *Bruen* analysis may be determined based on a "prefatory provision.").

Plaintiffs also contend that it is impossible to know the purpose of the nearly-identical 1647 Maryland statute that also barred firearms in the state assembly, because it does not contain an

express statement of purpose, and because the the stated purpose of the 1650 statute cannot be ascribed to the near-identical law passed three years earlier. Plaintiffs' Opp., ECF 87, at 30. But it is well-established that the "intent" of a statute may discerned through an analysis of "similar statutes." *See*, *e.g.*, *Lojuk v. Quandt*, 706 F.2d 1456, 1463 (7th Cir. 1983) (interpretating one statute through an "examination of the language . . . of several similar statutes"). Contrary to Plaintiffs' claims, an understanding of the purpose of the 1647 statute Maryland statute can certainly be informed by an analysis of the near-identical 1650 statute, and that analysis supports the conclusion that both statutes were passed for identical purposes. *Id.*

Finally, Plaintiffs try to distinguish Virginia's statement of purpose in its sensitive place statute, which was expressly passed for the purpose of "forbidding and punishing affrays." ECF 64-20, 1786 Va. Acts 33, ch.21. In their opposition brief, however, Plaintiffs seek to rewrite history and *Bruen* by falsely asserting that "affrays" means "going armed to terrify others . . . which *Bruen* explained is disanalogous to restrictions on peaceable carry." Plaintiffs' Opp., ECF 87, at 29–30, 31. This assertion is false, and has no basis in history or *Bruen*. As Blackstone makes clear, "affray" refers to "the fighting of two or more persons in some public place" in a manner that causes "the terror of his majesty's subjects," whether or not any of the people involved are armed, a fact Plaintiffs do not dispute. *See* ECF 88 at 31. Nothing in Bruen calls this definition into doubt. Plaintiffs' attempts to muddy the historical waters should be rejected, and the Court should recognize that the express purpose of the 1786 Virginia sensitive place statute was to prevent public violence. *Id.*

In sum, Plaintiffs cannot contest that the purposes of sensitive place restrictions enacted during the Colonial and Founding eras was comparable to the purpose of the Act's restriction on firearms in public transit systems—to protect order and safety at a given location. *See* State MSJ

Mem., ECF 65, at 24–25. Consequently, the State Parties have established the constitutionality of the Act because (a) public transit systems are analogous to the recognized sensitive places of the Colonial and Founding eras, and (b) the Act is a "dead ringer" for the "prohibitions" on firearms that applied to those sensitive places. *See Bruen*, 597 U.S. at 30. The Court can enter judgment for Defendants on this basis alone without proceeding any further.

## V.     The Act is part of a longstanding and well-established tradition of regulation.

In addition, the State Parties have *also* demonstrated the Act is constitutional for a separate, and independent basis—it is consistent with the Nation's well established and representative tradition of firearm regulation, stretching back to the earliest period of our history. *See* State MSJ Mem., ECF 65, at 25–30. This tradition originates as far back as "a 1328 British statute forbidding going or riding 'armed by night []or by day, in fairs, markets'" that remained in force in American colonies,  extending through at least two Founding-era statutes[3] and four Reconstruction era statutes[4] replicated this type of law, and through the well-established and representative regulations that applied to mass train travel from the earliest moments at which that technology was adopted at scale. *See id.*; *see also Antonyuk*, 89 F.4th at 356. "This long, unbroken line, beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this nation." *Antonyuk*, 89 F.4th at 358 (cleaned up).

Plaintiffs cannot dispute the existence of this unbroken tradition of regulation. At the

---

[3] *See Antonyuk*, 89 F.4th at 356; ECF 64-40, 1786 Va. Acts 35, Ch. 49; ECF 64-41, Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60-61, ch. 3 (F. Martin Ed. 1792) (North Carolina Statute); ECF 64 ¶¶ 52–53.

[4] *See Antonyuk*, 89 F.4th at 357–58; ECF 64-42, 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Pace and Prevent Homicide, Ch. 13, Section 1; ECF 64-43, 1870 Tex. Gen. Laws 63, ch. 46; ECF 64-44, 1883 Mo. Sess. Laws 76; ECF 64-45, 1889 Ariz. Sess. Laws 16-18; ECF 64-46, 1890 Okla. Terr. Stats., Art. 47, § 7; ECF 64 ¶¶ 54–58.

outset, Plaintiffs' arguments misses the standard *Bruen* actually establishes. *Bruen* specifically states that cases (such as this one) "implicat[ing] unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. Plaintiffs ignore this, transforming the *Bruen* standard into the "regulatory straightjacket" *Bruen* expressly forecloses. Moreover, Plaintiffs ignore what *Bruen* actually holds by insisting that Defendants identify historical "dead ringers" for modern regulations. The Supreme Court, however, has made clear that "even if a modern-day regulation is *not* a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphasis added). Moreover, Plaintiffs again ignore that the Supreme Court based its conclusion that prohibitions on firearms are constitutional in schools, legislative assemblies, polling places, and courts on (a) solely 19th century precedent as to schools, (b) two Colonial era Maryland statutes as to legislative assemblies, (c) two Founding era state statutes as to polling places, and (d) only one Colonial era state statute as to courts. *See* State MSJ Mem., ECF 65, at 9–10. In other words, the Supreme Court's *Bruen* decision has already rejected the standard Plaintiffs say applies here.

Additionally, Plaintiffs' contentions regarding the specific statutes and rules cited by the State Parties also fail. Plaintiffs attempt to dismiss these statutes, but ignore that the highest court to have addressed the law of sensitive places, the Second Circuit, has already rejected their arguments as to these sources. *See Antonyuk*, 89 F.4th at 355–58. Apart from this, their arguments fail on their own terms. For example, Plaintiffs falsely say the Supreme Court held that the Statute of Northampton and its Colonial progeny have "little bearing on the Second Amendment adopted in 1791." Plaintiffs' Opp., ECF 87, at 31. But what *Bruen actually* says is that the Statute of Northampton "*as it was understood during the Middle Ages*" has "little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41 (emphasis added). Here, the State is not arguing

based on how this statue "was understood during the Middle Ages." Rather, the State is arguing based on how this statute and its substantively similar progeny were understood and enforced by the Founding generation in the early American colonies and states. *See* State MSJ Mem., ECF 65, at 26. Moreover, while *Bruen* did not find the Statute of Northampton and progeny probative as to a specific New York proper-cause firearm license issuance scheme, this does not mean that Northampton and progeny are not probative as to *other* issues. Indeed, that is precisely what the Second Circuit found when it applied *Bruen*, and concluded that the Statute of Northampton and its descendants in force in the Colonies are *highly* probative into the constitutionality of firearm restrictions at various sensitive places, including theaters, conference centers, banquet halls, and public parks. *Antonyuk* 89 F.4th at 374, 355–63, 375–76. Rejecting the very arguments Plaintiffs make here, the Second Circuit applied *Bruen*, and concluded as follows:

> Two observations regarding these Founding-era statutes are warranted. First, while the Virginia statute differed from the medieval English Northampton statute in that it prohibited conduct and not simply carriage, i.e., bearing arms in "terror" of the county, the North Carolina statute, like the Northampton statute, appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct. And, as we will elaborate below, the tradition of regulating firearms in quintessentially crowded places evolved in the direction of the North Carolina statute, i.e., the prohibition of carriage without any reference to conduct. Thus, despite the Virginia law's "in terror of the county" language, we do not interpret the National tradition of regulating firearms in quintessentially crowded places to require a conduct element. Second, though *Bruen* rejected the medieval Northampton statute, it did so within the context in which that statute was offered: as an analogue supporting a carriage ban in public generally. In sum, *Bruen* addressed the statute in a different context; nor was the statute discounted by *Bruen* for the analogical purpose for which we rely upon it here.

*Antonyuk*, 89 F.4th at 357 n.74. The same result applies in this case.

Plaintiffs' arguments regarding subsequent laws identified by the State Parties also fail. Plaintiffs assert these laws "come too late" because the "State cannot start its historical tradition decades removed from when the people adopted the Second Amendment." Plaintiffs' Opp., ECF 87, at 36. Plaintiffs miss the point. The State did not "start its historical analysis" with 19th century

law. Rather, the State started its analysis with the Colonial and Founding era laws discussed above, and the subsequent 19th century laws represent a *continuation* of that earlier tradition of regulation into the 19th century. *See* State MSJ Mem., ECF 65, at 25–30. This evidence is not presented to establish a new tradition of regulation, but rather to confirm the continuing existence of a tradition that "had already been established." *Bruen*, 597 U.S. at 37.

Plaintiffs next insist that the laws cited by Defendants are neither analogous to the Act nor "sufficiently widespread," and therefore should be ignored. *See* Plaintiffs' Opp., ECF 87, at 36–39. But their arguments have already been soundly rejected by the Second Circuit in *Antonyuk*. Specifically, the Second Circuit rejected Plaintiffs' assertion that Texas's 1870 and 1871 laws must be discounted, holding that the armed public assembly restrictions in these laws are "consistent with the national tradition and existed in many states." *Antonyuk*, 89 F.4th at 357–58, 357 n.75. *Antonyuk* also makes clear that the other statutes the State cited are probative, analogous to the Act, and plainly not "outliers." *See Antonyuk*, 89 F.4th at 357–58.

Finally, Plaintiffs contend that the rules enacted by railroads are irrelevant to the *Bruen* analysis because the railroads in question were issued by "private" entities, not enacted by governments. *See* Plaintiffs' Opp., ECF 87, at 41. But it is clear that not even Plaintiffs believe this argument. Specifically, *Plaintiffs themselves* have argued and admitted in this case that the actions of private schools demonstrate the scope of the Second Amendment rights as applied to modern public schools. *See* Plaintiffs' Opp., ECF 87, at 19 n.3. Plaintiffs cited to rules enacted by the Harvard University, Yale University, Brown University, and George Washington University as probative of the scope of the Second Amendment right in schools. *Id.* In doing so, they followed the example of *Bruen* itself, which concluded that schools are "sensitive" based on citations to sources containing primarily rules enacted by private entities. *See* State MSJ Mem., ECF 65, at 10

23

n.10. Moreover, the actions of historic railroad systems have been found to support the constitutionality of restrictions on firearms in public transit systems. *See Frey v. Nigrelli*, 661 F. Supp. 3d 176, 205 (S.D.N.Y. 2023). Plaintiffs' attempt to discount the rules enacted by highly regulated railroads therefore fails.

## VI. Plaintiffs' security theory, if accepted, requires the rejection of their facial challenge to the Act.

In the State's Motion and Opposition, the State Parties showed that even if Plaintiffs' security theory is accepted, judgment must still be entered for Defendants. *See* State's MSJ Mem., ECF 65, at 19–23; State Opp., ECF 84, at 22–24. Plaintiffs' attempts to dispute this fall short.

Plaintiffs say that the level of security on the CTA is "woefully inadequate," but this argument is nothing more than the "means-ends" analysis the Supreme Court expressly rejected in *Bruen*. 597 U.S. at 17–19. If Plaintiffs' "security" theory is accepted, the question is not whether the level of security on public transit is somehow sufficient to fulfill a government purpose. Rather, the question is whether the level of security on public transit is *analogous to the level of security that existed at historic sensitive places. See id.* at 30. As the State Parties showed in their initial summary judgment filing, historic sensitive place security generally consisted of no more than a single, part-time door-keeper. State MSJ Mem., ECF 65, at 19–23. Consequently, the presence of even a single employee on a public transportation vehicle or in a public transportation facility provides a level of security exceeding that which existed at sensitive places during the Colonial and Founding eras. *Id.* Plaintiffs do not dispute that such a level of security is generally available on Illinois public transportation facilities. *See* disc. *supra*.

Plaintiffs' fallback position is to assert that the "State Defendants fail to show that Illinois comprehensively secures all modes of public transportation and associated facilities," and "says nothing about the security on modes of public transportation other than CTA, Metra, and

Metrolink." Plaintiffs' Opp., ECF 87, at 43, 44. Plaintiffs forget that they bring a facial challenge to the Act, and as such, their challenge fails unless "there is no set of circumstances under which the challenged statutes or regulations can operate constitutionally." *Midwest Fence Corp. v. United States DOT*, 840 F.3d 932, 941 (7th Cir. 2016). Consequently, the State Parties need not survey the security on all public transit systems in the State to prevail—it suffices to show that there is "set of circumstances" under which sufficient security could be provided. *Id.* Indeed, as the State Parties demonstrated in their Opposition to Plaintiffs' Motion for Summary Judgment, ECF 84, at 23–24, there is plainly *some* level of security that would be "comprehensive" enough under their proposed test. *See* Plaintiffs' Opp., ECF 87, at 43–45. And while Plaintiffs argue that for security to be "comprehensive," there must be numerous "armed guards" stationed "at entry and egress points, on every CTA car," and on "platforms," and "metal detectors," they do not argue that this level of security would be unattainable. *Id.* Plaintiffs own argument therefore demonstrates that their facial challenge cannot succeed if their security theory is accepted.

## CONCLUSION

For all of these reasons, and for the reasons stated in Defendants' Motions for Summary Judgment and filings in opposition to Plaintiffs' cross-motion for summary judgment, the State Parties respectfully request that the Court grant their Motion for Summary Judgment, deny Plaintiffs' Motion for Summary Judgment, and enter final judgment in favor of Defendants.

April 17, 2024                          Respectfully submitted,

Isaac Freilich Jones                    Defendants KWAME RAOUL, RICK AMATO,
Christopher G. Wells                    ROBERT BERLIN, and ERIC RINEHART
Gretchen Elizabeth Helfrich
Office of the Illinois Attorney General  KWAME RAOUL,
115 S. LaSalle St., 20th Floor Chicago,  Illinois Attorney General
Illinois 60603
Tel. 312-814-3000                        By: */s/ Isaac Freilich Jones*
                                         *One of the Attorneys for the State Defendants*

isaac.freilichjones@ilag.gov
christopher.wells@ilag.gov
gretchen.helfrich@ilag.gov

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on April 17, 2024 they caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record.

*/s/ Isaac Freilich Jones*
Assistant Attorney General
