IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, <br><br>    Plaintiffs, <br> v. <br><br> KWAME RAOUL, *et al.*, <br><br>    Defendants. | No. 3:22-CV-50326 <br><br> Hon. Iain D. Johnston |

**DEFENDANT FOXX'S REPLY IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGEMENT</u>**

Dated: April 17, 2024

Jessica M. Scheller
Prathima Yeddanapudi
Jonathon Byrer
Silvia Mercado Masters
Edward M. Brener
Megan Honingford
Assistant State's Attorneys
Cook County Assistant State's Attorney
50 W. Washington, 5th Floor
Chicago, Illinois 60602
(312) 603-6934
jessica.scheller@cookcountysao.org
prathima.yeddanapudi@cookcountysao.org

Despite extra pages encompassing myriad arguments, Plaintiffs do not establish that their inability to carry firearms on public transportation infringes upon the Second Amendment or asserts a redressable injury. Plaintiffs' Response Brief (Dkt. 87) fails to raise a question of material fact, or otherwise overcome the argument and authority set forth in Defendant Foxx's underlying motion for summary judgment. Defendant Foxx is entitled to summary judgment because: i) The Plaintiffs' claims cannot be redressed through these proceedings (Section I); ii) The State's interest is proprietary for the purposes of 430 ILCS 66/65 ("the Statute") regardless of the presence of potential criminal penalties (Sections II.A-C); iii) The Statute is historically analogous with the moderation principle of self-defense and other limited time, place and manner restrictions (Section III.A-D); iv) The Statute is not facially unconstitutional (Section IV); and v) Venue is improper in the Western District (Section V). For these reasons and those set forth in the underlying motion and memorandum, Defendant Foxx is entitled to summary judgment.

I. **Plaintiffs' Claims are Not Redressable by this Lawsuit.**

To review: Foxx argued in her motion for summary judgment that Plaintiffs' injuries could not be redressed through invalidation of the Statute because Plaintiffs would still be prohibited from carrying firearms on trains by the rules and regulations of the transit providers and railroads. Dkt. 68, at 6-7. Plaintiffs contrarily assert that they would in fact carry their firearms on public transportation regardless of the regulations maintained by the transit providers. Dkt. 87, at 6. If the transit operators then enforced their own no-carry policies, Plaintiffs would simply file a lawsuit against them as well. *Id*.; 30 ILCS 66/65(a-10).

Even if their plan were valid, it does not render Plaintiffs' injuries redressable. Plaintiffs admit they would need to file a subsequent claim against a non-party to this case to lawfully bring a firearm on a train or bus – a fatal acknowledgement that the alleged injury is not redressable

1

through this action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569-571 (1992). Even if Plaintiffs succeed in this suit, they will expose themselves to charges of criminal trespass if they bring a firearm on transit-system property, because the owner has independently forbidden individuals to enter that property while carrying firearms. *See, e.g.*, 720 ILCS 5/21-3(a)(1) (making it a criminal trespass to enter property "knowingly and without lawful authority"). All this suit would achieve is shifting the nature of the criminal charge from one statute to another; the desired conduct would still be unlawful.

Plaintiffs make no persuasive argument to the contrary. Relying upon language from *Allen v. Wright* touching on the difference between the "fairly traceable" and "redressability" components of constitutional standing, Plaintiffs miss the point by conflating "fairly traceable" with "redressable." However, "fairly traceable" goes to causation of the injury and "redressable" means the "causal connection between the alleged injury and the judicial relief requested." 468 U.S. 737, 753 n.19 (1984). The Court was addressing circumstances in which the relief requested went "well beyond the violation of law alleged" as opposed to here, where Plaintiffs would require relief this court may not order against parties whom are not present. *Id*. Plaintiffs also cite *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), but that case clearly holds that "relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court," *id.* at 107. Invalidation of this Statute will not clear a path for Plaintiffs to carry firearms onto public transit.

In response, Plaintiffs threaten action against the private transit operators pursuant to 42 U.S.C. § 1983. Dkt. 87, at 6. One questions the legal merits of such a claim, but it matters not. The question here is whether *this* suit will redress Plaintiffs' injury, not whether this suit might clear the way for some other hypothetical and unfiled suit. As the Fifth Circuit has explained, "that's not how redressability works." *E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022). Nor is it any answer

2

that partial redress is constitutionally sufficient. Any relief granted in this suit would leave Plaintiffs exactly where they are now. Thus, the invalidation of the Statute "is not a partial remedy of their alleged injuries; it's no remedy at all." *Id.*

## II. The Appropriate Standard of Review is Rational Basis when the State is Acting as a Market Participant.

### A. The State Can Enforce Criminal Penalties as a Proprietor.

According to Plaintiffs, CTA, Pace, and train lines which operate Metra are not entitled to exercise their rights as property holders to exclude individuals who do not conform to their rules. Dkt. 87-1, 87-2, 87-3, and 87-4.[1] Although the Supreme Court has recognized property owners' essential right to exclude, *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021), Plaintiffs stake out the unsupported position that the Second Amendment takes precedence over a property owner's essential bundle of rights. Dkt. 87 at 8; *But Cf. Cedar Point*, 141 S.Ct. at 2072 (citing Blackstone, Commentaries on the Laws of England 2 (1766)).

The State is a proprietor with respect to the Statute which Plaintiffs misidentify as part of Illinois' Criminal Code. First, the fact that criminal penalties are assessed for its violation has no bearing on whether the State is acting as proprietor or sovereign. Plaintiffs' cases, *White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204 (1983), and *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993), are not helpful here as they offer little instruction as to how to draw the distinction between proprietor v. sovereign and certainly none that is applicable here. Plaintiffs' assertion that a "normal" proprietor cannot

---

[1] Plaintiffs' steely resolve to carry their firearms on private property against the property owners' wishes is rather amusingly at odds with their prior declarations of their status as "law-abiding citizens" whose Second Amendment rights are protected. These new assertions contradict the statements in their complaint, motion for summary judgment, and statement of undisputed facts. Dkt. 1 at ¶ 74; Dkt. 70 at 3; Dkt. 71 at ¶¶ 7, 15, 23, 31.

3

enforce criminal penalties, Dkt. 87, at 8, is false. A private property owner has the right to seek criminal charges for trespass against an individual, and a "normal" proprietor can regulate constitutional conduct that occurs on their property. *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 569 (1972) (Finding the First Amendment's free speech protections do not extend to uninvited guests on private property).

The Supreme Court handily resolved the question of whether the State can be acting as a market participant when it may simultaneously avail itself of criminal penalties for violations of the same Statute. *Dep't of Revenue v. Davis*, 553 U.S. 328, 345 (2008). When, as here, a government regulation "goes hand in hand" with its participation in a particular market or activity, that regulation should not be subject to the same constitutional scrutiny it would face absent that participation. *Id*.

  B. *The State Is Acting as Proprietor and Not Drawing a Widespread Regulation.*

Plaintiffs' reliance on *Solomon v. Cook County Bd. of Comm'rs*, 559 F.Supp.3d 675 (N.D. Ill. 2021) is misplaced. In *Solomon* the court reasoned that the purpose of the Cook County Forest Preserve District lands at issue were for the "education, pleasure, and recreation of the public" and that it was doubtful the public could be excluded from the entire 70,000 acres of property, distinguishing it from the strictly military property in *GeorgiaCarry.org v. U.S. Army Corps of Engineers*, 212 F.Supp.3d 1348 (N.D. Ga. 2016). *See Solomon*, 559 F.Supp.3d at 695. The property at issue here is distinguishable from *Solomon* as well – the public can absolutely be, and regularly is, excluded from transit property because an individual must first purchase a ticket before riding. Transit property is not open to the public in the same way that the Cook County Forest Preserve lands are, or as sidewalks and streets are, to use Plaintiffs' examples. Dkt. 87, at 7.

Plaintiffs' reliance on *Koons v. Platkin*, 673 F. Supp.3d 515, 601 (D.N.J. 2023) is similarly misplaced. In *Koons*, the court rejected the State's argument that the Second Amendment is not

4

implicated "anywhere the State is acting 'as proprietor,' rather than as 'sovereign,'" finding inadequate foundation for this "sweeping power." *Id.* But the regulation in *Koons* identified 25 places it deemed as "sensitive places" in which the carry of firearms was banned, places ranging from government-owned buildings, libraries, entertainment facilities, and restaurants that serve alcohol, to all private property. *Id.* at 542. In that way *Koons* is more akin to *Solomon* than to the case at hand. Here, rather than carving out wide swaths of sensitive places, the Statute is extremely limited – and rather than dealing with public spaces and forums it applies only to *publicly-funded* public transportation property utilized for mass transit. (2022 N.J. Laws, ch. 131, § 1(g) but C.f. 430 ILCS 66/65-(a)(8)).

  C.  *The Conduct of the Proprietor Falls Outside the Scope of the Second Amendment.*

  Plaintiffs also cite *Koons*, 673 F.Supp.3d at 603, to argue that even if the State is acting as proprietor, allegations of government infringement would still be resolved according to *Bruen*. Dkt. 87, at 9. Not so. Because the State's government as proprietor argument failed in *Koons*, that district court's discussion of which analytical framework *would have been* applied is no more than nonbinding dicta. A closer logical analogue can be found in *Bonidy v. Postal Service*, 790 F.3d 1121, 1127 (10th Cir. 2015) (where the court found the Postal Service was acting as proprietor and found the regulation was substantially related to an important governmental interest). Plaintiffs' citations to *Wolford v. Lopez*, No. 23-cv-00265, 2023 U.S. Dist. LEXIS 138190, *56-57 (D. Haw. August 8, 2023), *United States v. Ayala*, No. 8:22-cr-369, 2024 U.S. Dist. LEXIS 7326, *42 (M. D. Fla. Jan. 12, 2024), *May v. Bonta*, No. 23-cv-01696, *38-39 (C.D. Cal. Dec. 20, 2023) and *Siegel v. Platkin*, 653 F. Supp. 3d 136, 155 (D.N.J. 2023) are similarly unhelpful. None of the cases is precedential, and each lacks a cohesive analysis of whether the Second Amendment is implicated when the government is acting as proprietor.

The *Bruen* framework identified by Plaintiffs, Dkt. 87, at 9, does not apply. If the State is acting as proprietor, then its conduct is assessed under rational-basis review. *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992) (where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.) Even when the government is exercising its regulatory power by funding a service or program, conditions on spending are permissible as long as those conditions do not seek to regulate "outside the contours of the program itself." *Camelot Banquet Rooms, Inc. v. United States SBA*, 24 F.4th 640, 650 (7th Cir. 2022) citing *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 214-15 (2013) (internal quotations omitted).The State, in managing and operating the property and service it funds, asserts its right to preserve the property for its designated purpose, specifically, the safe transportation of all riders.[2] Nothing in the Statute restricts Plaintiffs right to carry arms outside of the transit authorities' property.

Defendant does not argue that every government-owned or controlled property is "exempt" from the Second Amendment. But designated sensitive places can co-exist with the proposition that the State may exercise its rights over property and funds that it controls or manages; certain traditionally designated sensitive places, such as courthouses or legislative buildings, while they may be owned by the government, are not properties over which the government can be considered

---

[2] Plaintiffs' attempt to draw a corollary between the Statute and allowing police to stop and frisk anyone walking through the subway without probable cause simply because they are on government property, Dkt. 87, at 9, falls flat. In fact, many government-owned or operated properties require individuals to submit to searches, such as metal detectors, to gain entry. The State could require the same for entry to train platforms or subways. Further, barring transit riders from carrying firearms on transit property, limited by manner, time and location, is not akin to a search and seizure that may precede criminal prosecution.

a "proprietor" or a market participant. Similarly, places traditionally reserved as public forums such as parks, public buildings, and the like cannot be regulated in the same manner as they may be when the government is acting as a market participant. *See e.g., Solomon.* Therefore, the government as proprietor argument does not apply to every property where government is involved.

As the Seventh Circuit has noted, the government has an equal right to private property owners to preserve the property under its control for "the use to which it is lawfully dedicated." *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007). When "the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." *Int'l Soc'y for Krishna Consciousness*, 505 U.S. 672, 678 (1992). Because the Statute is constitutional without having to analyze it under *Bruen*, Defendant is entitled to summary judgment.

### III. Even if *Bruen* is the Appropriate Analytical Vehicle, the Statute is Consistent With the Second Amendment.

#### A. The Statute does not infringe upon the Second Amendment right.

The limited prohibition on carrying weapons on public transit does not violate Plaintiffs' Second Amendment rights. Plaintiffs wrongly maintain that the First Amendment's prohibition on "abridging" the rights protected therein has no meaningful difference from the Second Amendment's "infringe" language. Dkt. 87, at 13. However, this argument misses the mark for two reasons. First, the Supreme Court recently and vehemently instructed us to follow the plain text of the Constitution when engaging in legal analysis. *Bruen*, 597 U.S. at 32. Nowhere did the Court instruct us to comingle or substitute "abridge" for "infringe" or to otherwise substitute the words of our choosing for those appearing in the text. And Plaintiffs mistakenly compare the

7

Statute's limited manner, time and place restrictions on mass transit to the extremely broad ban on state-wide public carry which the Court rejected in *Bruen*. Dkt. 87, at 13. The Illinois Statute does not permit defensive firearm use on mass public transit; whereas the New York regulation prohibited public carry throughout the entire State of New York.

Defendant Foxx cites both historical evidence and various dictionary definitions showing that, while the First Amendment prohibits any diminishment of the rights protected, the "infringe" language in the Second Amendment requires the effective or actual destruction of the underlying right. Dkt. 68, at 10. Initially, Plaintiffs admit that the Supreme Court has not interpreted the meaning of "infringe." Dkt. 87, at 13-14.

Lacking any binding legal support for their argument, they look to other interpretations hunting for something a bit more favorable. Dkt. 87, at 13-14. *Frein v. Pa. State Police*, 47 F. 4th 247 (3d Cir. 2022) (finding infringement when guns were seized *en masse* eight years earlier by police, and never returned); *Md. Shall Issue, Inc. v. Moore*, 86 F. 4th 1038 (4th Cir. 2023) (the court explicitly avoided "line drawing" as to when a regulation becomes an infringement) (vacated to be re-heard *en banc*, *Md. Shall Issue, Inc. v. Moore*, 2024 U.S. App. LEXIS 766 (4th Cir. 2024)); *Vandermyde v. Cook County*, 2024 IL App (1st) 230413-U (unpublished opinion relying on the now vacated *Moore*). Unlike the minimal time and place restrictions in the Statute, both federal cases categorically denied firearms for a significant period, and the state court case may still be appealed. Plaintiffs offer no elaboration for their belief that this court should be persuaded by the non-binding reasoning of foreign courts of appeals. Dkt. 87, at 13-14

When Plaintiffs do engage with the history and definition of the word "infringe", they admit that, at the time of the founding, to "infringe" meant "'to violate,' 'to destroy,' or 'to hinder.'" Dkt. 87, at 14. As for Plaintiffs' reference to *Konigsberg v. State Bar of California*, 366 U.S. 39

8

(1960), the Court in a footnote did not say that "infringe" is equal to the word "abridging" as found in the First Amendment. *Id.*, at 49 n.10. Instead, it referred to the non-controversial principle that both Amendments contain an "unqualified command." *Id.* The Court made no ruling as to the scope of those commands as it pertains to "infringe," a fact that Plaintiffs have already admitted. Dkt. 68, at 13-14.

### B. The Moderation Principle of Lawful Self-Defense is a Historical Analogue.

Plaintiffs dismiss Defendant's reliance on certain founding-era regulations on the right to employ lethal (and legal) self-defense. Plaintiffs claim that these restrictions relating to time, place and manner include the intent to terrorize others, which Plaintiffs here do not harbor, as "law-abiding citizens." Dkt. 87, at 32. Plaintiffs ignore the historical analogue of the moderation principle applied to the right of self-defense, which existed pre-founding and restricts otherwise lawful actions. As explained by Blackstone, the acts that constitute excusable homicide end at "the bounds of moderation, either in the manner, the instrument, or the quantity," so an act otherwise permissible by the law becomes "manslaughter at least, and in some cases (according to the circumstances) murder" if a person uses a weapon in a manner unsuited for an otherwise-lawful task. 4 William Blackstone, Commentaries On The Laws Of England 183–84 (1769). As Blackstone later explains, such "excessive" actions "could not proceed but from a bad heart" and are thus "equivalent to a deliberate act of slaughter." Blackstone at 200–201.

This long-standing principle continues in Illinois law, which does not readily accept a claim of self-defense when the defendant "uses force greater than necessary to ward off the imminent danger." *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) (Pallmeyer, J.) (emphasis added); *accord People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999) (explaining Illinois law requires proof that "the kind and amount of force actually used was

9

necessary"). It is difficult to imagine any situation where one could safely use a firearm in self-defense on a crowded transit vehicle without endangering the lives of third parties. Therefore, carrying a weapon on public transportation conflicts with the historical requirement that lawful self-defense be exercised in moderation. Illinois law recognizes the boundaries of reasonable discharge of a weapon. See, e.g. 720 ILCS 5/24-1.2 (an individual may be charged with aggravated discharge of a firearm when he or she "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person" - *i.e.* in a crowded train.) The moderation principle of self-defense is a historical analogue to the Statute, which removes the option of using a firearm in a manner inconsistent with public safety – *i.e.* on government-funded property designated for mass transport.

C. *Analogous Historical Traditions of Regulation Support the Statute.*

Even if Bruen did apply, Plaintiffs' arguments remain unavailing. Plaintiffs undermine the Supreme Court's analogical framework by comparing the limited time and place restrictions in this case to the limitless public carry restriction that the State of New York placed on the plaintiffs in *Bruen*, Dkt. 87, at 13. They then attack the nuanced approach endorsed by the Supreme Court as dicta. *Id.* at 23. Plaintiffs' opposition to the nuanced approach is grounded in a misattribution of the supposed existence of a founding generation gun violence problem to the Supreme Court. However, neither *Bruen*, 597 U.S. at 26, nor *Heller*, 554 U.S. at 636, say anything regarding founding era gun violence. In fact, the *Heller* language Plaintiffs depend on refers only to a *modern* gun violence problem. *Heller*, 554 U.S. 636 ("We are aware of the problem of handgun violence in this country.") Plaintiffs likewise ignore the complex changes to American public transportation that the founders could not have foreseen. Dkt. 68, at 13-14.

Rather than engage with the way the overhaul of mass public transportation in this country has transformed society, Plaintiffs focus on the existence of "stagecoaches, horse-drawn

10

omnibuses, ferries, and other boats" at the time of the founding. Dkt. 87, at 23. Plaintiffs' recitation fails to address the fact that these Plaintiffs largely intend to ride trains, Dkt. 66, ¶24, 30, 37, 38, 48, 50, 56-58, a mass transportation technology that did not exist in America prior to the 1820s. Dkt. 66, ¶71-72. Plaintiffs attack the representative historical analogues offered by Defendant offering their own contrary statutes as analogues. Dkt. 70, at 15-19.

Plaintiffs' error in denying the validity of Defendant's analogues is grounded in their refusal to engage with "how and why" the Statute allegedly burdens their rights protected by the Second Amendment. *Bruen*, 597 U.S. at 29. The "how" is straightforward. As is true with the Statute at issue, both the English Black Act (Act 9 Geo. 1 c. 22 (1723)) and the Law of the Traveler (Dkt. 66, ¶ 88-89) make a time and place distinction as to when an individual may lawfully carry a weapon. The "why" of the Statute is also analogous. The Black Act and the law of the Traveler were motivated by fear for the individual who is far from home, beyond the likelihood of aid should he find himself in a dangerous situation. Dkt. 68, at 20. Plaintiffs are all local residents, to the point that they can access the Chicago area by public transit, and they intend to ride primarily on Metra. Dkt. 66, ¶24, 30, 37, 38, 48, 50, 56-58. Unlike the law at issue in *Bruen*, there is a clear history and tradition of the type of time and place restrictions which the Statute imposes.

Plaintiff has nothing to say in response to the Black Act analogue, and this court may find it apt and rule for Defendant. Plaintiffs do attack the doctrine of the Traveler, pointing out that they intend to travel larger distances than individuals subject to those historical laws may have traveled. Dkt. 87, at 36. This argument, which deliberately ignores the speed, safety, and capacity of modern commuter trains, only underscores the fundamental ways in which mass public transit differs from the transportation technology known to the founders.

11

Instead of reckoning with the cited laws themselves, Plaintiffs raise two more arguments to undermine the importance of Defendant's representative historical analogues. Both fail. First, Plaintiffs reiterate their belief that reconstruction era laws may not form the basis for a *Bruen* analogy. Dkt. 87, at 36. But *Heller* did not find, as Plaintiffs believe, that reconstruction era laws interpreting the Second Amendment have no probative value. Rather, the Court was careful to say only that such laws "do not provide as much insight" into the original meaning of the Second Amendment. *Heller*, 554 U.S. at 614. Further, J. Barrett's concurrence in *Bruen* makes it clear that the Court avoided deciding whether founding era or reconstruction era laws were more important. *Bruen* at 82 (Barrett, J., concurring).

The Supreme Court has not elaborated as to what makes a law "representative," but it is clear the Defendant has offered a tradition of carry regulation as well as regulation of the right to self-defense. Defendants cite to similar regulations on carry in Tennessee, Texas, Arkansas, and Alabama, in addition to England's Black Act. Dkt. 68, at 15-16. Defendant's analogy is more representative than the proverbial "single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense" in public" rejected by the Court. *Bruen*, 597 U.S. 66-67. While the Court in *Bruen* found that these laws were no analogues to New York's sweeping carry restrictions, *Bruen*, 597 U.S. at 53-54, the Statute is limited to manner, time and place in a way the New York law was not.

Finally, Plaintiffs argue that the First Amendment framework has no "applicability to the Second Amendment context." Dkt. 87, at 40. This is contradicted by *Heller* and reaffirmed in *Bruen*, which held that while the substance of the rights protected by the constitution differ, the way in which we analyze the meaning of those rights does not. *Heller*, 554 U.S. at 582; *Bruen*, 597 U.S. at 24-25 (internal citations omitted).

> D. *Plaintiffs Conflate Bruen's Historical Analysis and the Sensitive Places Doctrine*.

Plaintiffs argue that there is no daylight between the sensitive places analysis and *Bruen*'s historical analogue test. Asserting that *Bruen* identified only three places historically recognized as sensitive places – legislative assemblies, polling places, and courthouses – they argue the Court instructed that any new sensitive place must be analogous to those places. Dkt. 87, at 25. *Bruen* contains no such holding. The Court did not undertake to make an exhaustive list of sensitive places, nor did it analogize the law in front of it to historical sensitive places laws. 597 U.S. 1 at 30-31. *Bruen* offers little instruction on how to identify a sensitive place or how to analogize a modern sensitive place restriction to a historical regulation. *See Id*. at 114 (Breyer, J., dissenting) (noting the majority's lack of guidance on modern locations with no obvious historical analogues, including subways).

Nevertheless, Plaintiffs rely solely on what is perhaps the only clear suggestion in *Bruen* on how to identify a sensitive place: that the crowded nature of an area cannot be the sole characteristic that makes a place sensitive. Dkt. 87, at 26. This argument ignores the fact that trains, subways, and buses are different than crowded public places, not least of all because they are enclosed and moving. The out-of-circuit cases Plaintiffs cite as examples of how to conduct a sensitive places analysis involved comparing present-day regulations on places that existed at the time of the Founding, like post offices (*Ayala*) and parks (*Antonyuk*). These cases did not call for an analysis of a regulation on a place that did not exist in a substantially similar way at the Founding, as the case before this court does. Only *Koons* considered modern places, and that court noted the need to take a nuanced approach when conducting its analysis. *Koons v. Platkin*, 673 F.Supp. 3d 515, 647 (Dist. N.J. 2023). Similarly, the Hawaii District Court in *Wolford* recognized that sensitive places do not fit squarely within a rigid historical analysis, noting that sensitive places

13

are the "exception" to the historical analogue test in *Bruen*. *Wolford v. Lopez*, No. 23-cv-00265, 2023 U.S. Dist. LEXIS 138190 at *22 (Dist. Haw. Aug. 8, 2023).

Plaintiffs focus on why buses and trains are similar to typical public gatherings. They dismiss Defendant's expert testimony on the dangers of gunfire in enclosed crowded spaces as irrelevant interest balancing, Dkt. 87, at 27, but Defendant offered those facts in part to draw an analogy between the statute and historical restrictions on speech in public transportation, and consideration of those facts is thus proper. Dkt. 68, at 17-18.

### IV. Plaintiffs' Facial Challenge to the Statute Fails and Proper Venue Has Not Been Established.

Plaintiffs' facial challenge cannot succeed in light of the binding holding in *Bevis v. City of Naperville*, 85 F. 4th 1175 (7th Cir. 2023). Plainly, the weapons restriction in the Statute includes the categorical ban on assault weapons and certain handguns, which the Seventh Circuit has held are not arms within the ambit of the Second Amendment. *Bevis* at 1194. Plaintiffs do not dispute that *Bevis* reaches weapons which they may not carry on transit under the Statute. Plaintiffs dance around the principle announced in *United States v. Salerno*, 481 U.S. 739 (1987), that a statute is not facially unconstitutional unless there is no set of circumstances under which it survives. Dkt. 87, at 12. The Supreme Court reiterated as recently as last June in *United States v. Hansen*, 143 S. Ct. 1932 (2023), that *Salerno* remains good law outside the context of the First Amendment. *Hansen*, 143 S. Ct. at 1939. This court cannot invalidate the Statute on its face without ignoring binding Supreme Court precedent and setting aside the ruling in *Bevis*.

Venue in the Western Division remains improper since none of the relevant events have taken place in the Western Division. Dkt. 68, at 18. In response, Schoenthal submits a new declaration that asserts he intends to use the City of DeKalb's bus system to reach the Elburn Metra station in Kane County, which is where he typically boards Metra. Dkt. 87-1, ¶ 2, Dkt. 66, at ¶ 25.

14

"In general, parties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit." *Richards v. U.S. Steel*, 2015 U.S. Dist. LEXIS 46496, *12 (N.D. Ill. April 9, 2015). Plaintiff's new declaration should be disregarded as it contradicts earlier testimony.

In his deposition, Schoenthal testified that the goal of this lawsuit was to "be able to carry on the public transportation[.]" Dkt. 66, Ex. 27 at 20:13-20. When asked which public transportation he meant, Schoenthal said "The primary form of public transportation I use is the Metra system when I have to go downtown or to Central DuPage." *Id*. at 21:1-3. When asked whether there was any other mode of transportation he planned to take besides Metra, he mentioned Northern Illinois University buses "if he had the need and they're used as a public transportation for the DeKalb area," but at no point did he mention the City of DeKalb bus system. *Id*. at 21:16-32:24. Because Plaintiff's new declaration contradicts his earlier sworn testimony, it cannot be relied upon to satisfy Plaintiffs' obligation to show venue is proper.

## CONCLUSION

For each of the foregoing reasons, Defendant respectfully requests that this Honorable Court grant judgment in their favor and against the Plaintiffs.

Dated April 17, 2024

KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendants*

By s/ *Jessica M. Scheller*

JESSICA M. SCHELLER
Deputy Chief; Civil Actions Bureau
PRATHIMA YEDDANAPUDI,
JONATHON BYRER
SILVIA MERCADO MASTERS
EDWARD M. BRENER
MEGAN HONINGFORD
Assistant State's Attorneys
jessica.scheller@cookcountysao.org

15

**CERTIFICATE OF SERVICE**

  I, Jessica M. Scheller, hereby certify that on April 17, 2024 I caused a true and correct copy of the Defendants' Reply in Support of Motion for Summary Judgment be sent via e-filing to all counsel of record in accordance with the rules regarding the electronic filing and service of documents.

                */s/ Jessica M. Scheller*
                Jessica M. Scheller
                Cook County Assistant State's Attorney
                50 W. Washington, 5th Floor
                Chicago, Illinois 60602
                (312) 603-6934
                Jessica.Scheller@cookcountysao.org