IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, | |
| Plaintiffs, | No. 3:22-CV-50326 |
| v. | Hon. Iain D. Johnston |
| KWAME RAOUL, *et al.*, | |
| Defendants. | |

**SUPPLEMENTAL EXPERT REPORT OF DR. BRENNAN RIVAS**

In compliance with a Court order, this report supplements the original Report I previously submitted for this case. *See* ECF 64-11. I was asked to review certain exhibits, which can be divided into three categories: Exhibits 51-56 (seventeenth-century mandates to bear arms), Exhibits 11, 18-19 (arms aboard ferries or packet-boats), and Exhibits 20-21 (nineteenth-century public carry laws with travelers' exceptions).[1] I carefully read each one and, using the same historical methodology as described in my initial report, ECF 64-11 at 2–3, endeavored to provide contextual information necessary for understanding their significance to the history and tradition of firearm regulation in the United States.

Exhibits 20 and 21, pertaining to nineteenth-century public carry laws with travel exceptions, fall within the scope of regulations I discussed at pp. 21-24 of my initial report. Exhibits 11, 18, and 19 pertaining to armed men aboard ferries and/or packet-boats do not indicate that civilians carried personal weapons aboard ferries or packet-boats. Exhibits 51-56 relating to seventeenth-century arms-carrying mandates should be understood within the context of Indian warfare which inspired their enactment.

These exhibits do not alter the opinions related in my initial report because none of them shed light on the question of whether Colonial- and/or Founding-era Americans carried personal weapons about with them as an everyday matter of course. Instead, they reiterate that men fulfilling certain civic obligations or responsibilities of office at times carried weapons for the defense of the larger community. Illustrating the *obligations* bound up in the right to bear arms, these

---

[1] Each of the exhibits referenced in this Supplemental Report are identified using the exhibit numbers assigned by Plaintiffs in their Historical Appendix, ECF 72. To illustrate, Exhibit 20 refers to ECF 72 at Exhibit 20, Exhibit 22 refers to ECF 72 at Exhibit 22, *etc.*

1

historical sources show colonial militiamen carrying firearms aboard ferries as they signaled an alarm or traveled to muster day; armed crewmen protecting the passengers and cargo aboard packet-boats that traveled great distances through unsettled lands; and/or men and households who would otherwise travel unarmed being required to bring firearms to public gatherings during periods of violent conflict with Indigenous groups. Most of all, these sources show us how different—how characterized by wars and fears of wars—the Colonial and Founding periods were in comparison to life in the modern United States today.

**ANALYSIS**

I. <u>**Documents relating to the travel exception—Exhibits 20 and 21**</u>

Exhibits 20 and 21 pertain to nineteenth-century public carry laws with travel exceptions. These laws do not demonstrate that there was a right to go armed at all times outside the home. Rather, and as I wrote in my initial Report, "[t]he travel exception was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern public transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors." ECF 64-11 at 22–23.

II. <u>**Arms Aboard Watercraft—Exhibits 11, 18-19**</u>

Exhibit 11 is a 1725 law establishing a ferry in South Carolina that, among other things, mandates any operator to transport armed men free of charge during times of emergency. Importantly, this law was enacted during a period when Carolinians were more vulnerable to Indian attack than they had been before. In the decades after ousting the Yamasees in 1717, Carolinians maintained a tense but amicable relationship with the powerful Lower Creek—but an attack upon an outlying plantation was the quintessential indicator of Creek dissatisfaction with Carolinian trade policies.[2] Leaders understood their vulnerability and put security policies in place

---

[2] On the Yamasee War and the relationship between the Lower Creek and Carolina colony *after* that conflict, *see* Alan Gallay, *The Indian Slave Trade: The Rise of the English Empire in the American South, 1670-1717* (New Haven: Yale University Press, 2002), 345-357. For a shorter synthesis, see Chester B. DePratter, "The Yamasee Indians," in *The Yamasee War: 1715-1717* (October 2015), available at:
https://scholarcommons.sc.edu/cgi/viewcontent.cgi?article=1023&context=archmonth_poster.

for raising and carrying alarms that could notify people of a threat. This particular ferry policy, which applied to an isolated crossing, forced operators to subordinate their fare-collection to the good of the larger community during times of emergency; it tells us nothing about how often passengers carried firearms outside such situations or whether doing so was interpreted as a threat.

Exhibit 18 is an excerpt about ferries from an eighteenth-century legal guidebook. It relates to Sections IX and X of a law enacted in 1705 which, among other things, empowered Virginia County Courts (the primary organ of local government) to establish ferry crossings within their jurisdictions that might be necessary for militiamen to physically attend muster days.[3] This is essentially a law stating that the county government *may* arrange and pay for the carriage of armed militiamen across intra-county creeks and streams on muster days. It tells us nothing about how often colonial Virginians carried firearms while riding ferries, or whether doing so was interpreted as a threat.

Exhibit 19 is a newspaper clipping about a packet boat traveling along the Ohio River between Cincinnati and Pittsburgh, describing it as "well armed against any Indian attempt." It refers to shoulder arms and/or (cannons) for the use of the crew in an emergency, not a reliance upon passengers' weapons. The long distance of the trip (over 300 miles) and the nature of packet-boats as cargo transport make it an inapt analogy for intracity or metro-area travel today.

### III. Arms-Bearing Mandates—Exhibits 51-56

Plaintiffs also presented several arms-bearing mandates from the seventeenth century. These kinds of laws were not universally adopted in North American colonies, and they were generally undertaken in response to a particular perceived threat to the community at large. Each of the arms-carrying mandates cited by Plaintiffs was enacted at a time of severe tension with nearby Indigenous groups. In order to understand their context and significance, it is useful to divide them into two groups based on shared geography and history: 1) Exhibits 53, 55, and 52, from Chesapeake colonies Virginia and Maryland, 1623-1642; and 2) Exhibits 51, 54, and 56 from New England colonies Massachusetts Bay, Connecticut, and Rhode Island, 1631-1643.

Colonial Virginia experienced an especially tumultuous relationship with its neighboring Native Americans. One of the well-known periods of conflict was the "starving time" of 1609-1610, but relations did not devolve into "race war" until the 1620s—following a 1622 Powhatan

---

[3] William Waller Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia*, 13 vols. (Philadelphia, 1823), III: 475.

3

surprise attack on the colony that left more than 300 people dead. Shocked by their own vulnerability, Virginians responded with swift vengeance, dropping all efforts at peace for a war posture bent on eliminating the Powhatans. Virginia laws enacted in 1623 (Exhibit 53) and 1631 (Exhibit 55) should be interpreted within this context of a "race war."[4] Relations between English colonists and Native Americans in the Chesapeake remained tense into the 1640s. As colonies across the Atlantic seaboard grew and changed imperial hands, Indigenous groups lost land, jockeyed for position, and tried to adapt themselves to a new economic reality. This continued conflict affected both Virginia and Maryland in the time leading up to the church-specific laws enacted in 1642 (Exhibits 52 and 55). In Maryland, the law came amid attacks on settlements by the Susquehannocks in retaliation for unfavorable trade policies. Leaders turned to Virginians for assistance but were rebuffed by a neighbor embroiled in its own Indian conflicts. The economic controversy surrounding the Susquehannock trade soon mapped over religious divisions within Maryland, and Catholics were violently ousted from control of the colony in the mid-1640s. Virginians experienced tense relationships with Native groups throughout the 1600s as a result of a growing, land-hungry population eager to oust Indigenous people standing in their way.[5]

  Turning to New England, the arms-carry mandates recounted in Exhibits 51, 54, and 56 occurred within the context of colonial conflict with Indigenous neighbors or the precarity of newly established colonial settlements. Exhibit 51 consists of laws enacted in Massachusetts Bay in 1631 and 1636—a period of escalating conflict with the neighboring Pequots that culminated in the Pequot War of 1637. Pequots had already established a productive trade relationship with the Dutch and resented the interference presented by the growing English colony. To make matters worse, Massachusetts Bay had allied with Narragansetts, who were the Pequots' enemies. Even after the Pequot War, New England colonies struggled to maintain peaceful relationships with Native groups. Massachusetts Bay is notorious for its expulsion of dissenters throughout the 1600s, some of whom established neighboring colonies like Connecticut and Rhode Island. A group that departed in 1638 established themselves on Aquidneck Island (named Rhode Island by Roger

---

[4] Bernard Bailyn, *The Barbarous Years: The Conflict of Civilizations, 1600-1675* (New York: Vintage, 2012), 97-111; Edmund S. Morgan, *American Slavery, American Freedom: The Ordeal of Colonial Virginia* (New York: W. W. Norton & Company, 1975), 98-101.
[5] Bailyn, *The Barbarous Years*, 151-154; Debra Ruth Boender, "Our Fires Have Nearly Gone Out: A History of Indian-White Relations on the Colonial Maryland Frontier, 1633-1776," PhD diss., (University of New Mexico, 1988), 146-151.

Williams) at Portsmouth, but disputes among the dissenters quickly spawned a breakaway village in Newport. In these early years, both villages on Aquidneck Island lived in fear of Indian attacks, and both struggled to establish civil order without the social benefits of an authoritative charter or an organized church. Exhibit 54, a law pertaining to Newport enacted in 1639, must be understood in light of these challenges. Leaders of Massachusetts Bay, Connecticut, and Rhode Island continued to find themselves at odds with nearby Native groups. Amid a heightened sense of fear around 1640, they even went so far as to interfere in a dispute between Mohegans and Narragansetts, ultimately approving of the execution of one tribal leader by another in 1643. Exhibit 56, requiring Connecticut households to bring firearms with them to church services and lectures, was enacted in this period of intense anxiety about colonial security.[6]

In each instance, the laws contained in Exhibits 51-56 were enacted during periods of extreme vulnerability to Indian attack. In the words of William Waller Hening, (compiler of the cited Virginia laws), in its early years "the legislature was exclusively occupied in [Church of England matters]…; and in such temporary defensive operations against the Indians as the defenceless state of the colony rendered necessary."[7] Over time, Virginian arms-carrying mandates lessened as the threat of conflict with Native groups decreased—from carrying them at all times to a member of each household carrying one to church. This demonstrates that such laws are not evidence of a general right to bear arms outside the home, but were instead enacted to allow the community to address specific, immediate threats. Moreover, a review of the preceding and succeeding pages within these historical sources (Exhibits 51-56) clearly shows that colonists in those times and locales were intensely focused upon their own preparedness for war in ways that are inapposite to peacetime civilian settings today.

Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing, as well as my previous report dated October 23, 2023, are true and correct.

Executed on June  13 . 2024.   _____
                                Brennan Gardner Rivas

---

[6] Ronald Dale Karr, " 'Why Should You Be So Furious?': The Violence of the Pequot War," *Journal of American History* (December 1998), 876-909; Theodore Dwight Bozeman, "Religious Liberty and the Problem of Order in Early Rhode Island," *The New England Quarterly* 45, no. 1 (March 1972), 44-64; Daragh Grant, "The Treaty of Hartford (1638): Reconsidering Jurisdiction in Southern New England," *The William and Mary Quarterly* 72, no. 3 (July 2015), 461-498.
[7] Hening, *Laws of Virginia*, I: 120.