IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, | |
| Plaintiffs, | No. 3:22-CV-50326 |
| v. | Hon. Iain D. Johnston |
| KWAME RAOUL, *et al.*, | |
| Defendants. | |

### SUPPLEMENTAL EXPERT REPORT OF PROFESSOR JOSHUA SALZMANN

I have been asked to submit a supplemental report on certain documents in Plaintiffs' historical appendix, ECF 72, at Exs. 1–17. Specifically, I have been asked to evaluate the extent to which these documents support claims made by Plaintiffs, including that: "public transportation undoubtedly existed at the Founding," ECF 72 at 15; "public transportation can be traced at least to 16th century England," *id.*; and "[m]any ferries during the Colonial and Founding eras were also publicly owned and operated," *id.* at 16, and that arms were carried on transportation during and prior to the Founding, *id.* at 17. In conducting this analysis, I employed the methodology described in my original Report. *See* ECF 64-1 at 2.

Plaintiffs' documents do not support their assertions that public transportation systems existed before the Twentieth Century, or that arms were generally carried on the systems that did exist at that time. To the contrary, and as I expressed in my initial Report: "Public transportation dates to the first half of the 20th century. Prior to that time, transportation services were provided exclusively by private entities that usually received a charter or license to operate from a state or local government." ECF 64-1 at 3.

### I.  Public transit systems did not exist in America prior to the Twentieth Century.

Plaintiffs wrongly contend that public transit systems existed at and before the Founding. While several of Plaintiffs' exhibits (*e.g.*, ECF 72 Exs. 1–3) support the uncontroversial point that transportation services for hire existed in the Colonial and Revolutionary era, none of these services were public transit systems of the sort that exist today. Indeed, Plaintiffs' own documents show the dramatic changes in technology, organization, and social and economic function that distinguish modern public transit systems from transportation in the past.

The article by Justice Oliver Wendell Holmes Plaintiffs submit (ECF 72 Ex. 4) described how thoroughly the technology of transportation and the social and economic role of transportation have changed. Holmes's observation that changes in transportation technology were tied to fundamental shifts in American society, economy, and culture underscores key points in my Report. First, it underscores why I draw sharp distinctions between four different periods in American transportation history, including the preindustrial era (1600s to 1800), the canal and

1

steamboat era (1800 to 1830s), the industrial railroad city (1840s to 1920s), and the era of the modern automotive city (1920s to present) (ECF 64-1 at 3–4). And it illustrates why I conclude that: "To analogize between these four distinctive periods in U.S. transportation history—especially between contemporary public transportation systems and the private turnpikes, ships, ferries, and stagecoaches of the preindustrial era—would be to ignore the transformative power of these historical forces and deny the economic dynamism of the United States." *Id.*

      A.      **Plaintiffs provide no evidence that transportation was publicly owned and operated prior to the Twentieth Century.**

Plaintiffs maintain "public transportation undoubtedly existed at the Founding," in part because "[m]any ferries during the Colonial and Founding eras were also publicly owned and operated." But their exhibits do not provide any evidence of the existence of publicly-owned and operated stagecoaches, ferries, or ships.

Indeed, evidence of private individuals' central role in establishing and maintaining transit for profit before, during, and after the Founding can be found throughout Plaintiffs' exhibits. For example, in Plaintiffs' Exhibit 4 Justice Holmes described a New York stagecoach line between Albany and New York City established in 1785: "The Proprietors were Isaac Van Wyck, John Kinney and Talmage Hall, tavern-keepers…." ECF 72 at 24. Plaintiffs' exhibits also show that ferry services were also generally provided by private parties, acting with government sanction. In Exhibit 10, a 1792 Virginia law articulated the terms which private individuals designated as "ferry keepers" should operate. ECF 72 at 63–66. In Exhibit 11, Plaintiffs proffer a 1725 South Carolina act empowering commissioners to "agree with any person or persons who shall undertake the looking after of said ferry." ECF 72 at 48–51. In Exhibit 14, a 1730s New York law dictated the rates charged by the "ferry man," a private individual operating for the purposes of earning a profit. ECF 72 at 63–66. Exhibit 12, a 1796 Act For Regulating Ferries, shows the State of Massachusetts offering a license to individuals willing and able to operate a ferry for a profit: "no person or persons whatever shall keep a Ferry within this Commonwealth, so as to demand or receive pay, without a special license…." ECF 72 at 55–57. This law also noted the ferrymen must take responsibility for providing the right type of boat: "all ferrymen…shall keep a good Boat or Boats, in good repair, suitable to the water they are to ferry over…." *Id.* These exhibits show colonial and founding era transit providers were typically private individuals sanctioned by lawmakers to use their labors as well as their stagecoaches and boats to facilitate travel and earn a profit.

Plaintiffs submitted two exhibits that do not expressly state that a private party is to operate the ferry in question. The first document is Exhibit 13, a 1791 Connecticut law which granted the towns of Milford and Stratford "license and authority…to use and keep a ferry" (the "Stratford Ferry") over the Housatonic River. ECF 72 at 59–61. Plaintiffs mistakenly claim this document memorializes the existence of a publicly owned and operated ferry. While Plaintiffs' 1791 Connecticut law granted the towns authority to "keep" the ferry, historical evidence I found shows Milford and Stratford exclusively used private parties to actually establish and operate ferry services. In other words, this ferry was not publicly owned or operated, but was instead operated by private individuals consistent with the practice of that time. A history of the region shows the Stratford Ferry was started by Moses Wheeler in the 1600s, and in 1690, "a committee of the town

was appointed, who leased, 'the Stratford Ferry to Samuel Wheeler [son of Moses Wheeler]…'" for 21 years. "Previous to 1719," "Richard Blackleach had leased and conducted the ferry for some years, and a town committee was appointed to lease it twenty-one years longer." In 1727, the General Assembly granted Milford the "liberty to establish and ferry" on the east side of the river, but "[w]hether the ferry was established or not…is not known…." In 1758, the Assembly called Josiah Curtiss—keeper of the Stratford side of the ferry—to testify about establishing ferry service on the Milford side. By 1761, Peter Hepburn of Milford had taken on ferry operations in Milford and, in that same year, "he petitioned the Assembly 'to keep a house of public entertainment at said ferry….'" The passage concludes: "[i]n this way, the ferry was continued until a little after the year 1800" when the state legislature granted corporate status to the private Milford and Stratford Bridge Company to establish and operate a toll bridge.[1] The history of the Stratford Ferry shows practice of establishing ferry services through a private individual was well-established.

A second document, Exhibit 15, a 1783 Georgia law that empowered a group of commissioners in Augusta to see to the establishment of a ferry, also does not support Plaintiffs' historical theory. The law says the ferry "shall be under the direction of the commissioners…subject to such regulations…established by the legislature." ECF 72 at 68–69. In other words, this law only states the ferry shall be under the "direction" of the commissioners. It does not show the ferry was built and operated by a public agency, nor does it say anything to prevent the commissioners from designating an individual to create and maintain the ferry, which was the typical method of establishing service. The best interpretation of this document is that it authorized the commissioners to see to the establishment of a ferry following the practice of their time—by designating a private individual to establish and operate that ferry.

### B. Plaintiffs fail to recognize that the *role* of transportation in previous eras differs from that of modern public transit systems.

The Colonial and Founding-era ferries and stagecoaches Plaintiffs reference generally served a small number of travelers who lived in a rural, agricultural republic and moved through space slowly, often with animals, freight, letters, and/or business documents. Their exhibits on colonial and founding-era transportation illustrate how ships, ferries, and stagecoaches generally served long-distance travelers and bulk trade. For example:

- Exhibit 17, ECF 72 at 74, contains a historical journal article from 1931 on the North Carolina shipping industry from 1763 to 1789. This article describes the types of ships, "schooners," "sloops," and "brigs," used for the "coasting" trade and for passage to the West Indies and Europe. The article offers detailed discussion of the months-long voyages and the hundreds of tons of cargo carried by each ship. It notes, for example, that "The Hannah, of eighty tons, set sail for…England [from NC], with 606 barrels of tar, 163 casks of turpentine, and 10,164 barrel staves…"
- Several of the exhibits (5, 6, 7, 8, 9, 14, 16) consist of advertisements for stagecoaches and ships, which served long-distance travelers and transported freight. See ECF 72 at 26–35.

---

[1] SAMUEL ORCUTT, A HISTORY OF THE OLD TOWN OF STRATFORD AND THE CITY OF BRIDGEPORT CONNECTICUT 436-437 (1886).

3

> The *Poughkeepsie Journal* advertisement (exhibit 8), for the "Albany" stagecoach line, for instance, described a 24-hour round trip service on which passengers could take 150 lbs. of baggage.

- Exhibit 10, ECF 72 at 38, contains a 1792 Virginia statute showing ferry rates for the crossing of a "man," "a horse," a "hogshead of tobacco," a "head of neat cattle," "goat," and "lamb." Similarly, Exhibit 14, ECF 72 at 63, a 1732 New York statute, contains rates for transporting commodities including: "a barrel of bread," "every dozen of pigeons," and "bale[s] of cotton."

Modern public transit systems largely serve daily *commuters* and short-distance travelers moving within an urban agglomeration who live in a majority urban and suburban nation and move through space much more quickly, more frequently and without carrying animals and freight.

These dramatic differences are reflected in the evolution of language. The "commute" to work did not exist before the 1840s. The word "commute" originally meant "to make less severe." It is, of course, still used in this sense when people speak of a judge "commuting" a sentence. The word "commute" became associated with a daily trip to work, however, starting in the 1840s when railway lines connecting suburbs to large cities began to "commute," or reduce, the fares of the men who rode the train each day. Those men eventually became known as "commuters" in recognition of the new practice of daily travel to work.[2] The commute was a product of the steam engine as well as developments in the 19th century economy which made it more common for people to work far from their homes.

Conversely, the technological and economic conditions that made commuting a possibility starting in the 1840s did not exist in the colonial and founding era. The nation was an agricultural republic and work and home were not necessarily or even often distinctive places. Artisans frequently lived in, or very close to, their shops. Rural Americans (94% of Americans in 1800) frequently lived and worked on farmsteads.[3] Compared to industrial-era America, the colonial and Founding-era had a scant number of factories and few, if any, bureaucratic corporations with middle managers working in offices.[4] In sum, the "commute" required not just the technological means but also the motive—a large population of people who needed to leave their homes every day and go work in an office or factory. Neither the means nor the motive existed in the colonial and founding eras.

II. **Plaintiffs lack evidence that arms were generally carried on transit systems prior to the Twentieth Century.**

The documents Plaintiffs proffer do not support the proposition that firearms were typically carried on the transportation that existed in earlier eras. Rather, the laws and documents Plaintiffs cite demonstrate that certain forms of transport were considered to be security infrastructure, and arms

---

[2] ADRIAN ROOM, DICTIONARY OF CHANGES IN MEANING 65 (1986).
[3] CAMPBELL GIBSON, AMERICAN DEMOGRAPHIC HISTORY CHARTBOOK: 1790 TO 2010 figure 2-2 (2013).
[4] ALFRED CHANDLER, THE VISIBLE HAND: THE MANAGERIAL REVOLUTION IN AMERICAN BUSINESS (1977); RAYMOND A. MOHL AND ROGER BILES, THE MAKING OF URBAN AMERICA 11 (2012).

were carried during specific types of emergencies on those forms of transport by persons under arms responding to those emergencies.

For example, Exhibit 11, ECF 72 at 48, is a 1725 South Carolina statute authorizing guns to be transported on a colonial ferry by publicly-sanctioned security forces. The public security purposes of the law are stated in the preamble where it references the carrying of "alarms," or warnings of attack: "WHEREAS, it is thought necessary, for the better carrying on of alarms…that a ferry should be established…." Article VI then states: "…there shall be, and is hereby established, a scout consisting of seven men and an officer, to scout on the settlements of Ponpon, for the better security of the inhabitants, and to prevent their being surprised by Indians…." The law notes the scout should be "under the command of a field officer, to be nominated by…the Governor…" and that each scout shall be "armed with a gun…" as well as "a large mastiff…" to prevent them from "being surprised by Indians…" The scouts were to be paid: "for the officer, twelve pounds per month, and for each private man, seven pounds ten shillings…" In other words, the security force, the "scout," established in the 1725 South Carolina ferry law comprised paid professionals operating under public sanction. Finally, and in keeping with the focus on public safety, Article V of the law stipulated people engaged in public security service did not have to pay: "And be it further enacted…That all persons under arms in times of alarms and expresses, shall have their ferriage free…."

From these provisions, it is clear that this ferry was considered public safety infrastructure, and that carriage of firearms was tied to the need to respond to emergencies requiring the bearing of arms. This law also illustrates how different the Ponpon River ferry was from public transportation in the contemporary U.S. The ferry was security infrastructure, not a means of getting to and from the office for a mass of commuters, and the people who were authorized to carry guns on the ferry were professionals charged with protecting colonists from Indian attack. If there is an analogy to be drawn here, it is not between the ferry and contemporary public transit, but it is between the "scout" and our contemporary police or military.

Other sources Plaintiffs cite relate to the shipment of arms, not the bearing of arms, on transportation. For example, Exhibit 14, ECF 72 at 63, a 1730s era New York statute, established rates for transporting items. The document contains a nearly two-page list of rates that reflects the agricultural and extractive nature of the colonial economy, including setting a fee of "one penny" for "every gun." The inclusion of "guns" on the list of ferriage rates reflects that they were considered an article of freight. The fact that it noted the cost of "every gun" shows the ferry was a means for shipping more than one gun, and the fact that guns were among a long list of items for transport indicates firearms were considered an article of freight by the authors of that law. Nothing about this document suggests that arms were actually carried by anyone while on board.

Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing, as well as my previous report dated October 21, 2023, are true and correct.

Executed on June 13, 2024.

_____
Joshua Salzmann