### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL *et al.*,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>KWAME RAOUL *et al.*,<br><br>*Defendants*. | NO. 3:22-cv-50326<br><br>HON. IAIN D. JOHNSTON |

### MEMORANDUM OPINION AND ORDER

The Illinois Firearm Concealed Carry Act bans carrying firearms on public transportation, 430 ILCS 66/65(a)(8); to violate the ban is a misdemeanor, 430 ILCS 66/70(e). Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston allege that the ban violates the Second Amendment[1] and bring this action against several defendants with the power to enforce Illinois' criminal code: Attorney General Kwame Raoul,[2] DeKalb County State's Attorney Rick Amato, DuPage County State's Attorney Robert Berlin, Cook County State's Attorney Kimberly Foxx, and Lake County State's Attorney Eric Rinehart. Plaintiffs ask for a declaratory judgment that the ban is unconstitutional and seek to enjoin Defendants from enforcing it against them. Before the Court are three motions for summary judgment—one from

---

[1] As it is incorporated by the Due Process Clause of the Fourteenth Amendment against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

[2] The Court is not so sure that the Illinois Attorney General has the authority to enforce the criminal aspects of the ban, but he doesn't make that argument. So, the Court will assume for purposes of these motions that the Illinois Attorney General can enforce the criminal components of the ban.

Plaintiffs, one from Ms. Foxx,[3] and one from the remaining defendants ("State Defendants"). After an exhaustive review of the parties' filings and the historical record, as required by Supreme Court precedent, the Court finds that Defendants failed to meet their burden to show an American tradition of firearm regulation at the time of the Founding that would allow Illinois to prohibit Plaintiffs—who hold concealed-carry permits—from carrying concealed handguns for self-defense onto the CTA and Metra.[4] For the following reasons, Ms. Foxx's motion is denied, State Defendants' motion is denied, and Plaintiffs' motion is granted in part.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable factfinder could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).

---

[3] Ms. Foxx's briefs included a request for discovery sanctions, which the Court has already addressed. *Schoenthal v. Raoul*, No. 3:22-cv-50326, 2024 U.S. Dist. LEXIS 79497, at *5 (N.D. Ill. May 1, 2024).

[4] Keeping in mind Justice Gorsuch's explanation in his concurrence in *Rahimi*, this Court's ruling is specific to the facts presented. *See United States v. Rahimi*, 144 S. Ct. 1889, 1909-10 (2024) (Gorsuch, J., concurring). "Trump-appointed judge allows firearms on Illinois public transit" is a likely chyron for this decision. That's unfortunate. Federal judges—including those who will review this decision—engage in exacting, thoughtful, and careful analyses that are not results oriented or reducible to headlines and chyrons. We're doing the best we can.

2

Local Rule 56.1 statements of fact serve a valuable purpose in this process: they help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Each fact must be supported by evidentiary material. LR 56.1(d)(2); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.").[5] Legal arguments aren't permitted in factual allegations or responses, and responses "may not set forth any new facts." LR 56.1(d)(4), (e)(2).[6] "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004).

---

[5] In arguing that portions of Plaintiffs' LR 56.1 statement should be disregarded, Ms. Foxx contends that Plaintiffs' "self-serving" affidavits are improper. However, a "self-serving" affidavit should not be excluded just because it is self-serving. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). Nearly all litigants' statements are self-serving. And if a court could not consider self-serving affidavits during summary judgment, then no summary judgment motion could ever be granted, including Ms. Foxx's. The Court may ignore testimony from such affidavits if it contradicts previous sworn testimony from the declarant (also known as a "sham affidavit"), *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020), or if there are other evidentiary concerns, *see Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017), but the Court doesn't automatically strike any statement of fact that relies on a "self-serving" affidavit.

[6] Plaintiffs improperly open their response to Defendants' statement of facts with an argument for why they reserve analysis of the relevance and importance of asserted facts for their brief. Such an explanation is gratuitous—that is how the LR 56.1 statements are *supposed* to work. The lengthy responses where they reiterate the legal arguments in their brief, *e.g.*, Dkt. 88 at 10 ¶ 65, 16 ¶ 88, 19 ¶ 96, violate LR 56.1.

## BACKGROUND

In Illinois, openly carrying firearms is unlawful. 720 ILCS 5/24-1. Under the Firearm Concealed Carry Act, an individual with a concealed-carry license may generally carry a concealed handgun in public. 430 ILCS 66/10. This general permission, however, does not extend to a list of prohibited areas, including public transportation. Plaintiffs challenge this provision. The relevant part of the statute reads as follows:

(a) A licensee under this Act shall not knowingly carry a firearm on or into:

. . .

(8) Any bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds.

430 ILCS 66/65(a).

Plaintiffs are licensed under Illinois law to carry a concealed handgun. Dkt. 71 ¶¶ 9, 17, 25, 33. They don't use public transportation as much as they would like because of the statute's threat of criminal prosecution for carrying a concealed firearm on public transportation. *Id.* ¶¶ 12-13, 20-21, 27, 38-39; Dkt. 66 ¶ 22. There are two specific transit systems that Plaintiffs declare they would use—the Chicago Transit Authority (CTA), which operates approximately 140 bus routes and 242 miles of rapid transit railroad track in the Chicago region, and the Metra commuter rail agency, which operates eleven lines serving the six-county Chicago region. Dkt. 64 ¶¶ 2-3; Dkt. 64-2 ¶ 7; Dkt. 64-3 ¶ 7; Dkt. 64-4 ¶ 11; Dkt. 64-5 ¶¶ 8-9.

Mr. Schoenthal, who resides in DeKalb County, Illinois, uses public transportation for both personal and work purposes—he currently uses Metra to travel to

Northwestern Medicine Delnor Hospital, DuPage County, and downtown Chicago. Dkt. 64 ¶ 6; Dkt. 66-27 at 20:10-20; Dkt. 71 ¶¶ 7, 11; Dkt. 88 at 5 ¶ 24. Mr. Wroblewski resides in DuPage County, specifically Woodridge, Illinois. Dkt. 64 ¶ 7; Dkt. 66 ¶ 33; Dkt. 71 ¶ 15. He uses Metra to visit Chicago. Dkt. 66 ¶ 37; Dkt. 71 ¶ 19. Mr. Vesel lives in La Grange, Illinois, located in Cook County. Dkt. 64 ¶ 8; Dkt. 66 ¶¶ 43-44; Dkt. 71 ¶ 23. He hasn't taken public transportation for at least two years despite living less than half a mile from a Metra stop, but he wishes to take the CTA and Metra more frequently. Dkt. 64-4 ¶¶ 8, 11; Dkt. 66 ¶¶ 45, 48, 50; Dkt. 71 ¶¶ 27-28. Mr. Winston lives in Waukegan, in Lake County, Illinois. Dkt. 64 ¶ 9; Dkt. 66 ¶¶ 51-52; Dkt. 71 ¶ 31. Mr. Winston asserts that he has taken Metra (from the Ogilvie station) to travel to St. Louis.[7] Other than this asserted trip, he rarely takes public transit but wishes to do so more often by taking the CTA and Metra to visit Evanston and Chicago. Dkt. 64-5 ¶¶ 8-9; Dkt. 66 ¶¶ 55-56; Dkt. 71 ¶ 38. All four plaintiffs would carry a handgun on public transportation if not for the Firearm Concealed Carry Act's ban. Dkt. 71 ¶¶ 12-13, 20-21, 27, 38-39.

## DISCUSSION

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court laid out the framework to be applied in analyzing regulations that restrict the bearing of arms. *Atkinson v. Garland*, 70 F.4th 1018, 1019-20 (7th Cir. 2023). Rejecting the two-step means-end approach that courts had employed after *District of Columbia v.*

---

[7] The Court notes that this assertion doesn't make much sense as Amtrak, which travels to St. Louis, leaves Union Station, not Ogilvie, and Metra sure doesn't travel to St. Louis.

*Heller*, 554 U.S. 570 (2008), the Court introduced a new and fundamentally different two-step test, holding that

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 144 S. Ct. at 1898 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").[8] Although the test is grounded in history, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. When analyzing "modern regulations that were unimaginable at the founding," the government has the burden to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30; *see also Rahimi*, 144 S. Ct. at 1897-98.

---

[8] The motions before the Court were briefed before *Rahimi* was decided. However, *Rahimi* had little, if any, impact on the issues in this case. Reiterating that analogical reasoning is appropriate under *Bruen*, *Rahimi*'s "clarification" of how *Bruen* operates was akin to an *Allen* charge. *See Rahimi*, 144 S. Ct. at 1897-98 ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber."). It did not suggest the availability of any new arguments that could not have been made on the basis of *Bruen* alone.

At the outset, the Court notes that cross motions for summary judgment provided a confusing procedural posture (to put it lightly). The summary judgment standard is a different beast from assessing the substantive merits. *Cf. DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 3:12-cv-50324, 2024 U.S. Dist. LEXIS 99866, at *39-43 (describing six reasons why "equating the probable merits inquiry with the summary judgment inquiry" is "an uncomfortable fit"). With just one summary judgment motion, the Court construes the evidence in favor of the nonmovant. *Liberty Lobby*, 477 U.S. at 255. With cross motions, the Court must also switch back and forth between hats as it sifts through the facts presented before it. In this case, that is then exacerbated by the burden shifting imposed by *Bruen*.[9]

The main feature of this action is the as-applied claim under *Bruen*. But, like a movie theater with the inevitable slew of trailers preceding the feature film, the Court must first address several other issues raised by the parties.

## I. Preliminary Matters

Before addressing the merits, the Court addresses two threshold issues—venue and standing. *See Spuhler v. State Collection Serv.*, 983 F.3d 282, 284 (7th Cir. 2020); *In re LimitNone, LLC*, 551 F.3d 572, 577-78 (7th Cir. 2008).

---

[9] In retrospect, entering a prompt trial date and holding a bench trial on the merits would have been a more satisfactory procedure. Alternatively, the Court could have cajoled the parties to have a "trial on the papers." *Cf. Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003); *see generally* Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, Fed. Law., Aug. 1999, at 30. That would have also been a better approach compared to summary judgment, though it would lack the benefit of a public trial on an important issue.

## A. Venue

In her summary judgment filings, Ms. Foxx challenges venue for the first time. But she failed to contest venue earlier, so the challenge is waived. Fed. R. Civ. P. 12(h).

## B. Standing

Next, the parties dispute whether Plaintiffs have standing. "To establish 'the irreducible constitutional minimum of standing,' the plaintiff must have suffered an injury in fact traceable to the defendant and capable of being redressed through a favorable judicial ruling." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff may bring a pre-enforcement challenge instead of breaking a law to challenge its legitimacy "so long as the threatened enforcement is 'sufficiently imminent.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). This requires the plaintiff to establish "both 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and 'a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

The undisputed facts show that each plaintiff would carry a concealed handgun on public transportation for the purpose of self-defense if not for the Firearm Concealed Carry Act's ban and its threat of arrest and prosecution. Dkt. 71 ¶¶ 12-13, 20-21, 27, 38-39. That proposed course of conduct is "arguably affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbit*, 442 U.S. at 298)—indeed, as discussed later, it falls within the ambit of the Second Amendment's

8

right to armed self-defense. The conduct is also proscribed by the ban, as Plaintiffs assert they are concealed-carry licensees who will ride Metra and CTA, which receive public funding. *See* 70 ILCS 3615/1.03, 2.01(a). And finally, "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159; *Ezell v. City of Chicago*, 651 F.3d 684, 695-96 (7th Cir. 2011) ("The very 'existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as "injury" for the purpose of standing.'" (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010))). Defendants neither argue that the ban wouldn't reach Plaintiffs' proposed course of conduct nor disavow an intention to prosecute Plaintiffs under the ban. That satisfies the injury requirement for this pre-enforcement challenge.

However, each plaintiff's injury is limited to the specific proposed course of conduct in the record. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). The record shows that all four plaintiffs wish to carry concealed firearms aboard Metra trains, and that only Mr. Vesel and Mr. Winston wish to do so on CTA buses. Dkt. 64-2 ¶ 7; Dkt. 64-3 ¶ 7; Dkt. 64-4 ¶ 11; Dkt. 64-5 ¶ 8. Plaintiffs' injuries are also limited by where they intend to take public transit. Mr. Schoenthal takes Metra from the Elburn station (in Kane County) to Delnor Hospital (also in Kane County), "central DuPage," and Chicago (in Cook County), and he swears he would take public transit more often, absent the Firearm Concealed Carry

Act's prohibition. Dkt. 66 ¶ 24; Dkt. 88 at 5 ¶ 24.[10] The evidence for Mr. Wroblewski involves proposed trips to only Chicago. Dkt. 64-3 ¶ 7; Dkt. 66 ¶ 37. Mr. Vesel swears he would take trips to Chicago and Rosemont (also in Cook County). Dkt. 64-4 ¶¶ 9, 11. And Mr. Winston's testimony similarly includes locations in only Cook County— Chicago, Evanston, and the Ogilvie Metra station. Dkt. 64-5 ¶¶ 8-9.[11]

State Defendants challenge Plaintiffs' standing on the basis that Plaintiffs have failed to show an injury with respect to buildings, real property, and parking areas. But Plaintiffs all say they would take Metra more often if they could carry their hand-guns onto the train, and boarding a Metra train requires stepping foot on Metra's real property. *Cf. Nw. Mem'l Found. v. Johnson*, 490 N.E.2d 161, 164 (Ill. App. Ct. 1986) ("[T]his court takes judicial notice of the fact that the hospital complex is located in a densely populated urban area which necessitates the need for adequate employee parking."). So, they have standing with respect to Metra's real property, at least as far as needed to board a Metra train.

As for causation, Defendants, as the attorney general of Illinois and the state's attorneys of the Illinois counties relevant to Plaintiffs, enforce the statute. Dkt. 71

---

[10] Mr. Schoenthal's supplemental declaration indicates that he would like to use the DeKalb bus system to reach the Elburn Metra station. Dkt. 87-1 ¶ 2. There are two issues. First, this fact is presented without a citation to the statements of fact. *See* LR 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."). Second, this is an example of actual self-serving testimony that need not be accepted as true. *See James*, 959 F.3d at 316 ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."). As Ms. Foxx points out, during deposition, Mr. Schoenthal made no mention of the DeKalb bus system when naming all the forms of public transportation that he wanted to use. *See* Dkt. 66-27 at 20:10-28:17.

[11] Mr. Winston's use of public transit in St. Louis, Missouri, is irrelevant to this case.

¶¶ 1-6. But whether Plaintiffs' injuries can be traced to a particular defendant depends on where Plaintiffs use public transportation, based on the facts in the record. So for Mr. Schoenthal, his injuries can only be traced to Ms. Foxx (Cook County), Mr. Berlin (DuPage County), and Mr. Raoul.[12] And for Mr. Wroblewski, Mr. Vesel, and Mr. Winston—who specify only that they would take trips to locations in Cook County (Chicago, Evanston, Rosemont), but say nothing about their proposed points of departure—their injuries can be traced to only Ms. Foxx and Mr. Raoul. No plaintiff has standing against Mr. Amato (DeKalb County) or Mr. Rinehart (Lake County) absent evidence that a plaintiff would go to a Metra station located in Lake County. (There are no Metra stations in DeKalb County.)

Plaintiffs seek an injunction of the ban or a declaration that the ban is unconstitutional—either of which would redress Plaintiffs' injuries. But Ms. Foxx argues that this isn't enough because the public transit that Plaintiffs use have separate policies banning firearms. Plaintiffs' injuries to be redressed, however, aren't just that they can't carry their handguns on public transportation; after all, for a pre-enforcement challenge, there has to be a "credible threat of prosecution." *Babbitt*, 422 U.S. at 298. Plaintiffs' injuries trace back to the threat of enforcement from some of the defendants, so either an injunction or a declaration would redress that injury, regardless of potential injuries inflicted by nonparties. So, Plaintiffs have satisfied the redressability requirement of standing. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017) (finding that the

---

[12] Although Mr. Schoenthal rides Metra in Kane County (Elburn station, Delnor Hospital), Plaintiffs did not name the Kane County state's attorney as a defendant.

plaintiffs met the redressability requirement even though nonparty law enforcement officials, such as transit police, could also enforce the statute being challenged).

## II. *Bruen*-Avoidance Arguments

Not immediately conceding *Bruen*'s relevance, Ms. Foxx tries to borrow principles from other areas of law to defend the Firearm Concealed Carry Act's ban. Both her arguments fail.

### A. Government as a proprietor

Ms. Foxx first asserts that a "background principle[]" of constitutional law exempts the Firearm Concealed Carry Act's ban from the "strictures of the Second Amendment" and obviates the need to undertake the historical analysis called for by *Bruen*. Dkt. 68 at 3. Her argument—which is breathtaking, jawdropping, and eyepopping—is this: the ban applies only to property "funded in whole or in part" by Illinois, so Illinois has a proprietary interest in what it regulates. Because governments, like private property owners, enjoy "an absolute right to exclude others" from their property, Illinois may exclude whomever it wishes. *Id.* at 3-4. On her view, when the government regulates its own property, that regulation is exempt from the coverage of the Second Amendment, or any other constitutional guarantee of individual rights.[13]

---

[13] She says that this logic extends to Illinois' "proprietor[ship] of government funds." Dkt. 68 at 5. If her contention is that by partially funding some property the government thereby acquires a plenary authority over it, that argument obviously fails. As discussed below, not even property fully owned by the public affords to government the sweeping powers over it claimed by Ms. Foxx; a fortiori the argument fails with respect to property partially owned or funded by the public.

To the extent she maintains that the government's disbursement of funds allows it to lay down rules governing the conduct of third parties who use what it funds in something other than its sovereign capacity, that argument likewise fails. In support of this argument, she draws on cases about Congress' ability to "fix the terms" on which public money is disbursed

(More on this later, but under Ms. Foxx's argument, demonstrators could be barred from the Daley Center Plaza, despite it being a quintessential public forum. *Pindak v. Dart*, 125 F. Supp. 2d 720, 746 (N.D. Ill. 2015); *Grutzmacher v. Pub. Bldg. Comm'n of Chi.*, 700 F. Supp. 1497, 1502 (N.D. Ill. 1988).)

Although the right to exclude—including the right to exclude those bearing arms—may be a fundamental aspect of private property ownership, likely undiminished by the Second Amendment*, see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012), it doesn't necessarily follow that when a *government* like Illinois (through its transit agencies) act as a proprietor, the ban on arms bearing doesn't implicate Plaintiffs' rights under the Second Amendment. The constitutional protection afforded to other

---

under the Spending Clause. *E.g., Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent . . . . For that reason, the legitimacy of Congress' power to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on whether the recipient voluntarily and knowingly accepts the terms of that contract." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (cleaned up). Thus, if Spending Clause jurisprudence is at all instructive here, it forecloses Ms. Foxx's argument: a contract between Illinois and those who receive its funds cannot govern the conduct of nonconsenting nonparties like Plaintiffs.

individual rights isn't nullified on public property; Ms. Foxx's proffered authority says nothing to the contrary.[14] She first cites several[15] First Amendment cases:

- *Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007)—which held that a public university's prohibition against uninvited visitors using its library lawn to speak was consistent with the First Amendment—for its assertion that "[p]ublic property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests." *Id.* at 470.

- *Adderley v. Florida*, 385 U.S. 39 (1966)[16]—which held that the trespass convictions of protestors who blocked the entrance of a county jail did not violate the First Amendment in the absence of any evidence that the sheriff had a discriminatory, viewpoint-based purpose in invoking and enforcing the law—for its assertion that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 47.

- *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992)—which held that a ban on solicitation in a government-owned airport terminal (a nonpublic forum) did not violate the First Amendment—for the proposition that actions taken by the government as a proprietor are reviewed only for reasonableness. *Id.* at 679.

Ms. Foxx's position—that government's powers over public property are equivalent to those of private owners of property—is untenable, and was rejected by the

---

[14] Her argument is an impressive bricolage, cobbling together broad statements of principle drawn from disparate areas of law. Of course, however, what is said in judicial opinions "must 'be taken in connection with the case in which those expressions are used,' *Cohens v. Virginia*, [19 U.S. (6 Wheat.)] 264, 399 (1821), and may not be 'stretch[ed] . . . beyond their context,' *Brown v. Davenport*, 596 U.S. 118, 141 (2022)." *Rahimi*, 144 S. Ct. at 1910 (Gorsuch, J., concurring) (second alteration in original).

[15] Ms. Foxx also cites *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972), for its assertion that property does not "lose its private character merely because the public is generally invited to use it for designated purposes." Dkt. 68 at 4. But that case dealt with an alleged First Amendment right to distribute handbills in a private shopping mall against the wishes of the mall's owner. It is clear from its context that the quoted language refers only to private property, so it isn't relevant to her argument.

[16] The brief mistakenly asserts that the quote comes from *Greer v. Spock*, 424 U.S. 828, 836 (1976), rather than *Adderley*. In fairness, *Greer* also cites the same sentence from *Adderley* at the pincite given.

Supreme Court long ago.[17] The cited cases don't treat government ownership of property as a trump to the protection ordinarily due to an individual right. Although the government sometimes has greater power to regulate public property compared to elsewhere, otherwise protected conduct doesn't become categorically unprotected. If, as Ms. Foxx suggests, all speech on government property were exempt from First Amendment protection, the elaborate First Amendment doctrines of public forums and governmental motivations (and the different degrees of scrutiny applicable to each) would be utterly superfluous.

Ms. Foxx's other citations are equally unavailing. *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008)—which held that a public employee could not raise an equal protection claim for arbitrary treatment when not based on membership in any particular class—asserts that the Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.' *Id.* at 598 (quoting *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy,* 367 U.S. 886, 896 (1961)). In context, this refers only to the government's greater powers as an employer. But even if construed to refer to all proprietorship, it doesn't suggest that constitutional

---

[17] *Compare, e.g., Commonwealth v. Davis*, 39 N.E. 113, 113 (Mass. 1895) (Holmes, J., majority opinion) ("For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house."), *with Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515-16 (1939) ("The privilege of a citizen of the United States to use the [public] streets and parks for communication of views on national questions may be regulated in the interest of all; . . . but it must not, in the guise of regulation, be abridged or denied").

protections cease to be effective on public property. *Reeves, Inc. v. Stake*, 447 U.S. 429 (1980)—a case that applied the "market participant" exception to the Dormant Commerce Clause in allowing a state-owned enterprise to discriminate in favor of its own citizens—is inapposite. That a state-owned enterprise is exempt from limitations imposed by one part of the Constitution concerned with federalism says nothing about whether it is bound to respect individual rights.

Finally, and decisively, whatever is true elsewhere in the law, Ms. Foxx's proposed framework contradicts *Bruen*, which rejects the relevance of place to the threshold question of whether certain conduct is covered by the Second Amendment. *See Bruen,* 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."); *see also Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1201-02 (6th Cir. 2024) (Kethledge, J., dissenting) ("Thus—as described by the Court—the Second Amendment guarantees (1) to law-abiding citizens (2) a right to keep and bear arms (3) in common usage (4) for purposes of 'confrontation' (or 'self-defense')."). If the fact of government ownership is relevant to the constitutionality of the Firearm Concealed Carry Act's ban, it can only enter the calculus at *Bruen*'s second step.

*   *   *

Perhaps recognizing the futility of the first argument, Ms. Foxx purports to clarify (but in fact seems to change) her position in her reply brief.[18] She relies on the

---

[18] Waiting until the reply brief is reason enough to reject the argument. *See James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998). Because this is ostensibly part of the same argument Ms. Foxx presented in her opening brief, however, the Court still addresses it.

ambiguity of the word *proprietor*. Rather than founding the argument for rational basis review on the government's ownership of property simply, the reply brief stakes Ms. Foxx's case on the latitude afforded to the government when it acts as a "market participant"—that is, a proprietor in the sense of running an enterprise.

She disavows the notion, propounded by her opening brief, that "the government as proprietor argument" makes all "government-owned or controlled property 'exempt' from the Second Amendment." Dkt. 95 at 6; *compare id. with* Dkt. 68 at 3-4 ("One of the cornerstone principles of American law is that the owner or proprietor of private property has an absolute right to exclude others from that property. . . . That principle applies with equal force to the government . . . ."). Now, she says, only when the government is "acting as a market participant" and managing its internal operations does lesser scrutiny kick in. Thus, she no longer relies on a putative categorical exception from the Second Amendment's ambit, but an exception from *Bruen*'s framework of scrutiny within the Second Amendment's scope.

Although this is a slightly better argument than the last, it too must be rejected. The argument falters at its major premise: that the lax standard of review employed when the government exercises "managerial" authority[19]—for instance, in regulating nonpublic forums, making employment decisions, or prohibiting certain kinds of employee speech—applies in the Second Amendment context.

---

[19] *See* Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. Rev. 1713, 1782 (1987).

In the wake of *Heller*, it is true, the scope of government's managerial power over the Second Amendment was unclear.[20] And though the Supreme Court has not yet explicitly addressed the issue, *Bruen* decisively rejected the means-end scrutiny characteristic of other areas of constitutional law, describing the Second Amendment as itself the product of a considered balancing "struck by the traditions of the American people" that "elevates above all other interests the right of law-abiding, responsible citizens" to use arms for self-defense. *Id.* at 26 (quoting *Heller*, 554 U.S. at 635). This is fatal to Ms. Foxx's argument. The justification of the lenient treatment afforded to exercises of managerial power is precisely that kind of interest balancing—namely, a concern for the government's interest in efficiently carrying out its mission. *See, e.g.*, *Engquist*, 553 U.S. at 598-600; *Lee*, 505 U.S. at 682-83; *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303-04 (1974).

*Bruen* maintains that freestanding policy considerations, no matter how weighty, cannot be invoked to defeat the right protected by the Second Amendment, strictly insisting that all the relevant interest balancing was done at the Second Amendment's ratification. 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). The right to bear arms may be regulated *only* in the name of an interest that finds at least analogical

---

[20] *See, e.g.,* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1533 (2009) ("Courts need to work out a government-as-proprietor doctrine for the right to bear arms much as they have done for the freedom of speech."). And some courts found that the fact of property ownership did afford the government greater regulatory power. *E.g.*, *Bonidy v. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) (holding that government buildings were categorically exempt from Second Amendment scrutiny, and in the alternative, that the government's proprietary interest in a post office weighed heavily in favor of a ban on carrying guns there in upholding it under intermediate scrutiny).

support in the American tradition. *See Rahimi*, 144 S. Ct. at 1898 (describing how *Bruen* requires that regulations be "consistent with the principles that underpin our regulatory tradition" so that the "balance struck by the founding generation" is faithfully applied to "modern circumstances").[21] It would turn *Bruen* on its head to default to rational basis review when the government asserts an interest that it isn't required to demonstrate was part of the historical tradition of firearm regulation. Nearly[22] every district court to be confronted with similar arguments has rejected them.[23] This Court likewise rejects them.

---

[21] Whether this should be conceived of as a finding (1) that the conduct at issue was not part of the right to begin with, or (2) that the right was traditionally defeasible in the face of the asserted interest, is ultimately inconsequential here; either way, the only way to justify a regulation of conduct that falls *prima facie* within the Second Amendment is to point to an analogous interest embodied in the regulatory tradition.

[22] One district court refused to enjoin a ban on bearing arms in "mass transit facilities and in vehicles owned by the State [of Maryland]" on the ground that it constituted a permissible sensitive-place restriction, while leaving open the possibility that the regulation might also be justified by Maryland's status as a "market participant." *Kipke v. Moore*, 695 F. Supp. 3d 638, 655-56 (D. Md. 2023) (denying a motion for preliminary injunction); *Kipke v. Moore*, Nos. GLR-23-1293, GLR-23-1295, 2024 U.S. Dist. LEXIS 137003, at *15-16 (D. Md. Aug. 2, 2024) (adopting the analysis for denying a preliminary injunction to grant summary judgment). For this latter possibility, it relied on *Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993)—which held that a state's market activity was not preempted by the National Labor Relations Act as its regulatory activity in the same area would be—and its assertion that a State may "manage its own property when it pursues its purely proprietary interests . . . where analogous private conduct would be permitted." *Id.* at 231-32. Read in context, however, the court is not announcing a general principle, but only describing its statutory holding under the NLRA: that only state regulation, and not "proprietary conduct" lawful for an equivalent private party, was preempted by that federal statute. *Id.* at 232. So, *Building & Construction Trades Council* provides little support for a general market-participant exception to the recognition of individual rights.

[23] *Koons v. Platkin*, 673 F. Supp. 3d 515, 601 (D.N.J. 2023), *appeal docketed*, No. 23-2043 (3d Cir. Jan. 9, 2024) ("[T]he State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property."); *id.* at 605 n.33 (rejecting the state's "market participant" theory); *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1062 (D. Haw. 2023), *appeal docketed*, No. 23-16164 (9th Cir. June 21, 2024) ("Whether the government acted as a proprietor may have been relevant when assessing Second

### B.    First Amendment intermediate scrutiny

Ms. Foxx also relies on *Heller*'s statement that the Second Amendment can protect modern forms of arms in the same way that the First Amendment protects modern forms of communication. *Heller*, 554 U.S. at 582. She cites examples of intermediate scrutiny applied to content-neutral "time, place, or manner" restrictions. Take, for example, Ms. Foxx's reliance on *Anderson v. Milwaukee County*, 433 F.3d 975 (7th Cir. 2006), in which the court found that the government's interest in protecting bus passengers (a captive audience) allowed it to restrict otherwise protected speech. 433 F.3d at 980. But the intermediate scrutiny standard applied to content-neutral "time, place, or manner" restrictions is what *Bruen* unambiguously rejected. *See Bruen*, 597 U.S. at 22-24 ("Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt."). Ms. Foxx's attempt to apply intermediate scrutiny by treating the Firearm Concealed Carry Act's ban as a "time, place, or manner" restriction cannot succeed.

---

Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the *Bruen* analysis."); *United States v. Ayala*, __ F. Supp. 3d __, No. 8:22-cr-369-KKM-AAS, 2024 U.S. Dist. LEXIS 7326, at *41-43 (M.D. Fla. Jan. 12, 2024), *appeal docketed*, No. 24-10462 (11th Cir. May 7, 2024) ("The United States must point to a historical tradition justifying any claimed power to regulate conduct protected by the Second Amendment's plain text, even as a proprietor."); *May v. Bonta*, __ F. Supp. 3d __, Nos. SACV 23-01696-CJC (ADSx), SACV 23-01798-CJC (ADSx), 2023 WL 8946212, at *17 (C.D. Cal. Dec. 20, 2023), *appeal argued*, No. 23-4356 (9th Cir. Apr. 11, 2024).

### III.    The Main Event (*Bruen* Analysis)

#### A.    A disclaimer about "historical evidence"

There's one more matter to address before reaching the substantive *Bruen* analysis. *Bruen* exemplifies the phrase "easier said than done." It certainly left open a plethora of procedural questions about how to conduct the historical inquiry. *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 359-60 (5th Cir. 2023), *vacated*, __ S. Ct. __, No. 23-376, 2024 U.S. LEXIS 2910 (July 2, 2024) (Higginson, J., concurring) ("More foundationally, courts are laboring to give meaning to the *Bruen* requirement of 'historical inquiry.'"); *Rahimi*, 144 S. Ct. at 1927 & n.1 (Jackson, J., concurring) (collecting cases). The Supreme Court has acknowledged the potential difficulty but provided little guidance: "To be sure, '[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Bruen*, 597 U.S. at 25 (alteration in original) (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)). And multiple courts have expressed frustration at the process. *See, e.g.*, *Worth v. Harrington*, 666 F. Supp. 3d 902, 917 (D. Minn. 2023), *aff'd sub nom. Worth v. Jacobson*, 108 F.4th 677, (8th Cir. 2024); *United States v. Hill*, No. 3:23cr114, 2023 U.S. Dist. LEXIS 211689, at *28-41 (E.D. Va. Nov. 28, 2023), *appeal docketed*, No. 24-4194 (4th Cir. Apr. 8, 2024); *see also Vidal v. Elster*, 602 U.S. 286, 328 (2024) (Sotomayor, J., concurring) ("One need only read a handful of lower court decisions applying *Bruen* to appreciate the confusion this Court has caused."). Several data points support the notion that *Bruen*'s analysis can be complicated. Here are just a few: (1) four justices thought it was important to author concurring opinions in *Rahimi*, with a fifth justice

21

joining one of those concurrences; (2) Justice Thomas—the author of *Bruen*—dissented in *Rahimi*; and (3) eight justices reversed the Fifth Circuit's unanimous decision and had "no trouble," *Rahimi*, 144 S. Ct. at 1902, reaching the opposite conclusion of the judges on the Fifth Circuit under the same framework.

This case highlights one such question in the mix. The parties' disputes over how to proffer and use historical evidence exhibit the confusion occasioned by *Bruen*. Much ink has been spilled about the nature of the evidence the Court can consider in conducting the historical analysis required under *Bruen*, including what is an adjudicative fact and what is a legislative fact. The Court has spent a considerable amount of time considering the parties' arguments. In its discretion, this order is based upon what evidence the Court believes was properly proffered.

The Court has discretion in determining whether a party has failed to comply with Local Rule 56.1, but it must consider whether the party's submission has adequately complied with the purpose and intent of the rule or has impeded the rule's effectiveness. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see also Ammons*, 368 F.3d at 817. In this case, because of the lack of clear guidance as to how to treat the historical evidence required by *Bruen*'s framework, the Court doesn't believe that Plaintiffs' noncompliance was an attempt to deceive Defendants or otherwise gain an unfair advantage. They didn't completely ignore Local Rule 56.1; Plaintiffs compiled a statement of facts related to each individual plaintiff's personal experience. Defendants have also responded to the historical matter presented by Plaintiffs directly in their briefs, so Plaintiffs' noncompliance doesn't appear to have

substantially changed Defendants' arguments. And as stated previously, the Court prefers to decide things based on evidence. *Schoenthal*, 2024 U.S. Dist. LEXIS 79497, at \*5.[24]

Having said all that, this Court will adhere to Justice Kavanaugh's direction in his concurrence in *Rahimi. See Rahimi*, 144 S. Ct. at 1923-24 (Kavanaugh, J., concurring). This Court will quit its bellyaching and get on with it.

### B.   Plain text of the Second Amendment

The first step under *Bruen* is to determine whether the Second Amendment's "plain text"[25] covers the regulated conduct. *Bruen*, 597 U.S. at 17. Embedded within this step is first defining Plaintiffs' proposed course of conduct.

---

[24] The Court acknowledges that, even in considering the "full" record before it, historical inquiries reliant on party presentation (not to mention potentially evolving views of history) may lead to inconsistent results. Justice Scalia's discussion of a pitfall in analyzing legislative history rings true here:

But not the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history. And the present case nicely proves that point.

Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends. If I may pursue that metaphor: The legislative history of [the statute at issue] contains a variety of diverse personages, a selected few of whom—its "friends"—the Court has introduced to us in support of its result. But there are many other faces in the crowd, most of which, I think, are set against today's result.

*Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring); *see also Vidal*, 602 U.S. at 327-28 (Sotomayor, J., concurring) (applying the comparison to "history-and-tradition inquir[ies]").

[25] The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

### 1. Proposed course of conduct

Plaintiffs' proposed course of conduct, which Defendants don't dispute, is the licensed concealed carrying of handguns for self-defense on public transportation and associated facilities. *See* Dkt. 71 ¶¶ 12-13, 20-21, 39.

Note that this proposed conduct necessitates treating Plaintiffs' challenge to the Firearm Concealed Carry Act's ban as an as-applied challenge, as they have not argued that *any* person who "knowingly carr[ies] a firearm" onto public transit (or associated real property), 430 ILCS 66/65(a), is presumptively protected by the plain text of the Second Amendment. For example, the Firearm Concealed Carry Act doesn't consider one's purpose in carrying a handgun on public transit, and so its prohibition on carrying a handgun for purposes other than lawful self-defense would not implicate the Second Amendment.[26] Because Plaintiffs have framed their

---

[26] And with even one constitutional application, a facial challenge to the statute fails. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs argue that *Salerno* doesn't apply to this case. But the Supreme Court recently reiterated the applicability of *Salerno* to a facial challenge under the Second Amendment. *Rahimi*, 144 S. Ct. at 1898 ("This is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" (quoting *Salerno*, 481 U.S. at 745)).

Ms. Foxx also argues that Plaintiffs' facial challenge must fail because the Seventh Circuit, in *Bevis v. City of Naperville*, held that there is no Second Amendment protection for "weapons that may be reserved for military use." 85 F.4th 1175, 1194 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). Plaintiffs point out that they wish to carry only handguns on public transit, but that misses the point of a facial challenge. Plaintiffs also respond that "the statute indisputabl[y] refers generally to 'firearms,' not specifically to the category of arms *Bevis* held are unprotected." Dkt. 87 at 12. This argument, as it is articulated by Plaintiffs, doesn't contend that "firearms" *excludes* military weapons. Nor does their reliance on *Heller*'s silence help; *Heller*'s silence is not equivalent to rejection. *See In re Deere & Co. Repair Serv. Antitrust Litig.*, __ F. Supp. 3d __, No. 3:22-cv-50188, 2023 U.S. Dist. LEXIS 210516, at *37 (N.D. Ill. Nov. 27, 2023) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952)); *cf. United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). But reading the text of the Firearm Concealed Carry Act is helpful. Although the

challenge in terms of how the Firearm Concealed Carry Act *applies to them*, the Court proceeds accordingly. *See Doe v. Reed*, 561 U.S. 186, 194 (2010); *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2416 n.1 (2024) (Thomas, J., concurring) ("Federal courts are free to consider challenged statutes as applied to the plaintiff before them and limit any relief accordingly.").

### 2. Text of the Second Amendment

The Second Amendment guarantees the "right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. Naturally, Plaintiffs contend that their proposed conduct is covered by the Second Amendment's text. State Defendants appear to concede this point, but Ms. Foxx disagrees.

She first argues that the Firearm Concealed Carry Act's ban doesn't "infringe" on Plaintiffs' right to keep and bear arms, and so their proposed conduct and its violation of the ban don't fall under the Second Amendment's protection. She compares the definitions of "infringe" and "abridge" (from the First Amendment), relying on dictionary definitions from 1755 and 1773 to argue that "infringe" must denote a total destruction of a right—more than a mere "abridgement." But both of these words have multiple definitions, and Ms. Foxx cherry-picks the definitions to suit her argument. In particular, the second definition for "infringe" reads in full: "To destroy; to hinder." *Infringe, v.a. (1773)*, Samuel Johnson's Dictionary Online,

---

statute doesn't define "firearm" on its own, a "concealed firearm" is defined as a "loaded or unloaded handgun," and "handgun" is defined as a one-handed gun excluding stun guns or tasers, machine guns, short-barreled rifles or shotguns, and specific pneumatic guns, spring guns, paintball guns, and BB guns. 430 ILCS 66/5. This definition doesn't appear to allow for the military weapons contemplated by *Bevis*, so this is not a basis on which Plaintiffs' facial challenge fails.

https://johnsonsdictionaryonline.com/views/search.php?term=infringe (last visited Aug. 30, 2024). But she omits "to hinder"—which wouldn't require completely obstructing the right—without any explanation. Merriam-Webster's definition likewise doesn't require wholesale destruction—"to encroach upon in a way that violates law or the rights of another"—and it notes that "infringe" was first used with that meaning in 1513. *Infringe Definition & Meaning*, Merriam-Webster, https://www.merriam-webster.com/dictionary/infringe (last updated Aug. 20, 2024).

Other courts have agreed with this more modest—and plain—reading of "infringe." *See, e.g.*, *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("[The Second Amendment] also forbids lesser 'violat[ions]' that 'hinder' a person's ability to hold on to his guns." (citations omitted)); *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 n.8 (4th Cir. 2023), *reh'd en banc*, __ F.4th __, 2024 U.S. App. LEXIS 21378 (4th Cir. Aug. 23, 2024) ("[T]his stilted construction of the word 'infringed' lacks grounding in original meaning, history, and *Bruen* itself.").[27] And *Bruen* itself involved a regulation that didn't wholly ban individuals from possessing firearms—it was a licensing scheme. *Bruen*, 597 U.S. at 11-12. "Infringe" doesn't mean what Ms. Foxx says it means.

Ms. Foxx next argues that the Second Amendment doesn't cover Plaintiffs' proposed conduct because using a firearm on a crowded and confined public transit vehicle would result in more force than necessary for lawful self-defense, citing two

---

[27] The Fourth Circuit did not address this issue after the case was reheard *en banc*.

inapposite cases.[28] Even if the Second Amendment's reach were limited by that principle of self-defense,[29] Ms. Foxx fails to show how that limitation applies to the facts of this case beyond the unsubstantiated assertion that "there are few if any circumstances" where someone could discharge a firearm in a public transportation vehicle without endangering a third party. Dkt. 86 at 16.

### C.   Potential historical analogues

Because Plaintiffs' proposed conduct falls under the plain text of the Second Amendment, the conduct is presumptively protected. *Bruen*, 597 U.S. at 17. The second step is determining whether the regulation is consistent with the historical tradition of firearm regulation in this country. *Id.* Defendants bear the burden in this regard. As to how they can meet that burden, *Bruen* examined historical regulations as potential analogues, focusing on *why* and *how* regulations burdened the right to armed self-defense. *See id.* at 29. In addition to engaging in that mode of analogical analysis, the parties argue for other approaches potentially left open by *Bruen*.

---

[28] Both cases assert that one may not use more force than necessary to repel an attacker. *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) ("Illinois law does not readily accept a claim of self-defense when the defendant provokes the incident, uses force greater than necessary to ward off the imminent danger, or uses force when he could have avoided the situation."); *People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999) (requiring that a person "reasonably believe[]" that the force used "is necessary to prevent imminent death or great bodily harm"). But these cases plainly say nothing about Ms. Foxx's proposed principle—that one may not defend oneself if the force to be used would collaterally injure third parties.

[29] In *Heller*, the Supreme Court was careful to "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation," 554 U.S. at 594, but it offered no further guidance as to what confrontations don't count. *See Heller*, 554 U.S. at 720 (Breyer, J., dissenting). We do know, however, that the Second Amendment draws no location-based home–public distinction. *See Bruen*, 597 U.S. at 4; *see also Oakland Tactical Supply*, 103 F.4th at 1202-03 (Kethledge, J., dissenting).

The parties start by disagreeing over whether public transportation existed at the Founding. But whether there's anything from 1791 that might appropriately be labeled "public transportation" isn't a silver bullet that shortcuts *Bruen*'s framework. Even if there were something that could rightly be described as a *form of transportation funded by the public* at the time of the Second Amendment's ratification, how firearms were regulated there (if at all) wouldn't necessarily determine whether or how they can be regulated somewhere fitting that same description today. Regulation of today's public transportation may implicate different justifications or impose different burdens on the Second Amendment right based on public transportation's role in society. In other words, the *how* and *why* of such a regulation might be very different. Metra trains and CTA buses obviously didn't exist then, so resolving the permissibility of Illinois' law requires some degree of analogical reasoning. *See Bruen*, 597 U.S. at 27-28.[30]

So as to not bury the lede, the Court finds that Defendants have failed to meet their burden. That failure is dispositive. Still, mindful of the Seventh Circuit's directive to develop a full record in the trial court, the Court will address the parties' many arguments relating to historical analogues and other possible approaches to analyze the constitutionality of the Firearm Concealed Carry Act's prohibition against carrying concealed firearms on public transportation.

---

[30] The parties (and some courts) have labeled this the "nuanced" historical approach, based on *Bruen*'s language that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 28. Like Modell in *Diner*, the Court isn't comfortable with the word "nuance." Nevertheless, rather than transform an adjective into its own doctrine, this Court sees the "nuanced" approach as a difference in degree as to how much analogizing must be done.

### 1. Historical regulations

The approach demonstrated by *Bruen* (and by *Rahimi*) for assessing the constitutionality of a challenged regulation is to compare it with historical regulations. The Court understands this process involves several discrete steps. First, there is the factual question of whether the historical regulation exists. Next, the Court must determine how much weight, if at all, the historical regulation has in this inquiry. *See Bruen*, 597 U.S. at 34 ("We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal."). If the vetted historical regulations disclose some principle underpinning the tradition of firearm regulation in this country, then the Court can compare the challenged regulation in this case to the historical regulations. *See id.* at 29-30; *see also Rahimi*, 144 S. Ct. at 1898. In determining whether the regulations are "relevantly similar," "how and why the regulations burden a law-abiding citizen's right to armed self-defense" are "*central*" considerations. *Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898.

### a. Regulation of crowded spaces (Statute of Northampton)

Defendants cite the Statute of Northampton 1328, 2 Edw. 3 c. 3 (Gr. Brit.), and similar state laws patterned after it. *Bruen* rejected the Statute of Northampton as an analogue justifying a general ban on public carry. *See* 597 U.S. at 40-41. State Defendants, relying on *Antonyuk v. Chiumento*, 89 F.4th 271, 357 n.74 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James*, __ S. Ct. __, No. 23-910, 2024 U.S. LEXIS 2929 (2024),[31] argue that the statute, accompanied by the similar state statutes, provides

---

[31] *Antonyuk* was vacated "for further consideration in light of *United States v. Rahimi*, 602 U.S. __ (2024)." 2024 U.S. LEXIS 2929, at *1.

support for the narrower proposition that bearing arms may be restricted in crowded places like fairs and markets.

Plaintiffs' response to this argument draws on two reasons that *Bruen* deemed the Statute of Northampton to not be probative in that case. First, they argue that the Statute of Northampton is too old and should therefore be afforded no weight in ascertaining an *American* tradition. *Bruen*, 597 U.S. at 41 ("[T]he Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791."). State Defendants address this issue by citing the later state statutes that were based on the Statute of Northampton. This includes two commonwealth/state statutes from the Founding era: one from Virginia and one from North Carolina.[32]

Defendants also present Reconstruction-era statutes from three states—Tennessee, Texas, and Missouri—and two territories—Oklahoma, and Arizona.[33] Plaintiffs' response to these statutes amounts to "too little, too late"—they argue that they are outliers and not old enough to be probative of the meaning of the Second Amendment. But *Bruen* didn't foreclose using such later-in-time laws to show the continuation of

---

[32] Act of Oct. 16, 1786, ch. 49, 1786 Va. Acts 35 (forbidding and punishing affrays); *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (François-Xavier Martin ed., 1792). Plaintiffs argue that the North Carolina law was never in force. This doesn't affect the Court's analysis, so there is no need to address this factual dispute now.

[33] Act of June 11, 1870, ch. 13, 1870 Tenn. Pub. Acts 28 (preserving the peace and preventing homicide); Act of Aug. 12, 1870, ch. 49, 1870 Tex. Gen. Laws 63 (regulating the right to keep and bear arms); Act of Mar. 5, 1883, sec. 1, § 1274, 1883 Mo. Laws 76; *Acts, Resolutions and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona* 30-31 (Prescott 1889) (defining and punishing certain offenses against the public peace); *The Statutes of Oklahoma, 1890*, at 495 (Will T. Little et al. ed., Guthrie, The State Capital Printing Co. 1891) (Territory of Oklahoma Penal Code, article 47).

a tradition from before the Founding. *See Bruen*, 597 U.S. at 65-68 (rejecting postbellum and territorial laws because they "contradict[] the overwhelming weight of other evidence"). Defendants present these statutes in that light: to show a "'long, unbroken line,' beginning from medieval England and extending beyond Reconstruction," of the regulation of firearms in crowded public forums. *Antonyuk*, 89 F.4th at 358 (quoting *Bruen* 142 S. Ct. at 2136).

Even granting the existence of such a longstanding tradition, however, that doesn't address Plaintiffs' second response to these laws—that they aren't appropriate analogues because *why* they burdened the right to armed self-defense is not sufficiently similar.[34] *Bruen* found that the Statute of Northampton wasn't a general ban on bearing weapons; instead, the offense was arming oneself *to terrify others*. *Bruen*, 597 U.S. at 43-44.[35] This language is also reflected in the corresponding state

---

[34] The Court acknowledges that it is using a double negative. But the Court is using the double negative because describing the *why* as "different" doesn't seem quite right. *See* Susan Thurman, *The Only Grammar Book You'll Ever Need* 93-94 (2003) ("One exception to the rule of avoiding double negatives is when you intend a positive or lukewarm meaning."). And, at the risk of sending grammar geeks into a tither (or a dither), not all double negatives create a positive. *See Flores v. Minnesota*, 906 F.2d 1300, 1302 (8th Cir. 1990) ("The instruction states that there is '*no* presumption' an intoxicated person was '*in*capable' of premeditation . . . . The double negative here does not create a positive. The instruction simply tells the jury not to rule out the possibility of premeditation merely because Flores had been drinking: they should still consider whether or not he was capable of premeditation, and whether he in fact premeditated the killing.").

[35] *Rahimi* implies the same requirement of an intent to terrify others (and potentially other elements, like using dangerous or unusual weapons). *See Rahimi*, 144 S. Ct. at 1901 ("Whether classified as an affray law or a distinct prohibition, the going armed laws prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land. Such conduct disrupted the public order and led almost necessarily to actual violence." (cleaned up) (citations omitted)).

On the other hand, one of Defendants' experts, Dr. Brennan Rivas, notes that some scholars have found that these laws didn't require an intent element to terrorize others, and that carrying deadly weapons was inherently terrifying. Dkt. 64-11 at 20 n.57. Although this is at

statutes. For example, the Virginia statute states that nobody shall "ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the county*." Ch. 49, 1786 Va. Acts 35; *see also Rahimi*, 144 S. Ct. at 1901. Plaintiffs wish to carry *concealed* arms in self-defense, so the Firearm Concealed Carry Act's ban burdens Plaintiffs' Second Amendment right for a wholly different reason than the Statute of Northampton and similar state statutes did. The *why* is different. A concealed arm doesn't terrorize; it's concealed. Consequently, these historical laws do not serve as an appropriate historical analogue.

### b. *The Black Act*

Ms. Foxx also attempts to find a historical analogue in the Black Act 1723, 9 Geo. 1 c. 22 (Gr. Brit.), which prohibited the carrying of weapons in forests and on roads if the bearer's face was disguised. But Ms. Foxx doesn't present any evidence that the attitudes reflected in the Black Act carried over into "*this* Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17 (emphasis added). Without some evidence the Black Act reflects American attitudes at the time the Second Amendment was adopted, it cannot support the Firearm Concealed Carry Act's ban. *See id.* at 34-35, 39 (noting that it's less helpful "to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was

---

odds with *Bruen*'s interpretation, *Bruen* had a different record before it. *See Bruen*, 597 U.S. at 45 ("Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people."). Although reliance on party presentation in compiling a historical record would seem to allow for evolving understandings of history, Defendants don't offer evidence that the act of carrying a concealed handgun in public was alone sufficient to be considered terrifying, so the Court accepts *Bruen*'s understanding of these statutes.

acted upon or accepted in the colonies.'" (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935))).[36]

### c. Concealed-carry laws

Ms. Foxx then argues that 19th century laws from Tennessee, Texas, and Arkansas[37] show a tradition of regulating concealed firearms.[38] Plaintiffs' individual responses to the Tennessee and Arkansas statutes are that the statutes support Plaintiffs' position because of an exception for travelers. The Court sets that aside for now, as the exception matters only if the laws establish a historical tradition of banning concealed firearms in the first place.

---

[36] Even if the Black Act were to disclose some tradition, it's not "relevantly similar" to the ban, both in *why* and *how* the right to armed self-defense is burdened. The Black Act was enacted to prosecute gangs (seemingly inspired by Robin Hood) that operated from nearby forests (and roads). L. Radzinowicz, *The Waltham Black Act: A Study of the Legislative Attitude Towards Crime in the Eighteenth Century*, 9 Cambridge L.J. 56, 56-58 (1945); Pat Rogers, *The Waltham Blacks and the Black Act*, 17 Hist. J. 465, 467 (1974). The act's name shows that it was primarily concerned with *who* rather than *where*—the gang members were known as the "Blacks" because of how they obscured ("blackened") their faces. *See* Rogers, *supra*, at 468-69. At a very high level of generality, perhaps the two acts are similar in their motivation to keep public order. But though the Black Act contains a place restriction, it's inextricably coupled with the condition that one has disguised their face, because it was targeted at a specific group of people known to have an unlawful purpose in carrying weapons. The justification behind the Black Act is different from the Firearm Concealed Carry Act's ban, and the Black Act forbade people from carrying guns on roads only *if* they were masked, a condition not present in Illinois' ban. So, again, the *how* and *why* are different.

[37] Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws 25 (regulating the keeping and bearing of deadly weapons); Act of Oct. 19, 1821, ch. 13, 1821 Tenn. Pub. Acts 15 (preventing the wearing of dangerous and unlawful weapons); *Revised Statutes of the State of Arkansas Adopted at the October Session of the General Assembly of Said State, A.D. 1837*, at 280 (William McK. Ball & Sam. C. Roane, eds., Boston, Weeks, Jordan and Company 1838).

[38] Ms. Foxx lists a Louisiana statute in her statement of facts, but she doesn't reference it in her memorandum of law supporting her motion for summary judgment. Because it's not mentioned in her legal argument, the Court doesn't consider the Louisiana law in its analysis. *See generally* LR 56.1(a); *Bruen*, 597 U.S. at 25 n.6. In addition, Ms. Foxx says in her reply that she also cites Alabama law, but the only reference to Alabama law in her opening memorandum concerns the meaning of "journey" underlying the traveler exception, rather than the statute itself.

Plaintiffs rely on *Bruen* to discount the relevance of the Texas statute in estab-
lishing a historical tradition. *Bruen* examined an 1871 Texas law that required "rea-
sonable grounds for fearing an unlawful attack on his person" to carry a pistol, and it
deemed the statute (along with two Texas Supreme Court cases analyzing the consti-
tutionality of the statute) to be outliers, "provid[ing] little insight into how postbellum
courts viewed the right to carry protected arms in public." *Bruen*, 497 U.S. at 64-65.
Ms. Foxx's only counter in her reply brief is that the New York law in *Bruen* had
broader restrictions than the Firearm Concealed Carry Act's ban. Although it's true
that this case involves looking for different analogues than *Bruen* did, that doesn't
provide a reason to challenge *Bruen*'s finding that 1870s Texas was an outlier in its
view of the right to bear arms.

 Plaintiffs also respond with two general arguments concerning the Texas and Ar-
kansas statutes: (1) the laws are too recent, and (2) the laws aren't sufficiently wide-
spread.[39] As for the first argument—that 19th century laws cannot independently
demonstrate the scope of the Second Amendment—*Bruen* shied away from any defin-
itive statement on the matter. *Id.* at 37-38 ("We also acknowledge that there is an
ongoing scholarly debate on whether courts should primarily rely on the prevailing
understanding of an individual right when the Fourteenth Amendment was ratified
in 1868 when defining its scope (as well as the scope of the right against the Federal

---

[39] Plaintiffs grouped the statutes by time period in their response, so the 1821 Tennessee
statute was sorted into the Founding era bucket—separate from the mid to late 19th century
bucket where Plaintiffs addressed the Texas and Arkansas statutes. The Court isn't sure
what cutoff Plaintiffs have created to deny Arkansas' 1837 law the "Founding era" label and
instead count it as "mid"-19th century.

Government). We need not address this issue today . . . ." (citations omitted)). *Rahimi* similarly sidestepped the issue. *See Rahimi*, 144 S. Ct. at 1898 n.1; *id.* at 1929 n.4 (Jackson, J., concurring); *id.* at 1933 n.2 (Thomas, J., dissenting). Contrary to Plaintiffs' characterization, lower courts still must deal with the ambiguity.

As a result, this Court disagrees with Plaintiffs that *Bruen* mandates automatically writing off any law from the Reconstruction era. *Bruen* may have cautioned "against giving postenactment history more weight than it can rightly bear," but it also recognized that evidence of how the Second Amendment was interpreted "through the end of the 19th century" can be a "critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 35-36 (quoting *Heller*, 554 U.S. at 605). The potential relevance of evidence through the late 19th century is underscored by the fact that this case concerns determining the historical view of public carry—after all, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

That leaves Plaintiffs' argument that the statutes aren't sufficiently widespread.[40] As discussed above, *Bruen* disregarded the Texas statute as an outlier, and Ms. Foxx provides nothing to the contrary. This Court follows Supreme Court precedent. Left with only the Tennessee and Arkansas statutes, Defendants have failed to meet their burden of showing a national tradition. *Bruen* suggests that only two or three regulations often won't be sufficient—it discounted Texas as an outlier despite West

---

[40] Although Plaintiffs' brief was organized such that this response wasn't directed at the Tennessee statute, the Court finds it more sensible to include Tennessee in this part of the discussion. To artificially separate similar laws and then attack a subset as not sufficiently widespread isn't a logical way to approach the argument.

Virginia's similar provision, and it "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 46, 65. This isn't to say that simply looking at the number of states is enough to exclusively conclude that there wasn't a tradition, as Plaintiffs seem to imply,[41] but Defendants have failed to meet their burden under the facts of this case. With that, there's no need to discuss the so-called "traveler exception" in the context of Ms. Foxx's motion for summary judgment.

### d.   Railroads

State Defendants present restrictions by railroad companies across the country in the late 19th century.[42] Some of these restrictions merely required that passengers keep their firearms unloaded and in their bags, while others barred firearms completely. Plaintiffs respond that these railroad companies were private entities and so

---

[41] Regarding what's a widespread tradition versus just a few outliers, Plaintiffs don't do much to actually apply the reasoning in *Bruen* to the facts in this case, but the Court can certainly imagine some relevant factors that might have been helpful to this analysis, such as the geographic regions represented by the state regulations or the impact of migration patterns on cultural norms. One might even consider when the particular states joined the Union, although the emphasis on Founding-era statutes may already take that into account by proxy, as it consequently puts more focus, to some extent, on the original thirteen states. *Bruen*'s discussion of sensitive places and the lack of historical evidence suggests that there are times when only two or three regulations might be sufficient, but it's unclear if *Bruen* meant for that logic to apply beyond the "sensitive places" inquiry (nor does Ms. Foxx argue this as a reason for construing only a few state statutes as a widespread tradition).

[42] They argue that these railroad restrictions are a continuation of the tradition of regulating public forums and crowded places, as established by the Statute of Northampton and similar state statutes. However, as explained above, the tradition of regulation established by that line of statutes addressed public carry for the purpose of terrorizing others. So if the railroad restrictions are a continuation of this tradition, then they also cannot be an appropriate analogue for this case. But the railroad restrictions don't have the same wording about inflicting terror, so the Court treats these as a separate source for a potential analogue.

the restrictions aren't relevant under *Bruen*, that the restrictions aren't old enough, and that the restrictions aren't sufficiently widespread.

The Court agrees that the private nature of these restrictions defeats State Defendants' attempt to show a national tradition that would support the Concealed Carry Act's prohibition. The Second Amendment protects against governmental—not private—intrusion on rights and liberties. *See Rahimi*, 144 S. Ct. at 1897.[43]

    2.  *Sensitive places*

Defendants also levy arguments under *Bruen*'s directive that analogies to "sensitive places" can establish whether laws are constitutionally permissible. The discussion of sensitive places starts with this language in *Heller*:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27. *Heller* also added in a footnote: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to

---

[43] The Court sees the opening that State Defendants have identified. *Heller* and *Bruen* both included the assurance that schools could still constitutionally restrict firearms as sensitive places, considering that there were no public schools at the Founding. However, it's above this Court's pay grade to infer from the Supreme Court's silence that private restrictions alone can establish a historical tradition of regulation. Neither *Heller* nor *Bruen* explained why restrictions in schools are constitutional. *See Heller*, 554 U.S. at 626-27; *Bruen*, 597 U.S. at 30. The Court has enough trouble applying what the Supreme Court did say in *Heller* and *Bruen*; it's loath to attempt to apply the Supreme Court's silence. What's more, it certainly can't infer the Supreme Court's silence in favor of Defendants when they bear the burden.

be exhaustive." *Id.* at 627 n.26. *Bruen* then turned this unremarkable use of the word "sensitive" into its own vehicle of analogical reasoning:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U. S. at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11-17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Bruen*, 597 U.S. at 30. This Court views the "sensitive places" doctrine as but one method for demonstrating a historical analogue. Earlier, the Court analyzed the parties' arguments regarding whether a historical tradition existed and whether the historical regulations part of that tradition were analogous to the Firearm Concealed Carry Act's ban today. The "sensitive places" doctrine merely provides a shortcut for the former because the Supreme Court has stated there to be a longstanding tradition of prohibiting firearms in sensitive places.[44]

*Bruen* offers no insight as to what common thread might tie these sensitive places together, assuming a common thread is needed among these to support an analogy.

---

[44] Some courts have characterized it as an exception to the general *Bruen* framework. *See, e.g.*, *Wolford*, 686 F. Supp. 3d at 1049. Courts often refer to different analyses as "exceptions" even though they really aren't. *See In re Deere*, 2023 U.S. Dist. LEXIS 210516, at *32 n.12 (citing *Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)). This Court might disagree on the label, but the approach is still substantively the same.

*See, e.g.*, *Bruen*, 597 U.S. at 114 (Breyer, J., dissenting) (noting the ambiguity and wondering where "the many locations in a modern city with no obvious 18th- or 19th-century analogue" such as "subways, nightclubs, movie theaters, and sports stadiums" fall); *see also, e.g.*, *Heller*, 554 U.S. at 721 (Breyer, J., dissenting) ("Why these?"). Courts are left to guess if the location is sensitive because of what occurs at the location, who is present at the location, how many people are present at the location, or some other consideration. The only hint that *Bruen* provides is that Manhattan is *not* a "sensitive place":

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III-B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen*, 597 U.S. at 30-31.

The task before this Court is to decipher whether public transit can be analogous to schools or government buildings (including legislative assemblies, polling places, and courthouses), or to some other sensitive place if Defendants are able to identify

one.[45] The Court found only a handful of other courts that have considered the issue of how to analogize to the established "sensitive places" (and none that have explicitly extended the list of sensitive places). For example, some courts concluded that playgrounds and other adjoining school grounds are analogous to schools—a seemingly straightforward analysis. *Siegel v. Platkin*, 653 F. Supp. 3d 136, 151 (D.N.J. 2023);[46] *Kipke*, 695 F. Supp. 3d at 650; *Kipke*, 2024 U.S. Dist. LEXIS 137003, at *15-16; *Springer*, 2023 U.S. Dist. LEXIS 217447, at *23-24; *We The Patriots, Inc. v. Grisham*, 697 F. Supp. 3d 1222, 1237 (D.N.M. 2023), *appeal docketed*, No. 23-2166 (10th Cir. Mar. 11, 2024). In a similar vein, childcare facilities have also been deemed "sensitive." *Md. Shall Issue*, 680 F. Supp. 3d at 584.[47]

---

[45] Plaintiffs insist that *Bruen* didn't endorse "government buildings" generally or "schools" as sensitive places, but that is based on a strained reading of *Bruen*'s language. *See also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller* to emphasize that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations"). Other district courts also disagree with Plaintiffs, either implicitly by analogizing to schools or explicitly rejecting the argument. *E.g.*, *Kipke*, 695 F. Supp. 3d at 650; *United States v. Robertson*, No. 22-po-867-GLS, 2023 U.S. Dist. LEXIS 4998, at *12-13 (D. Md. Jan. 9, 2023); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 584 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. Feb. 22, 2024); *Springer v. Grisham*, __ F. Supp. 3d __, No. 1:23-cv-00781 KWR/LF, 2023 U.S. Dist. LEXIS 217447, at *23-24 (D.N.M. Dec. 5, 2023), *appeal docketed*, No. 23-2194 (10th Cir. Mar. 25, 2024). Only one district court takes such a narrow reading of *Bruen*, arguing that *Bruen*'s "these locations" refers only to legislative assemblies, polling places, and courthouses based on the grammatical rule that pronouns "generally" refer back to the nearest antecedent. *Ayala*, 2024 U.S. Dist. LEXIS 7326, at *36. But that logic breaks down in *Bruen*'s next sentence. *Bruen* instructs courts to analogize to "those historical regulations of 'sensitive places'"—and "those" modifies "regulations" not "sensitive places," so it refers back to "such prohibitions," which in turn refers back to the "longstanding" laws discussed by *Heller*. *See Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). This is a convoluted and pedantic way of saying that the Court finds it appropriate to analogize to government buildings and schools.

[46] In a subsequent ruling (that is on appeal), the court maintained its position regarding school playgrounds. *Koons*, 673 F. Supp. 3d at 639.

[47] The use of a public space for educating children may be seen as analogous to schools, even if the space isn't exclusively for children. *Lafave v. County of Fairfax*, No. 1:23-cv-1605

Courts have also considered whether buffer zones (e.g., a 1000-foot radius) around sensitive places are susceptible of the same treatment as the sensitive places themselves. One court found so. *United States v. Walter*, No. 3:20-cr-0039, 2023 U.S. Dist. LEXIS 69163, at *21-23 (D.V.I. Apr. 20, 2023). Another found the opposite, because the buffer zone around a school zone contained non-school property. *United States v. Allam*, 677 F. Supp. 3d 545, 560-62 (E.D. Tex. 2023). Yet another court specified that only the public locations within a buffer zone were sensitive and that private property within a buffer zone wasn't a sensitive location. *United States v. Metcalf*, No. CR 23-103-BLG-SPW, 2024 U.S. Dist. LEXIS 17275, at *21-23 (D. Mont. Jan. 31, 2024).

Defendants in this case offer various theories as to what makes a place "sensitive." The Court finds none of them convincing.

### a. *Publicly owned or operated, publicly accessible, and crowded*

State Defendants argue that modern public transit systems are sensitive places because they are crowded spaces that are publicly accessible and publicly owned or operated.[48] Based on *Bruen*'s admonition that Manhattan isn't a sensitive place just

---

(WBP), 2024 U.S. Dist. LEXIS 152000, at *37-38 (E.D. Va. Aug. 23, 2024) (finding Fairfax County's parks to be sensitive places because children attend summer camps at the parks and the county operates three preschools there). But merely having children or students present isn't enough—one court reasonably declined to declare the New York subway system a sensitive place "just by virtue of its connection with the school system." *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 206-07 (S.D.N.Y. 2023), *appeal docketed*, No. 23-365 (2d Cir. Jan. 10, 2024).

[48] The Court found no examples of this precise combination of factors considered by other courts—the closest was courts that have decided how broadly to construe "government buildings." Some courts have taken "government buildings" to mean any building owned by the government, rejecting the notion that there must be some kind of core government function associated with the building. *Kipke*, 695 F. Supp. 3d at 655-56 (analogizing mass transit facilities to both schools and government buildings); *Kipke*, 2024 U.S. Dist. LEXIS 137003, at *15-16; *Md. Shall Issue*, 680 F. Supp. 3d at 588 (finding public libraries to be sensitive places); *We The Patriots*, 2023 U.S. Dist. LEXIS 183043, at *31-32; *Robertson*, 2023 U.S. Dist. LEXIS

because it is crowded and generally protected by law enforcement, crowdedness alone is insufficient to qualify a location as sensitive. State Defendants' theory adds two more conditions—so it's not directly contrary to *Bruen*'s rejection of crowded and generally protected places—but those two added conditions still "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 31. After all, the streets of Manhattan—or Chicago, to pick an example closer to home—are crowded, publicly accessible, and publicly owned. State Defendants contend that "only a small slice of modern cities would be sensitive" under their test, Dkt. 94 at 15, but they don't explain how the additional two conditions would exclude most modern cities.

---

4998, at *12-14, 19-22 (finding the National Institutes of Health to be a sensitive place); *United States v. Power*, No. 20-po-331-GLS, 2023 U.S. Dist. LEXIS 4226, at *9-16, 19-21 (D. Md. Jan. 9, 2023) (same); *United States v. Marique*, No. 22-00467-PJM, 2023 U.S. Dist. LEXIS 145677, at *12-14 (D. Md. Aug. 17, 2023), *appeal docketed*, No. 23-4576 (4th Cir. Oct. 23, 2023) (same); *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 U.S. Dist. LEXIS 225175, at *20-22, 25 (D. Md. Dec. 12, 2022) (same). Other courts have taken a narrower approach. *Ayala*, 2024 U.S. Dist. LEXIS 7326, at *36 (finding that post offices aren't "government buildings" under *Bruen*); *United States v. Gearheart*, No. 6:23-po-00079-HBK-1, 2024 U.S. Dist. LEXIS 71033, at *27-28 (E.D. Cal. Apr. 18, 2024) (declining to find Yosemite National Park in its entirety to be a sensitive place, with the caveat that specific buildings in the park might be sensitive places); *United States v. Tolmosoff*, No. 6:23-po-00187-HBK-1, 2024 U.S. Dist. LEXIS 66920, at *26-27 (E.D. Cal. Apr. 11, 2024) (same). Absent further guidance, this Court is disinclined to construe "government buildings" so broadly because the examples of government buildings provided by *Bruen* all bear some relation to the processes of our democratic government, though the Court would also not go as far as to reject post offices as government buildings. Even if it were to construe "government buildings" broadly, that still wouldn't fully support State Defendants' theory, as they construe "buildings" even more broadly so as to include public transportation vehicles.

    *b.   Regulation of historical sensitive places*

State Defendants also compare the Firearm Concealed Carry Act's ban to histori-cal regulation of legislative assemblies and polling places.[49] But this argument fails on account of the purposes of the regulations. State Defendants ask the Court to find the regulations to be relevantly similar because of the shared purpose of protecting the public order, but treating any place where the government would want to protect public order and safety as a sensitive place casts too wide a net—this would seem to justify almost any gun restriction.

    *c.   Enclosed, moving vehicles with no escape*

Ms. Foxx doesn't offer a comprehensive theory for defining "sensitive places," but she argues that public transit (specifically the trains and buses) are sensitive places because they are enclosed, moving vehicles with no escape. But Ms. Foxx neither analogizes to the enumerated sensitive places nor provides any evidence to support the creation of a new "sensitive place" category, so this argument fails.

    *3.   Plaintiffs' arguments*

As stated, because Defendants bear the burden to justify the ban as consistent with the American tradition of firearm regulation, Plaintiffs don't need to inde-pendently prove that the ban is inconsistent with the American tradition. But, for the sake of developing a full record, the Court addresses Plaintiffs' arguments. Plaintiffs' arguments are based on the faulty premise that by simply citing colonial statutes

---

[49] This mode of analysis is more akin to the analysis comparing the Firearm Concealed Carry Act's ban to various historical regulations, but State Defendants frame it as part of their "sensitive places" argument.

regarding firearm possession, without considering the historical context, these statutes alone foreclose any firearm regulation today. But that's not what *Bruen* requires.

      a.    *"Public transportation"*

Plaintiffs argue that the lack of firearm regulation for "public transportation" at the Founding renders the Firearm Concealed Carry Act's ban necessarily unconstitutional. Plaintiffs detail two types of transportation that they allege are analogous: stagecoaches (including horse-drawn omnibuses) and ferries. But even if such transportation at the Founding was "public,"[50] that isn't an independent basis upon which to grant Plaintiffs summary judgment. As explained, *Bruen* doesn't say that a lack of regulation in a place or situation that happens to fit some modern label is dispositive. *Cf. Antonyuk*, 89 F.4th at 301-02 ("[T]he absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much."). Instead, in contemplating how a lack of regulation might be relevant, *Bruen* offers few suggestions of what might show that a challenged regulation is inconsistent with the Second Amendment. The only one potentially applicable to the record before the Court—and the only one that the parties argue—is to examine if the challenged regulation "addresses a general societal problem that has persisted since the 18th century" and there is no "distinctly similar" historical regulation. *Bruen*, 597 U.S. at 26-27.

---

[50] Plaintiffs discuss stagecoaches, but their evidence doesn't support the notion that stagecoach services were provided by public entities. *See also, e.g.*, Dkt. 72 Ex. 2 at 182 (discussing a waterman's displeasure after the introduction of "private coaches"). In addition, State Defendants, relying on their experts' reports, disputed whether ferries were actually publicly operated. *See* Dkt. 83 at 9 ¶¶ 47-49.

For the societal problem that the Firearm Concealed Carry Act addresses, State Defendants assert that the goal of the statute is to protect public order and safety from the dangers posed by concealed carry, which Plaintiffs don't challenge. In support of this assertion, State Defendants cite the statute's language that a concealed-carry permit is issued only to an individual who "does not pose a danger to himself, herself, or others, or a threat to public safety." 430 ILCS 66/10(a)(4). The source of danger (i.e., the societal problem) that the modern law addresses is the risk posed by the person with the firearm. By contrast, the lack of firearm restrictions for stage-coaches and ferries (and, indeed, sometimes the explicit permission to carry firearms) was tied to a different societal problem: dangers from the outside, such as wildlife. Dkt. 83 at 8 ¶ 45. Thus, the evidence about stagecoaches and ferries, as presented, isn't probative.[51] In other words, the *why* is not sufficiently similar to foreclose the possibility of Defendants putting forth a relevantly similar regulation to justify the ban.

### b. *Places that required firearms*

Plaintiffs also argue that there is no way to show a tradition of restricting firearms in crowded locations because of statutes that *required* people to bear arms at places

---

[51] In their reply brief, Plaintiffs try to go the opposite direction, starting with the motivation of the historical statutes and arguing that similar, external dangers on public transportation necessarily permits them to carry guns today. But this argument is logically flawed because it again ignores the different social contexts and different regulatory justifications in its attempt to draw an equivalence between "public transit" then and "public transit" now. In addition, "[a]rguments raised for the first time in a reply brief are waived." *James*, 137 F.3d at 1008.

of worship and public meetings.[52] However, Plaintiffs fail to logically connect the existence of those statutes to the proposition that there can *never* be a restriction of a firearm on public transit.

Plaintiffs also cite 17th century colonial laws—from Massachusetts, Maryland, Virginia, and Rhode Island[53]—requiring that arms be borne when traveling more than one mile (Massachusetts), two miles (Rhode Island), "any considerable distance" (Maryland), or "abroad" (Virginia). But Plaintiffs treat these laws as if they're "trapped in amber." *Rahimi*, 144 S. Ct. at 1897-98. Just as "public transit" then isn't necessarily equivalent to "public transit" now, requiring firearms on a two-mile trip in the 17th century doesn't necessarily mean one has the same right today. Plaintiffs fail to contend with the different context of such trips when the laws were enacted.

    *c.   Sensitive places*

As for their theory of "sensitive places," Plaintiffs argue that the key characteristic shared by legislative assemblies, polling places, and courthouses is the security

---

[52] 19 *The Colonial Records of the State of Georgia*, pt. 1, at 137-39 (Allen D. Candler ed., 1911) (1770 law); *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667*, at 103 (William Hand Browne ed., Baltimore, Maryland Historical Society 1885); 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619*, at 174, 263 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823) (1631 and 1642 laws); *The Public Records of the Colony of Connecticut* 95 (J. Hammond Trumbull ed., Hartford, Brown & Parsons 1850); 1 *Records of the Colony of Rhode Island and Providence Plantations* 94 (John Russell Bartlett ed., Providence, A. Crawford Greene and Brother 1856) (1639 law). Two notes about this list of statutes: first, Plaintiffs cited one more law from Virginia that allegedly required men to bear arms at church, but the Court was unable to find it in Plaintiffs' cited material; second, Plaintiffs included Massachusetts in their list of states that required going armed to public meetings, but they cited no Massachusetts statute.

[53] 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (Nathaniel B. Shurtleff ed., Boston, William White 1853) (1636 law); *Archives of Maryland*, *supra*, at 103 (1642 law); 1 *The Statutes at Large*, *supra*, at 127 (1631 Virginia law); 1 *Records of the Colony of Rhode Island and Providence Plantations*, *supra*, at 94 (1639 law).

provided by the government at these locations. In support, Plaintiffs cite a few sources. First, they cite David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018), specifically where authors argue that the presence of security indicates the government's assessment of whether that location is sensitive.[54] Next, Plaintiffs cite two amicus briefs—one before the Second Circuit and one before the Third Circuit—both of which rely on Mr. Kopel and Mr. Greenlee's argument that sensitive places were about protecting government deliberation from violent interference. Although the Third Circuit has yet to decide its case, the Second Circuit didn't adopt the argument from the amicus brief. *See Antonyuk*, 89 F.4th 271.[55]

The Court found only two courts that have addressed this question head-on. In the case now on appeal before the Third Circuit, the district court, relying solely on the arguments in Kopel and Greenlee's article, agreed with Plaintiffs' "security" theory. *Koons*, 673 F. Supp. 3d at 635. Another court unhesitatingly rejected the theory, calling it "baseless," but it offered little explanation. *Kipke*, 695 F. Supp. 3d at 650. *Bruen*'s only discussion of a location's security in relation to its status as a sensitive place was its rejection of Manhattan as a sensitive place even though it is crowded

---

[54] Although *Bruen* cited Mr. Kopel and Mr. Greenlee's article, it did so for only the narrow proposition that legislative assemblies, polling places, and courthouses are examples of sensitive places from the 18th and 19th centuries. *See Bruen*, 597 U.S. at 30. This Court doesn't see this as a wholesale endorsement of Mr. Kopel and Mr. Greenlee's theories for what makes a place sensitive, especially as *Bruen* disclaimed that it wasn't defining "sensitive places." To be clear, the Court is not discrediting (or crediting) Mr. Kopel and Mr. Greenlee's conclusions. The Court seeks to differentiate between academic research and legal precedent only as it pertains to what is binding on this Court.

[55] Although the statute in that case had its own list of "sensitive places," *Antonyuk* didn't frame its analysis with reference to "sensitive places" as the term is used by *Bruen*.

and has general protection provided by the city. *Bruen*, 597 U.S. at 30-31. Based on that, general protection alone should also be insufficient.

Plaintiffs' theory, however, differs in its formulation: they argue that a sensitive place must have "comprehensive" security, a presumably higher level of security that doesn't run afoul of *Bruen*'s rejection of Manhattan as a sensitive place. According to Plaintiffs, the closest modern equivalent to the "comprehensive" security at the Founding are the armed guards and metal detectors found at courthouses and airports.[56] There are at least two reasons why this makes little sense. First, that only courthouses and airports have modern security measures that meet Plaintiffs' definition of "comprehensive" doesn't explain why prohibitions at polling places and legislative assemblies are permissible. Polling places and legislative assemblies lack such security, but the Supreme Court has nevertheless deemed them to be sensitive places. Second, Plaintiffs fail to establish why "comprehensive" security is the right threshold. Their examples from the Founding era consist of laws that required and/or paid law enforcement to be present at legislatures, courthouses, and polling places, and Plaintiffs offer no explanation for how or why that translates to metal detectors in today's social context. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

---

[56] If the Court accepted Plaintiffs' theory, that would also doom Plaintiffs' facial challenge—Plaintiffs acknowledge in their reply brief that "[i]f Illinois were to install TSA-like security for its subways, buses, or trains, then it could constitutionally ban firearms at those locations." Dkt. 92 at 8 n.2.

## CONCLUSION

This action has been properly brought before this Court—despite the disputes over venue and standing, the parties can't escape the Court. The parties also can't escape that this case requires navigating the murky waters of *Bruen*. Plaintiffs' proposed conduct—carrying concealed handguns on public transit for self-defense—falls within the presumptive ambit of the Second Amendment, shifting the burden to Defendants to show that the Firearm Concealed Carry Act's ban falls within the historical tradition of firearm regulation in this country. On the record before the Court in this case, Defendants have failed to meet their burden.

As for injunctive relief, Plaintiffs have made no argument regarding why they're entitled to injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because they've forfeited the argument, they haven't established their entitlement to an injunction.

The claims against Rick Amato and Eric Rinehart are dismissed without prejudice for lack of subject-matter jurisdiction. Rick Amato and Eric Rinehart are terminated from the case. The remaining State Defendants' motion for summary judgment is denied. Kimberly Foxx's motion for summary judgment is denied.

Plaintiffs' motion for summary judgment is granted in part. The Court grants declaratory relief against Kwame Raoul, Kimberly Foxx, and Robert Berlin, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to:

- Benjamin Schoenthal carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra.

The Court grants declaratory relief against Kwame Raoul and Kimberly Foxx, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to:

- Mark Wroblewski carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra;
- Joseph Vesel carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA; and
- Douglas Winston carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA.

Date: August 30, 2024

Hon. Iain D. Johnston
*United States District Judge*