IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> KWAME RAOUL, *et al.*, <br><br> Defendants. | No. 3:22-cv-50326 <br><br> Hon. Iain D. Johnston |

### RESPONSE TO COURT'S ORDER DATED SEPTEMBER 25, 2024

On September 25, 2024, the Court issued an order raising questions about the inquiry counsel conducted to justify the following sentence, which appeared on page 8 of the Motion to Stay Judgment Pending Appeal:

> "Moreover, the potential safety implications of the Court's order are highlighted by a recent mass shooting on the CTAs Blue Line, in which four people were murdered with firearms three days after the Court's order was entered."

The Court set a hearing on October 2, 2024, and ordered that counsel be prepared to explain the basis for this sentence and show cause as to why its inclusion in Defendants' stay motion does not violate Rule 11(b). ECF 122.

Through the quoted sentence, the undersigned counsel aimed to argue that a stay of the Court's order is justified by the public interest in maintaining public safety. The Court's order, which by its terms applies to only the four plaintiffs, has already been misread to extend to others. The confusion caused by the misreading could result in an unintended increase in firearms carried on public transit in the future. Undersigned counsel intended to communicate that this order therefore raises "potential safety implications" that support the requested stay. This contention was based on counsel's knowledge of the documented connection between (i) legal changes that

1

tend to have the effect of increasing the prevalence of firearms in public places, and (ii) increased public safety risks. The sentence was not intended to suggest that the perpetrator of the Blue Line shootings held a concealed carry permit, acted in self-defense, or engaged in conduct permitted under the Court's order. The sentence also was not intended to state, suggest, or imply that this Court's order was responsible for or specifically related to the shooting referenced in the stay motion, and counsel apologizes if any such inference was mistakenly created. Rather, the shooting referenced in the stay motion was cited solely as an example of an extreme harm that can be associated with a greater prevalence of firearms in public spaces, and to argue that the potential for such extreme harms, combined with documented confusion regarding what rules apply to firearms in those spaces, merited keeping the challenged statute in full effect while the appeal proceeds. For these reasons, and for the additional reasons addressed below, the Court should not enter any sanctions under Rule 11.

## BACKGROUND

On August 30, 2024, the Court entered a Memorandum Opinion and Order and Judgment granting declaratory judgment that the Illinois Firearm Conceal Carry Act's restriction on carrying concealed firearms on public transportation, 430 ILCS 66/65(a)(8), is unconstitutional as applied to four individuals with conceal carry licenses who expressed an intent to carry firearms onto Metra and or CTA property for self-defense and to the extent necessary to ride Metra and/or the CTA. *See* Mem. Op., ECF 108, at 49–50.

On September 9, 2024, the undersigned, following a collaborative drafting effort with senior officials of the Office of the Illinois Attorney General, signed and filed a Motion to Stay Judgment Pending Appeal, ECF 110 (the "Stay Motion"). In relevant part, the Stay Motion argued that the "public interest overwhelmingly favors a stay." *Id.* at 7–9. To support this point, the

undersigned argued, among other things, that "[t]he Supreme Court and the Seventh Circuit have both made clear that stays pending appeal are appropriate where lower courts have questioned the constitutionality of firearm regulations." *Id.* at 7–8 (citing *Garland v. Vanderstok*, 144 S. Ct. 44 (2023), and *Bevis v. City of Naperville*, 85 F.4th 1175, 1187 (7th Cir. 2023)).

The undersigned presented two reasons why this pattern of decisions should be followed in this case. ECF 110 at 8. First, the undersigned pointed to "significant confusion regarding the Court's order." Undersigned counsel cited that at least one news publication was then "reporting that the Court's ruling allows all concealed carry license holders to carry concealed firearms in any train or bus in Illinois." *Id.* Such reporting could potentially cause confusion among members of the public without the time or training to directly review the Court's order, and even mislead law enforcement officers charged with enforcing firearms regulations during the pendency of any subsequent appeal.[1]

Second, the undersigned wrote the following sentence: "Moreover, the potential safety implications of the Court's order are highlighted by a recent mass shooting on the CTAs Blue Line, in which four people were murdered with firearms three days after the Court's order was entered." *Id.* By using the transitional word "moreover" to introduce this second reason, the undersigned aimed to connect the first reason to the second, suggesting that the potential public safety implications of the Court's order were tied to the erroneous reporting regarding the Court's order.

---

[1] As an example of confusing reporting, the Stay Motion cited a September 3, 2024 article published by WIFR. *See* Stay Motion, ECF 110, at 8 n.7. While the print version of this reporting appears to have been corrected, as of Sept. 30, 2024, WIFR continues to distribute video reporting stating: "Friday's ruling … potentially [lets] you bring a gun onto your next bus ride," and "A federal judge's ruling on Friday could open the door for anyone with a permit to carry their guns onto buses and trains." Nathaniel Langley, Federal Ruling in Rockford Shakes Up Illinois' Concealed Carry Law, WIFR, Sept. 3, 2024, available at https://www.wifr.com/2024/09/04/federal-ruling-rockford-shakes-up-illinois-concealed-carry-law/.

*Id.* Although the Court's order applied only to the four individual plaintiffs, it has been misread in the media to extend to others. This confusion could result in an unintended increase in firearms carried on public transit in the future. Through this sentence, undersigned counsel aimed to communicate that the order therefore has "potential safety implications" that support the requested stay. Counsel based this on his knowledge of published research, referenced below, identifying a connection between (i) actions that tend to have the effect of increasing the prevalence of firearms, and (ii) increased public safety risks. *Id.* The undersigned "highlighted" an example of an extreme outcome of such "potential" safety implications—a lethal shooting that occurred soon after the Court's final judgment. *Id.* The undersigned counsel did not intend to state, suggest, or imply that this Court's order was responsible for the shooting on the CTA's Blue Line referenced in the Stay Motion.

On September 25, 2024, the Court entered its order questioning the basis for the disputed sentence included in the Stay Motion. ECF 122. Among other things, the Court ordered responsible counsel to "be prepared to explain what reasonable inquiry was done as to the legal contentions and the evidentiary support for the factual contentions contained in this sentence." *Id*. at 1. The Court also ordered counsel to "be prepared to show cause why the factual and legal assertions in this sentence do not violate Rule 11(b)." *Id.* at 2.

## LEGAL STANDARD

Rule 11 requires that an "attorney must make a reasonable inquiry into the factual and legal basis for the claims asserted." *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993) (cleaned up). "Where Counsel's inquiry was objectively reasonable under the circumstances of the case … Rule 11 sanctions are inappropriate." *Vollmer v. Selden*, 350 F.3d 656, 659 (7th Cir. 2003) (quoting *Gottlieb*, 990 F.2d at 327). "While the Rule 11 sanction serves an important purpose, it

is a tool that must be used with utmost care and caution." *FDIC v. Tekfen Constr. & Installation Co.*, 847 F.2d 440, 444 (7th Cir. 1988). A claim must go beyond being "weak" for sanctions to be appropriate—it must be "devoid of factual support." *Bilharz v. First Interstate Bank*, 98 F.3d 985, 989 (7th Cir. 1996); *see also Osundairo v. Geragos*, 447 F. Supp. 3d 727, 745 (N.D. Ill. 2020).

*Sua sponte* show cause orders under Rule 11(c)(3) "will ordinarily be issued only in situations that are akin to a contempt of court." Advisory committee's notes to the 1993 amendments to Fed. R. Civ. P. 11. Thus, one circuit has reasoned that there is "strong support for the proposition that, when applying sanctions under Rule 11 for conduct that is 'akin to a contempt of court,' a bad faith standard should apply," as opposed to the objective unreasonableness standard otherwise applicable to Rule 11 motions by a party. *See In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003*); but see Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 40 (1st Cir. 2005) (rejecting bad faith standard but noting "[t]he 'akin to contempt' language used by the Advisory Committee's Note may well have meant only that no safe harbor was needed because judges would act only in the face of serious misconduct"). Other circuits have also concluded that a heightened standard applies when a court initiates sanctions under Rule 11(c)(3). *E.g.*, *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (court acting under Rule 11(c)(3) must apply "a higher standard ('akin to contempt') than in the case of party-initiated sanctions"); *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1115 (9th Cir. 2001) (Rule 11 "standard is applied with particular stringency where, as here, the sanctions are imposed on the court's own motion"). The Seventh Circuit has not specifically addressed this question since the 1993 revisions to Rule 11, although it did conclude that a prior version of Rule 11 allowed the district court to impose sanctions *sua sponte* without finding bad faith. *See Powers v. Duckworth*,

5

1995 U.S. App. LEXIS 23061, at *6 (7th Cir. Aug. 17, 1995)) (Ex. 3). In addition, any sanctions arising out of *sua sponte* Rule 11 orders are generally limited. *See Vollmer*, 350 F.3d at 663.

**RESPONSE**

The undersigned believes that Rule 11 sanctions are not appropriate in this circumstance under the typical "objective unreasonableness" standard, or any version of the heightened standard adopted in some circuits with respect to *sua sponte* Rule 11 show cause orders. The undersigned counsel conducted an objectively reasonable inquiry into the extent to which the relaxation of firearm regulations can be expected to have potential public safety implications, and reasonably believed his statement drawing that connection to be well founded in public safety research. Moreover, the Seventh Circuit has previously *granted* a stay based on a motion that presented a statement similar to the one at issue here.

*First*, the disputed sentence was objectively reasonable because it was founded on the undersigned counsel's familiarity with studies, gleaned over years of litigating Second Amendment cases, that have identified a linkage between measures that weaken firearm regulations and reductions in public safety.[2] This research supports a plausible inference that

---

[2] Examples include: Mitchell L. Doucette, Alexander D. McCourt, Cassandra K. Crifasi, Daniel W. Webster, *Impact of Changes to Concealed-Carry Weapons Laws on Fatal and Nonfatal Violent Crime*, 1980–2019, *American Journal of Epidemiology*, Volume 192, Issue 3, March 2023, 342–355, *available at* https://doi.org/10.1093/aje/kwac160 ("Increasing gun-carrying could increase the frequency with which individuals use firearms inappropriately in response to interpersonal conflicts, provocations, or situations that they want to control by threat of deadly force"; "increased exposure to firearms outside the home in response to legal and cultural changes supporting more gun-carrying appears to increase the likelihood of violence involving firearms."); John J. Donohue et al., *Right to Carry Laws and Violent Crime: A Comprehensive Assessment Using Data and a State-Level Synthetic Control Analysis,* 16 J. Empirical Legal Stud. 198, 203 (April 2019), *available at* https://www.nber.org/system/files/working_papers/w23510/w23510.pdf (right-to-carry laws "can lead to an increase in violent crime by increasing the likelihood a generally law-abiding citizen will commit a crime or increasing the criminal behavior of others"); Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014-2020,* J. of Urban Health, June 2022, *available at* https://link.springer.com/article/10.1007/s11524-022-00627-5 ("Our findings are consistent with

strengthening restrictions on firearms tends to result in reduced levels of violence, while *relaxing* restrictions on firearms, including by expanding the areas in which firearms may be carried, could *increase* levels of violence. In drafting the Stay Motion, the undersigned counsel relied on his knowledge of this body of research as support for the proposition that a stay is appropriate, arguing that the Court's order could therefore have "potential" safety impacts. As an illustration of a particularly extreme type of impact on safety, undersigned counsel pointed to the recent killings on the CTA Blue Line. The undersigned's argument also connected this concern to inaccurate media reporting regarding the scope of the Court's order, which might lead certain members of the public to believe (mistakenly) that they may carry loaded, operable firearms onto public transit.

The undersigned did not conduct any specific inquiry into whether the suspect in the Blue Line shooting held a concealed carry permit, brought the gun onto CTA property to protect himself, or was protecting himself from sleeping unhoused people when he allegedly shot them. *See* Order, ECF 122, at 1. Counsel did not conduct this inquiry because the existence or non-existence of these circumstances would not have altered the potential safety implications of the Court's order relaxing firearm regulations, particularly given the documented confusion regarding the scope of that order.

---

the theory that expanded access to firearms through lower restrictions for concealed carry increases both fatal and nonfatal OIS incidents."); Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 Am. J. Pub. Health 1923 (2017) *available at* https://bit.ly/3Bqd9JK (finding more permissive firearm control regulations "may also be inconsistent with the promotion of public safety"); Erika L. Sabbath et al., *State-Level Changes in Firearm Laws and Workplace Homicide Rates: United States, 2011 to 2017*, 110 Am. J. Pub. Health 230 (2020) *available at* https://bit.ly/3BsQfkU (quantifying reductions in workplace homicide rates associated with measures to strengthen concealed carry regulations). Moreover, the record in this case indicates that these risks might be exacerbated by the vehicles and infrastructure at issue here. According to the Expert Report of James E. Yurgealitis, any use of firearms in public transportation infrastructure could result in "[u]nintended casualties," and even "[b]randishing a firearm defensively may provoke a gunfight" that might not have otherwise occurred. ECF 64-13.

*Second*, the disputed sentence is akin to a similar argument that appeared in a recent motion that persuaded the Seventh Circuit to grant a stay in *Barnett v. Raoul*, another Second Amendment case.[3] On May 2, 2023, the Attorney General's Office, on behalf of Attorney General Raoul in his official capacity, filed before the Seventh Circuit a motion to stay a preliminary injunction enjoining the enforcement of a law preventing the sale and possession of certain assault weapons and magazines. Citing several news articles, the State Parties' stay motion contained the following passage:

> [I]n just the past few weeks, lone gunmen used AR-15s and LCMs to kill six people at an elementary school in Nashville, several former co-workers in Louisville, and five members of a neighbor's family in Texas. A stay pending appeal will reduce the risk that yet another Illinois community adds its name to this list.

Ex. 1, State Defendants' Emergency Motion to Stay the District Court's Preliminary Injunction Order Pending Appeal at 19, *Barnett et al. v. Raoul et al.*, No. 23-1825 (7th Cir. May 2, 2023). The Seventh Circuit did not enter any sanctions or issue an order to show cause because of this argument. Indeed, while the Seventh Circuit did not cite this argument in its four-sentence stay decision, it *granted* the State's stay motion. *See* Ex. 2, Order, *Barnett et al. v. Raoul et al.*, No. 23-1825 (7th Cir. May 4, 2023) (Easterbrook, J.).

The argument presented to the Seventh Circuit in *Barnett* closely resembles the public interest argument presented to this Court. As in this case, the Seventh Circuit argument asserted a general connection between the increased prevalence of firearms when restrictions are relaxed and the risk of a specific extreme harm—mass shootings. As in this case, the Seventh Circuit argument cited to one or more mass shooting incidents not directly related to the order at issue, and did so as a means of illustrating the harm that can be caused by the wider prevalence of firearms. Also as

---

[3] *Barnett* was ultimately consolidated with *Bevis*. 85 F.4th at 1186.

8

in this case, the Seventh Circuit argument was not intended to suggest that the order then being appealed had caused the enumerated shootings, or that those shootings would not have happened if the order being appealed had never been entered. Given these similarities, the Seventh Circuit's decision to *grant* a stay based on a motion containing this argument undermines the notion that undersigned counsel violated Rule 11.

## CONCLUSION

For these reasons, the undersigned respectfully submits that his conduct does not merit sanctions under Rule 11. The disputed sentence was not intended to state, suggest, or imply that this Court's order was in any way responsible for or specifically related to the shooting referenced in the stay motion, and apologizes to the Court for any such inference that may have been mistakenly created.

September 30, 2024                                    Respectfully submitted,

R. Douglas Rees                                       */s/ Isaac Freilich Jones*
Isaac Freilich Jones                                    *One of the Attorneys for Defendants*
Office of the Illinois Attorney General
115 S. LaSalle, 30th Floor
Chicago, Illinois 60603
Tel. 312-814-3000
richard.rees@ilag.gov
isaac.freilichjones@ilag.gov